UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF CALIFORNIA, COMMONWEALTH OF MASSACHUSETTS, STATE OF NEW JERSEY, STATE OF ARIZONA, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF DELAWARE, STATE OF ILLINOIS, STATE OF MAINE, STATE OF MARYLAND, STATE OF MICHIGAN, STATE OF MINNESOTA, STATE OF NEW MEXICO, STATE OF NEVADA, STATE OF NEW YORK, STATE OF OREGON, JOSH SHAPIRO, *in his official capacity as Governor of the Commonwealth of Pennsylvania,* STATE OF RHODE ISLAND, STATE OF VERMONT, STATE OF WASHINGTON, STATE OF WISCONSIN;<br><br>*Plaintiffs*,<br><br>v.<br><br>ROBERT F. KENNEDY, in his official capacity as Secretary of Health and Human Services, MEHMET OZ, in his official capacity as Administrator for the Centers for Medicare and Medicaid Services, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, U.S. CENTERS FOR MEDICARE AND MEDICAID SERVICES,<br><br>*Defendants*. | Civil Action No.: 25-12019 |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      Congress enacted the Patient Protection and Affordable Care Act (ACA) in 2010

to increase the number of Americans with health insurance and decrease the cost of healthcare.

Fifteen years later, the Act continues to meet its twin goals, with annual enrollment on the ACA

marketplace doubling over the past five years, resulting in over 24 million people signing up for

health insurance coverage for plan year 2025 on the ACA exchanges, the vast majority of whom receive subsidies to make coverage affordable, including approximately seven million people in Plaintiff States.[1]

2.      Now, with less than four months until open enrollment for plan year 2026 begins, Defendants, the U.S. Department of Health and Human Services (HHS) and Centers for Medicare & Medicaid Services (CMS), issued a regulation (Final Rule) that will abruptly reverse that trend, erecting a series of new barriers to enrollment that will deprive up to 1.8 million people of health insurance (by the agency's own estimates), and significantly drive up the costs incurred by Plaintiff States in providing healthcare, including increasing state expenditures on Medicaid, uncompensated emergency care, and funding other services provided to newly uninsured residents.

3.      The Final Rule effects a range of changes that violate the APA.

4.      *First*, it effects substantively invalid changes to the ACA marketplace. The Final Rule truncates and eliminates enrollment periods, makes enrollment more difficult, adds eligibility verification requirements, and erects unreasonable barriers to coverage—making sweeping changes that reach far beyond and bear little relation to the primary harm HHS asserted as its justification: fraudulent enrollment by insurance brokers and agents. The Final Rule makes a number of changes in contravention of substantial record evidence and without adequately considering reasonable alternatives or significant downsides, including the profound impact on the millions who will lose coverage. And it unlawfully allows for denial of coverage in violation of the ACA's "guaranteed issue" requirement, and changes how premiums are calculated in spite of a statutorily required method set by the ACA.

---

[1] *See* Health Insurance Exchanges 2025 Open Enrollment Report at 5.

5.      *Second*, the Final Rule unlawfully prohibits coverage of any "sex-trait modification procedure"[2] as an essential health benefit (EHB), an unwieldy and novel term which could conceivably capture services in multiple EHB categories.  The Final Rule's sole basis for treating these items and services as non-essential health benefits is HHS's conclusion that such care is not typically covered by employer plans. In excluding this wide, ambiguous range of benefits, HHS departed from its longstanding policy of prioritizing state flexibility in each State's regulation of healthcare. This conclusion is further belied by unrefuted evidence that was put before the agency yet disregarded without explanation.

6.      These categories of changes will cause tremendous harm if they take effect. Plaintiff States that operate their own ACA exchanges will incur unrecoverable compliance costs. Plaintiff States will also lose tax revenue derived from insurance premiums, and incur increased expenses providing healthcare to individuals whom the Final Rule renders uninsured. Worse still, the Final Rule will undermine Plaintiff States' health insurance markets and harm the public health,

---

[2] "Sex-trait modification" is a term that does not exist in medicine or law; it is a political creation that emerged in or around 2023 in work by the Manhattan Institute.  *See, e.g.,* Leor Sapir, "All Appearance, No Substance," CITY JOURNAL (Sept. 11, 2023), https://www.city-journal.org/article/does-sex-trait-modification-improve-mental-health. It cannot be found in a health insurance brochure, nor is it referenced in any State's benchmark plan.

In its Proposed Rule, HHS acknowledged that "sex trait modification," adopts the definition of "chemical and surgical mutilation" in E.O. 14187, in order to refer to "gender-affirming care." 90 F.R. 12,942, at 12,986.  While some treatments that might typically be considered gender-affirming care are encompassed by "specified sex trait modification procedures" as defined in the Final Rule, the terms do not map perfectly on each other.  For example, and as the Final Rule acknowledges, mental health treatment may be gender-affirming care and is not excluded as an EHB.  Rule at 27,159.  Gender-affirming care is an umbrella term that does not describe a discrete category of services; rather it describes care that falls within multiple EHB categories, including primary care visits, specialty care, outpatient mental health services, prescription drug benefits, and surgical services.

In this Complaint, Plaintiff States adopt the term "sex-trait modification" to refer to the ambiguous and arbitrary set of services HHS attempts to exclude as EHB.  Where appropriate, Plaintiff States may employ different terminology that best reflects the context, including "gender-affirming care," "treatment for gender dysphoria," and "medically necessary care for gender and sexual minorities."

including increasing the risk of disease outbreaks. And Plaintiff States' newly uninsured residents will suffer firsthand the profound harms of lacking access to necessary, affordable healthcare.

7.      Because the Final Rule's changes are contrary to law, arbitrary and capricious, and profoundly harmful to Plaintiff States, the States bring this suit to have this unlawful and unjustified HHS regulation preliminarily enjoined and ultimately vacated—protecting access to affordable health care for millions of our residents.

## JURISDICTION AND VENUE

8.      The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346. The Court has further authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202.

9.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1). Defendants are U.S. agencies or officers sued in their official capacities. The Commonwealth of Massachusetts is a resident of this judicial district and a substantial part of the events or omissions giving rise to this Complaint occurred within the District of Massachusetts.

## PARTIES

### I.    Plaintiffs

10.     Plaintiff the State of California is a sovereign state of the United States of America. It is represented by Attorney General Rob Bonta, the chief law officer of California.

11.     Plaintiff the Commonwealth of Massachusetts is a sovereign state of the United States of America. Massachusetts is represented by Attorney General Andrea Joy Campbell, the Commonwealth's chief legal officer.

12.     Plaintiff the State of New Jersey, represented by and through its Attorney General, Matthew J. Platkin, is a sovereign State of the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter.

13.    Plaintiff the State of Arizona is a sovereign state of the United States of America. Arizona is represented by Attorney General Kris Mayes, who is the chief law enforcement officer of Arizona and is authorized to act in federal court on behalf of the State.

14.    The State of Colorado is a sovereign state in the United States of America. Colorado is represented by Phil Weiser, the Attorney General of Colorado. The Attorney General acts as the chief legal representative of the state and is authorized by Colo Rev. Stat. § 24-31-101 to pursue this action.

15.    Plaintiff the State of Connecticut is a sovereign state of the United States of America. It is represented by Attorney General William Tong, the chief law officer of Connecticut.

16.    Plaintiff State of Delaware is a sovereign state of the United States of America. This action is brought on behalf of the State of Delaware by Attorney General Kathleen Jennings, the "chief law officer of the State." Darling Apartment Co. v. Springer, 22 A.2d 397, 403 (Del. 1941). Attorney General Jennings also brings this action on behalf of the State of Delaware pursuant to her statutory authority. Del. Code Ann. tit. 29, § 2504.

17.    Plaintiff the State of Illinois is a sovereign state in the United States of America. Illinois is represented by Kwame Raoul, the Attorney General of Illinois, who is the chief law enforcement officer of Illinois and authorized to sue on the State's behalf. Under Illinois law, the Attorney General is authorized to represent the State's interests by the Illinois Constitution, article V, section 15. See Ill. Comp. Stat. 205/4.

18.    The State of Maine is a sovereign state of the United States of America. Maine is represented by Aaron M. Frey, the Attorney General of Maine. The Attorney General is authorized to pursue this action pursuant to 5 Me. Rev. Stat. Ann. § 191.

19. The State of Maryland is a sovereign state of the United States of America. Maryland is represented by Attorney General Anthony G. Brown who is the chief legal officer of Maryland.

20. The People of the State of Michigan are represented by Attorney General Dana Nessel. The Attorney General is Michigan's chief law enforcement officer and is authorized to bring this action on behalf of the People of the State of Michigan pursuant to Mich. Comp. Laws § 14.28.

21. The State of Minnesota is a sovereign state of the United States. Minnesota is represented by and through its chief legal officer, Minnesota Attorney General Keith Ellison, who has common law and statutory authority to sue on Minnesota's behalf.

22. Plaintiff State of New Mexico, represented by and through its Attorney General, is a sovereign state of the United States of America. Attorney General Raúl Torrez is the chief legal officer of the State of New Mexico. He is authorized to prosecute all actions and proceedings on behalf of New Mexico when, in his judgment, the interest of the State requires such action. N.M. Stat. Ann. § 8-5-2(B). Likewise, he shall appear before federal courts to represent New Mexico when, in his judgment, the public interest of the state requires such action. N.M. Stat. Ann. § 8-5-2(J). This challenge is brought pursuant to Attorney General Torrez's statutory authority.

23. Plaintiff State of Nevada, represented by and through Attorney General Aaron D. Ford, is a sovereign State within the United States of America. The Attorney General is the chief law enforcement of the State of Nevada and is authorized to pursue this action under Nev. Rev. Stat. 228.110 and Nev. Rev. Stat. 228.170.

24. Plaintiff the State of New York is a sovereign state in the United States of America. New York is represented by Attorney General Letitia James, who is the chief law enforcement officer of New York.

25. The State of Oregon is a sovereign state of the United States. Oregon is represented by Attorney General Dan Rayfield. The Attorney General is the chief legal officer of Oregon and is authorized to institute this action.

26. Plaintiff Josh Shapiro brings this suit in his official capacity as Governor of the Commonwealth of Pennsylvania. The Pennsylvania Constitution vests "[t]he supreme executive power" in the Governor, who "shall take care that the laws be faithfully executed." Pa. Const. art. IV, § 2. The Governor oversees all executive agencies in Pennsylvania and is authorized to bring suit on their behalf. 71 P.S. §§ 732-204(c), 732-301(6), 732-303.

27. The State of Rhode Island is a sovereign state in the United States of America. Rhode Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island.

28. Plaintiff the State of Vermont is a sovereign state of the United States of America. Vermont is represented by Attorney General Charity Clark. Attorney General Clark is authorized to initiate litigation on Vermont's behalf.

29. Plaintiff State of Washington, represented by and through Attorney General Nicholas W. Brown, is a sovereign state of the United States of America. The Attorney General is Washington's chief law enforcement officer and is authorized under Wash. Rev. Code § 43.10.030 to pursue this action.

30. The State of Wisconsin is a sovereign state in the United States of America. Wisconsin is represented by Joshua L. Kaul, the Attorney General of Wisconsin. Attorney General

Kaul is authorized under Wis. Stat. § 165.25(1m) to pursue this action on behalf of the State of Wisconsin.

## II.    Defendants

31.    Defendant U.S. Department of Health and Human Services is a Department of the U.S. Executive Branch. HHS is an agency within the meaning of 5 U.S.C. § 551(1).

32.    Defendant Robert F. Kennedy, Jr. is the HHS Secretary. He is responsible for overseeing and administering all HHS programs through the Office of the Secretary and HHS's operating divisions. He is sued in his official capacity.

33.    Defendant Centers for Medicare and Medicaid Services is an agency within HHS. CMS is an agency within the meaning of 5 U.S.C. § 551(1).

34.    Defendant Mehmet Oz is the CMS Administrator. He is responsible for overseeing and administering all CMS programs through the Office of the Administrator and CMS's centers and offices. He is sued in his official capacity.

## BACKGROUND

## I.    The Affordable Care Act.

35.    The ACA is a landmark law that made affordable health coverage available to more than 44 million Americans this year alone, and the ACA works each year to sharply reduce the number of Americans without health insurance by both making private insurance more affordable and expanding access to Medicaid. The ACA was designed to reform state-based markets to create affordable insurance choices for consumers, in order to "increase the number of Americans covered by health insurance and decrease the cost of health care." *NFIB v. Sebelius*, 567 U.S. 519, 538 (2012). The ACA adopted a "series of interlocking reforms" to achieve these goals. *King v. Burwell*, 576 U.S. 473, 478 (2015). The closely intertwined reforms implemented by the ACA include both a statutory requirement that insurers must accept every person seeking coverage and

that they cannot charge them higher premiums based on their health (i.e., that they cannot discriminate based on "pre-existing conditions"), and the provision of federal subsidies designed to make insurance coverage more affordable. *Id*.

36.    To achieve these goals, the ACA created Exchanges, both state-run and federally-run, that allow people to compare and purchase insurance plans. Exchanges may be established either by a State, or, if a State does not establish an Exchange, by the federal government.

37.    Since plan year 2014, consumers and small businesses in every State have been able to obtain health coverage via exchanges operated by the States (State-based Exchanges, or SBEs), or pursuant to the exchange operated by the federal government (the Federally-facilitated Exchange, or FFE), or through a state's small group off-exchange market. There are currently 20 SBEs, as well as 3 SBEs on the federal platform (SBE-FPs).[3] 28 States lack SBEs, and are "FFE States" instead.

38.    Consumers and small businesses seeking health coverage typically sign up during the open enrollment period (OEP). For Plan Year (PY) 2025, the OEP on the federal exchange ran from November 1, 2024 through January 15, 2025. Open enrollment on SBEs began on November 1, 2024 and typically ended between mid-January and early February 2025. Exchanges calibrate the length of the OEP to balance the risk of adverse selection (a term that describes when enrollees seek coverage only after getting sick) against the need to ensure health coverage is accessible to as many people as possible. In addition to the OEP, there are special enrollment periods (SEPs), during which consumers who experience certain life events (like a change in their family status or financial circumstances) may enroll in health coverage at other times of the year.

---

[3] SBE-FPs rely on HHS to perform certain exchange functions (typically eligibility and enrollment), and consumers enroll in coverage through healthcare.gov. SBE-FP states retain responsibility for all other marketplace functions.

39.     For PY 2025, more than 24 million Americans signed up for health coverage through the ACA's state-based and federally-facilitated marketplaces.

40.     Healthcare expenses (for those with health insurance) generally fall into two categories. First, health insurance companies typically charge monthly premiums for the coverage that they provide. Second, insurance plans usually require insured individuals and families to make out-of-pocket payments to healthcare providers in the form of copayments for medical visits and prescription drugs, coinsurance, and deductibles (known as "cost-sharing" requirements).

41.     One critical component of the ACA is that it permanently appropriated billions of dollars in federal subsidies to make healthcare more affordable for eligible low- and moderate-income Americans. The ACA provides advance premium tax credits (APTCs) that reduce monthly insurance premiums for eligible individuals. 26 U.S.C. § 36B. Qualified individuals are those with household incomes between 100% and 400% of the federal poverty level (FPL).[4] Such individuals may purchase insurance with the APTCs—which the Treasury Secretary pays in advance directly to the individual's health insurer. APTCs are among the Act's key reforms, involving billions of dollars in spending each year and affecting the price of health insurance for millions of people. 92% of the 24 million Americans who signed up for health coverage through the exchanges in 2025 qualified for APTC and received at least partially subsidized coverage.[5]

42.     APTC awards are based on projections of future income. Some enrollees are entitled to APTC awards sufficient to reduce their out-of-pocket premium cost to $0. After filing

---

[4] The American Rescue Plan temporarily extended eligibility for APTCs beyond 400% of the federal poverty level, but those enhanced subsidies are scheduled to expire on December 31, 2025.

[5] *See* CMS.Gov, *Health Insurance Exchanges 2025 Open Enrollment Report* at 16, https://www.cms.gov/files/document/health-insurance-exchanges-2025-open-enrollment-report.pdf (Last Accessed July 16, 2025).

taxes, which are retrospective, individuals must reconcile their claimed APTC amount against their actual eligibility as shown in their tax filings. If the enrollee earned more than projected and thus collected more APTC than they should have, they owe the difference back to the government in the form of a tax liability, though such liability may be capped depending on income.

43.    Under existing law, an enrollee who fails to file taxes and reconcile their claimed APTC award against their actual eligibility—known as failure to file and reconcile, or FTR—for two consecutive years loses their eligibility for any future APTCs and must repay the amount of the overpayment in the amount of a tax liability. The amount of that repayment liability is currently capped at a certain level determined by household income and adjusted each year for inflation, but Congress recently eliminated those caps beginning with the 2026 tax year. *See* 26 U.S.C. § 36B(f)(2)(A), (B) (setting excess APTC repayment levels).

44.    The ACA also requires insurers to insure all eligible applicants, regardless of health status or other factors (known as the "guaranteed issue" requirement). *See* 42 U.S.C. § 300gg-1 (stating that health insurance issuers "must accept every employer and individual in the State that applies for such coverage"). Insurance plans can be terminated for failure to pay a premium after a grace period, but a new enrollee who pays the first-month premium must be issued coverage, even if they owe a past-due premium from their prior coverage. Insurers, like any other entity, can pursue ordinary collection methods and other remedies in the event of nonpayment of past premiums owed.

