

April 11, 2025

Dr. Mehmet Oz, Administrator
Centers for Medicare & Medicaid Services
Department of Health and Human Services
Attention: CMS–9884–P
P.O. Box 8016
Baltimore, MD 21244-8016

Subject: Patient Protection and Affordable Care Act; Marketplace Integrity and Affordability (RIN 0938-AV61)

Dear Administrator Oz,

Covered California welcomes the opportunity to offer the following insights in response to the U.S. Department of Health and Human Services, Centers for Medicare & Medicaid Services (CMS) proposed rule regarding marketplace integrity and affordability under the Patient Protection and Affordable Care Act (ACA).

Since Covered California launched in 2014, more than 6.3 million Californians, or about one in six, have had health insurance through the marketplace at one point in their lives. Additionally, the state's uninsured rate has fallen from 17.2 percent in 2014 to 6.4 percent in 2023, the largest percentage-point drop for any state in the nation during the ACA era.[1] With record-breaking enrollment of nearly 2 million Californians this past open enrollment, Covered California offers a competitive market, a robust risk pool, and high-quality health plan options as we proudly continue to deliver on the promise of the ACA to make sure all individuals have access to quality, affordable health coverage.

As we have made healthcare a reality for more Californians than ever before, our success is, in large part, due to our ability to implement innovative strategies that work best for California's unique needs. Through state flexibility and a deep understanding of our market, we have pioneered groundbreaking policies to make it easier for consumers to enroll in more generous plans at lower or no additional cost, expand financial assistance available with enhanced premium subsidies and cost-sharing reductions (CSRs), and implement robust fraud oversight and enforcement standards to effectively

---

[1] Covered California. (2025, March 25). With Record High Enrollment Covered California Celebrates the 15th Anniversary of the Historic Affordable Care Act. https://www.coveredca.com/newsroom/news-releases/2025/03/24/with-record-high-enrollment-covered-california-celebrates-the-15th-anniversary-of-the-historic-affordable-care-act/.

**COVERED CALIFORNIA**™   1601 EXPOSITION BOULEVARD, SACRAMENTO, CA 95815   WWW.COVEREDCA.COM

**BOARD MEMBERS**   Kim Johnson, Chair   Mayra Alvarez   Jerry Fleming   Sumi Sousa   **EXEC. DIR.**   Jessica Altman

April 11, 2025
Page 2

safeguard consumers from improper enrollments and hold agents and brokers accountable. This has enabled us to experience incredibly low instances of fraud, maintain one of the healthiest risk mixes in the country, and reduce administrative and financial barriers to coverage for those who need it most. It has also allowed us to uphold California's core values as a state to safeguard the rights of all communities, empowering individuals to lead healthier, happier lives.

This proposed rule is a marked departure from the traditional relationship between CMS and state-based marketplaces, now requiring state-based marketplaces to follow the same policies as the federal marketplace without robust explanation as to why such uniformity is necessary or beneficial. Covered California is deeply committed to program integrity and lauds CMS's efforts to identify and eliminate fraudulent activity on the federally facilitated marketplace. Covered California has continually invested in the integrity of our systems, and takes swift action if and when any improper activity is identified. As a result, Covered California does not have any indication of widespread fraud and abuse occurring in our market. In fact, a robust review of consumer complaints and enrollment partner activity in recent years did not reveal a single identified case of a consumer being enrolled in Covered California without their knowledge. These outcomes are largely because we have implemented tailored approaches that make sense for California's market and Covered California's systems, ensuring the over 14,000 enrollment partners we work with abide by the highest standards with comprehensive support and oversight. **With a one-size-fits-all solution to a problem that does not exist in California, we are concerned that the proposed changes would make it more difficult for eligible consumers to enroll in and pay for needed care while unnecessarily undermining the efficiency and stability of our marketplace operations.**

Drawing on our experience and shared commitment to upholding program integrity and strong consumer protections to best provide quality, affordable health coverage to all, we offer these recommendations on specific policies in the proposed rule related to eligibility criteria and enrollment opportunities, affordability and coverage, and compliance standards for agents, brokers, and web-based brokers.

