April 11, 2025

*Submitted via* https://www.regulations.gov/

The Honorable Robert F. Kennedy, Jr.
Secretary
Department of Health and Human Services

The Honorable Mehmet Oz, MD
Administrator
Centers for Medicare & Medicaid Services

Attention: CMS-9884-P, P.O. Box 8016
7500 Security Boulevard
Baltimore, MD 21244-8016

**RE: RIN 0938-AV61, CMS-9884-P Patient Protection and Affordable Care Act; Marketplace Integrity and Affordability**

Dear Mr. Kennedy and Dr. Oz:

Thank you for the opportunity to comment on the Marketplace Integrity and Affordability rule.

This proposed rule represents a sharp reversal of previous policy without sufficient new evidence, without a reasonable connection to the justifications provided, and without considering key reliance interests.

Virtually every provision individually is harmful to consumers and/or inconsistent with the best reading of the statute. In addition, the proposals are justified with flawed analysis with respect to the major goals cited: reducing improper enrollment and improving the risk pool. And even to the extent that real problems exist under current policy (including evidence of fraud by brokers), the proposals bear no reasonable relationship to solutions that would address these problems. There are ways to address concerns about fraud by agents and brokers, but the rule omits such measures.

The rule also undermines state autonomy, imposes needless costs on states, and requires states to make changes on infeasible timelines, often in ways that would reverse policies on which they have relied for years.

Finally, the rule fails to provide a meaningful opportunity to comment, due to both the short comment period and the Centers for Medicare and Medicaid Services' ("CMS") failure to make publicly available key data that the agency has access to.

1

We urge CMS to go back to square one on this rule. It should perform credible analysis, reconsider its proposals in light of this analysis, release such analysis, and provide a meaningful comment period to consider or challenge it, and delay any effective dates to allow for this process and a workable implementation timeline.

This comment is organized into three sections.
- The first provides comments on specific proposals of the rule.
- The second provides comments on the rule's regulatory impact analysis and analytical claims generally.
- The third raises additional concerns about procedural issues in promulgating the rule.

# Comments On Specific Proposals

The rule generally includes three categories of proposals, which we consider in turn:
- Proposals that reduce affordability and benefits
- Proposals that impose administrative burdens and reduce opportunities to enroll
- Proposals that narrow eligibility for coverage

## *Proposals that Reduce Affordability and Benefits*

### Changing the Premium Adjustment Percentage to Increase Consumers' Premium Contributions and Out-of-Pocket Costs (Section 156.130(e))

CMS proposes to change the rules for calculating the "premium adjustment percentage," a measure of premium growth that is used to make annual updates to several Affordable Care Act ("ACA") coverage parameters. The change would result in higher out-of-pocket costs for individuals with commercial health insurance (including the 160 million people with employer-based insurance), lower premium tax credits ("PTC") for Marketplace enrollees, and larger payments under the ACA's employer shared responsibility provision.

Under the ACA, the premium adjustment percentage is used to update the maximum annual limit on out-of-pocket cost-sharing ("MOOP") under employer-sponsored and individual market health plans. The Internal Revenue Service ("IRS") uses the premium adjustment percentage to update individual contributions for Marketplace enrollees receiving the PTC. It is also used to update other ACA parameters, like the employer shared responsibility payment.

Under current regulations, the premium adjustment percentage measures premium growth by looking at changes in the cost of employer-sponsored coverage. CMS proposes to change the calculation to also include coverage in the individual market. Either way, the calculation looks at changes to premiums dating back to 2013, before most of the ACA had taken effect.

Under the proposed new methodology, the premium adjustment percentage for 2026 would be about 4.5% higher than under the current methodology. This would mean a similar increase in the MOOP and employer payments for 2026, resulting in an overall increase of about 15% over 2025's levels. In addition, if the IRS adopts CMS's premium adjustment percentage methodology, as is required under current IRS regulations, consumers receiving Marketplace subsidies could expect to pay 4.5% higher premiums for a benchmark silver plan than under the current methodology. Together with the actuarial value change discussed below, this change would expose a typical family to an additional $900 in cost-sharing and $313 in premiums annually. CMS estimates that this would reduce federal PTC spending by $1.27 billion and enrollment by 80,000 individuals in 2026. The MOOP change would permit insurance companies to impose higher deductibles and other cost-sharing on not only Marketplace enrollees but also the 160 million people with employer-sponsored coverage.

*The proposal is contrary to Congress's intent for the premium adjustment percentage to account for underlying trends in the cost of health coverage.*

The premium adjustment percentage is intended to measure underlying trends in health insurance premiums, not the effect of the policy changes made in the ACA itself. Individual market premiums experienced a discrete period of volatility when the Marketplaces came online and due to subsequent policy changes, including changes in the PTC itself. Indeed, the existence of a temporary reinsurance program guaranteed premium increases as the program phased out–premium changes that are unrelated to any trends in health spending. As a result, looking at individual market premiums back to 2013 artificially inflates premium growth over time. Group market premiums are insulated from ACA policy changes and have been far more stable, making them the only accurate premium metric of actual trends in health care spending.

*The proposal is contrary to the ACA purpose of expanding coverage and affordability.*

In enacting the ACA, Congress's stated purpose was to expand access to affordable coverage options. By making premiums and cost-sharing less affordable, this proposal would undermine that goal and thus is inconsistent with the intent of Congress.

*The proposal will worsen the risk pool and increase premiums for unsubsidized enrollees.*

Increasing premiums for subsidized enrollees and worsening the value of coverage is expected to deter enrollment of healthier enrollees, as described in more detail below. This will worsen the average risk pool and increase premiums, contrary to CMS's purported goal of increasing affordability in promulgating this regulation.

For the foregoing reasons, we urge CMS not to finalize this proposal.

## Reduced Plan Generosity and Premium Tax Credits (Sections 156.140, 156.200, 156.400)

CMS proposes to change the de minimis ranges for health plans' actuarial values ("AV") in the individual and small-group markets. Under the ACA, insurers in the individual and small group markets are required to offer plans with specified levels of generosity (called "actuarial value"), labeled bronze (covering 60% of an average enrollee's costs), silver (70%), gold (80%), and platinum (90%). However, insurers have some flexibility in meeting these actuarial value levels. In the proposed rule, CMS would change the de minimis ranges to permit lower-value plans at each metal level:

**Figure 1. Proposed Changes to De Minimis Ranges for AV.**

| Plan Level or Type | Current range | Proposed range |
|---|---|---|
| Bronze | +2/-2 | +2/-4 |
| Expanded Bronze* | +5/-2 | +5/-4 |
| Silver | +2/-2 | +2/-4 |
| Cost-sharing reduced Silver variations | +1/0 | +1/-1 |
| On-Marketplace Silver | +2/0 | +2/-4 |
| Gold | +2/-2 | +2/-4 |
| Platinum | +2/-2 | +2/-4 |

CMS argues that giving issuers greater flexibility to increase cost-sharing for consumers will reduce premiums, improve the risk pool, and reduce the risk that issuers will exit the market. CMS estimates that gross premiums would decrease by 1%, on average, as a result of this change. CMS acknowledges that widening the de minimis range for on-Marketplace silver plans will reduce Advanced Premium Tax Credits ("APTC") for consumers and thus increase net premiums. This is because APTCs are based on the premiums for the second lowest-cost silver plan in the market, and plans with lower actuarial values generally have lower premiums.

As a result, the proposed change will result in higher costs for the vast majority of Marketplace enrollees. That is, due to smaller APTCs, recipients will have the choice of either purchasing less comprehensive coverage or paying more in premiums for comparable coverage. CMS's own analysis acknowledges that the expanded de minimis ranges will effectively transfer costs from the government to consumers, by reducing APTCs in 2026 by $1.22 billion, reaching $1.4 billion in plan year 2029.

Moreover, any resulting reduction in premiums for unsubsidized enrollees will be due to less-generous coverage, which exposes enrollees to higher deductibles and other cost sharing. This sort of shrinkflation does not help consumers. Indeed, under the current de minimis ranges, most consumers, subsidized and unsubsidized alike, who wish to pay lower premiums and risk higher cost-sharing can already do so by purchasing a plan at a lower metal level.

CMS also argues, without providing evidence, that increasing the de minimis range will improve the Marketplace risk pool. In fact, the opposite is likely to occur. That's because it will *increase* premiums for comparable coverage for subsidized enrollees, who represent most of the risk pool. Reducing APTCs by an estimated $1.2 billion in plan year 2026 will make coverage less affordable for most enrollees. The evidence is clear that those most likely to drop their insurance due to an increase in premiums are healthy individuals; sicker individuals are more willing to tolerate higher premiums because they need the coverage. This proposed change would thus lead to a smaller, sicker Marketplace risk pool. Accounting for that effect, the rule will ultimately raise gross premiums for unsubsidized individuals as well.

An additional rationale that CMS provides for the proposed changes to de minimis ranges is that issuers have threatened to leave the Marketplace if they are not accorded greater flexibility. Even if such threats have occurred, there is no evidence that issuers will actually withdraw from the Marketplaces. Since the Biden administration tightened the de minimis ranges in the 2023 Notice of Benefit and Payment Parameters, issuer participation has only increased. In 2022, an average of 9.2 issuers participated in the ACA Marketplaces. That number grew to 9.4 in 2023 and 9.6 in 2025. The Marketplaces have not only benefited from new issuers entering the market, but many existing issuers have also expanded their service areas since the tighter de minimis ranges were implemented. Thus, there is no evidence that the narrower de minimis ranges are reducing participation.

For the foregoing reasons, we urge CMS not to finalize the proposal to widen de minimis ranges.

## Prohibiting Coverage for Treatment of Gender Dysphoria (Section 156.115(d))

CMS proposes to prohibit issuers in the individual and small-group markets from covering what it refers to as "sex trait modification" as part of essential health benefits ("EHB"), beginning in plan year 2026. CMS asserts, without evidence, that the items and services associated with the treatment of gender dysphoria are not typically covered in employer-sponsored health plans. However, as described below, available evidence indicates that the majority of employer-sponsored health plans do in fact offer such coverage. Section 1302(b) of the ACA requires the Secretary of Health and Human Services to ensure that the scope of EHB be "equal to the scope of benefits provided under a typical employer plan." In doing so, the Secretary is prohibited from making coverage decisions or designing benefits in ways that discriminate against individuals because of a disability and must account for the health care needs of diverse segments of the population.

We urge CMS not to finalize this proposal because it is discriminatory. The proposal will also raise consumer costs, impose new administrative burdens on plans and issuers, and reduce access to medically necessary items and services that have been recommended by virtually all major U.S. medical associations. Barring plans from covering treatment for gender dysphoria as EHB will expose policyholders who need these services to higher out-of-pocket costs. Transgender individuals, on average, have lower incomes than cisgender individuals, making higher costs a greater barrier to getting the care they need.

CMS's stated rationale for removing gender-affirming care from EHB is grounded in a false premise: that employer-based insurance does not generally cover such services. In fact, the opposite is true. KFF, the publisher of the preeminent annual survey of employer health plans, finds that "[c]overage of gender affirming care services in employer plans is fairly common." In the 2025 Corporate Equality Index, the Human Rights Campaign Foundation found that 72% of Fortune 500 businesses (and 91% of businesses listed on the Corporate Equality Index) offer coverage of treatment for gender dysphoria. Similarly, coverage for gender dysphoria is widespread among state employee plans (24 states and Washington, DC), and 14 states and DC prohibit exclusions of coverage for gender dysphoria in state-regulated plans.

