





**STATE OF CALIFORNIA OFFICE OF THE ATTORNEY GENERAL ROB BONTA**

**COMMONWEALTH OF MASSACHUSETTS OFFICE OF THE ATTORNEY GENERAL ANDREA JOY CAMPBELL**

**STATE OF NEW JERSEY OFFICE OF THE ATTORNEY GENERAL MATTHEW J. PLATKIN**

April 11, 2025

**Via Federal eRulemaking Portal at www.regulations.gov**
Dr. Mehmet Oz, Administrator
Centers for Medicare & Medicaid Services
Department of Health and Human Services
P.O. Box 8016
Baltimore, MD 21244-8016

Re:   Comments on Proposed Rule: Patient Protection and Affordable Care Act; Marketplace Integrity and Affordability
Docket No. CMS-2025-0020-0011 (formerly CMS-9884-P), RIN 0938–AV61
90 Fed. Reg. 12,942 (Mar. 19, 2025)

Dear Ms. Carlton:

We, the undersigned Attorneys General of California, Massachusetts, New Jersey, Arizona, Colorado, Connecticut, the District of Columbia, Delaware, Hawaiʻi, Illinois, Maine, Maryland, Michigan, Minnesota, Nevada, New Mexico, New York, Oregon, Rhode Island, Vermont, Washington, and Wisconsin write[1] in response to the proposed rulemaking by the U.S. Department of Health and Human Services and Centers for Medicare & Medicaid Services (collectively, "Department") entitled "Patient Protection and Affordable Care Act; Marketplace Integrity and Affordability."[2] The Proposed Rule creates new hurdles that will significantly restrict eligibility, diminish enrollment, and increase consumers' health insurance premiums and out-of-pocket costs. This outcome will undermine the purpose of the Patient Protection and Affordable Care Act (the

---

[1] The Department should deem all materials cited to in this comment letter as submitted into the administrative record.
[2] 90 Fed. Reg. 12,942 (March 19, 2025) (hereafter the "Proposed Rule").

ACA), which is to increase access to high quality and affordable healthcare. As discussed below, most of the Proposed Rule's changes should be withdrawn.[3]

Congress enacted the ACA to "*increase* the number of Americans covered by health insurance and *decrease* the cost of health care."[4] The goal of covering as many Americans as possible is at the heart of the ACA; Congress elected to model the ACA on the then-existing system in Massachusetts, which combined tax credits, market regulations, and a coverage mandate, resulting in an uninsured rate of "2.6 percent, by far the lowest in the nation."[5]

The Department is tasked with furthering the ACA's twin goals—cover as many people as possible, as affordably as possible—when implementing its provisions, while protecting the financial integrity of the marketplace. The Proposed Rule, however, will have the opposite effect, and will not accomplish its purported goals. Millions of Americans will go uninsured under the Proposed Rule. The Proposed Rule projects that between 750,000 and two *million* individuals will lose their health coverage because of the proposed changes.[6] And when these newly uninsured individuals need healthcare—as everyone eventually will—the States will bear the cost.

The Proposed Rule claims to target fraud but does little to address the actual sources of fraud—most of which occurs at the federal, not state level. Instead, the Proposed Rule introduces measures that will not meaningfully decrease fraud, and instead will throw millions of people out of the healthcare marketplaces. This, in turn, will result in: (1) "potential costs to State governments and private hospitals in the form of charity care for individuals who become uninsured as a result of the proposals in this rule"; (2) increased state Medicaid expenditures from "enrolling more people in Medicaid who would have otherwise enrolled in" subsidized marketplace coverage; and (3) potential increased costs to the States from covering emergency medical treatment for DACA recipients "who would become uninsured if the proposal pertaining to DACA recipients in this Rule is finalized."[7] The Department should not finalize a Proposed

---

[3] The undersigned States also object to the truncated review period for the Proposed Rule. The Proposed Rule was published in the Federal Register on March 19, 2025, and comments are accepted through April 11, 2025. HHS therefore provided only 23 days to review a complicated, multifaceted rule spanning 90 pages in the Federal Register. At a minimum, rulemaking requires at least thirty full days, and ideally longer, for public comment. *See, e.g., Nat'l Lifeline Ass'n v. Fed. Commc'ns Comm'n*, 921 F.3d 1102, 1117-18 (D.C. Cir. 2019) ("When substantial rule changes are proposed, a 30-day comment period is generally the shortest time period sufficient for interested persons to meaningfully review a proposed rule and provide informed comment.") Nevertheless, a Proposed Rule of this complexity and magnitude warrants a comment period of 60 days, which is standard. That would have allowed for proper analysis of the dozens of significant changes being proposed. The California Attorney General submitted a letter to HHS and the Office of Management and Budget on April 2, 2025, making this objection and asking for at least 30, and ideally 60, days for public comment.

[4] *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012) (emphases added); *see King v. Burwell*, 576 U.S. 473, 491(2015) ("Congress passed the Affordable Care Act to improve health insurance markets, not to destroy them.")

[5] *King*, 576 U.S. at 481.

[6] 90 Fed. Reg. at 13,007.

[7] 90 Fed. Reg. at 13,008.

Rule that—by its own admission—will spike the uninsured rate and unfairly shift significant healthcare costs to state and local governments.

Nor is the damage limited to those who will lose their health coverage entirely. Consumers who remain in the marketplaces will face higher premiums and out-of-pocket costs because of the Proposed Rule's changes to the premium adjustment methodology[8] and actuarial value targets.[9] This will also lower the amount of advance premium tax credits (APTCs).

Additionally, the elimination of eligibility for DACA recipients does nothing to further the goals of the ACA, weakens the risk pool, and unfairly targets a vulnerable group of individuals who have lived in this country for at least 17 years (and often more). Because DACA recipients are frequently among the younger and healthier members of the health insurance risk pool, ending their eligibility for coverage is not just cruel and capricious, it squarely contradicts sound healthcare policy. Excluding DACA recipients from the marketplaces does nothing to advance public health.

Similarly, there is no reason to remove medically necessary treatments for transgender individuals from the definition of an Essential Health Benefit (EHB). The Proposed Rule is simply wrong when it asserts that employer-sponsored plans do not cover such care; many, in fact, do, at very little cost. This proposal, too, smacks of discriminatory targeting of a vulnerable group of individuals purely because they are politically disfavored.

Finally, the Proposed Rule infringes on our states' independence and sovereignty by mandating several changes that reduce flexibility in our own marketplaces. Congress established the Federally Facilitated Exchange (FFE) alongside the State-Based Exchanges (SBEs) precisely so that States could experiment with their own approaches to healthcare marketplace provisions if they wished to do so. States, not the federal government, are best positioned to respond to their citizens' unique needs, and allowing SBEs to operate with broad discretion promotes innovation in the marketplace. Tellingly, the Proposed Rule does not suggest that any of the integrity concerns it raises are present in the SBEs. The federal government should encourage, not suppress, the flexibility and experimentation represented in the SBEs.[10]

We appreciate the opportunity to provide these comments and stand ready to collaborate with the Department to ensure a robust, affordable, comprehensive, and secure healthcare marketplace.

---

[8] 90 Fed. Reg. at 12,987-95.

[9] 90 Fed. Reg. at 12,995-97.

[10] Randy Pate, former Director of the CMS Center for Consumer Information and Insurance Oversight during the previous Trump Administration, has argued that States should eschew the federal exchange platform and run their own SBEs and utilize the ACA's Section 1332 waivers to "reduce costs, increase state autonomy and oversight, and promote state flexibility," pointing out that the Constitution leaves health and welfare decisions largely to the States. Randy Pate, Statement to the Managed Care (B) Committee, Annual Conf. of the Nat'l Ass'n of Ins. Comm'rs (Summer 2022), https://tinyurl.com/4nc9pnh5.

I.   **THE MARKETPLACE INTEGRITY CHANGES ARE NOT SUPPORTED BY EVIDENCE, ARE NOT REASONABLY EXPLAINED, AND IGNORE SUBSTANTIAL RELIANCE INTERESTS**

A.   **Several Proposals Will Make Coverage Unnecessarily Difficult to Obtain**

Federal agencies may not justify their decisions using explanations that are "incongruent with what the record reveals about the agency's priorities and decisionmaking process."[11] The Department of Health and Human Services exists to promote public health. And while many of the Proposed Rule's changes are justified on the basis that they combat fraud, increase efficiency, or promote marketplace integrity and consumer protection, several of the proposed changes will make it more difficult for enrollees to secure coverage. These proposals contradict HHS's priorities and should be withdrawn.

1.   **Requiring all exchanges to end open enrollment on December 15 will likely cause hundreds of thousands of people to miss the enrollment window.**

To help encourage consumers to maintain coverage year-round, health insurance exchanges generally only accept enrollees for the upcoming calendar year during the open enrollment period (OEP). The length of the OEP should be calibrated to balance the risk of adverse selection—enrollees only seeking coverage when sick—against the need to make coverage accessible to as many people as possible. Sometimes, special circumstances might necessitate allowing enrollees to access coverage outside of the OEP, as discussed in the following section. Here, this Proposed Rule would limit open enrollment to 45 days (November 1 through December 15) on both the FFE and the SBEs.[12] SBEs have always had the flexibility to establish a longer open enrollment period, and most do so. There is no reason to eliminate states' flexibility to have a longer open enrollment period. Data shows that permitting open enrollment through mid-January allows hundreds of thousands of additional consumers to enroll and gives them sufficient time to choose the plan that is right for them.

The Proposed Rule claims that a longer open enrollment period contributes to adverse selection.[13] But the Proposed Rule does not provide any data showing that the risk of adverse selection is worsened by a longer OEP, or that shortening the OEP is likely to have a material impact on adverse selection risk for insurers. On the contrary, in previous rulemaking, the Department acknowledged that a "shortened enrollment period could lead to a reduction in enrollees, primarily younger and healthier enrollees who usually enroll late in the enrollment period."[14] The Proposed Rule also acknowledges that extending the OEP through January 15 allows consumers who had been automatically re-enrolled in a plan they may not want "the opportunity to change plans after receiving updated plan cost information from their issuer and to

---

[11] *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019).
[12] 90 Fed. Reg. at 12,976.
[13] *Id.*
[14] *Patient Protection and Affordable Care Act; Market Stabilization*, 82 Fed. Reg. 18,346, 18,377 (Apr. 18, 2017) (final rule).

select a new plan that is more affordable to them."[15] Further, the Proposed Rule acknowledges that several marketplace experts, including "Navigators, certified application counselors (CACs), agents, and brokers" conveyed during prior rulemaking that they were concerned about "a lack of time to fully assist all interested Exchange applicants with comparing their different plan choices," suggesting that the longer OEP is both necessary and justified.[16] The Department's sudden disregard for those concerns, which remain just as valid today, is not "reasonable and reasonably explained."[17]

As the Department admits, nearly half a million individuals—or approximately three percent of enrollees—for the 2025 plan year elected to end coverage or switch plans between December 15 and January 15.[18] Many of those consumers will likely fail to sign up in time if open enrollment ends on December 15. The shortening of the annual OEP to 45 days disregards the need for consumers to have sufficient time to understand their options and make informed decisions. At a bare minimum, if the Department finalizes the shorter OEP for the FFE, the Department should not take away the flexibility SBMs have had to set OEPs that work in their markets and should delay shortening the open enrollment period until 2027, given the uncertainty over whether the enhanced premium tax credits will expire at the end of 2025.

Our States know firsthand that longer OEPs benefit our residents. New Jersey, for instance, utilizes an OEP that runs from November 1 through January 31. In the most recent OEP, 513,217 New Jerseyans signed up for coverage through Get Covered NJ—a 30% increase year-over-year, and a 108% increase since New Jersey launched its Get Covered NJ initiative.[19] At the same time, New Jersey has no significant problem with fraudulent enrollments on its exchange. And in Massachusetts, over half of enrollees who manually shopped for a plan during the most recent OEP completed their plan selections after December 15, 2024. Those later enrollees also tended to have lower average medical expenses than the earlier enrollees. The story is similar in the District of Columbia, where an average of 46% of new enrollments in the two most recent OEPs occurred after December 15. In Colorado, too, those who enrolled after December 15 tended to be younger and healthier, raising concerns that a shorter OEP would harm the risk pool and cause premiums to increase. In Washington State, 46% of new customers selected a plan after December 15, and 4 in 10 of those new customers are under the age of 35, compared to 3 in 10 under age 35 for those who enrolled before December 15. Finally, in Connecticut, consumers who enrolled before December 15 tended to be older than those who enrolled on December 15 or later, and a higher percentage of the post-December 15 enrollment pool were "new" enrollees rather than returning enrollees. These data demonstrate that the longer enrollment period is key to maintaining robust enrollment and a balanced and healthy risk pool.

The proposal to not only shorten the OEP, but to mandate that independent state exchanges shorten theirs, too, is not in the best interests of consumers and should be withdrawn.

---

[15] 90 Fed. Reg. at 12,978.
[16] 90 Fed. Reg. at 12,978.
[17] *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).
[18] 90 Fed. Reg. at 12,978.
[19] N.J. Dep't. of Banking and Ins., *Governor Murphy and Commissioner Zimmerman Announce Historic 2025 Get Covered New Jersey Sign-Ups* (Feb. 20, 2025), https://tinyurl.com/379j9f9u.

**2. Eliminating the low-income special enrollment period (SEP) for individuals whose projected annual household income is at or below 150 percent of the federal poverty level (FPL) needlessly restricts access to coverage for low-income Americans.**

In addition to the standard OEP, there are several different special enrollment periods (SEPs) for individuals facing particular circumstances. One such SEP allows individuals or families whose projected annual household income is at or below 150 percent of the federal poverty level to sign up for coverage at any time of the year. This mirrors Medicaid and the Children's Health Insurance Program (CHIP), both of which allow enrollment for low-income Americans at any time of year. One rationale for creating this SEP was to ensure that those who were transitioning off Medicaid or CHIP would not be stranded without coverage until the next OEP. Such flexibility is especially vital now, with over 25 million people having been disenrolled from Medicaid since the unwinding of the Covid-era continuous enrollment condition.[20] The Proposed Rule eliminates the low-income SEP entirely.[21] This would harm hundreds of thousands of our residents. In Illinois alone, over 146,000 current enrollees have incomes that fall within 100 to 150 percent of the FPL.

The Department has cited no evidence supporting its contention that this SEP is a unique driver of fraudulent enrollment, or that eliminating it is likely to have a material effect on any such abuse. The monthly SEP for those with household incomes at or below 150 percent of the federal poverty level is a critical protection for the lowest-income Americans. Last year, the Department acknowledged that the continued availability of this SEP "may continue to help consumers who lose other [minimum essential] coverage, especially those disenrolling from Medicaid or CHIP coverage to regain health care coverage."[22] The Department additionally found that the risk of adverse selection associated with this SEP was lower than anticipated.[23]

Unable to point to any data showing that its prior evaluation was wrong, the Department now asserts—without citing evidence—that "more experience with this SEP suggests it has substantially increased the level of improper enrollments, as well as increased the risk for adverse selection, as [this] SEP incentivizes consumers to wait until they are sick to enroll in Exchange coverage."[24] Neither assertion is well taken.

With respect to improper enrollments, while it is true that "some agents, brokers, and web-brokers have exploited" certain weaknesses in the Healthcare.gov technology to allow

---

[20] *Medicaid Enrollment and Unwinding Tracker*, Kaiser Family Foundation (Mar. 31. 2025), https://tinyurl.com/5eb2rsbj.

[21] 90 Fed. Reg. at 12,979-82.

[22] Patient Protection and Affordable Care Act, HHS Notice of Benefit and Payment Parameters for 2025; Updating Section 1332 Waiver Public Notice Procedures; Medicaid; Consumer Operated and Oriented Plan (CO-OP) Program; and Basic Health Program, 89 Fed. Reg. 26,218, 26,320 (April 15, 2024) (final rule).

[23] *See* 89 Fed. Reg. at 26,321 ("[A]n analysis of the plans available to consumers in 2020, just before implementation of the enhanced subsidies, suggests that the risk of adverse selection we acknowledged may be lower than expected, and therefore, downstream impacts of that risk may be mitigated.")

[24] 90 Fed. Reg. at 12,979.

enrollment—and thus earn commissions—without a consumer's consent,[25] there are other, less burdensome changes—such as requiring two-factor authentication and verbal authorization from the consumer—that would adequately address the problem of fraudulent enrollment without imposing a heavy burden on the poorest Americans. The Department also acknowledges that the number of consumer complaints for unauthorized enrollments dropped from a high of 39,985 in February 2024 to just 7,134 in December 2024—even though the SEP remained available during that entire period.[26] In light of that massive decrease in complaints while the SEP remained in place, eliminating the SEP is not necessary to substantially reduce the problem of fraudulent enrollment by unscrupulous brokers.

The Department also points to a supposed discrepancy between the number of Floridians who claimed estimated annual household income between 100 and 150 percent of the FPL and the number of Floridians who have income within that level according to the U.S. Census American Community Survey.[27] But commentators have called this an "an apples-to-oranges" comparison,[28] and it is not clear why the Department expect households' estimates of income to match Census Bureau data, especially when the respondent populations do not perfectly overlap with one another and when other factors such as immigration status, household size, and geographic location may drive distinctions between the two groups.

Eliminating this SEP would harm the most vulnerable residents of our States and leave the lowest-income participants unable to obtain health coverage when they need it. This proposal should be withdrawn.

    **3. Requiring that all exchanges verify enrollment eligibility for those who claim SEP eligibility due to a "triggering event" risks barring consumers from coverage due to paperwork errors and imposes tremendous costs on State exchanges.**

Another kind of SEP allows for enrollment in a health plan after some triggering event such as the loss of a job, a move to a new geographical area, or the birth of a child. The Proposed Rule reintroduces an earlier rule that exchanges on the federal platform verify all such claims of eligibility, and newly requires that all exchanges—including SBEs—verify eligibility for at least 75% of new enrollees under this SEP prior to commencing coverage.

These changes would impose difficult—and sometimes insurmountable—verification barriers. The paperwork to verify qualifying life events is not always readily available. A small employer that suddenly goes bankrupt may not be able to provide its former employees with the paperwork that would allow access to the healthcare marketplace, or a local government might need over a month to mail a birth certificate to a new parent. In these situations, the enrollee faces

---

[25] 90 Fed. Reg. at 12,980.

