# EXHIBIT 9

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services, *et al.*,<br><br>*Defendants*. | Civil Action No.: 25-12019 |

## **DECLARATION OF MORGAN WINTERS**

I, Morgan Winters, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am the Marketplace Director at the Illinois Department of Insurance. I have been employed as Marketplace Director since March 25, 2024.

2. Prior to joining IDOI, I was with MNsure, the state of Minnesota's Health Benefits Exchange, for over a decade, where I served in various roles, most recently as MNsure's Chief Operating Officer.

3. My educational background includes a Master's Degree in Public Policy from the Humphrey School of Public Affairs at the University of Minnesota.

4. I am familiar with the information in the statements set forth below through personal knowledge and from documents and information that have been provided to and reviewed by me.

5. I submit this Declaration in support of the States' Motion for a Preliminary Injunction.

**Illinois' Health Insurance Marketplace**

6. Get Covered Illinois ("GCI") is the state's official health insurance marketplace, located within the Illinois Department of Insurance. GCI is currently operating in its first year as a State-based Marketplace on the Federal Platform ("SBM-FP"). That means GCI fulfills certain functions of a State-based Marketplace—such as administering a navigator program, managing marketing and outreach, maintaining a public website and toll-free number that provide general information about the Affordable Care Act to Illinois residents, and certifying Qualified Health Plans—while utilizing the federal marketplace platform at Healthcare.gov to support eligibility and enrollment functions and provide customer service. GCI is awaiting approval from the Centers for Medicare & Medicaid Services to operate GCI as a fully independent State-based Marketplace for the upcoming open enrollment period beginning November 1, 2025.

7. GCI has established a competitive market, a robust risk pool, and currently includes 11 health insurance issuers of medical plans and 8 issuers of dental plans.

8. GCI is funded through a combination of establishment funding from the state for initial implementation of the marketplace and user fee collection from the GCI health insurance issuers, which supports ongoing operations. In Fiscal Year 2024, Illinois paid $1.25 million to maintain the program.

**Impact of Final Rule on Enrollment Revenue**

9. Based on the Congressional Budget Office's estimate[1] of a 0.9 million increase in uninsured for the proposed version of the CMS "Marketplace Integrity and Affordability Rule"[2] and CMS' estimate[3] of 24 million ACA Marketplace enrollees nationwide, the proposed version of the rule would have caused a national decrease in enrollment of 3.75%. Because some provisions of the proposed rule that would have had negative enrollment impacts were not adopted in the Final Rule,[4] and lacking an updated estimate from the CBO about the Final Rule, we estimate that the Final Rule will cause total enrollment in GCI to decrease by 3% and will also cause the risk pool to significantly worsen, thereby causing premiums to rise. Based on the CMS state-level data on Illinois exchange participants for Plan Year 2025,[5] a 3% drop would mean about 14,000 people in Illinois would lose their health insurance access.

10. One direct consequence of this anticipated decrease in enrollment is a loss of State revenues. To fund operations, GCI collects a user fee of 0.5% as a State-based Marketplace on the Federal Platform and will, as a State-based Marketplace starting with Plan Year 2026, collect 2.75% of the total monthly premiums collected by an issuer for each medical or dental plan

---

[1] Congressional Budget Office. "Re: Estimated Effects on the Number of Uninsured People in 2034 Resulting From Policies Incorporated Within CBO's Baseline Projections and H.R. 1, the One Big Beautiful Bill Act" (Jun. 4, 2025). *Available at:* https://www.cbo.gov/system/files/2025-06/Wyden-Pallone-Neal_Letter_6-4-25.pdf.
[2] 90 Fed. Reg. 12542 (Mar. 19, 2025). *Available at*: https://www.federalregister.gov/documents/2025/03/19/2025-04083/patient-protection-and-affordable-care-act-marketplace-integrity-and-affordability.
[3] Centers for Medicare and Medicaid Services. Press Release (Jan. 17, 2025). *Available at:* https://www.cms.gov/newsroom/press-releases/over-24-million-consumers-selected-affordable-health-coverage-aca-marketplace-2025.
[4] 90 Fed. Reg. 27074 (Jun. 25, 2025). *Available at*: https://www.federalregister.gov/documents/2025/06/25/2025-11606/patient-protection-and-affordable-care-act-marketplace-integrity-and-affordability.
[5] Centers for Medicare and Medicaid Services. 2025 Marketplace Open Enrollment Period Public Use Files. *Available at:* https://www.cms.gov/data-research/statistics-trends-reports/marketplace-products/2025-marketplace-open-enrollment-period-public-use-files.

purchased through our individual exchange pursuant to 215 ILCS 122/5-21.[6] Since January 2025, GCI has collected $7,967,139.99 in user fees at the 0.5% rate.

