# EXHIBIT 10

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| STATE OF CALIFORNIA, et al.<br><br>*Plaintiffs,*<br><br>v.<br><br>ROBERT F. KENNEDY, JR., et al.,<br><br>*Defendants.* | Civil Action No.: 25-12019 |

## **DECLARATION OF HILARY SCHNEIDER**

I, Hilary Schneider, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct:

1. I am the Director at the Office of the Health Insurance Marketplace, Maine Department of Health and Human Services, located in Maine. I have a Master in Public Policy from Harvard Kennedy School of Government and a Bachelor of Arts in Economics from Bates College. I have been employed as the Director of Maine's State-Based Marketplace since September 2023. Previously, I served as a government relations director for the American Cancer Society Cancer Action Network for more than a decade, and have also held professional positions in economic and management consulting, market research, and consumer marketing. I have worked in roles conducting policy research and analysis related to Maine's health coverage landscape for nearly twenty years.

2. The Office of the Health Insurance Marketplace (OHIM) is an office within the State of Maine Department of Health and Human Services (Maine DHHS). OHIM administers the State of Maine's State-Based Health Insurance Exchange (SBE), which operates as CoverME.gov. OHIM is responsible for consumer enrollment into qualified health and dental plans and eligibility

for advance premium tax credits. OHIM oversees training and certification of brokers and Maine Enrollment Assisters, who are eligible to enroll Maine consumers in CoverME.gov health insurance coverage. OHIM has contracts with vendors who provide the following services: development, maintenance and operations of the eligibility and enrollment platform, consumer assistance center (call center and live chat) operations, marketing services, and consumer outreach and navigation.

3. I am familiar with the information in the statements set forth below through personal knowledge and from documents and information that have been provided to and reviewed by me.

4. I submit this Declaration in support of the States' Motion for a Preliminary Injunction.

### *Introduction*

5. CoverME.gov was established in 2020 through a hybrid model, where the federal marketplace was used as the enrollment platform and then transitioned to a full state-based marketplace in 2021 for the Plan Year 2022 Open Enrollment Period. Currently, CoverME.gov provides health coverage to more than 62,000 Maine residents. During the last Open Enrollment Period (November 1, 2024-January 15, 2025), 64,678 Maine residents enrolled in health coverage through CoverME.gov, including 11,285 new consumers. Eighty-five percent of consumers enrolled in coverage with Advance Premium Tax Credits ("APTC"), which helped lower their monthly premium costs. Maine's SBE provides coverage to individuals and families that were previously uninsured, and the plans sold through our marketplace provide coverage for gender-affirming care, as required by state law.

2

6. When CoverME.gov was established in 2020, Maine's uninsured rate was approximately 8 percent. As of 2025, Maine's uninsured rate has dropped to approximately 6 percent.

7. Maine's SBE has established a competitive market, a robust risk pool, and currently includes four health insurance plan issuers and two dental plan issuers.

8. CoverME.gov is primarily funded through an assessment on health and dental plan issuers equivalent to 3% of premiums charged for plans sold through marketplace. The SBE is also funded by federal Medicaid matching funds for eligible expenditures and some grant funding. In Fiscal Year 2024, Maine's SBE had operating expenditures of $13.8 million.

9. The flexibility that the U.S. Department of Health and Human Services (HHS) and the Centers from Medicare and Medicaid Services (CMS) have afforded SBEs in operating our unique marketplaces has allowed us to implement innovative policies which make it easier for consumers to enroll in more generous plans at low or no cost. For example, when determining coverage and/or premium tax credit eligibility, CoverME.gov allows self-attestation to verify certain eligibility criteria, including household income, residency, tribal membership, and family size changes. This flexibility provides consumers with the ability to prove eligibility in situations where documentation is unavailable or overly burdensome to obtain. Additionally, it has allowed CoverME.gov to successfully design qualified health plans that comply with Maine laws and develop targeted outreach and marketing campaigns utilizing Maine-specific data that best engage our state's residents, and leverage agency relationships and areas of opportunity. Close relationships and partnerships with our state's Medicaid offices and Bureau of Insurance (BOI) allow us to investigate, respond to, and resolve complaints and enrollment issues quickly.

10. Our special enrollment period (SEP) strategies have also been uniquely designed to meet Maine's needs, ensuring continuous coverage and minimizing enrollment barriers.

