# EXHIBIT 18

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF CALIFORNIA, et al.<br><br>*Plaintiffs,*<br><br>v.<br><br>ROBERT F. KENNEDY, et al.,<br><br>*Defendants.* | Civil Action No.: 25-12019 |

## DECLARATION OF JUSTIN ZIMMERMAN

I, Justin Zimmerman, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct:

1. I am Commissioner of the New Jersey Department of Banking and Insurance ("the Department"). I was appointed to lead the New Jersey Department of Banking and Insurance by Governor Phil Murphy in June 2023, and was subsequently unanimously confirmed by the State Senate. I lead Get Covered New Jersey, the state's official health insurance marketplace, and serve as the chief regulator of New Jersey's insurance industry, one of the largest in the nation, all state-chartered banks and credit unions, consumer finance licensees and the real estate industry.

2. The Department was the first state insurance department in which a state-based exchange is housed.

3. I have nearly 20 years of public service in New Jersey and joined the Department in January 2018, serving as the Department's Chief of Staff, where I oversaw the executive management team and managed all aspects of the department's policy implementation, under the direction

of the prior Commissioner. During my tenure as Chief of Staff, the department developed and implemented numerous consumer protections and programs impacting countless New Jerseyans, including New Jersey's out of network law, student loan protections, mortgage servicers licensing, expanding access to reproductive health care and Get Covered New Jersey. Since its inception in 2020, Get Covered New Jersey transformed New Jersey's health insurance landscape for consumers in the individual market, ensuring that more New Jerseyans have greater access to quality, affordable health insurance. New Jersey was the first in the nation to open its marketplace with state subsidies that lower premiums for most enrollees.

4. Since launching Get Covered New Jersey ("GetCoveredNJ") in 2020, I have overseen the leadership team of the Exchange, which has successfully implemented policies to expand access to and increase affordability of health insurance. GetCoveredNJ, New Jersey's ACA exchange, was established under P.L.2019, c. 141 (codified at N.J.S.A. 17B:27A-57 to -59).

5. I am familiar with the information in the statements set forth below through personal knowledge and from documents and information that have been provided to and reviewed by me.

6. I submit this Declaration in support of the States' Motion for a Preliminary Injunction.

### Get Covered New Jersey

7. Among other functions, the Department operates GetCoveredNJ, the State's official health insurance marketplace under P.L.2019, c.141 and the ACA, 42 U.S.C. § 180001 et seq., which includes, among other things, operating a technology platform and consumer assistance center consistent with the requirements of State and Federal law. GetCoveredNJ is a source of quality, affordable health insurance for New Jersey residents who do not have health coverage from

2

their employers or access to other health care programs. Financial assistance to lower the cost of premiums and out-of-pocket expenses is available for eligible residents.

8. GetCoveredNJ provides access to high-quality, affordable health coverage for New Jersey residents. GetCoveredNJ is where individuals and families who do not have health insurance through an employer or other program, such as Medicaid or Medicare, can easily shop for and buy quality, affordable health insurance. Hundreds of thousands of New Jersey residents have signed up for health insurance through GetCoveredNJ. During the 2025 Open Enrollment Period, plan selections increased over 108% since the Murphy Administration took over the marketplace's operations from the federal government in 2020.

9. Health plans offered through GetCoveredNJ cover preventative services, emergency services, prescription drugs, prenatal and pediatric care, as well as other services. No one can be denied coverage due to a pre-existing condition.

10. In addition to federal subsidies, consumers with annual incomes up to 600% of the federal poverty level are also eligible for state subsidies, known as New Jersey Health Plan Savings. An individual with an income of up to $90,360 and a family of four who makes up to $187,200 can receive state subsidies to lower the costs of health coverage.

11. To be eligible for GetCoveredNJ, under 45 C.F.R. § 155.305, New Jersey residents:
    a. Must live in the United States and have a primary residence in New Jersey;
    b. Must be considered a resident of the United States and New Jersey for tax purposes;
    c. Must be a United States citizen or national or be lawfully present; and
    d. Cannot be currently incarcerated.

12. A total of 513,217 New Jersey residents signed up for health insurance under Get Covered New Jersey during the Open Enrollment Period for plan year 2025. This includes 197,876 new

or existing consumers who actively selected a plan and 315,341 who were automatically renewed. This year's record-breaking sign-ups represent nearly a 30% increase compared to last year's Open Enrollment Period (for plan year 2024) when 397,942 residents signed up for 2024 health coverage.

13. Since its launch, GetCoveredNJ has established a competitive market, a robust risk pool, and currently includes six health insurance plan issuers. Not only did GetCoveredNJ more than double the number of enrollees since its launch, GetCoveredNJ also doubled the number of carriers selling plans on the marketplace since its inception. Nine in ten individuals enrolling in GetCoveredNJ qualify for financial help that reduces the costs of their monthly premium. Record levels of financial help through federal tax credits and state subsidies are available for New Jersey residents. Many consumers can find a plan for $10 a month or less. Indeed, 91% of individuals who purchase insurance on GetCoveredNJ receive state or federal subsidies. Thus, for many enrollees, losing access to GetCoveredNJ means not being able to afford private health insurance at all.

