EXHIBIT 20

|  |  |
|---|---|
| STATE OF CALIFORNIA, et al., | |
| | |
| *Plaintiffs,* | |
| v. | |
| ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services, et al., | Civil Action No.: __25-12019__ |
| | |
| *Defendants.* | |

## DECLARATION OF DANIELLE HOLAHAN

I, Danielle Holahan, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.   I am the Executive Director at NY State of Health, New York State's Official Health Plan Marketplace. I hold a Bachelor of Arts from Franklin & Marshall College and a Master of Public Health (MPH) from Columbia University's Joseph L. Mailman School of Public Health. I have been employed as Executive Director of NY State of Health since September 2021 after serving as Deputy Director since April 2011. I worked at the United Hospital Fund of New York from 1999 to 2011, where I was Co-Director of the Health Insurance Project, and from 1994 to 1997 at AARP's Public Policy Institute in Washington, D.C.

2. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with NY State of Health staff, or from my review of relevant documents and information.

3. I submit this Declaration in support of the States' Motion for a Preliminary Injunction.

4. New York's state-based health benefit exchange ("SBE"), known as "NY State of Health, the official health plan Marketplace" or "Marketplace," is authorized by the Federal Patient Protection and Affordable Care Act of 2010 ("ACA") and NY Public Health Law. The Marketplace is a division of the New York State Department of Health, an executive agency of the State of New York, which was established in April 2012 by Executive Order 42 for coverage starting January 1, 2014. It was codified in Article 2, Title VII of the NY Public Health Law in 2019.

5. The Marketplace certifies health plans and determines if an individual is eligible for insurance affordability programs including Medicaid, Child Health Plus, Essential Plan, premium tax credits ("PTCs") and cost-sharing reductions ("CSR"), as well as Qualified Health Plan ("QHP") coverage. It also provides an organized marketplace where New Yorkers shop for, and enroll in, public and private health insurance. Individuals, families, and small businesses use the Marketplace to compare insurance options, calculate costs, and select and enroll in health plans.

6. In 2015, with approval from the Centers for Medicare and Medicaid Services ("CMS"), the Marketplace established a Basic Health Program ("BHP"), branded the "Essential Plan." Pursuant to Section 1331(a) of the ACA, States may establish a BHP to offer health coverage for individuals with family incomes between 133 and 200% of the federal-poverty level (FPL) and for individuals from 0 to 200% FPL who are lawfully present in the United States but do not qualify for Medicaid due to their immigration status. Essential Plan coverage is in lieu of QHP coverage through the Marketplace for qualified individuals.

7. In 2023, to continue to address the affordability of health insurance for New Yorkers, the Marketplace sought approval from CMS of a Section 1332 State Innovation Waiver to operate

the Essential Plan pursuant to Section 1332 of the ACA (State Innovation Waivers), rather than under Section 1331 of the ACA (Basic Health Program). In addition, New York requested a suspension of its BHP through December 31, 2028, with an option to extend for an additional 5 years.

8. On March 1, 2024, CMS approved the Marketplace's 1332 State Innovation Waiver, which allowed an expansion of New York's successful Essential Plan. Under the 1332 Waiver, New Yorkers with incomes up to 250% of the FPL, who would otherwise be eligible for subsidized coverage on the Marketplace through enrollment in a QHP with premium tax credits, are eligible for the Essential Plan. New York has used waiver funds not expended to support the EP expansion to create additional care innovations like more generous cost-sharing reductions and benefits to support social determinates of health.

9. Consumers enrolled in plans that have been certified by the Marketplace and cover all essential health benefits required by the ACA, called QHPs, may also apply through the Marketplace for PTCs and CSRs to lower the cost of premiums and out of pocket costs for QHPs. PTCs, which are available based on a consumer's household income and the cost of QHPs in the consumer's area, may be applied directly by the insurer to lower monthly premium payments. Consumers with a household income of up to 250% of the FPL may also be eligible for financial assistance through CSRs, which reduce the cost of using their health insurance coverage. In New York, pursuant to our 1332 Waiver, consumers earning up to 400% of the FPL may also qualify for additional cost-sharing assistance. The Marketplace assists individuals in determining whether such financial assistance is available. New Yorkers must enroll in a QHP directly through the Marketplace during the annual Open Enrollment Period to qualify for and use PTCs and CSRs (unless they qualify for a Special Enrollment Period). Any New Yorker who needs health coverage can apply.

