

EXHIBIT 24

The Honorable _____

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

STATE OF CALIFORNIA, et al.

                *Plaintiffs*,

  v.

ROBERT F. KENNEDY, JR., et al.,

                *Defendants.*

NO.

DECLARATION OF
INGRID ULREY

Civil Action No.: 25-12019

I, INGRID ULREY, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct:

1. I am the chief executive officer at the Washington Health Benefit Exchange (Exchange), located in Washington State. I hold a master's in public policy from Georgetown University. I have been employed as chief executive officer at the Exchange since March 2023. Before my current position, I served as the Regional Director, HHS Region 10, for the U.S. Department of Health and Human Services. I have more than 30 years of experience in health care policy, public health, and advocacy.

2. I am familiar with the information in the statements set forth below through personal knowledge and from documents and information that have been provided to and reviewed by me.

3. I submit this Declaration in support of the States' Motion for a Preliminary Injunction.

**INTRODUCTION**

4. The Exchange is Washington State's health insurance exchange, or insurance marketplace. The Exchange was established in 2011 under the Patient Protection and Affordable Care Act (ACA) and state legislation, Wash. Rev. Code 43.71. The Exchange is a self-sustaining, public-private partnership governed by an 11-member bipartisan board. The Exchange serves more than 1.8 million Medicaid and commercial insurance customers through its website, www.wahealthplanfinder.org.

5. When the Exchange was established in 2011, Washington's uninsured rate was approximately 14.2%. As of 2023 (the most recent year data are available), our state's uninsured rate has dropped to 4.8%.

6. Our state-based exchange (SBE) has established a competitive individual market for health and dental insurance, maintained a robust risk pool, and currently includes 11 health insurance plan issuers and 5 dental plan issuers.

7. The Exchange operates Washington Healthplanfinder, the state's integrated eligibility and enrollment platform that determines eligibility for multiple health and dental programs. These include Washington Apple Health (modified adjusted gross income or "MAGI"-based Medicaid and Children's Health Insurance Program (CHIP)) coverage, commercial health insurance in the individual market (qualified health plans or QHPs), federal advance premium tax credits (APTC) and cost-sharing reduction subsidies, state premium assistance for health coverage, and commercial dental insurance. Healthplanfinder's integrated eligibility functionality provides customers with a seamless experience to identify what they and their family members are eligible for. In order to provide real time eligibility results, Healthplanfinder connects with multiple state and federal systems to check for eligibility. These include systems maintained by Washington State Department of Social and Health Services (DSHS) for program eligibility information; Employment Security Department (ESD) for state wage data; and Health Care Authority (HCA) for Medicaid enrollment. Healthplanfinder also connects to the federal eligibility hub, through which Social Security data, IRS financial data, and other program eligibility information is validated.

8. Changes to Healthplanfinder system functionality are performed in sprints, which begin with design and refinement sprints and then move to coding and testing sprints, and finally deployment, which typically occur quarterly. System changes take a minimum of twelve weeks in this system development lifecycle. Large changes, such as those impacting eligibility, require multiple teams and multiple sprint cycles. Changes to Healthplanfinder system functionality that require corresponding changes to be made with the DSHS Eligibility Service or HCA Provider One system take a minimum of eight months to coordinate, develop and execute. System changes to support new Exchange policies or laws must be balanced with system changes necessary to maintain, operate, and secure Healthplanfinder and system changes required by other programs or systems that Healthplanfinder connects to. Sprints for Healthplanfinder's third quarter (July to September) are already in their design phase, a majority of which are for mandatory security

enhancements, version upgrades to platform software products (current version no longer supported), and routine changes required to prepare the system for Exchange open enrollment. Sprints for Healthplanfinder's fourth quarter (October to December) are primarily consumed by supporting open enrollment which requires mid cycle deployments and a focus on system performance and stability during these maximum use months.

9.       The Exchange is primarily funded through a premium tax and carrier assessment on plans that are sold through the Exchange on Washington Healthplanfinder. The plan year 2026 carrier assessment for QHP is $5.11 per member per month (PMPM) and premium tax is 2%. The Exchange also receives some General Fund-State dollars and General Fund-Federal dollars. The Exchange's budget is appropriated by the state legislature, with federal funds being approved by the Centers for Medicare and Medicaid Services (CMS). In Fiscal Year 2024, the Exchange received a total operational appropriation of $83,669,000.

