# EXHIBIT 26

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF CALIFORNIA, et al.<br><br>        *Plaintiffs*,<br><br> v.<br><br>ROBERT F. KENNEDY, JR., et al.,<br><br>        *Defendants.* | Civil Action No.: __25-12019__ |

## DECLARATION OF T.K. KEEN

I, T.K. Keen, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct:

1. I am the Interim Oregon Insurance Commissioner and the Administrator for the Division of Financial Regulation of the Oregon Department of Consumer and Business Services (DCBS). I have been in this role since June of 2025. Prior to that, I served as Deputy Insurance Commissioner of DCBS from 2015 to 2025.

2. I am responsible for enforcement of the Oregon Insurance Code, including regulation of insurance carrier licensing, solvency, and product offerings; review and approval of rates and forms used by insurance carriers; and ensuring a fair insurance marketplace for Oregon consumers. These duties encompass the area of health insurance subject to regulation by the State of Oregon. They also include the enforcement of Oregon's prohibition against insurers' denial of medically-necessary gender-affirming treatment.

3. Oregon does not operate its own health insurance exchange. Rather, consumers in Oregon enroll in health coverage using healthcare.gov, which is operated and maintained by the U.S. Department of Health and Human Services.

4. I am familiar with the information in the statements set forth below through personal knowledge and from documents and information that have been provided to and reviewed by me.

5. I submit this Declaration in support of the States' Motion for a Preliminary Injunction.

*The Final Rule Will Adversely Impact Oregon's Risk Pool*

6. CMS's 2025 Marketplace Integrity and Affordability Final Rule (Final Rule) would increase costs to Oregon by removing a pool of relatively young and healthy individuals from the pool of insureds participating in health coverage in our State. While Oregon cannot yet estimate precisely how many of such individuals will be removed, as discussed below, the overall effect is likely to be significant.

7. The Final Rule makes several changes that adversely impact Oregon's risk pool, including, but not limited to, the following.

8. The Final Rule requires the Federal marketplace to conduct pre-enrollment eligibility verification for at least 75% of new enrollments through Special Enrolment Periods (SEP), including the SEPs that can be triggered by events such as a move to a new geographical area or the birth of a child. Compared to verification of SEPs triggered by the loss of minimum coverage, which was required by the prior policy, verification of other SEPs often cannot employ electronic data sources for auto-verification to the same extent, and therefore rely on consumers to submit supporting documentation. As a result, verification of all SEPs is likely to discourage younger, healthier individuals—who are less likely to navigate complex paperwork requirements successfully during life changes—from enrolling, undermining the stability of the risk pool and driving up costs for everyone.

9. Prior to the Final Rule, exchange plans accepted the self-attestation of an enrollee who claimed eligibility by projecting annual household income at or above 100% of the FPL. This self-attestation policy was designed to ensure that the lowest-income enrollees, who are often younger and healthier, are not discouraged from entering the risk pool due to paperwork burdens. The prior policy also recognized the challenges that low-income individuals face in accurately estimating their annual income. Many low-income individuals experience significant fluctuations in their

2

earnings over the course of the year. The Final Rule's elimination of this practice is an administrative barrier to enrollment that will likely cause younger and healthier consumers to drop out of the marketplace. That, in turn, will worsen the risk pool and increase premiums for both subsidized and unsubsidized consumers.

### *The Final Rule Will Increase Oregon's Healthcare Costs*

10. The Final Rule acknowledges that the changes it makes will result in a decrease in enrollment in the ACA marketplace exchanges of up to 1.8 million people nationwide.

11. A direct consequence of this decreased enrollment under the Final Rule is a higher rate of uninsured individuals in Oregon and a corresponding higher amount of costs incurred by hospitals. Hospitals would be responsible for paying the uncompensated care costs that result when an uninsured or underinsured patient requires emergency or other hospital-based medical care. Due to Oregon's generous financial assistance laws (outlined, for example, at ORS 442.601-618), as well as the Emergency Medicaid Treatment and Labor Act, hospitals in Oregon will still be required to provide services to people who are no longer insured by a Marketplace plan. Other health care providers would either lose patients or incur uncompensated care costs.

12. Oregon does not have a program in which the state would subsidize hospital uncompensated care, so the bulk of the cost burden would be shifted directly to hospitals. This, in turn, will likely put upward pressure on the price of hospital services, thereby increasing healthcare costs for the state—which directly pays for hospital services through its state Medicaid program, among other sources— and it will also have an impact on spending for public employee benefits. This will also likely drive up healthcare costs for all Oregonians.

