# EXHIBIT 3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF CALIFORNIA, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services, et al.,<br><br>*Defendants*. | Civil Action No. 25-12019 |

**Declaration of Jessica Altman in Support of Plaintiffs' Motion for a Preliminary Injunction**

I, Jessica Altman, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct:

1. I am the Executive Director of Covered California. I am familiar with the information in the statements set forth below either through personal knowledge or from documents that have been provided to and reviewed by me.

2. I submit this Declaration in support of the States' Motion for a Preliminary Injunction.

**Professional Background**

3. I, Jessica Altman, have served as the Executive Director for Covered California since 2022. In this role, I oversee all aspects of the organization's operations, strategy and policy implementation to ensure Covered California fulfills its mission of expanding access to health care, driving affordability, promoting equity, and improving outcomes for consumers across the state. Covered California provides coverage to over 1.9 million Californians annually and operates as a competitive health insurance marketplace that promotes choice and accountability among health plans.

4.   Prior to joining Covered California, I served as Pennsylvania's Insurance Commissioner, where I led efforts to protect consumers, regulate insurance carriers, and advance health care reform. I also served as the founding board chair of Pennsylvania's state-based exchange, Pennie, which began offering health coverage at the start of 2021. I hold a Master of Public Policy from Harvard University and a Bachelor of Science in Policy and Management from Cornell University. My education and experience in regulatory policy, marketplace operations, and consumer protection give me a comprehensive understanding of the challenges exchanges, and particularly state-based exchanges, face and the consequences federal regulations can have on their ability to serve consumers effectively.

**State-based Exchange (SBE) Background**

5.   Covered California was established in 2011 and began its first open enrollment period (OEP) in 2013 for coverage starting in the 2014 plan year. Following the recent OEP for the 2025 plan year, 1,979,504 residents were enrolled in health insurance through Covered California. Since our SBE was established, California's uninsured rate has dropped from 17.2 percent to 6.4 percent in 2023.[1] Through innovation and careful stewardship, our SBE has established a competitive market and a robust risk pool, and currently includes 12 health insurance plan issuers, five dental plan issuers, and 116 qualified health and dental plan options (a "plan option" is a unique carrier, network, and metal tier combination) for the 2025 plan year to ensure that all our residents have access to high quality and affordable health coverage. Moreover, Covered California has consistently cultivated a stable and healthier risk pool compared to the federally-facilitated exchange (FFE), as demonstrated by CMS's annual risk adjustment data, even when accounting for market-specific differences.

6.   The flexibility that CMS has afforded SBEs in operating our unique marketplaces has allowed us to implement innovative policies which make it easier for consumers to enroll in more generous plans at low or no cost. While CMS imposes rules to ensure a baseline level of

---

[1] Jessica Altman, Comment Letter on the Marketplace Integrity and Affordability Proposed Rule (Apr. 11, 2025), https://www.regulations.gov/comment/CMS-2025-0020-25629

2

performance across marketplaces, it also permits states to innovate and tailor policies to meet their unique needs. For example, Covered California has maintained a longer OEP, running from November 1 through January 31, which strengthens our risk pool by enrolling healthier and younger individuals who are more likely to sign up later in the period. Our special enrollment period (SEP) strategies have also been uniquely designed to meet California's needs, ensuring continuous coverage and minimizing enrollment barriers while maintaining a healthy risk pool. Moreover, our robust fraud oversight standards have ensured that consumer enrollments are conducted with the highest integrity, effectively safeguarding against improper enrollments with negligible instances of fraud. These flexibilities allow states like California to address local conditions while upholding program integrity and consumer protections.

7. Covered California has had very few instances of fraud. In fact, a robust review of consumer complaints and enrollment partner activity in recent years revealed that improper enrollments are exceedingly rare, thanks to the tailored oversight measures we have implemented, such as requiring agents to verify consumer consent through secure methods like three-way calls, one-time passcodes, or direct consumer portal updates. For the few instances reported, Covered California has taken swift and decisive corrective actions, including investigations, monitoring, warnings, suspensions, and, if necessary, decertifying agents. These measures have enabled us to uphold program integrity while simultaneously reducing financial and administrative barriers to obtaining coverage for those who need it most.

