# EXHIBIT 5

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF CALIFORNIA, et al.<br><br>*Plaintiffs*,<br><br>v.<br><br>ROBERT F. KENNEDY, JR., et al.,<br><br>*Defendants.* | Civil Action No.: 25-12019 |

## DECLARATION OF JAMES MICHEL

I, James Michel, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct:

1. I am the Chief Executive Officer (CEO) at the Connecticut Health Insurance Exchange dba Access Health CT (AHCT) located in Connecticut. I have a Masters of Business Administration (MBA) in Management, Finance and Accounting and a background in management, finance and audit. I have been employed as the CEO since 2018 and have worked at Access Health CT in various roles in Operations and Finance since 2013.

2. Access Health CT (AHCT), Connecticut's official health insurance marketplace established in 2011, supports health reform efforts at the state and national levels. AHCT provides Connecticut residents with resources for better health, and an enhanced and more coordinated healthcare experience, which results in healthier people, healthier communities and a healthier Connecticut. AHCT's mission is to decrease the number of uninsured residents, improve the quality of healthcare, and reduce health disparities through an innovative, competitive marketplace that empowers consumers to choose the health coverage that gives them the best value. Connecticut residents and small business owners can compare and enroll in healthcare coverage and apply for

tax credits for individuals through AHCT. AHCT also partners with the Dept. of Social Services for eligibility and enrollment for state Medicaid Insurance and Children's Health Insurance Programs.

3. I am familiar with the information in the statements set forth below through personal knowledge and from documents and information that have been provided to and reviewed by me.

***Introduction***

4. When AHCT first began enrolling consumers in health insurance coverage in 2013, our state's uninsured rate was 9.2%. As of 2025, our state's uninsured rate has dropped to 5.2%.

5. Through AHCT, Connecticut has established a competitive market and a robust risk pool, which currently includes 3 health insurance plan issuers and 2 dental plan issuers.

6. AHCT is funded through a market assessment.

7. The flexibility that the U.S. Department of Health and Human Services (HHS) and the Centers from Medicare and Medicaid Services (CMS) have afforded SBEs in operating our unique marketplaces has allowed AHCT and the State of Connecticut to implement innovative policies which make it easier for consumers to enroll in more generous plans at low or no cost. In 2021, the State of Connecticut created the Covered CT program enabling low-income adults who are above the income threshold for Medicaid to enroll in a qualified health plan (QHP) through AHCT with no consumer cost for premiums or cost-sharing. Eligible Connecticut residents with income above the income threshold for Medicaid and up to 175% of the federal poverty limit (FPL) enroll in a Silver-level QHP utilizing the full premium tax credit they are eligible to receive and in the appropriate level cost-sharing reduction (CSR) plan, and the State of Connecticut pays the consumer portion of premium and cost-sharing amounts. The State of Connecticut was granted a Section 1115 waiver for the 5-year demonstration period for the program. There are currently over 48,000 consumers enrolled in the program.

8. Our special enrollment period (SEP) strategies have also been uniquely designed to meet Connecticut's needs, ensuring continuous coverage and minimizing enrollment barriers.

### *Lack of enrollment fraud*

9.   AHCT has had very few instances of fraudulent enrollment. A review of consumer complaints and enrollment partner activity in recent years revealed that improper enrollments are exceedingly rare, thanks to the tailored oversight measures we have implemented, such as using the remote identity proofing (RIDP) service available through the Federal Data Services Hub (FDSH); requiring a two-way process for brokers to connect with consumers in the AHCT enrollment system ensuring that the consumer approves the connection before a broker may take any actions on behalf of the consumer; having a Compliance and Disciplinary Policy for Certified Independent Brokers in place since 2015 to govern broker/agents actions within the AHCT system and with AHCT consumers; and, conducting pre-enrollment verification for most applications for Special Enrollment eligibility including proof of permanent move to Connecticut.

10. For the few instances reported, AHCT has taken swift and decisive corrective actions, including investigations, monitoring, warnings, suspensions, and, if necessary, decertifying agents/brokers pursuant to AHCT Compliance and Disciplinary Policy for Certified Independent Brokers.

11. Connecticut's integrated eligibility and enrollment system verifies applicants for both Medicaid, the Children's Health Insurance Program (CHIP) and marketplace coverage, further limiting any potential for fraudulent enrollments.

12. Our data does not show any significant amount of fraud stemming from this low-income SEP. Because of AHCT's tailored program integrity measures, including oversight of enrollment partners and enforcement mechanisms, reports of any improper enrollments within AHCT remain very low.

### *Lost enrollment revenue*

13. We estimate that the Final Rule and other federal policy changes will cause total enrollment in AHCT to decrease by 30-35% by 2034, which is between 46,000 and 54,000 consumers based on AHCT's current enrollment of over 155,000.

