# EXHIBIT 6

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF CALIFORNIA, et al., <br><br> *Plaintiffs,* <br><br> v. <br><br> ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services, et al., <br><br> *Defendants.* | Civil Action No.:   25-12019 |

## DECLARATION OF STEVEN M. COSTANTINO

I, Steven M. Costantino, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct:

1.  I am the Director of Health Care Reform and Associate Deputy Secretary at the Delaware Department of Health and Social Services (DHSS). I oversee the Delaware Medicaid program, Public Health, Health Care Quality, and all payment reform models across DHSS. I have been employed in this position since May 2017. I have previously served as Commissioner of the Department of Vermont Health Access and Medicaid Director, and as Secretary of the Executive Office of Health and Human Services in Rhode Island. I have a Master's degree in Health Care Delivery Science from Dartmouth College and a BA in Psychology from Providence College.

2.  The DHSS mission is to improve the quality of life for Delaware's citizens by promoting health and well-being, fostering self-sufficiency, and protecting vulnerable populations. DHSS is a consolidated agency comprised of multiple divisions that provide services and funding to support low-income families and vulnerable populations. DHSS is responsible for administering a wide range of health and social service programs, including Medicaid, Delaware Healthy Children's Program (CHIP), Supplemental Nutrition Assistance Program (SNAP), Temporary Assistance for

Needy Families (TANF), and other state programs designed to assist individuals, including children, with access to healthcare, food benefits and cash assistance. These programs are crucial to ensure wellness and quality of life at all levels. DHSS also runs the Delaware Psychiatric Hospital and the Delaware Hospital for the Chronically Ill.

3. Delaware does not operate its own health insurance exchange. Rather, consumers in Delaware enroll in health coverage using healthcare.gov, which is operated and maintained by the U.S. Department of Health and Human Services.

4. I am familiar with the information in the statements set forth below through personal knowledge and from documents and information that have been provided to and reviewed by me.

5. I submit this Declaration in support of the States' Motion for a Preliminary Injunction.

6. The Final Rule is detrimental to Delaware's public health and is likely to lead to increased costs to the Delaware state budget.

7. By limiting access to affordable health insurance through the Health Insurance Marketplace, the rule is expected to result in a higher number of uninsured individuals in Delaware.

8. Increased access to affordable health insurance has been a critical mechanism in improving health outcomes for individuals and communities. Access to affordable health care coverage is essential to reducing disparities, promoting early intervention, and improving the overall health status of the population.

9. Insurance coverage facilitates access to preventive services such as immunizations, cancer screenings, chronic disease management, and behavioral health care, services that reduce the burden of illness and prevent complications that often lead to costly emergency department visits and hospitalizations. Individuals who are uninsured or underinsured are significantly less likely to access preventive services or participate in routine health screenings, such as mammograms, blood pressure checks, and vaccinations. These delays can lead to more advanced disease, poorer health outcomes, and higher treatment costs when care is eventually sought.

10. Lack of preventative care often leads to a greater reliance on state-funded programs, such as Medicaid and other safety net services, resulting in increased public expenditures. In addition,

the rule may place further strain on state-run hospitals and long-term care facilities, which may face increased demand from individuals with complex health needs who lack regular access to primary or preventive care.

11. DHSS expects that decreased enrollment in ACA marketplace plans, as a result of the Final Rule, will lead to increased costs to the state in the form of emergency room visits, preventable hospitalizations, and other healthcare expenditures associated with treating uninsured residents. These costs include both direct medical care and broader public health expenses related to managing outbreaks, emergency care surges, and follow-up interventions. The financial impact on state-supported health infrastructure is expected to be substantial and unsustainable over time.

12. DHSS's Public Health Division provides limited coverage, typically restricted to emergency services, and does not cover essential preventive, diagnostic, or specialty care services. These programs often have narrow eligibility criteria and limited provider participation. As a result, uninsured individuals who do not qualify for Medicaid and cannot afford private insurance or out-of-pocket payments are left without a viable option for receiving necessary care. This gap disproportionately affects vulnerable populations and increases reliance on emergency services, which are not designed to manage long-term or preventive health needs.

13. The lack of health insurance and the resulting negative health outcomes that would result if the Final Rule were to go into effect would extend beyond individual health and place broader social and economic pressures on the state. Without consistent access to preventive care, immunizations, and routine screenings, uninsured individuals face a significantly higher risk of untreated chronic conditions, delayed diagnoses, and preventable illnesses. This includes the undetected or unmanaged spread of communicable diseases such as sexually transmitted infections (STIs) and tuberculosis (TB), which pose serious public health threats if not identified and treated early. The consequences of these gaps in care not only compromise long-term health outcomes for individuals but also contribute to avoidable emergency room visits, increased disease transmission, and higher healthcare costs borne by public systems in Delaware.

14. Lack of insurance and resulting negative health outcomes also result in downstream consequences, including, absenteeism in the workplace and increased reliance on unemployment insurance, which relies on state funding.

15. Decreased access to adequate and affordable healthcare coverage also heightens the risk of public health emergencies. Uninsured individuals may avoid seeking care for infectious diseases such as influenza, COVID-19, tuberculosis, or sexually transmitted infections due to cost barriers. This delay or avoidance can lead to undetected transmission, larger outbreaks, and increased burden on public health response systems. Ensuring coverage helps enable timely detection, treatment, and containment of communicable diseases, which protects not only individuals but the community at large.

16. As explained above, should the Final Rule go into effect, Delaware and its residents will experience irreparable harm.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 15th day of July, 2025, in New Castle, Delaware.

Steven M. Costantino
Director of Health Care Reform and
Associate Deputy Secretary
Delaware Department of Health and Social Services

4