# EXHIBIT 8

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF CALIFORNIA, et al.<br><br>*Plaintiffs*,<br><br>v.<br><br>ROBERT F. KENNEDY, JR., et al.,<br><br>*Defendants.* | Civil Action No.: 25-12019 |

### DECLARATION OF JENNIFER EPSTEIN

I, Jennifer Epstein, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct:

1. I am the Deputy Director of the Office of Policy, Planning, and Statistics (OPPS) at the Illinois Department of Public Health (IDPH). I have a Master of Science in Urban and Regional Planning from the University of Wisconsin-Madison, with a concentration in community development, and a Bachelor of Arts from Macalester College in St. Paul, MN. I have been employed as the Deputy Director for OPPS since October 2022. I have over 15 years of experience in public health and a professional background that includes roles in both the nonprofit and public sectors in international and domestic settings.

2. IDPH is an advocate for and partner with the people of Illinois to re-envision health policy and promote health equity, prevent and protect against disease and injury, and prepare for health emergencies. IDPH plays a vital role in supporting hospitals and advancing healthcare access. OPPS's mission is to collect, analyze, and evaluate information on health status, needs, and disease occurrence in Illinois; conduct epidemiologic studies; support health assessments and

planning; and identify future needs for health care facilities, services, and personnel. OPPS preserves the state's records on births, deaths, marriages, civil unions, and dissolutions.

3. I am familiar with the information in the statements set forth below through personal knowledge and from documents and information that have been provided to and reviewed by me, in my professional capacity.

4. I submit this Declaration in support of the States' Motion for a Preliminary Injunction.

5. Prior to the passage of the Affordable Care Act (ACA), 17% of Illinois residents under age 65 had no health insurance. Following the passage of the ACA, that rate dropped by more than half and is now 8%.

6. The 2025 Marketplace Integrity and Affordability Final Rule (Final Rule), issued by CMS on June 25, 2025, acknowledges that the changes it makes will decrease enrollment in the ACA marketplace exchanges by about 1.8 million people nationwide. Final Rule, Table 16. I understand that the Illinois Department of Insurance estimates this will mean about 14,000 Illinoisians lose their ACA exchange-based insurance. (Winters Declaration dated 7-11-25 at ¶ 9).

7. A direct consequence of this decreased enrollment under the Final Rule is a higher rate of uninsured in Illinois, and a corresponding higher amount of costs incurred by Illinois and its hospitals.

8. In Illinois, all hospitals are required to treat patients who present to their emergency departments, regardless of any patient's ability to pay. 210 ILCS 70/1; 210 ILCS 80/1; 42 U.S.C. § 1395dd.

9. Many hospitals operate as "community hospitals," also known as "safety net" hospitals. A safety net hospital or health system provides a significant level of care to low-income, uninsured, and vulnerable populations. Safety net hospitals are not necessarily distinguished from other hospitals by ownership. Some are publicly owned and operated by local or state governments, and others are non-profit entities.

10. In Illinois, a hospital is designated a "safety net hospital" if it meets specific criteria. That includes being licensed by IDPH as a general acute care or pediatric hospital; qualifying as a Medicaid "Disproportionate Share" hospital per federal law (Section 1923 of the federal Social Security Act, 42 U.S.C. §1396-r4) and either having a Medicaid inpatient utilization rate (MIUR),[1] of at least 40%, and a charity percent[2] of at least 4%; or having a MIUR of at least 50%. 305 ILCS 5/5-5e.1. Some hospitals also are grandfathered into this status, based on their historic MIUR and charity rates. *Id.*; 305 ILCS 5/5-5e.1(c) and (c-5). In Illinois, approximately 34 hospitals meet the statutory definition of safety net hospital.

11. In addition, Illinois also has approximately 58 critical access hospitals. A "critical access hospital" is a Medicare-certified rural hospital, at least 35 miles drive away from any other hospital, offering 24-hour, 7-day-a-week emergency care. Critical access hospitals have no more than 25 inpatient beds and maintain an annual average length of stay of no more than 96 hours for acute inpatient care.

12. Many Illinois hospitals, especially those in rural communities and traditionally underserved areas of metropolitan areas, are already at or near a financial breaking point. Most

---

[1] MIUR is the percentage of a hospital's inpatient stay days used by Medicaid-eligible patients. 305 ILCS 5/5-5e.1(b)(2).
[2] Charity percent means the percentage of hospital charges that are for services provided to patients without health insurance or another source of coverage. 305 ILCS 5/5-5e.1(b)(1).

3

facilities that care for the uninsured or underinsured are operating at very low profit margins, with no financial buffer to absorb an increase in uninsured patients. Far above the 4% charity percent qualifier for a safety net hospital (depending on the qualification method), 40% of inpatients at Illinois hospitals are categorized and served as charity care patients, meaning patients without insurance or ability to pay.

13. The Final Rule, in increasing the population of uninsured Illinois residents, would reduce the revenue and thus operation of its hospitals, particularly its safety net and critical access hospitals. Increasing the number of uninsured Illinois residents likely would cause many of the safety net and critical access hospitals with lower profit margins to severely reduce the level of services they currently provide or cause such facilities to close altogether. The closure or severe reduction of services by safety net and critical access hospitals will ultimately affect other hospitals, as they will have no choice but to absorb uninsured patients.

14. A reduction of access to health services through safety net hospitals, particularly preventative and screening services, will result in an increase in poor health outcomes for vulnerable populations with historically poor track records. This in turn increases costs when those same people, now much sicker than they were initially, finally seek care. Decreased access to adequate and affordable health care also contributes to infectious diseases spreading more widely and rapidly, where those affected do not seek care due to being uninsured or underinsured.

15. If there is an increase in the uninsured population, Illinois patients utilizing safety net hospitals will face even longer delays receiving healthcare than they already do. Illinois patients may need to travel farther to receive services, which will again impact health outcomes, as many individuals will forgo preventative care where distance or a lack of transportation create barriers.

16. The potential loss of safety net hospitals would create financial instability far beyond the healthcare services lost by the individual closure of a safety net hospital. Hospitals are important to the economy as major employers, particularly in rural areas. The inevitable reduction in services would lead to an adverse impact on the workforce of the facility and the surrounding areas. The loss of employment would likely result in even more individuals becoming uninsured yet still needing healthcare, further impacting the local economy. Lack of insurance and resulting negative health outcomes also result in other downstream consequences, including absenteeism in the workplace and increased reliance on unemployment insurance, which relies on State funding.

17. Illinois residents recognize the adverse effects of reducing access to affordable healthcare on the broader community. For example, in connection with a now-pending application for a safety net hospital in Ottawa, Illinois to close its obstetric and intensive care operations and redirect patients to another location about a 30-minute drive away, local businesses and regional chambers of commerce are organizing against this outcome. Ahead of a state board vote, those community members have come together in significant numbers to emphasize the importance of access to comprehensive healthcare services in maintaining a community's economic vitality.

18. If safety net and critical access hospitals are forced to close or are unable to provide services to a larger uninsured population, the state will be very limited in its ability to fill in the gaps. Even if the state legislature were to enact new laws to address these gaps, a considerable amount of time and resources would be needed to implement a functioning system. In the meantime, residents of the affected areas would still face all the above issues.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this  15   day of July, 2025, in Chicago, Illinois.

                                                */s/ Jennifer Epstein*
JENNIFER EPSTEIN
Deputy Director
Office of Policy, Planning and Statistics
Illinois Department of Public Health
Paper document bears an original signature