# EXHIBIT 11

UNITED STATES DISTRICT COURT<br>FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF CALIFORNIA, et al.<br><br>*Plaintiffs*,<br><br>v.<br><br>ROBERT F. KENNEDY, JR., et al.,<br><br>*Defendants.* | Civil Action No.: 25-12019 |

## DECLARATION OF MARISSA WOLTMANN

I, Marissa Woltmann, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct:

1. I am the Chief of Policy at the Massachusetts Health Connector located in Massachusetts. I hold a Master's degree in Public Policy from the Heller School for Social Policy and Management at Brandeis University. I have been employed as the Chief of Policy and Plan Management since April 2023. Prior to that, I held multiple roles on the Health Connector's Policy team from 2013 to 2023 and on its Legal team from 2008 to 2013.

2. The Health Connector is the ACA marketplace for Massachusetts, providing insurance coverage to 375,000 state residents through individual market coverage. These individuals receive high-quality coverage through Qualified Health Plans (QHPs) certified by the Health Connector. The Health Connector is responsible for the design and implementation of a state subsidy program called ConnectorCare that supplements federal subsidies under the Affordable Care Act with state-funded premium and cost sharing subsidies.

3. I am familiar with the information in the statements set forth below through personal knowledge and from documents and information that have been provided to and reviewed by me.

4. I submit this Declaration in support of the States' Motion for a Preliminary Injunction.

1. When the Health Connector was established in 2006, our state's uninsured rate was approximately 10%. As of 2023, our state's uninsured rate has dropped to 2.6%.

2. Our SBE has established a competitive market, a stable risk pool, and currently includes 8 health insurance plan issuers and 2 dental plan issuers.

3. The Health Connector is funded through user fees assessed on plans sold through the Health Connector as well as through the Commonwealth Care Trust Fund, a state fund designated to support the Health Connector's work.

4. The flexibility that the U.S. Department of Health and Human Services (HHS) and the Centers from Medicare and Medicaid Services (CMS) have historically afforded SBEs in operating our unique marketplaces has allowed us to implement innovative policies which make it easier for consumers to enroll in more generous plans at low or no cost. Beginning in 2014, the Health Connector's ConnectorCare program carried forward the Commonwealth's commitment to universal coverage and served as the successor program of the Commonwealth Care program created by state health reform in 2006, which formed the model for the Affordable Care Act. ConnectorCare has provided access to more affordable premiums and cost sharing for low- and moderate-income Massachusetts residents by supplementing federal subsidies under the Affordable Care Act with state dollars. ConnectorCare historically served individuals eligible for federal subsidies with income up to 300 percent of the federal poverty level (FPL).

5. Our special enrollment period (SEP) strategies have also been uniquely designed to meet Massachusetts's needs, ensuring continuous coverage and minimizing enrollment barriers for eligible individuals.

6. The Health Connector engages in robust program integrity activities to prevent improper enrollment and to ensure people meet eligibility requirements for the coverage in which they enroll. The Health Connector does not experience those challenges that CMS describes as occurring within the FFE. The Health Connector prioritizes program integrity to ensure that member data is secure and that health insurance eligibility and associated premium tax credits are awarded correctly. In particular, the Health Connector does not use brokers or web-brokers for individual coverage or allow enhanced direct enrollment websites to enroll residents; such brokers are the primary source of fraudulent enrollment within the FFE. Certified Assisters and Health Connector call center agents undergo robust and continuous training to assist individuals and only act with explicit individual consent.

7. To date, out of the more than 1,266,000 people who have enrolled in Health Connector coverage since 2014, the Health Connector has received zero complaints about fraudulent or unauthorized activity by Assisters, or that members were unaware of their coverage and suspected fraudulent enrollment.

8. We estimate that the numerous changes in the Final Rule will require us to spend more than $150,000 and 1,500 hours of staff and vendor time updating our information technology (IT) systems. Additionally, the rule will require a substantial amount of staff time to implement its requirements and impose operational challenges on our SBE.

9. Some of the technical changes to our IT systems will be difficult to complete in time for the 2026 plan year. Specifically, the new income verification requirements—such as requiring documentation when tax data shows income under 100 percent of the FPL and requiring documentation when no tax data is available through the federal data services hub—are challenging to implement within our existing system infrastructure and complete testing in advance of Open Enrollment and pre-Open Enrollment activities to ensure system integrity.

10. Implementing these rules would necessitate new system programming and additional manual processes. This, in turn, would lead to higher operational costs, greater challenges for consumers, and added strain on critical resources. Specifically, it would increase the volume and complexity of mailings, require expanded enrollee outreach efforts to address potential confusion, and place additional demands on service center operations, including potentially longer wait times and increased staffing needs to handle inquiries and support requests.

11. Other costs that have been and would be required of the Health Connector to comply with the Final Rule include, but are not limited to, the following.

