# EXHIBIT 12

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF CALIFORNIA, et al.<br><br>*Plaintiffs*,<br><br>v.<br><br>ROBERT F. KENNEDY, JR., et al.,<br><br>*Defendants*. | Civil Action No.:  25-12019 |

## DECLARATION OF MICHELE EBERLE

I, Michele Eberle, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct:

1. I am the Executive Director at Maryland Health Benefit Exchange (MHBE), (the Exchange) located in Baltimore, Maryland. I hold a Bachelor of Science (B.S.) in Management and Computer Science and Religious Studies from Nazareth University as well as a Master of Business Administration (MBA) from Southern New Hampshire University. I have been employed as Executive Director since December 2017. Prior to serving as Executive Director of the Exchange, I was Chief Operating Officer of the Exchange from 2015 through 2017; as Executive Director of the Maryland Health Insurance Plan (MHIP) from 2013 through 2015 I served concurrently as the Acting Director for Plan and Partner Management for the Exchange.

2. The Exchange was established as a public corporation and independent unit of state government in 2011 in accordance with the 2010 Patient Protection and Affordable Care Act (ACA). The purpose of the Exchange is to reduce the number of uninsured in Maryland; facilitate

the purchase and sale of qualified health plans in the individual market in Maryland by providing a transparent marketplace; assist qualified employers in Maryland in facilitating the enrollment of their employees in qualified health plans in the small group market in Maryland and in accessing small business tax credits; assist individuals in accessing public programs (including the Maryland Medical Assistance Program (Medicaid)), premium tax credits, and cost-sharing reductions; and supplement the individual and small group insurance markets outside of the Exchange. The Exchange is responsible for the administration of Maryland Health Connection, the state's health insurance marketplace, under the ACA.

3. I am familiar with the information in the statements set forth below through personal knowledge and from documents and information that have been provided to and reviewed by me.

4. I submit this Declaration in support of the States' Motion for a Preliminary Injunction.

*Introduction*

5. When the Exchange was established in 2011, Maryland's uninsured rate was approximately 12%. As of 2025, our state's uninsured rate has dropped to 6%.

6. Our Exchange has established a competitive market, a robust risk pool, and currently includes 5 health insurance plan issuers and 4 dental plan issuers.

7. The Exchange is funded through Federal reimbursement (Medicaid and the 1332 Waiver Grant) and State Special and General Funds. In Fiscal Year 2024, Maryland paid $ 600,332,612 to run the Exchange and fund Maryland's reinsurance program.

8. The flexibility that the U.S. Department of Health and Human Services (HHS) and the Centers from Medicare and Medicaid Services (CMS) have afforded the Exchanges in operating our unique marketplace has allowed us to implement innovative policies which make it easier for consumers to enroll in more generous plans at low or no cost. Some examples include operating

Maryland's State Reinsurance Program which reduced individual market premiums by over 30% in the first four years of the program since 2019, with average rates still down more than 20% compared to 2018, enacting the Easy Enrollment Program to allow uninsured individuals to get connected to health coverage by checking a box on their state tax return or unemployment claim, and administering a state premium assistance program for young adults which provides an additional state subsidy that pairs with federal premium subsidies to further reduce premiums costs on a sliding scale for this population.

9. Our special enrollment period (SEP) strategies have also been uniquely designed to meet Maryland's needs, minimizing enrollment barriers and making it easier for Marylanders to maintain continuous coverage.

### *Lack of enrollment fraud*

10. MHBE has had few instances of fraudulent enrollment. A review of consumer complaints and enrollment partner activity in recent years revealed that improper enrollments are rare, thanks to the tailored oversight measures we have implemented, such as requiring agents to verify consumer consent through secure methods like three-way calls, one-time passcodes, and robotic process automation to verify consumer documents for data accuracy.

11. For the few instances reported, the Exchange has taken swift and decisive corrective actions, including investigations, monitoring, warnings, suspensions, and, if necessary, decertifying agents.

### *Lost enrollment revenue caused by Final Rule*

12. The requirement that MHBE request additional income documentation for individuals for which there is no IRS tax data to verify income could lead to up to 14% of on-exchange enrollees (34,000 individuals) losing coverage due to the additional burden.

13. One direct consequence of this anticipated decrease in enrollment is a loss of Maryland revenues. Health insurance companies in Maryland are subject to a 2% premium tax, of which a portion of the revenue generated is distributed to MHBE to fund the operations and administration of MHBE. Md. Code Ann., Ins. § 6–103.2.

14. If our estimates are accurate, then decreased enrollment due to the Final Rule could result in approximately $4 million in revenue lost from the premium tax that would have been generated by the approximately 34,000 individuals who are no longer enrolled in plans via the Exchange.

### *Compliance costs caused by Final Rule*

15. We estimate that the numerous changes in the Final Rule will require us to spend a substantial number of hours of staff time updating our information technology (IT) systems, at significant cost. Additionally, the rule will require a substantial amount of staff time to implement its requirements and will impose significant operational challenges for the Exchange. One example of necessary changes concerns individuals who we anticipate could enroll in significantly lower numbers under the Final Rule include individuals who have had recent changes to their household for reasons such as marriage, birth, death, and divorce. The IRS does not return income tax data to the Exchange to verify income if a tax filer's status has changed, for example due to marriage or divorce, or if their household size has changed. These individuals will be required to provide additional income documentation under the Final Rule, necessitating additional work to verify such documentation.

