# EXHIBIT 13

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF CALIFORNIA, et al.<br><br>*Plaintiffs*,<br><br>v.<br><br>ROBERT F. KENNEDY, JR., et al.,<br><br>*Defendants*. | Civil Action No.: 25-12019 |

## DECLARATION OF JOSEPH A. GARCIA

I, Joseph A. Garcia, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct:

1. I am a Senior Deputy Director and General Counsel at the Department of Insurance and Financial Services (DIFS) in Michigan. I have been employed as Senior Deputy Director for DIFS since February of 2025, as General Counsel at DIFS since December of 2022, and in total with DIFS for 17 years. The majority of my employment with DIFS has been within the Office of General Counsel, primarily as a Deputy General Counsel.

2. DIFS regulates Michigan's insurance and financial services industries. DIFS' mission is to ensure access to safe and secure insurance and financial services fundamental for the opportunity, security, and success of Michigan residents, while fostering economic growth and sustainability in both industries.

3. Michigan does not operate its own health insurance exchange. Rather, consumers in Michigan may enroll in health coverage using healthcare.gov, which is operated and maintained by the U.S. Department of Health and Human Services

4. I am familiar with the information in the statements set forth below through personal knowledge and from documents and information that have been provided to and reviewed by me.

5. I submit this Declaration in support of the States' Motion for a Preliminary Injunction.

**Federally Facilitated Exchange States: Risk pool impacts**

6. The Final Rule threatens to increase costs to Michigan by removing a pool of relatively young and healthy individuals from the pool of insureds participating in health coverage in our State.

7. The Final Rule makes several changes that adversely impact Michigan's risk pool, including, but not limited to, the following.

8. The Final Rule requires the Federal marketplace to conduct pre-enrollment eligibility verification for at least 75% of new enrollments through the SEPs, including the SEPs that can be triggered by a qualifying life event, such as a move to a new geographical area. These additional verification requirements may discourage younger, healthier individuals—who are less likely to navigate complex paperwork requirements successfully during life changes—from enrolling, undermining the stability of the risk pool and driving up costs for everyone.

9. The Final Rule requires the Federal marketplace to impose a $5 monthly charge on a subset of automatically reenrolled consumers who have $0 premiums because of the APTC for which they qualified. That charge would be levied until the consumer actively re-enrolls in coverage. This provision will pose an unjustified and duplicative reporting burden on consumers in our state who do not have changes to their accounts. Federal Plan Year 2025 data indicates that 51% of automatically reenrolled Michiganders had sufficient APTC to reduce their premiums to $10 or below, and many of these could have had sufficient APTC to reduce their premiums to $0. Under the Final Rule, automatic re-enrollees with such fully subsidized premiums would be charged $5 until they undertake an affirmative action to confirm their re-enrollment.

10. The imposition of this unexpected premium, when the consumer is accustomed to paying $0 out-of-pocket premiums, is likely to cause attrition and lead to lower enrollment in Michigan and thus causing consumers to lose coverage.

2

11. Prior to the Final Rule, exchange plans accepted the self-attestation of an enrollee who claimed eligibility by projecting annual household income at or above 100% of the FPL. This self-attestation policy was designed to ensure that the lowest-income enrollees are not discouraged from entering the risk pool due to paperwork burdens. The prior policy also recognized the challenges that low-income individuals face in accurately estimating their annual income and may experience significant fluctuations in their earnings over the course of the year. The Final Rule's elimination of this practice creates an administrative barrier to enrollment that could worsen the risk pool and increase premiums for both subsidized and unsubsidized consumers.

**Increased healthcare costs to states + uncompensated care**

12. The Final Rule acknowledges that the changes it makes will result in a decrease in enrollment in the ACA marketplace exchanges of up to 1.8 million people nationwide.

13. A decrease in enrollment under the Final Rule will result in a higher uninsured rate in Michigan and thus is likely to cause a corresponding increase in costs incurred by Michigan both in funding programs that pay for certain types of care offered to uninsured residents and costs for providing care that is uncompensated by such programs.

**Public Health Impacts**

14. The Final Rule is detrimental to Michigan's public health. With increased access to affordable health insurance via the Marketplace, individuals are more likely to seek preventive care and avoid costly emergency room visits. Individuals who do not have access to affordable health insurance are less likely to seek preventive care and thus incur costly expenses from emergency room visits and have the increased potential to have poor health outcomes.

**Gender-Affirming Care EHBs**

15. The ACA mandates that certain individual and small group health plans cover a set of Essential Health Benefits (EHBs) which must be equal to the scope of benefits provided under a

"typical employer plan" and may not have any annual or lifetime dollar limits, among other protections.

16. Per HHS, the items and services covered as EHBs must come from the following ten benefit categories: (1) ambulatory patient services; (2) emergency services; (3) hospitalization; (4) maternity and newborn care; (5) mental health and substance use disorder services including behavioral health treatment; (6) prescription drugs; (7) rehabilitative and habilitative services and devices; (8) laboratory services; (9) preventive and wellness services and chronic disease management; and (10) pediatric services, including oral and vision care.

17. The ACA and its effectuating regulations permit latitude to the states in determining how EHBs are defined. Accordingly, states submit their "benchmark" plans to HHS for approval. EHBs are a minimum standard, and plans can offer additional health benefits.

18. Each state maintains a benchmark plan on file with HHS, against which certain individual and small group health plans must compare to ensure compliance with the standards set forth therein. Further, if a state has not updated its benchmark plan to meet federal requirements, those insurers must also review plans for compliance with federal EHB mandates.

19. Michigan's EHB benchmark plan can be found here: https://www.michigan.gov/difs/industry/insurance/affordable-care-act/ehb-information

20. Michigan law prohibits discrimination in healthcare coverage. *See, e.g.,* MCL 37.2102; MCL 500.2027. In Michigan, this includes prohibiting differential treatment for care based on gender or gender identity or expression.

21. Requiring states to exclude these otherwise-covered services from EHB definitions would raise the defrayal cost borne by Michigan. This is because premium amounts that would otherwise be attributed to EHB services and covered by carriers in response to the state coverage mandate would be put back on states.

**Signature Page**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 16th day of July, 2025, in Lansing, Michigan.

*[signature]*

Joseph A. Garcia
Senior Deputy Director and General Counsel
Department of Insurance and Financial Services

5