EXHIBIT 15

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

STATE OF CALIFORNIA, et al.,

*Plaintiffs*,

v.

ROBERT F. KENNEDY, JR., et al.,

*Defendants*.

Civil Action No.
Judge

## DECLARATION OF JEFFREY A. BROWN

I, Jeffrey A. Brown, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct:

1. I am the Acting Commissioner of the New Jersey Department of Health ("NJDOH"). The information in the statements set forth below were compiled through personal knowledge, through NJDOH personnel who have assisted in gathering this information, or from documents that have been provided to and reviewed by me. I have also familiarized myself with the Final Rule in order to understand its immediate impact on NJDOH and New Jersey.

2. I submit this Declaration in support of Plaintiffs' challenge to the Final Rule issued by the U.S. Department of Health and Human Services and Center for Medicaid Services entitled, "Patient Protection and Affordable Care Act; Marketplace Integrity and Affordability."

**Professional Background**

3. I have been serving as the NJDOH Acting Commissioner since April of 2025. Prior to becoming NJDOH's Acting Commissioner, I served as the NJDOH Deputy Commissioner of

Health Systems, overseeing inspections, licensing, and the enforcement of regulations for licensed New Jersey health care facilities, mental health and addiction services and programs, the Office of Health Care Affordability and Transparency, and major hospital funding programs, including Charity Care. Prior to serving as the NJDOH Deputy Commissioner, I served as the first Executive Director of the New Jersey Cannabis Regulatory Commission (CRC), where I led and managed a newly-created state commission. Prior to my position with the CRC, I served as Assistant Commissioner for Medical Marijuana within the NJDOH and worked within healthcare policy and healthcare quality improvement for the State of New Jersey. I graduated from Rutgers University and have devoted my career to serving the public.

<u>The New Jersey Department of Health</u>

4.  NJDOH's mission is to protect the public's health, promote healthy communities, and continue to improve the quality of health care in New Jersey. To that end, NJDOH's three primary branches—Public Health Services, Health Systems, and Integrated Health—all work collaboratively to improve health by strengthening New Jersey's health system.

5.  NJDOH provides essential services and implements comprehensive measures to prioritize public health, including: preventing the spread of infectious diseases, educating the public to promote healthy lifestyles, preparing for emergencies and disasters, licensing and regulating health care facilities and professionals, collecting and analyzing data, and addressing health disparities.

6.  Data collection is the foundation of effective public health planning. NJDOH collects and analyzes health data to identify trends, assess community health needs, and inform policy

decisions. By maintaining vital records, conducting health surveys, and producing reports, NJDOH is able to shape public health programs and initiatives.

7.  The Center for Health Statistics & Informatics ("CHSI") is a program within NJDOH's Office of Health Care Quality and Informatics. CHSI is responsible for compiling and releasing statistical information on the health of New Jersey residents. CHSI publishes official reports on births, deaths, chronic illnesses, injuries, and behavioral risk factors, among other types of information. CHSI provides analytical support to state and other governmental agencies to support population health initiatives. The New Jersey State Health Assessment Data System is maintained by CHSI and provides on-demand access to public health datasets, statistics, and deidentified information on the health status of New Jerseyans.

8.  Via the New Jersey Hospital Discharge Data Collection System, New Jersey collects and manages data on emergency room visits as part of the State's efforts to monitor health outcomes and public health trends.

9.  Health Care Quality Assessment, an office of the NJDOH, collects data on the quality of health care services in New Jersey to produce reports which can help consumers, health care providers, policy makers, and regulators to make informed decisions.

<u>Charity Care</u>

10.  In New Jersey, "[n]o hospital shall deny any admission or appropriate service to a patient on the basis of that patient's ability to pay or source of payment." N.J.S.A. § 26:2H-18.64.

