EXHIBIT 16

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| STATE OF CALIFORNIA, et al.<br><br>*Plaintiffs*,<br><br>v.<br><br>ROBERT F. KENNEDY, JR., et al.,<br><br>*Defendants.* | Civil Action No.:  25-12019 |

**<u>DECLARATION OF ELIZABETH CAULUM</u>**

I, Elizabeth Caulum, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct:

1.      I am the Chief Executive Officer at MNsure, Minnesota's health insurance marketplace established pursuant to the Patient Protection and Affordable Care Act ("ACA"), 42 U.S.C. § 18051 *et seq.* and Minnesota law, Minnesota Statutes, chapter 62V. I have been employed as CEO since May 3, 2023. Before that I served as both MNsure's interim CEO and senior director for public affairs.

2.      MNsure is Minnesota's health insurance marketplace where individuals and families can shop, compare, and choose health insurance coverage that meets their needs. Individuals can apply for financial help to lower the cost of their monthly insurance premiums and out-of-pocket costs through MNsure. MNsure offers low-cost and free health insurance options provided through government-sponsored programs, Medical Assistance and MinnesotaCare, which are managed through the Minnesota Department of Human Services, to individuals who qualify.

3.      I am familiar with the information in the statements set forth below through personal knowledge and from documents and information that have been provided to and reviewed by me.

4.      I submit this Declaration in support of the States' Motion for a Preliminary Injunction.

### *MNsure: Introduction*

5.      When MNsure was established in 2013, Minnesota's uninsured rate was approximately 8.6%. As of the most recent data available, Minnesota's uninsured rate has dropped in 2023 to 3.8%.

6.      MNsure has established a competitive marketplace, a robust risk pool, and currently includes five health insurance plan issuers and three dental plan issuers.

7.      MNsure is funded through a statutory premium withhold (PWH) that is 3.5% of the premium. See Minn. Stat. § 62V.05, subd. 2. For Fiscal Year 2024, MNsure's entire PWH was approximately $25,418,000.

8.      The flexibility that the U.S. Department of Health and Human Services (HHS) and the Centers from Medicare and Medicaid Services (CMS) have afforded state-based exchanges (SBEs) in operating our unique marketplaces has allowed us to implement innovative policies which facilitate access to high-quality health and dental insurance plans at an affordable cost.

9.      MNsure has typically maintained Open Enrollment Periods (OEP) to maximize consumer access, running from November 1 through approximately January 15, which is longer than the Federally-Facilitated Exchange (FFE). In years when the Federally Facilitated Exchange (FFE) has shortened its OEP, MNsure maintained a longer opportunity for individuals and families to enroll in coverage recognizing Minnesota's unique marketplace, consumer behavior, and needs.

10.     Our special enrollment period (SEP) policies have also been uniquely designed to meet Minnesota's needs, ensuring continuous coverage and minimizing enrollment barriers.

*Lack of MNsure enrollment fraud*

11.    MNsure has had very few instances of fraudulent enrollment. A review of consumer complaints and enrollment partner activity in recent years revealed that improper enrollments through MNsure are exceedingly rare, thanks to the tailored oversight measures we have implemented, such as automated verifications with federal HUB service, and reviews of enrollment activity by health insurance carriers.

12.    For the few instances reported, MNsure has taken swift and decisive corrective actions, including conducting investigations and, when necessary, terminating enrollments.

13.    We believe instances of fraud are low because of MNsure's tailored program integrity measures, including oversight of enrollment partners and enforcement mechanisms.

*MNsure lost enrollment revenue*

14.    We estimate that the Final Rule will cause total enrollment in MNsure to decrease and will cause the risk pool to significantly worsen, thereby causing premiums to increase, especially for middle income enrollees who receive small or no premium subsidies.

15.    One direct consequence of this anticipated decrease in enrollment is a loss of revenue. To fund operations, MNsure collects a user fee of 3.5% percent of the total monthly premiums collected by an issuer for each plan purchased through our individual exchange, pursuant to Minnesota Statutes, section 62V.05, subdivision 2.

16.    If our estimates are accurate, MNsure anticipates our enrollments and revenue could decrease significantly at the same time we would be required to spend significant resources on implementing provisions within the rule. The loss in revenue and increased expenses would result in our inability to maintain adequate customer service levels.

*MNsure compliance costs*

17.    We estimate that the numerous changes in the Final Rule will require us to spend significant financial resources and staff time updating our information technology (IT) systems. Additionally, the rule will require a substantial amount of staff time to implement its requirements, impose significant operational challenges on our SBE, and require significant new investment in

outreach and communication campaigns to inform consumers about changes imposed by the final rule.

18.     Some of the technical changes to our IT systems cannot be completed in time for the 2026 plan year. Specifically, the new income verification requirements—such as requiring documentation when tax data shows income under 100 percent of the FPL and requiring documentation when no tax data is available through the federal data services hub—are impossible to implement within our existing system infrastructure.

19.     Implementing these rules would necessitate new system programming and additional manual processes, which compromises the efficiency of our automated systems. This, in turn, would lead to higher operational costs, greater challenges for consumers, and added strain on critical resources. Specifically, it could impact the accuracy and timeliness of consumer notices, increase the volume and complexity of mailings, require expanded enrollee outreach efforts to address potential confusion, and place additional demands on service center operations, including longer wait times and increased staffing needs to handle inquiries and support requests.

20.     Moreover, MNsure experiences a high amount of traffic during the OEP. As a result, MNsure requires internal teams and external partners to minimize technical changes during this period of time to prevent any unintended disruptions to consumers' ability to enroll by the deadline.

### *Risk pool impacts to MNsure*

21.     MNsure has consistently cultivated a stable and healthier risk pool compared to the FFE, as reflected by CMS's annual risk adjustment data, even when accounting for market-specific differences.

22.     Historically, MNsure sees a greater number of younger (18–44-year-olds) enrollees sign up for coverage after December 15 (i.e., 54%). Therefore, the Final Rule could increase costs to Minnesota by removing a pool of relatively young and healthy individuals from the pool of insureds participating in state-based exchanges.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 15th day of July 2025, in Saint Paul, Minnesota.

Elizabeth Caulum
Chief Executive Officer
MNsure