# EXHIBIT 21

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| STATE OF CALIFORNIA, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services, et al.,<br><br>*Defendants*. | Civil Action No.: 25-12019 |

## DECLARATION OF MICHAEL HUMPHREYS

I, Michael Humphreys, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct:

1. I am familiar with the information in the statements set forth below through personal knowledge and from documents and information that have been provided to and reviewed by me.

2. I submit this Declaration in support of the States' Motion for a Preliminary Injunction.

3. I am the Commissioner of the Pennsylvania Insurance Department (PID) located in Harrisburg, Pennsylvania. As Commissioner, I have the responsibility of regulating the Commonwealth's insurance marketplace, overseeing licensed agents and insurance professionals, monitoring the financial landscape of companies doing business in Pennsylvania, educating consumers, and ensuring residents are treated fairly. As Commissioner, I also serve as Chair of the Board of Directors of the Pennsylvania Health Insurance Exchange Authority d/b/a Pennie®

(Pennie®), Pennsylvania's state-based health insurance exchange. I joined PID in 2019 as Chief of Staff, and was appointed as Commissioner in 2022 (unanimously confirmed in early 2023). I previously served as Assistant Commissioner for Insurance at the Tennessee Department of Commerce and Insurance (TDCI). I have a Master's in Public Administration from Bowling Green State University and a Bachelor of Arts in Political Science from the University at Buffalo.

I. The Pennsylvania Insurance Department & Pennie®

4. PID protects and assists consumers, licenses insurance professionals and companies, and regulates the insurance marketplace. Relating to health insurance and the Affordable Care Act (ACA), PID is the primary regulator of the insurance industry to protect Pennsylvania's health insurance consumers.

5. PID requires insurance carriers intending to sell accident and health insurance policies in Pennsylvania to submit a Compliance Checklist and Certification with each policy form or rate that it files. With this certification, an insurer certifies that its product filing complies with all applicable ACA laws and regulations. All insurers make this certification as to the market-wide requirements of the ACA; insurers intending to sell a product on Pennie® additionally certify compliance with the Qualified Health Plan (QHP) requirements of the ACA.

6. Once a product is in the market, PID uses its enforcement authority to assure compliance with all of the ACA provisions as to which the company has certified compliance, as well as all applicable state law provisions. Through its market conduct division, PID is able to monitor the activities of insurers in the Pennsylvania market to assure that compliance is occurring, and take actions that will assure direct PID oversight of future violations. Further, PID regulates its producers (agents and brokers) as well as its navigators and exchange assisters.

7. CMS has recognized Pennsylvania as an effective rate review state since 2012, and as having an effective external review process since 2024.

8. Pennie® was made possible when Act 42 was signed into law in 2019 as a bipartisan effort to improve the accessibility and affordability of individual market health coverage for

Pennsylvanians. Pennie®, as a state-based health insurance marketplace, provides the flexibility to react to changes and serve Pennsylvania residents in a way that's best for them; to lower health insurance premiums; and to work more closely with insurers to foster a competitive marketplace.

9. In 2025, enrollment increased by over 14% from the previous year to a record 496,661 Pennsylvanians. This open enrollment period saw the highest number of new enrollees which was coupled with a smooth auto-renewal process. Enrollment has increased 50% - 164,836 - since Pennsylvania assumed responsibility for operating the marketplace, compared with the last year of enrollment under federal operations. When Pennie® began operations in 2020 for the 2021 coverage year, Pennsylvania's uninsured rate was approximately 5.6%. As of earlier this year, Pennsylvania's uninsured rate had dropped to 5.3%.

10. Pennsylvania has a competitive market, a robust risk pool, and the individual market currently includes eight health insurance plan issuers and nine dental plan issuers.

11. Pennie® is funded through fees collected from on-exchange insurers on the basis of 3% of gross premium. A portion of the user fee provides the state portion of Pennsylvania's Section 1332 Waiver Reinsurance program[1], which helps stabilize rates and premiums for health insurance policies in the individual market and provides greater financial certainty to consumers of health insurance in Pennsylvania. *See* 40 Pa.C.S. § 9305(b)(4); 40 Pa.C.S. § 9502(b). In 2024, Pennie® transmitted $44,400,000 to PID to maintain the reinsurance program.

12. The flexibility that the U.S. Department of Health and Human Services (HHS) and the Centers from Medicare and Medicaid Services (CMS) have afforded SBEs in operating our unique marketplaces has allowed Pennie® to implement innovative policies which make it easier for consumers to enroll in more generous plans at low or no cost.

