# EXHIBIT 22

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| STATE OF CALIFORNIA, et al.<br><br>*Plaintiffs*,<br><br>v.<br><br>ROBERT F. KENNEDY, JR., et al.,<br><br>*Defendants*. | Civil Action No.: 25-12019 |

## DECLARATION OF LINDSAY M. LANG

I, Lindsay M. Lang, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct:

1. I am the Director of HealthSource RI ("HSRI") located in Rhode Island. I have served as Director since 2019. Prior to that, I served as HSRI's General Counsel and Chief of Staff.

2. HSRI is Rhode Island's State-Based Health Exchange ("SBE") established under the Patient Protection and Affordable Care Act and R.I. Gen. Laws § 42-157-1 et seq.

3. I am familiar with the information in the statements set forth below through personal knowledge and from documents and information that have been provided to and reviewed by me.

4. I submit this Declaration in support of the States' Motion for a Preliminary Injunction.

5. When HSRI was established in 2013, our State's uninsured rate was approximately 12%. As of 2024, our state's uninsured rate has dropped to approximately 2%.

6. Our SBE has established a competitive market, a robust risk pool, and currently includes two health insurance plan issuers and two dental plan issuers.

7. HSRI is funded through a combination of general revenue and carrier assessments pursuant to R.I. Gen. Laws § 42-157-4. In Fiscal Year 2025, Rhode Island spent approximately $2,031,602.00 in general revenue to operate HSRI.

8. The flexibility that the U.S. Department of Health and Human Services (HHS) and the Centers from Medicare and Medicaid Services (CMS) have afforded SBEs in operating our unique marketplaces has allowed us to implement innovative policies which make it easier for consumers to enroll in more generous plans at low or no cost.

9. Our special enrollment period (SEP) strategies have also been uniquely designed to meet Rhode Island's needs, encourage a healthy risk pool and ensure continuous coverage and minimizing enrollment barriers.

10. HSRI has had very few instances of fraudulent enrollment. A review of consumer complaints and enrollment partner activity in recent years revealed that improper enrollments are exceedingly rare, thanks to the tailored oversight measures we have implemented, such as requiring Certified Application Assisters and Navigators to verify consumer consent.

11. Rhode Island's integrated eligibility and enrollment system verifies applicants for both Medicaid and marketplace coverage, further limiting any potential for fraudulent enrollment through this SEP.

12. Our data has not identified even a single instance of fraud stemming from this low-income SEP. Notably, Rhode Island does not have individual market brokers, agents or web-brokers operating in our individual market. HSRI instead relies upon its Navigator network and Certified Application Counselors to support customers in need of assistance enrolling in health coverage. The services of Navigators and CACs are provided at no cost to the consumer and these assisters are not individually compensated based on the help they provide to consumers. Because of this, as well as HSRI's tailored program integrity measures, including oversight of enrollment enforcement mechanisms, reports of any improper enrollments within HSRI remain very low.

13. We estimate that the Final Rule will cause total enrollment through HSRI to decrease by 3 percent and will also cause the risk pool to worsen, which will likely lead to increases in premiums.

14. One direct consequence of this anticipated decrease in enrollment is a loss of State revenues. To fund operations, HSRI collects an assessment of 3.5 percent of the total monthly

premiums collected by an issuer for each plan purchased through our individual exchange, pursuant to R.I. Gen. Laws § 42-157-4.

15. If our estimates are accurate, then decreased enrollment due to the Final Rule will result in approximately $273,000.00 in revenue lost from fees no longer being collected on premiums no longer being paid by individuals who are no longer enrolled in plans through HSRI.

16. The numerous changes in the Final Rule will require us to spend a significant number of hours of staff time updating our information technology (IT) systems. Additionally, the rule will require a substantial amount of staff time to implement its requirements and impose significant operational challenges on our SBE.

17. If the comment period for the Proposed Rule had been longer than 23 days, HSRI could have provided CMS with a robust analysis of the fiscal and administrative impact of the Final Rule's changes before they were finalized.

18. Implementing these rules would necessitate new system programming and additional manual processes, which would compromise the efficiency of our automated systems. This, in turn, would lead to higher operational costs, greater challenges for consumers, and added strain on critical resources. Specifically, it would impact the accuracy and timeliness of consumer notices, increase the volume and complexity of mailings, require expanded enrollee outreach efforts to address potential confusion, and place additional demands on service center operations, including longer wait times and increased staffing needs to handle inquiries and support requests.

19. Moreover, HSRI on average experiences a high amount of traffic during the OEP. As a result, the State requires HSRI's internal teams and external partners to minimize technical changes during this period of time to prevent any unintended disruptions to consumers' ability to enroll by the deadline.

20. Prior to the Final Rule, exchange plans accepted the self-attestation of an enrollee who claimed eligibility by projecting annual household income at or above 100% of the FPL. The Final Rule changes this policy in two ways. First, any time IRS data shows that a consumer has income below 100% of the FPL, a "data matching issue" (DMI) will be generated. Second, in the absence

3

of IRS data, a DMI will be generated. Whenever a DMI is generated, consumers will be required to track down and submit the necessary paperwork to verify their attested annual household income in order to purchase health insurance. DMIs also create administrative burdens on SBEs, which are required to receive, process, and determine whether the newly submitted paperwork adequately addresses the issue. These changes impose a heavy burden on SBEs. I estimate that HSRI will need to spend a significant number of hours to receive, process, and review documents generated by these new DMIs. Updating our eligibility systems and performing technical updates relating to this change will cost approximately $117,645.00.