45.    The ACA was enacted to improve access to comprehensive health insurance coverage and remedy disparities in access to healthcare, especially for more vulnerable populations

such as individuals with preexisting conditions.[6] In service of this mission, the ACA imposes minimum coverage requirements known as "essential health benefits" (EHB). By mandating coverage for EHBs, the ACA has drastically improved access to healthcare for those who need it most.[7]

46.    Before passage of the ACA, insurance plans could exclude a range of life-saving services from coverage, leaving many Americans without access to basic care, such as maternity care, substance use treatment, mental health treatment, or even prescription drugs.[8]

47.    To ensure that all Americans are able to access insurance for these basic needs, the ACA requires certain individual and small group health plans to provide an EHB package providing coverage for items and services falling within ten benefit categories. Classification of a benefit as an EHB matters: EHBs are "protected by cost-sharing limits and count towards a plan's actuarial value."[9] The EHBs are minimum standards for these plans, but States are free to add "additional benefits." 42 U.S.C. § 18031(d)(3)(B).

---

[6] *See Bank v. United States Dep't of Health and Human Services*, 413 F.Supp.3d 165, 167 (E.D.N.Y. 2019); *Fact Sheet: The Six Month Anniversary of the Affordable Care Act*, The White House: Office of the Press Secretary (Sept. 22, 2010), https://obamawhitehouse.archives.gov/the-press-office/2010/09/22/fact-sheet-six-month-anniversary-affordable-care-act (lauding passage of "Patient's Bill of Rights").

[7] Wei Ye & Javier M. Rodriguez, *Highly vulnerable communities and the Affordable Care Act: Health insurance coverage effects, 2010-2018,* 270 Soc. Sci. & Med. (Jan. 12, 2021); Thomas Buchmueller & Rebecca L. Haffajee, *Reducing Disparities in Health Care Coverage and Access Under the ACA*, HealthAffairs (Jun. 7, 2024), https://www.healthaffairs.org/content/forefront/reducing-disparities-health-care-coverage-and-access.

[8] Sarah Lueck, *If "Essential Health Benefits" Standards Are Repealed, Health Plans Would Cover Little*, Center on Budget &Policy Priorities (Mar. 23, 2017), https://tinyurl.com/44b8e9z2.

[9] Kaiser Family Found., New Rule Proposes Changes to ACA Coverage of Gender-Affirming Care, Potentially Increasing Costs for Consumers (Mar. 24, 2025), https://tinyurl.com/2637fye3.

48.    The ACA requires the HHS Secretary to "define" EHBs and to ensure that the scope of EHBs "is equal to the scope of benefits provided under a typical employer plan." 42 U.S.C. § 18022(b)(2)(A). That requires that the Secretary periodically review and further define EHBs to reflect changes in science and medicine or to address any gaps in access faced by enrollees. 42 U.S.C. § 18022(b)(4). The Secretary must also ensure that EHBs are provided in a nondiscriminatory manner and that they "take into account the health care needs of diverse segments of the population." 42 U.S.C. § 18022(b)(4)(C).

49.    Tied to HHS's statutory obligations, States must submit "benchmark" plans to HHS for review and approval. While the ACA requires that state plan provide coverage for EHBs (the federal EHB mandate), States also have authority to offer "additional health benefits, like vision, dental, and medical management programs (for example, for weight loss)."[10]  States may submit a customized plan or adopt "model" plans provided by HHS.[11]

50.    State benchmark plans are maintained on file with the Department, so that private insurers can compare plans to ensure compliance with the standards set forth therein. Even if a State has not updated its benchmark plan to match updated federal requirements, private insurers must also review plans for compliance with federal EHB mandates.[12]

51.    To date, the Department has only explicitly prohibited EHB status for a very limited number of services: abortion, non-pediatric dental or eye exam services, long-term nursing care, and non-medically necessary orthodontia. These limited services have long been served by existing

---

[10] Jared Ortaliza & Cynthia Cox, *The Affordable Care Act 101*, Kaiser Family Found. (May 28, 2024), https://tinyurl.com/yz5utdrn.

[11] Centers for Medicare and Medicaid Servs., Information on Essential Health Benefits (EHB) Benchmark Plans, https://tinyurl.com/3jbebvzc (last updated Jan. 14, 2025).

[12] *Id.*

separate plans. However, even for those limited services, a state EHB plan may cover them should a State so choose.

52.    For the States with anti-discrimination mandates prohibiting discrimination in insurance coverage on the basis of gender identity (that, in effect, require coverage of medically necessary treatment for gender dysphoria), and where those services fall within the ambit of an EHB—such as hospitalization or the provision of medication—those States could receive the benefit of the services being treated as an EHB even if not explicitly called out in their EHB benchmark plans.

53.    In many of these states, each plan listed on that State's marketplace must cover medically necessary treatment for gender dysphoria.  Absent an express prohibition, certain services that are part of this treatment, like medication, mental health care, surgeries, and lab services, are treated as EHBs for purposes of cost-sharing and premium tax credits.

54.    However, if gender-affirming care is explicitly barred from inclusion as an EHB, then States requiring coverage of gender-affirming care services would themselves be responsible for defraying the increased cost to cover those services and comply with state mandates.

55.    By way of illustration, each plan must provide to the State the breakdown of its services so that the State may understand what percent of the premium is subject to tax credits.  So if a plan has a premium that costs $100 and $96 of that premium is to cover the costs associated with the coverage of EHBs, then $96 is subject to premium tax credits.  The exclusion of medically necessary treatment for gender dysphoria from EHBs means that each plan must now segregate these costs out of that eligible premium amount.  So what was once $96 may be lowered to $95 in premiums eligible for tax credits.

56.     In States that mandate or guarantee gender-affirming care, the State is responsible for defraying the extra cost of premiums covering state-mandated services that are not EHBs, which gender-affirming care is now considered under the Final Rule.

## II.     The Final Rule

57.     HHS and CMS published a proposed rule on March 19, 2025, entitled *Patient Protection and Affordable Care Act; Marketplace Integrity and Affordability*, 90 Fed. Reg. 12,942 (March 19, 2025) (Proposed Rule), for the stated purpose of combating fraud.

58.     The Proposed Rule set forth a series of sweeping regulatory changes to eligibility and enrollment systems under the ACA. It admitted these changes would cause "750,000 to 2,000,000 individuals to lose coverage." Proposed Rule at 13,025.

59.     The Proposed Rule offered a mere twenty-three days for public comment, notwithstanding that HHS and the Office of Management and Budget received subsequent objections asking for at least 30, and ideally 60, days for public comment.

60.     CMS received 26,396 public comments in response to the Proposed Rule in the twenty-three-day period after publication during which HHS allowed public comment.

61.     Many of Plaintiff States submitted a comment in opposition to the Proposed Rule. *Letter from California, Massachusetts, New Jersey, and 19 Other States, Comment Letter on Proposed Rule*, (April 11, 2025), available at https://www.regulations.gov/comment/CMS-2025-0020-23836.

62.     Plaintiff States' comment objected to a wide variety of changes made to the ACA marketplace exchanges, including (1) a series of changes to eligibility criteria and enrollment procedures that would make it more difficult to access insurance via ACA exchanges, and (2) removal of medically necessary treatments for transgender individuals from the definition of an Essential Health Benefit.

63.     Many other commenters opposed the Proposed Rule, including professional health care organizations and health care providers—including the American Medical Association, the American College of Physicians, the American College of Obstetricians and Gynecologists, the American Academy of Pediatrics, the Society of Adolescent Health and Medicine, the Robert Wood Johnson Foundation, and more.

64.     These and many other comments explained that the Proposed Rule would decrease enrollment on ACA exchanges and health-insurance coverage, and as a result, would inexorably increase overall health care costs, limit availability of health care to vulnerable populations, and impose negative public health outcomes.

65.     But Defendants brushed these comments, and over 26,000 others, aside.

66.     Just over three months later, on June 25, 2025, HHS published its Final Rule. *See Patient Protection and Affordable Care Act; Marketplace Integrity and Affordability*, 90 Fed. Reg. 27,074 (June 25, 2025) (hereafter the "Final Rule").

67.     Despite the ACA's goal of increasing access to healthcare while lowering cost, *King v. Burwell*, 576 U.S. 473, 491 (2015) ("Congress passed the Affordable Care Act to improve health insurance markets, not to destroy them"), the Final Rule makes enrollment and reenrollment *more* burdensome and difficult rather than less: it shortens the OEP, imposes significant new paperwork verification requirements, doubles the frequency with which consumers must prove their eligibility for previously awarded premium tax credits, newly allows insurers to deny coverage for past-due premiums on earlier coverage, makes annual automatic reenrollment much more difficult every year, and even imposes an unlawful $5 monthly charge on automatic reenrollees who by law are entitled to pay $0 premiums.

68.     Not only does the Final Rule enact these sweeping changes, for the first time, HHS removes States' substantial autonomy to set their own policies on their SBEs with respect to several of these policies. For instance, rather than merely setting new regulations for the federal government's own platform, HealthCare.gov, HHS mandates that *States* impose some of these burdens upon their own enrollees—consumers who never touch the FFE.

69.     Supposedly in keeping with the President's directive that all Federal agencies must take pains to "increase the prosperity of the American worker," HHS claims that these changes are "aimed at strengthening the integrity of the [ACA] eligibility and enrollment systems to reduce waste, fraud, and abuse." Proposed Rule at 12,942. Specifically, HHS asserts that unscrupulous brokers and agents are wrongfully enrolling consumers in coverage they either do not want or are not eligible for, using tax credits they are not entitled to, costing the Federal government billions of dollars and imposing burdensome tax liabilities upon consumers when those improper credits must be repaid. Proposed Rule at 12,942-43. In addition, HHS claims that "several regulatory policies recently put in place to make it easier to enroll in subsidized coverage severely weakened program integrity and put consumers at risk from improper enrollment." *Id.* Therefore, the Final Rule's changes are aimed at reducing fraud, unauthorized enrollments, and improper payment of tax credits, while simultaneously strengthening program integrity and bringing costs down for consumers.

70.     If, as HHS acknowledges, the Final Rule will throw millions of people off the health insurance exchanges while imposing substantial new administrative barriers and increasing costs to States, Defendants must have robust evidence showing that these changes will accomplish their goals, justifying the burden on ordinary Americans. But they do not.

71.     Take the problem of fraudulent enrollments by brokers and agents. Reports of fraud spiked in early 2024, with "federal regulators receiv[ing] roughly 275,000 complaints about unauthorized enrollments or plan changes," which were "concentrated in states that use the federal marketplace, HealthCare.gov. There has been *no indication to date of similar problems in states that operate their own marketplaces.*"[13] Imposing these changes on States where no appreciable enrollment fraud exists, in the name of combatting enrollment fraud, is nonsensical.

72.     During the comment period, States and industry groups pointed out HHS's flawed logic and strongly urged Defendants to reconsider. In their comment letter, Plaintiff States noted that even California, with the largest SBE, "simply does not have a large-scale issue with fraudulent enrollments" due to simple security measures like multi-factor authentication and affirmative access monitoring, while Pennsylvania "similarly allows only agents designated by the consumer to access the user's account," and urged Defendants to adopt other, more targeted anti-fraud reforms instead of the Rule's sweeping changes.[14] The District of Columbia's Health Benefit Exchange Authority (DC HBEA), D.C.'s SBE, informed Defendants that fraud on its platform is "rare."[15] Covered California wrote that it "does not have any indication of widespread fraud and abuse occurring in our market," and decried Defendants' "one-size-fits-all solution to a problem

---

[13] Justin Giovannelli & Stacey Pogue, *Policymakers Can Protect Against Fraud in the ACA Marketplaces Without Hiking Premiums*, The Commonwealth Fund (March 5, 2025), https://tinyurl.com/rw5wxjze.

[14] Letter from California, Massachusetts, New Jersey, and 19 Other States, Comment Letter on Proposed Rule, (April 11, 2025), at 16, available at https://www.regulations.gov/comment/CMS-2025-0020-23836.

[15] Letter from Mila Kofman, Executive Director, DC Health Benefit Exchange Authority, Comment Letter on Proposed Rule (April 11, 2025), at 1, available at https://www.regulations.gov/comment/CMS-2025-0020-23984.

that does not exist in California."[16] As Covered California commented to HHS before the rule was finalized, "a robust review of consumer complaints and enrollment partner activity in recent years did not reveal a single identified case of a consumer being enrolled in Covered California without their knowledge." Altman Letter (Exhibit A) at 2. Washington, too, is simply not experiencing fraudulent enrollments on any serious scale, and told Defendants so during the comment period.[17]

73.     And the Blue Cross Blue Shield Association (BCBSA), an insurer, pointed out that the federal marketplace, not the State marketplaces, had the biggest issue with fraudulent enrollments; therefore, in BCBSA's view, "there is insufficient justification" to impose several of the Proposed Rule's requirements on "the State Exchanges." BCBSA Letter at 9. America's Health Insurance Plans, a trade group, agreed, writing, "State Exchanges did not experience the same rate of improper enrollments as the [Federally-Facilitated Marketplace] and therefore do not require the same policy solutions as the FFM."[18]

74.     But Defendants' goal was not to reduce fraud. If it was, Defendants would have considered the data and views submitted by states, exchanges, and industry experts during the comment period. In fact, only one of the Proposed Rule's changes—making it easier to remove brokers for cause—would have effectively addressed the fraud issue. Plaintiff States had supported that proposal.[19] If preventing fraud was Defendants' true concern, they would have finalized the

---

[16] Letter from Jessica Altman, Executive Director, Covered California, Comment Letter on Proposed Rule (April 11, 2025), at 2, available at https://www.regulations.gov/comment/CMS-2025-0020-25629 (EXHIBIT A).

[17] Letter from Washington State's Health Benefit Exchange, Comment Letter on Proposed Rule (April 11, 2025), at 3, available at https://www.regulations.gov/comment/CMS-2025-0020-24557.

[18] Letter from America's Health Insurance Plans, Comment Letter on Proposed Rule(April 11, 2025), at 2, available at https://www.regulations.gov/comment/CMS-2025-0020-24078.

[19] California et al. Comment Letter, *supra* note 13, at 15.

broker-removal provisions, implemented two-factor authentication, adopted several other changes Plaintiff States proposed—and stopped there.

75.    As for the issues of cost and marketplace integrity, several commenters with particular expertise—the State-Based Exchanges themselves—repeatedly pointed out that the very consumers who would likely be barred from, or drop out of, the Marketplaces as a result of the Proposed Rule's changes tended to be, on average, healthier, younger, and less costly to insure, with lower aggregate risk scores, than enrollees likelier to remain—meaning the Final Rule's ultimate changes in fact *harm* risk pools and will likely cause premiums to increase, not the reverse.

76.    As Covered California explained during rulemaking, "[E]ven small obstacles to enrollment significantly influence enrollment choices."[20] Every additional barrier that Defendants impose on enrollees will likely lower enrollment—and even without this Rule, significant barriers await in 2026. Washington Health Benefit Exchange in its comment letter stressed that the looming expiration of enhanced premium tax credits "will cause 80,000 [qualified health plan] enrollees in Washington to lose their coverage," and will "be a major disruption to customers' ability to afford their existing coverage," and urged Defendants "not to take action to make health coverage even less affordable and further destabilize the individual market."[21]

77.    The Final Rule, broadly speaking, adopts all of the categories of regulatory action that Plaintiff States opposed in their comment letter. Via the Final Rule, HHS and CMS (1) make a series of changes to eligibility criteria and enrollment procedures for the ACA's health insurance marketplace exchanges, that will truncate and eliminate enrollment periods for millions of consumers, limit access to benefits, and otherwise make it more difficult to participate on both

---

[20] Exhibit A at 6.

[21] Letter from Washington State's Health Benefit Exchange, *supra* note 16, at 3, 6, 14.

federal and state-run ACA exchanges, and (2) eliminate a broad swath of services as EHB, many of which are considered medically necessary treatments for transgender individuals, even though those services fall within multiple EHB categories. Many of these changes will begin to become effective on August 25, 2025. Notably, likely in recognizance of the injurious nature of many of the changes, the Final Rule sunsets the effective date of many of the first category of changes to expire after Plan Year 2026.

## ALLEGATIONS

### I.    HHS's 23 Day Period for Notice and Comment Was Legally Insufficient.

78.    HHS published the Proposed Rule in the Federal Register on March 19, 2025, with comments accepted through April 11, 2025.

79.    The Proposed Rule was a complicated, multifaceted rule spanning 90 pages in the Federal Register.

80.    HHS provided only 23 days to review the Proposed Rule.

81.    Plaintiff States submitted a comment letter objecting to the abbreviated comment period and requesting at least 30, and ideally 60 days, for public comment.[22] As Plaintiff States explained to HHS, the shortened comment period prejudiced their ability to address certain highly technical matters; for example, SBEs could not perform a complete analysis of the expected enrollment losses, premium impacts, and risk pool changes associated with this rule because of the truncated comment period.[23]

---

[22] California et al. Comment Letter, *supra* note 13, at 2.

[23] California Department of Managed Health Care, Comment Letter on Proposed Rule (Apr. 11, 2025), at 1-2, available at https://www.regulations.gov/comment/CMS-2025-0020-23127 (attachments); Washington Health Benefit Exchange, Comment Letter on Proposed Rule (Apr. 11, 2025), at 3, available at https://www.regulations.gov/comment/CMS-2025-0020-24557 (attachments) (Washington HBE Comment Letter).

82.    A 30-day comment period is generally the shortest period sufficient for interested

persons to meaningfully review and provide informed comment. *See Prometheus Radio Project v.*

*FCC*, 652 F.3d 431, 453 (3d Cir. 2011) (holding 28-day comment period insufficient); *Azar v.*

*Allina Health Servs.*, 139 S.Ct. 1804, 1809 (2019) (referring to the "APA minimum of 30 days").