### Eligibility Criteria and Enrollment Opportunities

*Shortened Open Enrollment Period (OEP)*

**Covered California strongly encourages CMS to maintain state flexibility in determining what OEP length works in our markets and meets the needs of our communities. In the absence of this flexibility, we urge CMS to allow states capable of initiating the OEP before November 1 to do so and extend the OEP through December 31 for coverage effective January 1.** For over ten years, Covered California has held its Open Enrollment Period (OEP) from November 1 through

January 31. Though CMS cites operational difficulties, consumer confusion, and increased risks of adverse selection as the need for a uniform, shortened OEP, our experience tells us that those would actually be the impacts of shortening the OEP in California.

Through close collaboration with our participating qualified health plan (QHP) issuers, enrollment partners, and community organizations, our consumers have grown very familiar with the January 31 deadline. Our enrollment partners already experience overwhelming demand during the OEP as they work around the clock to renew their existing customers and enroll new ones. Cutting the OEP in half would unnecessarily put significant strain on our enrollment partner workforce and potentially hinder their ability to reach and enroll. Further, our data and experience show that the longer OEP strengthens our risk pool and enhances overall market stability.

Specifically, as illustrated in Figure 1 below, our data shows that a significant portion of our enrollees opt into coverage after the proposed standardized cutoff date of December 15. In the past three OEP cycles, we have seen an average of 24 percent of our total enrollees make their health plan selections between December 15 and December 31. Moreover, the month of January has historically been a critical period for enrollment, with an average of 35 percent of enrollees securing their coverage during this time. In some years, the data indicates that nearly half of new enrollees chose their plans after December 15. Our data also indicates that enrollees who sign up later in the period tend to be healthier and younger, contributing positively to our risk pool and overall market health.[2]

**Figure 1: Distribution of Open Enrollment Plan Selections by Sign-Up Date**



---

[2] See slide 2. Covered California. (2025, Apr. 3). Data Snapshot: Covered California Open and Special Enrollment Periods. Covered California's 2024 Member Survey. https://hbex.coveredca.com/data-research/library/CoveredCA_OE_SEP_Data_Snapshot_20250403.pdf.

April 11, 2025
Page 4

Covered California's traditional OEP has proven effective and straightforward for our consumers, allowing them sufficient time to choose a plan that is right for them. Further, it has worked for our market, supporting both additional and healthier individuals to enroll, and has helped enhance the stability of our marketplace. Given the long-term stability of our OEP timeline, any change, and certainly one as significant as shortening the time period in half, risks mass consumer confusion and resulting instability in our marketplace.

Should CMS forego state flexibility with respect to continuing their OEP into January, we suggest that state-based marketplaces have other flexibilities as their infrastructure supports. Specifically, while the federally-facilitated marketplace and some state-based marketplaces can only support an enrollment deadline of December 15 for coverage effective January 1, Covered California and other state-based marketplaces that are able to enroll individuals through December 31 for coverage effective January 1 should be allowed to do so. Additionally, states should have the option to begin their OEP earlier than November 1.

*Pre-enrollment Verification for Special Enrollment Periods (SEPs)*

**Covered California recommends CMS maintain states' ability to customize SEP strategies that meet their specific needs, promoting healthy risk pools and reducing—not increasing—coverage barriers. At a minimum, we ask for sufficient time for states to implement these changes, considering the substantial costs and resources involved.** Supporting the ACA's broader goal of increasing and maintaining the insured population, SEPs serve the critical purpose of ensuring individuals and families who experience significant life changes are not left without coverage as they find themselves in new and often difficult circumstances. As SEPs promote continuous coverage and access to services, our data shows that these enrollments help maintain the stability and health of our marketplace.