The proposed rule notes that current federal rules prohibit issuers from including as part of EHB non-pediatric eye exam services, long-term/custodial nursing home care, or non-medically necessary orthodontia.[1] Such services are generally not covered in the commercial market, major medical health plans. Unlike these other services listed in 45 C.F.R. § 156.115(d), the medications and services used to treat gender dysphoria are commonly covered in major medical health plans, including by 55% of insurers that offered 2025 Marketplace plans. Indeed, this proposal would be the first time that CMS prohibited states from including in EHB benchmark services that clearly fall within the 10 statutory EHB categories–a substantial imposition on state autonomy.

CMS acknowledges that individual and small-group market plans cover treatment for gender dysphoria, noting that 0.11% of enrollees in non-grandfathered individual and small group market plans used this type of care in 2022 and 2023. CMS interprets this utilization level to indicate that treatment for gender dysphoria is not covered by these plans. But in fact, the relatively low utilization rate is explained by the small size of the transgender population and the fact that individual medical needs vary. Data from a UCLA School of Law Williams Institute report show that only 0.6% of people over the age of 13 are transgender, and, under expert standards of care, treatment for gender dysphoria is highly individualized. There are many other services, such as heart transplants, that are infrequently used by the population at large but are commonly covered by employer-based, major medical health insurance.

The proposed rule would also be difficult for issuers to implement because many of the items and services used to treat gender dysphoria cut across multiple EHB categories and are also

---

[1] For plan years 2026 and prior, federal rules also prohibited issuers from including routine non-pediatric dental services in EHB. CMS lifted that prohibition in the 2025 Notice of Benefit & Payment Parameters, effective for plan year 2027.

used to treat other medical conditions. If this proposed rule is finalized, issuers would need to determine when and how to cover a range of widely covered, medically necessary services—including mental and behavioral health care, prescription drugs, and surgical care (e.g., a hysterectomy)—based on diagnosis, significantly complicating claims and utilization management processes.

These challenges in differentiating whether common treatments are aimed at a specific diagnosis could delay or interfere with a wide range of patients receiving these treatments—compounding the already deep frustration that patients and their providers have with insurers' utilization management practices and diminishing the value of enrollees' coverage.

Furthermore, preventing plans and issuers from covering treatment for people with gender dysphoria as an EHB is contrary to the requirement that EHBs be defined in a way that protects individuals from discriminatory benefit design. It is also inconsistent with existing laws and policies, including Section 1557 of the ACA, the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act—laws that courts have interpreted to prohibit discrimination against people with gender dysphoria.[2]

## *Increased Administrative Burdens and Reduced Opportunities for Enrollment*

### Shortening the Opportunity to Enroll (Section 155.410)

CMS proposes to shorten the annual open enrollment period ("OEP") for the federally facilitated exchange ("FFE") from 76 to 45 days. Further, in a break from historic deference to state flexibility, the proposed rule would prohibit the state-based exchanges ("SBE") from having a longer OEP. If finalized, all Marketplace OEPs would be required to run from November 1-December 15. CMS supports this proposed change by suggesting, contrary to available evidence, that extending the OEP past December 15 contributes to adverse selection. CMS also asserts that a longer OEP does not help boost enrollment and contributes to "consumer confusion." However, the agency provides no evidence to support these claims.

*Available data contradict CMS's claims.*

In fact, the experience of SBEs suggests that longer OEP durations encourage greater enrollment among younger, healthier individuals, thereby strengthening the Marketplace risk pool. For example, average risk scores for individuals enrolling early in Covered California's OEP (before December 15) have consistently been higher than those enrolling after January 1. The trend is striking and consistent across all years and time periods: the later in the OEP consumers enroll, the healthier they are. See Fig. 2.

---

[2] Bostock v. Clayton County, 590 U.S. 644 (2020) (holding that discrimination based on gender identity constitutes sex discrimination).

**Figure 2. Risk Scores for Covered California Enrollees During OEP, Plan Years 2020-2025.**





*Source:* https://hbex.coveredca.com/data-research/library/CoveredCA_OE_SEP_Data_Snapshot_20250403.pdf

Covered California's longer OEP (which runs until January 31) has in fact resulted in a healthier risk pool over time. *See also* Figure 2.

Similarly, in the final month of New York State of Health's ("NYSOH") 2017 OEP, which ended January 31, more than 135,000 individuals enrolled in Marketplace health plans. Using age as a proxy for risk status, New York found that younger enrollees made up a higher share of total enrollment in January than they did earlier in the OEP. Enrollees ages 55-64 comprise a larger proportion of Marketplace enrollees before January as opposed to after. NYSOH has also found that a greater share of consumers enroll in Platinum and Gold plans earlier during OEP versus the final month of enrollment, when Bronze and Silver enrollment is predominant. This suggests that those enrolling in January are healthier than those who enroll early in the OEP.

Although CMS presumably has data about the relative risk profile of January enrollees for the FFE, it fails to provide this data to support its assertions about adverse selection. This may be because, as in the SBEs, sicker individuals or those expecting significant health expenditures are more motivated to sign up for coverage early in the OEP. Those who are healthy are less motivated to enroll, and more likely to be deterred by financial and time constraints during the busy holiday period.

*The proposed policy change will impose major costs on SBEs.*

If finalized, this proposed change in OEP dates will impose significant new costs on the FFE and SBEs alike. By CMS's own estimates, it would take each SBE 4,000 hours to develop and code changes to their IT systems, at a cost of almost $7.8 million. This cost estimate does not take into account the expenditures for SBEs and issuers associated with the required outreach to consumers and training of consumer assisters. The proposed rule provides no justification for extending the FFE OEP deadline to SBEs and constraining state autonomy.

The SBEs are in a better position than the federal government to assess their market and the needs of their consumers. As noted above, many maintain a longer OEP than the FFE because they have found that it boosts enrollment among young, healthy individuals. *See* Figure 2. Indeed, as the current director of the Center for Consumer Information and Insurance Oversight ("CCIIO") has previously noted: "states are in a better position [than the federal government] to assess the situation. This promotes a stable marketplace."

*Other important policy considerations weigh against finalizing the proposed policy change.*

There is also evidence that the holiday period that runs from Thanksgiving to New Year's Eve is a time of financial constraint, particularly for the low- and moderate-income families that enroll in the ACA Marketplaces. Giving these families until January 15 to enroll avoids imposing additional stress during this time. SBE enrollees may face additional confusion since many SBEs have maintained the same OEP duration for many years. For example, NYSOH's OEP has extended to January 31 since 2016.

Furthermore, CMS acknowledges that many current Marketplace enrollees could face significant premium increases for plan year 2026–both as a result of other provisions of this proposed rule and if Congress fails to extend the enhanced premium tax credits originally provided in the American Rescue Plan Act of 2021 and extended through 2025 in the Inflation Reduction Act of 2022. Many of these enrollees may not learn of those premium changes until they receive their first bill for 2026, which may be well after December 15. Ending OEP on December 15 would leave them without the necessary time to make plan changes.

At the same time, CMS has slashed Navigator grants by 90%, leaving these critical consumer assisters without the resources to educate consumers about changing Marketplace policies and with limited capacity to help during the shortened enrollment window. Indeed, CMS acknowledges that it has received concerns from Navigators, agents and brokers, and other consumer assisters that a 45-day OEP is insufficient time for them to fully assist Marketplace applicants with comparing their plan choices. Thus, rather than reducing burdens on these consumer assisters, the proposed shortened OEP will only make it harder for them to provide quality support for their clients. Similarly, shortening the OEP by half will place considerable strain on Marketplace call centers, resulting in longer wait times and a degraded customer experience.

We therefore urge CMS not to finalize this proposal, to maintain the current OEP duration of November 1-January 15, and to continue to provide SBEs with flexibility to determine their own OEP dates. Finalizing this proposal will result in reduced enrollment, a less-healthy risk pool, and higher premiums for Marketplace enrollees. At a minimum, the proposed change to the OEP dates should be delayed until 2027, to mitigate the harms and confusion consumers will face if Congress does not extend the enhanced APTCs.

## Eliminating a Critical Enrollment Opportunity for Low-Income Individuals (Section 155.420)

CMS proposes to repeal the special enrollment period ("SEP") made available to individuals at or below 150 percent of the federal poverty level ("FPL") (or an annual income of $23,475 for an individual, $48,225 for a family of four). In its 2025 Proposed Notice of Benefit and Payment Parameters, CMS found that the availability of this SEP has helped low-income consumers access affordable health insurance coverage and maintain access to care. However, CMS suggests that this SEP (referred to here as the "low-income SEP") has contributed to improper enrollments, driven largely by unscrupulous brokers and web-brokers seeking commissions. CMS also suggests, without evidence, that this SEP has increased adverse selection, leading to a less-healthy risk pool. The agency further posits that the low-income SEP lacks a statutory basis.

We urge CMS not to finalize this proposal. The low-income SEP has helped over one million individuals overcome challenges enrolling in health coverage. These challenges are particularly acute for lower-income individuals who may lack access to necessary information, face greater employment and household volatility, or reside in areas without sufficient enrollment assistance. These obstacles to health coverage will only be exacerbated if CMS finalizes its proposal to shorten the OEP by almost half, from 76 to 45 days.

There is no evidence that the existence of the low-income SEP has caused the increase in fraudulent enrollments experienced by the FFE in 2024. In fact, CMS traced the cause of enrollments and plan switches made without consumer consent to brokers and agents in the FFE taking advantage of system vulnerabilities that are unique to the FFE. CMS's proposed policy solutions seem poorly targeted to address the true problem of broker and agent fraud. Attempting to deter fraudulent enrollments by making it harder for people to obtain insurance coverage is like "trying to prevent car theft by making it more difficult for people to own cars."

By CMS's own estimates, fraud associated with unauthorized enrollments and plan switches for people under 150% FPL is concentrated in states that use the FFE and that have chosen not to expand Medicaid under the ACA. There is no evidence of any meaningful fraud in the SBE states, all but one of whom have expanded Medicaid and all but two have implemented the low-income SEP and have had it available to consumers for multiple years. None of these SBEs have reported problems with fraud. Indeed, Covered California reports that SEPs have become a critical source of enrollment, with more consumers signing up via SEP than during the annual OEP. See Figure 3. Yet there is no evidence of any meaningful fraud, due to Covered

California's comprehensive safeguards to ensure that brokers obtain consumer consent before completing an enrollment. Similarly, the Massachusetts Connector, which has long had a year-round SEP for low- and moderate-income individuals, has identified "zero consumer reports among the 1.2 million calls to its customer service center in 2024" of unauthorized enrollments.

**Figure 3. Covered California OEP and SEP Enrollment, Plan Years 2019-2024.**



*Source:* https://hbex.coveredca.com/data-research/library/CoveredCA_OE_SEP_Data_Snapshot_20250403.pdf

There is also no evidence that the low-income SEP has contributed to adverse selection. Although CMS has access to data that would indicate the risk status of people who enroll through SEPs compared to the OEP, data supporting that contention are notably absent from this proposed rule.