[26] *Id.*

[27] 90 Fed. Reg. at 12,980-81; *see also id.* at n.121 (citing U.S. Census Bureau, U.S. Dep't. of Commerce, *American Community Survey* (2022), https://tinyurl.com/4bw2aajf).

[28] Katie Keith & Jason Levitis, *HHS Proposes to Restrict Marketplace Eligibility, Enrollment, and Affordability In First Major Rule Under Trump Administration (Part 1)*, Health Affairs (March 12, 2025)*,* https://tinyurl.com/bd3289tp (hereafter "Keith & Levitis Part 1").

the prospect of going without coverage due to these paperwork requirements that they are unable to satisfy.

The Department acknowledges that only 73 percent of consumers were able to submit documents within 14 days after an SEP verification issue (SVI) was generated—meaning 27 percent, or more than one in four, enrollees attempting to utilize an SEP may be blocked from doing so for technical reasons unrelated to their eligibility.[29] Therefore, the Department's claim that pre-enrollment verification poses no "substantial enrollment barrier"[30] is simply untrue according to its own data. And any barrier to enrollment is likely to discourage younger, healthier enrollees from completing the sign-up process. Requiring consumers to navigate complex documentation processes, often during times of significant and sudden changes in their personal circumstances, will undoubtedly deter eligible individuals, including younger and healthier people, from obtaining coverage.

By turning away eligible individuals because of inadequate paperwork, this proposed change is also likely to negatively impact the risk pool. In DC, for instance, enrollees utilizing "triggering event" SEPs tend to be younger than enrollees utilizing the Open Enrollment Period. As the Department acknowledges, "younger people submit acceptable documentation to verify their SEP eligibility at lower rates than older consumers, which can negatively impact the risk pool as younger consumers use less health care on average,"[31] meaning that the added verification requirements are likely to result in fewer young enrollees entering the risk pool. Imposing this additional requirement is almost certain to weaken the risk pool, not strengthen it. *See infra* p. 31.

In addition to imposing an unnecessary burden on consumers and weakening the risk pool, this change also imposes substantial burdens on the State-Based Exchanges, which will have to fund extensive document verification operations in the absence of any demonstrated benefit to the States for doing so. With at least sixty days to evaluate this change, *see supra* n.2, California and other undersigned States could have conducted a robust analysis of the fiscal and administrative impact of the 75% verification requirement on their state Exchanges.

Finally, there is no evidence showing that this change is necessary to reduce fraudulent enrollment or adverse selection.

The Department should withdraw the proposal to require exchanges to verify enrollment eligibility for at least 75% of those who claim SEP eligibility due to a "triggering event," or, at a minimum, should allow SBEs to opt out of implementing this change.

---

[29] 90 Fed. Reg. at 12,983.
[30] 90 Fed. Reg. at 12,984.
[31] *Id*.

   **4. Eliminating APTC eligibility for individuals who fail to file and reconcile (FTR) their income data against their APTC award for one year rather than two years increases the chance of wrongful terminations due to administrative error, limits consumer choice, and threatens to allow government ineptitude to harm consumers.**

   The ACA provides tax credits—APTCs—to individuals whose projected household income qualifies them for assistance with paying their healthcare premiums. Because those APTC awards are based on projections, the recipient must later reconcile their APTC award against their actual income, as shown in their tax filings with the Internal Revenue Service (IRS). If the enrollee earned more than projected, the enrollee then owes the difference as a tax liability when they next file taxes. This requirement ensures that patients cannot claim and retain credits to which they are not entitled. When an individual fails to file taxes and reconcile their income data with the APTC award, they lose eligibility for future credits and owe the prior period's credits as a tax liability. This is known as failure to file and reconcile, or FTR. This proposal would eliminate APTC credit eligibility and impose a corresponding tax liability after one FTR year, rather than after two consecutive FTR years.

   Reverting to a one-year FTR rule increases the risk of eligible individuals losing access to APTCs due to administrative complexities or processing delays. Many more people receive one-year FTR codes than two-year FTR codes; in Massachusetts, for instance, one percent of enrollees for January 2025 coverage received a one-year FTR code, while just 0.1% received a two-year code. This implies that most people with one-year FTR codes can resolve their FTR status before receiving a two-year code. If this proposed change were to be implemented, all those people would lose coverage. But there are sometimes anodyne explanations for FTR status: the Department acknowledged that FTR needed to be paused during the Covid-19 public health emergency "due to concerns that consumers who had filed and reconciled would lose APTC due to IRS processing delays resulting from IRS processing facility closures and a corresponding processing backlog of paper filings."[32] The Department should formalize this practice via rulemaking, so that future IRS processing delays do not cause an enrollee to lose coverage through the FTR process. APTC beneficiaries are especially vulnerable to IRS processing delays in the future because the IRS is reportedly seeking to cut as much as half of its 90,000-person workforce.[33] The Department has not considered the potential impact of this change on otherwise eligible enrollees who may lose tax credits erroneously. The Department should evaluate the risk of IRS processing delays before implementing this change.

   The Department claims this change will help reduce tax liability for consumers, because the maximum accumulated wrongful benefit will be just one year of APTC rather than two.[34] To the extent any consumers do face increased tax liability, the Department should consider whether such a trade-off was a rational choice for the consumer at the time, *i.e.*, the maintenance of health coverage was worth more to the consumer than the increased tax liability at the end of the two-year FTR period. The Department should evaluate whether, for such consumers, the tax liability

---

[32] 90 Fed. Reg. at 12,958.
[33] Fatima Hussein, *The IRS is drafting plans to cut as much as half of its 90,000-person workforce, AP sources say,* Associated Press (March 4, 2025), https://tinyurl.com/m58czdjb.
[34] 90 Fed. Reg. at 12,959.

is not as burdensome as the loss of coverage would have been. Because the Department claims that respecting consumer choice is a motivating factor behind its proposal to eliminate the crosswalk policy, as discussed *infra*, the Department should also consider the role that consumer choice and rational economic decisionmaking plays in the FTR context.

The Department estimates this change could remove up to $1.86 billion of federal tax credits from the health insurance market.[35] Reducing tax credits, not protecting consumers, appears to be the reason behind this proposed change.

The proposal to move to a one-year FTR period should be withdrawn.

> **5. Allowing plans to deny coverage for those with prior past-due premiums will block access to healthcare for those whose prior nonpayment may have been unintentional.**

Currently, insurance plans may pursue collection for past-due premiums but may not condition the provision of new coverage upon the payment of past-due premiums from prior coverage. Insurers, like any business, have legal options for pursuing collection of amounts owed to them. This proposal, for the first time, would allow insurers to deny coverage to an enrollee who owes past-due premiums from *any* prior period, not just the last twelve months, as an earlier rule provided. This proposed change does not require insurers to notify enrollees if they implement this policy—raising concerns that consumers could be denied coverage without being aware that the denial is due to owing a past-due premium.

This rule change is likely to harm consumers whose earlier nonpayment may not have been intentional. The Department acknowledges that this change would cause those individuals to lose coverage but expects that such losses would be minimal; no evidence is provided for that assertion.[36]

In previous rulemaking, the Department acknowledged that nonpayment could be due to a variety of factors and found that existing balance-collection methods are sufficient to protect insurers.[37] At a minimum, the Department should not mandate this change across the board. States should be free to enact their own policies regarding premium payments.

The proposal to allow insurance plans to deny coverage to consumers who owe a past-due premium from any prior period should be withdrawn.

> **B.    Several Proposals Will Result in Increased Costs and Decreased Coverage for Remaining Enrollees**

The previous set of proposals, along with the wholesale deletion of DACA recipients from the risk pool, seem designed to eliminate coverage for as many people as possible. The following

---

[35] 90 Fed. Reg. at 13,011-12.
[36] 90 Fed. Reg. at 13,009-10.
[37] *Patient Protection and Affordable Care Act; Health Insurance Market Rules; Rate Review*, 78 Fed. Reg. 13,406, 13,416-17 (Feb. 27, 2013).

set of proposals, if adopted, will ensure that those who remain enrolled in an Exchange plan pay higher premiums for lower-quality coverage. The Department has wholly failed to consider the costs that these changes will impose on consumers, and has not explained why, in its view, the purported benefits of these changes outweigh the very significant harms.[38] Because it has not done so, the Department should withdraw these proposals.

1.  **Changing the premium adjustment calculation methodology and the acceptable actuarial value ranges will increase health insurance plans' costs and lower their quality.**

Exchange plans set a maximum annual limit on cost-sharing, such as copays, coinsurance, and out-of-pocket maxima due from the enrollee over the plan year. Those annual limits are adjusted in reference to a measure of premium inflation called the annual premium adjustment percentage, set by the HHS Secretary each year. In addition, the IRS uses the premium adjustment percentage when determining individuals' expected contributions and thus the amount of APTC the enrollee will receive. Accordingly, subtle changes in the way the premium adjustment percentage is calculated can have large effects on both out-of-pocket costs and the amount of APTC an enrollee is entitled to receive.

Present policy recognizes that the premium adjustment methodology needs to be price-stable to reduce volatility and keep premiums from spiking. Presently, the adjustment methodology looks to a biannual measure of premium inflation that is based on the employer-sponsored insurance (ESI) market, rather than the individual market, which is much more price-volatile. Including the more price-volatile market in the measure of inflation is certain to increase out-of-pocket costs to consumers.[39] The Department has not shown that this change will increase efficiency or improve resource allocation.

Because the point of the ACA is to make healthcare more accessible and affordable,[40] it is concerning that HHS now believes that "making coverage more accessible and affordable" is an improper "policy objective" that "can only serve to distort the alignment the ACA requires HHS to maintain between premium growth and the parameters subject to the premium adjustment percentage."[41] This exceedingly narrow reading of HHS' statutory authority is wrong and disregards Supreme Court precedent regarding the law's purpose.[42]

---

[38] *See Dep't. of Commerce v. New York*, 588 U.S. at 785 (agencies must provide "reasons that can be scrutinized by courts and the interested public.")

[39] *See* Keith & Levitis Part 1, *supra* note 28 (finding that the 2020 update to premium adjustment methodology, which accounted for individual market premiums, "resulted in a higher premium adjustment percentage *and thus a higher annual limit on out-of-pocket costs* and a higher required contribution from subsidy-eligible consumers") (emphasis added).

[40] *Nat'l. Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. at 539.

[41] 90 Fed. Reg. at 12,990.

[42] *See Nat'l. Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. at 539 (the purpose of the ACA is to "*increase* the number of Americans covered by health insurance and *decrease* the cost of health care") (emphasis added).

The change to premium adjustment methodology will cause out-of-pocket maxima, copays, and annual limits to increase, without justification. This proposal, if adopted, will cause "consumer premiums [to] rise as well to about 4.5 percent higher for a benchmark plan compared to current rules."[43] In 2023, for example, an average on-exchange plan in the individual market cost $590.08 per member per month (PMPM), for an annual premium of $7,080.96 per member.[44] A 4.5 percent increase in that premium is an additional $318.64 annually. For an average annual premium of $25,572 for family coverage, a 4.5% increase is an extra $1,150.74 per year.[45] Any increase in premiums causes enrollment to suffer.[46] States will be fiscally impacted as well. Massachusetts estimates that, because of this change, state subsidy costs will increase by approximately $10 million in 2026.

Aside from the increase to premiums, a change in the premium adjustment percentage would also affect other out-of-pocket costs such as copays and deductibles. "Even relatively small levels of cost sharing in the range of $1 to $5 are associated with reduced use of care, including necessary services."[47] Any increase in out-of-pocket cost for the consumer is statistically certain to result in a decreased utilization rate, meaning more Americans choosing to go without coverage (and then skipping needed medical treatment as a result).

The Department should withdraw this proposed change.

## 2. Expanding the acceptable actuarial value ranges for health plans will also increase health insurance plans' costs and lower their value.

Plans sold on the exchanges fall into Bronze, Silver, Gold, and Platinum tiers based on how much of an average consumer's expected medical cost will be paid by the plan. Bronze plans must cover 60 percent of the expected cost; Silver plans, 70 percent; Gold plans, 80 percent; and Platinum plans, 90 percent. Higher-tier plans typically have higher premiums and lower out-of-pocket costs. Lower-tier plans have the opposite: lower premiums and higher out-of-pocket costs. Insurers on the exchanges must offer plans that meet these targets within some range of accepted de minimis variation. These ranges are presently small—most plans must fall within +2/-2, or +2/-0, percentage points. The reason for this narrow range is to encourage transparency and diminish consumer confusion in the marketplace, because a plan that claims to be Silver but undershoots its target by five percentage points might only offer Bronze-level value and should be priced accordingly. Keeping the bands narrow promotes that policy goal.

The Proposed Rule widens the accepted ranges. For expanded bronze plans, the proposed range is +5/-4 percentage points. For all other plans, the proposed range is +2/-4 percentage points.

---

[43] Keith & Levitis Part 1, *supra* note 28.

[44] Cal. Dep't of Managed Health Care, *Individual and Small Group Aggregate Premium Rate Report: Measurement Year 2023* 1, https://tinyurl.com/mwjumsd5.

[45] *2024 Employer Health Benefits Survey*, Kaiser Family Foundation (Oct. 9, 2024), https://tinyurl.com/pd5umckm.

[46] *See* Samantha Artiga et al., *The Effects of Premiums and Cost Sharing on Low-Income Populations: Updated Review of Research Findings*, Kaiser Family Foundation (June 1, 2017), https://tinyurl.com/2hmm9pf7 (finding that "[p]remiums serve as a barrier to obtaining and maintaining Medicaid and CHIP coverage among low-income individuals.").

[47] *Id.*

By allowing all plans to undershoot their claimed targets by four percentage points, this proposal is certain to decrease the level of coverage provided to consumers, while charging those consumers the same price for their premiums.

The certain result of this change will be that a plan in 2027 will provide up to four percentage points less coverage than the same plan did in 2024. And although this change does not directly affect the premium, other rule changes affecting the premium adjustment methodology and shrinking the risk pool mean that consumers will be paying more for worse coverage. The Department claims that the benefit of this change is that plans need wider AV variability ranges for better plan cost sharing, but the Department did not provide any evidence to support this claim, nor did the Department acknowledge—let alone quantify—the harms to consumers of enrollment in lower-value plans.[48]

The proposed change to actuarial value *de minimis* variation will ultimately reduce affordability by increasing premiums and out-of-pocket costs for consumers. This change appears designed to prioritize insurer flexibility over ensuring affordable and comprehensive coverage for the public. This proposal should be withdrawn.

### 3. Eliminating the "crosswalk" policy will decrease marketplace efficiency and reduce the value of the ACA's subsidies to consumers.

Under current policy, an enrollee who selects a Bronze-tier plan, where there is a Silver-tier plan available at the same or lesser cost in the same provider network, will be automatically re-enrolled in the better plan. This policy ensures rational economic decisionmaking in the marketplace by automating the objectively superior plan choice when it is available. By automating the selection of the best available deal, this policy also minimizes the need for a consumer to rely on brokers and other third parties. The Proposed Rule eliminates this policy.

This proposed change is not supported by evidence and is counterproductive. The Department asserts that the crosswalk is no longer necessary because consumers are now aware of their options, and automatically enrolling a consumer in a better plan at the same or less cost overrides consumer choice. The Department does not explain how the deliberate selection of a lower-tier plan could ever be a rational choice. The crosswalk policy offers free upgrades to qualifying consumers. No reasonable consumer would decline the option to pay less for identical or better healthcare coverage.

Moreover, the Proposed Rule's reasoning disregards the reality that many enrollees, particularly those with limited resources, may not actively shop for or fully understand the nuances of different health plans.[49]

---

[48] *See* 90 Fed. Reg. at 12,996-97 (stating "we believe" seven times but providing no data).

[49] *See* Kaye Pestaina et al., *Signing Up for Marketplace Coverage Remains a Challenge for Many Consumers*, Kaiser Family Foundation (Oct. 30, 2023), https://tinyurl.com/7r8un3ac (finding that 35% of marketplace enrollees "found it somewhat or very difficult to find a plan that meets their needs," and that "[a] large share (41%) of people with Marketplace coverage said

This change prioritizes a narrow interpretation of consumer autonomy over the tangible benefits of automatically connecting eligible individuals with more comprehensive and affordable coverage. It should be withdrawn.

**4. Ending acceptance of self-attestation of projected annual household income at or above 100% of FPL will needlessly harm the lowest-income enrollees, who tend to be young and healthy, thus harming the risk pool and increasing premiums for everyone.**

Exchange plans currently accept the self-attestation of an enrollee who claims eligibility by projecting annual household income at or above 100% of the federal poverty level. This policy is distinct from the FTR rules, discussed above, which still ensure that an enrollee who over-claims APTC eligibility must repay the overpayment via tax liability or else lose APTC eligibility. This self-attestation policy is designed to ensure that the lowest-income enrollees, who are often younger and healthier, are not discouraged from entering the risk pool due to paperwork burdens.

Aside from a fleeting reference to "internal analysis of historical enrollment and DMI [data-matching issue] data," the Department provides no information on the number of enrollees actually submitting inflated income data to qualify for APTC, and thus offers no actual evidence that impoverished consumers are misusing the self-attestation feature when representing their income.[50] Nor does the Department acknowledge that many consumers might legitimately expect their incomes to be greater than 100% of FPL when they apply for coverage, but later finish the year with incomes below 100% of FPL; individuals in that position have committed no wrongdoing. As discussed *supra*, the existing FTR policy helps to ensure that overpayment of APTC is discouraged and recovered through tax liability imposed on those who over-claim.

With this questionable justification, the Proposed Rule ends this policy, requiring income verification for all such enrollees.

This policy is likely to cause younger, lower-income enrollees to drop out of the risk pool. Additionally, this policy is more likely to impact healthy enrollees than sick ones, because, as commentators have observed, "sicker individuals are typically more motivated to overcome administrative burdens to enroll in coverage."[51] The Department acknowledges this, too, writing

---

it was very or somewhat difficult to compare the doctors, hospitals, and other health care providers you could see for each option compared to fewer adults with Employer-sponsored coverage (32%), Medicaid (27%), and Medicare (19%) who said the same").