11. Therefore, when enrollment in GCI decreases, the issuer no longer receives those premiums and thus no longer pays a portion of them to the State of Illinois. Based on our estimates, the decreased enrollment in GCI in Illinois because of the Final Rule will result in approximately $1.8 million in lost user fee revenue for 2026.

12. According to CMS data, 418,039 Illinois consumers receive APTCs for Plan Year 2025 to make their coverage more affordable.[7] The Inflation Reduction Act of 2022 enhanced these subsidies through the end of 2025 and the average tax credit among Illinoisans enrolled in Marketplace coverage is $540.[8] With the anticipated end of these subsidy enhancements after 2025 leading to higher monthly premiums, the Final Rule will compound the effect on Marketplace enrollees by allowing QHP issuers to deny new coverage for individuals with past-due premiums. This alarming rise in premium costs would lead to potentially thousands of Illinois residents losing health insurance.

**Impact of Final Rule on Compliance Costs**

13. Prior to the Final Rule, exchange plans accepted the self-attestation of an enrollee who claimed eligibility by projecting annual household income at or above 100% of the FPL. The Final Rule changes this policy in two ways. First, anytime IRS data shows that a consumer has income below 100% of the FPL, a "data matching issue" (DMI) will be generated. Second, in the absence of IRS data, a DMI will be generated. Whenever a DMI is generated, consumers will be required to track down and submit the necessary paperwork to purchase health insurance. DMIs

---

[6] Statutorily, the user fee is the same for plans purchased through Illinois's small business exchange, but currently that exchange is not operational because issuers are not offering and have not proposed to offer plans through the small business exchange.
[7] *See* n.5, *supra*.
[8] *Id*.

also create administrative burdens on State Based Exchanges ("SBEs"), which are required to receive, process, and determine whether the newly submitted paperwork adequately addresses the issue.

14. These changes impose a burden on SBEs. GCI and its contractor will need to spend additional staff time analyzing the rule, confirm the information technology updates are correctly implemented, and create communications and content. This may cost in the tens of thousands of dollars. Also, the need to prioritize these updates has created risk and opportunity cost because our user acceptance testing contractor has had to prioritize the changes from the Final Rule, which diverted our contractor's focus away from other time-sensitive tasks related to Illinois' transition to a full State-based Marketplace for Plan Year 2026.

15. With respect to providing essential health benefits for gender-affirming care, the Final Rule will force GCI to examine carrier submissions to ensure the appropriate amounts have been excluded from federal cost-sharing. GCI will need to implement technical assistance on the back end to ensure this is done consistently across the market in Illinois. This will take up valuable time and resources. In addition, insurance carriers in Illinois do not all maintain their data in the same way. This means that conducting targeted assessments will be necessary to ensure that gender-affirming care services, which can take many different forms, have been excluded from coverage as EHBs. These targeted assessments would require additional time on part of marketplaces.

**Impact of Final Rule on Risk Pool**

16. The Final Rule would increase costs to Illinois by removing a pool of relatively young and healthy individuals from the pool of insureds participating in state-based exchanges.

17. The Final Rule makes several changes that adversely impact GCI's risk pool, including, but not limited to, the following.

18. The Final Rule shortens the annual Open Enrollment Period ("OEP") for the Federally Facilitated Exchange ("FFE") from 76 to 45 days, and it prohibits the SBEs from having an OEP that ends later than December 31. Since Plan Year 2022, Illinois has had an OEP from November 1 through January 15. Having an OEP of 76 days, or approximately two and a half months, has allowed our Exchange to increase enrollment and strengthen our risk pool by encouraging younger and healthier consumers to enroll. Even with a much longer OEP than the 45 days permitted by the Final Rule, our enrollment partners experience overwhelming demand and work long hours to renew their existing customers and enroll new ones. Reducing the OEP to just 45 days, or six weeks, would severely strain our enrollment partner workforce and likely hinder their ability to reach and enroll qualifying individuals, which would likely degrade the risk pool. CMS claims that a longer OEP does not boost enrollment and contributes to adverse selection; however, our data and experience show otherwise. The longer OEP has strengthened our risk pool and enhanced market stability.

19. The Final Rule also denies consumers Advance Premium Tax Credit ("APTC") eligibility and imposes a tax liability where an individual fails to file taxes and reconcile the projected household income that qualified them for APTC after one year, rather than after two consecutive years, which was the previous policy. This added barrier to marketplace enrollment will discourage healthier individuals from enrolling, deteriorate the risk pool, and lead to higher premiums for those who remain insured.

20. The Final Rule requires all FFEs and SBM-FPs to impose a $5 monthly charge on a subset of automatically reenrolled consumers: those who have $0 premiums because of the APTC for which they are qualified.[9] That charge would be levied until the consumer affirmatively re-

---

[9] In Illinois, all premiums are at least $1 per month. This paragraph is included in the event CMS applies this provision to any Illinois SBM-FP plans.