### *Lack of Enrollment Fraud*

11. CoverME.gov has had very few instances of fraudulent enrollment. In fact, I am not aware of any fraudulent enrollment since the state transitioned to an SBE. A review of consumer complaints and enrollment partner activity in recent years revealed that improper enrollments are exceedingly rare, thanks to the tailored oversight measures we have implemented, such as requiring agents to be assigned to consumer accounts through verified consumer consent using secure methods like consumer action either in the portal or by calling the call center. If a broker calls the call-center on behalf of a client without such verification, a three-way call with the consumer is required before proceeding. In addition, CoverME.gov's close partnership with the BOI allows us to coordinate efforts in documenting, investigating, and taking any necessary action in response to consumer complaints or evidence brought to our attention through other means related to inappropriate broker or Enrollment Assister conduct. These actions can include written warnings, required retraining, and/or removal of SBE certification or loss of professional licensure. Brokers and Enrollment Assisters are required to complete annual training and certification and enter into binding legal agreements with the SBE, in addition to the BOI's professional licensure requirements. CoverME.gov's team meets monthly by video with brokers and navigators to elicit feedback, answer questions, and present updated information. A quarterly email newsletter is sent to brokers and enrollment assisters, with interim email updates provided as needed and as capacity allows. These regular methods of communication provide opportunities to distribute user guides, reminders and other updates, including addressing areas of concern identified through recent consumer case escalations.

12. For the few instances reported, CoverME.gov has taken swift and decisive corrective actions, including investigations, monitoring, required retraining, and warnings. To date, I am not aware of any instances that have required suspensions or decertifying agents, but those options are available if the actions are determined to be in violation of law or regulation. BOI has the authority to revoke licensure if an agent has lost their license in another state. While I am not aware of instances where this has happened with agents certified by CoverME.gov, BOI has taken such action with insurance agents that work outside of the SBE.

13. Although Maine does not have an integrated eligibility and enrollment system, CoverME.gov does screen applicants for Medicaid and SBE eligibility and Maine DHHS has an account transfer process between CoverME.gov and the Maine DHHS Office of Family Independence, which is responsible for final determinations on Medicaid eligibility. In addition, two members of the CoverME.gov team have access to the Medicaid eligibility and enrollment system and can look up individuals and households within that system. The close partnership between the two offices further limits any potential for fraudulent enrollment.

## *Lost Enrollment Revenue*

14. OHIM estimates that the Final Rule will cause total enrollment in CoverME.gov to decrease by 10-15%, and will also cause the risk pool to worsen, resulting in a rise in premiums.

15. One direct consequence of this anticipated decrease in enrollment is a loss of Maine revenues. To fund operations, CoverME.gov collects a user fee of 3 percent of the total monthly premiums collected by an issuer for each plan purchased through our individual exchange, pursuant to 22 M.R.S. § 5406.

16. Based on current assessments, decreased enrollment due to the Final Rule will result in approximately $200,000 or more in revenue lost from fees no longer collected on premiums no longer paid by individuals who are no longer enrolled in plans via CoverME.gov.

17. Examples of currently enrolled individuals who we anticipate will enroll in significantly lower numbers under the Final Rule include younger, healthy individuals, individuals who are older or live in rural parts of the state, individuals with low- or variable incomes, and immigrants who are lawfully present immigrants.

### *Compliance Costs*

18. OHIM estimates that the numerous changes in the Final Rule will require us to spend more than $2 million and more than 500 hours of staff time updating our information technology (IT) systems. Additionally, the rule will require a substantial amount of staff time to implement its requirements and impose significant operational challenges on our SBE. With all available resources currently focused on preparing for Open Enrollment, OHIM's capacity to take on additional work is extremely limited. The anticipated system and operational changes require hundreds of hours of system testing, rewriting consumer, broker, and assister guides, updating website content and scripts, and developing training materials for stakeholders. Given the compressed timeline – where any system changes could not be deployed until just before renewals begin – there is a high risk of disrupting critical support functions and compromising the overall success of this year's open enrollment period. Implementing technology changes without proper lead time can result in the introduction of bugs in the system, which can lead to system outages, as well as improper enrollments and security vulnerabilities.