14. The flexibility that the U.S. Department of Health and Human Services (HHS) and the Centers from Medicare and Medicaid Services (CMS) have afforded SBEs in operating our unique marketplaces influenced New Jersey's decision to operate our own state-based exchange and has allowed New Jersey to implement innovative policies which make it easier for our consumers to enroll in more generous plans at low or no cost. New Jersey law, N.J.S.A.17B:27A-6.1, requires GetCoveredNJ to maintain at least a 90-day open enrollment period. Therefore, GetCoveredNJ has maintained a consistent OEP since our launch over five years ago, running from November 1 through January 31, which strengthens our risk pool by enrolling healthier and younger individuals who are more likely to sign up later in the period.

Additionally, GetCoveredNJ's approach to special enrollment periods (SEP) has been to provide appropriate SEPs to meet New Jersey's needs, ensuring continuous coverage and minimizing enrollment barriers while maintaining a healthy risk pool. Moreover, our approach has successfully deterred fraud while also ensuring that consumer enrollments are conducted appropriately and effectively. GetCoveredNJ has experienced a negligible number of cases of fraud. These flexibilities allow New Jersey and other states the ability to tailor policies to local conditions while upholding program integrity and consumer protections.

## Lack of enrollment fraud

15. GetCoveredNJ has had very few instances of fraudulent enrollment. A review of consumer complaints and enrollment partner activity in recent years revealed that improper enrollments are exceedingly rare and immediately addressed when found.

16. New Jersey's integrated eligibility and enrollment system verifies applicants for both Medicaid and marketplace coverage, limiting the potential for fraudulent enrollment.

17. We have no evidence of any significant amount of fraud stemming from any SEP. Because of GetCoveredNJ's tailored program integrity measures, reports of any improper enrollments within GetCoveredNJ remain very low. GetCoveredNJ did not experience the volume or type of fraudulent enrollments that healthcare.gov experienced.

## Lost Enrollment Revenue

18. To fund its operations, pursuant to N.J.S.A. 17B:27A-57, GetCoveredNJ collects a 3.5% user fee on the total monthly premium collected by a health insurance carrier for each health benefits plan sold in the individual market.

19. Because health insurance carriers receive a monthly premium payment for each individual enrolled in their insurance plans, the total monthly premium collected by a health insurance

carrier decreases as the number of enrollees decreases. And the total user fee collected by New Jersey correspondingly decreases as the number of enrollees decreases.

20. Thus, for each individual who ceases to be enrolled in a health benefits plan in New Jersey, including plans sold on GetCoveredNJ, the State loses user fee revenue.

21. The changes made by the Final Rule are expected to cause decreased enrollment in the exchange. One direct consequence of this anticipated decrease in enrollment is a loss of State revenues due to reduced user fee revenue from premiums.

22. The Final Rule estimates that its changes will cause enrollment to be reduced nationwide by approximately by up to 1.8 million, which would be about over seven percent of the total 24.3 million enrollees in ACA exchanges in 2025. If New Jersey experienced a drop of seven percent from its 2025 enrollment of 513,217, it would mean 35,925 fewer enrollees. Using the average 2025 projected premium in the individual market, the projected loss of exchange user fees if these enrollees were excluded from the market is estimated to be $10,759,307.58 in 2025.

## Compliance Costs

23. If the comment period for Proposed Rule had been longer than 23 days, GetCoveredNJ could have provided CMS with a robust analysis of the fiscal and administrative impact of the Final Rule's changes before they were finalized.

24. Implementing these rules would necessitate new system programming and additional manual processes. This, in turn, would lead to higher operational costs and greater challenges for consumers. Specifically, it would impact consumer notices, increase the volume and complexity of mailings, require expanded enrollee outreach efforts to address potential confusion, and place additional demands on service center operations, including longer wait times and increased staffing needs to handle inquiries and support requests.

25. Moreover, GetCoveredNJ on average experiences a high amount of traffic during the OEP. As a result, the State requires GetCoveredNJ's internal teams and external partners to minimize technical changes during this period of time to prevent any unintended disruptions to consumers' ability to enroll by the deadline.

26. With respect to providing essential health benefits for gender-affirming care, the Final Rule will force GetCoveredNJ to examine carrier submissions to ensure the appropriate amounts have been excluded from federal cost-sharing. GetCoveredNJ will need to implement technical assistance on the back end to ensure this is done consistently across the market in New Jersey. This will take up valuable time and resources. In addition, insurance carriers in New Jersey do not all maintain their data in the same way. This means that conducting targeted assessments will be necessary to ensure that gender-affirming care services, which can take many different forms, have been excluded from coverage as EHBs. These targeted assessments would require additional time on part of marketplaces.