10. When NY State of Health was established in 2012, approximately 11% of New York residents were uninsured. As of 2023, the rate has dropped to 4.8%.

11. There are over 6.7 million New York residents enrolled through NY State of Health, including 4.2 million enrolled in Medicaid, over 580,000 enrolled in Child Health Plus, over 220,000 enrolled in commercial QHPs (nearly 90% of the commercial individual market), and over 1.6 million in the Essential Plan. Nearly 65% of QHP enrollees have been determined eligible to receive PTC.

12. NY State of Health has established a competitive market with 12 health-insurance-plan issuers and five dental-plan issuers.

13. NY State of Health's QHP related costs are funded through a special revenue fund derived from a surcharge on health care services. In State Fiscal Year 2025, New York paid an estimated $154 million of NY State of Health operating costs. Other operating costs, totaling $357.1 million in State Fiscal year 2025, were supported by federal funds supporting Medicaid, Child Health Plus and Essential Plan administrative costs.

14. The flexibility that the U.S. Department of Health and Human Services ("HHS") and CMS have afforded SBEs in operating our unique marketplaces has allowed us to implement innovative policies that make it easier for consumers to enroll in more generous plans at low or no cost. New York's Marketplace provides a centralized platform through which all eligible individuals can access public and private coverage and one in three residents enroll in health coverage here. The system allows individual enrollees to seamlessly transition between programs in response to changes in individual circumstances. Additionally, under the approved Section 1332 Waiver, known as the Essential Plan, New York has expanded access to $0 premium coverage to 1.6 million low- and moderate-income individuals and extended cost sharing reductions to 45,000 moderate-income consumers in the QHP market—all of which has been achieved without increasing the federal deficit. In addition, commercial individual market coverage is significantly more affordable through NY State of Health today than it was prior to the implementation of the ACA in New York. In 2012, the average monthly premium for individual market coverage was unaffordable to most New Yorkers at $1,250, with significant cost-sharing, and only 18,000 individuals purchased this coverage. In 2025, over 240,000 are

4

enrolled in the individual market, most of whom purchase through the Marketplace. More than 140,000 enrollees through NY State of Health are eligible for federal PTCs and the average monthly premium is $300.

15. Our current special enrollment period (SEP) policies strike a balance between ensuring timely access to health coverage when individuals need it and minimizing the risk of adverse selection to help to maintain a stable risk pool.

16. NY State of Health already prevents and responds to its limited cases of fraudulent enrollment. A review of consumer complaints and enrollment partner activity in recent years revealed that improper enrollments are rare thanks to our tailored oversight measures such as regular training of certified enrollment assistors and monitoring of enrollment activities.

17. For the limited cases of identified inappropriate enrollment activity, NY State of Health has responded with swift and decisive corrective actions. This includes the immediate suspension of the implicated Marketplace account credentials pending investigation of the enroller. If unauthorized enrollment activity is confirmed, the Marketplace permanently terminates the relevant credentials and refers the matter to the appropriate authorities, which may include law enforcement, the New York State Office of the Medicaid Inspector General, and the New York Department of Financial Services.

18. The Final Rule will not only decrease total enrollment in NY State of Health by an estimated 12,000 individuals, but also drive-up premiums as it will worsen the risk pool.

19. One direct consequence of this anticipated decrease in enrollment is a loss of State revenues. To fund operations, NY State of Health leverages a special revenue fund derived from a surcharge on health care services. Revenue raised through this fund is directly correlated to the number of insured individuals using health care services.

20. The increased demands in the Final Rule will likely require New York to spend over $10 million on staff time, alone, to update our information technology (IT) systems. Additionally, the Final Rule will require redirecting a substantial amount of staff time away from other care-focused initiatives and impose significant operational challenges on our SBE.