10.      The state and federal partnership designed in the ACA results in consumers having uniform federal protections and state residents having marketplaces designed to meet unique needs of the state. This state flexibility has resulted in the Exchange implementing innovative policies that meet all federal minimum marketplace standards and are responsive to Washington's marketplace conditions that improve market competition and enrollment, making it easier for consumers to enroll in more generous plans at lower cost. For example, the Exchange features:

a.       Standard plans (Cascade Care plans) designed by the Exchange in collaboration with the Office of the Insurance Commissioner, the Health Care Authority, and a group of stakeholders representing a broad spectrum of health care and insurance perspectives from across the state. These plan designs have lower deductibles and more services up-front before the deductible. They allow for easy apples-to-apples plan comparison, where benefits are the same and customers shop based on metal tier, premium, provider network and carrier quality.

b.     A state premium assistance program (Cascade Care Savings) that allows for more affordable net premiums in selected standard plans. The Cascade Care Savings program provides premium assistance for lower-income Washingtonians who enroll in silver and gold metal level Cascade Care plans and has received funding from the state legislature at an amount of $55 million for Plan Year 2026. Due to the program's capped annual appropriation, as premiums increase, more state premium assistance dollars will be expended per enrollee and the number of enrollees that can receive Cascade Care Savings decreases.

c.     Enrollment periods that are optimized to meet Washington's needs, ensuring continuous coverage and minimizing enrollment barriers. The Exchange has historically maintained an open enrollment period from November 1 through January 15. This is based on over a decade of experience that combines customer survey feedback, assister and carrier input, and deep data analysis to deliver optimized enrollment with healthy risk pools and high customer satisfaction in the most efficient time and operational cost. Washington specific special enrollment periods (SEPs) include one for individuals that are eligible for state premium assistance to enroll in a qualifying plan and take advantage of available premium subsidies.

d.     Other affordability programs authorized by legislation. Public option plans (Cascade Select plans) utilize aggregate provider reimbursement caps to lower gross premiums, and therefore lower costs to the 25% of customers who pay full price and reduce expenditures on federal or state premium subsidies that reduce net premiums. A sponsorship program allows Tribes and community organizations to support enrollment for eligible individuals through the Exchange.

11.     Health insurance shopping is complex and challenging for most people, including residents that need coverage on the individual market who don't have someone like their employer managing health benefits and steering them through the process. The Exchange's reputation among consumers, brokers and health insurance carriers as a trusted, simple and stable

marketplace has grown, evidenced by its year-over-year enrollment growth and the steady presence of 11 or more health insurance carriers on the Exchange for the past five years. Even as we approach a year in which enrollment loss is expected due to anticipated expiration of the enhanced federal tax credits originally authorized under the American Rescue Plan Act (ARPA) in 2021, a new health carrier is planning to enter the Exchange marketplace for 2026. The Exchange has also experienced strong growth in partnerships, with now more than 1000 enrollment assisters, 2000 brokers, and 150 Tribal and community-based organizations signing up to help customers enroll in coverage through Healthplanfinder. The Exchange's investment in developing Healthplanfinder as a customer-friendly website that is easy to use supports 150,000 QHP customers who prefer to self-serve in applying and choosing a plan that is right for them. The Exchange has further built confidence by providing high quality customer service during open enrollment, evidenced by 96.2% handled calls, average caller wait times of under 90 seconds, and an average phone call resolution time of 13 minutes, during the 2025 open enrollment period.

12.    The Exchange has grown over time to be viewed as a reliable, efficient steward of state resources by the Washington State legislature. Early technical failures that occurred in the first few years of the Exchange's operations resulted in restricted funds and increased oversight and reporting. However, the legislature has exhibited increased trust in the Exchange and Healthplanfinder through less scrutiny and new responsibilities. For example, the Exchange secured Legislative support to expand dental plan coverage offerings in 2016, implement the Cascade Care program (including standard plans and the nation's first public option) in 2021, fund the Cascade Care Savings premium subsidy program in 2023, and launch an Immigrant Health Coverage program in 2024. Recently the Legislature exhibited continuing trust in the Exchange by funding coverage expansion projects utilizing Healthplanfinder technology (e.g., bringing non-MAGI Medicaid eligibility determinations onto the Healthplanfinder platform,

implementing facilitated enrollment functionality for individuals who lose Washinton Apple Health coverage).