13. Oregon cannot estimate the full cost impact to hospitals at this time because the precise magnitude of coverage losses based on this Rule are difficult to predict. Even so, because it is likely that the number of uninsured individuals in Oregon will increase because of the Final Rule, it is also likely that hospitals costs will increase, thereby increasing healthcare costs overall.

*The Final Rule Will Adversely Impact Public Health in Oregon*

14. The Final Rule is detrimental to public health in Oregon. With increased access to affordable health insurance via healthcare.gov, individuals are more likely to seek preventive care and avoid costly emergency room visits. Without individuals having access to affordable health insurance, they are more likely to refrain from seeking preventative care and incur costly emergency room visits. Oregon cannot yet predict the precise magnitude of this harm because it will depend, among other things, on how many individuals lose insurance coverage. But the cost is likely to be significant.

15. Increased access to health insurance improves public health. Uninsured individuals who lack access to affordable, adequate health insurance are less likely to seek preventive care or attend routine health screenings and may delay necessary medical care due to prohibitive costs.

16. Lack of insurance and resulting negative health outcomes also result in downstream consequences, including absenteeism in the workplace and increased reliance on unemployment insurance, which relies on State funding.

17. Decreased access to adequate and affordable health care could mean infectious diseases spread more widely and rapidly with those affected not seeking care due to being uninsured or underinsured.

*The Final Rule's Exclusion of Gender-Affirming Care as an EHB Harms Oregon*

18. The ACA mandates that certain individual and small group health plans cover a set of Essential Health Benefits (EHBs) which must be equal to the scope of benefits provided under a typical employer plan and may not have any annual or lifetime dollar limit under state plans.

19. Per HHS, the items and services covered must come from the following ten benefit categories: (1) ambulatory patient services; (2) emergency services; (3) hospitalization; (4) maternity and newborn care; (5) mental health and substance use disorder services including behavioral health treatment; (6) prescription drugs; (7) rehabilitative and habilitative services and devices; (8) laboratory services; (9) preventive and wellness services and chronic disease management; and (10) pediatric services, including oral and vision care.

20. The ACA and its effectuating regulations permit latitude to the states in determining how EHBs are defined. Accordingly, states submit their "benchmark" plans to HHS for approval. EHBs are a minimum standard, and benchmark plans can choose to offer additional health benefits, like vision, dental, and medical management programs (e.g., weight loss).

21. Each state maintains a benchmark plan on file with HHS, against which private insurers must compare plans to ensure compliance with the standards set forth therein. Further, if a state has not updated its benchmark plan to match federal requirements, private insurers must also review plans for compliance with federal EHB mandates.

22. Even in states like Oregon, where gender-affirming care is not listed as its own category of EHB in the state's benchmark plan, many services that fall within "gender-affirming care", such as surgeries, prescription medications, and mental health treatment, are treated as EHBs by state marketplaces.

23. Coverage for gender-affirming care is protected by law in Oregon. In 2023, the Oregon Legislative Assembly enacted Oregon House Bill 2002, including Section 20, since codified as ORS 743A.325. The statute codified a pre-existing regulatory requirement prohibiting an insurance carrier offering a health benefit plan from denying or limiting coverage for gender-affirming treatment that is medically necessary as determined by the physical or behavioral health care provider who prescribes the treatment and is prescribed in accordance with accepted standards of care. The bill prohibits carriers from applying categorical cosmetic or blanket exclusions to medically necessary gender-affirming treatment, including but not limited to tracheal shave, hair electrolysis, facial feminization surgery or other facial gender-affirming treatment, revisions to prior forms of gender-affirming treatment, and any combination of gender-affirming treatment procedures. HB 2002 required DCBS to adopt rules to implement these provisions. Those rules were adopted and codified at OAR 836-053-0441, and they became effective January 1, 2025.

24. Given the above legal requirements, employer-based health insurance plans offered in Oregon always cover gender-affirming care. Because of that, marketplace plans offered in Oregon also cover gender-affirming care.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 16th day of July, 2025 in Salem, Oregon.

_____
T.K. KEEN
Interim Oregon Insurance Commissioner and Administrator
Oregon Department of Consumer and Business Services