8. To fund our operations, Covered California collects a user fee of 2.25 percent of the total monthly premiums collected by an issuer for each plan purchased through our individual exchange and a 5.2 percent fee for each plan sold through our small business exchange. (Cal. Gov't Code, § 100503, subd. (n).) Therefore, policies which decrease enrollment in Covered California result in less revenue for Covered California to operate our state-run exchange.

9. Covered California develops annual standard benefit designs well in advance of the upcoming plan year to allow health plan issuers to finalize plan submissions and calculate upcoming rates. Beginning in late 2024, Covered California worked to develop 2026 standard

benefit designs with significant input from interested parties. Finalized benefit designs were adopted by Covered California's board of directors on February 20, 2025. Issuers submitted plan filings to Covered California and to their state regulators that incorporated the finalized benefit designs by April 30, 2025, as part of the plan year 2026 certification process. The Final Rule increases the maximum limitation on cost sharing beyond the value used to finalize Covered California's benefit designs. This change will require reconfiguration of the adopted benefit design for catastrophic plans and resubmission and review of issuer plan filings.

10. The Final Rule will make it difficult for consumers to enroll in coverage and significantly increase consumers' health insurance premiums and out-of-pocket costs. It will greatly increase financial costs, administrative burdens, and instability for Covered California while eliminating state flexibility to tailor our exchange to local needs.

11. We estimate that the numerous changes in the Final Rule will require us to spend more than $1.5 million and 12,500 hours of staff time updating our information technology (IT) systems alone. Additionally, the rule will require an unquantifiable amount of staff time to implement its requirements and impose significant operational challenges on our SBE. Moreover, some of the technical changes to our IT systems cannot be completed in time for the 2026 plan year. Specifically, the new income verification requirements—such as requiring documentation when tax data shows income under 100 percent of the federal poverty level (FPL) and requiring documentation when no tax data is available through the federal data services hub—are impossible to timely implement within our existing system infrastructure. Implementing these rules would necessitate new system programming and additional manual processes, which would compromise the efficiency of our automated systems. This, in turn, would lead to higher operational costs, greater challenges for consumers, and added strain on critical resources. Specifically, it would impact the accuracy and timeliness of consumer notices, increase the volume and complexity of mailings, require expanded enrollee outreach efforts to address potential confusion, and place additional demands on service center operations,

including longer wait times and increased staffing needs to handle the influx of inquiries and support requests.

12. The Final Rule's exclusion of medically necessary treatments for transgender individuals from the definition of an Essential Health Benefit (EHB) is also detrimental. This medical care is necessary for some transgender individuals. In addition, a typical employer plan in California covers the treatments commonly provided for treating gender dysphoria, and therefore it is improper to exclude such care from the EHB definition. Furthermore, singling out this one treatment for exclusion as an EHB marks a sharp departure from CMS's longstanding practice of increasing state flexibility in defining the scope of EHBs to keep pace with the diverse and evolving needs of states' residents. CMS has never before excluded benefits that are traditionally embedded within a health plan (as opposed to "excepted benefits" like dental benefits).

13. The timing of the Final Rule is deeply problematic for another reason. Enhanced premium tax credits are scheduled to expire on December 31, 2025, unless Congress extends them. The expiration of those enhanced federal subsidies will drastically lower enrollment in the exchanges and increase consumer costs. The Congressional Budget Office (CBO) estimates that the expiration of these enhanced subsidies will increase the number of people without health insurance by 4.2 million by 2034. Our internal estimates are that the expiration of enhanced premium tax credits will cause an average premium increase of 66 percent for Covered California enrollees and result in, on average, 346,000 to 522,000 fewer monthly enrollees through July 2031.[2] When factoring in the many harmful impacts of the Final Rule layered on top of the expiring subsidies, the result could be serious instability and volatility in both the federal and state-based exchanges.