14. One direct consequence of this anticipated decrease in enrollment is a loss of assessment revenues. To fund operations, AHCT collects a market assessment currently set at 1.85% percent of the total monthly premiums collected by an issuer for fully insured individual and small group medical and dental plan sold in Connecticut. C.G.S. § 38a-1083(7) authorizes AHCT to "charge assessments or user fees to health carriers that are capable of offering a qualified to health plan through the exchange . . ." and §38a-1083(a) directs AHCT to interpret its powers broadly effectuate its purposes.  In 2013, the Board of Directors adopted its Policy: Acquiring Operating Funding authorizing AHCT to determine the amount of the assessment rate as part of the annual budget approval process.

15. If our estimates are accurate, then decreased enrollment due to the Final Rule and other federal policy changes will result in decreases of approximately $4M in assessment revenue per year as enrollment begins to decrease, as premiums will no longer be paid by individuals and small employers who are no longer enrolled in plans in Connecticut.

16. Examples of currently enrolled individuals who we anticipate will enroll in significantly lower numbers under the Final Rule include all consumers receiving financial assistance as there will be more administrative burdens placed on consumers to receive assistance, and the amount of assistance will be smaller, as well as younger consumers who historically enroll in the January during the current Open Enrollment period term, and also low-income consumers generally due to provisions in the Final Rule impacting premium payment thresholds and allowing issuers to require payment of past-due premiums from any prior year before effectuation in a new coverage year.

### *Compliance costs, including as to Gender Affirming Care*

17. We estimate that the numerous changes in the Final Rule will require us to spend at least $300,000 and over 1,000 hours of staff time updating our information technology (IT) systems. Additionally, the rule will require a substantial amount of staff time to implement its requirements and impose significant operational challenges on AHCT.

4

18. If the comment period for the Proposed Rule had been longer than 23 days, AHCT could have provided CMS with a robust analysis of the fiscal and administrative impact of the Final Rule's changes before they were finalized.

19. Some of the technical changes to our IT systems may be challenging to be completed in time for the 2026 plan year. Specifically, the new income verification requirements—such as requiring documentation when tax data shows income under 100 percent of the FPL and requiring documentation when no tax data is available through the federal data services hub—are impossible to implement without changes our existing system infrastructure.

20. Further, if we are required to implement these changes for 2026 plan year, we will be forced to remove or delay other items currently in scope and budget for our Open Enrollment IT system release that is already scheduled, scoped and budgeted.

21. Implementing these rules would necessitate new system programming and additional manual processes, which would compromise the efficiency of our automated systems. This, in turn, would lead to higher operational costs, greater challenges for consumers, and added strain on critical resources. Specifically, it would impact the accuracy and timeliness of consumer notices, increase the volume and complexity of mailings, require expanded enrollee outreach efforts to address potential confusion, and place additional demands on service center operations, including longer wait times and increased staffing needs to handle inquiries and support requests.

22. Moreover, AHCT on average experiences a high amount of traffic during the OEP. As a result, AHCT requires internal teams and external partners to minimize technical changes during this period of time to prevent any unintended disruptions to consumers' ability to enroll by the deadline.

23. Prior to the Final Rule, exchanges accepted the self-attestation of an enrollee who claimed eligibility by projecting annual household income at or above 100% of the FPL in some cases. The Final Rule changes this policy in two ways. First, anytime IRS data shows that a consumer has income below 100% of the FPL, a "data matching issue" (DMI) will be generated. Second, in the absence of IRS data, a DMI will be generated. Whenever a DMI is generated,

consumers will be required to track down and submit the necessary paperwork in order to purchase health insurance. DMIs also create administrative burdens on SBEs, which are required to receive, process, and determine whether the newly submitted paperwork adequately addresses the issue. These changes impose a heavy burden on SBEs. It is estimated that the volume of DMI for annual income will increase significantly and AHCT will need to spend greatly increased hours to generate and mail numerous DMI notices to consumers, and to receive, process, and review documents generated by these new DMIs, greatly increasing AHCT's operational costs. Updating our eligibility systems and performing technical updates relating to this change will cost approximately over $200,000.

### *Increased healthcare costs to states*

24. The Final Rule acknowledges that the changes it makes will result in a decrease in enrollment in the ACA marketplace exchanges of up to 1.8 million people nationwide.

25. A direct consequence of this decreased enrollment under the Final Rule is a higher rate of uninsured residents in Connecticut, and a corresponding higher amount of costs incurred by Connecticut both in funding programs that pay for certain types of care offered to uninsured residents and costs for providing care that is uncompensated by such programs.