12. Prior to the Final Rule, Exchanges accepted the self-attestation of an enrollee who claimed eligibility by projecting annual household income at or above 100% of the FPL. The Final Rule changes this policy in two ways. First, anytime IRS data shows that a consumer has income below 100% of the FPL, a "data matching issue" (DMI) will be generated. Second, in the absence of IRS data, a DMI will be generated. Whenever a DMI is generated, consumers will be required to track

down and submit the necessary paperwork in order to purchase health insurance. DMIs also create administrative burdens on SBEs, which are required to receive, process, and determine whether the newly submitted paperwork adequately addresses the issue. Impacts to the Health Connector are still being assessed.

13. With respect to providing essential health benefits for gender-affirming care, the Final Rule will force the Health Connector to examine carrier submissions to ensure the appropriate amounts have been excluded from data outlining the portion of premiums allocable to Essential Health Benefits. The Health Connector will need to provide technical assistance in conjunction with the Division of Insurance to ensure this is done consistently across the market in Massachusetts and verify carriers have submitted materials consistent with such guidance. This will take up valuable time and resources.

14. The ACA mandates that certain individual and small group health plans cover a set of Essential Health Benefits (EHBs) which must be equal to the scope of benefits provided under a typical employer plan and may not have any annual or lifetime dollar limit under state plans.

15. Per HHS, the items and services covered must come from the following ten benefit categories: (1) ambulatory patient services; (2) emergency services; (3) hospitalization; (4) maternity and newborn care; (5) mental health and substance use disorder services including behavioral health treatment; (6) prescription drugs; (7) rehabilitative and habilitative services and devices; (8) laboratory services; (9) preventive and wellness services and chronic disease management; and (10) pediatric services, including oral and vision care.

16. The ACA and its effectuating regulations permit latitude to the states in determining how EHBs are defined. Accordingly, states submit their "benchmark" plans to HHS for approval. EHBs are a minimum standard, and benchmark plans can choose to offer additional health benefits, like vision, dental, and medical management programs (e.g., weight loss).

17. Each state maintains a benchmark plan on file with HHS, against which private insurers must compare plans to ensure compliance with the standards set forth therein. Further, if a state

has not updated its benchmark plan to match federal requirements, private insurers must also review plans for compliance with federal EHB mandates.

18. Pursuant to Section 1302 of the Affordable Care Act and federal rule 45 CFR 156.100, the Commonwealth of Massachusetts has selected the base-benchmark plan for coverage year 2017 and years thereafter. The EHB Benchmark Plan defines the EHBs to be included in all small group and individual plans (merged market plans) offered in the state, both within and outside of the Health Connector. For the 2017 plan year and years thereafter, Massachusetts has selected the HMO Blue New England $2000 Deductible Plan ("HMO Blue New England") offered by Blue Cross Blue Shield of Massachusetts HMO Blue, Inc. as its base-benchmark Plan.

19. State laws in Massachusetts prohibit discrimination in healthcare coverage. The Commonwealth of Massachusetts considers gender-affirming care a legally protected health activity and shields those in the Commonwealth who access, provide, and/or assist with the provision of such care from civil or criminal penalties by out-of-state jurisdictions that criminalize it.[1] Massachusetts covers gender-affirming care through MassHealth, the Commonwealth's Medicaid program, and prohibits state-regulated health insurance plans from refusing enrollment, unenrolling, or withholding coverage from individuals based on their gender identity or gender dysphoria.[2] Additionally, Massachusetts prohibits differential treatment by providers when caring for transgender residents.[3]

20. The fully-insured healthcare plans offered in Massachusetts all cover gender-affirming care. Because of that, marketplace plans offered in Massachusetts also cover gender-affirming care.

---

[1] Mass. Gen. Laws c. 12, § 11 I ½(b), (c), & (d); Mass. Gen. Laws ch. 147, § 63; Mass. Gen. Laws ch. 276, § 13.

[2] Mass. Gen. Laws c. 272, §§ 92A, 98; ; Mass. Division of Insurance Bulletins 2021-11 and 2014-03, available online at https://www.mass.gov/lists/doi-bulletins; R.I. Health Insur. Bull. 2015-03, available online at https://ohic.ri.gov/sites/g/files/xkgbur736/files/bulletins/Bulletin-2015-3-Guidance-Regarding-Prohibited-Discrimination.pdf.

[3] Mass. Gen. Laws c. 272, §§ 92A, 98; Massachusetts Board of Registration in Medicine Policy 16-01: Policy on Gender Identity and the Physician Profile Program, available online at https://www.mass.gov/lists/physician-regulations-policies-and-guidelines; 130 CMR 450.202(B); MA Board of Registration in Nursing: 244 Code Mass. Reg. § 9.03(13).

5

21. Even in states like Massachusetts, where gender-affirming care is not listed as its own category of EHB in the state's benchmark plan, many services that fall within "gender-affirming care", such as surgeries, prescription medications, and mental health treatment, are treated as EHBs by state marketplaces.

22. ConnectorCare provides state subsidies to support the portion of premium and out of pocket costs left after federal subsidies are applied. Because gender-affirming care will no longer qualify for Advance Premium Tax Credits, more premium may be paid for by the state.

[Signature Page]

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 15th day of July, 2025, in Boston, Massachusetts.

*Marissa Woltmann*

Marissa Woltmann
Chief of Policy
Massachusetts Health Connector