16. If the comment period for the Proposed Rule had been longer than 23 days, the Exchange could have provided CMS with a robust analysis of the fiscal and administrative impact of the Final Rule's changes before they were finalized.

17. Some of the technical changes to our IT systems would likely not be possible to implement in time for the 2026 plan year. Implementing these rules, particularly the new income verification requirements—such as requiring documentation when tax data shows income under 100 percent of the Federal Poverty Level (FPL) and requiring documentation when no tax data is available through the federal data services hub, would necessitate new system programming and additional manual processes, which would compromise the efficiency of our automated systems. This, in turn, would lead to higher operational costs, greater challenges for consumers, and added strain on critical resources. Specifically, it would impact the accuracy and timeliness of consumer notices, increase the volume and complexity of mailings, require expanded enrollee outreach efforts to address potential confusion, and place additional demands on service center operations, including longer wait times and increased staffing needs to handle inquiries and support requests.

18. Moreover, the Exchange on average experiences a high amount of traffic during the OEP. As a result, Maryland requires the Exchange's internal teams and external partners to minimize technical changes during this period of time to prevent any unintended disruptions to consumers' ability to enroll by the deadline.

19. MHBE's process to verify enrollee income begins with a request to the federal data services hub for IRS data. If no IRS data is returned, MHBE then requests Maryland Department of Labor quarterly wage data. If projected income is lower than the income data in these trusted data sources by a threshold within the CMS-designated range, we require the applicant to submit documentation to verify their projected income. Depending on the document type, the document

5

is verified either by a caseworker or via robotic process automation. If no federal or state data is available, MHBE generates a data matching issue (DMI) requesting that the enrollee provide attestation to verify their income.

20. However, the Final Rule requires Exchanges to verify income by generating a DMI that requires enrollees to provide verification documentation when tax data from the IRS is unavailable. It also requires Exchanges to generate a DMI that requires enrollees to provide verification documentation when an enrollee's attested household income is less than 100% of the FPL but IRS data shows income of more than 100% FPL. Generating DMIs that impose documentation requirements rather than allowing Exchanges to use their own processes which work for their markets creates a significant burden for enrollees and for MHBE. Whenever a DMI is generated, consumers will be required to track down and submit the necessary paperwork in order to purchase health insurance, discouraging enrollment. The Exchange is then required to receive, process, and determine whether the newly submitted paperwork adequately addresses the issue. I estimate that the Exchange will need to spend over 1,280 hours to receive, process, and review documents generated by these new DMIs, adding significant cost. This cost includes conducting outreach and determining DMI outcomes for applicants whose tax return data is unavailable. Updating our eligibility systems and performing technical updates relating to this change alone will cost approximately $152,064. This does not include costs for handling increased manual verifications, which we are not able to quantify at this time.

### *Risk pool impacts caused by Final Rule*

21. The Exchange has consistently cultivated a stable and healthy risk pool.

22. Final Rule would result in relatively younger and healthier individuals disproportionately dropping coverage due to a more burdensome enrollment process, which will negatively impact the overall health of the risk pool. Maryland estimates the Final Rule could result in a loss of approximately 34,000 such individuals.

23. Any differences between attested and actual income that result in over or underpayments of premium tax credits are reconciled during the individuals' federal tax filing. Maryland's self-attestation policy was designed to ensure that younger and healthier enrollees are not discouraged from entering the risk pool due to paperwork burdens. In particular, lower-income individuals face challenges in accurately estimating their annual income and experience significant fluctuations in their earnings over the course of the year; increased requirements will likely cause these individuals to drop coverage. Additional verification requirements will likely cause younger and healthier consumers to drop out of the marketplace. That, in turn, will worsen the risk pool and increase premiums for both subsidized and unsubsidized consumers.

### *Increased healthcare costs to Maryland Caused by Final Rule*

24. The Final Rule acknowledges that the changes it makes will result in a decrease in enrollment in the ACA marketplace exchanges of up to 1.8 million people nationwide.

25. A direct consequence of this decreased enrollment under the Final Rule is a higher rate of uninsured in Maryland, and a corresponding higher amount of costs incurred by Maryland both in funding programs that pay for certain types of care offered to uninsured residents and costs for providing care that is uncompensated by such programs.

26. Federal law requires all hospitals to treat patients presenting in their emergency departments, regardless of the patient's ability to pay and even if the patient's condition is not an emergency medical condition. *See* the Emergency Medical Treatment and Labor Act (EMTALA), 42 U. S. C. § 1395dd. In Maryland, hospitals are required to cover these associated uncompensated care (UCC) costs, which are built into the state's unique All-Payer Model hospital rate setting structure under the model's UCC policy. The All-Payer Model is administered by the Maryland Health Services Cost Review Commission (HSCRC) and ensures that all payers are charged the same rate for the same service at any given hospital. In 2024 the determined UCC amount to be built into rates for Maryland hospitals was 4.29 percent (HSCRC RY 2024 UCC Report). Increased UCC costs are therefore shouldered by all payers and health insurance purchasers in the state, including publicly funded programs and payers that impact the state budget like Maryland Medicaid, the state employee health plan, etc.