11.  The State offsets some of the costs that eligible hospitals incur as a result of treating uninsured patients through the New Jersey Hospital Care Payment Assistance Program, commonly known as Charity Care, administered by NJDOH. *See* Health Care Cost Reduction Act, N.J.S.A. § 26:2H-18.50 (1992). The chart below sets forth the number and

uninsured status of patients who presented in an emergency department at a New Jersey

hospital between 2021 and 2023 along with the costs of services through Charity Care

(before subsidies) that such hospitals have incurred for uninsured patients who have

presented in an emergency department during the same period:

|  | 2021 | 2022 | 2023 |
|---|---|---|---|
| **Total Patients** | 2,690,532 | 2,923,102 | 3,106,320 |
| **Uninsured Patients regardless of Charity Care status** | 246,826 | 247,171 | 231,164 |
| **Cost of Services for Uninsured Patients via Charity Care** | $63,226,640.86 | $72,764,116.66 | $92,063,158.04 |

12. Charity Care provides eligible hospitals with financial support in the form of a yearly subsidy

that is administered by NJDOH. N.J.S.A. § 26:2H-18.51. Charity Care relies on

intergovernmental funding; the State and federal government contribute equally to the

program. Charity Care does not reimburse individual claims made by individual patients.

13. From the patient's perspective, Charity Care offers free or reduced-charge care to patients

who receive inpatient and outpatient services at acute care hospitals throughout the State.

Hospital assistance and reduced charge care are available only for medically necessary

hospital care.

14. A New Jersey resident is eligible to receive free or reduced-charge services through Charity

Care if (a) they meet specific income and asset–eligibility criteria, (b) are ineligible for any

private or government-sponsored coverage (such as Medicaid), and (c) have no health

coverage or coverage that pays only for part of the bill. N.J.A.C. § 10:52-11.10(a) (assets

eligibility); N.J.A.C. § 10:52-11.8(c) (income eligibility). A New Jersey resident may be eligible for Charity Care services without regard to immigration status.

15. The Hospital Services Manual Rules, N.J.A.C. § 10:52, govern Charity Care eligibility and coverage. When a patient who is underinsured or uninsured receives medical care from an acute care hospital and seeks financial assistance to cover the cost of the care received, the hospital is required to screen the patient for Charity Care eligibility. N.J.A.C. § 10:52-11.5. If the patient meets the eligibility requirements, then the patient's medically necessary hospital services are fully or partially covered by Charity Care, with certain exemptions discussed further below. *See* N.J.A.C. § 10:52-1.6.

16. The funding source for Charity Care is the Health Care Subsidy Fund, which is dedicated for use by the State to distribute Charity Care subsidy payments to eligible hospitals. N.J.S.A. § 26:2H-18.58(a).

17. The New Jersey Legislature appropriates the total amount available for the Charity Care subsidy in each year's State Appropriations Act. In determining the precise amount of appropriations, the Legislature may consider data concerning the utilization of Charity Care subsidies, among other factors.

18. Once appropriated, NJDOH allocates the Charity Care subsidy in accordance with a statutory formula and any instructions mandated in the State fiscal year's Appropriations Act.

19. The statutory formula governing appropriation of the Charity Care subsidy among hospitals allocates the subsidy based on "the amount of hospital-specific gross revenue for charity care patients [divided] by the hospital's total gross revenue for all patients." N.J.S.A. § 26:2H-18.59i.

20. In State Fiscal Year 2025, the New Jersey Legislature appropriated $137.2 million for Charity Care. In State Fiscal Year 2024, the Legislature appropriated $342 million for Charity Care.

### Uncompensated Care Fund

21. In addition to funding Charity Care, the Health Care Subsidy Fund also funds the Federally Qualified Health Center Expansion, commonly known as the Uncompensated Care Fund. *See* N.J.S.A. § 26:2H-18.58(a), (d). Through the Uncompensated Care Fund, the State provides funding so Federally Qualified Health Centers are able to offer free or subsidized primary care, dental care, and mental health services to uninsured and underinsured New Jersey residents who are otherwise ineligible for Medicaid and have an income at or below 250% of the federal poverty level.

22. Federally Qualified Health Centers are required to serve all individuals, regardless of the individual's ability to pay. Federally Qualified Health Centers all provide primary care services and some are "one-stop" health centers with co-located services (medical, dental, and behavioral health) that make health care more accessible for eligible New Jersey residents. By comparison, the acute care hospitals covered by Charity Care provide emergency medicine to individuals experiencing acute medical conditions.

23. In New Jersey, there are twenty-three Federally Qualified Health Centers and two "look-alike" centers, which function as Federally Qualified Health Centers for purposes of the Uncompensated Care Fund.