13. Pennie® has adopted an Open Enrollment Period ("OEP") that allows Pennsylvania residents to enroll in health or dental plans through Pennie® from Nov. 1 through Jan. 15 every

---

[1] The reinsurance program also receives pass-through funds from the Center for Medicare and Medicaid Services and Center for Consumer information and Insurance Oversight (CMS/CCIIO).

3

year to ensure enough resources to assist with enrollments and sufficient time for individuals to compare plans. As needed, Pennie® has used flexibilities to adjust enrollment periods to meet unique situations or needs. For example, Pennie® has extended the OEP when the last day falls on a holiday. Pennsylvania also used flexibility afforded to SBEs to create policies unique to the unwinding of the COVID-19 Public Health Emergency, such as the extension of loss of Minimum Essential Coverage Special Enrollment Period ("SEP") to 120 days, and allowing for retroactive coverage for enrollments within the first 60 days of the SEP. These policies supported coverage transitions for tens of thousands of individuals transitioning from Medicaid. These SEP strategies have also been uniquely designed to meet Pennsylvania's needs, ensuring continuous coverage and minimizing enrollment barriers.

## II.     Enrollment fraud in Pennsylvania is exceedingly rare.

14. Pennie® has had very few instances of fraudulent enrollment. A review of consumer complaints and enrollment partner activity in recent years revealed that improper enrollments are exceedingly rare, thanks to the tailored oversight measures the marketplace has implemented to ensure brokers can only enroll individuals with their knowledge and consent. This includes relying mainly on consumer-initiated requests for broker help and best practice multi-factor authentication and identity proofing standards.

15. In the instances where fraudulent broker activity is reported, such cases are sent to PID for investigation, and are investigated.

16. Pennie® works closely with the Pennsylvania Department of Human Services (DHS), the agency that operates the Medical Assistance program within Pennsylvania. Through this partnership, Pennie® and DHS transfer applications only if income falls within the appropriate range, further limiting any potential for fraudulent enrollment.

**III.    The Final Rule will harm the Commonwealth.**

    **A.    The Final Rule will decrease enrollment and negatively impact the risk pool.**

17. Pennie® estimates that the Final Rule will cause up to an estimated 45,000 fewer enrollments in health insurance through Pennie®, which is likely to cause the risk pool to significantly worsen, thereby causing premiums to rise.

18. Pennsylvania anticipates that tens of thousands of younger and healthier individuals – who help the risk pool – will enroll in significantly lower numbers due to the enrollment burdens set forth in the Final Rule, thereby increasing costs to Pennsylvanians.

19. Prior to the Final Rule, exchange plans accepted the self-attestation of an enrollee who claimed eligibility by projecting annual household income at or above 100% of the FPL. This self-attestation policy was designed to ensure that the lowest-income enrollees, who are often younger and healthier, are not discouraged from entering the risk pool due to paperwork burdens. The prior policy also recognized the challenges that low-income individuals face in accurately estimating their annual income. Many low-income individuals experience significant fluctuations in their earnings over the course of the year.

20. The Final Rule changes this policy in two ways. First, any time Internal Revenue Service (IRS) data shows that a consumer has income below 100% of the FPL, a "data matching issue" (DMI) will be generated. Second, in the absence of IRS data, a DMI will be generated. Whenever a DMI is generated, consumers will be required to track down and submit the necessary paperwork in order to purchase health insurance.  DMIs also create administrative burdens on SBEs, which are required to receive, process, and determine whether the newly submitted paperwork adequately addresses the issue. These changes impose a heavy burden on SBEs, contributing to the increased operating costs already outlined. These costs include conducting outreach and determining DMI outcomes for applicants whose tax return data is unavailable, and providing higher levels of customer support.

21. The Final Rule's elimination of self-attestation is an administrative barrier to enrollment that will likely cause younger and healthier consumers to drop out of the marketplace. That, in

5

turn, will worsen the risk pool and increase premiums for both subsidized and unsubsidized consumers.

22. PID and Pennie® have consistently cultivated a stable and healthier risk pool compared to the FFE, as reflected by CMS's annual risk adjustment data, even when accounting for market-specific differences. Due to holistic market oversight by PID, and with Pennie®'s funding of the reinsurance program, Pennsylvania has a strong and highly competitive individual market, and with rate increases consistently at or below the national average.

23. The Final Rule acknowledges that the changes it makes will result in a decrease in enrollment in the ACA marketplace exchanges of up to 1.8 million people nationwide.