21. With respect to providing essential health benefits for gender-affirming care, the Final Rule will force HSRI to examine carrier submissions to ensure the appropriate amounts have been excluded from federal cost-sharing. HSRI will need to implement technical assistance on the back end to ensure this is done consistently across the market in Rhode Island. This will take up valuable time and resources. In addition, insurance carriers in Rhode Island do not all maintain their data in the same way. This means that conducting targeted assessments will be necessary to ensure that gender-affirming care services, which can take many different forms, have been excluded from coverage as EHBs. These targeted assessments would require additional time on part of marketplaces.

22. HSRI has consistently cultivated a stable and healthy risk pool. The Final Rule would increase costs to Rhode Island by removing a pool of relatively young and healthy individuals from the pool of insureds participating in state-based exchanges.

23. Prior to the Final Rule, exchange plans accepted the self-attestation of an enrollee who claimed eligibility by projecting annual household income at or above 100% of the FPL. This self-attestation policy was designed to ensure that the lowest-income enrollees, who are often younger and healthier, are not discouraged from entering the risk pool due to paperwork burdens. The prior policy also recognized the challenges that low-income individuals face in accurately estimating their annual income. Many low-income individuals experience significant fluctuations in their earnings over the course of the year. The Final Rule's elimination of this practice is an

administrative barrier to enrollment that will likely cause younger and healthier consumers to drop out of the marketplace. That, in turn, will worsen the risk pool and increase premiums for both subsidized and unsubsidized consumers.

24. The Final Rule acknowledges that the changes it makes will result in a decrease in enrollment in the ACA marketplace exchanges of up to 1.8 million people nationwide. An anticipated and direct consequence of this decreased enrollment under the Final Rule is a higher rate of uninsured in Rhode Island.

25. The Final Rule is detrimental to Rhode Island's public health. With increased access to affordable health insurance through HSRI, individuals are more likely to seek preventive care and avoid costly emergency room visits. Without individuals having access to affordable health insurance, they are more likely to not seek preventative care, incur costly emergency room visits, and require Rhode Island and the Rhode Island health care system to cover costs for uninsured individuals.

26. Increased access to health insurance also improves public health. Uninsured individuals who lack access to affordable, adequate health insurance are less likely to seek preventive care or attend routine health screenings, and may delay necessary medical care due to prohibitive costs.

27. Lack of insurance and resulting negative health outcomes also result in downstream consequences, including, absenteeism in the workplace and increased reliance on unemployment insurance, which relies on State funding.

28. Decreased access to adequate and affordable health care could mean infection diseases spread more widely and rapidly with those affected not seeking care due to being uninsured or underinsured.

29. The ACA mandates that certain individual and small group health plans cover a set of Essential Health Benefits (EHBs) which must be equal to the scope of benefits provided under a typical employer plan and may not have any annual or lifetime dollar limit under state plans.

30. Per HHS, the items and services covered must come from the following ten benefit categories: (1) ambulatory patient services; (2) emergency services; (3) hospitalization;

5

(4) maternity and newborn care; (5) mental health and substance use disorder services including behavioral health treatment; (6) prescription drugs; (7) rehabilitative and habilitative services and devices; (8) laboratory services; (9) preventive and wellness services and chronic disease management; and (10) pediatric services, including oral and vision care.

31. The ACA and its effectuating regulations permit latitude to the states in determining how EHBs are defined. Accordingly, states submit their "benchmark" plans to HHS for approval. EHBs are a minimum standard, and benchmark plans can choose to offer additional health benefits, like vision, dental, and medical management programs (e.g., weight loss).

32. Each state maintains a benchmark plan on file with HHS, against which private insurers must compare plans to ensure compliance with the standards set forth therein. Further, if a state has not updated its benchmark plan to match federal requirements, private insurers must also review plans for compliance with federal EHB mandates.

33. State laws in Rhode Island prohibit discrimination by state agencies, including HSRI. *See* R.I. Gen. Laws § 28-5.1-7 (prohibiting state agencies from discriminating on the basis of "gender identity or expression"). Further, Rhode Island state law prohibits insurance carriers from engaging in "unfair discrimination between individuals of the same class and of essentially the same hazard" with respect to costs and plan terms and conditions, and also prohibits plans from "refusing to insure, refusing continue to insure, or limiting the amount of coverage available to an individual because of the sex or marital status of the individual." *See* R.I. Gen. Laws §§ 27-29-7(ii), (v). This includes prohibiting differential treatment for care for transgender enrollees. *See* Health Insurance Bulletin 2015-3, Guidance Regarding Prohibited Discrimination on the Basis of Gender Identity or Expression (November 23, 2015), https://ohic.ri.gov/sites/g/files/xkgbur736/files/bulletins/Bulletin-2015-3-Guidance-Regarding-Prohibited-Discrimination.pdf.

34. Even in states like Rhode Island, where gender-affirming care is not listed as its own category of EHB in the state's benchmark plan, many services that fall within "gender-affirming

care", such as surgeries, prescription medications, and mental health treatment, are treated as EHBs by state marketplaces.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this __15__ day of July, 2025 in Providence, RI

                                                                            Lindsay M. Lang
                                                                            Director
                                                                            HealthSource RI