83.    Even a 30-day period is atypical, and highly disfavored, for such substantial

changes. *See Petry v. Block*, 737 F.2d 1193, 1202 (D.C. Cir. 1984) (observing that 30 days for

comment "cut[s] the comment period to the bone" and 60 days is "a more reasonable *minimum*

time for comment" for complex rules (quotation omitted)); *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d

1102, 1117-18 (D.C. Cir. 2019) ("When substantial rule changes are proposed, a 30-day comment

period is generally the shortest time period sufficient for interested persons to meaningfully review

a proposed rule and provide informed comment.").

84.    5 U.S.C. § 553(b)(B) requires an agency to find "good cause" for justifying a

truncated comment period. A rule that has a comment period of less than 30 days is "generally

characterized by the presence of exigent circumstances in which agency action was required in a

mere matter of days." *N.C. Growers' Ass'n, Inc.*, 702 F.3d 755, 770 (4th Cir. 2012).

85.    Here, the Final Rule includes no such finding of "good cause," and its mere 23-day

comment period is legally deficient, not only because it is less than the bare legal minimum of 30

days, but also because a rule of such complexity and magnitude, involving various technical issues

under the ACA, requires a significantly longer comment period to ensure technical comments and

allow for full consideration of reliance interests.

86.    Indeed, multiple recent prior rulemaking under the ACA typically afforded a

comment period well over 30 days. *See, e.g.*, *Extension of Comment Period for Rule Regarding*

*ACA Interoperability*, 84 Fed. Reg. 16,834 (Apr. 23, 2019) (extending existing comment period

from 60 days to 90 days in response to public feedback); *Patient Protection and Affordable Care Act; Increasing Consumer Choice Through the Sale of Individual Health Insurance Coverage Across State Lines Through Health Care Choice Compacts*, 84 Fed. Reg. 8,657 (Mar. 11, 2019) (56-day comment period).

87.     As such, the Final Rule is procedurally invalid—a sufficient basis for the Final Rule to be stayed and/or preliminarily enjoined (and ultimately vacated).

## II.     The Final Rule's Marketplace Integrity Changes Are Unlawful.

### A.  Mandating a $5 Minimum Premium for Auto-Reenrollments Is Unlawful and Arbitrary[24]

88.     Ever since Exchange coverage became available under the ACA, enrollees who maintained eligibility for coverage from year to year were automatically re-enrolled in the same plan unless they opted to disenroll or selected a different one. For those who receive sufficient APTC to fully cover their premium—leaving $0 in out-of-pocket costs—the Final Rule now directs Exchanges to reduce the APTC award by $5 per month for auto-re-enrollees, until those enrollees can confirm their continued eligibility for no-cost coverage.

89.     But APTC awards are set by statute, not by regulation, and cannot be reduced arbitrarily by executive fiat. This Final Rule orders Exchanges to calculate the amount of APTC required by law and then ignore the result, imposing an illegal charge on consumers who are by law entitled to $0 premiums.

90.     Section 36B of the Internal Revenue Code, which was added by the ACA, sets forth the calculations for determining an individual's PTC eligibility. Section 1412(c) of the Affordable Care Act specifies that APTC amounts "shall" be made in accordance with Section

---

[24] This provision of the Final Rule applies to States utilizing the Federal Exchange; among Plaintiff States, those states are Arizona, Delaware, Michigan, Oregon, and Wisconsin.

36B. Therefore, Section 36B is the only source of statutory authority for calculating PTC amounts. This calculation is not optional. The ACA explicitly specifies that APTC amounts "shall" be paid as directed by Section 36B. 42 U.S.C. § 18082(c)(2)(A).

91.    Section 1412 of the ACA does not allow the Secretary or CMS to pay, or an issuer to receive, an amount less than the amount calculated under Section 36B, and Defendants do not have the authority under the text of the statute to require the Exchanges to fail to make the full payment as calculated in accordance with Section 36B.

92.    In addition to being necessarily contrary to law, this provision of the Final Rule is arbitrary and capricious. Several commenters raised this concern; Defendants brush it aside with perfunctory statements of what they "believe." Responding to the objections that "section 1411(f)(1)(B) of the ACA does not give HHS the authority to withhold APTC," and that Exchanges lack authority "to reduce the amount of APTC used toward an enrollee's coverage," Defendants provide just two sentences. First, Defendants make the bald assertion that they "believe" the ACA "directs the Secretary to establish procedures by which it 'redetermines eligibility on a periodic basis in appropriate circumstances.'" Final Rule at 27,109. Second, Defendants assert that the "recent history of improper enrollments" is "an appropriate circumstance" for imposing an arbitrary $5 premium on consumers who are entitled by law to pay $0. *Id.* They cite no authority.

93.    Moreover, if a consumer fails to pay this $5 charge, they risk loss of coverage for the rest of the year—because loss of minimum essential coverage due to failure to pay a premium is *not* a triggering event allowing access to an SEP. This provision of the Final Rule, in other words, cruelly imposes a charge in January on consumers who are accustomed to $0 premiums and thus not expecting it, and then yanks their access to health care for the entire remainder of the year if they fail to notice and pay it.

94.     By requiring that all fully subsidized enrollees take "an affirmative action" to confirm their continued eligibility for APTC, the Final Rule imposes another barrier to coverage for the lowest-income consumers, who, by definition, are the ones entitled to $0 premiums. Even small barriers matter. As commenters pointed out during rulemaking, "one study found that premiums less than $10 led to a 14 percent decrease in enrollment." Levitis et al., Letter (Exhibit B) at 18. Even small premiums—as low as $1—are known to contribute to a decline in enrollment.[25] Additionally, "young and healthy consumers are at the greatest risk of failing to notice the junk premium charge and losing coverage as a result, while those with significant health care needs will likely resolve the issue more quickly." Exhibit B at 18. Therefore, this provision of the Final Rule poses a significant risk of weakening the risk pool.

95.     Defendants did not acknowledge or respond to those concerns.

**B. Shortening the Open Enrollment Period Is Unlawful and Arbitrary**

96.     Historically, Defendants have allowed SBEs wide latitude to determine the length of their open enrollment periods. In California, for instance, the length of the OEP set by its SBE, Covered California, has been 91 days in length (from November 1 to January 31) for over ten years.[26]  But the Final Rule limits the OEP to just nine weeks, beginning no later than November 1 and ending no later than December 31, on the federal exchange and the SBEs. The Final Rule specifically forbids any Exchange from extending the OEP into January. This change cuts the OEP by more than thirty percent in California. While this is a less drastic cut than initially proposed, it is still likely to be significantly detrimental. Covered California told Defendants during rulemaking that "[c]utting the OEP in half would unnecessarily put significant strain on our enrollment partner

---

[25] Adrianna McIntyre, Mark Shephard, & Timothy J. Layton, *Small Marketplace Premiums Pose Financial and Administrative Burdens: Evidence From Massachusetts, 2016-17*, Health Affairs (January 2024), https://doi.org/10.1377/hlthaff.2023.00649/.

[26] Altman Letter, Exhibit A at 2.

workforce and potentially hinder their ability to reach and enroll. Further, our data and experience show that the longer OEP strengthens our risk pool and enhances overall market stability."[27]

97.    For many consumers, the ability to change plans in January is valuable. *See* Rule at 27,140 ("One commenter noted that Exchange enrollees who are automatically re-enrolled into a plan may not learn of cost increases until after they receive their first bill in January."). During rulemaking, Defendants acknowledged that an OEP lasting through at least January 15 allows consumers who had been automatically re-enrolled into a plan that they may no longer want "the opportunity to change plans after receiving updated plan cost information from their issuer and to select a new plan that is more affordable to them." HHS previously took that position too. But HHS dismissed that concern without explaining why it was departing from its prior position. In the Final Rule, HHS inadequately addressed this concern by asserting merely that Defendants "provide notice in advance of the OEP to consumers about the importance of updating information for the future plan year and actively comparing plan options and prices." *Id.* That is not meaningfully responsive.

98.    HHS claims that this change will reduce consumer confusion by aligning the OEP with common employer OEPs outside of the Exchanges.

99.    Plaintiff States know firsthand that longer OEPs allow hundreds of thousands of additional consumers to enroll, strengthening the risk pool. Longer OEPs also afford consumers more time to comparison-shop between available Exchange plans and select the one that is right for them. And later enrollees tend to be younger and healthier than earlier enrollees, meaning that shortening the OEP is likely to weaken the risk pool.[28]

---

[27] Altman Letter, Exhibit A at 3.
[28] *Id.*

100.    In addition, the longer enrollment period gives States more time to process enrollments. Even with the current 90-day period, brokers are inundated with calls, working long hours to meet demand for enrollment assistance. States will be harmed by the mandatory shortened enrollment window. Agents and brokers who assist consumers with both the Medicare and the Exchange marketplaces will have fewer days to process applications after the close of the Medicare window.

101.    Despite Defendants' claims, there is no data showing that the risk of adverse selection or consumer confusion are worsened by a longer OEP, or that shortening the OEP is likely to have a material impact on adverse selection risk for insurers. On the contrary, in previous rulemaking, Defendants acknowledged that a "shortened enrollment period could lead to a reduction in enrollees, primarily younger and healthier enrollees who usually enroll late in the enrollment period."[29] Defendants also acknowledged that several Marketplace experts, including "Navigators, certified application counselors (CACs), agents, and brokers," were concerned about "a lack of time to fully assist all interested Exchange applicants with comparing their different plan choices," suggesting that the longer OEP is both necessary and justified. Rule at 27,136-37. Defendants have not explained why these concerns are no longer valid.

102.    In fact, shortening the OEP by thirty percent in some states, like California, would impose new, significant barriers to enrollment by substantially increasing the burden on those agents, brokers, and Navigators.

103.    By contrast, longer OEPs are correlated with higher enrollment and a healthier risk pool. The Department has previously found that a shorter OEP "could lead to a reduction in

---

[29] *Patient Protection and Affordable Care Act; Market Stabilization*, 82 Fed. Reg. 18,346, 18,377 (Apr. 18, 2017) (Final Rule).

enrollees, primarily younger and healthier enrollees who usually enroll late in the enrollment period."[30] The people most likely to drop out of coverage because of the shortened OEP are younger, healthier enrollees who contribute to the overall health of the risk pool. The shortened OEP will weaken the risk pool across all States.

104.    By decreasing the number of individuals insured, increasing the number of uninsured, and making it more difficult to access health insurance, this provision runs directly contrary to the purposes of the ACA by squarely undermining Congress' twin goals of expanding access to healthcare and making it more affordable. *See Sebelius*, 567 U.S. at 538 (Congress enacted the ACA to "increase the number of Americans covered by health insurance and decrease the cost of health care."). HHS has acted contrary to the ACA, and may not cast aside Congressional intent and replace statutory objectives with different policy goals. *See Indep. U.S. Tanker Owners Comm. v. Dole*, 809 F.2d 847, 854 (D.C. Cir. 1987).

### C.    Requiring 75% Verification for Triggering-Event SEPs Is Arbitrary[31]

105.    Consumers and small businesses seeking health coverage typically sign up during annual OEPs.

106.    But SEPs allow for enrollment in coverage outside of the OEP upon the occurrence of a triggering event, such as the loss of minimum essential coverage, a move to a new geographic region, or the birth of a child. To ensure that people in such circumstances are not locked out of accessing the healthcare system for several months, the ACA allows them to enroll in coverage outside of the OEP.

---

[30] *Id.*
[31] This provision of the Final Rule applies to States utilizing the Federal Exchange; among Plaintiff States, those states are Arizona, Delaware, Michigan, Oregon, and Wisconsin.

107.    The Final Rule also imposes new pre-enrollment verification requirements pertaining to individuals utilizing these triggering-event SEPs. Specifically, all Exchanges on the federal platform must now verify eligibility for at least 75% of new enrollees utilizing an SEP enrollment pathway before coverage can take effect, and this pre-enrollment verification requirement will apply to all *types* of SEPs—not just the loss of minimum essential coverage, as the prior policy required. Final Rule at 27,079.

108.    The Final Rule sunsets this provision after one year—meaning the verification requirements will revert to status quo for Plan Year 2027. Final Rule at 27,151.

109.    HHS claims that its analysis shows that the pre-enrollment verification process, which currently applies only to those claiming eligibility due to the loss of minimum essential coverage (MEC), presents no "substantial enrollment barrier." Final Rule at 27,149. HHS reasons that the supposed lack of impact for pre-verification of MEC loss will also extend to consumers claiming eligibility for every other pathway to SEP enrollment. *Id.*

110.    There are at least two problems with this line of reasoning. First, HHS has presented insufficient evidence showing that SEP enrollees are harming risk pools through adverse selection or fraudulent enrollments. Second, HHS has inadequately addressed the harm that will befall consumers who are deterred, or wrongly barred, from obtaining health coverage as a result of this rule.

111.    As to the first problem, this verification requirement might itself contribute to adverse selection. This is because more motivated individuals—i.e., sicker individuals—are more likely than less motivated individuals to overcome enrollment barriers. As a result, the verification process itself might *worsen* the adverse-selection problem. HHS acknowledges that "verification . . . may deter healthier, less motivated individuals from enrolling." Final Rule at 27,148. However,

Defendants simultaneously assert that they "believe the positive impact of verification on the risk pool far exceeds the potential negative impact on the risk pool." *Id.* Therefore, HHS claims that this change will in fact cause premiums to go *down* because the new verification requirements will prevent ineligible consumers from enrolling.

112.    There is a crucial piece missing from this logic: not only has HHS not demonstrated that improper enrollments are in fact occurring, CMS has failed to show that these phantom ineligible enrollees *are in fact more expensive to insure* than eligible consumers. Therefore, HHS has not demonstrated that blocking these improper enrollees—if they even exist—would lower premiums and improve the health of the insurance marketplaces' risk pools.

113.    During the comment period, many industry participants submitted evidence showing that SEP and non-SEP enrollees tend to have the same or similar risk scores, meaning they cost roughly the same amount of money to insure. If that is the case, then increasing barriers to enrollment for SEP consumers would harm, not improve, the risk pool. For example, Covered California informed Defendants that "the prospective risk scores for consumers enrolling during SEPs have been consistently equal to or lower than those during the OEP, even during years of flexible SEP policies and the implementation of enhanced federal premium tax credits (PTC)." [CC letter at 4]. As for Washington, "[t]here is no evidence of the type of fraud this proposal is attempting to address."[32] . As for the federal exchange, HHS analyzed this question in the 2023 Payment Notice, 87 Fed. Reg. 27,278, and "scaled back pre-enrollment verification for every SEP type, with the exception of . . . minimum essential coverage," due to recognition that "the extra step required by verification can deter eligible consumers from enrolling in coverage through an SEP, which in turn, can negatively impact the risk pool because younger, often healthier,

---

[32] Letter from Washington, *supra*, n. 16 at 9.

consumers submit acceptable documentation to verify their SEP eligibility at much lower rates than older consumers." Final Rule at 27,149.

114.    As to the second problem, this change will cause harm to consumers. The expansion of the pre-enrollment verification requirements for the remaining SEPs will cause an additional 293,073 SEP verification issues that the consumer will need to rectify before enrolling in coverage, per HHS's estimate. Final Rule at 27,186.

115.    The impact on consumers was brushed aside at the rulemaking phase. Defendants claimed during rulemaking, without justification, that a pre-enrollment verification process poses no "substantial enrollment barrier" to people seeking coverage via a triggering-event SEP, despite simultaneously acknowledging that more than one in four SEP enrollees (27%) were unable even to submit documents verifying their eligibility within fourteen days of an SEP verification issue (SVI) being generated. *See* Proposed Rule at 12,983 (73% of SEP enrollees who received an SVI were able to submit documents within fourteen days of the SVI). And only 63 percent were able to fully resolve their SVI within that time, and even after 30 days, 14 percent remained unable to verify. Proposed Rule at 12,983. Overall, more than 75 thousand individuals were blocked from obtaining coverage due to their inability to resolve an SVI in Plan Year 2019. Proposed Rule at 12,983. Still, in Defendants' view, this did not rise to the level of a "substantial" barrier to essential health insurance coverage.

116.    Requiring consumers to navigate complex documentation processes, often during times of significant and sudden changes in their personal circumstances, will undoubtedly discourage eligible individuals, including younger and healthier people, from obtaining coverage. This will in turn harm the risk pool, a downside Defendants readily acknowledge. Final Rule at 27,149.

117.    This rule change, by Defendants' own admission, could cause over 293,000 would-be enrollees to be blocked from coverage, at an increased cost of over $7 million in 2026. Rule at 27,186-27,187. HHS has provided no estimate of how many of those coverage denials would be in error, and HHS has moreover provided insufficient justification for this severe restriction on marketplace eligibility. Defendants' only justification is that SEP enrollees *might* be abusing the system to obtain coverage, but Defendants failed to show that is in fact happening, cannot estimate its likely prevalence, and cannot even show that the SEP enrollees are more expensive to cover than non-SEP enrollees.

118.    Defendants are not even persuaded by their own argument. They are sunsetting this requirement—supposedly essential to prevent fraud—after one year. Plaintiff States could not even comment on this requirement sunsetting after just one year because that was not included in the Proposed Rule. This rule change is arbitrary and capricious and contrary to the purposes of the ACA.