Specifically, in California, the prospective risk scores for consumers enrolling during SEPs have been consistently equal to or lower than those during the OEP, even during years of flexible SEP policies and the implementation of enhanced federal premium tax credits (PTC). For example, in 2024, the prospective risk scores for both OEP and SEP enrollment were the same, at 0.96. In previous years, the trend of SEP enrollees presenting a lower or equal risk compared to their OEP counterparts has been consistent.[3]

Moreover, the demographic profile of SEP enrollees, particularly since 2019, skews younger than those enrolling during the OEP, contributing to a healthier risk pool

---

[3] See slide 4. Covered California. (2025, Apr. 3). Data Snapshot: Covered California Open and Special Enrollment Periods. Covered California's 2024 Member Survey. https://hbex.coveredca.com/data-research/library/CoveredCA_OE_SEP_Data_Snapshot_20250403.pdf.

overall.[4] Since 2019, the average age of consumers enrolling through special enrollment was 36.3 years, compared to 38.2 years for those enrolling during the OEP, and significantly lower than the combined average age of 42.1 years for the OEP and renewal populations.

Given the success of SEPs and lack of identified issues, the proposed requirement that consumers identify and submit documentation proving that they have experienced a qualifying life event would impose an unnecessary and substantial burden on consumers genuinely in need of coverage during major personal life changes. As CMS knows, with very limited real-time verification data sources, these additional SEP verifications will require largely manual processes. With CMS data showing that 27 percent of people are unable to meet the SEP documentation deadline, it is clear that these verification hurdles are significant. They particularly discourage younger, healthier people from enrolling, who are less likely to navigate complex paperwork during life changes. This could lead to fewer healthy individuals in the insurance pool, undermining its stability and driving up costs for everyone.

Beyond placing an undue burden on consumers without benefit to the risk pool, this proposal would impose a significant administrative and financial burden on marketplaces to implement, especially given the anticipated rapid timeline. The requirement to operationalize and finance the proposed thorough document verification processes, many needing manual intervention, would lead to unforeseen expenses, stretch pre-assigned budgets and planned system updates, and necessitate extra staffing—all within a very tight timeframe. We urge CMS to preserve the autonomy of states to tailor SEP enrollment strategies that best suit their needs, ensuring the sustainability of healthy risk pools and minimizing coverage obstacles, rather than creating new ones. At minimum, we request CMS to give states a reasonable amount of time to implement these changes given the significant cost and resources required to do so.

*Automatic reenrollment of eligible consumers from a bronze to a silver plan*

**Covered California recommends that CMS continue to allow states to implement innovative reenrollment policies that enhance affordability and value for consumers, simplifying the process in a clear and transparent way that still accommodates consumer choice.** Proudly leading the nation with our bronze-to-silver Affordability Crosswalk, which has been in place since 2022, Covered California transitions eligible enrollees to the Silver CSR variant of their current plan at renewal, specifically targeting individuals with incomes below 250 percent of the federal poverty

---

[4] See slide 5. Covered California. (2025, Apr. 3). Data Snapshot: Covered California Open and Special Enrollment Periods. Covered California's 2024 Member Survey. https://hbex.coveredca.com/data-research/library/CoveredCA_OE_SEP_Data_Snapshot_20250403.pdf.

April 11, 2025
Page 6

level (FPL), allowing them access to the same benefits and providers with equal or better value at the same or lower premium. Importantly, we inform consumers of the plan change and provide ample time for them to opt out of their "crosswalked" plan should they choose. We note that, for these consumers, there is no advantage to remaining in their current plan, as it provides the same network and providers with only higher costs. These Crosswalks have proven to be the most effective tool to maximize consumer value and do not in any way inhibit consumer choice.

Building on this success, Covered California expanded the policy to include transitions from Gold and Platinum to Silver 87 and 94 plans, respectively, as well as from Bronze plans to $0 Silver 73 and Silver 87 plans. This strategic expansion resulted in more than 34,000 consumers receiving a higher value plan at a lower cost for the 2024 plan year. Notably, over 60 percent of these consumers were moved from either Gold or Platinum plans, saving them money each month on their premium and fewer out-of-pocket expenses given crosswalked to richer benefits while likely improving their long-term health. We also note that the Platinum and Gold crosswalks can lead to federal savings on the premium tax credit when the crosswalked plan happens to be the lowest cost Silver plan.