More strikingly, the experience of SBEs suggests that the people enrolling through low-income SEPs are, in fact, younger and lower-cost on average than those who enroll via OEP. For example, Massachusetts has long offered year-round enrollment to people who qualify for ConnectorCare, the state's Marketplace program for low- and moderate-income individuals. Massachusetts Health Connector officials report that they have "not experienced adverse selection within the program," and their "risk scores have been healthier than for insurers off-Marketplace."

Data included in a comment submitted by the Vermont Marketplace show that per-member-per-month costs associated with SEP enrollees are 8% lower than non-SEP enrollments, and that costs are lower-than-average among enrollees in an equivalent position to those who qualify for the FFE's under-150 SEP.

Covered California has found that the prospective risk scores of consumers enrolling through SEPs was equal to or lower than those enrolling through the OEP each year from 2020 to 2024. See Figure 4.

**Figure 4. Covered California Average Risk Scores for OEP and SEP Enrollees, Plan Years 2020-2025.**

| | Open Enrollment | Special Enrollment |
|---|---|---|
| 2020 | 0.86 | 0.85 |
| 2021 | 0.89 | 0.87 |
| 2022 | 0.96 | 0.93 |
| 2023 | 0.95 | 0.94 |
| 2024 | 0.96 | 0.96 |
| 2025* | 0.92 | |

*Source:* https://hbex.coveredca.com/data-research/library/CoveredCA_OE_SEP_Data_Snapshot_20250403.pdf

DC Health Link, in reviewing 2019-2021 enrollment, found that the age of the SEP population remained consistent with the population that enrolled during open enrollment, and in some cases was even younger. See Fig. 5.

**Figure 5. Ages of SEP and OEP Enrollees in DC Health Link, Plan Years 2019-2021**

| Age | 2019 Open Enrollment % | 2019 SEP % | 2020 Open Enrollment % | 2020 SEP % | 2021 Open Enrollment % | 2021 SEP % |
|---|---|---|---|---|---|---|
| < 18 | 10% | 10% | 10% | 10% | 9% | 10% |
| 18-25 | 5% | 7% | 10% | 9% | 10% | 9% |
| 26-34 | 34% | 40% | 39% | 44% | 42% | 44% |
| 35-44 | 22% | 22% | 20% | 18% | 19% | 19% |
| 45-54 | 15% | 12% | 11% | 10% | 11% | 9% |
| 55-64 | 13% | 9% | 9% | 8% | 8% | 8% |
| 65+ | 1% | 1% | 1% | 1% | 1% | 1% |
| **TOTAL** | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** |

*Source:
https://hbx.dc.gov/sites/default/files/dc/sites/hbx/page_content/attachments/DC%20HBX%2020
23%20NBPP%20Comments%20Final%201-27-22.pdf

Similarly, Massachusetts Connector officials have found that the average age of people enrolling through a SEP is 38—younger than the average age of enrollees overall, which is 41.

Even if Congress does not extend the enhanced APTCs this year, households with income at or below 150% FPL are still likely to find Marketplace plans with $0 premiums, further mitigating the risk of adverse selection. CMS's own data show that in 2020, before the enhanced APTCs were provided, 900,000 people were enrolled in fully subsidized bronze plans where the net premium was $0. About 77% of people at or below 150% FPL had access to a $0 premium bronze plan and 16 percent had access to a $0 premium silver plan. The availability of such plans to low-income consumers significantly mitigates the risk of adverse selection (because there is nothing to be gained by delaying enrollment), a fact CMS fails to take into account in its current rulemaking.

CMS does not provide an estimate of the cost to SBEs of implementing this proposed change, incorrectly stating that no SBE has implemented the low-income SEP. In fact, 18 SBEs—all but Idaho and Nevada—have implemented this SEP. The agency further proposes to require the removal of this SEP from SBEs immediately upon the effective date of the final rule. Requiring SBEs to remove this SEP from their eligibility and enrollment systems would result in significant costs, not only in terms of the necessary IT system changes but also to change current consumer communications, outreach, and training programs for consumer assisters. Furthermore, the requirement to implement this change in 60 days would be extremely challenging if not impossible.

As CCIIO's Director has observed, states are in a better position than the federal government to understand their markets and customer needs. Given that SBEs have reported neither fraud nor adverse selection arising from the low-income SEP, there is simply no rational basis to require the SBEs to eliminate this SEP.

CMS also posits that it lacks statutory authority to establish the low-income SEP, citing to the list of SEPs enumerated in sections 1311(c)(6)(C) and (D) of the ACA. However, section 1311(c)(6)(C) provides ample authority for this SEP. Specifically, it provides that "the Secretary *shall require* an Exchange to provide for…other special enrollment periods under circumstances similar to such periods under" Medicare Part D. Section 1860D-1(b)(3)(C) of the Social Security Act provides the Secretary with authority to establish SEPs for Medicare Part D enrollment, including the explicit authority to establish SEPs for "extraordinary circumstances," a broad term that the statute does not define. This alone creates the necessary authority.

CMS argues that the low-income SEP is dissimilar to Part D SEPs in statute. But in fact, Medicare Part D has a similar low-income SEP, which allows people with low incomes to change plans once per month or to drop Medicare Advantage and join traditional Medicare with a Part D drug plan. The Medicare Part D statute, similar to the ACA, lists certain specific SEPs that the Secretary must set up as a minimum; not all Medicare Part D SEPs are specified in statute. Thus, the low-income Marketplace SEP is indeed similar to a SEP in Medicare Part D.

More generally, Congress enacted the ACA with the goal of expanding access to health insurance. To effectuate this goal, section 1321(a) of the ACA provides the Secretary with broad authority to set standards for the offering of health plans through the Marketplaces, including standards relating to enrollment.

The authority in Section 1311(c)(6)(C) has been used dozens of times by CMS and by SBEs for all sorts of circumstances, including many that provide an enrollment opportunity for designated groups of applicants, such as during Medicaid unwinding and after certain natural disasters. Creating the low-income SEP is fully consistent with these precedents and the underlying authority. Asserting otherwise would represent a stark reversal from years of widespread practices.

## Added Paperwork for Consumers Using a Special Enrollment Period (Section 155.420(g))

CMS proposes to impose additional documentation requirements on consumers seeking to enroll in Marketplace coverage through a SEP. Additionally, although CMS has traditionally given SBEs deference in the establishment and verification of SEPs, the proposed rule would require all Marketplaces, including SBEs, to conduct pre-enrollment eligibility verification for at least 75% of new enrollments through SEPs.

In proposing this change, CMS argues that requiring consumers to submit documents proving that they have experienced a SEP-triggering event will prevent people from enrolling only after they become sick or need health care services. Without providing evidence, CMS asserts that new documentation burdens will improve, not worsen, the Marketplace risk pools. In fact, CMS's own analysis in this proposed rule found that "younger, often healthier, consumers submit acceptable documentation to verify their SEP eligibility at much lower rates than older consumers."

CMS appears to assume, without any basis, that providing pre-enrollment documentation is easy for consumers, and that all consumers have "ready access" to the necessary official documents. In fact, a considerable body of research has found that paperwork and other administrative hurdles to enrollment in coverage programs serve as a strong deterrent to enrollment among people who are otherwise eligible for the coverage. Younger, healthier individuals are more likely to be deterred from enrolling, leading to a less-healthy risk pool. For example, a study published by the American Economic Association found that adding one single additional step to the enrollment process prompted a 33 percent decline in enrollment, predominantly among young, healthy, and economically disadvantaged people. Removing paperwork burdens, on the other hand, has been found to significantly increase enrollment and continuity of coverage among healthy, younger individuals.

CMS also argues that imposing new documentation requirements on consumers will help curtail SEP enrollments made without consumer consent. However, there is no evidence that adding bureaucratic headaches to the lives of consumers will serve as an impediment to the brokers

and web-brokers set on committing fraud. Many SBEs use an applicant's self-attestation as the primary mechanism for verifying SEP eligibility, yet no SBE has reported any meaningful fraud in their markets. SBEs are also in close communication with their participating issuers and are in a better position than the federal government to identify and address any concerns about how the SEP verification process is being used. Currently, many SBEs require consumers seeking to enroll via many SEPs to attest, upon penalty of perjury, that they qualify for the SEP in question. CMS has provided no evidence of any abuse of this process.

CMS's proposal would extend the new paperwork requirements across all Marketplaces, not just the FFE. Such a requirement would pose a significant, unfunded mandate on the SBEs. CMS estimates that the proposed changes would result in an annual new cost of $1,736,615 per SBE, not including costs associated with consumer communications, outreach, and assister training. Although CMS proposes allowing SBEs to submit a request for an alternative verification process, submitting such requests to CMS also poses significant, unnecessary burdens on SBE staff. Because CMS provides no evidence to support either the use of SEPs to commit fraud in the SBEs, nor evidence of adverse selection, there is no rational basis to take away SBEs' traditional flexibility to determine the SEP verification processes that work for their issuers and markets.

We urge CMS not to finalize this proposal.

## Denying APTC for Failure to Reconcile (Section 155.305(f)(4))

CMS's proposal would change a recently instituted policy, under which consumers are only denied future APTC after IRS reports that they have not filed and reconciled past APTC for two years—referred to as failure to file and reconcile ("FTR"). If finalized, CMS's proposal would deny a consumer APTC if the IRS reports that they had not reconciled APTC for a single year, instead of the two years under the current policy.

Under the ACA, consumers receive APTC based on their projected income and then must file a tax return to reconcile APTC against the PTC they are ultimately due. An individual who fails to reconcile is subject to all of the IRS's normal enforcement tools for failing to properly file a return. FTR rules—created in CMS regulations—provided an additional penalty: individuals who failed to reconcile would also be denied APTC. But this FTR penalty appears nowhere in the statute.

FTR rules have long raised concerns about administrative burdens and fairness. IRS privacy rules generally prohibit Exchanges from providing applicants with information about their FTR status, even when denying them APTC on that basis—a recipe for consumer confusion and frustration. Consumers can also be incorrectly targeted for FTR denial due to delays or errors in processing tax returns. This is especially likely for individuals who file paper returns, which may disproportionately affect filers who are older and lower-income, and those who amend their returns. Delays and errors are also possible in the process the IRS must perform to share FTR information with Exchanges through the federal data services Hub. When these errors occur,

resolving them is complicated by the Exchanges' inability to discuss the reason for the denial. More generally, completing the forms to properly reconcile APTC is a complex process that may frustrate even those taxpayers attempting to comply.

To address these concerns, CMS adopted a new policy, effective for coverage year 2025, under which the Exchange denies APTC only when the IRS reports that a consumer has failed to reconcile for two consecutive years. This approach mitigates concerns about delayed or missing IRS data, consumer confusion, and administrative burden. In adopting this rule, CMS noted that this middle ground would "properly balance consumer protections and program integrity concerns, and therefore support that we should continue to improve the FTR process rather than repeal it entirely."