[50] 90 Fed. Reg. at 13,012. Indeed, in states that have accepted the ACA's Medicaid expansion, there is little to no incentive to inflate incomes for APTC purposes because adults with modified gross incomes up to 138% of the FPL are generally eligible for Medicaid. Many such states have mechanisms to ensure that Medicaid-eligible clients do not receive APTC. For example, Washington State has an integrated eligibility portal, so that those who opt out of Medicaid are barred from APTC eligibility until they provide updated documentation showing they once again qualify for APTC due to a change in income.

[51] Jason Levitis & Katie Keith, *HHS Proposes to Restrict Marketplace Eligibility, Enrollment, and Affordability in First Major Rule Under Trump Administration (Part 2)*, Health

that "verification [of SEP eligibility] can also undermine the risk pool by imposing a barrier to eligible enrollees, which may deter healthier, less motivated individuals from enrolling."[52]

In addition, terminating enrollment eligibility for those without available tax data is especially concerning given the likelihood of staffing cuts at the IRS, which increase the likelihood that tax data for many filers will be delayed or unavailable.[53] This policy change could lead to eligible individuals being wrongly denied crucial financial assistance. The Department estimates that this requirement would deny APTC to 81,000 people annually, reducing these tax credits by $189 million.[54] The Department further estimates that this change would create 550,000 data-matching issues (DMIs) per year, and that it would cost the Exchanges $32 million per year to verify enrollees' income and resolve those DMIs.[55] This policy should be withdrawn.

## C.    The Proposed Rule Should Implement Broker-Focused Anti-Fraud Provisions

All government programs should strive to obtain the most benefit per taxpayer dollar and minimize waste, fraud, and abuse; the ACA is no exception. However, the changes contemplated by this Proposed Rule discussed above are not necessary "to reduce waste, fraud, and abuse."[56] There are several other, far less burdensome changes that the Department should implement to reduce the problem of fraudulent enrollment or unauthorized plan-switching without placing the burden on Exchange enrollees. The Department considered none of them; here, there is no "rational connection between the facts found and the choice made."[57]

### 1.    Removing brokers for cause by a preponderance of the evidence will help protect consumers from unscrupulous business practices, but the Department should adopt other changes to combat broker fraud.

The Proposed Rule will allow HHS to utilize a preponderance-of-the-evidence standard when terminating brokers for cause, instead of a more stringent standard such as clear and convincing evidence. This change is aimed at penalizing brokers who change enrollees' plans without consent to collect a commission, or other such dishonest practices. The undersigned States share the Department's concern about the increased prevalence of unauthorized plan switching and enrollments. We support the proposed revision to Section 155.220(g)(1) regarding evidentiary standards that the Department will utilize when removing brokers for cause.[58] It is imperative that the Department take robust steps to curb this abusive and fraudulent practice, and to protect consumers from predatory brokers who engage in such tactics. Unauthorized plan changes can

---

Affairs (March 13, 2025), https://tinyurl.com/4xkjf7jy.
    [52] 90 Fed. Reg. at 12,983.
    [53] *See* Hussein, *supra* note 33 and accompanying text.
    [54] 90 Fed. Reg. at 13,013.
    [55] *90* Fed. Reg. at 13,013.
    [56] 90 Fed. Reg. at 12,942.
    [57] *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).
    [58] 90 Fed. Reg. at 12,955.

cause enrollees to lose access to medical care, face higher out-of-pocket costs, and be surprised with unexpected tax bills.

However, as explained above, the Proposed Rule does little to strike at the root of the problem. Broker-driven fraud is the main cause of unauthorized plan switching and enrollments. And this fraud has occurred primarily on the federal government's own healthcare platform, healthcare.gov—not on the exchanges operated by the States.[59] There is no indication that SBEs have experienced similar broker misconduct.[60] In light of that, the Proposed Rule should not limit the ability of SBEs to combat fraud that has not occurred on those platforms.

California, for instance, simply does not have a large-scale issue with fraudulent enrollments, despite having one of the largest state-based exchanges. California sends users a one-time code to share with an agent, while Pennsylvania similarly allows only agents designated by the consumer to access the user's account.[61] Other SBMs use multiple tools to prevent, mitigate, and shut down fraudulent enrollments including logging information recording changes, multi-factor authentication to access accounts, broker certification and all carrier appointments requirements, and rescissions in cases of fraud.

The Proposed Rule also fails to take meaningful steps to combat broker fraud on the federal platform (beyond lowering the evidentiary standard for broker misconduct). The Proposed Rule does not introduce new guidelines or limits on brokers' behavior, make it technically harder to engage in such behavior, or address the financial incentives underlying fraudulent enrollment. Curbing abusive broker practices will require the Department to address these issues. As other commentators have suggested,[62] the Department should consider introducing the following reforms:

- Impose a standard of conduct that obligates brokers to act in the best interest of the consumer and holds liable those who do not.

- Require two-factor authentication (such as a one-time password) or verbal or written consent from an enrollee before any plan change can occur, and require that a broker document, submit, and verify that consent before receiving a commission.

- Require enrollees to create an account on the exchange website and affirmatively select which brokers can access their account, and bar access to all other agents.

- Require third-party marketing entities—significant contributors to fraudulent plan-switching—to register with the marketplace and meet marketing standards.

---

[59] Justin Giovannelli & Stacey Pogue, *Policymakers Can Protect Against Fraud in the ACA Marketplaces Without Hiking Premiums*, The Commonwealth Fund (March 5, 2025), https://tinyurl.com/rw5wxjze.

[60] *Id.*

[61] Julie Appleby, *How the Government is Trying to Stop Rogue Brokers from Plaguing ACA Enrollees*, NPR: Health Shots (May 7, 2024), https://tinyurl.com/3bkbcu5d.

[62] Giovannelli & Pogue, *supra* note 59.

The cumulative result of the Proposed Rule's changes is a smaller risk pool and a sicker population that must pay more for lower-quality health coverage, all in the name of preventing fraud that is not occurring at scale in the SBEs.

## II. THE PROPOSAL TO BAR DACA RECIPIENTS FROM ACCESS TO STATE AND FEDERAL ACA EXCHANGES IS CONTRARY TO LAW, IS ARBITRARY AND CAPRICIOUS, AND WOULD HARM STATES AND THEIR RESIDENTS.

Less than a year ago, the U.S. Department of Health and Human Services and Centers for Medicare & Medicaid Services completed a thorough rulemaking aimed at increasing patient access to state and federal exchanges under the ACA.[63] The Department's current proposal reverses course, changing the definition of "lawfully present" so it excludes individuals receiving deferred action pursuant to the Deferred Action for Childhood Arrivals policy from the ACA exchanges.[64] That proposal is unlawful and harmful. First, the Proposed Rule will cause significant harm to the States' economies, public health, and welfare by ripping away ACA insurance eligibility from an entire population, thereby increasing the number of uninsured residents in our States. Second, the Proposed Rule is contrary to the text of the ACA, and undermines Congress's aim of increasing access to insurance. Third, the Proposed Rule is arbitrary and capricious for multiple reasons: it fails to consider the myriad of benefits associated with expanding ACA exchange eligibility to DACA recipients, its analysis runs contrary to the text of the ACA, it insufficiently considers the reliance interests of DACA recipients and the States, and it fails to consider reasonable alternatives to complete reversal of DACA recipients' eligibility to participate in ACA exchanges. Fourth, its Regulatory Impact Analysis ("RIA") is flawed and inaccurate, ignoring costs to persons who purchased insurance under the 2024 Rule and costs to States of reversing DACA recipients' ACA exchange eligibility. As state Attorneys General, we urge you to withdraw this proposal.

### A. Background

The 2024 Rule authorized DACA recipients to purchase their health insurance on the ACA exchanges, ensuring reliable access to insurance and benefiting DACA recipients, their families, and the States alike. During the rulemaking process for the 2024 Rule, the Department considered the views of businesses, industry groups, workers' organizations, unions, nonprofits, academics, states, state agencies, and private citizens as expressed in 583 comment letters. The Department discussed in detail the ways increasing health insurance access for DACA recipients provides

---

[63] *See Clarifying the Eligibility of Deferred Action for Childhood Arrivals (DACA) Recipients & Certain Other Noncitizens for a Qualified Health Plan through an Exchange, Advance Payments of the Premium Tax Credit, Cost-Sharing Reductions, & a Basic Health Prog.*, 89 Fed. Reg. 39,392 (May 8, 2024) ("2024 Rule").

[64] *See* 90 Fed. Reg. 12,942.

substantial health and financial benefits to recipients and their communities,[65] while assessing the harms associated with a lack of access to such affordable and adequate health insurance.[66]

Prior to the 2024 Rule, many DACA recipients were unable to obtain affordable health insurance through any means other than an employer-sponsored health plan. The federal government has a long history of deferred action, including seventeen different deferred action policies that existed prior to DACA, and none of the recipients of those other programs have been categorically denied access to government health insurance affordability programs. By comparison, prior to the 2024 Rule, the Department had an exception that carved out DACA recipients alone from eligibility, effectively locking recipients out of health insurance programs their tax dollars help fund. In other words, in many cases, unless a DACA recipient's employer provided health insurance benefits for employees, prior to the 2024 Rule, the DACA recipient would have been unable to secure insurance coverage for themselves or, in some instances, their children via ACA exchanges. This barrier to coverage translated to high uninsured rates among the DACA population[67] and resulted in an economic and health precarity felt by recipients' families, communities, and the States. The 2024 Rule extended to DACA recipients the ability to purchase adequate and affordable health insurance.

The 2024 Rule went into effect on November 1, 2024,[68] and thousands of DACA recipients have already enrolled in health plans purchased via ACA exchanges.[69] Given this newfound access to health insurance, DACA recipients have likely started seeking medical care that they previously put off because of insurance concerns.[70] And the States have come to rely on the expectation that

---

[65] *See, e.g.*, 89 Fed. Reg. at 39,405 (noting benefits of the 2024 Rule may be especially important "for those DACA recipients who may be victims of child abuse, domestic violence, sexual assault, and human trafficking")*; id.* at 39406 (Rule "could help decrease the amount of uncompensated care that [emergency departments] provide which could lead to better financial sustainability for emergency care safety net providers," and thus "promote a lower cost and more efficient health care system by reducing high-cost emergency care, increasing lower-cost preventive care, and ultimately decreasing the number of DACA recipients and other impacted noncitizens who qualify only for the treatment of an emergency medical condition under Medicaid").

[66] *See, e.g.*, 89 Fed. Reg. at 39,396 ("[i]ndividuals without health insurance are less likely to receive preventive or routine health screenings and may delay necessary medical care, incurring high costs and debts"); *id.* at 39,406 (explaining "that uninsured individuals might delay seeking vital care, which can result in [emergency department] use").

[67] *See* 89 Fed. Reg. at 39,392 (noting effective date); 89 Fed. Reg. at 39,395 (noting "that DACA recipients are still more than three times more likely to be uninsured than the general U.S. population, which had a national uninsured rate of 7.7 percent); Isobel Mohyeddin et al., *DACA Recipients' Access to Health Care: 2023 Report*, National Immigration Law Center (May 2023), https://tinyurl.com/5t2ra26w.

[68] *See* 89 Fed. Reg. at 39,392 (noting effective date).

[69] *Kansas et al. v. United States of America*, No. 1:24-cv-150 (D. N.D. Aug. 8, 2024), ECF 156-7 at ¶ 17 (As of January 2025, California estimates that over 1,868 DACA recipients have enrolled in a plan). Data on record with the New Jersey Department of Banking and Insurance (DOBI) indicates that, in New Jersey, 519 DACA recipients have enrolled in a plan for the 2024-2025 open enrollment period.

[70] *Cf.* 89 Fed. Reg. at 39,396 (noting "[i]ndividuals without health insurance are less likely to receive preventive or routine health screenings and may delay necessary medical care, incurring high costs and debts").

more residents will seek preventive care, less residents will need to seek emergency care, and the States will need to expend less on uncompensated care costs for uninsured individuals. *See infra* at 21-23. Significantly, the States are also now counting on increased taxes stemming from DACA recipients' enrollment in health plans via the ACA exchanges. But the Proposed Rule disregards all these benefits and threatens to throw these reliance interests into disarray.

## B.    Removal of DACA Recipients from ACA Exchanges Is Harmful and Unlawful

The Department should withdraw the Proposed Rule. The proposal would harm the States and their residents. It would violate the plain language and purpose of the ACA. It is arbitrary and capricious. And it rests on multiple analytical errors.

### 1.    The Proposed Rule would harm the States and their residents.

Eliminating DACA recipients' access to health insurance from the ACA exchanges would leave them, in many cases, without access to affordable quality health insurance. That would harm not only DACA recipients, but would impose significant harms on the States' economies and on public health and welfare within their borders. This Proposed Rule is ill-advised and harmful.

#### a.    The Proposed Rule, if adopted, would impose significant economic harm on the States.

The Proposed Rule, by its own terms, would deprive all DACA recipients of access to affordable health insurance options on ACA exchanges. In many cases, that would leave DACA recipients without access to health insurance entirely; as the Department recently acknowledged in its 2024 Rule, DACA recipients were over three times more likely than the general U.S. population to be uninsured.[71] But DACA recipients, like any other population, will still have health needs, whether or not they have insurance. Indeed, as the Department is well aware, States incur significant costs for the care of their uninsured residents, including millions in annual unreimbursed costs for the care of uninsured residents at public hospitals,[72] and hundreds of millions in annual subsidies to defray the cost of health care services provided to uninsured residents.[73] It is thereby undeniable that removing DACA recipients' access to ACA exchanges will generate significant expenses for preventive and emergency care that States would now have to assume.

New Jersey's health care programs illustrate ways in which States incur costs for health care services provided to uninsured residents, including uninsured DACA recipients. For example, an uninsured resident can visit Federally Qualified Healthcare Centers ("FQHC") to obtain free or

---

[71] 89 Fed. Reg. at 39,395.

[72] *Kansas*, No. 1:24-cv-00150, ECF 156-4 (New Jersey University Hospital's uninsured costs), ECF 156-5 (New Jersey Charity Care and Uncompensated Care Fund (UCF) costs).

[73] *Id.* at ECF 156-4 (same), ECF 156-5 (same), ECF 156-8 (NJ FamilyCare and related healthcare program costs), ECF 156-9 (Arizona uninsured DACA recipient emergency medical care costs).

low-cost preventive health services. New Jersey's UCF subsidizes these services by paying a flat rate from State funds per visit for an uninsured resident: $114 per visit for primary and dental care and $74 per visit for mental health services.[74] New Jersey funds the UCF, so the greater the number of uninsured residents in New Jersey, the more the State spends on preventive care for those who obtain such services.[75] Similar logic applies to New Jersey's Charity Care program (which offers annual subsidies to support free or low-cost emergency care services for uninsured residents), and its Supplemental Prenatal and Contraceptive Program (which provides prenatal and family-planning services to residents who do not qualify for Medicaid due to immigration status).[76] For each of these programs, the greater the number of uninsured residents, the more the State spends on health care for uninsured individuals.[77]

Other States' programs offer further illustrations of this reality. In FY 2024, Arizona paid $501,411 in state funds through the Federal Emergency Services Program (FESP) to provide emergency medical or behavioral health care services to 519 DACA recipients.[78]

The States would incur these costs for each of the thousands of DACA recipients who are no longer able to purchase insurance plans through an ACA exchange for the 2024-2025 open enrollment period.[79] Because the Department's Proposed Rule does not grandfather[80] in the DACA recipients that have purchased insurance through the exchanges,[81] it would leave most of these individuals without health insurance (even if they are eligible to procure health insurance via an employer in the middle of the year) and concomitantly require the States to incur significant expenses when they seek preventive or emergency health care.

Nor are those the only costs the Proposed Rule would impose on the States. The Proposed Rule would also result in lost revenue streams from the assessments levied on the payment of insurance premiums by many States for each DACA recipient who is no longer able to purchase insurance through the exchanges. States like New Jersey and California have assessed hundreds of thousands of dollars in fees tied directly to insurance premiums paid by DACA recipients who, under the 2024 Rule, can purchase insurance via ACA exchanges.[82] Moreover, the Proposed Rule would also impose direct and entirely unnecessary compliance costs on the States that operate their own state exchanges. If this Proposed Rule reverses DACA eligibility for their exchanges, such

---

[74] *Id.* at ECF 156-5 at ¶ 24.
[75] *Id.* at ECF 156-5 at ¶¶ 20-24.
[76] *Id.* at ECF 156-5 at ¶¶ 16-20; ECF 156-8 at ¶¶ 10-19.
[77] *Id.*
[78] *Id.* at ECF 156-9 at ¶ 9.
[79] *Id.* at ECF 156-7 at ¶ 17 (California estimates that over 1,868 DACA recipients have enrolled in a plan). Data on record with the New Jersey Department of Banking and Insurance (DOBI) indicates that, in New Jersey, 519 DACA recipients have enrolled in a plan for the 2024-2025 open enrollment period.
[80] *Infra* pp.34-35.
[81] On the contrary, the Proposed Rule estimates that its changes would result in 10,000 fewer QHP and 1,000 fewer BHP enrollments by DACA recipients. 90 Fed. Reg. at 13,010.
[82] *See, e.g.*, *Kansas*, No. 1:24-cv-150 at ECF 156-6 at ¶¶ 19-20 (New Jersey's projected loss of revenue would be $68,584 if the Proposed Rule is effectuated); ECF 156-7 at ¶¶ 29-30 (California's projected loss of revenue would be $409,151 if the Proposed Rule is effectuated).

States would incur compliance costs, including to implement changes to technology platforms, retrain their staff, update websites and publications, conduct advertising and outreach, and send notices to participating DACA recipients.[83]

The Proposed Rule thus imposes significant economic costs on the States—by (1) requiring them to incur costs for unreimbursed preventive and emergency care by newly-uninsured DACA recipients; (2) depriving them of lost revenue streams from insurance premium assessments; and (3) imposing compliance costs directly imposed by its reversal of a policy that required numerous technological and personnel-related changes to implement just last year.

**b.  In addition to economic harms, the Proposed Rule would impose significant harms to the public health of the States.**

Depriving DACA recipients of access to affordable health insurance on the exchanges will undermine short-term and long-term health outcomes across the board.