6

enrolls in coverage. This provision will pose an unjustified and duplicative reporting and financial burden on consumers who do not have changes to their account. Imposing an unnecessary administrative hurdle will cause many of these consumers to lose coverage and is likely to worsen the risk pool by disproportionately causing younger and healthier consumers to lose coverage, which would lead to higher premiums for both subsidized and unsubsidized enrollees.

21. Prior to the Final Rule, exchange plans accepted the self-attestation of an enrollee who claimed eligibility by projecting annual household income at or above 100% of the FPL. This self-attestation policy was designed to ensure that the lowest-income enrollees, who are often younger and healthier, are not discouraged from entering the risk pool due to paperwork burdens. The prior policy also recognized the challenges that low-income individuals face in accurately estimating their annual income. Many low-income individuals experience significant fluctuations in their earnings over the course of the year. The Final Rule's elimination of this practice is an administrative barrier to enrollment that will likely cause younger and healthier consumers to drop out of the marketplace. That, in turn, will worsen the risk pool and increase premiums for both subsidized and unsubsidized consumers.

### Impact of Final Rule's Prohibition on Designating Gender-Affirming Care as an Essential Health Benefit

22. The ACA mandates that certain individual and small group health plans cover a set of Essential Health Benefits (EHBs) which must be equal to the scope of benefits provided under a typical employer plan and may not have any annual or lifetime dollar limit under state plans.

23. Per HHS, the items and services covered must come from the following ten benefit categories: (1) ambulatory patient services; (2) emergency services; (3) hospitalization; (4) maternity and newborn care; (5) mental health and substance use disorder services including behavioral health treatment; (6) prescription drugs; (7) rehabilitative and habilitative services and

devices; (8) laboratory services; (9) preventive and wellness services and chronic disease management; and (10) pediatric services, including oral and vision care.

24. The ACA and its effectuating regulations permit latitude to the states in determining how EHBs are defined. Accordingly, states submit their "benchmark" plans to HHS for approval. EHBs are a minimum standard, and benchmark plans can choose to offer additional health benefits, like vision, dental, and medical management programs (e.g., weight loss).

25. Each state maintains a benchmark plan on file with HHS, against which private insurers must compare plans to ensure compliance with the standards set forth therein. Further, if a state has not updated its benchmark plan to match federal requirements, private insurers also must review plans for compliance with federal EHB mandates.

26. Illinois most recently updated the Illinois EHB Benchmark Plan effective for the 2020 Plan Year and onward.

27. State laws in Illinois prohibit discrimination in healthcare coverage. In Illinois, this includes discriminating on the basis of an insured's or prospective insured's actual or perceived gender identity, or on the basis that the insured or prospective insured is a transgender person. For example, health insurance coverage offered in Illinois must not contain discriminatory exclusionary clauses; limit, charge a higher rate for, or deny a claim for coverage of hospital and medical benefits for gender dysphoria if the benefits are provided for other medical conditions; cancel, limit, or refuse to issue or renew an insurance policy on the basis of an insured's or prospective insured's actual or perceived gender identity, or for the reason that the insured or prospective insured is a transgender person, or because the insured or prospective insured has undergone, or is in the process of undergoing, gender transition; exclude from, limit, charge a higher rate for, or deny a claim for coverage for the surgical treatments for gender dysphoria; deny or limit coverage relating to health care services that are ordinarily available to individuals of one

sex based on the fact that an individual's sex assigned at birth, actual or perceived gender identity, or gender otherwise recorded is different from the one to which such services are ordinarily available; or, subject to medical necessity under generally accepted standards of care, deny or limit coverage for covered services relating to gender transition based on a categorical age limitation. 50 Ill. Adm. Code 2603.35.

28. Even in states like Illinois, where gender-affirming care is not listed as its own category of EHB in the state's benchmark plan, many services that fall within "gender-affirming care," such as surgeries, prescription medications, and mental health treatment, are treated as EHBs by state marketplaces. The Illinois EHB Benchmark Plan covers surgeries on an outpatient and inpatient hospital basis, prescription medications, and mental health treatment, and it has no exclusions that conflict with Illinois' prohibitions on gender identity discrimination listed above.

29. To the extent that the Rule may override the Illinois EHB Benchmark Plan by determining gender-affirming care not to be EHB, the Rule will reduce the amount of premium eligible for APTCs, which will increase premiums for consumers. Based on data submitted by health insurance issuers seeking certification of qualified health plans for Plan Year 2026, APTCs may decrease up to 0.4% as a result of switching these forms of gender-affirming care from EHB to non-EHB status.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 11 day of July 2025, in Chicago, Illinois.

*Morgan Winters*
MORGAN WINTERS
Marketplace Director
Illinois Department of Insurance
Paper document bears an original signature

9