19. If the comment period for Proposed Rule had been longer than 23 days, OHIM could have provided CMS with a robust analysis of the fiscal and administrative impact of the Final Rule's changes before they were finalized.

20. Some of the technical changes to our IT systems cannot be completed in time for the 2026 plan year. Specifically, new income verification requirements—such as requiring documentation when tax data shows income under 100 percent of the FPL, requiring documentation when no tax data is available through the federal data services hub and eliminating the additional 60-day window to verify household income—are impossible to implement within our existing system infrastructure.

21. Implementing these rules would necessitate new system programming and additional manual processes, which would compromise the efficiency of our automated systems. This, in turn, would lead to higher operational costs, greater challenges for consumers, and added strain on critical resources. Specifically, it would impact the accuracy and timeliness of consumer notices, increase the volume and complexity of mailings, require expanded enrollee outreach efforts to address potential confusion, and place additional demands on service center operations, including longer wait times and increased staffing needs to handle inquiries and support requests.

22. Moreover, CoverME.gov on average experiences a high amount of traffic during the OEP. As a result, OHIM requires that its internal teams and external partners minimize technical changes during this period of time to prevent any unintended disruptions to consumers' ability to enroll by the deadline.

23. Prior to the Final Rule, exchange plans accepted the self-attestation of an enrollee who claimed eligibility by projecting annual household income at or above 100% of the FPL. The Final Rule changes this policy in two ways. First, anytime IRS data shows that a consumer has

income below 100% of the FPL, a "data matching issue" (DMI) will be generated. Second, in the absence of IRS data, a DMI will be generated. Whenever a DMI is generated, consumers will be required to track down and submit the necessary paperwork in order to purchase health insurance. DMIs also create administrative burdens on SBEs, which are required to receive, process, and determine whether the newly submitted paperwork adequately addresses the issue. These changes impose a heavy burden on SBEs. OHIM estimates that CoverME.gov will need to spend over 2,000 hours to receive, process, and review documents generated by these new DMIs, costing over $120,000.00. This cost includes conducting outreach and determining DMI outcomes for applicants whose tax return data is unavailable. Updating our eligibility systems and performing technical updates relating to this change will cost approximately $600,000.00.

### *Risk Pool Impacts*

24. CoverME.gov has consistently cultivated a stable and healthier risk pool since transitioning to an SBE. This is reflected in the individual Plan Liability Risk Score (PLRS) scores, designed to be a measure of liability risk present within a healthcare plan, which have gone down from a range of 1.363-1.476 when Maine operated on the FFE to 1.215-1.289 since transitioning to an SBE (excluding the COVID year in 2020).

### *Increased Healthcare Costs to States and Uncompensated Care*

25. The Final Rule acknowledges that the changes it makes will result in a decrease in enrollment in the ACA marketplace exchanges of up to 1.8 million people nationwide.

26. A direct consequence of this decreased enrollment under the Final Rule is a higher rate of uninsured in Maine, and a corresponding higher amount of costs incurred by Maine both in funding programs that pay for certain types of care offered to uninsured residents and costs for providing care that is uncompensated by such programs.

27. In accordance with the federal Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395dd, and the Centers for Medicare and Medicaid Services regulations at 42 C.F.R. § 489.24, all Medicare certified hospitals are required to provide an appropriate medical screening exam and necessary medical treatment to stabilize an emergency medical condition In Maine, P.L. 2025, ch. 488, § 3 (to be codified at 22 M.R.S. § 1716-A) and 22 M.R.S. § 1715 require hospitals and certain medical facilities providing outpatient (non-emergency) medical care and diagnostic tests to meet certain charity care requirements.

28. As an instrumentality of Maine, Riverview Psychiatric Center (RPC) and Dorothea Dix Psychiatric Center (DDPC) treat uninsured patients and/or patients that cannot afford the full cost of urgent and/or acute care treatments, services, and procedures, the costs of which are often not fully covered. More uninsured individuals receiving treatment at RPC and DDPC who cannot afford to pay for their care translate to higher costs to the Hospital, and ultimately, to Maine.

*Public Health Impacts*

29. The Final Rule is detrimental to Maine's public health. With increased access to affordable health insurance via CoverME.gov, individuals are more likely to seek preventive care and avoid costly emergency room visits. Without individuals having access to affordable health insurance, they are more likely to delay or avoid preventive care, incur costly emergency room visits, and require Maine to cover costs for uninsured individuals.