27. We estimate that the numerous changes in the Final Rule will require us to spend approximately $2 million updating our information technology (IT) systems.

28. The Final Rule will also carry administrative burdens relating to "data matching issues" (DMI) generated as part of the new enrollee verification requirement when a consumer has income below 100% of the Federal Poverty Line (FPL).

### Risk Pool Impacts

29. The Final Rule makes several changes that adversely impact GetCoveredNJ's risk pool, including, but not limited to, the following.

30. The Final Rule denies consumers APTC eligibility and imposes a tax liability after one year where an individual fails to file taxes and reconcile the projected household income that qualified them for APTC, rather than after two consecutive years, which was the previous policy. This added barrier to marketplace enrollment will discourage healthier individuals from enrolling, deteriorate the risk pool, and lead to higher premiums for those who remain insured.

31. Since the Market Integrity rule was announced, one carrier that sold plans on GetCoveredNJ announced that it was leaving the individual market nationally. That carrier currently represents approximately 25% of the plans sold on GetCoveredNJ. Additionally, another carrier that expressed interest in joining the individual market in New Jersey to sell products on GetCoveredNJ informed the Department that they were no longer going to pursue entering the individual market in New Jersey with one reason being the uncertainty from the federal administration. Less competition in the market will negatively impact the risk pool and over the long run possibly lead to higher premiums for consumers.

32. Prior to the Final Rule, exchange plans accepted the self-attestation of an enrollee who claimed eligibility by projecting annual household income at or above 100% of the FPL. This self-attestation policy was designed to ensure that the lowest-income enrollees, who are often younger and healthier, are not discouraged from entering the risk pool due to paperwork burdens. The prior policy also recognized the challenges that low-income individuals face in accurately estimating their annual income. Many low-income individuals experience significant fluctuations in their earnings over the course of the year. The Final Rule's elimination of this practice is an administrative barrier to enrollment that will likely cause younger and healthier consumers to drop out of the marketplace. That, in turn, will worsen the risk pool and increase premiums for both subsidized and unsubsidized consumers.

### Gender-Affirming Care EHBs

33. The ACA mandates that certain individual and small group health plans cover a set of Essential Health Benefits (EHBs) which must be equal to the scope of benefits provided under a typical employer plan and may not have any annual or lifetime dollar limit under state plans.

34. Per HHS, the items and services covered must come from the following ten benefit categories: (1) ambulatory patient services; (2) emergency services; (3) hospitalization; (4) maternity and newborn care; (5) mental health and substance use disorder services including behavioral

health treatment; (6) prescription drugs; (7) rehabilitative and habilitative services and devices; (8) laboratory services; (9) preventive and wellness services and chronic disease management; and (10) pediatric services, including oral and vision care.

35. Under New Jersey law, P.L.2017, c.176, carriers are prohibited from discriminating on the basis of a covered person's or prospective covered person's gender identity or expression or on the basis that the covered person or prospective covered person is a transgender person. This prohibited discrimination includes, among other things, issuing or renewing health benefits plans containing provisions that discriminate, or act to discriminate, on the basis of a covered person's or prospective covered person's gender identity or gender expression or on the basis that the covered person or prospective covered person is a transgender person.

36. The Department has issued Bulletin 23-05 to direct carriers on following applicable state and federal laws, including P.L.2019, c.58 (Requires coverage and parity for Mental Health Conditions), The Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act, 29 U.S.C. 1185a (MHPAEA), and the Patient Protection and Affordable Care Act, section 1557a (42 U.S.C. 18116). Under these laws, a carrier may not deny coverage for medically necessary, transition-related care on the basis of the covered person's gender identity or gender expression or on the basis that the covered person is a transgender person if the covered person's health benefits plan provides coverage for the same services related to the treatment of other conditions or illnesses. Additionally, among other things, Bulletin 23-05 reminds carriers that they may not apply a different medical necessity review process, or impose extra documentation requirements, for transgender individuals relative to other individuals seeking the same or similar services.

**The Final Rule Will Irreparably Harm New Jersey**

37. The Final Rule results in fewer New Jersey residents accessing the state exchange, increasing the number of uninsured individuals in the State.

38. The Final Rule would harm New Jersey as it would likely render quality affordable health insurance coverage more difficult to access for certain New Jerseyans, thereby contributing to negative health outcomes. Without access to quality affordable health insurance via the state's official health insurance marketplace, some New Jersey residents may be less likely to seek preventative care and avoid costly emergency room visits. This may also make these New Jerseyans more likely to incur costly medical bills leading to an increased financial strain on these individuals.

39. Should the Final Rule go into effect, even a temporary disruption in health insurance coverage due to barriers to access would likely cause significant harm to impacted New Jersey residents seeking healthcare services.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 16th day of July, 2025, in Mercer County, New Jersey.

Justin Zimmerman
Commissioner
New Jersey Department of Banking and Insurance