21. If the comment period for the Proposed Rule had been longer than 23 days, NY State of Health could have provided CMS with a robust analysis of the fiscal and administrative impact of the Final Rule's changes before they were finalized.

22. Some of the technical changes to our IT systems cannot be completed in time for the 2026 plan year. Specifically, the new income verification requirements—which require collection and review of documents when tax data shows income under 100% of the FPL and when no tax data is available through the federal data services hub or other approved data sources—are impossible to implement within the implementation timeline and our existing system infrastructure.

23. Implementing these rules would necessitate new system programming and additional manual processes which would compromise the efficiency of our current, automated systems. This, in turn, would lead to higher operational costs, greater challenges for consumers, and added strain on critical resources. Specifically, it would impact the accuracy and timeliness of consumer notices, increase the volume and complexity of mailings, require expanded enrollee outreach efforts to address potential confusion, and place additional demands on service center operations, including longer wait times and increased staffing needs to handle inquiries and support requests.

24. Moreover, NY State of Health, which enrolls consumers across four programs with a total of 6.7 million enrollees, experiences an above-average amount of traffic during the Annual Open Enrollment Period ("OEP"). As a result, the State requires NY State of Health's internal teams and external partners to minimize technical changes during this period to prevent any unintended disruptions to consumers' ability to enroll by the deadline.

25. The Final Rule would increase costs to New York by removing a group of relatively young and healthy individuals from the pool of insureds participating in state-based exchanges. New York estimates that such changes to the risk pool for NY State of Health will result in a loss of up to 12,000 individuals from the risk pool when fully implemented.

26. Further, prior to the Final Rule, exchange plans accepted the self-attestation of an applicant who projected an annual household income at or above 100% of the FPL. This self-attestation policy was designed to ensure that the lowest-income enrollees, often younger and healthier than

the average enrollee, are not discouraged from entering the risk pool due to paperwork burdens. The prior policy also recognized the challenges that low-income individuals face in accurately estimating their annual income. Many low-income individuals experience significant fluctuations in their earnings over the course of the year. The Final Rule's temporary elimination of this practice is an administrative barrier to enrollment that will likely cause younger and healthier consumers to drop out of the Marketplace. That, in turn, will worsen the risk pool and increase premiums for both subsidized and unsubsidized consumers.

27. The Final Rule's requirement to implement certain provisions on a temporary, one-year basis imposes significant yet transitory burdens on New York. This approach necessitates duplicative expenditures on IT system modifications, Customer Service Center operations, and training for staff and enrollment assistors—first for the initial implementation, and again when states must transition to the subsequent policy framework.

28. The Final Rule acknowledges that the changes it makes will result in a decrease in enrollment in the ACA marketplace exchanges of up to 2 million people nationwide.

29. A direct consequence of this decreased enrollment under the Final Rule is a higher rate of uninsured in New York, and a corresponding higher amount of costs incurred by New York both in funding programs that pay for certain types of care offered to uninsured residents and costs for providing care that is uncompensated by such programs.

30. In addition, in New York, emergency departments are required to screen all patients who appear, stabilize them, and provide treatment for an emergency medical condition or a pregnant person in labor, or transfer the patient to a hospital that can provide treatment. *See,* 42 U.S.C. § 1395dd; N.Y. Pub. Health Law § 2805-b (Consol. 2025). Hospitals must afford to each patient the right to treatment without discrimination as to source of payment. N.Y. Comp. Codes R. & Regs. tit. 10, § 405.7 (2019). New York offsets some of the costs that eligible hospitals sustain because of this requirement. Federally Qualified Health Centers are also required to treat patients, regardless of coverage status.

31. In Fiscal Year 2024, New York State provided $3.2 billion through the Safety Net Hospital State Directed Payment. *See* 42 C.F.R. § 438.6(c) and the Hospital Vital Access Provider Assurance Program (Hospital VAPAP). These programs administered by the New York State Department of Health provide additional subsidies to providers that serve a majority of Medicaid and uninsured members.