13.     The Exchange has built over a decade of expertise in analyzing its marketplace data and providing reports and analyses relied upon by its Board, the legislature, state and federal agencies, carriers, consumer advocates, and other stakeholders. Exchange employees and contractors regularly perform data analysis using Healthplanfinder enrollment, eligibility, and premium data and using Washington's All Payer Claims Database (APCD). Analysis includes historical, current and projected future enrollment, premiums, and health care utilization. It is used for audit and compliance purposes, providing public and legislative reports, setting premium assessments and state subsidy levels, and for analyzing impacts of policy changes, including state and federal laws. The Exchange estimates in this declaration are based on Washington Healthplanfinder and APCD data and prepared or reviewed by senior policy analysts, data scientists, associate director for strategic budget planning, analytics leader, policy director, and contracted certified actuaries who conduct analysis for the Exchange as part of their regular responsibilities. For example, the uncompensated care in hospital setting estimate is based on the latest complete year of Exchange enrollee hospital claims (Healthplanfinder enrollee data and APCD utilization data for inpatient and outpatient hospital expenditures) and applies enrollment loss projections.

**A.      Immediate and Irreparable Harm Caused by Enrollment Loss and Requirements to Comply with Final Rule for Plan Year 2026.**

14.     Generally, the Final Rule will have the impact of reducing enrollment through the Exchange. The Exchange estimates that the cumulative impact of enrollment loss directly resulting from the rule change could range from 6.1% to 16.6% of Exchange's current enrollment of about 280,000 Washington residents. This enrollment loss would be in addition to the loss of up to 80,000 enrollees that is projected from the expiration of ARPA enhanced premium tax

credits for 2026. A decreased enrollment of 16.6% results in loss of revenue to the Exchange of $10,299,000 annually. It is too late to change the plan year 2026 (PY2026) assessment set by the Exchange Board in March 2025 and already included in proposed 2026 carrier rates submitted to the Office of Insurance Commissioner in May 2025. Neither this assessment amount nor our legislatively appropriated budget account for increased operational costs or projected enrollment loss caused by this rule. If the Exchange is not able to cover operational costs with reduced assessment revenues, it will have to reduce costs through contract or staff reductions or cut other programs that support the success of open enrollment (e.g., pre-open enrollment system testing to ensure operational success, Customer Support Center funding, broker and navigator training, direct customer marketing and education), further reducing enrollment, damaging the individual market risk pool, and increasing uninsurance. Once lost, enrollment cannot easily be recaptured; once terminated, employees and programs cannot easily be reinstated.

15. Implementing this rule in Washington is not feasible for plan year 2026 because of the timing and magnitude of the required changes. CMS engages in annual marketplace rulemaking with the typical timing being a late fall proposed rule that is finalized by early spring for the following plan year because marketplaces and carriers need these "instructions" early in the year in order to incorporate changes that impact carrier premium rates filed in late spring and provide a minimal required amount of time for marketplace readiness. CMS already proposed in October 2024 and finalized in January 2025 the marketplace rule for plan year 2026. This unprecedented second rule for plan year 2026 would upend months of planning, updates and premium rate filings that followed the then current law.

16. Compliance with several provisions of the final rule would necessitate new system programming and additional manual processes and staff, which would compromise the efficiency of our operations. This, in turn, would lead to higher operational costs, greater challenges for consumers, and added strain on critical resources. The proposed rule estimated that several provisions, including verification changes, would cost Washington State up to $21.7

million per year to implement and all state marketplaces up to $596 million. Even with some provisions removed in the final rule, CMS estimated a total implementation cost for exchanges of up to $370 million in 2026. We expect that Washington State's portion of that total would likely remain in the $20-25 million range for 2026, or about 25% of our appropriated operating budget for 2024. The final rule would impact the accuracy and timeliness of consumer notices, increase the volume and complexity of mailings, require expanded enrollee outreach efforts to address potential confusion, and place additional demands on customer service center operations, including longer wait times and increased staffing needs to handle inquiries and support requests. All of these impacts would be felt during the critical open enrollment period at the end of 2025 for the 2026 plan year if the Exchange were to pursue compliance with even some of the rule's provisions taking effect in plan year 2026. Moreover, the Exchange on average experiences a high amount of traffic during the open enrollment period. As a result, it is necessary for the Washington Exchange and external partners to minimize technical changes during this period of time to prevent any unintended disruptions to consumers' ability to enroll by the deadline.