---

[2] Covered California, *The Impact of Expiring Enhanced Tax Credits on Californians and Communities in Need*, HBEX.COVEREDCA.COM, https://hbex.coveredca.com/data-research/library/Brief%201%20IRA%20ACA%20Premium%20Impacts%202025.pdf (last visited Jun. 12, 2025); Covered California Board of Directors, *Policy and Action Items at the May 15, 2025 Board Meeting,* p. 9-10, BOARD.COVEREDCA.COM (May 15, 2025), https://board.coveredca.com/meetings/2025/May%2015,%202025/2025.05.15_Policy_and_Action.pdf

5

14. Beyond the impact of the expiring enhanced premium tax credits, the cumulative effect of the Final Rule will inflict immediate and significant harm on our SBE and the consumers we serve, with lasting consequences that will be challenging to reverse if implemented. Covered California's historical success will be undone under the Final Rule, leading to an increase in California's uninsured rate and triggering broader macroeconomic challenges as a result. Covered California will be forced to divert more than $1.5 million and potentially hundreds of thousands of staff hours towards changing our IT systems and helping consumers meet unnecessary and burdensome eligibility and verification requirements. Moreover, the Final Rule carries multi-year implications that threaten to undermine marketplace competitiveness over time, as smaller plans may struggle to withstand the prolonged volatility caused by substantial changes to the risk pool.

15. We estimate that the Final Rule will cause total Covered California enrollment to decrease by a range of 58,000 to 144,000 (8 percent), and the risk pool will significantly worsen, thereby causing premiums to rise.[3] As such, the Final Rule poses a profound threat not only to Covered California's stability and success but also to the broader healthcare landscape, undermining affordability, access, and marketplace competitiveness.

---

[3] Based on national 2025 Open Enrollment data, California represents approximately 8 percent of Marketplace plan selections. Using this methodology, we estimate potential coverage loss of 58,000 to 144,000 Covered California enrollees, applying 8 percent to CMS's updated projection of 725,000 to 1,800,000 fewer individuals enrolling in Qualified Health Plan (QHP) coverage nationwide due to the Final Rule.

**Denying Advanced Premium Tax Credits (APTC) for Individuals Who Fail to File and Reconcile Their Income Data After Only One Year**

16. The ACA provides APTCs to individuals whose projected household income qualifies them for assistance with paying their healthcare premiums. Because those APTC awards are based on a consumer's projected income, the recipient must later reconcile their APTC award against the allowed premium tax credit based on their actual income, as shown in their tax filings with the Internal Revenue Service (IRS). If the enrollee received more APTC during the benefit year than allowed, the enrollee then owes the difference as a tax liability when they file taxes for that year. This requirement ensures that consumers cannot claim and retain credits to which they are not entitled. When an individual fails to file taxes and reconcile the amount of credit allowed with the APTC award received, they lose eligibility for future APTCs and owe the prior period's excess APTC as a tax liability. This is known as failure to file and reconcile, or FTR. The Final Rule temporarily shortens the failure-to-file period to one year for plan year 2026, meaning consumers will lose APTC credit eligibility and incur a corresponding tax liability after just one FTR year, rather than after two consecutive FTR years (which was the previous policy).

17. Reverting to a one-year FTR rule increases the risk of eligible individuals losing access to APTCs due to administrative complexities or processing delays, especially IRS processing delays (or outright errors) that are not the fault of the consumer. Many more people receive one-year FTR codes than two-year FTR codes (because the former fix the issue before year two comes around). In California, 220,000 enrollees renewing for January 2025 coverage received a one-year FTR code, while 47,000 received a two-year code.