26. In addition, in Connecticut all hospitals are required to treat patients presenting in their emergency departments with acute emergency conditions, regardless of the patient's ability to pay. See Conn. Agency Regs., § 19-13-D3 (j).

### *Public Health Impacts*

27. The Final Rule is detrimental to Connecticut's public health. With increased access to affordable health insurance via AHCT, individuals are more likely to seek preventive care, have better health outcomes and avoid costly emergency room visits. Without access to affordable health insurance, individuals are more likely delay or fail to seek preventive care, resulting in more serious

6

health outcomes and disease, and incurring costly emergency room visits, and requiring the State of Connecticut to cover costs for uninsured individuals.

28. Increased access to health insurance also improves public health. Uninsured individuals who lack access to affordable, adequate health insurance are less likely to seek preventive care or attend routine health screenings, and may delay necessary medical care due to prohibitive costs.

29. In 2021, AHCT conducted a study of the negative consequences to public health resulting from a lack of access to health insurance along with the disparities that exist in health status and healthcare delivered to lower income people.  These factors lead to increased burdens from disease and risk of premature death.  Reducing the uninsured rate along with reducing the health disparities that exist is key to improving public health.  One of the outcomes of the Study was the creation of the Broker Academy program, designed to increase the number of licensed brokers in targeted communities around the state.

30. Lack of insurance and resulting negative health outcomes also result in downstream consequences, including, absenteeism in the workplace and increased reliance on unemployment insurance, which relies on State funding.

31. Decreased access to adequate and affordable health care could mean infectious diseases spread more widely and rapidly with those affected not seeking care due to being uninsured or underinsured.

### *Gender-Affirming Care EHBs*

32. The ACA mandates that certain individual and small group health plans cover a set of Essential Health Benefits (EHBs) which must be equal to the scope of benefits provided under a typical employer plan and may not have any annual or lifetime dollar limit under state plans.

33. Per HHS, the items and services covered must come from the following ten benefit categories: (1) ambulatory patient services; (2) emergency services; (3) hospitalization; (4) maternity and newborn care; (5) mental health and substance use disorder services including

behavioral health treatment; (6) prescription drugs; (7) rehabilitative and habilitative services and devices; (8) laboratory services; (9) preventive and wellness services and chronic disease management; and (10) pediatric services, including oral and vision care.

34. The ACA and its effectuating regulations permit latitude to the states in determining how EHBs are defined. Accordingly, states submit their "benchmark" plans to HHS for approval. EHBs are a minimum standard, and benchmark plans can choose to offer additional health benefits, like vision, dental, and medical management programs (e.g., weight loss).

35. Each state maintains a benchmark plan on file with HHS, against which private insurers must compare plans to ensure compliance with the standards set forth therein. Further, if a state has not updated its benchmark plan to match federal requirements, private insurers must also review plans for compliance with federal EHB mandates.

36. Connecticut's current benchmark plan is available at: https://www.cms.gov/files/document/ct-bmp-summary-py2025-2027.pdf.

37. Connecticut's statutes requiring mental health parity compliance, C.G.S. § 38a-488a and 38a-514, include parity and coverage for services for the diagnosis and treatment of "mental or nervous conditions" which are defined as those mental disorders in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM-5-TR). Gender dysphoria is a diagnosis listed in the DSM-5-TR. Connecticut Public Act 11-55 specifically prohibits discrimination on the basis of gender identity or expression with regard to health insurance practices as well as in other areas. Connecticut Insurance Dept. Bulletin IC-34 confirms gender identity nondiscrimination requirements for health insurance coverage. Further, Connecticut S.B. 1380, 2025 prohibits discrimination on the basis of gender identity in the provision of healthcare.

38. QHPs offered through AHCT offer coverage for gender affirming care. Premium for these services will be required to be separated as non-EHB portion of premium by issuers.

39. Although "gender affirming care" is not its own category of EHB, different types of services for gender affirming care are covered through the ten EHB categories: hospitalization; mental health and substance use disorder services including behavioral health treatment;

prescription drugs; rehabilitative and habilitative services and devices; laboratory services; preventive and wellness services and chronic disease management; and pediatric services.

40. Even in states like Connecticut, where gender-affirming care is not listed as its own category of EHB in the state's benchmark plan, many services that fall within "gender-affirming care", such as surgeries, hospitalizations, prescription medications, and mental health treatment, are treated as EHBs by state marketplaces.

41. Even in states that do not have a mandate for insurers to cover gender-affirming care, the Rule will reduce the amount of premium eligible for APTCs, which will increase premiums for consumers.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 15th day of July, 2025, in Hartford, Connecticut.

_____

James Michel
Chief Executive Officer
Access Health CT