## *Public Health Impact to Maryland from Final Rule*

27. The Final Rule is detrimental to Maryland's public health. With increased access to affordable health insurance via the Exchange, individuals are more likely to seek preventive care and avoid costly emergency room visits. But the Final Rule causes the inverse: without access to affordable health insurance, individuals are more likely to not seek preventative care, and will instead incur costly emergency room visits, and require Maryland to cover costs for uninsured individuals.

28. Maryland estimates that the decreased enrollment in the ACA insurance market resulting from the Final Rule would increase costs in Maryland for preventive care, emergency room visits, and other expenses associated with funding care provided to uninsured residents.

29. Increased access to health insurance also improves public health. By contrast, uninsured individuals who lack access to affordable, adequate health insurance are less likely to seek preventive care or attend routine health screenings, and may delay necessary medical care due to prohibitive costs.

30. Lack of insurance and resulting negative health outcomes also result in downstream consequences, including, absenteeism in the workplace and increased reliance on unemployment insurance, which relies on State funding.

31. Decreased access to adequate and affordable health care also increases the risk that infectious diseases spread more widely and rapidly, with those affected not seeking care due to being uninsured or underinsured.

### *Gender-Affirming Care EHBs Effects of the Final Rule*

32. The ACA mandates that certain individual and small group health plans cover a set of Essential Health Benefits (EHBs) which must be equal to the scope of benefits provided under a typical employer plan and may not have any annual or lifetime dollar limit under state plans.

33. Per HHS, the items and services covered must come from the following ten benefit categories: (1) ambulatory patient services; (2) emergency services; (3) hospitalization; (4) maternity and newborn care; (5) mental health and substance use disorder services including behavioral health treatment; (6) prescription drugs; (7) rehabilitative and habilitative services and devices; (8) laboratory services; (9) preventive and wellness services and chronic disease management; and (10) pediatric services, including oral and vision care.

34. The ACA and its effectuating regulations permit latitude to the states in determining how EHBs are defined. Accordingly, states submit their "benchmark" plans to HHS for approval. EHBs are a minimum standard, and benchmark plans can choose to offer additional health benefits, like vision, dental, and medical management programs (e.g., weight loss).

35. Each state maintains a benchmark plan on file with HHS, against which private insurers must compare plans to ensure compliance with the standards set forth therein. Further, if a state has not updated its benchmark plan to match federal requirements, private insurers must also review plans for compliance with federal EHB mandates.

36. Maryland's EHB Benchmark Plan for 2025-2027, Blue Choice HMO HSA-HRA, is a small group market plan issued by CareFirst BlueChoice, Inc. This has been Maryland's benchmark plan since 2017 and it covers the ten items and services required under the ACA.

37. State laws in Maryland prohibit discrimination in healthcare coverage. In Maryland, this includes prohibiting differential treatment for care for transgender residents. Maryland law

requires that Medical Assistance provide gender-affirming care in a non-discriminatory manner. *See* Md. Code Ann., Health-Gen. § 15-151 (2023 Repl. Vol.). Maryland law also prohibits Maryland-regulated private health insurance carriers from discriminating against individuals by refusing enrollment, unenrolling, or withholding coverage from an individual on the basis of their gender identity, sexual orientation, or sex. *See* Md. Code Ann., Ins. § 15-1A-22 (2017 Repl. Vol.).

38. In 2024 all Marketplace plans offered in Maryland included coverage for services categorized as gender-affirming care.

39. The employer plans offered in Maryland often cover gender-affirming care. Similarly, Marketplace plans offered in Maryland also cover gender-affirming care.

40. Even in states like Maryland, where gender-affirming care is not listed as its own category of EHB in the state's benchmark plan, many services that fall within "gender-affirming care", such as surgeries, prescription medications, and mental health treatment, are treated as EHBs by state marketplaces. Furthermore, the Final Rule promulgates a definition of "sex trait modification procedure" which contains provisions that would be widely open to interpretation and therefore difficult to comply with as well as to enforce. For example, the Final Rule will force the Maryland Insurance Administration (MIA) to utilize time and resources in deciphering whether an individual undergoing certain medical procedures has "asserted" an identity that differs from the individual's physical appearance and whether the purpose of such procedure is to interfere with the "normal" physical development of the individual's gender. As an individual's assertion of gender, the interpretation of one's physical appearance, and the definition of "normal" are all subjective, it is unclear how it is to be determined whether medical procedures fall within this definition and ensure that they are not being included as EHBs in violation of the Final Rule.

41. Even in states like Maryland that do not have a mandate for insurers to cover gender-affirming care, the Rule will reduce the amount of premium eligible for Advance Premium Tax Credits, which will increase premiums for consumers.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 15th day of July, 2025 in Baltimore, MD.

*Michele Eberle*

Michele Eberle
Executive Director
Maryland Health Benefit Exchange