24. The Uncompensated Care Fund is funded exclusively by the State. Through the program, the State pays Federally Qualified Health Centers a flat rate for uninsured and underinsured patient visits: $114 per visit for primary and dental care, and $74 per visit for mental health services.

25. In State Fiscal Years 2022, 2023, and 2024, New Jersey spent $26,030,696, $28,701,063, and

$32,163,822, in payments to Federally Qualified Health Centers. The chart below breaks

down this data by total number of unique patients and total visits:

| | State Fiscal Year 2022<br>7/1/2021 to 6/30/2022 | State Fiscal Year 2023<br>7/1/2022 to 6/30/2023 | State Fiscal Year 2024<br>7/1/2023 to 6/30/2024 |
|---|---|---|---|
| Total Unique Patients | 111,824 | 102,600* | 107,179 |
| Total Visits | 251,114 | 263,913 | 283,005 |
| Cost | $26,030,696 | $28,701,063 | $32,163,822 |
| * The unique patient count for State Fiscal Year 2023 is an estimate due to a data conversion issue. | | | |

Impacts of Health Insurance on Public Health

26. Increased access to health insurance improves public health. With increased access to

affordable health insurance via the State's exchange, individuals are more likely to seek

preventative care and avoid costly emergency room visits. However, without individuals

having access to affordable health insurance, they are more likely to not seek preventative

care, incur costly emergency room visits, and require New Jersey to cover costs for uninsured

individuals.

27. Though the Uncompensated Care Fund covers primary care, dental care, and behavioral

health services, it provides reimbursement only for limited specialty services and does not

cover the cost of prescription medications. Thus, uninsured individuals who lack access to

affordable, adequate health insurance, would be unable to properly cover all their medical

needs.

28. Additionally, health care under the Uncompensated Care Fund can only be accessed at a

Federally Qualified Health Center rather than any doctor of the patient's choosing. The Final

Rule's change to marketplace eligibility criteria, which would create barriers to enrollment

resulting in New Jersey residents losing marketplace coverage would leave various individuals uninsured. So, an uninsured individual who does not qualify for Medicaid, like an individual who slightly falls above the Medicaid qualifying threshold, and who cannot pay out of pocket for a prescription or specialist visit, would be unable to get those medical services under the Uncompensated Care Fund.

29. While the New Jersey Department of Health can reimburse Federally Qualified Health Centers for some limited specialty services provided to uninsured individuals, the reimbursement rate is substantially lower than that of Medicaid. Given that Federally Qualified Health Centers operate on narrow financial margins, they depend heavily on higher Medicaid reimbursements to maintain operations. A large-scale shift from Medicaid to the Uncompensated Care Fund would result in significant funding shortfall, ultimately forcing potential closures and reductions in services provided. In turn, this would reduce access to care for New Jersey's most vulnerable populations, leading to worsening existing health issues.

30. Charity Care only covers services provided at acute care hospitals, and it does not cover any service that is not provided through the hospital directly, but rather are contracted out.  Such services may include physician services, anesthesiology services, radiology interpretation, and outpatient prescriptions. This is because only those services directly provided by a hospital are covered by the State's mandate that hospitals provide appropriate services to all patients regardless of ability to pay. *See* N.J.S.A. § 26:2H-18.64; *see also* N.J.A.C. § 10:52-1.8(a)(10) (excluding vendor services from Charity Care coverage).

31. So, while Charity Care and the Uncompensated Care Fund allow uninsured individuals, in New Jersey to access some degree of State-funded health care, there remain gaps in access.

32. For example, an uninsured resident may have difficulty accessing a Federally Qualified Health Center for preventive care based on its location or hours. Even if they can access preventive care at a Federally Qualified Health Center, they may not be able to access all the affordable care they need. Federally Qualified Health Centers, like individual hospitals participating in Charity Care, offer a limited subset of providers, as compared to providers that accept insurance. As such, an uninsured New Jersey resident may have less choice in the provider they see.

33. If, for example, an uninsured or underinsured New Jerseyan needs to see a specialist for a cancer screening, or if they need prescription medication to treat high blood pressure, neither would be covered by the Uncompensated Care Fund. Thus, the Final Rule now creates a circumstance where, if the uninsured or underinsured New Jerseyan cannot pay out of pocket for those services, they cannot receive that care.