    **B. The Final Rule will decrease revenue and require significant compliance costs.**

24. One direct consequence of this anticipated decrease in enrollment is a loss of user fees. To fund operations, Pennsylvania collects a user fee of 3 percent of the total monthly premiums collected by an issuer for each plan purchased through our individual exchange pursuant to 40 Pa.C.S. § 9305(b)(4). Because a portion of the user fee provides the state portion of Pennsylvania's Section 1332 Waiver Reinsurance program funding, a decrease in enrollment and a decrease in the user fee collected will also result in a decrease in the impact of the Reinsurance program.

25. If Pennie®'s estimates are accurate, then decreased enrollment due to the Final Rule will result in approximately $12.53 million dollars in revenue lost from fees no longer being collected on premiums no longer being paid by individuals who are no longer enrolled in plans via Pennie®.

26. Implementing the Final Rule will also necessitate new system programming and additional manual processes, which would compromise the efficiency of Pennie®'s automated systems. This, in turn, would lead to higher operational costs, greater challenges for consumers, and added strain on critical resources. Specifically, it would impact the accuracy and timeliness of consumer notices, increase the volume and complexity of mailings, require expanded enrollee outreach efforts to address potential confusion, and place additional demands on service center operations, including longer wait times and increased staffing needs to handle inquiries and support requests.

27. Moreover, Pennie® on average experiences a high amount of traffic during the OEP. SBEs, including Pennie®, minimize or decrease technical changes during this period of time to prevent any unintended disruptions to consumers' ability to enroll by the deadline.

28. It is estimated that the numerous changes in the Final Rule will require Pennie® to spend up to an estimated $5.5 million dollars in annual operating costs—an 8.4% increase for costs such as information technology (IT) system updates and operational costs.

29. If the comment period for the Proposed Rule had been longer than 23 days, SBEs, including Pennie®, could have provided CMS with a robust analysis of the fiscal and administrative impact of the Final Rule's changes before they were finalized.

  **C.** **The Final Rule will harm public health in the Commonwealth.**

30. A direct consequence of this decreased enrollment under the Final Rule is a higher rate of uninsured in Pennsylvania.

31. The Final Rule is detrimental to Pennsylvania's public health. With increased access to affordable health insurance via Pennie®, individuals are more likely to seek preventive care and avoid costly emergency room visits. Without individuals having access to affordable health insurance, they are more likely to not seek preventive care, incur costly emergency room visits, and require Pennsylvania to cover costs for uninsured individuals.

32. Increased access to health insurance also improves public health. Uninsured individuals who lack access to affordable, adequate health insurance are less likely to seek preventive care or attend routine health screenings, and may delay necessary medical care due to prohibitive costs.

33. The ACA mandates that certain individual and small group health plans cover a set of EHBs which must be equal to the scope of benefits provided under a typical employer plan and may not have any annual or lifetime dollar limit in individual and small group health plans sold in the state.

34. In addition, the Final Rule limits what states can include as essential health benefits (EHBs), which guarantee the minimum items and services that all insurance plans must cover. Per

HHS, the items and services covered must come from the following ten benefit categories: (1) ambulatory patient services; (2) emergency services; (3) hospitalization; (4) maternity and newborn care; (5) mental health and substance use disorder services including behavioral health treatment; (6) prescription drugs; (7) rehabilitative and habilitative services and devices; (8) laboratory services; (9) preventive and wellness services and chronic disease management; and (10) pediatric services, including oral and vision care.

35. The ACA and its effectuating regulations permit latitude to the states in determining how EHBs are defined. Accordingly, states submit their "benchmark" plans to HHS for approval. EHBs are a minimum standard, and benchmark plans can choose to offer additional health benefits, like vision, dental, and medical management programs (e.g., weight loss).

36. As explained in Pennsylvania's "Notice Regarding Nondiscrimination: Notice 2016-05" (46 Pa. B. 2251, Apr. 30, 2016), both State and Federal law prohibit discrimination against individuals in the terms, conditions and benefits covered by a policy. *See generally* § 1557 of the Affordable Care Act (42 U.S.C. § 18116). In Pennsylvania law, section 626 of The Insurance Company Law of 1921 (40 P.S. § 761) and section 5(a)(7)(i) of the Unfair Insurance Practices Act (40 P.S. § 1171.5(a)(7)(ii)) prohibit discrimination generally among individuals "of the same class." To that end, Notice 2016-05 announced PID's expectation "that a policy will not exclude services based on gender identity and will not contain a categorical exclusion of coverage for all health services related to gender transition, as described in [the HHS Office of Civil Rights then-proposed rule at 80 FR 54172 (September 8, 2015)], and also will affirmatively provide that medically necessary covered services will be available to a policyholder regardless of their gender identity."

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 15th day of July, 2025, in Harrisburg, Pennsylvania.

_____
Michael Humphreys
Commissioner
Pennsylvania Insurance Department

9