119.    Moreover, this change is arbitrary to the extent that it is intended to address fraud because Defendants failed to adequately consider adopting the several changes Plaintiff States proposed during the comment period calibrated to reduce fraud, such as multi-factor authentication.[33] Defendants' only response is that they "are continuing to explore additional operational solutions to further curb improper enrollments, including two-factor verification." Final Rule at 27,147. Nowhere do Defendants acknowledge these myriad solutions that would have effectively blocked improper enrollments without burdening innocent consumers. The Final Rule is arbitrary and capricious due to its failure to consider these reasonable alternatives.

---

[33] States of California, Massachusetts, New Jersey, et al. Comment Letter (Apr. 11, 2025), at 16, https://www.regulations.gov/comment/CMS-2025-0020-23836 (accessible as download).

### D. Ending Acceptance of Self-Attested Projected Household Income for Low-Income Enrollees is Arbitrary

120. Similar to the requirement that Exchanges verify enrollees who claim SEP eligibility, the Final Rule also imposes burdensome verification requirements on the lowest-income enrollees. In both cases, HHS claims that ineligible enrollees are obtaining coverage and APTC for which they are not eligible. In the former case, HHS at least limits the policy change to the Federal platform, where, Defendants concede, the lion's share of improper enrollment occurs. But here, HHS imposes these new verification requirements on all Exchanges—even though, as described below, all of the SBE Plaintiff States are Medicaid-expansion states where the incentive underlying this purported fraud does not exist. Defendants impose an extraordinarily burdensome verification regime upon States that will produce little, or no, benefit, because fraud is not occurring.

121. Prior to the Final Rule, Exchange plans accepted the self-attestation of an enrollee who claimed eligibility by projecting annual household income at or above 100% of the federal poverty level (FPL). This previous self-attestation policy was designed to ensure that the lowest-income enrollees, who are often younger and healthier, are not discouraged from entering the risk pool due to paperwork burdens. The prior policy also recognized the challenges that low-income individuals face in accurately estimating their annual income. Many low-income individuals experience significant fluctuations in their earnings over the course of the year, and it can be especially challenging for such individuals to accurately predict how much they will earn.

122. The Final Rule changes this policy in two ways. First, whenever Internal Revenue Service (IRS) data or other trusted data sources show that a consumer has income below 100% of the FPL (in contrast to what the consumer projected), a "data matching issue" (DMI), described below, will be automatically generated. Second, if the consumer projects income at or above the

FPL, and there is no IRS data available to confirm that, the Exchange must then verify household income using other trusted data sources; if those do not agree with the consumer's projection, then the Exchange must generate a DMI.

123.    When a DMI is generated, consumers will have 90 days to track down and submit the necessary paperwork to verify their projected income, with extensions granted on a case-by-case basis. Final Rule at 27,124-25. In the meantime, they can access APTCs and enroll in provisional coverage; after 90 days, if they have not completed the verification process, they may lose APTCs and be disenrolled from coverage. *Id.*

124.    These changes will impose enormous paperwork and financial burdens on low-income consumers. Together, these changes will generate an estimated 2.7 million new DMIs—"requiring 2.7 million people, many of whom live just above the FPL, to track down and submit paperwork in order to buy health insurance every year." Exhibit B at 20. Moreover, the vast majority of these DMIs—2.1 million—will be generated because of missing IRS data, which may be due to no fault of the consumer. *Id.*

125.    DMIs also create costly and burdensome administrative requirements for SBEs, which are required to receive, process, and determine whether the newly submitted paperwork adequately addresses the issue. The Final Rule estimates that the first type of DMI (with contradictory IRS data) will cost SBEs $12.4 million to receive, review, and verify submitted verification documents and to conduct outreach and determine DMI outcomes for consumers, as well as $14.7 million in one-time costs to update their eligibility systems and perform other technical updates for this change. Final Rule at 27,199. And because this provision, too, is sunsetting at the end of PY2026, Exchanges must incur $14.7 million in costs *again* to undo the

changes required by this Rule. *Id.* ("Exchanges would incur the same one-time costs at the time of sunsetting this policy at the end of 2026").

126.    For the second type of DMI (a lack of IRS data), the Final Rule estimates an increase in annual burden costs of approximately $62.8 million for SBEs to receive, review, and verify submitted verification documents as well as: conduct outreach and determine DMI outcomes for consumers; approximate one-time costs of $16.6 million to update their eligibility systems; perform other technical updates for this change, and; another $16.6 million when this provision sunsets. Final Rule at 27,200. Low-income consumers will spend *nearly $67 million* trying to obtain and submit the proper documents in 2026 alone, and 407,000 could lose APTCs entirely based on this DMI (155,000 on SBEs and 252,000 on FFEs and SBE-FPs Federal platform). *Id.*

127.    All told, by HHS's estimates, these new paperwork burdens relating to both forms of DMIs will cost consumers and exchanges hundreds of millions of dollars to implement and will result in close to half a million people—"most of whom are likely eligible" for APTCs—losing health coverage because they are unable to submit all the necessary documentation. Exhibit B at 20.

128.    In response to several SBEs who voiced concerns about implementation costs, Defendants say only that they "believe that the program integrity gains outweigh the potential costs to State Exchanges," and do not respond at all to one State's concern that they would be entirely unable to implement this provision "due to their State's limits on how they can use Federal tax information." Final Rule at 27,126.

129.    Imposing costly and burdensome administrative hurdles will cause younger and healthier consumers to drop out of the marketplace. That inevitable result, in turn, will worsen the

risk pool, cause adverse selection, and ultimately increase premiums for unsubsidized consumers. The Final Rule "acknowledge[s] that income verification can be more challenging for lower-income tax filers due to less consistent employment," but nevertheless asserts that "the [income verification] process does not impose a substantial burden." Final Rule at 27,200. But that evidence-free conclusion "runs counter to the evidence before the agency." *See Motor Vehicle Mfrs. Ass'n of U.S.,* 463 U.S. at 43. It also contradicts HHS's own conclusion that consumers and exchanges will spend hundreds of millions of dollars and hundreds of thousands of hours trying to meet these new requirements, and that almost half a million people will fail to do so. Final Rule at 27,199.

130.    The Final Rule claims that enough consumers "are intentionally inflating their incomes" to justify these new requirements. Final Rule at 27,121. The Final Rule points to a Government Accountability Office (GAO) recommendation that CMS verify household incomes "when attested income amounts significantly exceed income amounts reported by IRS or other third-party sources." *Id.* As a preliminary matter, that recommendation would at most justify only the first DMI—based on an actual *contradiction* between self-reported income and IRS-reported income. It would not justify the second DMI (based on the mere absence of data), which would generate more than 75% of new DMIs under this policy change.

131.    To support its claim that low-income individuals are improperly inflating their expected income, the Final Rule cites a recent analysis of 2024 open enrollment data. Final Rule at 27,122. Even setting aside the fact that the analysis was produced by a partisan think tank, on its own terms, that analysis pointed to income inflation that purportedly occurred in a handful of non-Medicaid expansion FFE states. *Id.*

132.    Only 10 states have declined to expand Medicaid. None of them are plaintiffs in this lawsuit except Wisconsin. Yet this burdensome rule change—aimed at addressing a problem that exists almost nowhere outside of those non-plaintiff States—is being forced upon all states.

133.    In states that have accepted the ACA's Medicaid expansion, there is no incentive to inflate incomes for APTC purposes because adults with incomes up to 138% of the FPL are generally eligible for Medicaid. In addition, many Medicaid-expansion states have mechanisms to ensure that Medicaid-eligible clients do not receive APTC. For example, the State of Washington has an integrated eligibility portal, so that those who opt out of Medicaid are barred from APTC eligibility until they provide updated documentation showing they once again qualify for APTC due to a change in income.[34] In fact, the very same think-tank study that CMS cited as justifying this Rule examined Washington enrollment data and "found that Washington Exchange enrollees reporting income between 100% and 150% of the [FPL] represented only 17% of enrollees, well below the 50% benchmark the authors suggest as an indicator of potential fraudulent enrollments for Medicaid expansion states."[35]

134.    And as discussed previously, purported fraud in a small subset of States on the federal exchange is no basis to impose new, burdensome requirements on SBEs where there is no allegation that such fraud is widespread. Defendants could have ended self-attestation of projected household income for low-income enrollees in FFE states, just like they imposed the 75% SEP verification requirement only on the FFE states. Or they could have imposed the Final Rule only on States that have not expanded Medicaid. But the Final Rule failed to consider these obvious alternatives that would have narrowly targeted the problematic conduct. At a minimum, the Final

---

[34] Washington State Health Benefit Exchange, Comment Letter on Proposed Rule (April 11, 2025), at 4, available at https://www.regulations.gov/comment/CMS-2025-0020-24557.

[35] *Id*. at 3.

Rule does not rationally connect the data cited with its sweeping imposition of these new DMI requirements on all exchanges (including SBEs), making it arbitrary and capricious on that basis as well.

135.    Moreover, this change is arbitrary to the extent that it is intended to address fraud because Defendants failed to adequately consider adopting the several changes Plaintiff States proposed during the comment period calibrated to reduce fraud, such as multi-factor authentication,[36] or ending self-attestation of projected household income for low-income enrollees in states that have not expanded Medicaid, as commenters urged.[37] Defendants' only response is that they "are continuing to explore additional operational solutions to further curb improper enrollments, including two-factor verification." Final Rule at 27,147. Nowhere do Defendants acknowledge these myriad solutions that would have effectively blocked improper enrollments (committed primarily by unscrupulous brokers) without burdening innocent consumers. The Final Rule is arbitrary and capricious due to its failure to consider these reasonable alternatives.

### E.  Transitioning to a One-Year FTR Eligibility Window is Arbitrary

136.    The ACA awards APTCs to enrollees based on their projected future income. 26 U.S.C. § 36B; 42 U.S.C. § 18082. When the enrollee files income taxes with the IRS the following year, the amount of the APTC award that was claimed is reconciled against eligibility as shown by the tax data. Importantly, HHS does not have access to such data—only the IRS does. *See* Rule at 27,116 ("privacy concerns" prevent HHS from knowing individual FTR status). Under existing law, an enrollee who fails to file taxes and reconcile their claimed award against their actual eligibility—known as failure to file and reconcile, or FTR—for two consecutive years loses

---

[36] California et al. Comment Letter, *supra* note 13, at 16.
[37] *E.g.*, Washington HBE Comment Letter, *supra* note 23, at 9-10.

eligibility for future APTCs. The Final Rule temporarily ends this policy, imposing a one-year FTR window.[38]

137.    Reverting to a one-year FTR grace period rather than a two-year grace period is unlikely to accomplish HHS' stated goal of reducing fraud on the Exchanges, as demonstrated by the fact that many more people receive one-year FTR codes than two-year FTR codes.[39]  HHS acknowledges that the availability of enhanced APTCs (eAPTCs) drove fraudulent enrollment in the first place, and further acknowledges that the eAPTCs are expiring at the end of *2025*—yet imposes this change for 2026 anyway, before reverting back to a two-year window once again for 2027. Rule at 27,075.

138.    Not only is this change ineffective, it is also harmful. A one-year FTR window risks eligible individuals losing access to APTCs due to administrative errors or paperwork delays. HHS acknowledged during rulemaking that the FTR eligibility check needed to be suspended during the Covid-19 emergency "due to concerns that consumers who had filed and reconciled would lose APTC due to IRS processing delays resulting from IRS processing facility closures and a corresponding processing backlog of paper filings." 90 Fed. Reg. 12,958 (March 19, 2025). Far from theoretical, HHS acknowledged that the IRS backlog during the pandemic "severely impacted the IRS's ability to process tax returns for the 2019, 2020, and 2021 tax years." Rule at 27,114. That concern is especially relevant today, when the Administration may be planning to cut

---

[38] Underscoring the absurdity, the recently enacted budget reconciliation bill then *re-imposes* this sunsetted FTR provision for plan years 2028 and beyond. *See* Pub. L. 119-21 §§ 71303(a)-(c), 139 Stat. 72, 324 (July 4, 2025) (implementing this provision of the Final Rule with an effective date of January 1, 2028). Thus, over the next few years, Exchanges must change to a one-year FTR window for 2026 (due to the Final Rule), revert to a two-year window for 2027 (due to the Final Rule's sunset provision), and then change *again* to a one-year window for 2028 (due to the legislation).

[39] California et al. Comment Letter, *supra* note 13, at 9.

the IRS in half.[40] Plaintiff States pointed this out during rulemaking,[41] and HHS did not specifically respond to the concern regarding the looming cuts to IRS staffing.

139.    Moreover, the compliance costs of this change are significant. HHS estimates one-time costs of $19.4 million borne by the SBEs to update their systems, and then another $19.4 million to revert to the two-year window that will once again be in effect for 2027. Rule at 27,189. Additionally, some states, such as Washington, will struggle severely to create a new one-year FTR window from scratch in a matter of months. But HHS is unmoved. Remarkably, HHS seems not to care that the "majority of State Exchanges expressed in comments that they *could not make the technological changes* to revert back to a 1-year FTR policy in time for OEP 2026," requiring "all exchanges" to "impose a 1-year FTR requirement beginning for PY 2026" regardless of the Exchanges' warnings that compliance on this timeline is impossible. *See* Rule at 27,199 (emphasis added).

### F.  Allowing Plans to Deny Coverage for Those Who Owe Past-Due Premiums from Previous Policies is Unlawful and Arbitrary

140.    The Final Rule allows—but does not require—insurance plans to decline to issue coverage to eligible applicants who owe a past-due premium of any amount, from any previous coverage year, even if the applicant pays the first-month premium for the coverage period for which they are eligible. Rule at 27,077. If an insurance plan intends to deny an applicant on this basis, inexplicably, the Final Rule does not require the plan to tell applicants about this policy and that they may be denied new coverage if they cannot also pay past-due premiums for old coverage.

141.    The ACA requires "each health insurance issuer that offers health insurance coverage in the individual or group market in a State" to "accept every employer and individual in

---

[40] Fatima Hussein, *The IRS is drafting plans to cut as much as half of its 90,000-person workforce, AP sources say*, Associated Press (March 4, 2025), https://tinyurl.com/m58czdjb.

[41] California et al. Comment Letter, *supra* note 13, at 9.

the State that applies for such coverage," subject to certain exceptions. 42 U.S.C. § 300gg-1. This is known as the "guaranteed issue" provision. No exception allows an insurer to deny new coverage to an otherwise eligible individual who owes a past-due premium from a prior period of coverage.

142.    Insurers, just like any other vendor of goods and services, can pursue collections in the event of nonpayment, and can terminate coverage after a grace period for failure to pay a premium. But the text of the ACA does not allow an insurer to deny coverage to otherwise eligible new enrollees who pay their first-month premium, and insurers are forbidden from attributing payment of a new premium to a past-due premium for prior coverage; in other words, insurers cannot deny coverage to new enrollees who owe past-due premiums from prior coverage, so long as the enrollee pays the new premium. *See* 42 U.S.C. § 300gg-1.

143.    This Final Rule change is likely to cause confusion among consumers. Consider an individual who can no longer afford premiums and stops paying, understanding and fully accepting that this means his coverage will terminate. What he may not understand is that, even after he stops paying, he falls into a "grace period" during which his insurer must still cover him if he pays his premium. *See* Rule at 27,085. If he does not pay his premium, that grace period *still counts* as a period for which a premium is outstanding—even if he did not utilize any healthcare during the grace period and may not even realize he is still covered. Later, when his finances recover and he attempts to re-enroll, he will be barred from doing so unless he is able to pay his new premium and the grace period premium. And moreover, under the Final Rule, he may never understand why he owes so much for new coverage because the insurer will not even be required to tell him about this new policy. Had he known, he could have tried to enroll with a different insurance plan. Instead, he might go without coverage.

144.    The Final Rule is likely to harm the risk pool, because the people most likely to be denied coverage as a result of this Rule are younger, healthier, and less wealthy enrollees. As explained above, several commenters pointed out, and Defendants acknowledge, that "less healthy individuals would be most likely" to overcome barriers to enrollment—meaning that each additional barrier risks contributing to adverse selection, harming the risk pool. *See* Rule at 27,090.

145.    This provision is contrary to the ACA, and is therefore unlawful.

146.    It is also arbitrary and capricious insofar as the Department has not provided any evidence for its assertion that any discouragement from enrolling as a result of this change "would be minimal." Rule at 27,087.

### G. HHS's Changes to the Premium Adjustment Percentage Methodology are Arbitrary

147.    Section 1302(c)(4) of the ACA directs the Secretary to determine an annual premium adjustment percentage, a measure of premium growth that is used to set the rate of increase for three parameters: (1) the maximum annual limitation on cost sharing (section 1302(c)(1) of the ACA); (2) the required contribution percentage used to determine whether an individual can afford minimum essential coverage (MEC) (section 5000A of the Internal Revenue Code of 1986 (the Code), as enacted by section 1501 of the ACA); and (3) the employer shared responsibility payment amounts (section 4980H of the Code, as enacted by section 1513 of the ACA). 42 U.S.C. § 18022(c). Cost-sharing includes copays, coinsurance, and deductibles due from the enrollee over the plan year. *Id*.

148.    Each of these values are adjusted in reference to a measure of premium inflation called the annual premium adjustment percentage, which is set by the HHS Secretary each year. *Id*. In addition, the IRS uses the premium adjustment percentage when determining individuals' expected contributions and thus the amount of APTC the enrollee will receive. Accordingly, even

small changes in the way the premium adjustment percentage is calculated can have large effects on both out-of-pocket costs and the amount of APTC an enrollee is entitled to receive.