The 2024 Covered California Member Survey[5] reflects strong approval for the Affordability Crosswalk initiative, with 90 percent of members who were notified about their plan change finding the crosswalk useful. This indicates broad endorsement of the policy and, crucially, has not led to consumer confusion or grievances.

We strongly recommend that CMS continue to allow states the freedom to adopt these innovative policies that make it easier for consumers to obtain the best coverage, value, and affordability for them.

*Minimum premium payment to renew fully subsidized coverage*

**Covered California urges CMS to preserve state flexibility in enacting automatic reenrollment policies that effectively maximize affordability, ease the renewal process, and reduce barriers to coverage—particularly for economically vulnerable groups.** Our experience with the Affordability Crosswalk also informs our views on annually reenrolling consumers with $0 premiums. We have observed that even small obstacles to enrollment significantly influence enrollment choices. Imposing a $5 charge on those seeking to continue their fully subsidized coverage, even temporarily, unfairly impacts the most economically vulnerable groups.

---

[5] NORC at the University of Chicago and Covered California. (2024, Nov. 21). Covered California's 2024 Member Survey. https://hbex.coveredca.com/data-research/library/Member_Survey_2024_Public_Report.pdf.

Furthermore, without evidence of confusion or complaints about the annual re-enrollment process, introducing a $5 premium complicates a previously clear procedure, risking lower enrollment, market destabilization, decreased long-term affordability and added administrative hurdles. On the contrary, Covered California enrollee survey feedback demonstrates strong support for automatic reenrollment, highlighting its positive impact on accessibility and satisfaction with the renewal process. This feedback aligns with the widespread use of automatic reenrollment across the larger healthcare system, a norm in employer-sponsored insurance, Medicare, and Medicaid alike. Imposing a more cumbersome reenrollment process exclusively on marketplace consumers is both unjustified and illogical. Ironically, implementing a $5 charge that may later be eliminated is more likely to lead to consumer confusion, and ultimately, loss of coverage. Again, we urge CMS to continue to allow states the ability to continue policies that have proven effective for their marketplaces.

### SEP for low-income consumers

**Covered California recommends CMS provide states the flexibility to continue with this SEP, particularly if they are not experiencing associated adverse selection or improper enrollments.** While we recognize CMS's concern that this policy encourages consumers to wait until they become sick instead of promoting continuous enrollment, Covered California's low enrollment in this SEP due to the expansion of our Medicaid program, together with our strong risk mix, suggests that the problems of improper enrollments and adverse selection are just not prevalent in our marketplace. Here, especially, recognizing the unique dynamics of each individual state is paramount in determining whether these proposed solutions are necessary. In California, the state has an integrated eligibility and enrollment system that verifies applicants for both Medicaid and marketplace coverage, limiting any fraudulent enrollment through this SEP.

## Affordability and Coverage

### DACA recipient eligibility for coverage and financial assistance

**With a mutual commitment to the well-being of all communities, Covered California advocates for CMS to keep DACA recipients within the lawful presence definition, preserving their access to marketplace coverage and financial assistance. If this proposal is implemented, we urge CMS to allow states enough time to effectively communicate and implement these changes.** Covered California is deeply committed to ensuring that all individuals and communities have access to comprehensive, equitable healthcare, reflecting our state's core values of equity and accessibility. By embracing the diversity of our state and recognizing healthcare as a fundamental right, we work towards a healthier California. Including DACA recipients in marketplace coverage reduces uninsured rates, brings younger enrollees into the

market, and connects Californians to coverage they need and deserve. We strongly oppose removing DACA recipients from the definition of lawful presence.

However, should this proposal be finalized, we urge CMS to provide states sufficient time to effectively communicate changes, manage the notice and disenrollment process, and ensure that individuals are not inadvertently receiving financial assistance for which they are no longer eligible. For example, delaying implementation until the end of the plan year would allow for smoother transitions and minimize impact to consumers. The thoughtful and accurate execution of these changes is especially critical for this population, as they have consistently experienced significant instability and rapid policy shifts with very tangible consequences.