In addition, the IRS recently made an administrative change that minimizes the risk that consumers could fail to reconcile in the first place. If a consumer received APTC and then attempts to e-file a return without reconciling, the IRS will now bounce back that return. This policy increases the likelihood that any appearance of an FTR flag is due to IRS delay or error. CMS does not mention this recent change and does not appear to have considered it. This measure is in addition to the IRS's long-standing enforcement mechanisms for individuals who fail to properly file a return or pay taxes that are due, which can include the withholding of tax refunds and liens and levies.

CMS estimates that its proposal would deny APTC to between 265,000 and 424,000 consumers and reduce APTC spending by between $1.16 billion and $1.86 billion in 2026. Of course, CMS justifies this change by claiming that "new analysis of the enrollment and tax filing status suggests a large number of people with FTR status are ineligible for APTC and that pausing removal of APTC due to an FTR status allows ineligible enrollees to accumulate tax liabilities." But the agency offers no data to support this claim. Its claim about "further analysis of enrollment data" is cited generally to the CMS webpage listing public use files—no specific statistics are cited. Similarly, CMS asserts that "[a]fter reviewing the tax filing data, we remain concerned that enrollees are accumulating tax liabilities due to misestimating their income." But no tax statistics are provided. CMS also asserts that those with FTR status account for a substantial number of those improperly enrolled. But it similarly provides no data to support this assertion.

CMS does not address the premium impact of this change. But given that sicker individuals are more motivated to overcome administrative burdens to enroll in coverage than healthier ones, it would likely worsen the risk pool and increase premiums.

This proposal would be implemented in fall 2025, beginning with the 2026 open enrollment period. Eligibility would be tied to filing a 2024 federal tax return and reconciling APTC in order to remain eligible for APTC in 2026. This implementation timeline may be infeasible for some SBEs and for the IRS, both of which have historically required years to implement new FTR rules.

We urge CMS not to finalize this proposal.

## Junk Charges for Automatic Re-Enrollment (Section 155.335)

CMS proposes an unlawful approach to calculating APTC for certain consumers at automatic re-enrollment. Specifically, the agency proposes that Marketplaces will first make an eligibility determination for APTC following the terms of the statute, and then if APTC is sufficiently large, arbitrarily reduce the amount of APTC made available so that the consumer owes $5 in premium until the consumer returns to the Marketplace for an active enrollment. The ACA prohibits the imposition of this junk charge, which has no basis in statute.

### The ACA specifies how APTC must be calculated.

Automatic re-enrollment is the process by which a consumer from the prior year who has not actively submitted an application and enrolled in coverage for the upcoming benefit year is re-enrolled. In determining eligibility for APTC during the re-enrollment process, agency action is governed by several sections of the ACA.

Section 36B of the Internal Revenue Code (as added by the ACA) specifies a series of criteria and calculations used in determining premium tax credit amounts. ACA section 1411 directs the Secretary of the U.S. Department of Health and Human Services ("HHS") to "establish a program… for determining… in the case of an individual claiming a premium tax credit or reduced cost-sharing under Section 36B of such Code or section 1402 whether the individual meets the income and coverage requirements of such sections." Section 1412(a) directs the Secretary to "establish a program under which… advanced determinations are made under section 1411." And section 1412(c) directs that the federal government "shall make the advanced payment under this section of any premium tax credit allowed under section 36B."

In other words, section 36B is the sole statutory instruction in how to calculate a premium tax credit amount. The program established under section 1411 must determine eligibility under section 36B. And once an individual has been determined eligible under section 1411, the federal government "shall make" payments in the amount "allowed under section 36B," as required under section 1412. In other words, the statute makes payment of the full amount mandatory.

### There is no statutory authority to alter an eligibility determination.

CMS has expressed a policy concern about consumers for whom APTC fully covers their premium, such that they owe nothing out-of-pocket each month. The agency thus proposes that when a Marketplace has conducted an eligibility determination that results in that outcome, the Marketplace must arbitrarily reduce APTC so that the consumer owes a premium of $5. Section 1412 clearly forecloses this outcome. Section 1412(c) requires payment of the amount "allowed under section 36B," not some other amount determined arbitrarily by CMS. It is true that ACA section 1411(f)(1)(B) provides general authority for the agency to "establish procedures" for eligibility redeterminations, as CMS notes. But nothing in that section confers authority to make

the advance determination of eligibility but then pay less than the amount dictated by the eligibility determination; rather the Marketplace "shall" pay the amount of APTC established pursuant to the eligibility determination process. Whatever policy concerns the agency may have, the text of the statute is clear and provides no discretion for a Marketplace to impose a $5 junk charge that is squarely contrary to the express provisions of the law.

These same prohibitions apply to an alternative proposal that CMS discusses, under which APTC would be removed in its entirety. A decision to apply no APTC at all for consumers determined eligible under section 1411 transparently violates the requirement that the federal government "shall make the advanced payment." If an individual has been determined eligible, APTC must be paid.[3]  Similarly, these same concerns would apply if CMS attempted to direct Marketplaces not to re-enroll all consumers who qualify for APTC. If a Marketplace conducts an eligibility determination, section 1411 specifies that it must evaluate eligibility for APTC. And once an eligibility determination has occurred, the Marketplace is bound by the results—CMS has no statutory authority to direct the Marketplace to do anything different.

*CMS fails to address important policy considerations.*

Beyond the fact that the proposal violates the statute, CMS's analysis of the issue ignores a number of important policy considerations. These changes will require significant action on the part of state-based Marketplaces—requiring them to expend technical resources and damage their brand by charging consumers money they should not owe—despite no evidence of a problem. Further, in this rule, CMS proposes shortening the Marketplace OEP to end on December 15, which makes it impossible for consumers who notice the junk charge only as they are about to lose coverage to avoid paying it while keeping coverage for the rest of the year.

Finally, CMS does not quantify or grapple with the risk pool impacts of this proposal. Enrollment will fall as a result of this barrier: one study found that premiums less than $10 led to a 14 percent decrease in enrollment. As discussed extensively below, young and healthy consumers are at the greatest risk of failing to notice the junk premium charge and losing coverage as a result, while those with significant health care needs will likely resolve the issue more quickly. Indeed, real-world evidence underscores that supporting automatic re-enrollment rather than imposing small premium burdens is associated with retention of healthier consumers. CMS's proposal will worsen the risk pool and drive up premiums for unsubsidized consumers.

---

[3] We note that this circumstance is completely different from other cases where a consumer may lose APTC at automatic enrollment. In those cases, the Marketplace is making a determination *pursuant to section 1411* that the individual does not "meet[] the income and coverage requirements" of section 36B. Here, CMS is proposing the Marketplace would make a determination under section 1411 that a person is eligible and calculate an amount under section 36B, and then reject or alter that determination and apply a different amount of APTC or no APTC at all. It may not do so. Section 1412 requires the payment of APTC in the amount for which the consumer has been determined eligible.

## Imposing Higher Deductibles at Re-Enrollment (Section 155.335)

CMS proposes to end a policy that lowers deductibles and cost-sharing for enrollees at automatic re-enrollment. Under current policy, if an individual who is being automatically enrolled into a bronze plan can be moved into a silver plan (with lower deductibles and other cost-sharing), with the same network and from the same issuer, and with the same or lower premium, then they will be automatically re-enrolled into the silver plan. This maximizes consumer value and promotes consumer retention in coverage. The arguments CMS advances for changing the policy are not supported by evidence.

CMS's primary justification is that consumer awareness of APTC generosity has increased and therefore support to help enroll consumers in plans with lower deductibles is not necessary. Yet the agency offers no empirical evidence of such an improvement in understanding. Instead, polling data show that public awareness of the existence of APTC at all—much less the nuances of metal levels and recent changes—remains quite low. The agency also points to alleged harms from consumer confusion but offers no plausible reason why a consumer would be "confused" by being enrolled into a plan that is identical to her prior coverage, except for the fact that it has lower deductibles and cost-sharing. Indeed, the agency has provided no plausible justification for making this change and should not finalize the policy.

## More "Data Matching Issues" and More Paperwork Burden (Section 155.320)

CMS proposes two policies that will generate more paperwork related to income verification, especially for low-income people: generating a "data matching issue" ("DMI") when IRS data show income below 100% FPL, and generating a DMI in the absence of IRS data. These changes will have the effect of making it more burdensome and less efficient for low-income people and those with variable incomes or family circumstances (like small business owners and the self-employed) to receive benefits to which they are entitled. For this reason, the policy changes will deter enrollment of healthy people. The proposed changes are also expected to meaningfully worsen the Marketplace risk pool and increase premiums for unsubsidized enrollees. Indeed, a 2019 version of one of these policies was struck down under the APA. The court found that CMS's decision to "prioritize a hypothetical risk of fraud over the substantiated risk that its decision [would] result in immense administrative burdens at best, and a loss of coverage for eligible individuals at worst, defies logic."[4] While CMS claims that "new" data show that the package of policies is justified, it offers no data supporting this view. In fact, the available data *undermine* the policy rationale for the proposals. Further, CMS's claims that the statute requires these changes are specious.

---

[4] City of Columbus v. Cochran, 523 F. Supp. 3d 731, 763 (2021).

*The proposed changes will cause a significant increase in administrative burden that will worsen the risk pool and increase premiums.*

The CMS proposal to generate DMIs when IRS data is absent or shows income below 100% FPL will place substantial new administrative burdens on people and on state and federal Marketplaces. Together, the proposals will generate an estimated 2.7 million new income DMIs (550,000 for tax data below 100% FPL and 2.1 million for missing tax data)—requiring 2.7 million people, many of whom live just above the FPL, to track down and submit paperwork in order to buy health insurance. Every year, CMS expects that people will spend $66 million dealing with the paperwork requests, and state and federal Marketplaces will spend $155 million in reviewing these documents. An estimated 480,000 people, most of whom are likely eligible, will lose health insurance because they fail to successfully navigate the process.

As discussed above, this is exactly the kind of administrative burden that deters enrollment of younger and healthier enrollees and causes problematic adverse selection. An enrollee with heart disease who is taking multiple expensive medications is *far* more motivated to track down a stack of documents to prove their income than a healthy 30-year-old enrolling in coverage for the financial security it provides. CMS has long underscored that coverage losses associated with DMIs are concentrated among the young, a pattern that CMS acknowledges continues to this day. Recent data from Massachusetts document the same pattern. Deterring these younger and healthier people from enrolling worsens the risk pool and increases premiums—further deterring enrollment of healthy unsubsidized enrollees. This "spiral" is exactly the kind of practice that CMS purports to be trying to avoid in this rule.

CMS briefly acknowledges these impacts but asserts that it is moving forward regardless because of concerns about fraud and improper enrollments. Yet CMS provides no analysis quantifying the scale of the premium increases associated with this large new administrative burden and attendant losses of coverage. Without acknowledging and assessing the adverse impacts on the risk pool and on premiums, CMS has not provided sufficient justification for the proposed additional paperwork burdens being placed on Marketplace consumers. Thus, the agency cannot make such a tradeoff in any non-arbitrary way. This is doubly true because, as discussed below, CMS's purported evidence of large-scale fraud in fact shows nothing of the kind.