The Proposed Rule recognizes that the loss of affordable insurance for a large swath of DACA recipients would result in many recipients becoming uninsured.[84] But while the Proposed Rule acknowledges "[t]his may result in costs to the Federal Government and [] States,"[85] it does not analyze the dangers that this poses to health outcomes for DACA recipients. The absence of such consideration is particularly striking given that the Proposed Rule does consider the potential for adverse health outcomes in connection with other provisions unrelated to DACA recipients.[86] And there would no doubt be adverse health outcomes for DACA recipients and other residents in our states. The Department is well aware that "[i]ndividuals without health insurance are less likely to receive preventive or routine health screenings and may delay necessary medical care, incurring high costs and debts."[87] This includes foregoing preventive services for chronic conditions such as cardiovascular disease, cancer, and diabetes.[88] Such "[d]elays in care can lead to negative health outcomes including longer hospital stays and increased mortality."[89]

These negative health outcomes are not just limited to DACA recipients who lose their affordable and adequate health insurance. To take one obvious example, reversing the 2024 Rule will also immediately impact the children of uninsured DACA recipients—who number at least

---

[83] *See, e.g.*, *Kansas*, No. 1:24-cv-150 at ECF 156-7 at ¶¶ 21-27 (detailing over $600,000 in compliance costs incurred by California and describing additional costs that would be incurred if the 2024 Rule were invalidated); ECF 156-6 at ¶¶ 23-27 (describing New Jersey's compliance costs).

[84] 90 Fed. Reg. at 13,010 ("However, we anticipate the majority who lose Exchange or BHP coverage would become uninsured.").

[85] *Id.*

[86] *See* 90 Fed Reg. at 13,014 (potential impact of proposed change to annual eligibility redetermination "could lead to adverse health outcomes"), 13,019 (potential impact of premium adjustment percentage index changes "may contribute to negative public health outcomes").

[87] 89 Fed. Reg. at 39,396.

[88] U.S. Dep't of Health and Human Servs., *Access to Health Services*, Healthy People 2030, https://tinyurl.com/5n7s2cu7 (last visited Apr. 7, 2025).

[89] 89 Fed. Reg. at 39,396.

250,000, as the Department of Homeland Security has found—who are likely to be uninsured, since children are generally less likely to be uninsured when their parents have health insurance.[90] Medicaid and CHIP do not serve to patch up these insurance holes as DACA recipients are often hesitant to enroll their U.S.-born children in these programs due to fear and uncertainty in their own status and a concern over threats of deportation and family separation.[91]

The Proposed Rule's harms to public health would also redound beyond the households of DACA recipients to the broader communities of DACA recipients' home states by increasing the risk and magnitude of disease outbreaks and placing a greater strain on hospitals. One study found that "wider insurance gaps exacerbated local COVID-19 outbreaks and resulted in more cases, hospitalization, and death than experienced by jurisdictions with better coverage," meaning that "[r]educing the number of [individuals] without health insurance is a crucial and underappreciated component of pandemic preparedness."[92]

Additionally, by decreasing access to health insurance, the Proposed Rule would decrease access to regular outpatient care, leading to greater rates of hospitalization for longer periods of time.[93] This can cause particularly acute problems in smaller communities with fewer resources to address these higher hospitalization rates, where "[h]igh uninsured rates contribute to rural hospital closures and greater financial challenges for rural hospitals, leaving individuals living in rural areas at an even greater disadvantage to accessing care."[94] Simply put, the Proposed Rule increases gaps in insurance coverage[95] and so threatens the public health of the greater community.[96]

In short, the Proposed Rule would undermine public health within our States: of our DACA recipient residents, their families, and the broader communities at large.

### c. Beyond threatening public health, the Proposed Rule also endangers public welfare.

As the Department has previously recognized, real-world evidence confirms that a lack of insurance can result in uncompensated care costs, increased medical debt, reduced spending power, lost work productivity, absenteeism, and increased premature mortality—among other

---

[90] 89 Fed. Reg. at 39,402.

[91] Samantha Artiga & Anthony Damico, *Nearly 20 Million Children Live in Immigrant Families that Could Be Affected by Evolving Immigration Policies*, Kaiser Family Foundation (Apr. 18, 2018), https://tinyurl.com/37dwfce9. *See also* Samantha Artiga & Petry Ubri, *Living in an Immigrant Family in America: How Fear and Toxic Stress are Affecting Daily Life, Well-Being, & Health*, Kaiser Family Foundation (Dec. 13, 2017), https://tinyurl.com/46m24hur.

[92] Travis Campbell et al., *Exacerbation of COVID-19 mortality by the fragmented United States healthcare system: A retrospective observational study*, The Lancet Regional Health (May 12, 2022), https://tinyurl.com/mr26zt3r.

[93] *See* 89 Fed. Reg. at 39,396.

[94] Jennifer Tolbert et al., *Key Facts about the Uninsured Population*, Kaiser Family Foundation (Dec. 18, 2024), https://tinyurl.com/2s3jmmbm.

[95] 90 Fed. Reg. at 13,010.

[96] *See* Tolbert et al., *supra* note 94.

harms.[97] And, as the Department recognizes, DACA recipients are generally younger and healthier than the overall population who participates in the exchanges.[98] By eliminating them from the ACA insurance pools, the Proposed Rule will likely weaken those pools and increase costs across the board.[99]

Overall, the Proposed Rule threatens significant harms to the States' economies and their public health and welfare. The Department should withdraw this proposal.

### 2. The Proposed Rule contravenes the text and purpose of the ACA.

### a. The Proposed Rule is contrary to the text, history, and structure of the ACA.

Under the ACA, noncitizens may be eligible to purchase insurance through ACA exchanges and to receive certain federal subsidies, provided that they are "lawfully present in the United States." For almost three decades, the Executive Branch has understood this term of art to encompass recipients of deferred action for purposes of certain federal benefits statutes. The 2024 Rule removes the Department's previous exception to this well-established understanding of lawful presence as it relates to DACA recipients, and allows DACA recipients to access affordable and adequate health insurance under the ACA.

The ACA uses a term of art—"lawfully present"—as an eligibility criterion in numerous provisions.[100] In doing so, Congress conveyed a clear policy directive: individuals who are lawfully present, rather than only those who have citizenship or another lawful status, would receive access to the ACA's benefits.[101] Although the ACA does not define "lawfully present," the phrase is also used in 8 U.S.C. § 1611(b)(2), which predates the ACA, as an eligibility criterion for Social Security. That statutory provision grants authority to the Attorney General (now the Secretary of Homeland Security) to define who is lawfully present.[102] Lawful presence has long been understood to encompass an individual "who is (under the law as enacted by Congress) subject to removal, and whose immigration status affords no protection from removal, but whose temporary presence in the United States the Government has chosen to tolerate, including for reasons of resource allocation, administrability, humanitarian concern, agency convenience, and

---

[97] *See* 89 Fed. Reg. at 39,396 (lack of insurance "can have downstream impacts that further disrupt individuals' health and financial stability, and therefore their ability to work or study. Delays in care can lead to negative health outcomes …whereas being unable to pay medical bill puts individuals at higher risk of food and housing insecurity.").

[98] 90 Fed. Reg. at 13,010.

[99] *See* 89 Fed. Reg. at 39,398; *Kansas*, No. 1:24-cv-150 at ECF 156-7 at ¶¶ 32-33, ECF 156-10 at ¶¶ 24-26, ECF 156-8 at ¶¶ 7, 33.

[100] *See* 42 U.S.C. § 18032(f)(3) (eligibility to enroll in a health plan on the exchange); 26 U.S.C. § 36B(e) (eligibility for refundable premium tax credits); 42 U.S.C. § 18071(e) (eligibility for cost sharing); 42 U.S.C. 18081(c) (process by which lawful presence will be verified); 42 U.S.C. § 18082(d) (advanced payment of credits or cost sharing).

[101] *See id.*

[102] *See* 8 U.S.C. § 1103(a)(1).

other factors."[103] That background understanding was in place before the adoption of the ACA, and thus Congress's use of that term brought with it that old soil.[104]

The Department's contrary statutory analysis—an about-face from its view as recently as a few months ago—is unavailing. The reason the Department provides for reversing course from its 2024 Rule is that it believes its proposal "realign[s] [HHS's] policy with the text of the ACA."[105] Citing only to two recent Executive Orders, the Department explains it is "reconsidering the[] arguments" that it laid out in the 2024 Rule.[106] The Department maintains simply that, even though it previously believed it "should 'align' its position to that of DHS," it now believes that "the separate statutory and policy considerations" that govern HHS and DHS do "not compel HHS to 'align' its position on DACA recipients with the position that DHS took with regard to DACA recipients' eligibility for certain Social Security benefits."[107] But the Department says nothing of how "the broad aims of the ACA"—namely "to increase access to health coverage"— informed its analysis just a year prior.[108] And it does not sufficiently grapple with the reality that the ACA is using a specialized term that already carried with it a specialized meaning. The Department gives no reason why Congress would have wanted to use that term but to abrogate its meaning.

By comparison, as part of the rulemaking for its 2024 Rule, the Department reviewed comments noting its prior exclusion of DACA recipients from the definition of "lawfully present" was "inconsistent with other rules pertaining to public benefits for individuals with deferred action," including DHS regulations for Social Security benefits.[109] The Department also addressed comments opposing the changes the then-proposed 2024 Rule would make, ultimately noting that its inclusion of DACA recipients in the definition of "lawfully present" for purposes of the ACA exchanges is "consistent with the relevant statutory authorities," and consistent with DHS's ability to "recognize[] that even individuals who did not enter the United States legally could become 'lawfully present' under the statutes governing particular benefit programs."[110] In response to comments, the Department explained that the 2024 Rule "aim[ed] to establish criteria only for [the ACA exchanges]" and "d[id] not address or revise immigration policy, including DHS's DACA policy," reiterating "that other recipients of deferred action have long been considered lawfully present under [HHS] regulations and policies" and the Department was simply "removing the exception for DACA Recipients for the purposes of eligibility for [the ACA exchanges]."[111] The Department underscored that it "d[id] not believe that [the 2024 Rule] w[ould] encourage irregular

---

[103] 87 Fed. Reg. at 53,209.

[104] *Cf., e.g.*, *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 721-22 (2018) (noting use of term of art with preexisting meaning indicates Congress intended for the statutory term to carry with it that same meaning).

[105] 90 Fed. Reg. at 12,954.

[106] 90 Fed. Reg. at 12,954.

[107] 90 Fed. Reg. at 12,954.

[108] 89 Fed. Reg. at 39,395 (explaining rationale for 2024 Rule); *see also* 90 Fed. Reg. at 12953-55 (briefly acknowledging the benefits that underpinned the 2024 Rule, but otherwise failing to engage with the Department's own analysis of the ACA in 2024).

[109] *See* 89 Fed. Reg. at 39,398.

[110] 89 Fed. Reg. at 39,399 (explaining how the term "lawfully presence" has been applied historically).

[111] 89 Fed. Reg. at 39,399.

migration, fraud or abuse of government systems, or encourage dependency on Federal programs."[112] In its new proposal, the Department fails to engage with any of its previous reasons for including DACA recipients in the definition of "lawfully present," other than saying excluding DACA recipients "reflect[s] the better view of the appropriate intersection of DACA and the ACA."[113] That is not statutory analysis.

The Department's current reasoning also completely disregards how DHS treats DACA recipients for the purposes of immigration law. Although DACA (and deferred action generally) is not a form of "lawful status," DHS does not consider those subject to a grant of deferred action to be *un*lawfully present in the U.S. as long as the deferred action is in effect.[114] Unlawful presence has serious ramifications: a person who accrues unlawful presence in the U.S. and leaves the country and tries to reenter may be barred and deemed inadmissible for 3 or 10 years, depending on the length of unlawful stay.[115] DACA recipients do not accrue that unlawful presence time so long as the individualized grant of their DACA requests and renewals remains valid.[116] Moreover, DACA recipients and other recipients of deferred action are, due to decades-old DHS regulations, eligible for work authorization.[117] Taken as a whole, for the past decade, current DACA recipients had been eligible to live and work in the U.S. and have been eligible to receive benefits like Social Security, but they still *could not* access crucial aspects of the healthcare system. This is despite the fact that according to one estimate, as of 2021, DACA recipients and their households pay $6.2 billion in annual federal taxes and about $3.3 billion in annual State and local taxes—meaning that DACA recipients were previously paying into the very same benefits from which they are barred.[118] By denying DACA recipients access to the ACA's benefits, the Proposed Rule once again treats these individuals as a *sui generis* subset of deferred action recipients when, in fact, DACA is just one in a historically long line of deferred action programs in the nation's history.[119]

Setting aside the Department's slipshod statutory analysis and its disregard for DHS's treatment of deferred action historically, the Proposed Rule simply misunderstands immigration law. The Department raises a purported concern about "inadvertently expand[ing] the scope of the DACA process"[120] as a basis for its proposal. The Proposed Rule maintains that DACA's "purpose did not include extending ACA access to health insurance Exchanges."[121] But nothing in the

---

[112] 89 Fed. Reg. at 39,399.

[113] 90 Fed. Reg. at 12,954.

[114] *See What is Deferred Action for Childhood Arrivals*, U.S. Citizenship and Immigr. Servs., https://tinyurl.com/mr4yn5pe (last updated May 30, 2023).

[115] Immigration and Nationality Act (INA), 8 U.S.C. § 1182(a)(9)(B)(i)(1). *See also Unlawful Presence and Inadmissibility*, U.S. Citizenship and Immigr. Servs., https://tinyurl.com/2eazvc4v (last updated June 24, 2022).

[116] *See What is Deferred Action for Childhood Arrivals?*, *supra* note 114.

[117] 8 C.F.R. §§ 274a.12, 274a.13.

[118] Nicole Prchal Svajlenka & Trinh Q. Truong, *The Demographic and Economic Impacts of DACA Recipients: Fall 2021 Edition*, Center For American Progress (Nov. 24, 2021), https://tinyurl.com/mryjxdkd.

[119] *See* Ben Harrington, Congressional Research Service, *An Overview of Discretionary Reprieves from Removal: Deferred Action, DACA, TPS, and Others* (April 10, 2018), https://tinyurl.com/2f3z4mt9.

[120] 90 Fed. Reg. at 12,955 (cleaned up).

[121] 90 Fed. Reg. at 12,954 (explaining that DACA rests on three principles: the

DACA regulations indicates that *denying* DACA recipients access to health insurance fits deferred action either. In fact, DACA recipients can access health insurance through employer-sponsored health plans. Allowing them to access the ACA exchanges only gives them the ability to *purchase* health insurance on the marketplace when an employer-sponsored plan is unaffordable or inadequate—it does not fold DACA recipients into government-funded benefits programs like Medicaid. Just a year ago, the Department discussed DHS's DACA regulations, noting DHS itself acknowledged that the term "lawfully present" "does not confer lawful status or authorization to remain in the United States, but instead describes noncitizens who are eligible for certain benefits."[122] In that vein, the Department's prior rulemaking aptly understood DHS's goal in promulgating the DACA regulations, noting "it is clear that the DACA policy is intended to provide recipients with a degree of stability and assurance that would allow them to obtain education and lawful employment, including because recipients remain lower priorities for removal," and "[e]xtending eligibility to these individuals is consistent with those [DHS] goals."[123] The Department's current concern that allowing DACA recipients to buy health insurance on the marketplace would disrupt DHS's immigration policy is not supported by law—as giving DACA recipients access to the marketplace does not change anything about their legal immigration status.[124]

Despite its misplaced concerns over immigration law, the Department also asserts that it does not need to operate in lock-step with DHS.[125] As noted, the Proposed Rule avers "there is no requirement that HHS align[] its definition of 'lawfully present' with DHS's" definition, and there is "no requirement that HHS align its treatment of DACA recipients with other recipients of deferred action, particularly given the fundamental differences between DHS's DACA policy and other policies under which DHS may grant deferred action."[126] But the Proposed Rule also points to nothing requiring the Department maintain a separate definition of "lawfully present" that excludes DACA recipients.[127] Simply because the Department is not *required* to harmonize its definition of "lawfully present" with DHS's definition, does not mean it is *prohibited* from doing so. And where the Department previously sought to adopt a definition to effectuate "the broad aims of the ACA to increase access to health coverage,"[128] and cited evidence in support of its regulatory change, this Proposed Rule does precisely the opposite.

---

identification of a group of individuals deemed low enforcement priorities, forbearance from removal for these individuals, and work authorization during this period of deferred action).

[122] 89 Fed. Reg. at 39,394 (referencing DHS's discussion of "lawfully present" in its DACA regulations).

[123] 89 Fed. Reg. at 39,395.

[124] *See* 89 Fed. Reg. at 39,400 (making clear the 2024 Rule "in [no] way change[s] existing immigration policy, nor does it confer lawful immigration status").

[125] 90 Fed. Reg. at 12,955.

[126] *Id.*

[127] *Cf.* 89 Fed. Reg. at 39,395 (noting in 2024 Rule that there is "no statutory mandate to distinguish between recipients of deferred action under the DACA policy and other deferred action recipients").

[128] *Id.*

Put simply, the Proposed Rule rests on circular logic.[129] The Department's explanation for changing course amounts to: because DACA recipients were previously excluded from the definition of "lawfully present" they should remain excluded now. This reasoning does nothing to engage with the Department's rationale for changing the definition of "lawfully present" last year, or to justify its change in position now. As discussed, the rulemaking for the 2024 Rule indicates that the inclusion of DACA recipients in the definition of "lawful presence" is supported by the fact that "other recipients of deferred action have long been considered lawfully present under [HHS] regulations and policies."[130] Likewise, nothing in the DACA regulations indicate that DHS intended to deny DACA recipients the ability to purchase affordable and adequate health insurance on the ACA exchanges as part of the agency's deferred action policy.[131] Importantly, the 2024 Rule did not "change existing immigration policy," nor did it "confer lawful immigration status."[132]

The Department has disregarded the statutory arguments that underlaid its prior position, failing to engage with its own reasons for including DACA recipients in the definition of "lawfully present" just a year ago. The Department's Proposed Rule is contrary to law and, in its current formulation, violates the APA.[133]

> **b. The Proposed Rule is also inconsistent with Congress's purposes in adopting the ACA.**

Insufficient insurance coverage is a barrier to improving health outcomes and addressing health disparities across the United States. Inequitable access to healthcare and resulting adverse health outcomes, in turn, impose significant costs on society at large, diminish national and local economic potential, and increase national vulnerability to future disease outbreaks and pandemics. Recognizing these systemic issues, Congress enacted the ACA to increase access to health insurance and improve health and well-being by tackling barriers to accessing affordable, quality insurance coverage. Tens of millions of individuals have since gained insurance coverage through ACA policies focused primarily on helping individuals who do not receive coverage through an employer or government program to purchase affordable insurance directly. ACA coverage can improve health, quality of life, and economic productivity for all State residents, including low-income and vulnerable individuals. In passing the ACA, Congress intended to reduce the number of uninsured individuals in the country and to make health insurance more available. The 2024 Rule sought to align the eligibility for all lawfully present recipients of deferred action with the aims of the ACA, with data demonstrating that the 2024 Rule would address a significant health insurance coverage gap and provide substantial economic and public health benefits for many states.[134] The Proposed Rule does the opposite, while lacking any evidence-based justification.