30. Maine estimates that the decreased enrollment in the ACA insurance market resulting from the Final Rule would significantly increase the cost to Maine for preventive care, emergency room visits, and other expenses associated with funding care provided to uninsured residents.

31. Increased access to health insurance also improves public health. Uninsured individuals who lack access to affordable, adequate health insurance are less likely to seek preventive care or attend routine health screenings, and may delay necessary medical care due to prohibitive costs.

32. Lack of insurance and resulting negative health outcomes also result in downstream consequences, including absenteeism in the workplace and increased reliance on unemployment insurance, which relies on State funding.

33. Decreased access to adequate and affordable health care could mean infectious diseases spread more widely and rapidly with those affected not seeking care due to being uninsured or underinsured.

### *Gender-Affirming Care EHBs*

34. The ACA mandates that certain individual and small group health plans cover a set of Essential Health Benefits (EHBs) which must be equal to the scope of benefits provided under a typical employer plan and may not have any annual or lifetime dollar limit under state plans.

35. Per HHS, the items and services covered must come from the following ten benefit categories: (1) ambulatory patient services; (2) emergency services; (3) hospitalization; (4) maternity and newborn care; (5) mental health and substance use disorder services including behavioral health treatment; (6) prescription drugs; (7) rehabilitative and habilitative services and devices; (8) laboratory services; (9) preventive and wellness services and chronic disease management; and (10) pediatric services, including oral and vision care.

36. The ACA and its effectuating regulations permit latitude to the states in determining how EHBs are defined. Accordingly, states submit their "benchmark" plans to HHS for approval.

EHBs are a minimum standard, and benchmark plans can choose to offer additional health benefits, like vision, dental, and medical management programs (e.g., weight loss).

37. Each state maintains a benchmark plan on file with HHS, against which private insurers must compare plans to ensure compliance with the standards set forth therein. Further, if a state has not updated its benchmark plan to match federal requirements, private insurers must also review plans for compliance with federal EHB mandates.

38. The current EHB-Benchmark Plan is the Small Group Market PPO Off-Exchange Blue Choice $30.00 $2,500 Deductible Plan offered by Anthem Health Plans of Maine. This EHB-Benchmark Plan was set for plan year 2017 and has remained unchanged through plan year 2027. The current EHB-Benchmark Plan does not specifically mention coverage for gender-affirming care, though many aspects of gender-affirming care are covered under other areas including surgical services, prescriptions medications, and mental and behavioral health services. Coverage under Maine's EHB-Benchmark Plan does not include cosmetic surgical services intended solely to change or improve appearance, or to treat emotional, psychiatric or psychological conditions.

39. The Maine Human Rights Act (5 M.R.S. Chapter 337) prohibits discrimination based on gender identity, which includes gender expression, and this prohibition includes discrimination in healthcare coverage. Maine's Health Plan Improvement Act, 24-A M.R.S. § 4301 et seq., enacted in 2019, prohibits an individual from being subjected to discrimination under a fully-insured health plan on the basis of demographic characteristics including sexual orientation or gender identity. The nondiscrimination prohibitions mean a carrier may not:

- Deny or limit coverage or a claim or impose additional cost sharing or other limitations or restrictions on coverage for any health services that are ordinarily or exclusively available to individuals of one sex to a transgender;

- Have or implement a categorical coverage exclusion or limitation for all health services related to gender transition; or

- Otherwise deny or limit coverage or a claim or impose additional cost sharing or other limitations or restrictions on coverage for specific health services related to gender transition if such denial, limitation or restriction results in discrimination against a transgender individual. (24-A M.R.S. Section § 4320-L(1)(C)-(E).

40. The employer plans offered in Maine cover gender-affirming care to the extent that it is required as equal treatment under the Maine Human Rights Act and constitutes nondiscrimination under the Maine Health Plan Improvement Act.

41. Even in states like Maine, where gender-affirming care is not listed as its own category of EHB in the state's benchmark plan, many services that fall within "gender-affirming care", such as surgeries, prescription medications, and mental health treatment, are treated as EHBs by state marketplaces.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 15th day of July, 2025, in Portland, Maine.

*Hilary Schneider*
Hilary Schneider
Director
Office of the Health Insurance Marketplace,
Maine Department of Health and Human Services