32. The Final Rule is detrimental to New York's public health. With increased access to affordable health insurance via NY State of Health, individuals are more likely to seek preventive care and avoid costly emergency room visits. Without access to affordable health insurance, the same individuals are less likely to seek preventive care and more likely to incur costly emergency room visits. Under the Final Rule, New York will have to cover the costs of those emergency room visits for uninsured individuals.

33. Increased access to health insurance also improves public health. Uninsured individuals who lack access to affordable, adequate health insurance are less likely to seek preventive care or complete routine health screenings, and may delay necessary medical care due to prohibitive costs.

34. Lack of insurance and resulting negative health outcomes also result in downstream consequences, including, absenteeism in the workplace and increased reliance on unemployment insurance, which relies on State funding.

35. Decreased access to adequate and affordable health care could mean infectious diseases spread more widely and rapidly with those affected not seeking care due to being uninsured or underinsured.

36. The ACA mandates that certain individual and small-group health plans cover a set of EHBs which must be equal to the scope of benefits provided under a typical employer plan and may not have any annual or lifetime dollar limit under state plans.

37. Per HHS, the items and services covered must come from the following ten benefit categories: (1) ambulatory patient services; (2) emergency services; (3) hospitalization; (4) maternity and newborn care; (5) mental health and substance use disorder services including behavioral health treatment; (6) prescription drugs; (7) rehabilitative and habilitative services and

devices; (8) laboratory services; (9) preventive and wellness services and chronic disease management; and (10) pediatric services, including oral and vision care.

38. The ACA and its effectuating regulations permit latitude to the states in determining how EHBs are defined. Accordingly, states submit their "benchmark" plans, selecting from one of ten benchmark plan options and supplementing, as needed to meet the EHB minimum standards, to HHS for approval. States can also choose to offer additional health benefits, like vision, dental, and medical management programs (e.g., weight loss).

39. Each state maintains a benchmark plan on file with HHS, against which private insurers must compare plans to ensure compliance with the standards set forth therein. Further, if a state has not updated its benchmark plan to match federal requirements, private insurers must also review plans for compliance with federal EHB mandates.

40. The New York State benchmark plan includes broad coverage for mental health and substance use disorder treatment, ambulatory patient services, laboratory services, hospitalization, and prescription drugs due to state law requirements that were in effect well before the enactment of the Affordable Care Act and consistent with typical employer plans.

41. New York Insurance Law §§ 3216(i)(35)(A), 3221(l)(5)(A), and 4303(g) require health insurance policies to provide coverage for the diagnosis and treatment of mental health conditions. Insurance Law §§ 3216(i)(35)(E)(iv), 3221(l)(5)(E)(iv), and 4303(g)(6)(D), define "mental health condition" as any mental health disorder as defined in the most recent edition of the diagnostic and statistical manual of mental disorders ("DSM") or the most recent edition of another generally recognized independent standard of current medical practice, such as the international classification of diseases ("ICD"). The most recent DSM edition (5-TR edition) includes "gender dysphoria" as a mental health condition that afflicts people whose gender at birth is contrary to the one with which they identify. As such, New York Insurance Law requires health insurance policies to provide coverage for the treatment of gender dysphoria.

42. New York Insurance Law §§ 3216(i)(35)(C), 3221(l)(5)(C), and 4303(g)(4) and the federal Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008

("MHPAEA"), 29 U.S.C. § 1185a, prohibit an insurer from applying financial requirements or treatment limitations to mental health benefits that are more restrictive than the predominant financial requirements and treatment limitations applied to substantially all medical and surgical benefits covered by the policy or contract. Imposing a treatment limitation on gender dysphoria that is not imposed on other benefits is inconsistent with both state law and MHPAEA.