17.    The enrollment loss expected to result from the Final Rule will harm the Exchange risk pool. System changes and other operational fallout from rushed compliance with the changes in a few months will result in a more administratively challenging and burdensome customer experience during open enrollment, which will disproportionately cause younger and healthier customers to drop coverage, further harming the risk pool. The harm to the risk pool will be compounding and cannot easily be reversed.

18.    Individual market enrollment loss expected from the Final Rule will result in an increased uninsurance rate in Washington State and an increase in uncompensated care. Washington individual market customers use at least $425 million annually in hospital care, and a reduction of the Exchange market by up to one-third will lead to uninsured (and largely uncompensated) hospital care increasing by at least $100 million. Uncompensated care costs will result in additional costs borne by the state, providers, carriers, employers, and others, and will

cause irreparable harm to Washington's healthcare system. For example, PBGH, a non-profit coalition representing 40 private employers and public entities across the U.S. that collectively spend $350 billion annually purchasing health care services for more than 21 million Americans and their families estimates[1] that 20% of uncompensated care costs is passed onto employer sponsored insurance, which includes both private employers and state employee benefits.

19.     Below we have described and provided data to quantify the harms to the Exchange and Washington State caused by specific provisions of the Final Rule.

**B.     Exchanges must determine a tax filer ineligible for advance premium tax credits (APTC) if the individual failed to file or reconcile a tax return in a prior year.**

20.     The Final Rule requires the Exchange to deny an individual APTC if the tax filer (or spouse) received APTC for a prior year but there is not a verification that Federal income tax return was filed with APTC reconciled. This is called failure to reconcile or FTR. This is a change from the current requirement for the Exchange to deny APTC if it is notified by HHS that the tax filer or spouse received APTC in the past two years but did not file taxes or reconcile the APTC received. The "past two years" rule that was in effect during the 2025 open enrollment period was the first year of that requirement being in place, after the IRS paused all FTR functionality during the pandemic and it remained paused for the past four years.

21.     This provision applies to all exchanges, including SBEs, upon the effective date of the Final Rule, and sunsets at the end of 2026.

**(i)     Washington Data**

a.     Up to 16,768 enrollees have received two-year FTR codes since these codes were reinstated in 2024. These individuals were permitted to attest to having filed or reconciled

[1] Purchaser Business Group on Health, PBGH Encourages Congress to Prioritize Health Care Affordability and Access in Budget Reconciliation Process available at: https://www.pbgh.org/pbgh-encourages-congress-to-prioritize-health-care-affordability-and-access-in-budget-reconciliation-process/.

their taxes and their eligibility for tax credits was re-checked on June 12, 2025. If an FTR code was received, APTC has been terminated.

b. The Exchange estimates that this provision of the Final Rule could drive rate increases of up to 1.6% and could cause an enrollment loss of up to 8.4%.

c. Up to 16,966 fewer enrollees could receive Cascade Care Savings based on projected premium increases caused by this provision in the Final Rule.

**(ii)    Evidence of Harm**

22.    Exchange: Exchange analysis indicates that enrollment loss of up to 8.4% could occur, causing loss of revenue to the Exchange which is funded directly by a carrier assessment and premium tax on each enrollment. Lost revenue endangers the Exchange's operational functioning, resulting in the need to cut costs by terminating employees and/or reducing programs that support the success of open enrollment, which will cause further enrollment declines.

23.    This rule will likely result in irreparable reputational harm to the Exchange due to the complex nature of the message and the timing. Messages about tax filing status are not welcomed or trusted by customers, especially when they are inconsistent (varying from year to year), inaccurate (IRS data incomplete or backlogged), or the customer has authorization (tax filing extension) but is now being denied a tax credit they are entitled to. They are also complex. Messaging about tax filing is required to be vague so as not to disclose any federal tax information to a household and it will be contradictory to the messaging that was required to be provided to customers about their tax filing requirements last year. This will result in lost trust, customer confusion, and frustration, and customers that leave the Exchange during this process are unlikely to return to seek coverage in the future, even after tax filing issues are resolved.  In addition, the final rule mandates this change for a single year (plan year 2026), so the customer message would change again, shortly after adoption. This flip-flopping creates uncertainty. In a similar situation, customers were told they would be eligible for state subsidy, but due to the

popularity of the program, entry into the program was halted mid-way through open enrollment, resulting in 2,300 of individuals not enrolling in coverage who otherwise would have. The Exchange also heard from its assisters how difficult it was to maintain trust with customers who were told different things at different times.