18. Moreover, even in a world where the IRS processes all returns perfectly and on time, there are legitimate reasons why a consumer might knowingly accrue (and pay) a higher tax liability after two years rather than one. For some consumers, maintaining health coverage over a two-year span, even at the costs of a higher tax liability at the end, might be a rational tradeoff. And, either way, whether after one year or two years, the consumer must pay the federal government back for any APTC that was higher than it should have been based on the

consumer's income. Thus, there is no reason for shortening the FTR period to force a reconciliation after just one year.

19. Implementing this new FTR rule will likely cause consumer confusion because SBEs will be required to deny APTC much more frequently than under the current system, often based on IRS processing delays or mistakes. As the U.S. Office of the National Taxpayer Advocate highlighted in its 2024 annual report to Congress, the IRS continues to experience ongoing challenges stemming from persistent paper processing delays, correspondence issues, and data errors in monitoring reports and tax return handling.[4] Further, added barriers to marketplace enrollment discourage healthier individuals from enrolling, deteriorate the risk pool, and lead to higher premiums for those who remain insured.

**Ending Acceptance of Self-Attestation of Projected Annual Household Income At or Above 100 Percent of the FPL**

20. Prior to the Final Rule, exchange plans accepted the self-attestation of an enrollee who claimed eligibility by projecting annual household income at or above 100 percent of the FPL. This policy is distinct from the FTR rules, discussed above, which still ensure that an enrollee who over-claims APTC eligibility must repay the overpayment via tax liability or else lose APTC eligibility. This self-attestation policy was designed to ensure that the lowest-income enrollees, who are often younger and healthier, are not discouraged from entering the risk pool due to paperwork burdens. The prior policy also recognized the challenges that low-income individuals face in accurately estimating their annual income. Many low-income individuals experience significant fluctuations in their earnings over the course of the year.

21. The Final Rule changed this policy in two ways.  First, anytime IRS data shows that a consumer has income below 100 percent of the FPL, a "data matching issue" (DMI) will be generated. Second, in the absence of IRS data, a DMI will be generated. Whenever a DMI is generated, consumers will be required to track down and submit the necessary paperwork in

---

[4] National Taxpayer Advocate, *Annual Report to Congress 2024*.
https://www.taxpayeradvocate.irs.gov/reports/2024-annual-report-to-congress/full-report/

8

order to purchase health insurance. DMIs also create administrative burdens on SBEs, which are required to receive, process, and determine whether the newly submitted paperwork adequately addresses the issue.

22. These changes impose a heavy burden on SBEs. I estimate that Covered California will need to spend over 52,000 hours to receive, process, and review documents generated by these new DMIs, costing over $2.5 million. This cost includes conducting outreach and determining DMI outcomes for applicants whose tax return data is unavailable. Updating our eligibility systems and performing technical updates relating to this change will cost approximately $1,250,000. This change represents yet another administrative barrier to enrollment that will likely cause younger and healthier consumers to drop out of the marketplace. That, in turn, will worsen the risk pool and increase premiums for both subsidized and unsubsidized consumers.

**Changing the Premium Adjustment Calculation Method**

23. Exchange plans set a maximum annual limit on cost-sharing, such as copays, coinsurance, and out-of-pocket maxima due from the enrollee over the plan year. Those annual limits are adjusted in reference to a measure of premium inflation called the annual premium adjustment percentage, set by the HHS Secretary each year. In addition, the IRS uses the premium adjustment percentage when determining individuals' expected contributions and thus the amount of APTC the enrollee will receive. Accordingly, even small changes in the way the premium adjustment percentage is calculated can have large effects on both out-of-pocket costs and the amount of APTC an enrollee is entitled to receive.