34. An uninsured individual failing to access such preventative care increases the risk that they will need emergency care services, such as to treat a heart attack, which the State would pay for in part through Charity Care.

35. Especially in light of these continuing gaps in access, NJDOH has found that increased access to health insurance both improves public health and reduces the costs of uncompensated care to the State.

36. New Jersey's experience with Medicaid Expansion is an example of how increased access to health insurance can reduce the costs of uncompensated care.

37. New Jersey's Medicaid expansion began in 2014. With more individuals eligible for Medicaid, costs of providing health care to uninsured or underinsured individuals shifted from State-funded Charity Care to federally-funded Medicaid.

38. Documented Charity Care for a particular hospital is the dollar amount of Charity Care provided by the hospital, as verified by NJDOH audit, and valued at the same rate paid to that hospital by the Medicaid program. *See* N.J.S.A. § 26:2H-18.59e(a).

39. As Medicaid enrollment increased each year, Documented Charity Care costs decreased from 2013 (over $1 billion), beginning in 2014 ($570.2 million) and continuing into 2015 ($479.6 million) and 2016 ($450.6 million). This decrease is likely associated with New Jersey's Medicaid expansion.

40. The chart below illustrates this relationship by comparing Documented Charity Care costs with Medicaid enrollment figures from 2012 to 2016. The data shows a strong negative correlation between Documented Charity Care costs and Medicaid enrollment.



41. Generally speaking, uninsured individuals are less likely to seek preventive care or attend routine health screenings, and may further delay necessary medical care due to prohibitive costs. Crucial preventive services include cardiovascular, cancer, and diabetes screenings. Foregoing such services can result in negative health outcomes, such as emergency medical

care with longer hospital stays and increased mortality rates, and ultimately result in increased costs to the State through uncompensated hospital emergency costs.

42. Increased access to health insurance results in both better health outcomes for New Jersey residents as well as reduced costs for the State. As noted, when New Jersey residents are uninsured or underinsured they are less likely to access all the preventive care services they need, resulting in worse health outcomes. Conversely, an individual without adequate insurance is more likely experiencing a health issue that could have been caught at a routine screening but has now evolved into an emergency medical issue. In that example, the State would assist with the uncompensated emergency medical costs through Charity Care.

43. The lack of insurance and resulting deleterious health outcomes could also result in downstream consequences. These include, for example, increased absenteeism in the workplace, ultimately leading to an increased reliance on unemployment insurance.

44. Similarly, decreased access to adequate and affordable health insurance could mean that infectious diseases, like the novel coronavirus, spread more widely and rapidly in New Jersey because uninsured and underinsured individuals are less likely to access vaccines or seek care at the early onset of symptoms.

<u>The Final Rule Will Irreparably Harm New Jersey</u>

45. The Final Rule would harm New Jersey as it would likely render affordable health insurance coverage unavailable to various New Jersey residents, thereby contributing to negative health outcomes. Without access to affordable health insurance via the state insurance marketplace, these uninsured or underinsured New Jersey residents are less likely to seek preventive care and avoid costly emergency room visits.

46. Additionally, a decrease of enrollment under the Final Rule, due to its increased barriers to enrollment in states' exchanges, would create a higher rate of uninsured in New Jersey, resulting in a higher amount of costs incurred by New Jersey in funding programs that pay for uninsured residents' care.

47. The Final Rule will further affect New Jersey providers such as Federally Qualified Health Centers who would become further overburdened. These centers are already grappling with significant workforce shortages that hinder their ability to expand services. The shortages would be further exacerbated in response to the rising demand that would be caused by having less individuals insured.

48. Should the Final Rule go into effect, the substantial increase in the uninsured population would place further strain on New Jersey's safety nets for individuals without insurance. The strains on these already overburdened providers will result in delays in accessing essential services for uninsured individuals. The delays could impact preventative care, immunizations, medical management, and timely referrals to specialist. These delays would potentially result in worsening health outcomes, avoidable hospitalizations, or even death.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 15th day of July, 2025, in Trenton, New Jersey.

Jeffrey A. Brown
Acting Commissioner
New Jersey Department of Health