149.    For many years, HHS policy recognized that the premium adjustment methodology needed to be price-stable to reduce volatility and keep premiums from spiking. Under that prior policy, the adjustment methodology looked to a biannual measure of premium inflation that is based on the employer-sponsored insurance (ESI) market. The Final Rule changes the premium adjustment methodology to include consideration of premium changes in the individual market, in addition to premium changes in the ESI market. Rule at 27,166-73. Under the Final Rule, CMS would consider individual market premiums going back to 2013, before the ACA was in effect. *Id*. at 27,167.

150.    The premium adjustment percentage is intended to measure underlying trends in health insurance premiums. Including the more price-volatile individual market premiums in the measure of inflation will harm consumers by significantly increasing premium contributions for those who qualify for premium tax credits for Exchange coverage and allowing higher out-of-pocket costs (including for the 160 million Americans with employer-based insurance).[42]

151.    First, this change will cause the amount that consumers pay towards premiums to rise. By including consideration of inflation in the individual market, the premium adjustment percentage in 2026 will be about 4.5 percent higher than under the previous methodology. That means that the consumer's share of premiums for the APTC benchmark silver plan in 2026 will be about 4.5 percent higher than under the prior methodology on account of this change. That is

---

[42] *See* The Origins and Growth of Employer-Provided Insurance | U.S. Chamber of Commerce.

substantial. For a family of four making $85,000 a year, this change will result in an annual premium increase of $313.[43]

152.    Second, this change will directly cause out-of-pocket costs to rise significantly. According to the Final Rule, applying this new premium adjustment percentage in 2026 will cause "approximately a 15.2 percent increase [in the annual limitation on cost-sharing] from the [Plan Year] PY 2025 parameters of $9,200 for self-only coverage and $18,400 for other than self-only coverage." Rule at 12,993. That is an increase of $1400 for self-only coverage and $2800 for all other coverage. *Id*. Many commenters explained to HHS that this would threaten the affordability of healthcare coverage for many consumers. "[T]his change would expose a typical family to an additional $900 in cost-sharing and $313 in premiums annually." Exhibit B at 3. "[T]he proposed escalation of out-of-pocket costs directly threatens the affordability of essential health coverage, particularly for individuals already struggling to manage healthcare expenses." Exhibit A at 9.

153.    HHS openly acknowledges these detrimental effects. HHS stated during rulemaking that this change will "result in a higher maximum annual limitation on cost sharing, higher reduced annual limitations on cost sharing, a higher required contribution percentage, and higher employer shared responsibility payment amounts than if the current premium adjustment percentage premium measure (ESI only) were used for PY 2026." Proposed Rule at 12,992. HHS further acknowledged that this change will "increase the portion of the premium the consumer is responsible for paying and therefore would decrease the amount of APTC for which consumers qualify." *Id*. at 12,993. But the Final Rule does not address how this change is consistent with Congress's goal of expanding coverage and affordability. *See Nat'l Fed'n of Indep. Bus. v.*

---

[43] *See* Proposed ACA Marketplace Rule Would Raise Health Care Costs for Millions of Families | Center on Budget and Policy Priorities at Table 2.

*Sebelius*, 567 U.S. 519, 538 (2012) (Congress enacted the ACA to "increase the number of Americans covered by health insurance and decrease the cost of health care.").

154.    Other commenters pointed out that, "because the premium adjustment percentage is a cumulative measure," the high price volatility of the individual market in the early post-ACA years will skew the growth measure if incorporated into the calculation. Rule at 27,173. Defendants acknowledge this but assert that the effect of the skew diminishes over time as the skewed years become a smaller proportion of the total number of elapsed years since 2013. *Id*. However, Defendants provide no data or analysis quantifying this effect on premium growth.

155.    Although the ACA requires using 2013 as the comparator year when calculating the premium adjustment percentage, *see* 42 U.S.C. § 18022(c)(4), HHS is not required to consider the more price-volatile individual market, and has historically only considered the employer-sponsored insurance market because it is more price-stable. Indeed, in rulemaking, HHS acknowledged that "between 2015 and 2018, private individual health insurance market per enrollee premiums offered on-Exchange grew faster than [employer-sponsored insurance] premiums, most notably in PY 2017 and PY 2018." Proposed Rule at 12,992. For this reason, commenters during rulemaking informed HHS of their concern that "looking at individual market premiums back to 2013 artificially inflates premium growth over time." Exhibit B at 3. Factoring in those non-representative premiums into the premium adjustment percentage is not "reasonable and reasonably explained." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

156.    Moreover, the changes to the premium adjustment percentage methodology squarely undermines Congress' twin goals of expanding access to healthcare and making it more affordable. *See Sebelius*, 567 U.S. at 538 (Congress enacted the ACA to "increase the number of

Americans covered by health insurance and decrease the cost of health care."). Although this change knowingly reduces enrollment and sharply increases premiums and cost-sharing, HHS claims that "making coverage more accessible and affordable" is an improper "policy objective[]." Proposed Rule at 12,990. HHS, by its own admission, has acted contrary to the ACA, and may not cast aside Congressional intent and replace statutory objectives with different policy goals. *See Indep. U.S. Tanker Owners Comm. v. Dole*, 809 F.2d 847, 854 (D.C. Cir. 1987).

157.    Finally, tens of millions of healthcare consumers have also relied on HHS to keep healthcare premiums and out-of-pocket costs from rising too quickly, and this change completely disregards those reliance interests by imposing a 15.2% increase in the annual cost-sharing limit. *See Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 236, 259 (2020) (When an agency changes course, it must "be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.) (internal citations omitted).

158.    These revisions are contrary to the purposes of the ACA, and are arbitrary and capricious.

## H. Expanding the Acceptable Actuarial Value Ranges for Health Plans is Arbitrary

159.    Plans sold on the exchanges fall into bronze, silver, gold, and platinum tiers based on their actuarial value (AV), or the percentage of an average consumer's expected health care expenses will be paid by the plan. Section 1302(d)(1) of the ACA requires an AV of: 60 percent for bronze plans, 70 percent for silver plans, 80 percent for gold plans, and 90 percent for platinum plans. 42 U.S.C. § 18022(d)(1). Higher-tier plans typically have higher premiums and lower out-of-pocket costs, whereas lower-tier plans have lower premiums and higher out-of-pocket costs.

160.    The ACA also directs CMS to define a range of accepted *de minimis* variation "to account for differences in actuarial value estimates." 42 U.S.C. § 18022(d)(3). Initially, the *de*

*minimis* AV range for all plans was small, requiring most plans to fall within +2/-2 or +2/-0 percentage points. *See* 78 Fed. Reg. 12,834, 12,851 (Feb. 25, 2013). The narrow range ensured that "consumers can easily compare plans of similar generosity," while providing issuers with flexibility to set "simple and competitive" cost-sharing rates. *Id.*

161.    In the 2018 Payment Notice, CMS expanded the range to +5/-2 percentage points specifically for expanded bronze plans, which are bronze plans that cover at least one major service, other than preventive services, before the deductible is met with reasonable cost-sharing rates or qualify as a high deductible health plan. 2018 Payment Notice, 81 Fed. Reg. 94,058, 94,142 (Dec. 22, 2016). The change promoted flexibility and specifically ensured that bronze plans "remain[ed] as generous as catastrophic plans." *Id.*

162.    From 2018 to 2022, CMS expanded the *de minimis* actuarial value ranges to +2/-4 percentage points for standard bronze, silver, gold, and platinum plans and +5/-4 percentage points for expanded bronze plans, 82 Fed. Reg. 18,346, 18,368-18,369 (Apr. 18, 2017), before reverting back to the narrower ranges in the 2023 Payment Notice. In the 2023 Payment Notice, CMS concluded that the wider ranges undermined consumers' ability to meaningfully compare plans. 87 Fed. Reg. 27,307, 27,310 (May 6, 2022). In particular, CMS was concerned about consumers' ability "to distinguish the level of coverage between bronze plans and silver plans" under the wider ranges, given "significantly different cost sharing" offered by each tier. *Id*. at 27,306 (noting "generally a 10-percentage point difference in median coinsurance . . . between expanded bronze and base silver plans offered on Heathcare.gov.").

163.    The *de minimis* AV range for individual silver market plans also influences the generosity of APTC because the APTC benchmark plan is the second lowest cost silver plan in the market. *See* 81 Fed. Reg. 94,058, 94,144; 87 Fed. Reg. 27,208, 27,276 (May 6, 2022). Beginning

in plan year 2023, CMS set the *de minimis* AV range for individual market silver plans at +2/-0 percentage points "to achieve the compelling policy interest of addressing the rising cost of health insurance premiums by influencing the generosity of the [second lowest cost silver plan]." 87 Fed. Reg. 27,208, 27,309.

164.    Now the Final Rule reverses course, significantly expanding the *de minimis* AV range for expanded bronze plans to +5/-4 percentage points and +2/-4 percentage points for standard bronze, silver, gold, and platinum.

165.    Allowing plans to undershoot AV requirements by four percentage points decreases the level of coverage offered by these plans, which increases consumers' out-of-pocket costs. By allowing less generous plans within each metal tier, the Final Rule's expanded AV ranges undermine consumer choice, by decreasing the differences between metal tiers, and reduce affordability, by increasing out-of-pocket costs and premiums. As a result, these expanded *de minimis* ranges will lead to higher costs for most individuals enrolled on exchanges.

166.    The Final Rule recognizes that wider AV ranges will decrease APTCs by $1.22 billion in 2026 (and more in each subsequent year) because the APTC benchmark plan, the second lowest cost silver plan in the market, can now undershoot the 70% AV requirement by an additional 4 percentage points. Rule at 27,208.

167.    The Final Rule will damage risk pools by increasing costs for subsidized enrollees. Decreased APTCs increase costs for subsidized enrollees because they must either purchase less generous coverage and incur higher out-of-pocket expenses or pay higher net premiums for comparable coverage. Subsidized enrollees make up the majority of the risk pool, and healthier individuals are more likely to drop the health insurance due to an increase in premiums.

168.    As a result, less healthy risk pools will increase gross premiums for unsubsidized enrollees as well because healthier subsidized enrollees drop their coverage due to increased premiums.

169.    The Final Rule claims that the prior ranges "substantially reduce[d] issuer flexibility" and that issuers "voiced concern about their ability to continue to participate in the market generally." Rule at 27,175. But the Final Rule offers no empirical support for these assertions, and the record shows issuer participation in the ACA marketplaces increased under the prior policy, starting at an average of 9.2 issuers in 2022 under the wider ranges and then increasing to an average of 9.4 issuers in 2023 and 9.6 issuers in 2024 under the narrower AV ranges. *See* Jason Levitis et al., Comment Letter on Proposed Rule (Apr. 11, 2025), at 5, available at https://www.regulations.gov/comment/CMS-2025-0020-25047 (attachments) (Levitis et al. Comment Letter). Commenters also noted that existing issuers also expanded their service areas under the narrower ranges. *See id.* Because the explanation for broadening the AV range "runs counter to the evidence before the agency," the Final Rule's decision to change the *de minimis* AV range is arbitrary and capricious. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

170.    The Final Rule also asserts that the wider *de minimis* AV ranges will improve the risk pool by attracting unsubsidized enrollee participation with lowered premiums. Rule at 27,175. Yet commenters emphasized that any decrease in premiums comes at the expense of more generous coverage. *See* Levitis et al. Comment Letter 13. The Final Rule does not meaningfully explain why less generous plans with lower premiums will attract unsubsidized consumers, given that lower metal tier plans already offer these options.

171.    The Final Rule also fails to consider whether wider AV ranges will have the opposite effect of increasing gross premiums for unsubsidized enrollees, eliminating any purported benefit on risk pools. HHS accepted commenters' prediction of "some initial weakening of the risk pool," caused by healthier subsidized enrollees "drop[ping] coverage when net premiums rise," Rule at 27,177, and the likely effect of weakened risk pools is increased gross premiums for unsubsidized enrollees. See Levitis et al. Comment Letter 5 (explaining how increased net premiums caused by decreased APTCs will "lead to a smaller, sicker Marketplace risk pool"). By making coverage less affordable for both subsidized and unsubsidized enrollees, the wider AV ranges will further deter unsubsidized enrollees participation, undermining the Final Rule's stated aims.

### III.    The Final Rule's Elimination of "Sex-Trait Modification Procedures" as an Essential Health Benefit Is Unlawful.

#### A.    The Final Rule Excludes Medically Necessary Treatment of Gender Dysphoria from EHBs

172.    The Final Rule provides that "[f]or plan years beginning on any day in calendar year 2026" a plan issuer "may not include . . . specified sex-trait modification procedures (as defined at § 156.400) as EHB." Rule at 27,223.

173.    The Final Rule defines "sex-trait modification procedure" as:

any pharmaceutical or surgical intervention that is provided for the purpose of attempting to align an individual's physical appearance or body with an asserted identity that differs from the individual's sex either by:

(1) Intentionally disrupting or suppressing the normal development of natural biological functions, including primary or secondary sex-based traits; or

(2) Intentionally altering an individual's physical appearance or body, including amputating, minimizing or destroying primary or secondary sex-based traits such as the sexual and reproductive organs.

(3) This term does not include procedures undertaken:

(i) To treat a person with a medically verifiable disorder of sexual development; or

(ii) For purposes other than attempting to align an individual's physical appearance or body with an asserted identity that differs from the individual's sex.

Rule at 27,223.

174.    The novel definition adopted by the Final Rule requires providers to look to the "purpose" for which a service is sought in order to determine whether a service is or is not an EHB. This is contrary to the statutory method of establishing EHB as a set of categorically defined benefits, such as emergency services, hospitalization, or prescription drugs. 42 U.S.C. § 18022(b)(1). Under the Final Rule, instead of covering "generic prescription drugs," a provider would have to parse whether that service is intended "to align an individual's physical appearance or body with an asserted identity that differs from the individual's sex."

175.    Notably, the only individuals who might seek services with the express purpose of aligning their gender identity and their body, and their gender identity differs from their sex, are transgender individuals.

176.    The Final Rule claims that the reason for the exclusion of any "sex-trait modification procedure" from EHBs is that "such benefits are not covered under typical employer plans." Rule at 27,158.

177.    The Final Rule notes that Section 1302(b)(2)(A) of the ACA directs that the scope of the EHB "be equal in scope to the benefits provided under a typical employer plan and that they include at least the 10 general categories outlined in the statute and the items and services covered within those categories." Rule at 27,152.

178.    In doing so, the Final Rule adds "sex-trait modification procedures" to the very limited number of services that have been specifically excluded from EHBs noted within the Final

Rule itself: non-pediatric dental or eye exam services, long-term/custodial nursing care, and non-medically necessary orthodontia. Rule at 27,223.[44]

179.     But, unlike the other listed services, the Final Rule prohibits insurers from covering certain treatments as EHBs only if those services are "provided to align an individual's physical appearance or body with an asserted identity that differs from the individual's sex." Rule at 27,223.

180.     The Final Rule does not prohibit the same treatment if it is offered (i) to treat a person with a medically verifiable disorder of sexual development, or (ii) for purposes other than attempting to align an individual's physical appearance or body with an asserted identity that differs from the individual's sex. Rule at 27,223-24.

181.     For example, puberty-delaying medication is commonly used to treat precocious puberty, the premature initiation of puberty by the central nervous system.  If left untreated, precocious puberty may lead to negative impacts, including psychosocial issues[45] and impairment of final adult height.[46]  The Final Rule allows plan issuers to cover as an EHB the use of hormone agonist medication for the treatment of precocious puberty or cancer, *see* Rule at 27,159, but prohibits EHB coverage of the same treatment when prescribed as medically necessary to treat gender dysphoria, *see* Rule at 27,223-24.

   **B. The Exclusion of "Sex-Trait Modification Procedures" from EHBs Is Unlawful**

      **a.      The Final Rule is Contrary to Law**

---

[44] For plan years beginning on or after January 1, 2027, an issuer of a plan offering EHB may not include routine non-pediatric eye exam services, long-term/custodial nursing home care benefits, or non-medically necessary orthodontia as EHB.

[45] Kirsten Weir, *The risks of earlier puberty*, American Psychological Association: Monitor on Psychology (Mar. 2016), https://www.apa.org/monitor/2016/03/puberty.

[46] Jean-Claude Carel, *Precocious puberty and structural growth*, National Institute of Health (Mar. 2004), https://pubmed.ncbi.nlm.nih.gov/15073143/.

182.    The ACA requires that the HHS Secretary ensure that the scope of EHBs "is equal to the scope of benefits provided under a typical employer plan." 42 U.S.C. § 18022(b)(2)(A).

183.    To determine typicality, the ACA requires Labor Secretary to conduct a survey of employer-sponsored coverage "to determine the benefits typically covered by employers" so as to "inform" the HHS Secretary's determination of what is "typical." 42 U.S.C. § 18022(b)(2)(A).

184.    In December 2011, in anticipation of the ACA's EHB provisions becoming effective, HHS determined for the first time what benefits are typically covered by employers. In doing so, it considered a Department of Labor survey,[47] recommendations from the Institute of Medicine (IOM), and public input. Based on that information, HHS issued agency guidance. *See* CMS, Ctr. for Consumer Information & Oversight, "Essential Health Benefits Bulletin" (Dec. 16, 2011) (2011 CMS Bulletin).

185.    HHS failed to conduct such a study before drafting the Final Rule that changed the scope of EHBs, violating its statutory mandate.

186.    Moreover, the ACA mandates that in "revising [EHB] the Secretary shall submit a report to the appropriate committees of Congress," presumably premised on renewed reports by DOL based on "a survey of employer-sponsored coverage." 42 U.S.C. § 18022(a)(2). HHS did not conduct or consider a new DOL report in excluding treatment for gender dysphoria from EHB.