### *Sex trait modification as an Essential Health Benefit (EHB)*

**Covered California recommends CMS preserve state flexibility in defining their EHBs, allowing states to uphold both their commitments to equitable healthcare for diverse needs and the ACA's requirement to align with typical employer coverage standards.** CMS's proposal to exclude sex trait modification, or gender-affirming care, as an EHB is problematic in several ways. First, similar to CMS's proposal to bar DACA recipients from marketplace coverage, this suggested exclusion challenges California's broader commitment to equitable and accessible healthcare for all. Second, it contradicts the ACA's requirement that the scope of EHB represent those offered under a typical employer plan. Further, it marks a sharp departure from CMS's approach of increasing state flexibility in defining the scope of EHB to keep pace with the diverse healthcare needs of Americans and variation across states.

The ACA and its implementing regulations require EHB to be equal in scope to the benefits provided under a typical employer plan and give states flexibility to define EHB through selecting a benchmark plan.[6] While federal law requires CMS to ensure that the scope of EHB reflect a typical employer plan through data-driven analysis,[7] CMS has not provided a coverage survey, report, or study to support its claim that "sex-trait modification" is not covered within a typical employer plan.

In California, longstanding nondiscrimination requirements prohibit coverage exclusions based on an enrollee's sex, including gender identity.[8] Such requirements apply to all state-regulated employer-sponsored coverage in California, and applied to California's selected EHB benchmark plan at the time of adoption. CMS's proposal to prohibit "sex-trait modification" within EHB would be nonrepresentative of a typical employer plan within California. Additionally, available evidence suggests gender-affirming care is

---

[6] 42 U.S.C. § 18022(b); 45 C.F.R. § 156.100.
[7] 42 U.S.C. § 18022(b).
[8] See Cal. Health & Safety Code, § 1365.5; Cal. Ins. Code, § 10140.

widely covered by employer-sponsored coverage across the country, especially among large employers.[9]

The ACA provides States the authority to define the scope of EHB to account for the specific needs of a state's population, with narrow limitations.[10] Existing regulations include a small number of benefits that may not be considered EHB, including those such as routine non-pediatric eye exams and long-term/custodial nursing home care benefits.[11] CMS determined these benefits are not representative of a typical employer plan because they are generally offered by employers as excepted benefits. However, recognizing the importance of state flexibility and differences in employer-sponsored coverage offerings across the country, CMS recently removed the exclusion for non-pediatric dental services from this section beginning with Plan Year 2027. CMS is now reversing course by proposing to add "sex-trait modification" to the list of EHB exclusions. CMS's proposal, for the first time, would exclude benefits that are traditionally embedded within a health plan. This proposal is contrary to CMS's use of this restriction only for excepted benefits and would now inappropriately limit the state's ability to determine benefits within their own state benchmark plan.

Rather than implementing a blanket prohibition on coverage of "sex-trait modification" as an EHB, CMS should honor state flexibility in EHB definition, ensuring packages are comprehensive, evidence-based, and match employer coverage standards, in line with the ACA's purpose.

***Premium growth methodology***

**Covered California urges CMS to reevaluate the proposed premium growth methodology adjustments, as they would lead to higher costs for consumers.** Covered California expresses concern over CMS's proposal to revise the premium adjustment calculation for Plan Year 2026, which would substantially raise the Maximum Annual Limitation on Cost Sharing. While these adjustments aim to reflect market fluctuations in both the individual and employer sponsored insurance markets, we believe that they will have a detrimental impact on consumers. Specifically, the proposed escalation of out-of-pocket costs directly threatens the affordability of essential healthcare coverage, particularly for individuals already struggling to manage healthcare expenses. This proposed increase in cost-sharing limits will

---

[9] Dawson, Lindsey, et al. "New Rule Proposes Changes to ACA Coverage of Gender-Affirming Care, Potentially Increasing Costs for Consumers." KFF, 24 Mar. 2025, https://www.kff.org/private-insurance/issue-brief/new-rule-proposes-changes-to-aca-coverage-of-gender-affirming-care-potentially-increasing-costs-for-consumers/.
[10] 45 C.F.R. §§ 156.100, 156.111.
[11] 45 C.F.R. § 156.115(d)

disproportionately affect consumers, potentially leading to decreased access to necessary medical care.