*CMS's policy is based on faulty analysis that could justify the opposite conclusion as the one reached by the agency.*

CMS asserts that it needs to impose these major burdens on people because the status quo—under which CMS has focused on ways to simplify enrollment—has facilitated fraud and improper enrollment. CMS provides analysis that the agency claims demonstrates these problems at a meaningful scale. However, the analysis does not support that conclusion.

Marketplace financial assistance is based on *projected* annual income for the year. This is not a knowable number that is measured in any surveys or on one's tax return; it is a subjective projection based on the household's expectations. As described in more detail below, CMS

fundamentally misunderstands this distinction in its analysis of Marketplace enrollment patterns. In focusing on enrollment of individuals who end up having an annual income below 100% FPL, CMS claims that such an enrollment is "improper." This is simply untrue; if an enrollee had a reasonable basis for expecting that her future income would be above 100% FPL, then her enrollment is wholly legitimate, even if their income turns out to be below 100% FPL at the end of the year. CMS's claim that enrollment near the poverty level is "136 percent higher than the total population of potential enrollments" is false: the accurate denominator in such a calculation is the number of people who have reason to believe they will have income above 100% FPL, not the smaller number based on the post hoc results that are used in the calculation on which CMS relies.

Indeed, challenges in estimating annual income are especially acute for the low-income people targeted by CMS's policies, a fact which the agency entirely fails to address. One detailed analysis of earnings variability among low-income workers found that more than half experienced significant variability in income, a proportion that is greater than higher income workers. Moreover, the actual magnitude of this income variability is quite striking, with workers in the lowest quintile having more than double the magnitude of variability than all other income groups. (For low-income workers, the standard deviation of monthly income was 85% of the mean—so that someone who earned an average of $1000 per month had so much variation month-to-month that a month where their income was anything from $150 to $1850 would be within a single standard deviation.) Multiple other analyses find this same basic pattern. Against this factual backdrop, it is clear that projected income and actual annual income are fundamentally distinct concepts, especially for low-income people. The agency's acknowledgement that variability exists does not mitigate the fact that the agency's assertions regarding improper enrollment are based on that faulty premise.

Moreover, the agency's data on changes in certain enrollment patterns over time show the exact opposite of what it claims. CMS presents a table that examines the rate at which people at different income levels end the year with more APTC than the PTC calculated based on their actual end of year income. It finds that after CMS made changes to prevent unnecessary income DMIs (changes that this proposed rule would undo), the rate at which low-income people received more APTC than PTC did increase. But CMS ignores that the rate for low-income people remained *less than half* of the rate for higher income people. While there are certain structural differences between PTC calculations for high-income and low-income people, this analysis undercuts their claims that improper enrollments are concentrated among low-income people. This is especially true because income variability is so much greater for this population. Instead, to the extent that these data are a useful metric, they suggest just the opposite: that the agency was right to be concerned that aspects of their 2019-era enrollment policies were "punitive," and that changes to decrease administrative burdens were justified. Far from these data showing that the agency has more basis for acting than they did in 2019, the analysis shows that it has even less justification than it thought.

*Claims that the ACA requires change are wrong.*

Finally, CMS claims that it is required to make one or both of these changes because its current policy violates the ACA. In fact, the law clearly authorizes the status quo.

To advance its argument to the contrary, CMS claims that statutory language that provides "flexibility" for the agency to "modify the program" "for the exchange and verification of information" somehow does not actually provide flexibility to modify verification. This rests on two assertions: (1) that the statute only authorizes modifications if those modifications affect *both* "exchange" and "verification" of information, and (2) that the status quo is too significant a departure to be understood as agency action to "modify" these rules. Both claims are inconsistent with the ACA's statutory language.

To start, section 1411 of the ACA establishes a process for obtaining information related to eligibility and using that information to verify eligibility. Under a subsection labeled "Actions Relating to Verification," section 1411 establishes the DMI process that is at issue in this section of the proposed rule. In a separate subsection, the statute provides the flexibility noted above to "modify the methods used under the program established by this section for the Exchange and verification of information." This clearly authorizes modifications related to "verification." Yet CMS argues that what Congress really meant was that modifications were only allowed if they were directly related to rules for how information is *both* exchanged and verified. If Congress had meant this, they would have said so. They did not.

Similarly, CMS's claims that modifications under current policy are not actually modifications are baseless. The current rule modifies the circumstances under which a DMI is triggered and considers information adequately verified without paperwork in more circumstances. This is squarely a "modification" of the general rule and is precisely the sort of modification to reduce administrative burdens that was envisioned by the statute.

Thus, CMS cannot justify the proposals in the rule to generate new DMIs with claims that they are required by the statute to adopt these changes.

## Making Data Matching Issues Harder to Resolve (Section 155.315)

CMS also proposes to make DMIs harder to resolve by requiring a manual request for additional time to resolve a DMI rather than automatically extending the clock by 60 days. CMS justifies this primarily by arguing that the statutory language noted above that provides "flexibility" related to "verification" does not provide statutory authority for current policy. That argument fails for all the reasons noted above: the time period for resolving a DMI is clearly an aspect of verification, and so modifying it is clearly authorized under the statute.

CMS also fails to grapple with a number of critical aspects of this policy. First and foremost, the changes described above will result in a substantial increase in the number of income DMIs generated and a major additional burden in reviewing documents. As the agency sheds critical staff who, among other things, monitor contractor performance in reviewing DMIs documents

timely and make adjustments as needed, it is not at all clear whether the agency has a plan to ensure that consumers are not harmed by contractor back-ups caused by agency actions. Without automatic clock extensions, this inefficiency could cause consumers to lose coverage through no fault of their own. CMS also fails to address the additional information collection burden associated with requesting 60-day extensions.

## *Limiting Eligibility for Coverage*

### Terminating Coverage for Thousands of DACA Recipients (Section 155.20)

CMS proposes to reverse its policy relating to Deferred Action for Childhood Arrivals ("DACA") recipients by re-defining the term "lawfully present" to exclude DACA recipients for the purposes of enrollment in Marketplace and Basic Health Program ("BHP") coverage, premium tax credits, and cost-sharing reductions. This proposed change in definition would go into effect upon the effective date of the final rule, prompting DACA recipients currently enrolled in Marketplace or BHP coverage to lose eligibility mid-year. This change will cause significant disruptions in the form of interrupted and canceled health care services, increased exposure to catastrophic medical bills for this financially vulnerable population, and greater uncompensated care costs for providers. Some current Marketplace or BHP enrollees could lose coverage while in the middle of a course of treatment.

We urge CMS not to finalize this proposal and to retain its current definition of "lawfully present" to include DACA recipients. HHS has generally interpreted "lawfully present" to include those granted deferred action by the Department of Homeland Security ("DHS"). Although HHS excluded DACA recipients from the definition of lawfully present in 2012—after DHS first announced its DACA policy earlier that year—since then DHS issued regulations formalizing its DACA policy. Among other policies, DHS's DACA final rule reiterated the agency's view that a non-citizen who has been granted deferred action is deemed "lawfully present" for purposes of Social Security benefits.

CMS reconsidered its Marketplace and BHP policies in light of the DHS 2022 rule, and in 2024 the agency finalized a rule that would no longer treat DACA recipients differently than other people granted deferred action. Not only does this ensure equitable treatment across this population, the 2024 final rule better aligns with the goals of the ACA to reduce the numbers of uninsured and improve access to affordable health coverage.

In several sections of the preamble to this proposed rule, CMS expresses concerns about adverse selection in the ACA Marketplaces. Yet the proposal to end coverage for DACA recipients would remove from the risk pool a population that is healthier, on average, than the general population. A 2024 analysis of federal survey data found that the majority of immigrants likely eligible for DACA are working and have self-reported excellent or very good health.

CMS estimates that 10,000 DACA recipients will lose their Marketplace coverage and 1,000 will lose BHP coverage if this proposed rule is finalized. However, this may be an underestimate of the harm. In the final 2024 rule that includes DACA recipients in the definition of lawfully present, CMS estimated that about 100,000 people with DACA would benefit from access to Marketplace coverage and subsidies. Although only a small proportion of those may be enrolled in Marketplace or BHP coverage for plan year 2025, this is likely because the policy is new, and many DACA recipients may not have known about their new coverage options in time to enroll. Additionally, litigation over the DHS and HHS DACA rules has likely contributed to confusion among DACA recipients about their right to enroll in Marketplace or BHP coverage.

Furthermore, CMS's proposed change will place considerable burdens on SBEs and the two BHP states, requiring them to reverse current processes and change their systems, mid-year, to terminate coverage for existing enrollees and halt future enrollment for DACA recipients. Additionally, CMS's estimates of the time and cost burden for SBEs and the BHP states do not appear to take into account expenditures related to customer outreach and education, changing call center scripts and website copy, and training for call center workers and consumer assisters.

## Reducing State and Insurer Flexibility on Premium Payment Thresholds (Section 155.400(g))

CMS proposes to revoke the recently finalized policy to give insurers additional options to avoid terminating coverage when enrollees underpay premiums by a de minimis amount. Specifically, CMS would eliminate the options, finalized in the plan year 2026 payment notice, to provide fixed-dollar thresholds and gross premium percentage thresholds. This change has not yet taken effect.

Long-standing regulations permit insurers to set a minimum percentage of the consumer's premium share (a "net premium percentage threshold") that they will accept for purposes effectuating enrollment (referred to as a "binder payment") or avoiding triggering a three-month grace period or termination. For example, if a consumer's full premium is $400, of which APTC covers $300, and the issuer permits a net premium threshold of 95%, the consumer satisfies the threshold so long as they pay at least $95 (95 percent of the $100 net premium).

This threshold provides relief where a consumer makes a nearly complete payment. But it does not help if the consumer owes only a minimal amount and pays a smaller share. For example, if the full premium was $400, APTC was $398, and the consumer paid none (or even $1.50) of their $2 share, a net premium threshold of 95% would not protect the consumer, since they would not have paid 95% of their $2 net premium.

To address such situations, the 2026 payment notice created two additional threshold options. First, insurers could set a threshold of no less than 98 percent for the combined premium paid by APTC and the consumer (a "gross premium percentage threshold"). Second, insurers could set a dollar value for permissible non-payment (a "fixed-dollar threshold"), which had to be no

more than $10. The rule also clarified that, for the existing option (the net premium percentage threshold), a threshold of at least 95 percent of the net premium would be considered reasonable.

Current rules include some significant constraints on the new options. Both apply for purposes of triggering grace periods and coverage loss, but not for binder payments. As a result, an enrollee with even a very small or nominal premium must make a payment to effectuate coverage. Second, insurers may offer only one of the percentage-based thresholds. Finally, all of the options are based on the accumulated non-payment. For example, if the insurer has a dollar-value threshold of $5 and a consumer underpays by $3 for two consecutive months, the accumulated shortfall of $6 is considered as exceeding the $5 threshold.

Offering such thresholds is generally optional for insurers, and states may also limit them using insurance regulatory authority.

CMS now proposes to eliminate both new threshold options before they take effect, preemptively reducing the flexibility afforded to states and insurers. Insurers' flexibility would be limited to offering only net premium percentage thresholds. As a result, de minimis non-payments would continue to result in coverage loss. CMS estimates that this change would reduce APTC payments by about $820 million in 2026.