---

[129] *See* 90 Fed. Reg. at 12,954 (maintaining that "the use of the term 'lawfully present' in the ACA is best implemented by excluding DACA recipients for purposes of" ACA exchange eligibility).

[130] 89 Fed. Reg. at 39,399.

[131] See 89 Fed. Reg. at 39,400-01.

[132] 89 Fed. Reg. at 39,400.

[133] *Ball, Ball & Brosamer, Inc. v. Reich*, 24 F.3d 1447, 1450 (2d Cir. 1994).

[134] *See, e.g.*, 89 Fed. Reg. at 39,395-96, 39,403-04.

Further, the ACA may expressly prohibit the type of action the Proposed Rule seeks in removing eligibility for participation in ACA exchanges to DACA recipients. The ACA prohibits HHS from promulgating "any regulation that creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care . . . [or] limits the availability of health care treatment for the full duration of a patient's medical needs."[135] When a Rule, like the Proposed Rule, places a "substantive barrier" on individuals' ability to obtain appropriate care, it runs afoul of the statutory intent of the ACA.[136] This is not an instance where Congress has decided whether or not to fund programs under the ACA, but rather an explicit rulemaking proposal that prevents DACA recipients who accessed ACA marketplaces—and who may have begun care—from continuing to receive appropriate medical care.

High rates of uninsured can result in uncompensated care costs, increased medical debt, reduced spending power, lost work productivity, absenteeism, increased premature mortality, and social and systemic costs-of-illness. *See supra* pp. 22-23. Without recognizing the economic burden associated with coverage gaps, the Proposed Rule overlooks significant social, systemic, and economic benefits that result from the expanded, rather than restricted, access to health insurance.

The Proposed Rule undermines the ACA's aims to increase access and availability to health insurance and will result in significant costs on States' medical and insurance industries. Without access to affordable health insurance, DACA recipients are "less likely to receive preventive or routine health screenings and may delay necessary medical care, incurring high costs and debts."[137] The Proposed Rule acknowledges that prohibiting DACA recipients from purchasing insurance on the ACA exchanges would reduce enrollments by up to 10,000 otherwise eligible individuals.[138] The Proposed Rule discounts the effect of the 2024 Rule, asserting that actual enrollment of DACA recipients in insurance was much lower than anticipated.[139] States who have expanded insurance and Medicaid access to DACA recipients provide ample evidence that increasing access to health insurance yields positive outcomes for residents and public health at large. For example, a May 2024 report by the Kaiser Family Foundation indicated that immigrant adults in States with more expansive health care coverage policies are half as likely to be uninsured or to report delaying or going without medical care due to cost compared to those in less expansive States.[140] Another study found that after New York and California extended eligibility for their States' Medicaid programs to DACA recipients, DACA-eligible immigrants were 4% more likely to report insurance coverage than in other States that did not extend coverage to low-income DACA recipients.[141] In New York alone, more than 13,000 DACA recipients have enrolled in Medicaid,

---

[135] 42 U.S.C. § 18114.

[136] *California v. Azar*, 950 F.3d 1067, 1095 (9th Cir. 2020) (articulating a standard for invalidating a regulation under 42 U.S.C. § 18114.

[137] 89 Fed. Reg. at 39,396.

[138] 90 Fed. Reg. at 13,010.

[139] 90 Fed. Reg. at 13,010.

[140] Akash Pillai et al., *State Health Coverage for Immigrants and Implications for Health Coverage and Care*, Kaiser Family Foundation (May 1, 2024), https://tinyurl.com/5cd2jjx6.

[141] *See State Spotlight: California's Landmark Coverage Expansion for Immigrant Populations*, Manatt Health (Nov. 2022), https://tinyurl.com/3b4jcu5f; Osea Giuntella & Jakub Lonsky, *The Effects of DACA on Health Insurance, Access to Care, and Health Outcomes*, IZA

aided by specially trained enrollment assistants in a number of languages,[142] while in Minnesota, 281 DACA recipients have received state-funded Medicaid through MinnesotaCare.[143] And in 2023, New Jersey expanded Medicaid and CHIP to children under 19 whose families meet income and eligibility requirements regardless of immigration status.[144] During the initial six-month period, 17,896 children who satisfied income and other eligibility criteria and who had previously been ineligible due to their immigration status were enrolled. As of the end of August 2024, the total number of enrolled children had reached 41,532.[145]

While the Proposed Rule asserts that the actual number of DACA recipients is lower than the 2024 Rule anticipated, it ignores the consequence of a preliminary injunction issued in the midst of many States' open enrollment periods that halted eligibility for individuals living in States covered by the injunction.[146] Indeed, several States represented in this letter filed an amicus brief in support of the 2024 Rule[147] and, as articulated *supra*, several of these States demonstrate the effectiveness and benefits of extending eligibility for insurance programs to DACA recipients.

### 3. The Proposed Rule is arbitrary and capricious

Under the APA, agencies must engage in "reasoned decisionmaking."[148] When an agency changes longstanding policies, it must "show that there are good reasons for the new policy" and provide a "detailed justification" for adopting its proposed policy.[149] Agencies must consider "the advantages *and* the disadvantages of agency decisions" before taking action.[150] If an agency fails to meet these requirements, the action can be set aside as arbitrary and capricious.[151] That is so even where a federal agency believes its prior policy was unlawful, and that a new policy is remedying that prior illegality; it must still engage in the broader reasoned decisionmaking that the APA requires.[152] But the Department has failed to engage in reasoned decisionmaking here.

---

Institute of Labor Economics (April 2018), at 10, https://repec.iza.org/dp11469.pdf.

[142] Information provided by NYSDOH; *see also Fast Facts on Health Insurance for Immigrants*, NSYDOH (Sept. 2015), https://tinyurl.com/ccfd5sd7.

[143] Information provided by the Minnesota Department of Human Services.

[144] *See Governor Highlights Expanded Eligibility for NJ FamilyCare Health Care Coverage as Administration Continues Efforts to Cover All Kids*, N.J. Dep't of Human Servs. (Jan 18, 2023), https://tinyurl.com/24rxdyb5.

[145] *Kansas*, No. 1:24-cv-150 at ECF 156-12 at ¶ 11.

[146] 90 Fed. Reg. at 13,010.

[147] *Kansas*, No. 1:24-cv-150 at ECF 69.

[148] *State Farm*, 463 U.S. at 52.

[149] *FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009).

[150] *Michigan v. EPA*, 576 U.S. 743, 753 (2015).

[151] *See Fox Television Stations*, 556 U.S. at 537.

[152] *See, e.g.*, *Dep't of Homeland Security v. Regents of the Univ. of Calif.*, 591 U.S. 1, 29-30 (holding that agency's change in course from policy it deemed was illegal still required reasoned decisionmaking, including consideration of reliance interests); *Nat'l Lifeline Ass'n*, 921 F.3d at 1111 (APA's standard of reasoned decisionmaking applies to changes in policy, and agency must show "there are good reasons for the new policy") (cleaned up); *Open Soc'y Inst. v. U.S. Citizenship & Immigr. Servs.*, 573 F. Supp. 3d 294, 321 (D.D.C. 2021) (when reviewing an agency's change in policy, the "touchstone" is that the agency's explanation must "enable" a reviewing court to conclude it was the product of reasoned decisionmaking) (cleaned up).

### a. The Department failed to consider myriad benefits of the 2024 Rule

In contrast to the comprehensive and carefully considered 2024 Rule, the Department's current plan to exclude DACA recipients from access to ACA exchanges relies upon an inadequate analysis. Simply put, the Department ignores multiple important benefits that it previously, and recently, found would result from allowing DACA recipients to purchase health insurance plans from the marketplace, all of which formed the basis for the 2024 Rule.[153] Indeed, the Department acknowledges that the proposal "may result in costs to the Federal Government and to States" due to increased emergency medical care for DACA recipients "who become uninsured as a result of this rule."[154] The Department never explains why incurring these costs would be justified, but more fundamentally, the Proposed Rule never accounts for the loss of the many other benefits the Department and commenters identified as flowing from the 2024 Rule.

While an agency "need not always provide a more detailed justification than what would suffice for a new policy created on a blank slate," "[s]ometimes it must," including when "its new policy rests upon factual findings that contradict those which underlay its prior policy."[155] A "reasoned explanation is needed for disregarding facts and circumstances that underlay . . . the prior policy," and it "would be arbitrary and capricious to ignore such matters."[156] In its proposal, the Department simply ignores the fact that increased access to health insurance results in better public health outcomes for the individual and the public generally, increased financial stability and productivity at work and school, and reduced uncompensated care costs for the States—all of which are consistent with the purpose of the ACA.[157] The Department's failure to adequately explain its proposal, and its complete disregard of nearly all the factual findings in the 2024 Rule, renders its proposal arbitrary and capricious in multiple ways, as discussed below.

First, as the Department anticipated just last year, "[i]ndividuals without health insurance are less likely to receive preventive or routine health screenings and may delay necessary medical care, incurring high costs and debts."[158] In support of this finding, the Department pointed to survey data that showed "48 percent of respondents" delaying "medical care due to their immigration status," with "71 percent of respondents unable to pay medical bills or expenses."[159] These types of outcomes "have downstream impacts that further disrupt individuals' health and financial stability," affecting "their ability to work or study."[160] Delays in care not only lead to "negative health outcomes" like "longer hospital stays and increased mortality," but the delays can result in unpaid medical bills, which puts individuals "at higher risk of food and housing

---

[153] *See* 89 Fed. Reg. at 39,395 (explaining goal of 2024 Rule was to effectuate "the broad aims of the ACA to increase access to health coverage"); *id.* at 39396 (detailing harms associated with lack of health insurance coverage, as well as benefits that stem from DACA recipients' increased access to health insurance).

[154] 90 Fed. Reg. at 13,010.

[155] *Fox Television Stations*, 556 U.S. at 5161.

[156] *Id.* at 515-16.

[157] 89 Fed. Reg. at 39,395-96 (explaining why the 2024 Rule is consistent with the ACA, and detailing the benefits of increased access to health insurance).

[158] 89 Fed. Reg. at 39,396.

[159] *Id.*

[160] *Id.*

insecurity."[161] Given that "over 200,000 DACA recipients served as essential workers during the COVID-19 [public health emergency],"—including "43,500 DACA recipients who worked in health care and social assistance occupations" with "10,300 in hospitals and 2,000 in nursing care facilities"—it is crucial that these individuals have access to affordable and adequate health insurance.[162] The Department fails to grapple with the impact of reducing DACA recipients' access to affordable and adequate health insurance, noting only that it "anticipate[s] the majority who lose" access to the ACA exchanges "would become uninsured," which "may result in costs to the Federal Government and to States to provide limited Medicaid coverage for the treatment of an emergency medical condition to DACA recipients who have a qualifying medical emergency and who become uninsured as a result of this rule."[163] Rather than address the downstream impacts of so many people losing their health insurance in one fell swoop, the Department tries to summarily minimize the harms to DACA recipients, the States, and the Federal Government.[164]

Second, and by comparison, in 2024 the Department found that "increasing access to health insurance would improve the health and well-being of many DACA recipients currently without coverage."[165] Beyond these improved health outcomes, DACA recipients "could be even more productive and better economic contributors to their communities and society at large with improved access to health care."[166] In support of this conclusion, the Department cited to a 2016 study, which found that "a worker with health insurance is estimated to miss 77 percent fewer days than an uninsured worker."[167] Now, the Department fails to address these benefits, even though they formed the basis for the 2024 Rule, and does nothing to engage with the harms that come from DACA recipients' losing access to the ACA exchanges. Short of acknowledging in an unrelated section elsewhere in the proposal that "[a]n increase in the rate of uninsurance may . . . cause an overall reduction to labor productivity,"[168] the Department does nothing to engage with the impacts of its proposal on DACA recipients, their families, and the communities they live in.

Third, in 2024 the Department found that allowing DACA recipients to access affordable, quality health insurance on the ACA exchanges "align[ed] with the goals of the ACA," to "lower the number of people who are uninsured in the United States and make affordable health insurance available to more people."[169] Because "DACA recipients represent a pool of relatively young, healthy adults," who are "younger than the general Exchange population," inclusion of DACA recipients in the marketplace may have "a slight positive effect on the [ACA exchanges'] risk pools."[170] This improvement to risk pools "could result in cost savings for health insurance issuers in the form of lower claims costs and for individuals in the form of lower health insurance

---

[161] *Id.*

[162] *Id.* (noting that at "the height of the pandemic, essential workers were disproportionately likely to contract COVID-19").

[163] 90 Fed. Reg. at 13,010.

[164] *Id.*

[165] 89 Fed. Reg. at 39,396; *id.* at 39,403.

[166] 89 Fed. Reg. at 39,396.

[167] *Id.*

[168] 90 Fed. Reg. at 13,025.

[169] 89 Fed. Reg. at 39,396.

[170] *Id.*

premiums."[171] In its current proposal, the Department acknowledges that "[b]ecause DACA recipients are young" and "generally tend to be healthier," excluding them from ACA exchanges "would have a small negative impact on the individual market risk pool," without saying anything more on the subject,[172] failing to explain why it is reasonable to forego this benefit of the 2024 Rule.

Fourth, and as discussed above, the Proposed Rule disregards the harms that it would work on the States. As State Attorneys General, we are particularly concerned with the impact that the Proposed Rule would have on public health in our States and on our States' ability to absorb uncompensated care costs. *See supra* pp.19-23. Because DACA recipients remain ineligible for Medicaid, access to the private market is a crucial way of ensuring that more of our residents can receive affordable and adequate health insurance. States that operate ACA exchanges experience an increase in user fees that help fund the state-run exchanges; the total user fee collected by States operating their own exchanges increases when there are more enrollees.[173] Consistent with the Department's findings in 2024, increased access to health insurance means that our states will see improved public health outcomes, healthier and more productive residents, and lower uncompensated care costs. While the Department acknowledges that "the majority who lose" access to the marketplace "would become uninsured," it tries to minimize the costs to the States and Federal Government, noting this increase in uninsured individuals "may result in costs . . . to provide *limited* Medicaid coverage for the treatment of an emergency medical condition to DACA recipients who have a qualifying medical emergency and who become uninsured as a result of this rule."[174] But this cursory analysis does not account for the fact that uninsured individuals are more likely to put off preventive and routine health screenings, resulting in more serious health outcomes with "longer hospital stays and increased mortality."[175] These more serious and expensive health care costs will either put individuals at a higher risk of food and housing insecurity, or result in the States having to absorb the cost. Those are costs that the Department has yet to seriously grapple with.

In sum, allowing DACA recipients to purchase health insurance from the marketplace allows DACA recipients to seek routine and preventive care, results in less emergency medical care, decreases the spread of contagious diseases, increases worker productivity, brings in tax revenue to our States, improves the risk pool leading to cost savings for consumers, and decreases the need for States to absorb uncompensated care costs for uninsured individuals. *See supra* pp. 19-23. These are all significant and concrete benefits that the Department recognized and discussed in detail in the rulemaking leading up to the 2024 Rule. All of these benefits derive from the Department changing the definition of "lawfully present" to include DACA recipients and, thus, effectuating the goal of the ACA. The Department's current failure to even consider these benefits, or the impact of its proposal depriving the States of these benefits, is arbitrary and capricious and

---

[171] 89 Fed. Reg. at 39,429.
[172] 90 Fed. Reg. at 13,010.
[173] *Kansas*, ECF 156-6 at ¶¶ 14-16 (noting that, in New Jersey, "the total user fee collected by [the State] correspondingly decreases as the number of enrollees decreases").
[174] 90 Fed. Reg. at 13,010 (emphasis added).
[175] 89 Fed. Reg. at 39,396.

shows a blatant disregard for public health and the goal of increasing access to health services, which the Department is charged with protecting.[176]

###### b. The Department failed to account for reliance interests.

At no point in the Proposed Rule does the Department acknowledge that DACA recipients and States have reliance interests following the 2024 Rule. Because the Department is "not writing on a blank slate" with its proposal, "it [i]s required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns."[177] The Department's "failure" to "even address[] the options of . . . accommodating particular reliance interests" is "arbitrary and capricious in violation of the APA."[178]

In 2024, the Department cited evidence supporting its findings that "[i]ndividuals without health insurance are less likely to receive preventive or routine health screenings," and "may delay necessary medical care."[179] This makes sense because "[m]any doctors will not even see a patient without first seeing proof of insurance."[180] It is reasonable to assume that DACA recipients who have been able to purchase health insurance on the ACA exchanges have sought treatment they were previously putting off, like chemotherapy or surgery to address chronic pain.[181] Additionally, DACA recipients who already purchased insurance on the ACA exchanges and who need regular bloodwork because of health conditions like heart disease or cancer by now assume those testing costs would be covered by their insurance—and without coverage they will have to resume paying out of pocket, or the State will again have to resume absorbing the cost.[182]

It is not just DACA recipients who have developed reliance interests following the 2024 Rule, but our States and residents. As noted, *supra* pp. 19-21, States incur significant costs for the care of uninsured residents at public hospitals and through annual subsidies intended to defray the cost of healthcare services provided to uninsured individuals. The greater the number of uninsured residents, the more States spend on uncompensated care.[183] It follows, with DACA recipients eligible for health insurance via the ACA exchanges, that our States anticipated a decrease in the

---

[176] U.S. Department of Health and Human Services (HHS), https://tinyurl.com/bdwr5knz (last visited April 9, 2025).