43. New York State laws and regulations also prohibit discrimination in healthcare coverage. Specifically, Insurance Law §§ 3243 and 4330 prohibit discrimination in comprehensive health insurance policies because of sexual orientation, gender identity or expression, and transgender status. N.Y. Comp. Codes R. & Regs. tit. 11, § 52.16(c) prohibits an insurer from limiting coverage by type of illness, treatment, or medical condition. Separately, Section 52.75(a)(2) prohibits an insurer from denying, limiting, or otherwise excluding medically necessary services or treatment otherwise covered by a policy or contract on the basis that the treatment is for gender dysphoria. N.Y. Comp. Codes R. & Regs. tit. 11, § § 52.75(a)(2). In addition, § 52.75(a)(1) prohibits a policy or contract clause that purports to deny, limit, or exclude coverage based on an insured's sexual orientation, gender identity or expression, or transgender status. Under these laws and regulations, if a health insurance policy provides coverage for benefits like ambulatory surgical services, hospitalizations, and prescription drugs, that policy cannot limit the benefit to only cover certain conditions like a traumatic injury or cancer, but not other conditions like gender dysphoria.

44. State laws in New York prohibit discrimination in healthcare coverage. In New York, this includes:

    a.   N.Y. Const. art. I, § 11 ("No person shall, because of . . . sex, including sexual orientation, gender identity, gender expression, . . . be subjected to any discrimination in their civil rights by any other person or by any firm, corporation, or institution, or by the state or any agency or subdivision of the state, pursuant to law.");

    b.   N.Y. Civ. Rights Law § 40-c (prohibiting private and public entities from discriminating);

c. N.Y. Exec. Law § 300 (Human Rights Law is liberally construed independent of less protective federal laws);

d. N.Y. Comp. Codes R. & Regs. tit. 9, § 466.13 (discrimination on the basis of gender identity or expression is also sex discrimination and gender dysphoria counts as a disability which may grant reasonable accommodations) (state);

e. N.Y. Comp. Codes R. & Regs. tit. 10, § 405.7(c) ("The hospital shall afford to each patient the right to: . . . treatment without discrimination as to race, color, religion, sex, gender identity, national origin, disability, sexual orientation, age, or source of payment.");

f. N.Y. Civ. Rts. Law §§ 64(3) (saying name changes must be honored), 67, 67-A, 67-B (respecting name changes and sex designation changes, sealing records for privacy of transgender status);

g. N.Y. Vehicle and Traffic Law §§ 490, 502 (recognizing gender x on state IDs and self-attestation of gender);

h. N.Y. Public Health Law §§ 4132, 4138(f) (allowing inclusive of trans identities on birth certificates);

i. NYC Admin. Code § 8-107 et seq. (city law prohibiting discrimination);

j. 47 NYCRR §§ 2-01 (city) (definition of gender and gender identity inclusive of transgender and nonbinary individuals), 2-06 (prohibition on discrimination based on gender identity), § 2-10 (city) (prohibition on discrimination based on sexual or reproductive health decisions).

45. Even in states like New York, where gender-affirming care is not listed as its own category of EHB in the state's benchmark plan, many services that fall within "gender-affirming care," including mental health and substance use disorder, ambulatory patient services, laboratory services, hospitalization, and prescription drugs are covered services in state marketplaces.

46. The New York State statutory and regulatory coverage requirements and prohibitions on discrimination apply to all fully insured individual, small-group, and large-group health insurance

11

policies delivered or issued for delivery in New York. As a result, all these health insurance policies cover treatment for gender dysphoria. There are 3,715,726 people covered under these policies as of April 30, 2025, in the commercial market (with 934,653 people covered under individual and small-group policies and 2,781,073 people covered under large-group policies). In addition, the New York State Health Insurance Program (NYSHIP), a comprehensive self-funded health insurance program for New York State public employees, also covers treatment for gender dysphoria. NYSHIP is one of the largest employer-sponsored group health insurance programs in the United States, covering nearly 1.2 million people. Clearly, a significant number of people in New York with fully insured and self-funded coverage have coverage for gender dysphoria under their health insurance policies.

47. Requiring states to exclude these otherwise-covered services from EHB definitions would raise the defrayal cost borne by New York. This is because premium amounts that would otherwise be attributed to EHB services and covered by carriers in response to the state coverage mandate would be put back on states. In 2023, insurers in New York paid $17 million in claims for medical and surgical services and prescription drugs for gender affirming care under individual and small group health insurance policies. This number is expected to increase in 2026 to an estimated $21 to $27 million.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed this 16th day of July, 2025, in Westchester, NY

_____

Danielle Holahan
Executive Director
NY State of Health