24.     Updates to the Washington Healthplanfinder system that are necessary to comply with this change are not possible to complete while also preparing for and running open enrollment. The Exchange's technical roadmap is already at 100% of capacity for the next six-month period and changes that can occur prior to open enrollment were required to be on the roadmap in May so that design and refinement as well as dependency mapping can occur. The roadmap is planned in advance to account for dependencies among programs, among different subsystems and across three agencies' technology roadmaps, as well as the federal hub, where applicable. Technical changes currently in flight are necessary to comply with law (such as security updates), Medicaid program changes, and open enrollment configuration and deployment. In addition to lack of capacity, timing is too late for 2026. Quarter three system changes (July through September) have already begun and are in or have completed their design and refinement. No system changes are deployed during October when plan renewals for next plan year must be processed. System changes in November through January 15 are minimized to stabilize the system and preserve open enrollment functioning. Specific to this rule provision, at least a three-month development period would be necessary for prioritization, design, building/testing, and release. The Exchange is incapable of coming into compliance with this provision of the Final Rule prior to its implementation date.

25.     In addition to system impacts, training materials for the Customer Support Center and enrollment assisters will need to be revised. The Exchange Customer Support Center and in-house Eligibility and Enrollment teams expect increased ticket and call volume driven by increased volume of notifications and increased customer confusion. For example, when customer confusion driven by the COVID outbreak occurred in 2020, we saw negative impacts

to the level of customer service the Exchange was able to provide and evidence of decreased customer satisfaction, including a longer average wait time before customers could talk to a representative (2 minutes 47 seconds in 2020 versus 2 minutes 3 seconds in 2019) and a significantly higher percentage of customers abandoning calls (9.12% in 2020 compared to 2.37% in 2019). To support the increase in customer support needs, the Customer Support Center contract would have to be amended to fund additional call center staffing that is not currently legislatively appropriated. The Exchange's ability to effectively support enrollment of new customers, who numbered about 50,000 in the last open enrollment period, as well as renewing customers will be endangered when customer support resources that are already stretched thin are further taxed during open enrollment.

26.     This provision in the Final Rule, effective only for plan year 2026, causes additional harm to the Exchange because under current law the Exchange will be required to reverse system and other operational changes made to comply with this change in advance of the 2027 plan year (when this provision will no longer apply).

27.     <u>Washington State</u>: Increased premium rates result in enrollment loss, with younger and healthier consumers disproportionately leaving the market, which directly harms Washington's state premium subsidy program, Cascade Care Savings. As rates increase due to this provision of the Final Rule, the state's investment in coverage ($55M for plan year 2026) would be diluted and the state subsidy would be able to help up to 16,966 fewer customers afford coverage. The state's ability to achieve the intent of the state subsidy program, providing necessary premium support to help more Washingtonians get and stay covered, would be frustrated, irreparably harming the state.

**C.      Creating data matching inconsistencies (DMIs) and requiring further income verifications when federal tax data (1) indicates a customer's income is below 100% FPL or (2) is unavailable.**

28.     The Exchange requires that an enrollee attest to the accuracy of their income and verifies that claim using federal income data or other trusted electronic data sources (e.g., Employment Security Department in Washington State), and considers the data to match if the electronically verified income is not more than 25% higher than the customer's attested income. The Final Rule changes this policy in two ways. First, anytime a consumer has an attested income of 138% or higher (above the threshold for WA Apple Health eligibility) and IRS or other electronic data source returns income below 100% FPL, a DMI will be generated. Second, when IRS data is absent (an IRS error unrelated to a customer's tax filing activity), a DMI will be generated if other electronic income data is not available to validate the attested income. These changes apply to all exchanges, including SBEs, upon the effective date of the final rule, and sunset at the end of 2026.

**(i)     Washington Data**

a.      For plan year 2025 coverage, 39,739 customers have attested to income above 138% FPL and verified (federal or state) income was below 100%.

b.      For plan year 2025 coverage, 65,476 Washington enrollees have received a "Null" income response from the federal hub.

c.      The Exchange estimates that these provisions of the Final Rule could drive rate increases of up to 1.6% and could cause enrollment loss off up to 6.4%.

d.      Up to 16,966 fewer enrollees could receive Cascade Care Savings based on projected premium increases.