24. Prior to the Final Rule, CMS policy recognized that the premium adjustment methodology needed to be price-stable to reduce volatility and keep premiums from spiking. Under that prior policy, the adjustment methodology looked to a biannual measure of premium inflation that is based on the employer-sponsored insurance (ESI) market, rather than the individual market, which is much more price-volatile. It is important to highlight that a reduction in marketplace enrollment directly contributes to a rise in the uninsured rate, which in turn increases the burden of uncompensated care on the healthcare system. This uncompensated care

ultimately impacts negotiated rates in the ESI market. The ESI market is already likely to face rising costs as a result of this Final Rule, further exacerbating premium inflation under the current methodology. Regardless, including the more price-volatile individual market in the measure of inflation increases out-of-pocket costs to consumers.

25. The Final Rule changes the premium adjustment methodology to include consideration of inflation in the volatile individual market. That will directly harm consumers by significantly increasing premium contributions (including for the 160 million Americans with employer-based insurance).

26. First, this change will directly cause premiums to rise. By including consideration of inflation in the individual market, the premium adjustment percentage in 2026 will be about 4.5 percent higher than under the previous methodology. That means that the premium for a benchmark silver plan in 2026 will be about 4.5 percent higher than it was in 2025 on account of this change. That is a hefty increase, given the cost of health insurance, and the impact could be further compounded if the enhanced premium tax credits expire at the end of 2025. In 2023, for example, an average on-exchange plan in the individual market cost $590.08 per member per month (PMPM), for an annual premium of $7,080.96 per member. A 4.5 percent increase in that premium is an additional $318.64 annually. For an average annual premium of $25,572 for family coverage, a 4.5 percent increase is an extra $1,150.74 per year.

**Expanding the Actuarial Value Ranges for Health Plans**

27. Plans sold on the exchanges fall into Bronze, Silver, Gold, and Platinum tiers based on how much of an average consumer's expected medical cost will be paid by the plan. Bronze plans must cover 60 percent of the expected cost; Silver plans, 70 percent; Gold plans, 80 percent; and Platinum plans, 90 percent. Higher-tier plans, meaning richer benefits, typically have higher premiums and lower out-of-pocket costs. Lower-tier plans have the opposite: lower premiums and higher out-of-pocket costs. Issuers on the exchanges must offer plans that meet these targets within some range of accepted *de minimis* variation. These ranges are presently small—most plans must fall within +2/-2, or +2/- 0, percentage points. This narrow range

10

encourages transparency and diminishes consumer confusion in the marketplace, because a plan that claims to be Silver but undershoots its target by five percentage might only offer Bronze-level value and should be priced accordingly. Keeping the bands narrow promotes that policy goal.

28. The Final Rule significantly widens the accepted ranges for the actuarial value of health plans. For expanded bronze plans, the proposed range is +5/-4 percentage points. For all other plans, the proposed range is +2/-4 percentage points. By allowing all plans to undershoot their claimed targets by four percentage points, this proposal is certain to decrease the level of coverage provided to consumers, while charging those consumers the same price for their premiums that they would otherwise be charged (which includes annual increases). This change to actuarial value de minimis variation will reduce affordability by increasing premiums and out-of-pocket costs for consumers. It will also reduce APTC because APTC is keyed off the second lowest cost silver plan in the market, and plans with lower actuarial values will generally have lower premiums.

29. CMS claims that issuers need this flexibility to remain in the marketplace. However, California's experience demonstrates that such flexibility is unnecessary for fostering a thriving and stable market. Covered California utilizes standard plans, ensuring there is no variation in actuarial value ranges within our marketplace. With this consistency, issuer participation in our SBE has grown from 10 issuers in 2015 to 12 issuers today, with two expanding their service areas across the state. These results illustrate that a marketplace can succeed, grow, and provide stability for both consumers and issuers without relying on actuarial value range flexibility. Furthermore, we are not aware of any empirical evidence suggesting that rigid actuarial value requirements are prompting issuers to exit Covered California or threatening their participation. On the contrary, the success of our marketplace underscores how standard plans with consistent actuarial value requirements can enhance consumer confidence while encouraging sustained issuer engagement.