      **b.**     **HHS's Exclusion of "Sex Trait Modification Procedures" is Arbitrary and Capricious**

---

[47] The Department of Labor (DOL) released that survey of employer-sponsored plans, which included those of large and small employers, on April 15, 2011. *See* "Selected Medical Benefits: A Report from the Department of Labor to the Department of Health and Human Services" (Apr. 15, 2011), https://www.bls.gov/ebs/additional-resources/selected-medical-benefits-a-report-from-dol-to-hhs.pdf. The survey used 2008 and 2009 National Compensation Survey data. Essential Health Benefits Bulletin (p. 2). This 2011 DOL survey was the first and last completed in accordance with 42 U.S.C. §18022(b)(2).

187.    The Final Rule unlawfully and unreasonably eliminates any "sex-trait modification procedure" from EHBs, which includes many forms of medically necessary treatment for gender dysphoria.

188.    HHS claims that its approach is a reasonable way to comply with its statutory mandate to ensure that the scope of EHBs "is equal to the scope of benefits provided under a typical employer plan," *see* 42 U.S.C. § 18022(b)(2)(A), but this claim does not withstand even the slightest scrutiny.

189.    *First*, HHS diverges without good reason, *see FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009), from its settled policy of determining on a state-by-state basis (*not* on a uniform national basis) what benefits may be included in a state's benchmark plan, based on the benefits provided under a "typical" employer plan in each state. And HHS does so without even considering and addressing the significant reliance interests of states. *See Regents of the Univ. of Cal.*, 591 U.S. at 33.

190.    *Second*, even taken on its own terms, HHS's explanation of what benefits are covered under a "typical" employer plan inexplicably "runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 43.

191.    *Third*, HHS failed to take statutorily required steps in redefining EHBs that would have provided additional evidence that coverage of medically necessary treatments for transgender individuals is more common than shown by the limited data set used by HHS in drafting the Final Rule.

192.    The Final Rule arbitrarily diverges from the longstanding approach of determining a "typical" employer plan on a state-by-state basis.

193.    In its 2011 guidance setting out the contents of EHBs, HHS announced its commitment to "State flexibility" and clarified that assessing the contents of a "typical employer plan" is a state-specific inquiry. *See* 2011 CMS Bulletin at 9.

194.    Consequently, the process by which each state fills in the details of the ten statutory EHB categories has always been in the form of a benchmark plan "reflecting both the scope of services and any limits offered by a 'typical employer plan' *in that state* as required by Section 1302(b)(2)(A) of the [ACA]." *Id.* at 8 (emphasis added).

195.    HHS confirmed in its 2013 rule on EHBs that "typical employer plans differ by state" and that the EHB benchmark system allows "states [to] continue to maintain their traditional role in defining the scope of insurance benefits and may exercise that authority by selecting a plan that reflects the benefit priorities *of that state*." *ACA; Standards Related to EHBs, Actuarial Value, and Accreditation*, 78 Fed. Reg. 12,834, 12,843 (Feb. 25, 2013) (emphasis added).

196.    HHS has consistently updated marketplace rules to enhance state flexibility. *See, e.g.,* 83 F.R. 16,930, 16,931 (adopting rule to "provide[] States with additional flexibility in applying the definition of EHBs to their markets" allowing "States to modify EHBs to increase affordability of health insurance in the individual and small group markets"). In the Plaintiff States that expressly *prohibit* insurers from excluding or denying coverage and claims based on a consumer's gender identity, every fully insured employer plan, regardless of employer size, *must cover* medically necessary care for the treatment of gender dysphoria.[48]

---

[48] *See* Movement Advancement Project, Healthcare Laws and Policies: Private Insurance Nondiscrimination Laws, Bans on Exclusions of Transgender Health Care, and Related Policies (Apr. 26, 2024), https://tinyurl.com/39h489an. The Final Rule relies on EDGE data to assess whether gender-affirming care is covered by the typical employer plan. Rule at 27,155 ("[W]e believe these data reflect the coverage experiences of consumers receiving coverage through the small business health options program (SHOP), which we believe to be more reflective of the

197.    Considering the established state-by-state approach to EHBs and state prohibitions on excluding or denying this coverage, it is beyond dispute that the "typical" employer plan in each Plaintiff State provides coverage for medically necessary treatments of gender dysphoria, services that likely fall within the definition of "sex-trait modification." As such, CMS's decision to exclude this care in Plaintiff States—purportedly to match "the scope of benefits provided under a typical employer plan," Final Rule at 27,163—is inconsistent and wholly capricious.

198.    Although the Final Rule acknowledges that in defining typicality HHS "relied on and represented [insurance coverage data from the Movement Advancement Project (MAP)] and that [said data] represent a sound statistical basis to inform [the Final Rule]," Rule at 27,155. HHS did not consider the most salient aspect of this MAP data:[49] that is, twenty-four (24) states—including Plaintiff States—explicitly *cover* gender-affirming care as part of their state employee health insurance package.

199.    Therefore, the Final Rule not only "entirely fail[s] to consider an important aspect of the problem," *State Farm*, 463 U.S. at 43, it also squarely conflicts with HHS's longstanding and settled policy of State flexibility, providing no good reason for that drastic change, *Fox*, 556 U.S. at 515.

---

coverage typically provided by the majority of employers, which are significantly smaller than those employers surveyed by, for example, the Corporate Equity Index or KFF."). SHOP plans are fully insured, which means that SHOP plans in each Plaintiff State cover gender-affirming care. Notably, the Final Rule does not even evaluate SHOP plans; rather, it uses enrollment and claims data from a variety of plans to make an assertion about SHOP plans specifically.

[49] MAP provides tables describing the prevalence of state antidiscrimination laws and the "state laws or administrative policies which explicitly include, explicitly exclude, or have no clear policy covering transition-related or gender-affirming care for transgender people who are state employees as part of their state employee health benefits." https://www.lgbtmap.org/equality-maps/healthcare_laws_and_policies.

200.    The Final Rule effects this drastic change while failing to consider or address the significant reliance interests of SBEs. *See Regents of the Univ. of Cal.*, 591 U.S. at 33.

201.    States have selected their EHB benchmark plans to best reflect the coverage and benefits typical to each state's insurance market, including coverage that complies with state-based legal requirements, including nondiscrimination protections, and state-specific conditions. HHS's abrupt decision to exclude services from EHBs nationwide *on the very basis of gender identity* is highly disruptive, interferes with the States' ability to regulate healthcare, and will force states to re-evaluate their benchmark plans.

202.    Five states explicitly include certain gender-affirming care in their benchmark plans. *See* Rule at 27,154 n.196 ("The EHB-benchmark plans for California, Colorado, New Mexico, Vermont, and Washington specifically include coverage of some sex-trait modification.").

203.    For those states that do not explicitly include gender-affirming care in their benchmark plans, but that otherwise require coverage of this care through state anti-discrimination mandates, they will be subject to defrayal costs pursuant to §155.170, and will separately be forced to analyze and exclude care that would have previously been eligible for treatment as an EHB, such as surgery or medication, from that category. The Final Rule acknowledges as much: "if any State separately mandates coverage for sex-trait modification outside of its EHB-benchmark plan, the State would be required to defray the cost of that State mandated benefit as it would be considered in addition to EHB." Rule at 27,154.

204.    States could not have reasonably anticipated such a nationwide restriction in part because gender-affirming care is not a stand-alone category of health care and rather spans nearly every mandatory category of EHBs, including emergency services, hospitalization, mental health

and substance use disorders services, prescription drugs, laboratory services, preventive and wellness services, and pediatric services. Further, HHS previously affirmed that this coverage is consistent with the "typical" employer plan in a state. Rule at 27,154 (EHB benchmark plans for five states include medically necessary treatment for gender dysphoria).

205.    Because the Final Rule applies the exclusion to PY 2026, states must finalize these changes in under two months, though many states have already adopted benchmark plans under prior HHS guidelines.

206.    Rather than continue to allow the scope of EHBs to be determined on a state-by-state basis as contemplated by the ACA and HHS's regulations, the Final Rule tries to dictate nationwide what has since its inception been, and been understood as, a state-by-state process. *See* 78 Fed. Reg. at 12,841 ("The benchmark plan options for each state reflect the scope of benefits and services typically offered in the employer market *in that state*. This approach meets the statutory requirement that EHB reflect a typical employer plan as well as the recommendation provided by the IOM on the approach to defining EHB." (emphasis added)).

207.    HHS was required to at least consider the states' significant reliance interests when imposing such a profound change in approach, and HHS's failure to do so is arbitrary and capricious. *Regents of the Univ. of Cal.*, 591 U.S. at 33 (where agency is "'not writing on a blank slate,' it [i]s required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns" (citation omitted)).

208.    Even on its own terms, HHS's purported finding that a typical employer plan does not cover gender-affirming care is contradicted by the very evidence before the agency, rendering the Final Rule arbitrary. *State Farm*, 463 U.S. at 43.

209.    As detailed above, HHS relied on MAP data, which shows that 24 states explicitly require coverage of gender-affirming care by state employee health benefit plans, as compared to 14 states that exclude coverage.

210.    When compared to other services HHS has determined qualify as EHB, the level of coverage for gender-affirming care is sufficiently "typical" even on a nationwide basis. By way of comparison, HHS's 2011 determination of EHBs was informed by the Department of Labor's dataset, which revealed that only 27 percent of plans surveyed offered coverage for infertility treatments.[50] Yet HHS did not exclude coverage for infertility treatment services on the basis that they were not part of a typical employer plan under 42 U.S.C. § 18022(b)(2)(A).

211.    The Final Rule fails to explain why it is holding gender-affirming care to a different and higher standard than it held infertility treatments, though both are medically necessary, leading to the logical conclusion that the exclusion of gender-affirming care from EHBs is arbitrary and capricious.

212.    Further evidencing its untenable rationale, HHS's Final Rule cherry-picks from nationwide data, disregarding without meaningful explanation the evidence that undercuts the premise for its regulatory action.

---

[50] "Selected Medical Benefits: A Report from the Department of Labor to the Department of Health and Human Services" (Apr. 15, 2011), https://www.bls.gov/ebs/additional-resources/selected-medical-benefits-a-report-from-dol-to-hhs.pdf. In order to assess employer-sponsored coverage for the report, DOL drew on data from the Bureau of Labor Statistics (BLS). *Id.* DOL not only reviewed the BLS National Compensation Survey, which captured data from approximately 36,000 employers, but also a BLS analysis of 3,900 private sector plans to assess "detailed provisions of employment-based health care benefits." *Id.* BLS analyzed plan documents requested from those 3,900 private sector plans to evaluate existing coverage for treatments for conditions like infertility; BLS found that, of all of the private sector plans, only 27 percent covered infertility treatments (meaning, covered diagnosis *and* treatment). Overall, 47 percent of assessed plan documents mentioned infertility treatments, and 60 percent of those that mentioned infertility treatments covered more than a diagnosis. *Id.*

213.    Employer plans are the predominant source of healthcare coverage in the United States, and a substantial number of them offer gender-affirming care coverage. A significant proportion of American workers with employer healthcare plans have coverage for gender transition services, and this number has grown over time. According to the Human Rights Campaign's Corporate Equality Index 2025 Report, 72 percent of Fortune 500 companies offer "transgender-inclusive healthcare benefits," which includes hormone therapies, surgeries, and mental health care, up from 0 percent in 2002. [51]

214.    A 2024 survey run by the Kaiser Family Foundation (KFF) found that 50 percent of companies with 5,000 or more workers certified that they specifically cover gender-affirming hormone therapy.  A little less than half of all workers covered by employer plans in the United States (43 percent) work for companies with 5,000 or more workers. Even after broadening to all large employers (companies with 200 or more workers that offer health benefits), which employ over 72 percent of American workers with job-based coverage, around one fourth (24 percent) stated that they explicitly cover gender-affirming hormone therapy. [52]

215.    The analogous KFF survey from 2023 reported similar findings regarding employer coverage for gender-affirming surgery. Over 60 percent of companies with 5,000 or more workers stated that they provide coverage for gender-affirming surgery; 12 percent were unsure about whether they provide the same coverage. As was the case with employer coverage for gender-affirming hormone therapies, a little less than one fourth (23 percent) of all large employers, with

---

[51] Human Rights Campaign Foundation, Corporate Equality Index 2025: Rating Workplaces on Lesbian, Gay Bisexual, Transgender and Queer Equality (Jan. 2025), https://tinyurl.com/53dwc7mb.
[52] Kaiser Family Foundation, 2024 Employer Health Benefits Survey (Oct. 9, 2024), https://tinyurl.com/46t4msuh.

200 or more workers, were certain that they explicitly cover gender-affirming surgery.  Forty

percent did not know whether offered health benefits included such surgery.[53]

216.    The Final Rule rejects data proving that the vast majority of Fortune 500 companies

and that a substantial number of companies of all sizes cover medically necessary treatments for

transgender individuals on the basis that the typicality analysis should focus solely on small

employers, not large employer plans, even though the latter plans cover more Americans.[54] *See*

Rule at 27,154-55. Once again, this approach is a sharp divergence from how HHS has approached

these issues until now.

217.    HHS's 2011 analysis of DOL survey data, for example, examined benefits offered

by plans of all sizes,[55] and the CMS's December 2011 Essential Health Benefits Bulletin explained

that, in trying to define "typical," HHS "gathered benefit information on large employer plans

(which account for the majority of employer plan enrollees)" as well as "small employer products

(which account for the majority of employer plans), and plans offered to public employees." 2011

---

[53] Kaiser Family Foundation, 2023 Employer Health Benefits Survey (Oct. 18, 2023), https://tinyurl.com/2mshf4hz.

[54] HHS tries to dismiss this data by suggesting, without evidence, that "very large employers also receive more pressure from advocacy organizations to cover sex-trait modification procedures and, therefore, likely do not represent the typical employer to the degree a portion respond to this pressure." 90 F.R. 27074 at 27155. HHS suggests that the "voluntary participation" of employers in that survey "suggests these employers do not represent the typical employer and, instead, align with the advocacy organization's views." *Id*. However, HHS misunderstands that survey data on employer benefits is typically based on voluntary participation. *See, e.g.*, Kaiser Family Foundation, *2024 Employer Health Benefits Survey*, (Oct. 9, 2024), https://www.kff.org/health-costs/report/2024-employer-health-benefits-survey/. If HHS wanted to commission its own survey or analysis—as it did through an extensive process before issuing guidance in 2011—it could have. But the agency cannot use its own failure to thoroughly investigate this issue to dismiss evidence submitted by commenters that its policies are capricious.

[55] *See* "Selected Medical Benefits: A Report from the Department of Labor to the Department of Health and Human Services" (Apr. 15, 2011), https://www.bls.gov/ebs/additional-resources/selected-medical-benefits-a-report-from-dol-to-hhs.pdf. As stated above, this was the first and last DOL report on the contents of typical employer plans.

CMS Bulletin at 3-4. While the Bulletin expressed that HHS's "intended approach to EHB incorporates plans typically offered by small employers," it clarified that the approach also "incorporates . . . benefits that are covered *across the current employer marketplace*" – those covered by plans of all sizes. 2011 CMS Bulletin at 8 (emphasis added). This underscores the importance of the state-by-state approach—disregarded here by HHS—which provides the most accurate picture of the benefits covered in the employer marketplace in each state.

218.    Further, in asserting that small employer plans somehow provide a better model of the "typical employer plan," the Final Rule capriciously relies on and misinterprets a "limited data set" collected by HHS to assist researchers, the External Data Gathering Environment (EDGE data).[56] Rule at 27,155.

219.    EDGE data describes levels of enrollment in certain plans and the frequency of types of claims submitted. The Final Rule does not provide a substantive analysis of that data nor does it describe the method by which it determined what types of services it considered as "claims." Rather, the Final Rule makes the conclusory statement that the number of claims for "sex trait modification procedures" is low, then leaps to the conclusion that this care is infrequently utilized and therefore not typically covered by small business plans. Rule at 27,155-56. But there is a marked difference between a lack of coverage and infrequent utilization of that coverage. Public and commercial insurance regularly covers healthcare services that are infrequently used. For instance, there were 3,456 patients waiting for heart transplants and 898 patients waiting for lung transplants in the United States in 2024.[57] Although these transplants are exceptionally rare,

---

[56] The data set covers "masked enrollee-level data submitted to EDGE servers by issuers of risk adjustment covered plans in the individual and small group (including merged) markets."

[57] Detailed Description of Data, Health Res. and Servs. Admin., https://tinyurl.com/m3nvrvzd (Last Accessed July. 16, 2025).

the vast majority of public and private insurance plans cover them, and transplants themselves are not excluded from EHBs. Similarly, most healthcare plans cover treatment for multiple sclerosis, which affects almost 1 million people in the United States, and major insurance providers also cover treatment for scleroderma, which impacts only around 300,000 Americans.[58]

220.    Furthermore, HHS has never before cited utilization as grounds for exclusion from EHB coverage, *see* 78 Fed. Reg. at 12,844-45 (excluding as EHBs limited category of services "because they are not typically included in medical plans offered by a typical employer"), *See* 89 Fed. Reg. 26,218, 26,342-26,349 (Apr. 15, 2024) (lifting exclusion of non-pediatric dental benefits from EHBs because services typically covered in employer plans, action would promote State flexibility and promote health outcomes and equity). This is for good reason. Medical care should not be denied simply because a need is not overly common. Indeed, even within the Final Rule itself, low utilization is not consistently grounds for exclusion from EHB coverage.