## Compliance Standards for Agents, Brokers, and Web-Brokers

**Covered California fully supports CMS's proposal to enhance oversight of agents, brokers, and web-based brokers operating within the federally-facilitated marketplace.** We share CMS's commitment to safeguarding our enrollees from improper enrollments and holding these entities, collectively referred to as agents, accountable for unauthorized activity. To this end, Covered California has proactively instituted stringent requirements, tools, and oversight mechanisms to ensure that agents have consent prior to making any coverage changes.

For example, to act on behalf of a consumer, agents must either be specifically added by the consumer through the consumer portal or verify consent through three-way calls with a consumer and a Covered California representative. Consumers can use this same portal to edit and remove permissions. Alternatively, agents may verify the consumer's personal information they have and, if the details match, a one-time passcode is sent directly to the consumer for the agent to access the case. Additionally, agency delegation transfers may only be done by those Covered California authorizes. These practices have been so successful in California that CMS adopted several of them in 2024 when it sought to address growing complaints of improper enrollments on the federally-facilitated marketplace.

As a result, reports of unauthorized enrollments within Covered California remain very low. For the few instances reported, we have taken decisive corrective measures, including comprehensive investigations, monitoring agents, and if necessary, issuing warnings, suspensions, or even decertifying and terminating agreements with agents. Additionally, Covered California collaborates closely with state regulators and law enforcement to ensure these matters are properly addressed. We recommend CMS adopt similar program integrity standards as the means of addressing improper enrollments and not put unnecessary burdens on consumers in state-based marketplaces as the proposed rule does in other areas.

## Future of Federal Subsidies and Impact on Marketplace Stability

As a final note, the proposed implementation of these policies coincides with a moment already marked by significant uncertainty and potential disruption for marketplaces due to the upcoming expiration of the enhanced federal PTCs. **If CMS chooses to move forward on these proposals, Covered California urges CMS to consider delaying these proposals until there is greater certainty on the future of the enhanced PTCs and to provide flexibility on implementation timelines for new eligibility rules. This would allow marketplaces more time to mitigate impacts to pricing,**

**enrollee risk profiles, and other dynamics that will affect the coverage millions of Californians rely upon. This is the most important step CMS can take to support stable markets and risk pools in light of the significant uncertainty already facing marketplaces and the consumers we serve.**

Expiration of the enhanced PTCs would drastically increase consumer costs and reduce enrollment in marketplaces across the country. Even without additional broad changes to marketplace rules, if enhanced PTCs expire, the upcoming open enrollment will be stressful and confusing for consumers facing difficult coverage choices, overwhelming for enrollment partners and health plans supporting consumers through those choices, challenging for marketplaces to adjust systems and other operations to accommodate last minute federal decisions, and disruptive of market stability due to decreased enrollment and associated risk pool degradation.

This proposed rule contains many provisions that, if finalized, would exacerbate these same challenges by giving less time, increasing consumer confusion and barriers to coverage, and imposing unnecessary uncertainties and last-minute operational burdens on marketplaces and our partners. In particular, the proposed rule would require several significant changes to our eligibility system within a very rapid period, some of which are not even possible to complete by the proposed implementation date. Operationalizing others in such a short window would disrupt additional system changes planned well in advance and strain pre-established budgets. Moreover, these changes would heavily impact our communication and outreach efforts, as well as service center staffing, potentially necessitating an expansion of our resources. To provide marketplaces with the necessary time to adapt, stabilize, and minimize impact to consumers, we recommend postponing implementation of any finalized proposals.

**We appreciate your consideration of Covered California's comments and look forward to our ongoing partnership to ensure that the ACA continues to work effectively and build on its foundation to ensure that all Americans have access to high-quality, affordable health care.**

If you have any questions or would like more information, please feel free to contact me.

Sincerely,


Jessica Altman
Executive Director