The agency justifies this proposal based on continued reports of enrollment fraud tied to brokers, which they say indicate that anti-fraud measures to date have been insufficient. CMS notes that it received 7,134 consumer complaints of improper enrollments in December 2024, an increase from 5,032 in December 2023, and that complaints in 2024 overall were up from 2023.

This explanation does not reasonably support the proposal for several reasons. First, CMS's measures to reduce broker fraud were phased in over the course of 2024, so the annual figures shed little light on their impact. Indeed, CMS released data in October finding "a dramatic and sustained drop across several key metrics that indicate that Marketplace system changes that were implemented in July 2024 are having the desired effect of successfully preventing consumers from being switched to different plans or enrolled in coverage without their informed consent." Moreover, CMS provides no evidence that this fraud—which has been tied to brokers—is related to premium payment thresholds. Such a connection seems especially unlikely given that the options CMS proposes to abolish have not yet taken effect, so they clearly have played no role in fraud to date.

## Allowing Coverage Denials for Past-Due Premiums (Section 147.104(i))

CMS proposes to allow issuers to condition new coverage on the repayment of outstanding premium debt for prior coverage. This policy is confusing for consumers, violates the statute, and will worsen Marketplace risk pools.

Under current policy, issuers are permitted to pursue traditional payment collection activities to collect on past-due premiums that an enrollee failed to pay; however, when a consumer makes a payment to the issuer for a *new* enrollment, the issuer must accept their new enrollment and cannot treat that payment as if it were payment for an *old* debt. To allow otherwise would be confusing for consumers. Marketplace consumers are generally engaging in an e-commerce-like transaction in which they have gone to a website, selected an item for purchase, and then visited another website and provided payment information in order to complete the purchase. CMS proposes to allow the issuer to accept the consumer's payment—but *not* actually sell them the item and instead keep the payment for an unrelated debt. Consumers in this situation could feel tricked into payment, and CMS is proposing to permit this once again.

Indeed, CMS has historically—and correctly—interpreted the statute to prohibit this behavior. Section 2702 of the PHS Act specifies that the issuer "must accept every... individual in the state that applies." The statute notes one limited exception to this requirement, relating to the time of year in which the enrollment occurs. No exceptions are available related to past due premium collections. Thus, an issuer that takes a consumer's payment but refuses the enrollment on the grounds that the funds have been applied to an old debt has violated the guaranteed availability requirements of section 2702. CMS was historically correct to articulate that the statute prohibits this behavior, and the statutory language clearly forecloses the atextual exception that is proposed.

Moreover, allowing these coverage denials will worsen Marketplace risk pools and raise premiums for all consumers, including the unsubsidized. These effects are the exact opposite of CMS's articulated goals in this proposed rule. A large body of literature demonstrates that young and healthier enrollees are far more price sensitive than older and sicker enrollees. These young and healthy individuals are more likely to decline to enroll if they make a payment—which they expect is their full premium payment—and yet are told they need to make an even greater payment to enroll. Moreover, these young and healthy enrollees are far more likely to have fallen out of coverage in the first place for past nonpayment of premiums. Deterring this group from returning to the Marketplace will only worsen the overall risk pool. In the proposed rule preamble, CMS notes that the proportion of enrollees terminated for nonpayment of premiums fell in a prior time period in which a version of this policy was in place. That analysis, however, ignores the fact that overall Marketplace enrollment also fell during this time period and premiums rose significantly—suggesting that a combination of policies led to fewer healthy enrollees retaining coverage and Marketplace coverage remaining only for those more at risk of health events, who are more likely to pay premiums throughout. CMS fails to account for these negative effects on this risk pool in their analysis of the proposed rule.

## Holding Agents, Brokers, and Web-Brokers Accountable for Unauthorized Enrollments (Section 155.220(g)(2))

CMS proposes to clarify the standards under which it would pursue a termination of an agent, broker, or web-broker's (collectively, "broker") Marketplace agreement. Specifically, CMS would

use a "preponderance of the evidence" standard of proof in order to assess whether a broker is in compliance with relevant laws, regulatory requirements, and agreement terms and conditions.

We support CMS's efforts to clarify the standard of proof it uses to assess brokers' conduct and pursue cases of suspected fraud or misconduct. We also appreciate CMS's recent efforts to mitigate the risk of unauthorized enrollments or plan switching, including the July 2024 action requiring a 3-way call with the Marketplace before a new broker can change an enrollee's existing plan. Following this action, broker-initiated plan changes dropped nearly 70%, and the redirection of commissions from a consumer's original broker to a new one (an indicator of potential misconduct) fell almost 90%. We further applaud the rule finalized in January 2025 clarifying CMS's authority to pursue actions against fraud or misconduct directed or facilitated by broker agencies.

However, we are concerned that CMS, without notifying the public, has reinstated the certifications of brokers that it previously suspended. This places consumers at continued risk of being victims of fraudulent enrollments or plan switching and sends a signal to the broker community that they will not be held accountable for misconduct. We are also extremely concerned about the past and possible future reductions in the CCIIO workforce and their impact on efforts to identify improper enrollments and conduct enforcement actions against brokers who have failed to properly gain consumer consent for an enrollment or plan change.

CMS seeks comment on further actions it should take to mitigate the harms associated with unauthorized enrollments and plan switching. We offer the following recommendations:

- CMS should provide an exceptional circumstances SEP, beginning when a consumer learns that he or she has been improperly switched to a new plan, to enroll in the plan of their choice.

- CMS should ensure that consumers are held harmless for any APTCs paid towards a plan for which their consent to enroll cannot be documented.

- CMS should work with participating issuers to stop payment of broker commissions on enrollments where consumer consent cannot be adequately documented.

- CMS should share information about troubling patterns of broker behavior with state insurance regulators prior to the final adjudication of a case. While we recognize that the details of an investigation cannot be made public, state insurance regulators are responsible for the licensure of brokers within their states. Therefore, regulators can and should be important partners with CMS in protecting consumers from broker misconduct.

- CMS should conduct consumer testing on its model consent form and scripts. Once tested, CMS should require the use of these forms and scripts by brokers for documenting consumers' review and confirmation of consent.

# Comments on the Regulatory Impact Analysis

The proposed rule includes a regulatory impact analysis that is central to its justification for the package overall and specific proposals. CMS requests comments on all aspects of the analysis. This section responds to those requests. It addresses two central elements of the analysis: claims about improper enrollment and claims about the rule's impact on the individual market risk pool.

The analysis is lengthy but frequently unclear about its specific methods and the data it relies on. It is also poorly connected to the proposals in the rule and thus does not provide a reasonable basis for finalizing the rule.

## *Analysis of Improper Enrollment*

The rule says that its primary purpose is to address the large number of improper enrollments that CMS claims exist. This is reflected in the reference to "integrity" in the rule's title and the numerous places in which CMS justifies its proposals on that basis.

CMS estimates that there were 4 to 5 million "improper" enrollments overall in 2024. It arrives at this figure by comparing actual enrollment in each state based on 2024 administrative enrollment data to estimates of the eligible population in each state based on 2023 survey data from the Census Bureau, trended forward to 2024. CMS finds that enrollment exceeds estimated eligibility in nine states, and the excesses in these states add up to 4.4 million. This methodology follows a Paragon paper, "The Great Obamacare Fraud." CMS also cites extensively documented data on consumer complaints about broker fraud.

CMS next estimates improper enrollments in 2026 by reducing the 2024 figure to account for the expiration of the PTC enhancements. CMS claims that the expiration of the enhancements will eliminate more than half of improper enrollments. CMS then appears to claim that the proposals in this rule will eliminate all remaining improper enrollments—reducing enrollment by between 750,000 and 2 million people. CMS further claims that the reduction in enrollment would only affect those improperly enrolled; in other words, the proposals will have no effect on legitimate enrollment. This final claim is addressed in the next section of this comment, focusing on risk pool effects of the proposals.

CMS's state-by-state estimates find that excess enrollment is highly concentrated in FFE states, especially non-expansion states. Indeed, 8 of the 9 states that were found to have take-up over 100% were non-expansion FFE states at the time of the data. None was an SBE state.

### **CMS's analysis of improper enrollment suffers from numerous flaws that undermine its credibility as a reasonable basis for rulemaking.**

The recent well-documented fraud by brokers is a legitimate and serious program integrity problem. CMS must have the resources and authority to investigate and take action against

fraudulent actions that compromise the integrity of marketplace programs. Indeed, it has already taken multiple steps to do so, as discussed below.

That said, CMS's analysis of "improper enrollments" contains numerous flaws that undermine its credibility and call into question the justifications for the rule's proposals. CMS concedes numerous shortcomings with its methodology, including that it does not account for recent CMS actions to improve program integrity, enrollees' uncertainty around their expected income, the tendency of survey respondents to understate income, and "the imprecision inherent in the use of survey data." CMS seeks comment on ways to improve its estimate, and on its proposals.

We respectfully submit the following suggestion to improve the analysis:

- **CMS should revise its analysis to avoid inaccurately describing individuals who enroll consistent with statutory rules as ineligible.** As we discuss in the section on denying APTC for FTR, CMS's analysis mis-applies eligibility rules in a way that leads it to overstate improper enrollment. Under the ACA, Marketplace financial assistance is based on *projected* annual income for the year. A consumer can receive APTC if they reasonably project that their income for the coverage year will be within the eligible range–for example, because they currently have a job in which they expect to earn 150% of FPL for the year, or they own a small business that is expected to produce that much profit. Because the reasonable projection standard is built into the rules, the consumer does not become "improperly enrolled" if they unexpectedly lose their job or realize a smaller-than-expected profit. Thus CMS's calculations of the "take-up rate" use the wrong denominator: it uses the number of people reporting eligible income for the year, but it should use the number of people who reasonably expected that they would have eligible income. (Measuring this correct figure is challenging, but that doesn't justify grounding policy changes in inaccurate figures.) Given that FPL is quite low—just over $15,000 for a single person for 2025 coverage—it is not unreasonable for people to think that their income could reach that level.

  It's also important to note that challenges in estimating annual income are especially acute for the low-income people targeted by CMS's policies, which means that the difference between the *correct* measure of the potentially eligible population and the number CMS uses will be especially wide. One detailed analysis of earnings variability among low-income workers found that more than half experienced significant variability in income, greater than higher income workers. The actual magnitude of this income variability is quite striking, with workers in the lowest quintile having more than double the magnitude of variability than all other income groups. (For low-income workers, the standard deviation of monthly income was 85% of the mean—so that someone who earned an average of $1,000 per month had so much variation month-to-month that a month where their income was anything from $150 to $1,850 would be within a single standard deviation.) Multiple other analyses find this same basic pattern.

This uncertainty point is reinforced by a paper by former and current Congressional Budget Office authors cited by CMS in the rule. The paper notes that "[g]iven the high income-volatility among low-income families, these results do not necessarily prove that ineligible people are signing up for marketplace coverage. Eligibility for advanced PTCs is based on an enrollee's expected annual household income for the coming year rather than on point-in-time income at the time of enrollment. This amount is hard to estimate, especially for households whose members may work part-time or seasonally, expect to change jobs, or are self-employed." CMS's analysis omits this qualification of the paper's findings.