[177] *Regents*, 591 U.S. at 33 (citation omitted).

[178] *Id.*

[179] 89 Fed. Reg. at 39,396.

[180] *Hector v. Raymond*, 692 So.2d 1284, 1288 (La. App. 3 Cir. 1997).

[181] *See* Rachel Garfield & Katherine Young, *How Does Gaining Coverage Affect People's Lives? Access, Utilization, and Financial Security among Newly Insured Adults*, Kaiser Family Foundation (June 19, 2015), https://tinyurl.com/323r257j (those who newly gained coverage in 2014 were "more likely to be linked to regular care, less likely to postpone care when they need it, and more likely to use preventive services than those who remained uninsured."); *cf.* JPMorgan Chase & Co. Institute, *Deferred Care: How Tax Refunds Enable Healthcare Spending* (January 2018), https://tinyurl.com/46r7zpsb (finding that "[c]onsumers immediately increased their total out-of-pocket healthcare spending by 60 percent in the week after receiving a tax refund").

[182] *See, e.g.*, *Kansas*, ECF 49-4 at ¶¶ 9-13 (small business owner without access to employer-sponsored insurance requires regular cancer-related bloodwork).

[183] *Id.*, ECF 156-5 at ¶¶ 16-25; ECF 165-8 at ¶¶ 10-25.

number of uninsured individuals and an improvement in public health. *See supra* pp. 19-23. For States that operate their own ACA exchange, an increase in the number of insurance enrollees results in an increase in the user fees that the States use to fund those state-based exchanges.[184] The 2024 Rule already resulted in increased enrollment in health insurance plans,[185] and our States planned for an uptick in user fees for state-based exchanges. If the Proposed Rule were finalized, our States would again have to absorb higher uncompensated care costs for uninsured individuals, risk greater harms to public health, and would experience a decrease in user fees from insurance premiums. Further, States that manage their own ACA exchanges incurred compliance costs, and would now incur *additional* compliance costs as the Department whipsaws to remove this group of otherwise eligible ACA exchange participants after welcoming them in just last year.

The Department does nothing to engage with the possibility that the 2024 Rule has already engendered these reliance interests.[186] It fails to make note that such reliance interests could exist, and does not solicit any comments on the subject. The Department is not required "to consider all policy alternatives" in its rulemaking, but it must, at the very least, consider the reliance interests at stake when it is changing course.[187] The Department's failure to do so makes its proposal arbitrary and capricious.

### c. The Department failed to consider reasonable alternatives.

The Department also acted in an arbitrary and capricious manner by failing to meaningfully consider reasonable alternatives that preserve DACA recipients' access to health insurance. Consistent with bedrock principles of administrative law, if there are "significant and viable and obvious alternatives" that address rising health care costs but reduce harm to DACA recipients, the Department needs to explain sufficiently why it did not adopt them.[188] Failure to give these alternatives serious consideration would therefore fall far short of a requisite justification.[189] That is what happened here: the Department failed to explore multiple significant alternatives to their

---

[184] *Id.*, ECF 156-6 at ¶¶ 14-16 (noting that, in New Jersey, "for each individual who ceases to be enrolled in a health benefits plan in New Jersey, including plans sold on [the state-based exchange]" the State "loses user fee revenue").

[185] *See e.g.*, *id.* at ECF 156-7 at ¶ 17 (as of January 2025, California estimates that over 1,868 DACA recipients have enrolled in a plan). Data on record with the New Jersey Department of Banking and Insurance (DOBI) indicates that, in New Jersey, 519 DACA recipients have enrolled in a plan for the 2024-2025 open enrollment period.

[186] *Regents*, 591 U.S. at 31 (noting that regardless of the "strength of any reliance interests," "consideration must be undertaken by the agency in the first instance").

[187] *Id.* at 33 (citation omitted).

[188] *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 59 (D.C. Cir. 2015) (cleaned up); *see also Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 708-08 (2020) (Kagan, J., concurring in the judgment).

[189] *See City of Brookings Mun. Tel. Co. v. FCC*, 822 F.2d 1153, 1169 (D.C. Cir. 1987) (agency must provide a "reasoned explanation" for rejecting "reasonable alternatives"); *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 106 (2015) ("APA requires an agency to provide a more substantial justification when … its prior policy has engendered serious reliance interests that must be taken into account.") (cleaned up).

chosen action—including making "more limited" changes to the existing policy—and thus failed to provide any reasoned explanation for rejecting them.[190]

First, the Department should have considered minimizing harm to DACA recipients by "grandfathering" in DACA recipients who have already purchased health insurance plans from an ACA exchange. The Department has done so before by grandfathering certain health insurance plans that existed before the ACA was enacted "to help people keep existing health plans that are working for them;"[191] it should consider doing so again now. The Department's own analysis suggests that this approach would have a positive impact on the individual market risk pool and reduce the number of uninsured.[192] And it would certainly reduce the harm to the significant reliance interests of those who have already purchased plans from the exchanges and potentially made major healthcare decisions based on that insurance.[193] But the Department did not even consider these interests, much less the possibility of preserving access to healthcare of DACA recipients.

Second, the Department could have permitted (or at least could have considered permitting) state ACA exchanges to choose to allow DACA recipients to enroll on their own exchanges, if those States have concluded that doing so will benefit their populations and the ACA exchanges themselves. Such discretion has ample precedent, as a total of 23 States (and Washington, D.C.) have exercised discretion to extend CHIP coverage to pregnant individuals regardless of their immigration status.[194] Similarly, 41 States (and D.C.) have exercised their discretion to expand Medicaid coverage to nearly all adults with incomes up to 138% of the Federal Poverty Level.[195] Nine states also provide eligible residents with premium tax credits or cost-sharing reductions in addition to the incentives provided by the federal government.[196] But the Proposed Rule did not consider any such alternative, or any other alternatives for that matter. It simply reverses the 2024 Rule without making any allowances or exceptions.[197]

Third, although the Department makes brief reference to the Fifth Circuit's 2025 decision in *Texas v. United States*,[198] it failed to consider the clear alternative left available by that decision.

---

[190] *See Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 216 (D.C. Cir. 2013); *see also Regents*, 591 U.S. at 30 ("reasoned analysis" must include consideration of more limited alternatives "within the ambit of the existing policy") (cleaned up).

[191] *Amendment to Regulation on "Grandfathered" Health Plans under the Affordable Care Act*, Centers for Medicare & Medicaid Servs., https://tinyurl.com/4ytbur4e (last updated Sept. 10, 2024).

[192] *See* 90 Fed. Reg. at 13,010.

[193] *See* Garfield & Young, *supra* note 181.

[194] Akash Pillai et al., *State Health Coverage for Immigrants and Implications for Health Coverage and Care*, Kaiser Family Foundation (May 1, 2024), https://tinyurl.com/5m425hzx.

[195] *Status of State Medicaid Expansion Decisions*, Kaiser Family Foundation (Feb. 12, 2025), https://tinyurl.com/4uxa7k7y.

[196] *Which states offer additional financial assistance for Marketplace plans?*, Kaiser Family Foundation, https://tinyurl.com/4x2zexyu (last visited Apr. 7, 2025).

[197] *See* 90 Fed. Reg at 13,010-11.

[198] 90 Fed. Reg. at 12,954 n.37 (citing *Texas v. United States*, 126 F.4th 392, 420-21 (5th Cir. 2025)).

The Department emphasizes that the Fifth Circuit concluded that DHS's 2022 DACA Final Rule[199] substantively violated the Immigration and Nationality Act.[200] (The Department's analysis is quite brief; after quoting from a prior Fifth Circuit decision finding DACA unlawful,[201] the Department says only that "[u]pon further reconsideration, we now believe it was improper for HHS to define 'lawfully present' under the ACA in a way that departed from the longstanding understanding of that term with respect to DACA recipients."[202]). But the Department fails to then grapple with the remainder of the 2025 *Texas* opinion, which made clear that the aspect of DACA that forebears removal for recipients survives ("severing the . . . forbearance provisions from the work authorization provisions") and also that the entirety of DACA—including work authorization and the remaining associated features, like Social Security—would survive in every State other than in Texas alone (choosing to "narrow the scope of the injunction to Texas," finding that the injuries Texas alleged were "redressable by a geographically limited injunction").[203] The Department should therefore have considered an alternative that tracks the geographic scope of DACA as it remains in effect after *Texas*. Where individuals can obtain only forbearance and not obtain work authorization or the other benefits associated with "lawful presence" under federal law, then they might be unable to access ACA exchanges tied to "lawful presence" too. But where individuals in light of *Texas* are unquestionably still able to access work authorization and other benefits that are associated with "lawful presence," it makes eminent sense and supports uniformity across policies to allow those individuals to access ACA exchanges as well. The Department did not even consider this alternative, let alone explain its shortcomings, despite otherwise citing to the *Texas* 2022 decision.

These errors in failing to consider reasonable alternatives are especially egregious in light of the underlying statutory obligation in Section 1554 of the ACA to avoid issuing any rule that "creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care" or "impedes timely access to health care services."[204] Despite its direct regulation of ACA exchanges and ACA provisions, the Department's Proposed Rule fails to even mention Section 1554 in the context of DACA recipients, much less consider DACA recipients' ability to obtain medical care or timely access to health care services.[205] Here, the Department had a statutory obligation to avoid creating "unreasonable barriers" to health care. It did not do so, instead adopting a blanket reversal without at least *considering* reasonable alternatives. That is textbook arbitrary decisionmaking.

---

[199] *Deferred Action for Childhood Arrivals*, 87 Fed. Reg. 53,152 (Aug. 30, 2022).
[200] *Texas*, 126 F.4th at 417.
[201] 90 Fed. Reg. at 12,954 (quoting *Texas v. United States*, 50 F.4th 498, 526 (5th Cir. 2022).
[202] 90 Fed. Reg. at 12,954.
[203] *Texas*, 126 F.4th at 419-21.
[204] 42 U.S.C. § 18114(1)-(2).
[205] *See* 90 Fed. Reg. at 13,010-11 (Proposed Rule's analysis of DACA recipients). *Contra* 89 Fed. Reg. at 39,402 (2024 Rule's discussion of unique barriers to health care that DACA recipients experience).

4. **The Regulatory Impact Analysis fails to accurately assess the effect of the Proposed Rule in reversing the 2024 Rule.**

The Department asserts that the Proposed Rule will ultimately be a cost-saving measure, returning ACA eligibility to the pre-2024 Rule standard. However, even a cursory review of the Department's costs analysis reveals its inadequacies as related to the exclusion of DACA recipients from Marketplace eligibility. The Proposed Rule acknowledges the Department's obligation to "assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select those regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety, and other advantages; distributive impacts; and equity)."[206] The Proposed Rule falls woefully short of this required calculus. As articulated above, the Proposed Rule's reversal of the 2024 Rule ultimately results in fewer people with health insurance, exacerbating State and Federal expenditures, harming individual and community health, and impeding DACA recipients' ability to access healthcare, contrary to law.

As to benefits, the Proposed Rule suggests that the reduced enrollment resulting from denying DACA recipients access to ACA exchanges results in an annual APTC cost saving of $34 million and an annual BHP cost saving s of $3.2 million, for a total of $37.2 million in savings.[207] As to benefits, the Proposed Rule fails to quantify significant costs. It conspicuously leaves unquantified both the "small negative impact on the individuals market risk pool"[208] and, most notably, as articulated below, the "costs to the Federal Government and States to provide limited Medicaid coverage for the treatment of an emergency medical condition to DACA recipients who have a qualifying medical emergency and who will become uninsured as a result of the rule."[209] And the Proposed Rule recognizes that "the majority" of beneficiaries of the 2024 Rule would lose coverage,[210] thus exacerbating costs to the Federal Government and States.

As a result of the Proposed Rule "the majority [of DACA recipients] who lose. . . coverage would become uninsured."[211] Lapses in insurance coverage can have a negative effect on public health, especially in States with large populations of DACA recipients. In a 2021 survey of over 1,000 DACA recipients, 61% of respondents identified their immigration status as a "significant barrier" to receiving health insurance and health care, 47% reported delaying medical care due to immigration status, and 67% indicated that they or a family member were unable to pay medical bills or expenses.[212] Uninsured adults are less likely to receive preventive services for chronic conditions like cardiovascular disease, cancer, and diabetes.[213] And uninsured DACA recipients are also often hesitant to enroll their U.S.-born children in Medicaid and CHIP, resulting in

---

[206] 90 Fed. Reg. 13,005
[207] 90 Fed. Reg. at 13,010.
[208] *Id.*
[209] *Id.*
[210] *Id.*
[211] *Id.*
[212] Nat'l Immigr. Law Center, *Tracking DACA Recipients' Access to Health Care*, at 2 (June 1, 2022), https://tinyurl.com/ypdmtrzw.
[213] U.S. Dep't of Health and Human Servs., *Access to Health Services*, Office of Disease Prevention and Health Promotion, https://tinyurl.com/5n7s2cu7 (last visited April 8, 2025).

decreased enrollment relative to those with U.S.-born parents.[214] Lack of insurance also poses a grave threat to public health at the national level. One study found that "wider insurance gaps exacerbated local COVID-19 outbreaks and resulted in more cases, hospitalizations, and death than experienced by jurisdictions with better coverage" such that "[r]educing the number of [individuals within the country] without health insurance is a crucial and underappreciated component of pandemic preparedness."[215] This is especially important because, as the 2024 Rule noted, over 200,000 DACA recipients served as essential workers during the COVID-19 pandemic, including 43,500 DACA recipients who worked in health care and social assistance occupations. Of those working in health care settings, at least 10,300 served in hospitals and 2,000 in nursing care facilities.[216] Moreover, individuals without health insurance are less likely to have access to regular outpatient care, leading to greater rates of hospitalization. These problems redound at the local level, especially in smaller rural communities, where "[h]igh uninsured rates contribute to rural hospital closures and greater financial challenges for rural hospitals, leaving individuals living in rural areas at an even greater disadvantage to accessing care."[217] As such, high rates of uninsured individuals can easily threaten the public health of the greater community.[218]

Beyond compliance costs,[219] States will incur significant costs and burdens to their medical systems as a result of the Proposed Rule. The Proposed Rule is likely to increase States' spending on social services by increasing reliance on emergency and charity-healthcare costs. Indeed, the Proposed Rule anticipates that it would have the effect of excluding young, generally healthier DACA recipients from the individual market, causing a negative impact on the market risk pool. Further, because the Proposed Rule recognizes that DACA recipients will become uninsured, the costs will be passed to "the Federal Government and States to provide treatment."[220] States are obligated to pay certain emergency healthcare costs of undocumented immigrants who otherwise meet Medicaid eligibility criteria.[221] Removing access to health insurance for most DACA recipients, therefore, imposes an increased burden on States.[222] The Proposed Rule ignores thorough research that increases in the number of insured individuals has "decreased uncompensated care costs (UCC) overall and for specific types of hospitals, including those in rural areas."[223]

---

[214] Samantha Artiga & Anthony Damico, *Nearly 20 Million Children Live in Immigrant Families that Could Be Affected by Evolving Immigration Policies*, Kaiser Family Foundation (Apr. 18, 2018), https://tinyurl.com/37dwfce9.

[215] Travis Campbell et al., *Exacerbation of COVID-19 mortality by the fragmented United States healthcare system: A retrospective observational study*, The Lancet Regional Health (May 12, 2022), https://tinyurl.com/mr26zt3r.

[216] 89 Fed. Reg. at 39,396.

[217] Jennifer Tolbert et al., *Key Facts about the Uninsured Population*, Kaiser Family Foundation (Dec. 18, 2023), https://tinyurl.com/2s3jmmbm.

[218] *Id.*

[219] *See* 90 Fed. Reg. 13,010-11.

[220] 90 Fed. Reg. 13,010.

[221] *Id.*

[222] *Id.*

[223] *See e.g.,* Guth & Meghana Ammula, Building on the Evidence Base: Studies on the Effects of Medicaid Expansion, February 2020 to March 2021, Kaiser Fam. Found. 2 (2021); Benjamin D. Sommers et al., Three-Year Impacts of the Affordable Care Act: Improved Medical

Not only does the Proposed Rule ignore the aforementioned economic costs stemming from a lack of health coverage and the benefits of increased health coverage, it ignores essential socioeconomic facts about the DACA recipient population. DACA recipients attend public and private universities and are employed by companies, nonprofit organizations, and government agencies and institutions, all of which benefit from their skills and productivity. They help grow the economy and contribute an estimated $6.2 billion in federal taxes and $3.3 billion in State and local taxes each year.[224] In fact, a 2022 study indicated that Texas's DACA recipients—one of the largest DACA populations in the nation—have a collective spending power of $3.7 billion, and Texas would stand to lose around $139.7 million in annual State and local taxes if the DACA program ended entirely.[225] Important here, "[e]xtending health coverage to noncitizens, including undocumented immigrants, may not be as costly for States as it would be [for] citizens. Studies have shown that immigrants' medical expenditures are roughly one-half to two-thirds that of citizens," and "have a lower per capita expenditure for public and [private] insurers, providing a low-risk pool."[226]

The minimal savings cited by the Proposed Rule[227] are negligible when compared against the benefit to States with DACA recipients in their insurance pool, the loss of revenue for state-based exchanges, and the increased costs to States for covering the emergency medical costs for the newly uninsured DACA recipients. The Department cannot possibly fulfill its obligation to maximize net benefits when it fails to quantify such significant costs in the RIA. This is evident given the Proposed Rule's consideration of regulatory alternatives[228] plainly fails to consider or engage with any reasonable alternatives that would avoid these significant costs. In short, the analysis and cost savings outlined in the Proposed Rule's RIA is, at best, inaccurate, misleading, and woefully incomplete.