**(ii)    Evidence of Harm**

29.     <u>Exchange</u>: These provisions could result in enrollment loss of up to 6.4%, causing loss of revenue to the Exchange which is funded directly by a carrier assessment and premium tax on each enrollment. Lost revenue will endanger the Exchange's operational functioning,

resulting in the need to cut costs by terminating employees and/or reducing programs that support the success of open enrollment, which would cause further enrollment declines.

30.　　When a DMI is generated, consumers are required to track down and submit the necessary paperwork in order to stay enrolled in their health insurance with premium subsidies applied to reduce their monthly costs. Customers will be notified that they are required to provide documentation of their income, which will drive customer confusion and increased volume of contacts to the Customer Support Center during open enrollment. The Exchange will likely be viewed as implementing barriers to affordable coverage, causing negative customer experiences and irreparable Exchange reputational damage. The Exchange Customer Support Center and in-house Eligibility and Enrollment teams expect increased ticket and call volume driven by increased volume of notifications and increased customer confusion. For example, when customer confusion driven by the COVID outbreak occurred in 2020, we saw negative impacts to the level of customer service the Exchange was able to provide and evidence of decreased customer satisfaction, including a longer average wait time before customers could talk to a representative (2 minutes 47 seconds in 2020 versus 2 minutes 3 seconds in 2019) and a significantly higher percentage of customers abandoning calls (9.12% in 2020 compared to 2.37% in 2019). To support the increase in customer support needs, the Customer Support Center contract would have to be amended to fund additional call center staffing that is not currently legislatively appropriated. Training materials for the Customer Support Center and enrollment assisters will need to be revised. The Exchange's ability to effectively support enrollment of new customers, who numbered about 50,000 in the last open enrollment period, as well as renewing customers will be endangered when customer support resources that are already stretched thin are further taxed during open enrollment.

31.　　DMIs also create administrative burdens on SBEs, which are required to receive, process, and determine whether the newly submitted paperwork adequately addresses the issue. These changes impose a heavy burden on SBEs. The additional volume of manual effort that would be created by up to 105,000 additional DMIs would require hiring six Eligibility

Specialists at the Grade 6 level and one supervisor at the Grade 9 level. The Exchange estimates that it would need these additional resources for a six-month period during and after open enrollment when most DMIs would be generated. The cost of these additional resources would be more than $345,000 for a six-month period.

32.     Updates to the Washington Healthplanfinder system that are necessary to comply with this change are not possible to complete while also preparing for and running open enrollment. The Exchange's technical roadmap is already at 100% of capacity for the next six-month period and changes that can occur prior to open enrollment were required to be on the roadmap in May so that design and refinement as well as dependency mapping can occur. The roadmap is planned in advance to account for dependencies among programs, among different subsystems and across three agencies' technology roadmaps, as well as the federal hub, where applicable. Technical changes currently in flight are necessary to comply with law (such as security updates); Medicaid program changes; and open enrollment configuration and deployment. In addition to lack of capacity, timing is too late for 2026. Quarter three system changes (July through September) have already begun and are in or have completed their design and refinement. No system changes are deployed during October when plan renewals for next plan year must be processed. System changes in November through January 15 are minimized to stabilize the system and preserve open enrollment functioning.

33.     Specific to this rule provision, at least a three-month development period would be necessary for prioritization, design, building/testing, and release of Healthplanfinder changes. This provision also requires an aligned system release with the Eligibility Service operated by DSHS, whose release roadmap is finalized at 100% capacity through January 2026. The next availability for an aligned release with DSHS for this provision in the Final Rule is April 2026. The three-month Healthplanfinder development period described above could begin after completion of the April 2026 DSHS release.

34.     In addition to system impacts, training materials for the Customer Support Center and enrollment assisters will need to be revised. The Exchange Customer Support Center and in-house Eligibility and Enrollment teams expect increased ticket and call volume driven by increased volume of notifications and increased customer confusion. To support the increase in customer support needs, the Customer Support Center contract would have to be amended to fund additional call center staffing that is not currently legislatively appropriated. The Exchange's ability to effectively support enrollment of new customers, who numbered about 50,000 in the last open enrollment period, as well as renewing customers will be endangered when customer support resources that are already stretched thin are further taxed during open enrollment.