**Prohibiting Coverage for Treating Gender Dysphoria**

30. The ACA mandates that certain individual and small group health plans cover a set of Essential Health Benefits (EHBs) which must be equal to the scope of benefits provided under a typical employer plan and may not have any annual or lifetime dollar limit under state plans.

31. Per HHS, the items and services covered must come from the following ten benefit categories: (1) ambulatory patient services; (2) emergency services; (3) hospitalization; (4) maternity and newborn care; (5) mental health and substance use disorder services including behavioral health treatment; (6) prescription drugs; (7) rehabilitative and habilitative services and devices; (8) laboratory services; (9) preventive and wellness services and chronic disease management; and (10) pediatric services, including oral and vision care.

32. The ACA and its effectuating regulations permit latitude to the states in determining how EHBs are defined. Accordingly, states submit their "benchmark" plans to HHS for approval. EHBs are a minimum standard, and benchmark plans can choose to offer additional health benefits.

33. Each state maintains a benchmark plan on file with HHS, against which private insurers must compare plans to ensure compliance with the standards set forth therein. Further, if a state has not updated its benchmark plan to match federal requirements, private insurers must also review plans for compliance with federal EHB mandates.

34. California's EHB benchmark plan is based on the Kaiser Foundation Health Plan Small Group Health Maintenance Organization (HMO) 30 plan,[5] supplemented with pediatric oral benefits from the former Children's Health Insurance Program (CHIP) and pediatric vision benefits from the Federal Employees Dental and Vision Insurance Program (FEDVIP). California also defined habilitative services as medically necessary care to assist in acquiring or improving skills, covered under the same terms as rehabilitative services. This benchmark plan ensures compliance with the ten federally required EHB categories, including coverage for

---

[5] California Health & Safety Code § 1367.005; Insurance Code § 10112.27

medically necessary basic health care services. California has retained this benchmark plan since 2014, submitting it to the federal Centers for Medicare & Medicaid Services (CMS) as required, with no changes to its scope of benefits.

35. California's longstanding nondiscrimination laws prohibit coverage exclusions based on an enrollee's sex, including gender identity, ensuring equitable access to healthcare for transgender individuals.[6] These protections apply to all state-regulated employer-sponsored coverage and are embedded in California's EHB benchmark plan, which aligns with the ACA's requirement to reflect the scope of benefits provided under a typical employer plan.[7]

36. "Gender-affirming care" services fall within many categories of EHBs, such as surgeries, prescription medications, and mental health treatment. QHP issuers, like all plans in California, must make these services available to all enrollees when medically necessary, in a nondiscriminatory manner.

37. Requiring states to exclude these otherwise-covered services from EHB definitions would raise the defrayal cost borne by California. This is because premium amounts that would otherwise be attributed to EHB services and covered by carriers in response to the state coverage mandate would be put back on states. At estimated 2026 enrollment levels, assuming that enhanced premium tax credits are not extended, Covered California estimates it will cost roughly $15 million to defray the cost of gender-affirming care for enrollees in the individual market, plus more for those enrolled in small group coverage.

38. With respect to providing essential health benefits for gender-affirming care, the Final Rule will force Covered California to examine carrier submissions to ensure the appropriate amounts have been excluded from federal cost-sharing. Covered California estimates it will cost $200,000 for related information technology changes. Covered California will need to implement technical assistance on the back end to ensure this is done consistently across the market in California.  This will take up valuable time and resources. In addition, insurance carriers in

---

[6] Cal. Health & Safety Code § 1365.5; Cal. Ins. Code § 10140
[7] 42 U.S.C. § 18022(b); 45 C.F.R. § 156.100

13

California do not all maintain their data in the same way. This means that conducting targeted assessments will be necessary to ensure that gender-affirming care services, which can take many different forms, have been excluded from coverage as EHBs. These targeted assessments would require additional time on part of marketplaces.

/s/ Jessica Altman

Jessica Altman

Paper document bears an original signature.

Date: July 16, 2025