221.    The Final Rule itself also does not consistently apply utilization as a ground for exclusion of care.   The Final Rule explicitly excepts hormone therapy for the treatment of precocious puberty, which affects a smaller percentage of the population than individuals who seek hormone therapy for the treatment of gender dysphoria as a ground for exclusion of care.[59]

---

[58] Natl. Scleroderma Found., *Who Gets Scleroderma?*, https://tinyurl.com/3ap44hk9 (Last Accessed July 16, 2025.
[59] Precocious puberty affects between 0.0001 and 0.0002 percent (1 in 5-10,000) of adolescents in the U.S. population, predominantly girls, whereas 1.4 percent of adolescents identify as transgender. Eunice Kennedy Shriver National Institute of Child Health and Human Development, *How Many Children are Affected by/at risk of Precocious Puberty?*, https://www.nichd.nih.gov/health/topics/puberty/conditioninfo/risk (Last Accessed July 16, 2025); *see also*, Ahmed Alghamdi, *Precocious Puberty Types, Pathogenesis and Updated Management*, Cureus (Oct. 22, 2023), https://pmc.ncbi.nlm.nih.gov/articles/PMC10663169/ (Last Accessed July 16, 2025).; UCLA School of Law Williams Institute, *How Many Adults and Youth Identify as Transgender in the United States?* (June 2022), https://williamsinstitute.law.ucla.edu/publications/trans-adults-united-states/ (Last Accessed July 16, 2025).

222.     The fact that a condition only impacts a subset of the general population is not, in and of itself, a sufficient reason to exclude it from inclusion in EHBs.[60] Thus, even if gender-affirming care coverage were infrequently utilized, the usage rate alone would not be a reason to exclude the care from EHBs.

223.     A low number of claims in EDGE data is also not surprising given that transgender people make up a small proportion of the population. Indeed, only an estimated 0.6% of U.S. residents, or over 2 million Americans, experience gender dysphoria.[61] Of those who experience gender dysphoria, treatment is individualized, and not all items or services may be medically necessary, prescribed, or otherwise recommended for a given individual based on standards of care.

224.     Ultimately, because HHS failed to consider evidence and incorrectly dismissed gender-affirming care as not being covered by "typical" employer plans, the decision to exclude gender-affirming care from EHBs is arbitrary and capricious.

### C. Gender-Affirming Care to Treat Gender Dysphoria Is Medically Necessary

225.     Gender-affirming care is critical healthcare that people rely on.

226.     Gender identity refers to a person's internal sense of belonging to a particular gender.

227.     An individual's gender identity often aligns with their sex assigned at birth.

228.     Transgender people have a gender identity that varies from their sex assigned at birth.  For some transgender people, the incongruence between their gender identity and sex assigned at birth can cause clinically significant distress, recognized by the American Psychiatric

---

[60] Gender dysphoria, for instance, does not even meet the requirements of a "rare" condition, which would typically require that it impact fewer than 200,000 Americans.

[61] Danyon Anderson et al., *Gender Dysphoria and Its Non-Surgical and Surgical Treatments*, 10 Health Psychology Res. (Sept. 2022), https://tinyurl.com/tvnvukzw.

Association's *Diagnostic & Statistical Manual of Mental Disorders, Fifth Edition, Text Revision* ("DSM-5-TR") as "gender dysphoria."[62]

229.    Gender dysphoria is a serious medical condition.  Treatment for gender dysphoria is medically necessary and aims to resolve the distress associated with the incongruence between a transgender person's assigned sex at birth and their gender identity.[63]

230.    Left untreated, gender dysphoria can cause clinically significant distress and may result in "symptoms of depression and anxiety, substance use disorders, a negative sense of well-being and poor self-esteem, and an increased risk of self-harm and suicidality."[64]

231.    Around 300,000 minors between the ages of 13 and 17 and 1.3 million adults identify as transgender and approximately 1.2 million people in the U.S. identify as nonbinary.[65] Though there are overlapping populations within these gender diverse groups, it is clear that millions of Americans need access to gender-affirming care. Gender dysphoria can be treated with social and medical interventions. Medical interventions include surgery, prescription medications such as puberty-delaying medication and hormone treatment, and other forms of treatment—typically referred to collectively as "gender-affirming care."[66]

---

[62] Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 513-14 (5th ed., text rev. 2022).

[63] *Id.*

[64] *Id.*

[65] Press Release, UCLA Williams Inst., New Estimates Show 300,000 Youth Ages 13-17 Identify as Transgender in the U.S. (June 10, 2022), https://tinyurl.com/4h3wdp77p Press Release, UCLA Williams Inst., 1.2 Million LGBTQ Adults in the U.S. Identify as Nonbinary (June 22, 2021), https://tinyurl.com/vbwr387f.

295 Rebecca Boone & Jeff McMillan, How Many Transgender and Intersex People Live in the U.S.? Anti-LGBTQ+ Laws Will Impact Millions, Associated Press (July 27, 2023), https://tinyurl.com/mvbe6xk8.

[66] Patrick Boyle, *What is gender-affirming care? Your questions answered*, Am. Ass'n Med. Coll. (Apr. 12, 2022), https://www.aamc.org/news/what-gender-affirming-care-your-questions-

232.    Major medical associations—including the American Medical Association, American Psychiatric Association, American College of Physicians, American Academy of Pediatrics, American Academy of Child and Adolescent Psychiatry, American Academy of Family Physicians, and the American College of Obstetricians and Gynecologists—recognize that "[g]ender-affirming care has consistently been shown to improve quality of life, improve health outcomes, and reduce rates of SI and SAs."[67]

233.    There is overwhelming medical evidence that gender-affirming care improves the symptoms of gender dysphoria, and that denying such care can have tragic consequences for transgender individuals' physical and mental well-being.

234.    Medically necessary treatment for gender dysphoria is essential healthcare, and prohibitions on this medical care are a "dangerous intrusion into the practice of medicine" and violate the "sanctity of the patient-physician relationship."[68]

## THE FINAL RULE HARMS THE STATES

235.    Nearly every marketplace change implemented by the Final Rule will be harmful to individual consumers and state and local governments. And the cumulative effects of these changes—coupled with the expiring enhanced APTCs—will be catastrophic. The Final Rule

---

answered#:~:text=Gender%2Daffirming%20care%2C%20as%20defined,they%20were%20assigned%20at%20birth (Last Accessed July 16, 2025).

[67] Nita Bhatt, Jesse Cannella, & Julie P. Gentile, *Gender-affirming Care for Transgender Patients*, 19 Innovations Clinical Neuroscience 23, 23 – 31 (2022) https://pubmed.ncbi.nlm.nih.gov/35958971/; *see also* Medical Association Statements in Support of Health Care for Transgender People and Youth, GLAAD (June 26, 2024), https://tinyurl.com/2thfbh4m; Moira Szilagyi, *Why We Stand Up for Transgender Children and Teens*, Am. Acad. of Pediatrics Voices Blog (Aug. 10, 2022), https://tinyurl.com/4v7m9b72(Last Accessed July 16, 2025).

[68] Press Release, Am. Med. Ass'n, *AMA To States: Stop Interfering in Health Care of Transgender Children* (Apr. 26, 2021), https://www.ama-assn.org/press-center/press-releases/ama-states-stop-interfering-health-care-transgender-children (Last Accessed July 16, 2025).

imposes burdensome and costly paperwork requirements, limits the opportunities to sign up for health coverage, diminishes the actuarial value of coverage for those who still manage to procure coverage, substantially increases cost-sharing limits, and forces exchanges and consumers to spend hundreds of millions of dollars to prove eligibility for coverage and subsidies. These changes will result in direct and immediate costs to States as well as harms tied to decreased enrollment.

236.    *First*, the Final Rule correctly acknowledges that it will "result in costs to State Exchanges and the Federal Government to update eligibility systems in accordance with this policy." Rule at 27,193. As open enrollment for benefit year 2026 begins in less than four months, Plaintiff States that operate their own ACA exchange are *already* incurring and will continue to incur compliance costs. The changes made by the Final Rule require such States to implement changes to technology platforms, retrain their staff, update websites and publications, conduct advertising and outreach, and send notices to affected individuals. For example, in California there will be over $1.5 million in compliance costs that will be incurred as a result of the Final Rule. The Final Rule's exclusion of treatment for gender dysphoria from essential health benefits further requires SBEs to work with carriers to review revised health plans and develop cost-defrayal mechanisms on an expedited basis. Even if the Final Rule is later enjoined after it has become effective, Plaintiff States will not be able to recover these costs, and indeed would incur additional costs to revert to the pre-Final Rule status quo.

237.    *Second*, the Final Rule will also reduce the specific revenue streams from the assessments levied on the payment of insurance premiums by many Plaintiff States. As the Final Rule acknowledges, once it becomes effective, up to 1.8 million people, many of whom reside in Plaintiff States, will immediately lose access to health insurance coverage. Rule at 27,213. Plaintiff States with SBEs and State exchanges based on the federal platform have assessed millions of

dollars in fees tied directly to insurance premiums paid by individuals who were allowed to access insurance through ACA exchanges. As one example, California's state-run exchange, Covered California, generates revenue because insurance carriers pay a 2.25% fee on the total monthly premium collected for each health benefits plan sold through the individual exchange and a 5.2% fee for each plan sold through California's small business exchange. Altman Decl. ¶ 8. The Final Rule will deprive the States of the revenues generated by these premiums. Moreover, this population of newly-uninsured individuals now has only six months to secure alternative coverage, assuming any affordable coverage remains available. Any individuals who cannot secure coverage will be foreclosed from enrolling in exchange plans for all of plan year 2026, and a subsequent ruling will not be able to reinstate it or restore the associated lost revenue.

238.    *Third*, the Final Rule imposes on Plaintiff States increased expenses for providing medical care to individuals who lose insurance due to these changes. State Medicaid expenditures will only balloon as people who lose subsidized marketplace coverage turn to publicly funded healthcare as a backstop. And for those individuals who become uninsured, Plaintiff States will incur substantial costs for their care, including millions annually in unreimbursed costs for the care of uninsured residents at public hospitals and hundreds of millions in annual subsidies to defray the cost of health care services that are provided to uninsured residents. The Final Rule expressly acknowledges these harms. *See, e.g.,* Rule at 27,213 ("An individual who loses coverage may be required to incur additional expense to obtain coverage or may go uninsured. An increase in the rate of uninsurance may impose greater burdens on the health care system through strain on emergency departments, additional costs to the Federal Government and to States to provide limited Medicaid coverage for the treatment of an emergency medical condition").

239.    These costs include subsidies for preventive or emergency care services for uninsured residents. One example is New Jersey's Uncompensated Care Fund, which subsidizes preventive health services for uninsured residents by paying a flat rate from State funds per visit ($114 per visit for primary and dental care, and $74 per visit for mental health services). For this program, and similar programs across Plaintiff States, the greater the number of uninsured residents, the more the State spends on health care for uninsured individuals. Moreover, because these state-operated programs do not defray all costs of uncompensated care, state-owned hospitals also incur significant costs in providing services to uninsured patients.

240.    *Fourth*, Plaintiff States face increased costs resulting from the adverse health outcomes that predictably follow from newly-uninsured individuals foregoing preventive or emergency health care absent affordable insurance. Just a year ago, HHS acknowledged that "[i]ndividuals without health insurance are less likely to receive preventive or routine health screenings and may delay necessary medical care, incurring high costs and debts," and that such "[d]elays in care can lead to negative health outcomes including longer hospital stays and increased mortality." 89 Fed. Reg. at 39,396. Loss of insurance can also result in increased medical debt, reduced spending power, lost work productivity, and absenteeism—as uninsured individuals, less likely to seek preventive care, are more likely to get sick and miss work. *See* 89 Fed. Reg. at 39,396. Moreover, individuals who have recently initiated a time-sensitive course of treatment they were previously delaying, such as chemotherapy, will now have to decide whether to continue such treatment and pay out-of-pocket, or to interrupt treatment and risk significant adverse health consequences.

241.    *Fifth*, the Final Rule acknowledges some of its changes "may deter enrollments among younger people at higher rates, which could worsen the risk pool and increase premiums."

Rule at 27,203. The changes that HHS acknowledges will deteriorate risk pools include shortening the Open Enrollment Period by thirty percent or more in some States, imposing an unlawful $5 charge on all automatic re-enrollees, the barriers to coverage that will be imposed by the new SEP verification requirements on the Federal Exchange, ending self-attestation for low-income consumers, allowing insurers to deny coverage for those who owe past-due premiums, and expanding the acceptable actuarial value ranges for health plans. Rule at 27,201-16; 27,145-48.

242.    And *sixth*, the Final Rule causing up to 1.8 million people to lose insurance coverage will increase the risk and magnitude of disease outbreaks and thus place a greater strain on hospitals due to the nature of communicable diseases. *See e.g.*, Travis Campbell et al., Exacerbation of COVID-19 mortality by the fragmented United States healthcare system, *The Lancet Regional Health* (May 12, 2022), https://tinyurl.com/mr26zt3r (finding that "insurance gaps exacerbated local COVID-19 outbreaks and resulted in more cases, hospitalization, and death than experienced by jurisdictions with better coverage"). And because uninsured individuals are less likely to have access to regular outpatient care—leading to greater rates of hospitalization for longer periods, *see* 89 Fed. Reg. at 39,396—smaller communities with fewer resources to address higher hospitalization rates will feel the strain most acutely. *See* Jennifer Tolbert et al., Key Facts about the Uninsured Population, Kaiser Family Foundation (Dec. 18, 2023), https://tinyurl.com/2s3jmmbm ("[h]igh uninsured rates contribute to rural hospital closures and greater financial challenges for rural hospitals, leaving individuals living in rural areas at an even greater disadvantage to accessing care").

243.    The result of the implementation of the Final Rule's provisions is that millions of Americans will lose health coverage. Those who maintain coverage will pay higher premiums for diminished coverage and will spend more on out-of-pocket costs to use that coverage (in the form

of co-pays and deductibles). And when these newly uninsured individuals need healthcare—as everyone eventually will—the States will bear the cost. State and local governments will pay for the dramatic increase in uncompensated care costs for individuals who become uninsured as a result of the Final Rule. State Medicaid expenditures will balloon as people who lose their subsidized marketplace coverage will turn to publicly funded healthcare as a backstop. And States will lose tax revenue derived from insurance premiums no longer paid by those who have dropped or lost coverage as a result of these changes.

244.    The Final Rule's exclusion of treatment for gender dysphoria as an EHB will result in additional harms to Plaintiff States.

245.    As detailed above, whether gender-affirming care is included as an EHB has long been for individual states to decide. Indeed, states historically have enjoyed the authority to refine EHB requirements within statutory parameters since the Affordable Care Act was passed.

246.    Prior to the issuance of this Final Rule, HHS has not interfered with a state's power by imposing a nationwide ban on EHB coverage for treatment for transgender people.

247.    To the contrary, in 2021, HHS affirmatively approved a change to Colorado's state benchmark plan to explicitly standardize and clarify the coverage of gender-affirming care as an EHB. As a result, many states have administered their marketplaces and benchmark plans with the expectation that employer healthcare plans would cover gender-affirming care as an EHB, and employers followed suit.

248.    A variety of states, including many Plaintiff States prohibit insurers from excluding or denying coverage and claims based on a consumer's gender identity through non-discrimination laws. If treatments for transgender people are reclassified under the Final Rule, these consumers would lose ACA protections such as annual out-of-pocket maximum limits and prohibitions on

lifetime or annual coverage caps, thereby creating substantial financial barriers for transgender individuals seeking medically necessary care.

249.    Transgender and gender non-conforming individuals face significant barriers to accessing healthcare and the Final Rule will only exacerbate accessibility and affordability concerns expressed by these populations in Plaintiff States, despite efforts to protect such care.[69]

250.    In sum, the Final Rule, if allowed to stand, will work direct and substantial injuries to Plaintiff States and their residents.

## FIRST CAUSE OF ACTION

### Administrative Procedure Act – 5 U.S.C. § 706(2)(D)
### Agency Action Without Observance of Procedure Required by Law

251.    Plaintiff States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

252.    The APA requires agencies to provide public notice and an opportunity to be heard before promulgating a regulation. 5 U.S.C. § 553(c). The APA provides that a court "shall . . . hold unlawful and set aside agency action" that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

253.    Defendants violated the APA by providing the public with less than 30 days to comment on the proposed rule. The Final Rule's 30-day comment period was inadequate to give interested persons a meaningful opportunity to participate in light of the number of changes

---

[69]    https://publichealth.jhu.edu/2024/study-reveals-significant-barriers-for-tgnc-adults-accessing-healthcare-in-the-us

proposed by the Proposed Rule, a complicated, multifaceted rule spanning 90 pages in the Federal Register.

254.    Notice and comment is particularly important in legally and factually complex circumstances like those presented here. Notice and comment allows affected parties—including states—to explain the practical effects of a rule before it is implemented, and ensures that the agency proceeds in a fully informed manner, exploring alternative, less harmful approaches.

255.    Defendants have not and cannot demonstrate good cause for providing an inadequate notice and comment period. The Final Rule is therefore procedurally invalid and should be set aside under the APA.

256.    The Final Rule will cause harm to Plaintiff States and their residents.

### SECOND CAUSE OF ACTION

**Administrative Procedure Act – 5 U.S.C. § 706(2)(A)**
**Arbitrary and Capricious Agency Action–Marketplace Integrity**

257.    Plaintiff States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

258.    The Final Rule is a "final agency action for which there is no other adequate remedy in a court" and is subject to judicial review. 5 U.S.C. § 704.