- **The analysis should not calculate improper enrollment by comparing actual enrollment data to survey-based estimates of the eligible population.** CMS's estimate of improper enrollment relies on the conceptually incorrect method of comparing the actual enrollment data to estimates of the eligible population based on survey data. This approach creates several methodological problems, some of which CMS recognizes in the rule.
    - As CMS notes, the survey asks about income for the prior year, not the individual's reasonable expectation as to their income for the upcoming one. As noted above, the latter is what is relevant to eligibility.
    - Survey data generally understate incomes, as CMS notes in the rule. This inflates the number of people reporting income below the APTC eligibility range.
    - The survey data come from 2023. At this time the Medicaid continuous coverage requirement was in effect, which increased Medicaid enrollment by millions of people—many of whom would otherwise have qualified for subsidized Marketplace coverage. This reduces CMS's estimates of the number "eligible" for subsidized Marketplace coverage and thus exaggerates the number of improper enrollments.
    - The survey data used in the analysis that CMS cites uses a different family unit than is used for APTC eligibility.

Given these flaws, any efforts to estimate improper enrollments should use a different method. For example, research could be undertaken based on a sampling of actual enrollees. This is the method commonly employed by oversight agencies like GAO.

- **CMS's analysis should not ignore the effects of recent policy changes to address fraud.** Over the course of 2024 and into early 2025, CMS instituted numerous changes to protect consumers from unauthorized enrollments and plan switching in the FFE. The effects of these changes are not reflected in the enrollment counts used for CMS's analysis, since they are based on data from the OEP for 2024. These measures include the following:

    - Adding a documentation requirement for agents and brokers to show that individuals have consented to enroll.

- Imposing a requirement that prevented new brokers from changing existing coverage through enhanced direct enrollment ("EDE") channels until the Marketplace documented consumer consent through a 3-way call.
- Re-allocating staff to review and address consumer complaints as quickly as possible.
- Adding a requirement for agent and brokers to provide an SSN for applicants.
- Updating Marketplace IT systems to detect suspicious activity and prevent fraud
- Arming consumers with resources and information to better identify and protect themselves from unauthorized enrollments.
- Providing brokers with model consent notices and scripts to ensure their consumer clients are fully informed and that consent is adequately documented.
- Finalizing (in January 2025) rules clarifying CMS's authority to suspend brokers from facilitating enrollments and extending CMS's enforcement authority to broker agencies that direct or facilitate improper behavior by brokers, agents, or web-brokers.
- Several technical safeguard changes across enrollment platforms to protect against misuse of broker credentials.

There is evidence that these measures are working. After implementing the 3-way-call rule, broker-initiated plan changes dropped nearly 70% and changes that redirected a commission from a consumer's original broker to a new one—an indicator of potential misconduct—fell almost 90%. As CMS noted in October, "Marketplace system changes that were implemented in July 2024 are having the desired effect of successfully preventing consumers from being switched to different plans or enrolled in coverage without their informed consent." The current CCIIO director also recently noted that these measures are working.

- **CMS should wait until it can release more reliable results before proposing policy changes based on them.** CMS admits that its estimates of improper enrollment are deeply flawed and yet proceeds to propose policy changes justified by those estimates. This order of operations indicates a rulemaking process that is not grounded in careful analysis. CMS repeatedly asserts that changes are worth doing despite their downsides because there are so many improper enrollments.[5] Flaws in the improper enrollment figures undermine this central justification for the rule. These flaws also deny the public a meaningful opportunity to comment, since they lack information about the true scope and nature of the problem.

---

[5] For example, regarding the DMI policy when tax data are unavailable, CMS notes: "Considering the amount of improper enrollments under the current policy, we believe this administrative burden of requiring people with an income DMI due to unavailable IRS data to provide documentation to verify income are more than offset by the program integrity benefits." Regarding shortening the period to resolve a DMI, CMS notes: "However, we must weigh this potential positive impact on the risk pool against the substantial increase in APTC expenditures that we identified from ineligible people who stay enrolled and receive APTC for an additional 60 days. We believe the cost to taxpayers and decline in program integrity outweigh any possible benefit to the risk pool."

**Even if CMS's estimates of improper enrollment were credible, they would not provide a reasonable basis for many of the proposals in the rule.**

- **CMS should not require nationwide changes because it finds no evidence of improper enrollment in the vast majority of states.** CMS's analysis claims that there is excess enrollment in just 9 states, all of which use the FFE and all but one of which hadn't expanded Medicaid at the time the analysis was conducted. As such, the primary basis for the proposals in the rule is absent in 41 states. CMS finds excess enrollment in none of the 16 SBE states included in the analysis. Indeed, CMS finds an average take-up in the SBE states of just 32%—nowhere near the over 100% take up found in those 9 FFE states.

  This geographic trend is consistent with previously reported information about key FFE shortcomings involving brokers, EDE, and lead generators. It's also consistent with SBEs' experience on the ground, as noted in several comment letters and in comments at a recent NAIC meeting by Idaho insurance commissioner Dean Cameron. These comments confirm that SBEs are not seeing widespread complaints about fraud. And this dog-that-didn't-bark is meaningful—as CMS's experience shows, when this fraud exists, people complain, because it often leads to them losing other coverage, such as Medicaid.

  Despite this lack of evidence of improper enrollment in over four-fifths of states, the rule would force numerous changes nationwide. As discussed in comments by SBEs, this is a substantial imposition on state resources and autonomy that is not justified by CMS's data.

- **CMS should afford states flexibility and deference to manage their insurance markets.** The importance of state flexibility has been articulated by CCIIO Director Peter Nelson when, in 2024, he wrote, "States deserve more trust to protect consumers than the feds. Critics of state authority over health insurance take the untenable position that the federal government knows best and cares more. But state regulators live next door to the consumers they serve. They know the communities, the hospital systems, the provider shortage (and surplus) areas, the local economies, insurer footprints, and enrollee experiences better and more intimately than the federal government ever can. States have more incentive to keep a watchful eye on insurers and address policy problems without delay. Citizens can more easily hold states accountable when they don't."

- **Since CMS finds that improper enrollments are concentrated in FFE states, it should focus solutions on what FFE states are doing differently.** CMS's analysis finds that "take-up" rates in 2024 are high in FFE states, averaging 106% due to exceptionally high values in a few large states. Take-up rates are especially high in states that have not expanded Medicaid, averaging 179%. Again, this is consistent with

previously reported information about key FFE shortcomings involving brokers, EDE, and lead generators.

Given that the problem appears confined to a small group of states, it makes sense to consider what these states are doing differently and address those discrepancies. For example, while most SBEs maintain and operate their own agent and broker portals for assisted enrollments, the FFE allows enhanced direct enrollment entities to provide an enrollment platform for agents and brokers. In 2024, only FFE states used enhanced direct enrollment, which is known to be a key source of the problem. The FFE sees clear evidence of problems with agent and broker behavior in their use of enhanced direct enrollment platforms

Yet CMS does not include proposals that would address the known FFE issues, such as strengthening the FFE actions already taken, bringing FFE practices in line with SBEs practices, ensuring adequate regulation and enforcement of regulations governing EDE entities, regulating lead generators, and other options that target the actual problem rather than imposing new burdens on consumers. Instead, they force Marketplaces to make changes that lack a clear connection to the known problems.

In short, the proposals bear no reasonable connection to their stated justification and should be considered only if a suitable justification is provided.

## *Analysis Relating to Risk Pool Effects of the Rule*

CMS's second main justification for the proposed rule is that it would reduce premiums overall. CMS notes that this would encourage unsubsidized enrollment and help such enrollees, which CMS claims is especially important to the strength of the market.

Specifically, CMS claims that the proposed rule would improve the risk pool and thus reduce premiums by between 0.9% and 5.4%, depending on how much it reduces enrollment. The methodology for calculating the enrollment change is not entirely clear, but it appears to be based primarily on the assumption that the proposals would eliminate all improper enrollment while leaving all other enrollment unaffected—both extremely aggressive assumptions.

CMS estimates a range of potential enrollment reduction equal to its estimated range of improper enrollments in 2026, which—as discussed above—is three-quarters of a million to 2 million. CMS concedes that "this range may underestimate the actual number of individuals impacted, as eligible enrollees may lose coverage as a result of the administrative burdens imposed by the provisions of this rule." But it proceeds with its calculations as though no such coverage loss would occur.

CMS projects that this attrition of three quarters of a million to two million improperly enrolled people would likely hurt the risk pool, in part because individuals improperly enrolled by brokers may be unaware that they were enrolled and thus make little use of the coverage. Relying on

this projection, it estimates that eliminating improper enrollment would change premiums by between -0.5% and +4%. CMS then combines this range with several risk pool improvements that it claims will result from measures in the proposed rule. Specifically, CMS estimates that eliminating the under-150 SEP would reduce premiums by 3.4%, that expanding SEP verification would reduce premiums by 0.5%, and that the AV de minimis change will reduce premiums by 1%. Summing those figures arrives at the projected range of improvement—from 0.9% to 5.4%. CMS then assumes that the imposition of new administrative burdens will not cause eligible individuals to lose coverage, and thus that the range of a 0.9% to 5.4% improvement is the total impact.

CMS requests comments on this analysis and on the proposals it supports.

## CMS's analysis of the risk pool effect of the rule suffers from numerous flaws that undermine its credibility as a reasonable basis for rulemaking.

CMS's method for calculating the risk pool effects (and coverage effects) of its proposals is flawed in crucial ways that undermine the calculation's accuracy. The method makes unsupported assumptions, ignores key effects, fails to provide available data, and relies heavily on its flawed calculations about improper enrollment, as discussed above. The analysis could be improved in the following ways:

- **The risk analysis should not rely on the rule's deeply flawed estimate of improper enrollments, as discussed above.** Instead, CMS should improve that analysis, as discussed above, and then use better estimates of improper enrollment as the basis for its projections about coverage and the risk pool.

- **The analysis should not assume that the proposed rule would be 100% successful in eliminating improper enrollment.** CMS begins its methodological discussion by noting that "[o]ne approach to estimate the possible reduction in erroneous and improper enrollments under the proposed changes in this rule is to [use its estimate of total improper enrollments]." It then proceeds to follow this approach without explaining why it makes sense. The key assumption at work here—that the proposed rule would eliminate all improper enrollment—is implausible for several reasons. First, achieving a 100% success rate in eliminating improper payments is unheard of in any context—CMS provides no examples of it being achieved. Second, CMS offers no basis for such a bold assumption in this case. It provides no microsimulation analysis modeling the proposals, nor any scenario analysis for how its proposals would stop brokers in various situations. Third, as discussed above, CMS's proposals do not address many of the problems that are known to be leading to improper enrollments in the FFE. To produce a more accurate estimate, CMS should drop this assumption of perfection and engage in analysis of how its specific proposals would affect consumers.