## III.    GENDER-AFFIRMING CARE SHOULD CONTINUE TO BE PERMITTED AS AN ESSENTIAL HEALTH BENEFIT

The Proposed Rule would unlawfully exclude coverage for gender-affirming care[229] as an EHB and should be withdrawn for three reasons: ***First***, gender-affirming care is essential healthcare and the Proposed Rule represents a dangerous incursion into the practice of medicine;

---

Care and Health Among Low-Income Adults, 36 Health Affs. 1119, 1124 (2017), https://tinyurl.com/49uvdame.
    [224] 89 Fed. Reg. at 39,399.
    [225] Skyler Korgel, *Celebrating a Decade of DACA in Texas*, Every Texan (Sept. 29, 2022), https://tinyurl.com/4m8vyh8f.
    [226] Matthew Buttegens & Urmi Ramchandani, *The Health Coverage of Noncitizens in the United States, 2024*, Urban Institute (May 2023), https://tinyurl.com/3j5x7csa.
    [227] *See* 90 Fed. Reg. at 13,010-11.
    [228] 90 Fed. Reg. at 13,026-28.
    [229] "Sex-trait modification" as used in the Proposed Rule is defined to mirror the definition of "chemical and surgical mutilation" as included in Executive Order 14187. *See* p. 154. This letter will refer to what the Proposed Rule calls "sex-trait modification" as "gender-affirming care", which is the appropriate term and which the Proposed Rule acknowledges refers to the same categories of healthcare. *See id.*

**Second**, the exclusion of gender-affirming care from EHB coverage is contrary to law because it violates the Equal Protection Clause and Section 1557 of the ACA; and **Third**, the Proposed Rule is arbitrary and capricious because it fails to consider important facts, including the widespread coverage of gender-affirming care by employer-based health plans, in its proposal to exclude gender-affirming care from EHB coverage.

## A.    Background

### 1.    Importance of Essential Health Benefits

The ACA requires certain individual and small group health plans to cover a set of EHBs which must be "equal to the scope of benefits provided under a typical employer plan."[230] These EHBs are "protected by cost-sharing limits and count towards a plan's actuarial value."[231] This means the categories protected as EHBs may not have any annual or lifetime dollar limit under the state plans. Per the Department, the "items and services" covered must come from the following ten benefit categories: (1) ambulatory patient services; (2) emergency services; (3) hospitalization; (4) maternity and newborn care; (5) mental health and substance use disorder services including behavioral health treatment; (6) prescription drugs; (7) rehabilitative and habilitative services and devices; (8) laboratory services; (9) preventive and wellness services and chronic disease management; and (10) pediatric services, including oral and vision care.[232]

Before the ACA, insurance plans could exclude certain key services from coverage. "For example, in 2011, 62 percent of enrollees had individual-market plans [that] didn't cover maternity care; 34 percent had plans that didn't cover substance use treatment; 18 percent had plans that didn't cover mental health; and 9 percent had plans that didn't cover prescription drugs."[233] By including EHBs as part of the minimum standard that must be provided, the ACA reduced these disparities and improved coverage for those who previously did not have access to these services.[234] Mandating coverage for EHB categories also improves coverage for those individuals

---

[230] Kaiser Family Foundation, New Rule Proposes Changes to ACA Coverage of Gender-Affirming Care, Potentially Increasing Costs for Consumers (Mar. 24, 2025), https://tinyurl.com/2637fye3.

[231] *Id.*

[232] Centers for Medicare and Medicaid Servs., Information on Essential Health Benefits (EHB) Benchmark Plans, https://tinyurl.com/3jbebvzc (last updated Jan. 14, 2025).

[233] Center on Budget and Policy Priorities, Essential Health Benefits Under Threat, http://cbpp.org/ehbs (last visited Apr. 9, 2025).

[234] Sarah Lueck, *If "Essential Health Benefits" Standards Are Repealed, Health Plans Would Cover Little*, Ctr. on Budget & Policy Priorities (Mar. 23, 2017), https://tinyurl.com/44b8e9z2 (explaining that the consequences of repealing EHBs would include leaving people with pre-existing conditions without healthcare coverage, women being charged more than men, and lead to many people with health insurance to have prohibitively expensive bills); Lois K. Lee, et al., *Women's Coverage, Utilization, Affordability, And Health After The ACA: A Review Of The Literature*, 39 HEALTH AFFAIRS 387, 390 (2020), https://tinyurl.com/3adau3rm.

with pre-existing conditions, as it prevents insurers from screening these individuals out of critical care.[235]

The ACA and its effectuating regulations permit significant latitude to the states in determining how EHBs are defined.[236] As such, states submit their "benchmark" plans to the Department for approval. As the name suggests, EHBs are a minimum standard, and benchmark plans can choose to offer "additional health benefits, like vision, dental, and medical management programs (for example, for weight loss)."[237] Each state maintains a benchmark plan on file with the Department, against which private insurers must compare plans to ensure compliance with the standards set forth therein. Further, if a state has not updated its benchmark plan to match federal requirements, private insurers must also review plans for compliance with federal EHB mandates.

### 2. Coverage of Gender-Affirming Care as EHBs

Gender-affirming care is a catch-all term for medical and psychosocial healthcare "'designed to support and affirm an individual's gender identity' [one's internal sense of one's gender], when it conflicts with the gender they were assigned at birth.'"[238] Gender-affirming care may include treatment such as surgery, prescription drugs, and mental health treatment, which fall within statutorily defined EHB categories. As such, states have made different coverage decisions with respect to whether to specifically name gender-affirming care in their EHB benchmark plans.

For example, in 2021, the Department approved the state of Colorado's benchmark plan that explicitly included gender-affirming care as an EHB.[239] The plan, which went into effect in 2023, was the first to formally include gender-affirming care in a state benchmark plan.[240] In response to the inclusion of gender-affirming care as an EHB, HHS Secretary Xavier Becerra stated: "Health care should be in reach for everyone; by guaranteeing transgender individuals can access recommended care, we're one step closer to making this a reality . . . I am proud to stand with Colorado to remove barriers that have historically made it difficult for transgender people to access health coverage and medical care." Echoing these sentiments, then-CMS Administrator Chiquita Brooks-LaSure commented: "Health care should be accessible, affordable and delivered equitably to all…To truly break down barriers to care, we must expand access to the full scope of health care, including gender-affirming surgery and other treatments, for people who rely on coverage

---

[235] Center for American Progress, *10 Ways the ACA Has Improved Health Care in the Past Decade* (Mar. 23, 2020), https://tinyurl.com/24usu69u.

[236] Center on Budget and Policy Priorities, *supra* note 233.

[237] Jared Ortaliza & Cynthia Cox, *The Affordable Care Act 101*, Kaiser Family Found. (May 28, 2024), https://tinyurl.com/yz5utdrn.

[238] *What is gender-affirming care? Your questions answered*, Am. Assoc. Med. Colleges (Apr. 12, 2022), https://tinyurl.com/yrm9wn6f.

[239] Centers for Medicare & Medicaid Servs., Biden-Harris Administration Greenlights Coverage of LGBTQ+ Care as an Essential Health Benefit in Colorado (Oct. 12, 2021), https://tinyurl.com/4bczc5wj.

[240] Colorado Dept. of Regulatory Agencies, Gender-Affirming Care Coverage Guide, https://tinyurl.com/umw3329c.

through Medicare, Medicaid & CHIP and the Marketplaces….” Twenty-four states also expressly *prohibit* providers from excluding transgender-related healthcare.[241]

For states that require coverage for gender-affirming care, the Proposed Rule would have considerable consequences. Indeed, the Proposed Rule states that “if any State separately mandates coverage for sex-trait modification outside of its EHB-benchmark plan, the State would be required to defray the cost of that State mandated benefit as it would be considered in addition to EHB.”[242] As a result, according to the Department, states with laws that mandate coverage outside of its EHB benchmark plan will suddenly be responsible for defraying the costs of covering those services under certain scenarios.[243]

## B.    The Department Should Not Exclude Gender-Affirming Care as an EHB.

As an initial matter, gender-affirming care is essential healthcare for transgender individuals. Gender-affirming care has proven benefits for transgender individuals, including greatly improved mental health and overall well-being of gender diverse, transgender, and nonbinary children and adolescents.[244] Further, given the scope of what is currently included in EHBs, there is no principled way to exclude gender-affirming care, which may include prescription drugs, mental health treatment, and surgery, from the scope of EHBs. The only explanation for banning this care from coverage as an EHB is sheer animus toward transgender, nonbinary, and gender diverse individuals who may seek to access this care. Thus, the exclusion of gender-affirming care is contrary to law in violation of the APA. The exclusion of gender-affirming care from EHBs is also arbitrary and capricious, as in the past twenty years, coverage for gender-affirming care has increased significantly and coverage for gender-affirming care in employer-sponsored plans is comparable to many other benefits currently considered EHBs.[245] This expansion of coverage marks a recognition by health plans that this treatment has considerable benefits and can improve overall health outcomes for its recipients. The failure of the Proposed Rule to consider these benefits and to improperly state that gender-affirming care is not typically covered is arbitrary and capricious in violation of the APA. The Proposed Rule should be withdrawn.

### 1.    Gender-Affirming care has important benefits.

Gender-affirming care is essential medical treatment for transgender individuals and those experiencing gender dysphoria, a medical condition characterized by an incongruence between gender identity and sex assigned at birth. Gender dysphoria can cause clinically significant distress

---

[241] Movement Advancement Project, Healthcare Laws and Policies: Private Insurance Nondiscrimination Laws, Bans on Exclusions of Transgender Health Care, and Related Policies (Apr. 26, 2024), https://tinyurl.com/39h489an.

[242] 90 Fed. Reg. at 12,987.

[243] Kaiser Family Foundation, New Rule Proposes Changes to ACA Coverage of Gender-Affirming Care, Potentially Increasing Costs for Consumers, *supra* note 230.

[244] *Id.*

[245] Kaiser Family Foundation, 2024 Employer Health Benefits Survey (Oct. 9, 2024), https://tinyurl.com/46t4msuh; Human Rights Campaign Foundation, Corporate Equality Index 2025: Rating Workplaces on Lesbian, Gay Bisexual, Transgender and Queer Equality (Jan. 2025), https://tinyurl.com/53dwc7mb.

and may result in "symptoms of depression and anxiety, substance use disorders, a negative sense of well-being and poor self-esteem, and an increased risk of self-harm and suicidality."[246] Major medical associations—including the American Medical Association, American Psychiatric Association, American College of Physicians, American Academy of Pediatrics, American Academy of Child and Adolescent Psychiatry, American Academy of Family Physicians, and the American College of Obstetricians and Gynecologists—recognize the overwhelming evidence "that evidence-based, gender-affirming care for transgender children and adolescents is medically necessary and appropriate."[247] Even when transgender individuals are not experiencing gender dysphoria, gender-affirming care may be lifesaving preventative mental health care.[248] Gender-affirming care is essential healthcare, and prohibitions on this medical care are a "dangerous intrusion into the practice of medicine" and violate the "sanctity of the patient-physician relationship."[249]

### 2. The exclusion of Gender-Affirming Care from EHBs is contrary to law.

The exclusion of gender-affirming care is contrary to law in violation of the APA for the additional reason that it discriminates against the undersigned States' residents in violation of the Equal Protection Clause and Section 1557 of the ACA.

### a. The Proposed Rule violates the Equal Protection Clause.

At the outset, the Proposed Rule plainly classifies on the basis of sex and transgender status. It thus triggers heightened scrutiny under the Equal Protection Clause;[250] yet HHS offers no legitimate justification for the Rule.

### (1) The Proposed Rule classifies based on sex.

The Proposed Rule would prohibit insurers from covering certain healthcare services as EHBs only if those services "attempt to transform an individual's physical appearance to align

---

[246] Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 513-14 (5th ed., text rev. 2022); Garima Garg et al., *Gender Dysphoria*, StatPearls (July 11, 2023), https://tinyurl.com/yj333bw8.

[247] *Medical Association Statements in Support of Health Care for Transgender People and Youth*, GLAAD (June 26, 2024), https://tinyurl.com/2thfbh4m. Moira Szilagyi, *Why We Stand Up for Transgender Children and Teens*, Am. Acad. of Pediatrics Voices Blog (Aug. 10, 2022), https://tinyurl.com/4v7m9b72.

[248] *Why Gender-Affirming Care Should Be Part of Preventive Mental Health Care for Trans People*, Univ. of Wash. Dept. of Epidemiology (July 14, 2023), https://tinyurl.com/yp4pfnp4.

[249] Press Release, Am. Med. Ass'n, AMA To States: Stop Interfering in Health Care of Transgender Children (Apr. 26, 2021), https://www.ama-assn.org/press-center/press-releases/ama-states-stop-interfering-health-care-transgender-children.

[250] *See, e.g., Hecox v. Little*, 104 F.4th 1061, 1073-1080 (9th Cir. 2024); *Kadel v. Folwell*, 100 F.4th 122, 142-156 (4th Cir. 2024); *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 607-608 (4th Cir. 2020); *Doe v. Horne*, 115 F.4th 1083, 1102-1107 (9th Cir. 2024); *Karnoski v. Trump*, 926 F.3d 1180, 1200-1202 (9th Cir. 2019); *Massachusetts v. U.S. Dep't of Health & Hum. Servs.*, 682 F.3d 1, 8-9 (1st Cir. 2012).

with an identity that differs from his or her sex" or "attempt to alter or remove an individual's sexual organs to minimize or destroy their natural biological functions"—but not for any other purposes.[251] The Department drives this point home by soliciting comments on whether it should incorporate "*explicit* exceptions" into the final rule to ensure that the targeted healthcare services (e.g., puberty blockers, hormone treatments, and surgeries) remain eligible for EHB-status when used to treat any other medical condition, "such as precocious puberty, or therapy subsequent to traumatic injury."[252]

The Proposed Rule is thus "a line drawn on the basis of sex, plain and simple."[253] This is "textbook sex discrimination."[254] With or without any "explicit exceptions," the description of "sex trait modification" reveals that an insurer must know the sex of the patient to determine whether a particular health care service qualifies as an EHB. As an example, consider the provision of testosterone to a sixteen-year-old who identifies as a male and who wishes to align his appearance to his male identity. The Proposed Rule would prohibit an insurer from covering that care as an EHB if the patient was assigned female at birth because it would "transform [his] physical appearance to align with an identity that differs from his . . . sex." But it would allow an insurer to cover that exact same care if the patient was assigned male at birth. Similarly, it would be impossible to know whether any particular surgery was undertaken to "alter or remove an individual's sexual organs to minimize or destroy their natural biological functions"—and thus banned as an EHB under the Rule—without knowing the patient's assigned sex.

The Proposed Rule further discriminates on the basis of sex by reinforcing sex stereotypes and punishing gender nonconformity.[255] It would allow insurers to include as EHBs medical care that aligns a person's appearance with an identity that corresponds to their sex assigned at birth while forcing them to exclude medical care that aligns a person's appearance with an identity that differs from their sex assigned at birth. The Rule thus presumes there is one set way to live as the male and female sexes and penalizes transgender, nonbinary, and gender diverse people for not comporting with those stereotypes by limiting their coverage options.[256]

---

[251] 90 Fed. Reg. at 12,986.

[252] 90 Fed. Reg. at 12,987 (emphasis added).

[253] *Doe v. Ladapo*, 676 F. Supp. 3d. 1205, 1217 (N.D. Fl. 2023).

[254] *Kadel*, 100 F.4th at 153.

[255] "Many courts … have held that various forms of discrimination against transgender individuals constitute sex-based discrimination for purposes of the Equal Protection Clause because such policies punish transgender persons for gender non-conformity, thereby relying on sex stereotypes. In so holding, these courts have recognized a central tenet of equal protection in sex discrimination cases: that states 'must not rely on overbroad generalizations' regarding the sexes." *Grimm*, 972 F.3d at 608-609 (internal citations omitted).

[256] *See Kadel*, 100 F.4th at 154 (holding that "a policy that conditions access to gender-affirming surgery on whether the surgery will better align the patient's gender presentation with their sex assigned at birth is a policy based on gender stereotypes"). An example from *Kadel* illustrates this point: "[W]hile mastectomies are available for both people assigned male at birth and those assigned female at birth, when they are conducted for gender-affirming purposes, they are only available to those assigned male at birth [and would be excluded under the Proposed Rule]. This difference in coverage is rooted in a gender stereotype: the assumption that people who have been assigned female at birth are supposed to have breasts, and that people assigned male at birth are not. No doubt, the majority of those assigned female at birth have breasts, and

The Proposed Rule similarly penalizes another segment of the population—intersex people—without even recognizing that they exist.[257] Intersex people may have variations in chromosomes, external genitalia, hormones, and reproductive organs, among other characteristics, that make them neither "male" nor "female."[258] When an intersex person receives gender-affirming care to align their external appearance or reproductive organs with their gender identity, they are not really transforming their appearance "to align with an identity that differs from [their]…sex" because they have traits that correspond with both "male" and "female." However, the Proposed Rule would limit or grant coverage for an intersex person's gender-affirming care based on what their birth certificate happens to say, or, more practically, what gender identity they are raised to inhabit. If an intersex person has a birth certificate that says "female" (and was raised accordingly) and identifies as male, this Proposed Rule would limit coverage for gender-affirming care, like hormone therapy, that aligns their appearance with a male gender identity. However, if this person's birth certificate happened to be marked as "male" (and they were raised accordingly), the Proposed Rule would not limit coverage for that same hormone therapy. That an intersex individual's insurance coverage for the same care would hinge on whether they adhere to certain sex stereotypes prior to receiving gender-affirming care is clearly discriminatory.

### (2) The Proposed Rule makes impermissible classification based on transgender status.

The Proposed Rule triggers heightened scrutiny for the additional reason that it targets transgender people. As explained above, the Rule only excludes medical care that aims to address the incongruity between sex assigned at birth and gender identity. Yet that incongruity lies at "the very heart of transgender status."[259] It is not legally significant that the Rule was written to avoid the word "transgender." The Equal Protection Clause looks beyond creative drafting that ensures a discriminatory law would technically apply to all groups to examine whether it would exclusively or predominantly affect only one.[260] Such is the case here. By targeting medical care that enables a person to live in an identity different than their sex assigned at birth, the Proposed Rule plainly and unlawfully targets transgender, nonbinary, and gender diverse people.

### (3) The Proposed Rule cannot survive any level of scrutiny.

To survive heightened scrutiny, "the government must show that the classification serves important governmental objectives and that the discriminatory means employed are substantially

---

the majority of those assigned male at birth do not. But we cannot mistake what is for what must be. And because gender stereotypes can be so ingrained, we must be particularly careful in order to keep them out of our Equal Protection jurisprudence." *Id.*

[257] The fact that the Proposed Rule does not even consider the needs of intersex people further shows that it is arbitrary and capricious, in violation of the APA. *See State Farm,* 463 U.S. at 43.