35.     These provisions in the Final Rule, effective only for plan year 2026, cause additional harm to the Exchange because under current law the Exchange will be required to reverse system and other operational changes made to comply with these changes in advance of the 2027 plan year (when these provisions will no longer apply).

36.     <u>Washington State</u>: This rule will harm the State's investment in Cascade Care Savings by resulting in premium increases which dilute Washington's investment in the program and allow fewer enrollees to receive Cascade Care Savings. In addition, when enrollees who qualify for state premium subsidies do not also receive federal premium subsidies, the state's expenditure per enrollee is much greater. Each Cascade Care Savings enrollee that receives the full amount of Cascade Care Savings ($250 per member per month (PMPM) in 2025) instead of receiving a lesser amount as a supplement to their federal APTC (average of $36 PMPM in 2025) has a significant impact on sustainability of a program with a total annual budget of $55 million. These factors will reduce the reach of the state's investment, resulting in up to 17,000 fewer customers being able to benefit from Cascade Care Savings. The state's ability to achieve the intent of the state subsidy program, providing necessary premium support to help as many

1    Washingtonians as possible get and stay covered, would be frustrated, irreparably harming the

2    state.

3

4    **D.    Modifying the automatic re-enrollment hierarchy by removing the option for**
     **Exchanges to direct re-enrollment from a bronze QHP to a silver QHP, with same**
5    **or lower premium, in the same product, with same provider network.**

6        37.    This change to 45 CFR § 155.335(j)(4) applies to all Exchanges, including SBEs,

7    upon the effective date of the final rule. Because of reasoning included in the preamble to the

8    Final Rule, there is concern that the Exchange would not be able to secure CMS approval of an

9    alternate procedure under 45 CFR § 155.335(a)(2)(iii), as it has in the past, that would map

10   certain enrollees to a higher value plan with the same or a lower premium, with the same carrier

11   and network. If the Exchange does not have the ability to employ this mapping for 2026 as it

12   would under alternate procedures approved by CMS in the past, the harms described below

13   would occur.

14       **(i)    Washington Data**

15       a.    The Exchange estimates that approximately 54,000 current enrollees would

16   qualify under previously-approved alternate procedures to be cross-mapped from a silver

17   plan to a higher value, lower premium plan of a different metal level in the upcoming open

18   enrollment.

19       b.    Up to 60,000 fewer people will be able to benefit from Cascade Care Savings in

20   2026 if the Exchange is not able to employ its previously-approved cross-mapping approach,

21   because program expenditures per enrollee will be significantly higher when individuals

22   remain enrolled in plans with higher premiums.

23       **(ii)    Evidence of Harm**

24       38.    <u>Exchange</u>: Enrollment loss will occur when individuals experience large net

25   premium increases in silver plans that they could otherwise be shielded from by planned

26   Exchange cross-mapping to higher value, lower premium gold plans, causing loss of revenue to

the Exchange which is funded directly by a carrier assessment and premium tax on each enrollment. Lost revenue endangers the Exchange's operational functioning, resulting in the need to cut costs by terminating employees and/or reducing programs that support the success of open enrollment, which will cause further enrollment declines.

39. The Exchange will suffer significant reputational harm if customers, who could otherwise be shielded from premium increases by planned cross-mapping activity, experience significant and unnecessary premium increases as they are automatically renewed into 2026 coverage. Confusion and frustration will follow, damaging customer trust in the Exchange, followed by increased volume of Customer Support Center contacts and potentially appeals. As an example, the market experienced its highest single-year rate increase in 2018, when Exchange silver plan premiums increased by 35% on average. During the open enrollment period for 2018, the Exchange Customer Support Center experienced a significantly higher volume of calls compared to both 2017 (13.6% higher volume) and 2019 (14.9% higher volume). This volume resulted in negative impacts to the level of customer service the Exchange was able to provide and evidence of decreased customer satisfaction, including a significantly longer average wait time before customers could talk to a representative (4 minutes 51 seconds in 2018 versus 1 minute 48 seconds in 2019) and a higher percentage of customers abandoning calls (5.56% in 2018 compared to 3.38% in 2019). To support the increase in customer support needs, the Customer Support Center contract would have to be amended to fund additional call center staffing that is not currently legislatively appropriated. The Exchange's ability to effectively support enrollment of new customers, who numbered about 50,000 in the last open enrollment period, as well as renewing customers will be endangered when customer support resources that are already stretched thin are further taxed during open enrollment.