259.    The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

260.    As discussed above, Defendants failed to provide adequate reasons for numerous changes that they imposed, nor did they meaningfully respond to comments about those proposed changes. The following changes were not "reasonable and reasonably explained" and should be vacated as arbitrary and capricious under section 706(2)(A):

a.  The $5 premium penalty on automatic re-enrollees in the Final Rule's addition of 45 C.F.R. § 155.335(a)(3) and (n);

b.  The shortening of the open enrollment period in the Final Rule's amendments to 45 C.F.R. § 155.410(e) and (f);

c.  The Final Rule's requirement that states utilizing the federal exchange conduct pre-enrollment eligibility verification for at least 75% of Special Enrollment Periods triggered by a major live event, pursuant to 45 C.F.R. § 155.420(g);

d.  The Final Rule's requirement that a data-matching issue be generated if either existing federal tax data shows a lower income than an enrollee's projected annual household income at or above 100% of the federal poverty level, or if there is no federal tax available, effective as of August 25, 2025, pursuant to 45 C.F.R. § 155.320(c)(3)(iii), (5);

e.  The failure to reconcile (FTR) policy in 45 C.F.R. § 155.305(f), including the Final Rule's amendments to 45 C.F.R. § 155.305(f)(4);

f.  The Final Rule's revocation of guaranteed insurance coverage for individuals with past-due premiums, effective August 25, 2025, pursuant to 45 C.F.R. § 147.104(i);

g.  The Final Rule's change to the premium adjustment percentage methodology, effective as of plan year 2026, pursuant to 45 C.F.R. § 156.130(e); and

h.  The Final Rule's revisions to the de minimis ranges for actuarial value calculations in the Final Rule's amendments to 45 C.F.R. §§ 156.140(c), 156.200(b)(3), and 156.400.

261.    Defendants' issuance of the Final Rule is therefore arbitrary or capricious. Pursuant to 5 U.S.C. § 706(2)(A), Plaintiff States are entitled to an order vacating the Final Rule and declaratory and injunctive relief against Defendants taking any action to implement the Final Rule.

262.    The Final Rule will cause harm to Plaintiff States and their residents.

### THIRD CAUSE OF ACTION

**Administrative Procedure Act – 5 U.S.C. § 706(2)(A)**
**Arbitrary and Capricious Agency Action–Exclusion of Treatment for Gender Dysphoria**

263.    Plaintiff States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

264.    The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

265.    To date, Defendants explicitly prohibited EHB coverage for only a limited number of services: abortion, non-pediatric dental or eye exam services, long-term nursing care, and non-medically necessary orthodontia.  However, even for those services, an EHB plan may cover them should a state so choose. For example, non-pediatric dental care, which cannot be required to be covered as an EHB, is permitted to be covered as part of an EHB benchmark plan should a state choose to do so.

266.    The Defendants have not sufficiently justified why what they refer to as "sex-trait modification procedures" should be treated similarly to those other services explicitly excluded, as opposed to the litany of services that are covered as EHBs under law, and none of the purported justifications provided meet the appropriate standard.

267.    Defendants' exclusion of medically necessary treatment for gender dysphoria from EHBs is arbitrary and capricious because this care is often covered by employer-sponsored health

plans.  As described above, Defendants failed to fully consider national and state-specific data which demonstrates that coverage for treatment for gender dysphoria is "typical" as is required under the statute.

268.    Further, Defendants' decision is arbitrary and capricious for the additional reason that the rate of utilization of a particular healthcare benefit is not an appropriate standard for exclusion from EHBs and has not previously been used to deny EHB inclusion.

269.    Defendants' decision is arbitrary and capricious for the additional reason that it does not accommodate or acknowledge important reliance interests around coverage for the health needs of transgender people due to the preexisting federal regulatory environment.

270.    The Defendants are "not writing on a blank slate" here.  See *Regents*, 591 U.S. at 33 (where agency was "not writing on a blank slate, it was required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns") (cleaned up). States have enjoyed the authority to refine EHB requirements within statutory parameters since the ACA was passed; and the Defendants have never before sought to interfere with that authority by imposing a nation-wide ban on EHB coverage for treatment for gender dysphoria. Far from it, in 2021, the Defendants affirmatively approved a state benchmark plan that explicitly identified that care as an EHB.

271.    As a result, many States have administered their marketplaces and benchmark plans with the expectation that healthcare plans would cover gender-affirming care as an EHB; and insurers followed suit.

272.    States that continue to mandate coverage for the medically necessary treatment of gender dysphoria—through their State non-discrimination laws or otherwise—are suddenly required to absorb the associated defrayal costs under the Proposed Rule at 12,987.

273.    The Final Rule will cause harm to Plaintiff States and their residents.

## FOURTH CAUSE OF ACTION

### Administrative Procedure Act – 5 U.S.C. § 706(2)(C)
### Agency Action That Is In Excess Of Statutory Authority–Marketplace Integrity

274.    Plaintiff States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

275.    The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

276.    The Final Rule is a "final agency action for which there is no other adequate remedy in a court" and is "subject to judicial review." 5 U.S.C. § 704.

277.    Several of the Final Rule's provisions violate the ACA and other federal statutes and regulations and therefore are "in excess of statutory jurisdiction" or "otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), (C). These include:

a.    The $5 premium penalty on automatic re-enrollees in the Final Rule's addition of 45 C.F.R. § 155.335(a)(3) and (n) is contrary to 42 U.S.C. §§ 18081 and 18082, as the statutes provide no authority for the Secretary to set APTC amounts, withhold APTCs, or require consumers to pay an arbitrary amount in pre-APTC premiums;

b.    The revocation of guaranteed insurance coverage for individuals with past due premiums in the 2025 Rule's amendment to 45 C.F.R. § 147.104(i) is contrary to the requirement in 42 U.S.C. § 300gg-1 that "each health insurance issuer that offers health insurance coverage in the individual or group market in a State must accept every employer and individual in the state that applies for such coverage,"

subject to exceptions not applicable here, 42 U.S.C. § 300gg-1(a), and the guaranteed renewability requirement in 42 U.S.C. § 300gg-2(a).

278.    The Final Rule will cause harm to Plaintiff States and their residents.

## FIFTH CAUSE OF ACTION

### Administrative Procedure Act – 5 U.S.C. § 706(2)(C)
### Agency Action That Is In Excess Of Statutory Authority–Exclusion of Treatment for Gender Dysphoria

279.    Plaintiff States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

280.    The APA provides that a court "shall . . . hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

281.    The HHS Secretary must ensure that the scope of EHBs "is equal to the scope of benefits provided under a typical employer plan." 42 U.S.C. § 18022(b)(2)(A). To determine typicality, the ACA requires the Labor Secretary to conduct a survey of employer-sponsored coverage "to determine the benefits typically covered by employers." 42 U.S.C. § 18022(b)(2)(A).

282.    Defendants violated the APA by failing to conduct a survey of employer-sponsored coverage to "determine the benefits typically covered by employers." 42 U.S.C. § 18022(b)(2)(A).

283.    Further, the ACA mandates that in "revising [EHB] the Secretary shall submit a report to the appropriate committees of Congress." based on "a survey of employer-sponsored coverage." 42 U.S.C. § 18022(a)(2).

284.    Defendants violated the APA by failing to submit such a report to Congress during its revisions of EHB coverage nationwide.  The Final Rule contains no mention of such a report.

285.    The Final Rule will cause harm to Plaintiff States and their residents.

## SIXTH CAUSE OF ACTION

### *Ultra Vires* Agency Action Not Authorized by Congress

286.    Plaintiff States reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

287.    An executive agency "has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).

288.    Defendants may exercise only that authority which is conferred by statute. *See City of Arlington v. FCC*, 569 U.S. 290, 297 (2013) (federal agencies' "power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly, no less than when they act beyond their jurisdiction, what they do is ultra vires").

289.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015). Indeed, the Supreme Court has repeatedly allowed equitable relief against federal officials who act "beyond th[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

290.    Defendants lack the statutory authority to impose the following measures in the Final Rule: (1) The $5 premium penalty on automatic re-enrollees in the Final Rule's addition of 45 C.F.R. § 155.335(a)(3) and (n) which is contrary to 42 U.S.C. §§ 18081 and 18082; (2) the revocation of guaranteed insurance coverage for individuals with past due premiums in the Final Rule's amendment to 45 C.F.R. § 147.104(i) which is contrary to the requirement in 42 U.S.C. § 300gg-1; (3) excluding "sex-trait modification" as an EHB without conducting a survey of employer-sponsored coverage to "determine the benefits typically covered by employers," 42 U.S.C. § 18022(b)(2)(A) and submitting a report to the appropriate committees of Congress based on that "survey of employer-sponsored coverage." 42 U.S.C. § 18022(a)(2).

291.    No provision of the ACA or any other statute authorizes the agency to impose these measures. Indeed, the plain text of the ACA precludes their imposition.

292.    In imposing these measures through the Final Rule, Defendants exceeded the statutory authority granted to HHS and CMS by Congress. These measures are therefore ultra vires executive agency actions.

293.    The Final Rule will cause harm to Plaintiff States and their residents.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff States pray that the Court:

a.    Postpone the effective date of the challenged provisions of Final Rule, as to Plaintiff States, pending judicial review;

b.    Declare that the Final Rule violates the laws of the United States;

c.    Declare that the Final Rule violates the Administrative Procedure Act;

d.    Preliminarily and permanently enjoin Defendants from implementing or enforcing the challenged provisions of the Final Rule as to Plaintiff States;

e.    Vacate the Final Rule; and

f.    Award such additional relief as the interests of justice may require.

July 17, 2025

Respectfully submitted,

**ANDREA JOY CAMPBELL**
Attorney General
Commonwealth of Massachusetts

*/s/ Allyson Slater*
ALLYSON SLATER (BBO No. 704545)
Director, Reproductive Justice Unit
Office of the Attorney General
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2811
Allyson.slater@mass.gov
*Attorneys for Plaintiff Commonwealth of Massachusetts*

**MATTHEW J. PLATKIN**
Attorney General
State of New Jersey

*/s/ Mayur P. Saxena*
JEREMY M. FEIGENBAUM*
Solicitor General
MAYUR P. SAXENA*
Assistant Attorney General
JOSHUA P. BOHN*
MONICA E. FINKE*
BASSAM F. GERGI*
VIVIANA M. HANLEY
BRYCE K. HURST*
AMANDA I. MOREJÓN
MEGHAN K. MUSSO*
ESTEFANIA PUGLIESE-SAVILLE *
Deputy Attorneys General
Office of the Attorney General
25 Market Street
Trenton, NJ 08625
(609) 969-5365
Mayur.Saxena@law.njoag.gov
*Attorneys for Plaintiff State of New Jersey*

**ROB BONTA**
Attorney General
State of California

*/s/ Sean C. McGuire*
SEAN C. MCGUIRE*
Deputy Attorney General
NELI PALMA*
Senior Assistant Attorney General
KATHLEEN BOERGERS*
Supervising Deputy Attorney General
NIMROD PITSKER ELIAS*
CRYSTAL ADAMS*
HILARY BURKE CHAN*
*Deputy Attorneys General*
600 West Broadway, Suite 1800
San Diego, CA 92101
(619) 738-9543
Sean.McGuire@doj.ca.gov
*Attorneys for Plaintiff State of California*

**KRISTIN K. MAYES**
Attorney General
State of Arizona

*/s/ Joshua Nomkin*
JOSHUA NOMKIN*
LAUREN WATFORD*
Office of the Attorney General
2005 North Central Avenue
Phoenix, Arizona 85004
(602) 542-3333
Joshua.Nomkin@azag.gov
Lauren.Watford@azag.gov
*Attorneys for Plaintiff State of Arizona*

**PHILIP J. WEISER**
Attorney General
State of Colorado

*/s/ David Moskowitz*
DAVID MOSKOWITZ*
Deputy Solicitor General
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203
Phone: (720) 508-6000
david.moskowitz@coag.gov
*Attorneys for Plaintiff State of Colorado*

**KATHLEEN JENNINGS**
Attorney General
State of Delaware

*/s/ Vanessa L. Kassab*
IAN R. LISTON*
Director of Impact Litigation
VANESSA L. KASSAB*
DAVID WEINSTEIN*
Deputy Attorneys General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov
*Attorneys for Plaintiff State of Delaware*

**AARON M. FREY**
Attorney General
State of Maine

*/s/ Lauren LaRochelle*
LAUREN LAROCHELLE*
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
Tel.: 207-626-8800
Lauren.LaRochelle@maine.gov
*Attorneys for Plaintiff State of Maine*

**WILLIAM TONG**
Attorney General
State of Connecticut

*/s/ Janelle Medeiros*
JANELLE MEDEIROS*
Special Counsel for Civil Rights
165 Capitol Ave
Hartford, CT 06106
(860) 808-5450
Janelle.Medeiros@ct.gov
*Attorneys for Plaintiff State of Connecticut*

**KWAME RAOUL**
Attorney General
State of Illinois

*/s/ Alice L. Riechers*
SARAH J. NORTH*
*Deputy Chief, Public Interest Division*
ALICE L. RIECHERS*
*Assistant Attorney General, Special Litigation Bureau*
Office of the Illinois Attorney General
115 S. LaSalle Street
Chicago, IL 60603
312-814-3000
Sarah.North@ilag.gov
Alice.Riechers@ilag.gov
*Attorneys for Plaintiff State of Illinois*

**ANTHONY G. BROWN**
Attorney General
State of Maryland

*/s Michael Drezner*
MICHAEL DREZNER*
Senior Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6959
Mdrezner@oag.state.md.us
*Attorneys for Plaintiff State of Maryland*

**DANA NESSEL**
Attorney General
State of Michigan

*/s/ Carl Hammaker*
CARL HAMMAKER (P81203)*
AARON LEVIN (P81310)*
Assistant Attorneys General
Michigan Department of Attorney General
525 W. Ottawa St.
Lansing, MI 48933-1067
517.335.7573
hammakerc@michigan.gov
levina@michigan.gov
*Attorneys for Plaintiff State of Michigan*

**RAÚL TORREZ**
Attorney General
State of New Mexico

*/s/ Aletheia V.P. Allen*
ALETHEIA V.P. ALLEN*
Solicitor General
LAWRENCE M. MARCUS*
Assistant Solicitor General
New Mexico Department of Justice
201 Third St. NW, Suite 300
Albuquerque, NM 87102
505-527-2776
aallen@nmdoj.gov
*Attorneys for Plaintiff State of New Mexico*

**LETITIA JAMES**
Attorney General
State of New York

*/s/ Stephen Thompson*
STEPHEN C. THOMPSON*
Special Counsel
ANDRES IVAN NAVEDO*
Assistant Attorney General
28 Liberty Street
New York, NY 10005
(212) 416-6183
stephen.thompson@ag.ny.gov
*Attorneys for Plaintiff State of New York*

**KEITH ELLISON**
Attorney General
State of Minnesota

*/s/ Lindsey E. Middlecamp*
LINDSEY E. MIDDLECAMP*
Special Counsel, Rule of Law
445 Minnesota Street, Suite 600
St. Paul, Minnesota, 55101
(651) 300-0711
Lindsey.middlecamp@ag.state.mn.us
*Attorneys for Plaintiff State of Minnesota*

**AARON D. FORD**
Attorney General
State of Nevada

*/s/ Heidi Parry Stern*
HEIDI PARRY STERN (Bar. No. 8873)
Solicitor General
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
HStern@ag.nv.gov
*Attorneys for Plaintiff State of Nevada*

**DAN RAYFIELD**
Attorney General
State of Oregon

*/s/ Scott P. Kennedy*
SCOTT P. KENNEDY*
Senior Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel (971) 453-9050
Fax (971) 673-5000
Scott.Kennedy@doj.oregon.gov
*Attorneys for Plaintiff State of Oregon*

**JOSH SHAPIRO**
in his official capacity as Governor of the
Commonwealth of Pennsylvania

JENNIFER SELBER
General Counsel

*/s/ Aimee D. Thomson*
AIMEE D. THOMSON*
Deputy General Counsel
Pennsylvania Office of the Governor
30 N. 3rd St., Suite 200
Harrisburg, PA 17101
(223) 234-4986
aimeethomson@pa.gov
*Counsel for Governor Josh Shapiro*

**CHARITY R. CLARK**
Attorney General
State of Vermont

*/s/ Jonathan T. Rose*
JONATHAN T. ROSE*
Solicitor General
109 State Street
Montpelier, VT 05609
(802) 828-3171
Jonathan.rose@vermont.gov
*Attorneys for Plaintiff State of Vermont*

**JOSHUA L. KAUL**
Attorney General
State of Wisconsin

*/s/ Jody J. Schmelzer*
JODY J. SCHMELZER*
Assistant Attorney General
Wisconsin Department of Justice
17 West Main Street
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-3094
jody.schmelzer@wisdoj.gov
*Attorneys for Plaintiff State of Wisconsin*

**PETER F. NERONHA**
Attorney General
State of Rhode Island

*/s/ Julia Harvey*
JULIA HARVEY (RI Bar No. 10529)*
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2103
jharvey@riag.ri.gov
*Attorneys for Plaintiff State of Rhode Island*

**NICHOLAS W. BROWN**
Attorney General
State of Washington

*/s/ William McGinty*
WILLIAM MCGINTY, WSBA 41868*
Deputy Solicitor General
1125 Washington Street SE
PO Box 40100
Olympia, WA  98504-0100
William.McGinty@atg.wa.gov
360-709-6027
*Attorneys for Plaintiff State of Washington*

*Application for pro hac vice admission forthcoming*