- **The analysis should not make the implausible assumption that increasing administrative burdens will have no effect on enrollment and thus coverage**

**losses will be limited to people who weren't eligible to begin with. CMS should further recognize that the eligible people deterred from enrolling by these administrative burdens will be disproportionately healthy, and thus that these new administrative burdens will hurt the risk pool.** The rule asserts repeatedly that only improperly enrolled people will lose coverage. This appears to be based on two errors. First, CMS's estimates assume that increasing administrative burdens would lead to no coverage loss (and thus no risk pool impact) among eligible people. The proposed rule includes a wide array of proposals that increase administrative burdens on eligible people seeking to enroll, including new paperwork requirements under the DMI and SEP verification proposals, less margin of error for complying with administrative requirements under the FTR and premium payment threshold proposal, and narrower enrollment opportunities. A substantial body of evidence (including those listed below) indicates that administrative burdens reduce take-up among eligible people. In addition, this attrition disproportionately affects lower-risk individuals, since sicker people are more likely to fight through the burdens to stay covered.

- A [Mcintyre, Shepard, & Layton study](#) finds that states that implemented nominal monthly premiums saw enrollment fall by 14%.
- A [2025 study in the American Economic Review](#) finds that imposing administrative burdens to enrollment "differentially exclud[es] young, healthy, and economically disadvantaged people."
- An [American Economic Association study on auto-retention](#) finds "that automatic retention has a sizable impact,...differentially retaining healthy, low-cost individuals."
- [Commonwealth Fund report (Policy Innovations in the Affordable Care Act Marketplaces)](#)
- A [KFF brief (Key Facts about the Uninsured Population)](#) describes how almost 20 percent of uninsured nonelderly adults cite the difficulty or complexity of signing up as a reason for their lack of health insurance coverage
- [National Bureau of Economic Research report (Reducing Administrative Barriers Increases Take-up of Subsidized Health Insurance Coverage)](#)
- [2016 Urban Institute research report (Helping Special Enrollment Periods Work under the Affordable Care Act)](#)

There is also evidence to this effect from SBEs, as discussed below.
CMS makes no effort to address or refute this overwhelming evidence. It simply assumes that administrative burdens will not reduce enrollment.

This claim also appears to be predicated on the high estimates for improper enrollment, discussed above. Given that improper enrollments are likely much smaller than CMS estimates, it's implausible that all coverage losses would fall in this group.

- **CMS should tabulate and release the data it clearly possesses on the coverage and risk effects of its proposals.** The proposed rule repeatedly asserts impacts from its proposals without providing directly relevant data that it clearly has access to. For

example, the central basis for the claim of risk pool improvement is the estimate that eliminating the under-150 SEP would improve the risk pool by 3.4%. To support this estimate, CMS cites the estimate it made at the time it issued the regulation that created the SEP; at that time, CMS thought it would hurt the risk pool. However, CMS should have access to data obtained from the actual experience with implementing and utilizing the SEP, which could readily be used to calculate the risk profile of enrollees using it. But CMS does not provide such data. CMS explains this omission by arguing that releasing such information would not cleanly capture the risk impact of eliminating the SEP, since some people could switch to a different SEP. Still, it could provide an extremely relevant data point. Similarly, CMS could readily calculate the risk profile of individuals enrolling during the open enrollment period after Dec. 15, individuals losing coverage due to DMIs, individuals losing coverage due to FTR, and individuals re-enrolling with a zero premium. That CMS withholds such information likely suggests that available data do not support its case. CMS should release this information to permit a clearer understanding of the impacts of its proposals.

- **CMS's analysis fails to incorporate available evidence from state-based Marketplaces, which undermines its assumptions.** While CMS has not released FFE data directly applicable to its proposals, several SBEs have released such data. Their evidence directly contradicts CMS's assumptions and analysis. For example:
    - Actuarial data from California show that enrollees using SEPs generally have about the same risk profile as OEP enrollees. The California data also show that individuals using the OEP after Dec. 15 have a better risk profile than those enrolling earlier during OEP.
    - Actuarial data from the Massachusetts Connector show that their population with the most SEP eligibility generally has lower risk than other enrollees. Additionally, consumers enrolling through an SEP tend to be slightly younger than those enrolling through an OEP.
    - Enrollment data from the Massachusetts Connector show that younger individuals are slightly more likely to receive a non-income response from the IRS.
    - Enrollment data from New York show younger enrollees were more likely to enroll late in the open enrollment period.
    - DC Health Link found that the age of the SEP population remained consistent with the population that enrolled during open enrollment, and in some cases was even younger. See Fig. 5.

- **CMS should heed its own previous analysis suggesting that its current proposals would harm the risk pool.** For example, in eliminating data matching issues where tax data are missing in the 2024 NBPP, HHS noted that ending such DMIs would "strengthen the risk pool." However, the proposed rule does not acknowledge that reinstituting such DMIs would harm the risk pool. CMS has not even attempted to justify this change in position.

- **The analysis should recognize that adding administrative burdens is especially likely to be harmful amidst substantial cuts to staff that are needed to help resolve them.** Imposing additional administrative hurdles leads to more consumers needing help in meeting requirements to avoid losing coverage. But recent and ongoing funding and workforce reductions will mean less of this help. Recent cuts to Navigators will mean less enrollment support for consumers in resolving all of these issues. CMS staff reductions could mean less capacity to process DMI and SEP-V documentation. IRS staff reductions could mean less support for consumers facing FTR issues and fewer staff to ensure that returns are quickly processed and that Hub data are quickly updated to reflect processed returns. In addition to ignoring the prospect of coverage losses due to administrative burdens, CMS also ignores the fact that these losses could be exacerbated by staffing reductions. CMS's analysis should be revised to consider the impact of these cuts on coverage losses due to administrative burdens.

- **CMS's estimates regarding the risk pool and improper enrollment should be internally consistent.** Throughout multiple parts of its rule, CMS claims that the real-world impact of terminating 2 million people from coverage will be small, at times suggesting that most of these enrollments are from people who were enrolled without their knowledge. For all the reasons described above, that is certainly not true. CMS's proposals will result in families losing coverage on which they depend and to which they are entitled. But if CMS believes its claim to be true, then it would cause a very large *increase* in premiums that the agency is not accounting for. As a stylized example, if CMS's actions were to result in 2 million such enrollments being eliminated, premiums would increase for remaining enrollees by a staggering 9%. CMS has no basis for any of the claims about premium reductions made in its analysis, but they certainly cannot sustain those claims in the face of a 9% impact pointing the other direction.

- **CMS should recognize that its proposed rule would very likely increase premiums overall and reduce unsubsidized enrollment.** Given the numerous flaws discussed above with CMS's risk pool analysis and overwhelming countervailing evidence, it is almost certain that the proposed rule would in fact hurt the risk pool and increase premiums overall. In addition, several of the new administrative burdens would interfere with not just subsidized enrollment but unsubsidized enrollment as well. As a result, unsubsidized enrollment would be very likely to fall as well.

- **CMS should abandon its claim that the interests of subsidized and unsubsidized enrollees are at odds.** CMS seems to concede that its proposals would harm subsidized enrollees. To justify this, it attempts to make the case that the interests of subsidized and unsubsidized enrollees are somehow in conflict, and that making subsidies smaller and harder to get will somehow help the unsubsidized. This view is in conflict with decades of experience with health policy. Efforts to provide good coverage at a premium that doesn't account for health risk, without a strong financial incentive to enroll—such as strong subsidies—has uniformly led to an adverse selection death spiral. The best thing for unsubsidized people is a good risk pool, which requires strong

subsidies that are easy to get and thus induce healthier people to enroll. This is the hard-earned lesson that became the basis for health reform in Massachusetts under Governor Mitt Romney and then for the ACA.

# Comments on Procedural Issues Under the Rule

The proposed rule suffers from several problems of administrative procedure and law that, individually and together, deny the public a meaningful opportunity to comment. These problems must be addressed before the rule can be finalized.

### The rule fails to provide readily available information that is directly relevant to understanding the proposals.

As noted above, the rule fails in numerous places to provide data that are clearly relevant to understanding the proposals and that CMS has access to. For example, CMS certainly has the data needed to calculate the risk profile of individuals who lose coverage under DMI and FTR policies. Yet it does not reveal this information. Instead, it repeatedly claims generally that its proposals are supported by "analysis" without citing specific data, sometimes citing generally to "public use files" or "tax filing data." (Indeed, as noted above publicly available data and data from SBEs often indicate the opposite of what CMS claims.) Withholding this information on which CMS purports to rely denies the public a reasonable opportunity to comment.

### The rule and subsequent CMS actions indicate a premeditated intent to finalize the proposals without meaningfully considering comments.

The rule includes the following statement disparaging commenters and the comment process:

> We acknowledge that a higher number of comments can suggest a position we should consider more closely. However, we must also consider that many parties who comment on rulemaking may represent the will of special interests who do not necessarily represent all special interests or the general public interest in the faithful and efficient administration of the statute. It is not uncommon to receive comments that only represent one side and no opposing comments that might represent other special interests or a more general interest in good governance or the equities of the taxpayer. As our constitutional role is to faithfully execute the statute, we are responsible for considering all comments, as well as perspectives that may not be fully represented in comments, within the context of what the statute requires.

We are aware of no precedent for a statement like this. Its disparagement of commenters as "special interests" shows a disrespect for the notice and comment process required by the Administrative Procedure Act ("APA"). Its threat of dismissing prevailing public views suggests a premeditated intent to finalize the rule's proposals regardless of comments.

CMS confirmed this intent when, during the comment period, it released a revised final actual value calculator reflecting the changes in the proposed rule, which commits the agency to finalize certain policies as proposed.

In short, CMS has made clear that it does not intend to meaningfully consider comments, as required by the APA.

In addition, we note that by deciding to finalize certain provisions of the rule before consideration of public comments, CMS has also restricted the administrative record on which the agency can rely in defending their choices regarding those provisions as non-arbitrary. CMS had decided and committed the agency to finalize many of the policies in the rule before the comment period for the proposed rule had closed. Therefore, any analysis that CMS conducts in response to comments—and any explanation that appears in the final rule preamble—is a post hoc justification. Such analysis will have occurred entirely *after* CMS had committed the agency to finalize the policies as proposed and cannot be treated as analysis that the agency considered in the course of reaching a non-arbitrary decision to finalize. CMS will generally be limited to the analysis that it provided in the preamble to the proposed rule, unless the agency can make a specific showing that any additional considerations were weighed internally by the agency before release of the AV calculator. Attempts to cite the final rule preamble for this purpose have been foreclosed by the agency.

## The public comment period is too short to provide meaningful comments—especially given the request for detailed comments on analytical claims—and should be extended.

CMS provides an unusually short comment period for the rule, despite its great complexity. The comment period is just 23 days from when the rule was published in the Federal Register (March 19, 2025) to the deadline on April 11.

The short comment period is especially troubling because of CMS's request for comments on the methods and results in the regulatory impact analysis. Such analysis requires detailed modeling work, which is impossible in the timeframe provided. CMS should extend the comment period, providing a minimum of 90 days from the announced extension.

The short comment period is likely connected to speedy effective dates for several provisions. Many of the proposed changes would be impossible for Exchanges to implement in the timespan contemplated. When it announces an extension of the comment period, CMS should also delay these proposed effective dates.

Sincerely,


Jason Levitis
Senior Fellow

The Urban Institute

Christen Linke Young
Visiting Fellow
The Brookings Institution

Sabrina Corlette
Research Professor
Georgetown University
McCourt School of Public Policy

Organizational affiliations of the authors are listed for identification purposes. The views expressed in this comment are those of the authors and do not necessarily represent those of their organizations or funders.