[258] *Improving Health Care for Intersex People*, Fenway Health (Oct. 26, 2020), https://tinyurl.com/mt9jtv3y.

[259] *Kadel*, 100 F.4th at 146; *see Hecox*, 104 F.4th at 1080 ("A 'transgender' individual's gender identity does not correspond to their sex assigned at birth[.]").

[260] *See Kadel*, 100 F.4th at 148 and cases cited.

related to the achievement of those objectives."[261] None of the objectives identified in the Rule survive this demanding standard. Indeed, the Department claims to have issued the Proposed Rule "because sex-trait modification is not typically included in employer health plans and therefore cannot legally be covered as an EHB."[262] Yet the Rule does not provide sufficient evidence or any analysis to support this point; and as described below, it is readily disproven.[263]

The Proposed Rule separately suggests that the Department is "concerned about the scientific integrity of claims made to support [the use of gender-affirming care] in health care settings."[264] Incredibly, the Rule does not cite *any* evidence to support this claim and, in failing to do so, cannot "articulate a satisfactory explanation for its action."[265] And in any event, every major medical organization in American has publicly supported the types of care targeted by the Rule.[266]

The Proposed Rule discriminates against people who do not conform to the Trump Administration's conception of what it means to be "male" and "female." That is not a legitimate state interest, much less an "important" one.[267] The Proposed Rule will not survive any level of scrutiny and must be withdrawn.

---

[261] *Id.* at 156 (internal quotation marks and citation omitted).

[262] 90 Fed. Reg. at 12,986.

[263] In the same vein, the Proposed Rule alludes to "some stakeholders [that] do not believe that sex-trait modification services fit into any of the 10 categories of EHB and, therefore, do not fit within the EHB framework even if some employers cover such services." 90 Fed. Reg. 12,987. But it does not identify those alleged stakeholders or provide any more information about their alleged belief, making it impossible for the States to fully respond to this claim. In any event, as multiple States have determined, gender-affirming care fits easily within the EHB categories. *See supra* pp. 41-42; 42 U.S.C. § 18022(b)(1) (defining the 10 EHB categories as ambulatory patient services; emergency services; hospitalization; maternity and newborn care; mental health and substance use disorder services, including behavioral health treatment; prescription drugs; rehabilitative and habilitative services and devices; laboratory services; preventive and wellness services and chronic disease management; and pediatric services, including oral and vision care).

[264] 90 Fed. Reg. at 12,987.

[265] *See State Farm.*, 463 U.S. at 43 ("the agency must examine the relevant data and articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made") (internal quotation omitted).

[266] "Organizations who have formally recognized this include the American Academy of Pediatrics, American Academy of Child and Adolescent Psychiatry, American Academy of Family Physicians, American College of Obstetricians and Gynecologists, American College of Physicians, American Medical Association, American Psychiatric Association, and at least a dozen more." *Dekker v. Weida,* 679 F. Supp. 3d 1271, 1285 (N.D. Fla. 2023). To the extent the Department means to refer back to the Trump Administration's apparent disdain for standards set forth by the World Professional Association for Transgender Health ("WPATH"), *see* Exec. Order No. 14,187, Protecting Children from Chemical and Surgical Mutilation, 90 Fed. Reg. 8,771 (Jan. 28, 2025), multiple courts have recognized those standards provide the "generally accepted" protocols for treating gender dysphoria. *Kadel*, 100 F.4th at 136-137; *Edmo v. Corizon, Inc.*, 935 F.3d 757, 769-770 (9th Cir. 2019).

[267] Government action motivated by a "bare . . . desire to harm" a disfavored group cannot survive any level of scrutiny. *Romer v. Evans*, 517 U.S. 620, 634-635 (1996).

### b.  The Proposed Rule violates Section 1557 of the ACA.

In addition to violating the equal protection rights of States' residents, the Proposed Rule contravenes the non-discrimination mandate of the ACA.[268] As relevant here, Section 1557(a) provides that "an individual shall not, on the ground prohibited under . . . title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.) . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance . . . ." Title IX prohibits discrimination on the basis of sex and, as many courts have recognized, transgender status.[269] The reason for this is simple: "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex."[270] Section 1557 imposes those same safeguards on federally funded health care entities.[271] Yet the Proposed Rule tosses those safeguards aside, allowing or prohibiting insurers from covering medical care as an EHB based on whether the care aligns with the person's sex assigned at birth. The law does not countenance such flagrant sex-based classifications and stereotypes.

### 3.  The Exclusion of Gender-Affirming Care from EHBs is arbitrary and capricious.

The "arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained."[272]An agency action fails to meet this test where, among other things, "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [made a decision that] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[273] The Proposed Rule violates a number of these APA principles.

To date, the Department has explicitly prohibited EHB coverage for only a limited number of services: abortion, non-pediatric dental or eye exam services, long-term nursing care, and non-medically necessary orthodontia.[274] However, even for those services, an EHB plan may cover them should a state so choose.[275] For example, non-pediatric dental care, which cannot be required to be covered as an EHB, is permitted to be covered as part of an EHB benchmark plan should a

---

[268] *See* 42 U.S.C. § 18116 ("Section 1557").

[269] *See A.C. v. Metropolitan Sch. District of Martinsville*, 75 F.4th 760, 768-769 (7th Cir. 2023); *Grimm*, 972 F.3d at 616-617.

[270] *Bostock v. Clayton Cty.*, 590 U.S. 644, 660 (2020). Though *Bostock* interpreted Title VII of the Civil Rights At of 1964, its analysis applies with equal force to Title IX both because Congress modeled Title IX after Title VI and because in either context "the discriminator is necessarily referring to the individual's sex to determine incongruence between sex and gender, making sex a but-for cause for the discriminator's action." *Grimm*, 972 F.3d at 616-617.

[271] *See Kadel*, 100 F.4th at 164.

[272] *Prometheus Radio Project*, 592 U.S. at 423.

[273] *State Farm*, 463 U.S. at 43.

[274]45 C.F.R. § 156.115(d); https://tinyurl.com/mr3f37yh (noting that abortion, non-pediatric dental or eye exam services, long-term nursing care, and non-medically necessary orthodontia are excluded from EHB inclusion).

[275] *Id.*

state choose to do so.[276] The Department has not sufficiently justified why gender-affirming care should be treated similarly to those other services explicitly excluded, as opposed to the litany of services that are covered as EHBs under law, and none of the purported justifications provided meet the appropriate standard.

### a.  EHB Coverage is not as limited as the Proposed Rule suggests.

As justification for excluding gender-affirming care from EHBs, the Proposed Rule argues that gender-affirming care "is not typically included in employer-sponsored plans," so should be left out of EHB coverage.[277] The Proposed Rule fails to cite data supporting this claim, and, unsurprisingly, EHB coverage for gender-affirming care is not as limited as the Proposed Rule maintains. Employer plans are the most dominant source of healthcare coverage in the United States, and a substantial number of them offer gender-affirming care coverage.[278] A 2024 survey run by the Kaiser Family Foundation (KFF) found that 50 percent of companies with 5,000 or more workers were able to certify that they specifically cover gender-affirming hormone therapy.[279] A little less than half of all workers covered by employer plans in the United States (43 percent) work for companies with 5,000 or more workers. Even after broadening to all large employers (companies with 200 or more workers that offer health benefits), which employ over 72 percent of American workers with job-based coverage, around one fourth (24 percent) stated that they cover gender-affirming hormone therapy.[280]

The analogous KFF survey from 2023 reported similar findings regarding employer coverage for gender-affirming surgery.[281] Over 60 percent of companies with 5,000 or more workers stated that they provide coverage for gender-affirming surgery; 12 percent were unsure about whether they provide the same coverage. As was the case with employer coverage for gender-affirming hormone therapies, a little less than one fourth (23 percent) of all large employers, with 200 or more workers, were certain that they provide gender-affirming surgery. 40 percent did not know whether offered health benefits included such surgery.

A significant proportion of American workers with employer healthcare plans have coverage for gender-affirming healthcare services, and this number has grown over time. According to the Human Rights Watch's Corporate Equality Index 2025 Report, 72 percent of Fortune 500 companies offer "transgender-inclusive healthcare benefits," which includes hormone therapies,

---

[276] *Id.*

[277] 90 Fed. Reg. at 12,986.

[278] Human Rights Campaign Foundation, Corporate Equality Index 2025: Rating Workplaces on Lesbian, Gay Bisexual, Transgender and Queer Equality (Jan. 2025), https://tinyurl.com/53dwc7mb.

[279] Kaiser Family Foundation, 2024 Employer Health Benefits Survey (Oct. 9, 2024), https://tinyurl.com/46t4msuh. Eighteen percent of companies of this size did not know if they offer such coverage. *Id.*

[280] *Id.* Only 31 percent of these large employers stated that they did not offer coverage for gender-affirming hormone therapy; around 45 percent of responding large employers did not know if they covered these services. *Id.*

[281] Kaiser Family Foundation, 2023 Employer Health Benefits Survey (Oct. 18, 2023), https://tinyurl.com/2mshf4hz.

surgeries, and mental health care, up from 0 percent in 2002.[282] The purported basis for excluding gender-affirming care as an EHB—that they are not typically included in employer plans—is factually inaccurate and fails as a foundation for such exclusion.

**b.    The fact that health conditions are rare does not warrant exclusion from EHB coverage.**

The Proposed Rule theorizes (again without support) that the lack of employer coverage of gender-affirming care stems from the low utilization of such care.[283] It explains that "less than 1 percent of the U.S. population seeks forms of sex-trait modification."[284] Yet, there is a marked difference between a lack of coverage and infrequent utilization of that coverage. Public and commercial insurance regularly covers healthcare services that are infrequently used. For instance, there were 3,456 patients waiting for heart transplants and 898 patients waiting for lung transplants in the United States in 2024.[285] Although these transplants are exceptionally rare, the vast majority of public and private insurance plans cover them, and transplants themselves are not excluded from EHBs.[286] Thus, even if gender-affirming care coverage were infrequently utilized, the usage rate alone would not be a reason to exclude the care from EHBs.

Health care utilization is determined by a number of factors, including geography, sex, race, and spoken language.[287] The need for health care is a "major determinant" of utilization.[288] Conditions that motivate the use of gender-affirming care coverage are not truly rare; gender dysphoria, for instance, does not even meet the requirements of a "rare" condition, which would typically require that it impact fewer than 200,000 Americans.[289] Indeed, an estimated 0.6% of U.S. residents, or over 2 million Americans, experience gender dysphoria.[290] Also, most public

---

[282] Human Rights Campaign Foundation, *supra* note 278.

[283] 90 Fed. Reg. at 12,986-87.

[284] 90 Fed. Reg. at 12,987.

[285] *Detailed Description of Data*, Health Res. and Servs. Admin., https://tinyurl.com/m3nvrvzd (last visited Apr. 8, 2025).

[286] *Heart Disease and Heart Transplant*, WebMD (James Beckerman ed., June 30, 2023) https://tinyurl.com/4kk3ydwu  ("More than 80% of commercial insurers and 97% of Blue Cross/Blue Shield plans offer coverage for heart transplants."); *Planning to Pay for a Transplant*, Cystic Fibrosis Found., https://tinyurl.com/3u96vpyh (last visited Apr. 8, 2025) ("Most health insurance and government programs, including Medicaid, will pay for a lung transplant…"); Lindsey Dawson, Kaye Pestaina, & Matthew Rae, *New Rule Proposes Changes to ACA Coverage of Gender-Affirming Care, Potentially Increasing Costs for Consumers*, Kaiser Family Found. (Mar. 24, 2025), https://tinyurl.com/2637fye3 ("There are other cases where a small share of the population uses a service that is generally covered by insurance. For example, there were fewer than 5,000 heart transplants in the US in 2023 (equaling one ten thousandth of a percent of the population) but public and commercial insurance typically covers this service.").

[287] National Academies of Sciences, Engineering, and Medicine, *Factors That Affect Health-Care Utilization, in* Health-Care Utilization as a Proxy in Disability Determination (2018), https://tinyurl.com/mtcsjc7f.

[288] *Id.* The other factors that impact healthcare utilization, like geography, race, and sex, have independent impacts on utilization. *Id.*

[289] *Rare and Orphan Diseases*, Cleveland Clinic, https://tinyurl.com/5eyz4e2b (last visited Apr. 8, 2025).

[290] Danyon Anderson et al., *Gender Dysphoria and Its Non-Surgical and Surgical*

and private insurance plans cover treatment for a variety of conditions that, while not rare in the medical sense, impact fewer people than gender dysphoria. For example, most healthcare plans cover treatment for multiple sclerosis, which affects almost 1 million people in the United States,[291] and major insurance providers also cover treatment for scleroderma, which impacts only around 300,000 Americans.[292] The fact that a condition only impacts a subset of the general population is not, in and of itself, a sufficient reason to exclude it from inclusion in EHBs.

Additionally, those experiencing gender dysphoria are not the only people who need access to, or make use of, gender-affirming care. Transgender, nonbinary, and intersex individuals who do not suffer from gender dysphoria may need or want gender-affirming care so that they may live as their authentic selves. Around 300,000 minors between the ages of 13 and 17 and 1.3 million adults identify as transgender,[293] approximately 1.2 million LGBTQ people in the U.S. identify as nonbinary,[294] and around 5.6 million people in the U.S. are born intersex.[295] Though there are overlapping populations within these gender diverse groups, it is clear that millions of Americans need access to gender-affirming care.

### c. The Proposed Rule fails to account for reliance interests.

The Proposed Rule is arbitrary and capricious for another, related reason: it does not accommodate or even acknowledge that individuals and States have developed important reliance interests around coverage for gender-affirming care due to the preexisting federal regulatory environment. As in the DACA context, the Department is "not writing on a blank slate" here.[296] States have enjoyed the authority to refine EHB requirements within statutory parameters since the ACA was passed; and the Department has never before sought to interfere with that authority by imposing a nation-wide ban on EHB coverage for gender-affirming care. Far from it, in 2021, the Department affirmatively approved a state benchmark plan that explicitly identified that care as an EHB. As a result, many States have administered their marketplaces and benchmark plans with the expectation that employer healthcare plans would cover gender-affirming care as an EHB; and employers followed suit. If the Proposed Rule takes effect, these States would lose the

---

*Treatments*, 10 Health Psychology Res. (Sept. 2022), https://tinyurl.com/tvnvukzw.

[291] Alexandra Benisek, *Covering the Cost of B-Cell Therapy*, WebMD (Oct. 21, 2024), https://tinyurl.com/3urfssdm ("Insurance covers most MS treatments…"); *How Many People Live With Multiple Sclerosis?*, Natl. Multiple Sclerosis Soc'y, https://tinyurl.com/2k8zrd64 (last visited Apr. 8, 2025).

[292] *Who Gets Scleroderma?*, Natl. Scleroderma Found., https://tinyurl.com/3ap44hk9 (last visited Apr. 8, 2025); *Insurance Coverage for Therapeutic Plasma Exchange in the U.S.*, The Scleroderma Education Project, (last visited Apr. 8, 2025).

[293] Press Release, UCLA Williams Inst., New Estimates Show 300,000 Youth Ages 13-17 Identify as Transgender in the U.S. (June 10, 2022), https://tinyurl.com/4h3wdp77.

[294] Press Release, UCLA Williams Inst., 1.2 Million LGBTQ Adults in the U.S. Identify as Nonbinary (June 22, 2021), https://tinyurl.com/vbwr387f.

[295] Rebecca Boone & Jeff McMillan, *How Many Transgender and Intersex People Live in the U.S.? Anti-LGBTQ+ Laws Will Impact Millions*, Associated Press (July 27, 2023), https://tinyurl.com/mvbe6xk8.

[296] *See Regents*, 591 U.S. at 33 (where agency was "not writing on a blank slate, it was required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns") (cleaned up).

flexibility to tailor EHB coverage to the particular needs of their population; and those States that continue to mandate coverage for gender-affirming care—through their State non-discrimination laws or otherwise—would suddenly be required to absorb the associated defrayal costs under 90 Fed. Reg. 12,987. Individuals who currently access gender-affirming care as an EHB through employer healthcare plans also may experience disruptions and increased costs.

However the Department may view these reliance interests, it was obligated to at least acknowledge their existence and consider them when formulating the Proposed Rule.[297] Its failure to do so renders the Rule arbitrary and capricious.

Respectfully submitted,

ROB BONTA
CALIFORNIA ATTORNEY GENERAL

ANDREA JOY CAMPBELL
MASSACHUSETTS ATTORNEY GENERAL

MATTHEW J. PLATKIN
NEW JERSEY ATTORNEY GENERAL

KRISTIN MAYES
ARIZONA ATTORNEY GENERAL

PHILIP J. WEISER
COLORADO ATTORNEY GENERAL

WILLIAM TONG
CONNECTICUT ATTORNEY GENERAL

---

[297] *Regents*, 591 U.S. at 31.



BRIAN L. SCHWALB
DISTRICT OF COLUMBIA ATTORNEY GENERAL



KATHLEEN JENNINGS
DELAWARE ATTORNEY GENERAL



ANNE E. LOPEZ
HAWAIʻI ATTORNEY GENERAL



KWAME RAOUL
ILLINOIS ATTORNEY GENERAL

AARON M. FREY
MAINE ATTORNEY GENERAL

ANTHONY G. BROWN
MARYLAND ATTORNEY GENERAL



DANA NESSEL
MICHIGAN ATTORNEY GENERAL



KEITH ELLISON
MINNESOTA ATTORNEY GENERAL



AARON D. FORD
NEVADA ATTORNEY GENERAL



RAÚL TORREZ
NEW MEXICO ATTORNEY GENERAL



LETITIA JAMES
NEW YORK ATTORNEY GENERAL

DAN RAYFIELD
OREGON ATTORNEY GENERAL

PETER NERONHA
RHODE ISLAND ATTORNEY GENERAL

CHARITY R. CLARK
VERMONT ATTORNEY GENERAL

NICK BROWN
WASHINGTON ATTORNEY GENERAL

JOSHUA L. KAUL
WISCONSIN ATTORNEY GENERAL