40. <u>Washington State</u>: This rule would harm the state's investment in Cascade Care Savings by resulting in more Cascade Care Savings being expended per eligible enrollee. When certain Cascade Care Savings eligible individuals remain in silver plans instead of moving to

lower premium, higher value gold plans under the Exchange's intended cross-mapping strategy, they will receive a larger Cascade Care Savings subsidy per person, although their silver plan will cover less out-of-pocket for them and also result in higher net premiums. This will reduce the reach of the state's investment and result in up to 60,000 fewer customers being able to benefit from Cascade Care Savings. The state's ability to achieve the intent of the state subsidy program, providing necessary premium support to help as many Washingtonians as possible get and stay covered, will be frustrated, irreparably harming the state.

**E.    Updating the premium adjustment percentage methodology to include premium changes in the private individual and group markets (excluding Medigap and property and casualty insurance).**

41.    This change to 45 CFR § 156.130(e) would apply beginning with PY 2026 cost-sharing limits and applies to all exchanges. It causes out-of-pocket limits for customers to increase faster and reduces premium tax credits for customers over time.

**(i)    Washington Data**

a.    This change will increase the 2026 maximum out-of-pocket amount (MOOP) by 15% over 2025 ($10,600 MOOP for individual coverage in 2026 compared to $9,200 in 2025).

b.    When adopted by the Internal Revenue Service (IRS), this change would result in lower premium tax credit amounts resulting in 4.5% higher net premiums.

c.    The Exchange estimates that this change could result in gross premium increases of up to 0.3% and enrollment losses of up to 1.8% for 2026.

d.    Up to 3,863 fewer enrollees could receive Cascade Care Savings based on projected premium increases.

**(ii)    Evidence of Harm**

42.     <u>Exchange</u>: Enrollment loss of up to 1.8% will occur when premiums increase as a result of this provision in the Final Rule. Lost revenue endangers the Exchange's operational functioning, resulting in the need to cut costs by terminating employees and/or reducing programs that support the success of open enrollment, which will cause further enrollment declines.

43.     The Exchange will suffer reputational harm when customers experience significant premium increases as they are automatically renewed into 2026 coverage. While numerous factors will be responsible for premium increases in 2026, an average additional net increase of 4.5% caused by this provision of the Final Rule on top of other expected drivers of premium increases, including expiration of enhanced premium tax credits for 2026, will result in loss of customer trust. Confusion and frustration will follow, damaging customer confidence in the Exchange, followed by increased volume of Customer Support Center contacts and potentially appeals. As an example, the market experienced its highest single-year rate increase in 2018, when Exchange silver plan premiums increased 35% on average. During the open enrollment period for 2018, the Exchange Customer Support Center experienced a significantly higher volume of calls compared to both 2017 (13.6% higher volume) and 2019 (14.9% higher volume). This volume resulted in negative impacts to the level of customer service the Exchange was able to provide and evidence of decreased customer satisfaction, including a significantly longer average wait time before customers could talk to a representative (4 minutes 51 seconds in 2018 versus 1 minute 48 seconds in 2019) and a higher percentage of customers abandoning calls (5.56% in 2018 compared to 3.38% in 2019). To support the increase in customer support needs, the Customer Support Center contract would have to be amended to fund additional call center staffing that is not currently legislatively appropriated. The Exchange's ability to effectively support enrollment of new customers, who numbered about 50,000 in the last open enrollment period, as well as renewing customers will be endangered when customer support resources that are already stretched thin are further taxed

during open enrollment. Customers who leave individual market coverage in such a year of premium increases and confusion may never return to the market.

44.     <u>Washington State</u>: Due to resulting premium increases, this change in the Final Rule would increase premiums and reduce the reach of the state's investment in the Cascade Care Savings premium subsidy, resulting in up to 3,863 fewer customers being able to benefit from Cascade Care Savings. The state's ability to achieve the intent of the state subsidy program, providing necessary premium support to help as many Washingtonians as possible get and stay covered, would be frustrated, irreparably harming the state.

I declare under penalty of perjury under the laws of the United States and the State of Washington that the foregoing is true and correct.

SIGNED this  14  day of ___July___, 2025, at _____Olympia_____, Washington.

_____
INGRID ULREY
Chief Executive Officer
Washington Health Benefit Exchange