# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

STATE OF CALIFORNIA, *et al.*,

        Plaintiffs,

    v.

ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services, *et al.*,

        Defendants.

Case No. 1:25-cv-12019-NMG

Leave to file excess pages granted on August 8, 2025

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND STAY

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

BACKGROUND .................................................................................................................2

I.  The Affordable Care Act ..........................................................................................2

II.  The Marketplace Integrity and Affordability Rule ...............................................4

III.  Procedural History ....................................................................................................5

LEGAL STANDARD .........................................................................................................5

ARGUMENT ......................................................................................................................5

I.  The Notice-and-Comment Process Satisfied the APA .........................................5

II.  Plaintiffs Are Not Likely to Succeed on the Merits of Their APA Claims .................9

    A.  Past-Due Premium Policy ..........................................................................10

    B.  Failure to Reconcile Provision ..................................................................13

    C.  Annual Eligibility Redetermination Provision ........................................15

    D.  Income Eligibility Verification Policies ....................................................18

    E.  Special Enrollment Period Eligibility Verification Policy .......................21

    F.  Premium Adjustment Percentage Methodology ......................................23

    G.  Actuarial Value Policy ...............................................................................24

    H.  Specified Sex-Trait Modification Procedures Provision .........................26

    I.  HHS's Consideration of Alternatives ......................................................32

III.  The Remaining Preliminary Relief Factors Weigh Against Plaintiffs .......................32

    A.  Plaintiffs Fail to Show They Will Be Irreparably Harmed By Each Of the Challenged Rule Provisions ................................................................32

    B.  The Equities and Public Interest Weigh Against Preliminary Relief ...............34

IV.  Any Relief Should Be Appropriately Limited ......................................................34

V.  The Court Should Require Plaintiffs to Submit a Bond as Security ..........................35

CONCLUSION ..................................................................................................................35

# TABLE OF AUTHORITIES

**CASES**

*Abbott v. Perez*,
   585 U.S. 579 (2018) ................................................................................................35

*Ass'n of Am. Univs. v. Dep't of Def.*,
   -- F. Supp. 3d --, 2025 WL 2022628 (D. Mass. July 18, 2025) ..............................5

*Atieh v. Riordan*,
   797 F.3d 135 (1st Cir. 2015) ...........................................................................10, 23

*Axia NetMedia Corp. v. Mass. Tech. Park Corp.*,
   889 F.3d 1 (1st Cir. 2018) ......................................................................................36

*Barr v. Am. Ass'n of Political Consultants, Inc.*,
   591 U.S. 610 (2020) ...............................................................................................35

*Califano v. Yamasaki*,
   442 U.S. 682 (1979) ...............................................................................................35

*California v. EPA*,
   72 F.4th 308 (D.C. Cir. 2023) ................................................................................32

*Carlson v. Postal Reg. Comm'n*,
   938 F.3d 337 (D.C. Cir. 2019) ..............................................................................35

*Chamber of Com. of U.S. v. SEC*,
   115 F.4th 740 (6th Cir. 2024).............................................................................7, 9

*Charlesbank Equity Fund II v. Blinds To Go, Inc.*,
   370 F.3d 151 (1st Cir. 2004) ...........................................................................33, 34

*Conn. Light & Power Co. v. Nuclear Regul. Comm'n*,
   673 F.2d 525 (D.C. Cir. 1982) ................................................................................8

*Craker v. DEA*,
   44 F.4th 48 (1st Cir. 2022) ................................................................................9, 32

*Dep't of Com. v. New York*
   588 U.S. 752 (2019) ...............................................................................................30

*DHS v. Regents of the Univ. of Cal.*,
   591 U.S. 1 (2020) .............................................................................................31, 32

*Doe v. Trs. of Boston Coll.*,
   942 F.3d 527 (1st Cir. 2019)....................................................................................6

*Encino Motorcars, LLC v. Navarro,*
    579 U.S. 211 (2016) ................................................................................*passim*

*FBME Bank Ltd. v. Mnuchin,*
    249 F. Supp. 3d 215 (D.D.C. 2017) .....................................................15

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ..........................................................................15, 32

*FCC v. Prometheus Radio Project,*
    592 U.S. 414 (2021) .............................................................................*passim*

*FERC v. Elec. Power Supply Ass'n,*
    577 U.S. 260 (2016) ..........................................................................18, 32

*Fla. Power & Light Co. v. United States,*
    846 F.2d 765 (D.C. Cir. 1988) .................................................................7

*Gen. Motors Corp. v. Darling's,*
    444 F.3d 98 (1st Cir. 2006).....................................................................29

*King v. Burwell,*
    576 U.S. 473 (2015) ..................................................................................2

*Little Sisters of the Poor Saints Peter & Paul Homes v. Pennsylvania,*
    591 U.S. 657 (2020) ..............................................................................7, 8

*Loper Bright Enters. v. Raimondo,*
    603 U.S. 369 (2024) ................................................................................10

*Massachusetts v. Nat'l Inst. of Health,*
    770 F. Supp. 3d 277 (D. Mass. 2025) ...............................................33, 34

*Nat'l Treasury Emps. Union v. Trump,*
    No. 25-5157, 2025 WL 1441563 (D.C. Cir. May 16, 2025)..................35

*New Jersey v. Trump,*
    131 F.4th 27 (1st Cir. 2025) .................................................................6, 34

*New Mexico v. Musk,*
    769 F. Supp. 3d 1 (D.D.C. 2025) ..........................................................34

*New York v. EPA,*
    413 F.3d 3 (D.C. Cir. 2005).......................................................................9

*Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.,*
    494 F.3d 188 (D.C. Cir. 2007) ........................................................16, 21, 27

*P.R. Tel. Co. v. Telecomms. Regul. Bd. of P.R.*,
 665 F.3d 309 (1st Cir. 2011) ................................................................... 10

*Pennsylvania v. New Jersey*,
 426 U.S. 660 (1976) ............................................................................... 12

*Perez v. Mortg. Bankers Ass'n*,
 575 U.S. 92 (2015) ............................................................................... 6, 7

*Petry v. Block*,
 737 F.2d 1193 (D.C. Cir. 1984) ............................................................... 7

*Shinseki v. Sanders*,
 556 U.S. 396 (2009) ................................................................................. 8

*Shurtleff v. City of Boston*,
 928 F.3d 166 (1st Cir. 2019) ................................................................. 32

*U.S. Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*,
 121 F.4th 339 (1st Cir. 2024) ................................................................. 5

*Victim Rts. Law Ctr. v. Cardona*,
 552 F. Supp. 3d 104 (D. Mass. 2021) ...................................................... 9

**STATUTES**

5 U.S.C. § 553(c) ..................................................................................... 7

5 U.S.C. § 705 .......................................................................................... 5

5 U.S.C. § 706 ..................................................................................... 8, 10

26 U.S.C. § 36B ................................................................................. *passim*

42 U.S.C. § 300gg-1 .......................................................................... 2, 11

42 U.S.C. § 300gg-2 ..................................................................... 2, 11, 16

42 U.S.C. § 18022 ............................................................................. *passim*

42 U.S.C. § 18031 ............................................................................. 2, 22

42 U.S.C. § 18041 ...................................................................................... 3

42 U.S.C. § 18081 .................................................................. 13, 16, 18, 21

42 U.S.C. § 18082 .................................................................. 3, 14, 16, 18

44 U.S.C. § 1503 .................................................................................................................6

44 U.S.C. § 1507 .................................................................................................................6

Pub. L. No. 111-148, 124 Stat. 119 (2010) .......................................................................2

Pub. L. No. 117-2, 135 Stat. 4 (2021) ("ARPA"). ............................................................3

Pub. L. No. 117-169, 136 Stat. 1818 (2022) ("IRA"), .....................................................3

**RULES**

Fed. R. Civ. P. 65(c) .........................................................................................................35

**REGULATIONS**

45 C.F.R. § 147.104 ..........................................................................................................11

45 C.F.R. § 155.170 ..........................................................................................................28

45 C.F.R. § 155.305 .............................................................................................13, 16, 18

45 C.F.R. § 155.315 ..........................................................................................................19

45 C.F.R. § 155.320 .....................................................................................................19, 20

45 C.F.R. § 155.335 ..........................................................................................................16

45 C.F.R. § 155.400 ..........................................................................................................11

45 C.F.R. § 155.410 ..........................................................................................................22

45 C.F.R. § 155.420 ..........................................................................................................22

45 C.F.R. § 156.111 .....................................................................................................27, 30

45 C.F.R. § 156.115 .................................................................................................27, 28, 30

45 C.F.R. § 156.130 ..........................................................................................................23

45 C.F.R. § 156.140 .....................................................................................................25, 26

77 Fed. Reg. 18,310 (Mar. 27, 2012) ...............................................................................3

82 Fed. Reg. 18,346 (Apr. 18, 2017) ................................................................................3

90 Fed. Reg. 4,424 (Jan. 15, 2025) ..................................................................................4

90 Fed. Reg. 12,942 (Mar. 19, 2025) ("NPRM") .............................................................. 4, 11, 16

90 Fed. Reg. 27,074 (June 25, 2025) ("the Rule"). ..............................................................*passim*

**OTHER AUTHORITIES**

CMS, *Failure to File and Reconcile (FTR) Operations Frequently Asked Questions (FAQ)* (Apr. 19, 2024),
    https://www.cms.gov/files/document/failure-file-and-reconcile-faq.pdf. .......................................14

CMS, *Health Coverage Effectuation, Grace Periods, and Terminations* (June 2024),
    https://www.cms.gov/files/document/coverage-effectuation-job-aid.pdf .......................................12

## INTRODUCTION

The Affordable Care Act is complex and far-reaching, its scope touching on multiple facets of the American health care system.  The ACA grants the Secretary of Health and Human Services broad authority to issue regulations that implement and set standards for its many requirements.  And HHS Secretaries across presidential administrations have routinely exercised that authority by promulgating, adjusting, rescinding, and reinstating such regulations to advance various policy goals.

The 2025 Marketplace Integrity and Affordability Final Rule is the latest iteration of that practice.  The Rule makes several regulatory changes to strengthen the integrity of the health insurance "Exchanges" where consumers purchase health care coverage under the ACA, and to make that coverage more affordable.  In particular, the Rule seeks to address high levels of improper enrollment in federally subsidized plans by better enforcing compliance with the eligibility requirements for such plans and providing additional safeguards to protect consumers from unwanted changes to their coverage.  As HHS explained, this growth in improper enrollments is largely a consequence of temporary legislative changes related to the COVID-19 pandemic that expanded access to ACA premium subsidies and made those subsidies more generous, which in turn increased the availability of fully subsidized health care coverage and fueled enrollment, some of it improper, in Exchange plans.  Those enhanced premium subsidies are set to expire at the end of the year.  The Rule accordingly implements a number of policies meant to reduce improper enrollments over the short term as Exchanges readjust to a new subsidy environment.  And the Rule also makes permanent reforms to improve the stability of Exchanges, provide premium relief to enrollees who do not qualify for ACA premium subsidies, and protect the public fisc.

The plaintiffs in this case—a group of 21 States—oppose HHS's approach.  They challenge eight different provisions of the Rule under the Administrative Procedure Act, claiming that three are contrary to law and all eight are arbitrary and capricious.  And they seek to preliminarily enjoin those provisions before they go into effect.  Many of Plaintiffs' objections to the Rule—that it pursues certain priorities over others, takes steps that Plaintiffs think are misguided, and implements regulatory changes different from what Plaintiffs would prefer—sound more in policy than law.  Yet the APA is

1

not a vehicle through which Plaintiffs can challenge policies and regulations merely because they disagree with them.   Nor does the APA give litigants or courts license to flyspeck agency decisionmaking or second-guess reasonable judgments made in the face of competing priorities.

Plaintiffs fall well short of meeting the high bar for obtaining preliminary relief.   They are not likely to succeed on the merits of any of their challenges to the Rule.   They fail to show that the challenged provisions will cause them imminent and irreparable harm.   And the equities and public interest do not weigh in favor of staying a Rule based largely on policy disagreements.   Plaintiffs' motion for preliminary relief should accordingly be denied.

**BACKGROUND**

## I.    The Affordable Care Act

Enacted in 2010, the ACA "adopts a series of interlocking reforms designed to expand coverage in the individual health insurance market" and "to make insurance more affordable."   *King v. Burwell*, 576 U.S. 473, 478-79 (2015); *see* Pub. L. No. 111-148, 124 Stat. 119 (2010).   To "ensure that anyone can buy insurance," *King*, 576 U.S. at 493, the ACA generally prohibits health insurance issuers in individual and group markets from denying coverage to applicants because of their health.   42 U.S.C. § 300gg-1(a).   And to promote continuous coverage, the ACA generally requires issuers to "renew or continue in force" an enrolled customer's coverage "at the option of . . . the individual," provided the customer pays his premiums.   *Id.* § 300gg-2(a), (b)(1).

The ACA also required the creation of an "Exchange" in each State where customers can compare and purchase individual (as opposed to group or employer-sponsored) "qualified health plans," which must cover certain "essential health benefits" and adhere to limits on enrollee cost sharing (*i.e.*, deductibles, coinsurance, and co-payments).   *Id.* §§ 18022(a)-(c), 18031(b)(1).   States can elect to operate their own Exchanges ("SBEs").   In States that do not do so, HHS operates a federally facilitated Exchange ("FFE").   Customers can typically enroll in Exchange plans for the upcoming plan year during an annual "open enrollment period," or for the current plan year during "special enrollment periods" that become available if a certain "triggering event" occurs (*e.g.*, a person loses employer-based coverage).   *Id.* § 18031(c)(6).   Exchange plans are categorized into different "metal

2

tiers"—bronze, silver, gold, and platinum—based on their "level of coverage". *Id.* § 18022(d). Generally speaking, the higher the level of coverage, the higher the premiums.

To help make insurance more affordable, the ACA provides subsidies to eligible Exchange enrollees in the form of "premium tax credits" ("PTC"), which enrollees can claim on their annual federal income tax returns. 26 U.S.C. § 36B. The amount of a PTC is based on the enrollee's annual household income and the premium charged for the "benchmark" plan—*i.e.*, the second-lowest cost silver plan—in the enrollee's geographical area. *Id.* Enrollees also have the option of receiving their PTC in advance to lower their monthly insurance payments. These advance premium tax credits ("APTCs") are paid directly to an enrollee's insurance provider to offset premium costs. *See* 42 U.S.C. § 18082. Because APTCs are based on an enrollee's projected annual household income, however, recipients must file a federal tax return and "reconcile" the APTCs they received with the PTC amount they ultimately qualify for based on their actual income during the tax year. *See* 26 U.S.C. § 36B(f)(1).

Before 2021, PTCs and APTCs were available only to Exchange enrollees with household incomes between 100 and 400 percent of the Federal poverty level ("FPL"). *Id.* § 36B(c)(1)(A). During the COVID-19 pandemic, Congress temporarily increased the generosity of the ACA's premium subsidies and expanded eligibility to enrollees with household incomes above 400 percent of the FPL via the American Rescue Plan Act of 2021, Pub. L. No. 117-2, 135 Stat. 4 ("ARPA"). The 2022 Inflation Reduction Act, Pub. L. No. 117-169, 136 Stat. 1818 ("IRA"), extended these enhanced subsides through 2025. The enhanced subsidies are currently set to expire at the end of the year.

The HHS Secretary has broad authority under the ACA to issue regulations implementing and "setting standards for" the ACA's requirements, including those regarding Exchanges and "such other requirements as the Secretary determines appropriate." 42 U.S.C. § 18041(a)(1). Since the ACA's enactment, HHS has accordingly engaged in numerous rulemakings in order to implement various aspects of the ACA. *See, e.g.*, 77 Fed. Reg. 18,310 (Mar. 27, 2012) ("Exchange Establishment Rule"); 82 Fed. Reg. 18,346 (Apr. 18, 2017) ("Market Stabilization Rule"). Since 2013, HHS has also issued annual "Payment Notices" that set standards for, and make adjustments to, different facets of Exchanges and ACA coverage for the upcoming plan year. *See, e.g.*, 90 Fed. Reg. 4,424 (Jan. 15, 2025).

## II.    The Marketplace Integrity and Affordability Rule

In March 2025, the Centers for Medicare & Medicaid Services ("CMS"), an agency within HHS, issued a Notice of Proposed Rulemaking ("NPRM") for a proposed rule that would implement "several regulatory actions aimed at strengthening the integrity of the [ACA] eligibility and enrollment systems to reduce waste, fraud, and abuse."  90 Fed. Reg. 12,942 (Mar. 19, 2025).  CMS further explained that it "expect[ed] these actions would provide premium relief to families who do not qualify for [ACA] subsidies and reduce the burden of . . . [ACA] subsidy expenditures on the Federal taxpayer."  *Id.*  CMS received more than 26,000 comments, some supporting and others opposing different aspects of the proposed rule.   After reviewing those comments and revising certain provisions of the proposed rule in response, HHS issued and publicly released the Final Rule on June 20, 2025, and it was published in the Federal Register on June 25.  90 Fed. Reg. 27,074 ("the Rule").

HHS explained in the Rule's preamble that, "[b]ased on [its] review of enrollment data and [its] experience fielding consumer complaints," it believes that the "temporary expansion of ACA premium subsidies" via the ARPA and IRA "resulted in conditions that were exploited to improperly gain access to fully-subsidized coverage" on Exchanges.  *Id.*  More specifically, "the widespread availability" of fully subsidized Exchange plans—*i.e.*, plans with post-subsidy net premiums of $0—"created the incentive and opportunity for fraudulent and improper enrollments at scale," either by enrollees wanting no-cost Exchange coverage or by third-party brokers that collected commissions on improper enrollments that were made without customers' knowledge.  *Id.*  The Rule accordingly "takes a carefully curated set of temporary actions" to reduce these high levels of improper enrollment "over the short-term," which will then sunset after the Exchange marketplace "readjusts to" a new environment in which the soon-to-expire enhanced premium subsidies provided by the ARPA and IRA (and, by extension, fully subsidized Exchange plans) "are no longer available."  *Id.*  The Rule also implements a number of "permanent reforms to help" Exchanges "reset to the changing subsidy environment to improve affordability and stability over the long-term."  *Id.*[1]

---

[1] Each of the specific Rule provisions Plaintiffs challenge will be discussed in detail below.

The Rule is set to take effect on August 25, 2025, but many of its provisions will apply to Exchange plans that will take effect in 2026. *Id.* at 27,075, 27,178-79.

### III.    Procedural History

Plaintiffs are 21 States. Five have FFEs, and the rest operate SBEs. *See* Compl. at 23 n.24. Plaintiffs brought suit on July 17, 2025, and allege in their Complaint that the notice-and-comment process for the Rule was inadequate (Count I), that various Rule provisions are arbitrary and capricious (Counts II and III), and that some of those same provisions are contrary to law (Counts IV and V), all in violation of the APA. *Id.* ¶¶ 251-85. They also bring an *ultra vires* claim (Count VI). *Id.* ¶¶ 286-93. Concurrent with their Complaint, Plaintiffs filed a motion for preliminary relief, in which they ask the Court to (1) preliminarily enjoin the challenged Rule provisions and (2) stay their effective date "pending a final ruling on the merits of this case." ECF No. 5; *see* ECF No. 6 ("PI Motion").

### LEGAL STANDARD

The APA provides that a court "may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of . . . review proceedings" where "required and to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705. "The same standard governs" the issuance of a § 705 stay and a preliminary injunction. *Ass'n of Am. Univs. v. Dep't of Def.*, -- F. Supp. 3d --, 2025 WL 2022628, at *13 (D. Mass. July 18, 2025). Both are "extraordinary and drastic remed[ies] that [are] never awarded as of right." *U.S. Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*, 121 F.4th 339, 347 (1st Cir. 2024). And such relief is warranted only if a movant establishes that "(1) it is 'likely to succeed on the merits'; (2) it is 'likely to suffer irreparable harm in the absence of preliminary relief'; (3) 'the balance of equities tips in [its] favor' and (4) 'an injunction is in the public interest,'" *New Jersey v. Trump*, 131 F.4th 27, 33 (1st Cir. 2025), with the first factor being "the most important," *Doe v. Trs. of Boston Coll.*, 942 F.3d 527, 533 (1st Cir. 2019).

### ARGUMENT

### I.    The Notice-and-Comment Process Satisfied the APA

Plaintiffs first raise a procedural challenge to the notice-and-comment process, claiming that HHS violated the APA by "allowing only twenty-three days of public comment on" a "complicated,

multifaceted rule." PI Motion at 6. But Plaintiffs are wrong on both the facts and the law.

Start with the facts. Plaintiffs insist that HHS "provided only 23 days" to review and comment on the proposed rule. *Id.* Not so. The proposed rule was announced on CMS's website on March 10, 2025, and filed with the Federal Register and made available for public inspection on March 12; HHS began receiving comments as early as March 12; and comments were accepted until April 11. *See* 90 Fed. Reg. at 27,076, 27,180. The public thus had at least 30 days to comment on the proposed rule. Plaintiffs assert that the comment period did not formally start until the proposed rule was *published* in the Federal Register on March 19. *See* PI Motion at 6. Yet Plaintiffs offer no evidence establishing that, as a practical matter, they lacked notice of the proposed rule's contents until the March 19 publication date, or that they were unable to provide comments before then. *See* 44 U.S.C. § 1507 (providing that the "filing of a document" with the Federal Register is generally "sufficient to give notice of" the document's contents "to a person subject to or affected by it"); *id.* § 1503 ("Upon filing, the document shall be immediately available for public inspection."). Indeed, the fact that HHS received comments between March 12 (the date the proposed rule was displayed for public inspection) and March 19 (the date the proposed rule was published in the Federal Register) confirms that the comment period was well underway during that time span. *See* 90 Fed. Reg. at 27,180.

Plaintiffs misunderstand the law as well by incorrectly suggesting that the APA requires a minimum 30-day comment period—it does not. The APA "establishes the procedures" federal agencies must use "for 'rule making.'" *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). One such procedure is that an agency must "publish a notice of proposed rulemaking in the Federal Register before promulgating a rule that has legal force." *Little Sisters of the Poor Saints Peter & Paul Homes v. Pennsylvania*, 591 U.S. 657, 683 (2020) (citing 5 U.S.C. § 553(b)). HHS satisfied that straightforward requirement when it published the NPRM, and Plaintiffs do not contend otherwise. They instead quibble with the length of the comment period, claiming that HHS, "[b]y allowing only [23] days of public comment on [the] Rule," failed to provide a "meaningful 'opportunity to participate in the rulemaking through submission of written data, views, or arguments.'" PI Motion at 6 (quoting 5 U.S.C. § 553(c)). That argument, of course, rests on the flawed premise that the comment period

lasted only 23 days; it lasted at least 30 days, as just explained.  The APA, in any event, "does not specify a minimum time for submission of comments in an informal rulemaking."  *Petry v. Block*, 737 F.2d 1193, 1201 (D.C. Cir. 1984); *see Chamber of Com. of U.S. v. SEC*, 115 F.4th 740, 755 (6th Cir. 2024) (noting that "[t]he APA sets forth no minimum duration over which executive agencies must solicit public comments").  And courts generally lack the authority to "impose[] on agencies an obligation beyond the 'maximum procedural requirements' specified in the APA."  *Perez*, 575 U.S. at 100. Plaintiffs' suggestion that a comment period of less than 30 days is per se unlawful can thus be rejected outright.  *See Little Sisters*, 591 U.S. at 685 ("[W]e have repeatedly rejected courts' attempts to impose judge-made procedures in addition to the APA's mandates." (citation modified)); *see also Fla. Power & Light Co. v. United States*, 846 F.2d 765, 772 (D.C. Cir. 1988) (upholding a 15-day comment period).

The relevant question here does not concern the precise length of the comment period (*i.e.*, 23 days versus 29 days versus 30 or more days).  It is instead whether "interested persons" had "an opportunity to participate in the rule making" by submitting comments about the proposed rule for HHS to consider.  5 U.S.C. § 553(c).  That HHS received over 26,000 comments, 90 Fed. Reg. at 27,076, confirms that this requirement was easily met.  Indeed, Plaintiffs themselves took advantage of the "opportunity to participate in the rulemaking" by submitting their own comments.  PI Motion at 4.  Plaintiffs nonetheless argue that the comment period should have been "significantly longer" because the Rule is "complex" and "highly technical."  *Id.* at 6-7.  Given that many of the Rule provisions Plaintiffs challenge reinstate policies that existed previously, the Rule is not as complicated or novel as Plaintiffs make it out to be.  *See, e.g.*, 90 Fed. Reg. at 27,084 (implementing a policy similar to one finalized in a 2017 rule); *id.* at 27,113 (reinstating a policy that was changed in 2023).  Courts have also found that a 30-day comment period is reasonable even for regulations that were "technical[ly] complex."  *Conn. Light & Power Co. v. Nuclear Regul. Comm'n*, 673 F.2d 525, 534 (D.C. Cir. 1982) ("We cannot say that the NRC's choice of a [30-day] comment period was unreasonable. Neither statute nor regulation mandates that the agency do more.").

Regardless, even taking Plaintiffs' complaints about the comment period at face value, Plaintiffs "do not come close to demonstrating that they experienced any harm" due to the comment

period being shorter than they would have liked. *Little Sisters*, 591 U.S. at 684; *see* 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error."); *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination."). After all, Plaintiffs submitted comments—and lengthy ones, too. *See* PI Motion at 4 n.3 (citing their 51-page comment letter). The only specific example of potential prejudice they point to is that Washington State's SBE "could not perform a complete analysis of the expected enrollment losses, premium impacts, and risk pool changes associated with th[e] [R]ule because of the truncated comment period." PI Motion at 6-7. Plaintiffs presumably expected that analysis to show that the Rule would impact each of those factors. But HHS addressed and assessed those very same factors throughout the Rule's preamble, and nevertheless concluded that the Rule's likely benefits will outweigh its potential costs. *See, e.g.*, 90 Fed. Reg. at 27,214 ("[W]e anticipate that most of this decrease in enrollment will be attributable to improper enrollments that should never have enrolled in Exchange coverage."); *id.* at 27,121 ("[W]e believe that the positive impact to program integrity will outweigh any negative impacts to the risk pool."). Plaintiffs do not explain, let alone persuasively so, how a more "complete analysis" from a single SBE would have yielded information materially different from the information and arguments HHS has already thoroughly considered. Nor do they identify the other "highly technical matters" they supposedly would have addressed during a longer comment period. PI Motion at 6. Plaintiffs' failure to show "how an extended comment period would have enhanced the substantive record," or how they were otherwise harmed by the comment period they were given, thus renders their objection to the notice-and-comment process "an empty gesture." *Chamber of Com.*, 115 F.4th at 758; *see Craker v. DEA*, 44 F.4th 48, 57 (1st Cir. 2022) (rejecting a procedural challenge to a proposed rule because "the petitioners can point to no prejudice").

Finally, Plaintiffs separately argue that, irrespective of the length of the comment period, the "notice-and-comment process was still inadequate because [HHS] failed to notify the public" that Rule provisions "could be adopted for 2026 only." PI Motion at 8. They assert that "[h]ad HHS disclosed th[e] possibility" that certain provisions might only have a one-year duration, "commenters could have pointed out the fundamental illogic" of that approach. *Id.* Yet Plaintiffs "do not explain

what additional, concrete commentary they would have introduced," *Craker*, 44 F.4th at 57 (finding no prejudicial error in similar circumstances), let alone grapple with HHS's reasonable justifications for sunsetting certain provisions after one year. *See, e.g.*, 90 Fed. Reg. at 27,091 ("[HHS] has concluded it would be reasonable to accept some risk of future improper enrollments after these policies sunset, in favor of limiting overall disruptions as the market adjusts and sheds holdover improper enrollments."). Moreover, when an agency proposes to implement a policy, "[o]ne logical outgrowth" of that proposal "is surely . . . to refrain from taking the proposed step." *New York v. EPA*, 413 F.3d 3, 44 (D.C. Cir. 2005). And if not adopting a policy *at all* is a logical and foreseeable outgrowth of an initial proposal, *id.*, then the same is surely true of a decision to adopt a policy for a more limited duration than initially proposed, especially where, as here, that change is made in direct response to concerns commenters raised. *See Victim Rts. Law Ctr. v. Cardona*, 552 F. Supp. 3d 104, 134 (D. Mass. 2021) ("An agency may deviate from its proposed rule because '[a]gencies are free—indeed, they are encouraged—to modify proposed rules as a result of the comments they receive.'"). Plaintiffs' conclusory assertion that they lacked sufficient notice of the possibility that HHS might shorten the duration of certain Rule provisions accordingly lacks merit.

## II. Plaintiffs Are Not Likely to Succeed on the Merits of Their APA Claims

The bulk of Plaintiffs' PI Motion is devoted to challenging eight Rule provisions under the APA. Plaintiffs claim that three of the provisions are contrary to law and that all eight are arbitrary and capricious. PI Motion at 8-30. They are not likely to succeed on the merits of any of their claims.

The APA provides that a reviewing court "shall . . . hold unlawful and set aside agency action" that is "found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). When reviewing a contrary-to-law claim, "courts must exercise independent judgment in determining the meaning of statutory provisions" and "set aside" any action that is "inconsistent with the law as they interpret it." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392, 394 (2024). When determining whether an agency decision was arbitrary or capricious, a court must leave the decision undisturbed "unless 'the agency lacks a rational basis for making the determination or if the decision was not based on consideration of the relevant factors.'" *P.R. Tel. Co.*

*v. Telecomms. Regul. Bd. of P.R.*, 665 F.3d 309, 319 (1st Cir. 2011) (citation omitted).  Review under the arbitrary-and-capricious standard is thus "highly deferential": a court "may not substitute its judgment for that of the agency, even if it disagrees with the agency's conclusions."  *Atieh v. Riordan*, 797 F.3d 135, 138 (1st Cir. 2015).  Agency decisions are instead "presumed to be valid," *P.R. Tel. Co.*, 665 F.3d at 319, and if a decision "is supported by any rational view of the record," a court "must uphold it," *Atieh*, 797 F.3d at 138.  Agencies are also "free to change their existing policies as long as they provide a reasoned explanation for the change."  *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).

Plaintiffs level various scattershot arguments against different Rule provisions.  Most of those arguments amount to little more than policy disagreements with HHS, and all lack merit.

### A.    Past-Due Premium Policy

To promote continuous health insurance coverage and improve customer accountability, the Rule will allow, subject to applicable state law, health insurance issuers to require a customer seeking new insurance coverage to pay any past-due premiums owed to the issuer for prior coverage before that customer can pay the initial premium needed to effectuate new coverage.  *See* 90 Fed. Reg. at 27,084.  Put another way, the Rule will allow issuers to require a customer to pay (1) any past-due premiums the customer owes the issuer (or related issuers) for prior coverage *and* (2) the initial premium amount required for new coverage before the latter coverage is effectuated.  *Id.* at 27,084, 27,088.  And if the customer fails to pay that combined amount in full, the issuer can decline to effectuate the new coverage.  *Id.* at 27,084.  Plaintiffs argue that this past-due premium policy is both contrary to law and arbitrary and capricious.  *See* PI Motion at 20-21.  It is neither.

The Rule's past-due premium policy is similar to one that CMS implemented in 2017.  *See* NPRM, 90 Fed. Reg. at 12,951.  That prior policy was replaced in 2022 with the current regulation, which bars a health insurance issuer from denying coverage to an individual "due to the individual's . . . failure to pay premium[s] owed under a prior policy," including by attributing payment made for a new policy to past-due premiums.  45 C.F.R. § 147.104(i).  Under the Rule, issuers will once again be allowed—subject to applicable state law—to (1) attribute payments made for an initial premium for new coverage to past-due premium amounts owed to the issuer, and (2) then refuse to

effectuate the new coverage if *both* the past-due and initial premium amounts are not paid in full. 90 Fed. Reg. at 27,084. As explained in the Rule's preamble, HHS anticipates that this past-due premium policy will "help to promote continuous coverage, reduce gaming and adverse selection, ensure that ACA subsidies are targeted to those who are eligible, and allow issuers to more accurately predict costs and price plans." *Id.* For instance, HHS predicts that Exchange enrollees, including healthier ones who might stop paying their premiums if they anticipate not needing health services for the rest of the plan year, will likely "be more inclined to remain in their coverage" if they know that they would have to pay any past-due premiums before effectuating new coverage. *Id.* at 27,086.

Plaintiffs contend that the Rule's past-due premium policy is contrary to the ACA's guaranteed-availability provision, 42 U.S.C. § 300gg-1(a). But they oversimplify the relevant law. While it is true that the ACA requires health insurance issuers to "accept every . . . individual in the State that applies for such coverage," *id.*, an issuer's provision of coverage is of course contingent on the enrollee's payment of premiums, *see id.* § 300gg-2(b)(1) (providing that an issuer may "nonrenew or discontinue health insurance coverage" if an enrollee "has failed to pay premiums"). The ACA, in short, cannot be sensibly read to "require issuers to provide coverage to applicants who have not paid for such coverage." 90 Fed. Reg. at 27,087. And that principle applies with equal force to individuals who fail to pay the initial premium required to effectuate a new policy. *See* 45 C.F.R. § 155.400(e) (providing that a FFE "will . . . require payment" equivalent to "the first month's premium" to "effectuate an enrollment" in an Exchange plan). If an individual applies for a new Exchange plan but fails to pay the full amount of the initial premium, that plan never goes into effect.[2] The Rule simply allows an issuer who is owed past-due premiums from a particular customer to lawfully credit any payments made by that customer for new coverage to the past-due balance before crediting those payments to the initial premium amount for the new coverage. And if, as a result of such a lawful allocation policy, the customer still has an outstanding balance on the initial premium amount, the

---

[2] *See* CMS, *Health Coverage Effectuation, Grace Periods, and Terminations* at 2 (June 2024), https://www.cms.gov/files/document/coverage-effectuation-job-aid.pdf ("Consumers must pay their binder payment (often the first month's premium) for enrollment to be effectuated (i.e., the policy is active).").

issuer can decline to effectuate the new policy for failure to pay the requisite initial premium. *See* 90 Fed. Reg. at 27,087 (explaining that a customer in such circumstances "has not made sufficient initial payment for the new coverage"). The Rule's past-due premium policy is thus entirely consistent with the ACA and regulations governing the effectuation of a new Exchange plan via an initial premium.

Plaintiffs also fail to acknowledge a key facet of the Rule's past-due premium policy—States retain the flexibility to choose whether the policy will apply in their respective insurance markets at all, and they can likewise "apply additional parameters governing issuers' premium payment policies, to the extent permitted under Federal law." 90 Fed. Reg. at 27,084; *see id.* at 27,085 ("We agree that States are in the best position to decide whether it is appropriate to permit or prohibit this policy."). To the extent Plaintiffs disagree with the wisdom of past-due premium policies, they can simply elect to take a different approach, and Plaintiffs do not credibly describe how they are harmed by a policy they are not required to adopt. *Cf. Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (per curiam) (rejecting a theory of standing based on a State's "self-inflicted" legislative decisions).

Plaintiffs separately contend that the Rule's past-due premium policy is arbitrary and capricious. They assert that the only "point" of the policy is "to help consumers avoid 'premium debt,'" and they seem to argue that HHS did not adequately explain why the policy was "necessary" to achieve that lone objective. PI Motion at 21. But this blinkered understanding of the Rule overlooks the many other benefits the past-due premium policy is expected to yield, which HHS amply explained. *See, e.g.*, 90 Fed. Reg. at 27,087 (noting that when a similar policy was in place, the percentage of Exchange enrollees who had their coverage terminated for non-payment of premiums "dropped substantially"); *id.* at 27,192 ("This policy aims to balance multiple objectives, including promoting continuous coverage, maintaining stable risk pools, addressing concerns about adverse selection, and respecting States' ability to regulate their insurance markets."). HHS also considered Plaintiffs' concerns about Exchange customers not knowing about past-due premium policies and decided to "defer to States on any additional parameters or standards that issuers must satisfy," which could include "provid[ing] advance notice" of such policies. *Id.* at 27,085. And Plaintiffs' objection to HHS's "change in position" regarding debt-collection practices, PI Motion at 21, is a non-starter:

HHS gave a "reasoned explanation for the change," which is all that the ACA requires, *Encino Motorcars*, 579 U.S. at 221. *See* 90 Fed. Reg. at 27,089 (explaining that the past-due premium policy will "facilitate issuer premium collection efforts" and likely "prevent" premium debt in the first place).

**B.    Failure to Reconcile Provision**

The Rule reinstates a prior policy that requires an Exchange to determine a "tax filer" ineligible for APTCs if the filer (1) received APTCs the prior year and (2) failed to comply with the ACA requirement that he file a tax return and "reconcile APTC" for that year. *Id.* at 27,113; *see* 26 U.S.C. § 36B(f)(1). This failure-to-reconcile ("FTR") provision—which will apply only through 2026— amends the current requirement that such an eligibility determination be made only after a tax filer fails to reconcile for two consecutive tax years. *See* 45 C.F.R. § 155.305(f)(4). Plaintiffs claim that this policy change is arbitrary and capricious, PI Motion at 14-16, but their arguments fall short.

As explained above, the ACA provides that certain individuals who purchase health coverage on an Exchange are eligible for premium subsidies in the form of a credit against federal income tax. *See* 26 U.S.C. § 36B. The amount of that PTC turns on (1) the percentage of annual household income that an individual is required to contribute to monthly health insurance premiums (as prescribed by statute) and (2) the monthly premium cost of a "benchmark" silver plan on the relevant Exchange. *Id.* § 36B(b)(2)-(3). The ACA tasks HHS with "determining" whether individuals claiming PTCs meet the applicable eligibility requirements. 42 U.S.C. § 18081; *see id.* § 18081(a)-(e) (prescribing the information applicants must provide as part of that eligibility determination and the means by which HHS must verify that information). The statute further directs the agency to "establish a program under which" PTCs can be paid to eligible applicants in advance—that is, before those applicants claim the PTCs on their federal tax returns—to help offset the cost of the applicants' monthly insurance premiums. *Id.* § 18082(a). An individual's eligibility for these APTCs is tied to his or her eligibility for PTCs, *see id.* § 18082(c); if HHS determines that an individual is eligible for the latter, then the Treasury Department must make an "advance payment" (*i.e.*, an APTC) to that person that is equivalent to the applicable PTC amount, *id.* § 18082(c)(2)(A). The IRS then requires taxpayers who receive APTCs—which are typically scaled to the recipient's *projected* annual household income—

to reconcile those advance payments with the PTC amount they otherwise qualify for in the applicable tax year, as determined by their *actual* annual household income. *See* 26 U.S.C. § 36B(f). If the APTCs the taxpayer received exceed that allowable PTC amount, the taxpayer may incur a tax liability, subject to certain income-based caps. *Id.* § 36B(f)(2).

HHS conditions APTC eligibility on an individual's compliance with this statutory reconciliation requirement. Indeed, starting in 2012, HHS prohibited an Exchange from determining a tax filer eligible for APTCs if the filer (1) received APTCs the prior year and (2) failed to file a tax return and reconcile those APTCs for that year. *See* 90 Fed. Reg. at 27,081-82.[3] (Taxpayers who are deemed ineligible for APTCs due to their failure to reconcile can still claim on their tax returns the full amount of the PTC they are otherwise eligible for; they just would not be able to receive that PTC amount in advance.) In 2023, HHS amended the FTR regulation such that a taxpayer becomes ineligible for APTCs only if they fail to reconcile for two consecutive tax years. *See id.* at 27,113. The Rule simply reverts back to the requirement that a taxpayer be deemed ineligible for APTCs after one year of failing to reconcile, and this one-year policy applies only through 2026. *Id.* HHS made this change to "align" its regulations with the ACA's reconciliation requirement, to "protect" APTC recipients "from accumulating additional Federal tax liabilities," and to "reduce" federal expenditures on APTCs paid to "ineligible enrollees." *Id.* at 27,115.

Plaintiffs assert that HHS's reversion to a one-year FTR policy is arbitrary and capricious because it is "unlikely to accomplish [HHS's] stated goal of reducing fraud on the Exchanges." PI Motion at 15. Yet as explained in the Rule's preamble, HHS's review of enrollment and tax-filing data suggests that the current two-year policy has resulted in FFEs having "a substantially higher than normal number of enrollees who have not filed and reconciled as compared to the previous 1-year [policy]," a disparity that could be explained by the fact that under the two-year policy, a tax filer who

---

[3] Due to the COVID-19 pandemic's impact on "the processing of federal income tax returns," CMS "did not act on" data indicating that an enrollee had failed to comply with the ACA's reconciliation requirement in plan years 2021 through 2023. CMS, *Failure to File and Reconcile (FTR) Operations Frequently Asked Questions (FAQ)* at 1(Apr. 19, 2024), https://www.cms.gov/files/document/failure-file-and-reconcile-faq.pdf.

failed to reconcile in one year can do so again and still "keep APTC eligibility." 90 Fed. Reg. at 27,113-14. HHS also provided data suggesting that one-year notices sent during the open enrollment period for Exchange coverage "were relatively effective" in resolving FTR issues. *Id.* at 27,114. Plaintiffs' conclusory assertion that the Rule's one-year policy will be "ineffective," PI Motion at 15, is hardly a sufficient basis for deeming HHS's reasonable, data-based determinations to the contrary invalid. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 521 (2009) (explaining that an agency's "predictive judgment . . . merits deference").

Plaintiffs also claim that the one-year FTR policy will cause eligible individuals to "los[e] access to APTCs" due to potential "administrative error" and "IRS processing delays," and they suggest that HHS did not "specifically respond to" such concerns. PI Motion at 15-16. But HHS *did* acknowledge such concerns; it just made the reasonable policy judgment that the potential for "long IRS processing times" in some cases is "unlikely a sufficient reason to maintain" the current two-year policy over the Rule's one-year policy in light of "imminent program integrity concerns." 90 Fed. Reg. at 27,116; *see FBME Bank Ltd. v. Mnuchin*, 249 F. Supp. 3d 215, 222 (D.D.C. 2017) (noting that an agency is not required to "respond to significant comments in a manner that satisfies the commenter."). The effect of any such reporting delays will be mitigated in any event by CMS's "FTR Recheck process," under which enrollees who file their federal tax returns by the October 15 extended filing date can attest to doing so and thus maintain their APTC eligibility for the following coverage year while their FTR status is verified. 90 Fed. Reg. at 27,116. Plaintiffs likewise maintain that HHS did not adequately consider the compliance costs States will face while implementing the one-year FTR policy. *See* PI Motion at 16. But again, HHS acknowledged such concerns and determined that those compliance costs were outweighed by "the potential costs of paying APTC to those who have not filed and reconciled for a second consecutive tax year." 90 Fed. Reg. at 27,199. Plaintiffs "may disagree with" HHS's "policy balance," but that does not render the Rule's FTR policy arbitrary or capricious. *Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 211 (D.C. Cir. 2007).

## C. Annual Eligibility Redetermination Provision

Plaintiffs challenge as both contrary to law and arbitrary and capricious a Rule provision that

concerns the annual process by which HHS determines an individual's eligibility to re-enroll in a subsidized health care plan on an Exchange. The eligibility requirements for enrolling in an Exchange plan and for receiving PTCs and APTCs are set forth in the ACA and its implementing regulations. *See* 42 U.S.C. §§ 18081(a), 18082(a); 26 U.S.C. § 36B, (c)(1)(A); 45 C.F.R. § 155.305(a), (f). HHS is generally responsible for determining whether a customer satisfies those requirements. If a customer does, then he can enroll in an Exchange plan for the upcoming plan year and receive PTCs and APTCs. And as a general matter, the ACA requires plan issuers to renew an enrollee's coverage the next year, subject to certain statutory exceptions. 42 U.S.C. § 300gg-2(a). Even when an enrollee's plan is subject to that guaranteed-renewability provision, however, an Exchange must still "redetermine" the enrollee's eligibility for subsidized Exchange coverage "on an annual basis" in accordance with HHS regulations. 45 C.F.R. § 155.335(a)(1).

The Rule sets forth procedures that will apply to certain annual eligibility redeterminations for plan year 2026—and only on FFEs. *See* 90 Fed. Reg. at 27,102. The Rule provides that (1) if an enrollee does not submit an application for an updated eligibility redetermination for plan year 2026 on or before the deadline to select Exchange coverage and (2) that enrollee's post-APTC premium will be zero dollars (*i.e.*, the enrollee's coverage will be fully subsidized), then (3) the Exchange "must decrease the amount of" the APTC "applied to the [enrollee's] policy such that the remaining monthly premium owed for the policy equals $5." NPRM, 90 Fed. Reg. at 13,031. As explained in the Rule's preamble, this temporary change to the annual eligibility redetermination process responds to HHS's increasing concern about "the level of improper enrollments" in zero-premium plans on federal Exchanges. 90 Fed. Reg. at 27,102. HHS attributes that problem in part to agents and brokers improperly enrolling consumers in fully subsidized Exchange plans "without their knowledge" in order to earn commission payments. *Id.* at 27,103; *see id.* ("Because these enrollees do not receive a monthly premium bill requiring action on their part, they may not be aware they are enrolled."). HHS also notes that the recent expansion of premium subsidies via the ARPA and IRA "significantly increased the number of enrollees" who are enrolled in fully subsidized Exchange plans, and it concluded that many of those enrollments are likely improper in light of data indicating that actual

enrollment in subsidized Exchange plans substantially exceeds the number of such enrollments reported on Census surveys. *Id.* at 27,103, 27,105-06. Because improper enrollments can persist due to enrollees being continuously re-enrolled in fully subsidized Exchange plans from year to year without having to take any action, the Rule addresses the issue by "prompt[ing]" individuals "to update or confirm" their eligibility for such coverage "or else pay a $5 monthly premium" until they do so. *Id.* at 27,103; *see id.* at 27,102 (explaining that the "full amount of" an enrollee's APTC will be "reinstate[d]" once their eligibility is confirmed).

Plaintiffs claim that this eligibility redetermination provision is arbitrary and capricious because, in their view, HHS (1) did not provide enough evidence "to support its claim that the $5 charge would reduce improper enrollments," (2) offered "no justification for choosing" the $5 amount, and (3) did not adequately consider the prospect of "customer confusion." PI Motion at 10. Yet these alleged shortcomings do not square with reality or the deferential arbitrary-and-capricious standard. HHS clearly explained in the Rule's preamble the problem it was trying to address—*i.e.*, improper enrollments in fully subsidized Exchange plans that persist because of automatic re-enrollment, *see* 90 Fed. Reg. at 27,102—and how the Rule reasonably attempts to address that problem—*i.e.*, by encouraging enrollees in fully subsidized plans to actively confirm their knowledge of and eligibility for such plans, *id.* at 27,104. *See Encino Motorcars*, 579 U.S. at 221 (explaining that an agency need only "articulate . . . a rational connection between the facts found and the choice made"). After considering higher and lower amounts, HHS also concluded that $5 is "a reasonable amount to encourage most low-income enrollees to act without being cost prohibitive such that it prevents their action." 90 Fed. Reg. at 27,104. Plaintiffs' unreasoned objection to the $5 figure does not undermine that otherwise-rational determination. As for Plaintiffs' concern about "consumer confusion," HHS highlighted that Exchanges will have "sufficient time" to "educate" enrollees about the Rule's eligibility redetermination provision through "updated notices," and that "training and technical assistance" will be provided to agents, brokers, issuers, and other "interested parties" so that they can "assist enrollees in understanding the proposed change." *Id.* at 27,107. HHS, in short, "examined the relevant considerations and articulated a satisfactory explanation for its action," and the APA does

17

not demand more. *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 292 (2016) (citation modified).

Plaintiffs separately argue that the Rule's eligibility redetermination provision is contrary to law because "the Rule commands a reduction in the amount of APTC credited to enrollees by $5, without lawful authority to do so." PI Motion at 10. The ACA, however, tasks HHS with "determining" whether individuals enrolled in Exchange plans "meet[] the income and coverage requirements" for claiming PTCs, and with determining "the amount" of those tax credits. 42 U.S.C. § 18081(a)(2). It is likewise HHS's responsibility to determine an enrollee's eligibility for APTCs and the amount of those APTCs (which mirror the applicable PTC amount). *See id.* § 18082(a)(1), (3); 45 C.F.R. § 155.305(f)(5). And the ACA grants the HHS Secretary the authority to "establish a program" for making these eligibility determinations, 42 U.S.C. § 18081(a)(1), and to "establish procedures" for "redetermin[ing] eligibility on a periodic basis in appropriate circumstances," *id.* § 18081(f)(1)(B). The Rule's eligibility redetermination provision comports with that grant of authority. Indeed, the provision's very purpose is to facilitate HHS's ability to *redetermine* enrollees' *eligibility* to remain enrolled in fully subsidized Exchange plans, and the "procedure[]" HHS opted for in the Rule is a nominal reduction in APTC that is designed to prompt certain enrollees to affirmatively reconfirm their eligibility. *See id.* The high level of improper enrollment in fully subsidized Exchange plans—a problem that stems in part from a soon-to-expire enhanced subsidy regime, *see* 90 Fed. Reg. at 27,103—also presents the "appropriate circumstance" for implementing this temporary nominal-APTC-reduction procedure, 42 U.S.C. § 18081(f)(1)(B). Because HHS has the statutory authority to utilize such a procedure to redetermine eligibility when appropriate, and reasonably explained its decision to do so here, Plaintiffs' challenge to the Rule's eligibility redetermination provision fails.

### D.    Income Eligibility Verification Policies

Plaintiffs challenge two Rule provisions that concern the processes by which HHS verifies "income eligibility" for APTC and cost-sharing-reduction subsidies. *See* 90 Fed. Reg. at 27,112. These provisions address the "critical balance HHS must achieve between assuring responsible stewardship of taxpayer dollars with protecting access to Federal program[s] for those who qualify for them." *Id.* at 27,113. Plaintiffs assert that the two provisions will "impose enormous financial and administrative

burdens on SBEs and low-income consumers" for "meritless" reasons, "rendering [them] arbitrary and capricious." PI Motion at 12-13. But both provisions are "reasonable and reasonably explained" and thus pass muster under the APA. *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

When verifying an applicant's household income for purposes of determining their eligibility for APTCs, an Exchange typically must consider the applicant's tax return information, as well as the applicant's attestation regarding their "projected annual household income." 45 C.F.R. § 155.320(c)(3)(ii). Under current regulations, if an applicant attests to having a projected annual household income that is higher than the household income reflected in income data provided by the IRS or certain other sources, an Exchange generally "must accept the applicant's attestation . . . without further verification." *Id.* § 155.320(c)(3)(iii)(A). The first income-verification provision that Plaintiffs challenge amends this regulation by requiring Exchanges to instead further verify an applicant's household income if (1) an applicant attests to income that is between 100 and 400 percent of the FPL, (2) income data from the IRS indicates household income below 100 percent of the FPL, and (3) the former income amount exceeds the latter amount by a "reasonable threshold." 90 Fed. Reg. at 27,123. The applicant would then be given an opportunity to resolve the inconsistency by providing additional documentation and taking other steps to verify their household income. *See* 45 C.F.R. § 155.315(f)(1)-(4) (prescribing procedures for resolving data-matching inconsistencies related to eligibility determinations).

As explained in the Rule's preamble, HHS's reasons for taking additional steps to verify an applicant's income when tax return data indicates that the applicant's household income is less than 100 percent of the FPL are straightforward. Because individuals with incomes below that threshold generally are not eligible for PTCs or, by extension, APTCs, *see* 26 U.S.C. § 36B(a), (c)(1), an applicant who attests to having a projected household income that is equal to or above 100 percent of the FPL might be deemed eligible for subsidized Exchange coverage despite income data from other sources showing otherwise. 90 Fed. Reg. at 27,121. And given that such a discrepancy could be a consequence of an applicant overestimating his projected household income in order to obtain APTCs for which he is not otherwise eligible, it is "reasonable," HHS explains, to request additional documentation

verifying the applicant's actual income in such circumstances, so as to protect against overpayment of APTCs. *Id.* That additional verification is precisely what the Rule will require. Given that HHS's concerns about improper enrollments in fully subsidized plans "will likely have abetted," however, once the health insurance market "readjust[s]" to the expiration of enhanced premium subsidies, HHS decided to adopt this verification requirement only through 2026. *Id.* at 27,123-24.

The second income-verification provision Plaintiffs challenge rescinds a regulation that requires an Exchange to accept an applicant's self-attestation of projected annual household income "without further verification" whenever (1) the Exchange requests tax return data from the IRS to verify the applicant's attested income, but (2) the IRS confirms that no such data is available, 45 C.F.R. § 155.320(c)(5). *See* 90 Fed. Reg. at 27,130. The current regulation, adopted in 2023, creates an exception to the general requirement that an Exchange must verify an applicant's annual household income with certain trusted data sources, 45 C.F.R. § 155.320(c)(1)(ii), and otherwise follow an alternative verification process if tax return data for an applicant is unavailable, *id.* § 155.320(c)(3)(vi). The Rule simply removes this exception and requires Exchanges to follow standard verification and data-matching procedures "when tax return data is unavailable to immediately verify a consumer's attestation of annual household income." 90 Fed. Reg. at 27,132. This change also sunsets after 2026.

Plaintiffs object to HHS's conclusion that any administrative burden these two income-verification provisions will impose on affected enrollees is expected to be "minimal," *id.* at 27,123. *See* PI Motion at 13-14. Yet HHS made the reasonable observation that such enrollees will likely have documentation verifying their household income (*e.g.*, pay stubs) "readily available," and that the burden of submitting that documentation would not be substantial. 90 Fed. Reg. at 27,131-32; *see id.* at 27,126 (observing that "younger individuals generally are accustomed to requirements to prove their eligibility for a variety of benefits and activities, including proving their identities and income"). And HHS underscored that the "90-day period provided under statute" for resolving income-related inconsistencies "provides ample time for applicants to provide proof of their household income" before any change is made to their APTCs. *Id.* at 27,132; *see* 42 U.S.C. § 18081(e)(4)(A)(ii)(II). As for Plaintiffs' concerns about the compliance costs SBEs will face, HHS addressed those concerns head

20

on and concluded that such costs were "justified" in light of the "program integrity gains" the Rule's income-verification provisions are expected to yield. 90 Fed. Reg. at 27,126. Again, Plaintiffs may disagree with this "policy balance," but that alone does not mean that HHS's actions were arbitrary or capricious. *Owner-Operator*, 494 F.3d at 211.

Plaintiffs also claim that HHS should have adopted a "far narrower policy change," either by adopting only one of the Rule's income-verification provisions rather than both, or by applying the two provisions only in States that did not expand Medicaid eligibility under the ACA. PI Motion at 14. HHS noted that the incentive to overestimate annual household income to (improperly) qualify for subsidized Exchange coverage was particularly acute in non-Medicaid expansion States. *See* 90 Fed. Reg. at 27,121. But the agency nonetheless concluded that it is still "vital . . . to ensure that" Exchange enrollees' "annual household income is fully verified" and that "they are receiving the correct eligibility determinations," even in States that expanded Medicaid eligibility. *Id.* at 27,128. Plaintiffs offer nothing beyond basic policy objections to this commitment on HHS's part to enforce APTC-eligibility requirements set by statute—an obligation that cannot be disregarded simply because tax return data might be incomplete or unavailable in some cases, or because reasonable income-verification requirements might result in some people being deemed ineligible for Exchange coverage. At bottom, HHS provided the very sort of "reasoned explanation" for its policy changes that the APA requires. *Encino Motorcars*, 579 U.S. at 221.

### E.    Special Enrollment Period Eligibility Verification Policy

Individuals wanting to enroll in an Exchange plan typically do so during an annual "open enrollment period" ("OEP") that takes place at the end of the calendar year. *See* 45 C.F.R. § 155.410(a). The ACA also requires Exchanges to provide "special enrollment periods" ("SEP"), during which applicants may enroll in an Exchange plan outside of the OEP if a certain "triggering event" occurs. *See* 42 U.S.C. § 18031(c)(6). Common "triggering events" include losing non-Exchange health coverage, getting married, having a child, or moving to a different state. *See* 45 C.F.R. § 155.420(d)(1)(i), (2)(i), (7). Under current regulations, FFEs are permitted to conduct pre-enrollment eligibility verification only for enrollment via the loss-of-other-health-coverage SEP. *See id.*

21

§ 155.420(g).  Under the Rule, FFEs (but not SBEs) will instead be required to conduct pre-enrollment eligibility verification for other categories of SEPs as well (*e.g.*, permanent move, marriage, etc.), and they will need to conduct such pre-enrollment verification "for at least 75 percent of new enrollments through SEPs."  90 Fed. Reg. at 27,148, 27,223.  For reasons related to the upcoming expiration of the enhanced subsidy regime, these requirements will sunset after 2026.  *Id.* at 27,151.

Plaintiffs argue that this SEP eligibility verification requirement is arbitrary and capricious, ostensibly because they think HHS's conclusions about the policy's potential effect on adverse selection and Exchange risk pools are unsatisfactory.  PI Motion at 11-12.  HHS acknowledged that verification requirements "may deter healthier, less motivated individuals from enrolling" in Exchange coverage via SEPs.  90 Fed. Reg. at 27,148.  But it also identified what it deemed a critical shortcoming of the current SEP eligibility verification regulations—namely that, because of their limited scope, they enable otherwise ineligible individuals to enroll in Exchange plans "only after they become sick or . . . need expensive health care services," which in turn "negatively impacts both the risk pool and program integrity around determining eligibility for APTC[s] and [other] subsidies."  *Id.* at 27,148.  HHS explained that more robust eligibility verification for SEP enrollment would "restrict[] people from" engaging in such "gaming [of] SEPs," which would improve Exchange risk pools, "make[] health coverage more affordable for unsubsidized enrollees," and reduce federal expenditures on APTC subsidies.  *Id.* at 27,150.  HHS also pointed to data suggesting that pre-enrollment verification requirements that applied to SEPs prior to a 2022 regulatory change did not create substantial barriers to Exchange enrollment, and that such requirements had the effect of "encourag[ing] continuous enrollment by making it more difficult to engage in strategic enrollment and disenrollment."  *Id.* at 27,149.  And the agency underscored its general "responsibility to comply with the ACA," *id.* at 27,152, which includes adhering to statutory and regulatory eligibility requirements for SEP enrollment.

This thorough explanation of HHS's reasoning and its reasons for adopting pre-enrollment verification requirements for SEPs puts to rest Plaintiffs' contention that such changes are arbitrary and capricious.  Plaintiffs insist that HHS should have provided more data "showing that SEP enrollees are more expensive to insure compared to non-SEP enrollees."  PI Motion at 11.  But the

APA does not require agencies to obtain "perfect empirical or statistical data," and HHS "made a reasonable predictive judgment based on the evidence it had." *Prometheus*, 592 U.S. at 427. The Rule's eligibility-verification requirements for SEP enrollment must be upheld so long as they are "supported by any rational view of the record." *Atieh*, 797 F.3d at 138. They easily satisfy that deferential standard.

### F. Premium Adjustment Percentage Methodology

Plaintiffs next challenge a Rule provision that updates the methodology used to calculate what is known as the "premium adjustment percentage" ("PAP"), such that the calculation will "capture[] premium changes" in the individual health insurance market in addition to those for employer-sponsored insurance. *See* 90 Fed. Reg. at 27,166. Plaintiffs argue that this change is arbitrary and capricious, but they again miss the mark.

The ACA directs the HHS Secretary to determine an annual PAP based on "the average per capita premium for health insurance coverage in the United States for the preceding calendar year." 42 U.S.C. § 18022(c)(4). That measure of premium growth is then used to set the rate of increase for a number of parameters defined in the ACA, such as the maximum annual limitation on cost sharing under Exchange plans. *See* 45 C.F.R. § 156.130(a). In ACA's early days, the PAP was calculated based solely on estimates of average premiums for employer-sponsored health plans because that approach "reflected trends in health care costs without being skewed by . . . premium fluctuations" in the individual insurance market. 90 Fed. Reg. at 27,166. HHS later adopted a methodology that also considered "private health insurance premiums" but reversed course in 2021 and presently considers only premiums for employer-sponsored coverage in the PAP calculation. *Id.* at 27,166-67. In the Rule, HHS once against adopts a PAP methodology that takes account of premium changes in both the individual and group health insurance markets. *Id.* at 27,167.

Plaintiffs give three reasons for why this change is purportedly arbitrary and capricious, but each can be readily dismissed. First, they claim that the new methodology "improperly factor[s] in individual market premiums from 2013" because those figures were "highly volatile." PI Motion at 17. But Plaintiffs do not appear to argue that HHS is somehow prohibited from considering individual market premiums from later years in the PAP calculation. And to the extent they object to HHS using

2013 figures specifically, that benchmark year is set by statute.  *See* 42 U.S.C. § 18022(c)(4).

Second, Plaintiffs argue that HHS's changes to the PAP methodology "squarely undermine" the ACA's "twin goals of expanding access to healthcare and making it more affordable."  PI Motion at 18.  Yet as HHS explained in the Rule's preamble, the PAP reflects Congress's intent to "appropriately index various parameters defined in the ACA."  90 Fed. Reg. at 27,172.  The ACA's text, moreover, is clear: the PAP must measure yearly changes in the "average per capita premium for health insurance coverage in the United States."  42 U.S.C. § 18022(c)(4).  Given this definition, then, "the primary consideration for setting [the PAP's] value . . . should be whether it accurately and comprehensively captures the rate of premium growth in the United States" writ large.  90 Fed. Reg. at 27,173.  And placing undue weight on considerations other than the rate of premium growth "in the United States" when calculating the PAP—including concerns about premium subsidies and Exchange enrollment—could yield a figure that "artificially inflate[s] the generosity of provisions of the ACA beyond the intent of Congress."  *Id.* at 27,172.  HHS therefore concluded, and reasonably so, that a PAP methodology that considers "all private health insurance premiums," including those for individuals health plans, is "more consistent with" congressional intent and the ACA's text.  *Id.*

Third, Plaintiffs maintain that HHS failed to properly consider the reliance interests of Exchange enrollees.  PI Motion at 18.  As an initial matter, it strains credulity to think that the average Exchange enrollee is aware of the PAP, let alone could have developed a legitimate reliance interest in the means by which that figure is calculated.  Regardless, contrary to Plaintiffs' assertion that HHS "disregard[ed]" the new PAP methodology's potential effect on cost sharing and net premiums for Exchange plans, HHS expressly addressed those very factors, *see* 90 Fed. Reg. at 27,171, 27,206-07, and offered a reasonable (and compelling) explanation for why it was adopting a new PAP methodology any way.  HHS thus "reasonably considered the relevant issues and reasonably explained [its] decision," all in accordance with the APA.  *Prometheus*, 592 U.S. at 423.

## G.    Actuarial Value Policy

Plaintiffs also challenge as arbitrary and capricious the Rule's adjustment to the allowable ranges of actuarial values ("AVs") applicable to the different plan types sold on Exchanges.  *See* PI

Motion at 18-20.  This claim likewise lacks merit.

Under the ACA, health insurance plans offered on Exchanges must adhere to certain "level[s] of coverage" specified in the statute.  42 U.S.C. § 18022(a)(3).  A plan's "level of coverage," or AV, reflects the estimated average percentage of covered health care expenses that will be paid by the insurance plan.  For example, under a plan with an AV of 80 percent, the insurer will pay, on average, 80 percent of covered medical expenses, and the enrollee will pay the remaining 20 percent through a combination of deductibles, coinsurance, co-payments, and maximum out-of-pocket limits.  Consequently, the higher a plan's AV, the lower an enrollee's out-of-pocket costs, on average.  Of course, plans that have a higher AV also have higher premiums.  Exchange plans are divided into four "metal tiers" based on their AVs: bronze plans have an AV of 60 percent, silver plans have an AV of 70 percent, and gold and platinum plans have AVs of 80 percent and 90 percent, respectively.  *Id.* § 18022(d)(1).  The AVs of Exchange plans are calculated pursuant to regulations issued by the HHS Secretary.  *See id.* § 18022(d)(2).  The ACA also instructs the Secretary to "develop guidelines to provide for a de minimis variation in the actuarial valuations used in determining the level of coverage of a plan to account for differences in actuarial estimates."  *Id.* § 18022(d)(3).  As relevant here, current regulations provide that the "allowable variation" in the AV of silver, gold, and platinum plans is two percentage points above and below their respective benchmark AVs (*i.e.*, +2/-2 percentage points).  45 C.F.R. § 156.140(c)(2).  The Rule will change this range to +2/-4 percentage points.  90 Fed. Reg. at 27,174.  And for bronze plans, current regulations allow for a +5/-2 percentage point range, which the Rule will change to +5/-4 percentage points.  *Id.*

Plaintiffs claim that HHS "offer[ed] no empirical support for" the "primary justifications" the agency gave for these changes to the "de minimis" ranges, PI Motion at 19—namely, that the "expanded ranges" would "allow issuers to design plans that better promote competition in the market" and "help maintain robust issuer participation, which is important for overall market stability," 90 Fed. Reg. at 27,176.  Notwithstanding that Plaintiffs' demand for empirical evidence finds no support in the APA, *see Prometheus*, 592 U.S. at 427, HHS explained that it had received "considerable feedback from issuers" indicating that "narrower de minimis ranges substantially reduce

issuer flexibility in establishing plan cost sharing"; that issuers had "voiced concern about their ability to continue to participate in the market generally" because of these limits on plan design; and that "several issuers have publicly announced their intent to end participation in the Exchange" in 2026. 90 Fed. Reg. at 27,175-76.  HHS thus provided a "clear enough" explanation for its decision, which is what the APA actually requires.  *Encino Motorcars*, 579 U.S. at 221.

Plaintiffs also argue that HHS did not adequately explain "why less-generous plans with lower premiums will attract unsubsidized consumers" and did not adequately consider the possibility that "wider AV ranges may in fact increase gross premiums for unsubsidized enrollees."  PI Motion at 19. But HHS clearly explained that "lower AVs would lead to lower premiums"—which Plaintiffs do not dispute—and that "more affordable" Exchange coverage would naturally appeal to enrollees who do not qualify for premium subsidies.  90 Fed. Reg. at 27,175, 27,177.  It also made the reasonable observation that consumers considering different plan options typically care less about marginal differences in AVs than they do about more "meaningful differences" that they can "understand and appreciate," *id.* at 27,177, such as whether a high-deductible plan with a relatively low premium is a better value than a plan with a lower deductible but higher premium.  And HHS squarely considered the "impact" wider de minimis ranges would have on PTCs, as well as the "burden that increased cost-sharing . . . may have on enrollees in the short-term."  *Id.* at 27,176, 27,208.  It just made the reasoned judgment that such "short-term" concerns should not necessarily take priority over the longer-term prospect of plans with lower premiums and competitive cost-sharing structures drawing unsubsidized consumers to the Exchange risk pool.  *Id.* at 27,175.  That reasoning represents a paradigmatic "policy balance" between short-term costs and long-term benefits, and Plaintiffs' mere disagreement with that balance does not constitute a viable arbitrary-and-capricious claim.  *Owner-Operator*, 494 F.3d at 211.

## H.    Specified Sex-Trait Modification Procedures Provision

The eighth and final Rule provision Plaintiffs challenge concerns the regulations that implement the ACA's "essential health benefits" ("EHB") requirements.  Under the Rule, issuers will not be permitted to provide EHB coverage for "specified sex-trait modification procedures" (a term the Rule defines) beginning in plan year 2026.  90 Fed. Reg. at 27,152.  Plaintiffs argue that this change

is both contrary to law and arbitrary and capricious, but these claims, too, fail.

As a general matter, the ACA requires health insurance coverage in the individual and small group markets, including coverage offered on Exchanges, to cover a "package" of "essential health benefits." 42 U.S.C. § 18022(a)(1). This EHB package must cover at least ten different "categories" of services, ranging from "[a]mbulatory patient services" and "[h]ospitalization" to "[p]rescription drugs" and "[l]aboratory services." *Id.* § 18022(b)(1). EHB services are also subject to certain cost-sharing limits, such as annual out-of-pocket maximums. *Id.* § 18022(a)(2)-(3), (c)(1), (d). The ACA provides that the HHS Secretary "shall define the essential health benefits," and, as relevant here, directs the Secretary to "ensure that the scope of" those benefits "is equal to the scope of benefits provided under a typical employer plan, as determined by the Secretary." 42 U.S.C. § 18022(b)(1), (2)(A). Pursuant to this authority, HHS adopted a regulatory framework during the initial rollout of the ACA in which EHB are defined based on a "benchmark" health plan selected by each State. Under this framework, States designate a benchmark plan pursuant to various parameters, one of which is that the plan must cover items and services within all ten EHB categories. *See* 45 C.F.R. § 156.111(b)(1). And all health plans sold in a State's individual and small group markets, including Exchange plans, must provide coverage for EHB that is "substantially equal to" the applicable benchmark plan. *Id.* § 156.115(a)(1). Health plans can of course cover more than just EHB. Non-EHB, however, are not subject to the cost-sharing limits and other requirements that apply to EHB. PTCs and APTCs also cannot be applied to the portion of an enrollee's premium that covers non-EHB. Relatedly, States can mandate that health plans cover certain benefits in addition to EHB, but States must "defray the cost" of any such "additional required benefits," which ensures that those benefits are not covered by federal premium subsidies. *Id.* § 155.170.

In addition to setting the parameters under which States can select their EHB benchmark plans, HHS regulations provide that "an issuer of a plan offering EHB may not include" certain listed benefits and services "as EHB." *Id.* § 156.115(d). Those listed benefits and services currently include "routine non-pediatric dental services, routine non-pediatric eye exam services, long-term/custodial nursing home care benefits, [and] non-medically necessary orthodontia." *Id.* The Rule adds to that

27

list "specified sex-trait modification procedures," which the Rule defines as

> any pharmaceutical or surgical intervention that is provided for the purpose of attempting to align an individual's physical appearance or body with an asserted identity that differs from the individual's sex either by: (1) Intentionally disrupting or suppressing the normal development of natural biological functions, including primary or secondary sex-based traits; or (2) Intentionally altering an individual's physical appearance or body, including amputating, minimizing or destroying primary or secondary sex-based traits such as the sexual and reproductive organs.

90 Fed. Reg. at 27,152, 27,154. This policy regarding specified sex-trait modification procedures ("SSTMP") will be applicable to health plans taking effect in 2026 and beyond. *Id.* at 27,154.

"The basis for" this exclusion of SSTMP from EHB "is that such benefits are not covered under typical employer plans." *Id.* at 27,158. As HHS explained in the Rule's preamble, the ACA requires that the "scope of EHB . . . be equal in scope to the benefits provided under a typical employer plan." *Id.* at 27,152; *see* 42 U.S.C. § 18022(b)(2)(A). The statute likewise "gives the [HHS] Secretary broad latitude to define EHB, subject to ensuring that EHB" comport with this typicality requirement, 90 Fed. Reg. at 27,158. Based on its review of data "suggesting that . . . [SSTMP], as defined in th[e] [R]ule, are not benefits covered under a typical employer plan," HHS determined that such procedures should not be covered as EHB. *Id.* at 27,164; *see id.* at 27,157 ("[W]e take seriously the responsibility to ensure consistency with the parameters on EHB enumerated in the [ACA].").

Plaintiffs argue that the Rule's exclusion of SSTMP from EHB is contrary to law, seemingly because they read the ACA to require the *Secretary of Labor* to "conduct a survey of employer-sponsored coverage" assessing "the benefits typically covered by employers" before the *HHS Secretary* can do anything with respect to his statutory obligation to "ensure that the scope of" EHB "is equal to the scope of benefits provided under a typical employer plan," 42 U.S.C. § 18022(b)(2)(A). *See* PI Motion at 22-23. That cabined reading of the HHS Secretary's authority cannot be squared with the ACA's text. Indeed, the ACA instructs the HHS Secretary to "define" EHB and to "ensure that the scope of" such EHB "is equal to the scope of benefits provided under a typical employer plan, as determined by the Secretary." 42 U.S.C. § 18022(b)(2)(A). The statute separately instructs the Secretary of Labor to "conduct a survey of employer-sponsored coverage," which is meant to "inform" the HHS

Secretary of "the benefits typically covered by employers." *Id.* That "survey" was conducted back in the ACA's early days, when the HHS Secretary was still in the process of initially "defin[ing]" EHB and the regulations that would implement EHB requirements moving forward. That survey ultimately "inform[ed]" HHS's decision to "define" EHB by implementing the state-benchmark-plan framework described above. Yet the ACA provides that the HHS Secretary must continue to "ensure" that the scope of EHB "*is* equal" to the scope of benefits covered by a "typical employer plan, *as determined by the Secretary*." *Id.* (emphases added). That present-tense and HHS-specific language indicates that the HHS Secretary's obligation to "ensure" consistency between EHB and "typical employer plan" coverage is an ongoing one. And it would be nonsensical to read the ACA—as Plaintiffs apparently do—to condition the HHS Secretary's ability to fulfill that ongoing obligation on another federal official's (*i.e.*, the Secretary of Labor) willingness and ability to repeatedly conduct economy-wide surveys. Such an interpretation would be at odds with the HHS Secretary's authority and obligation to "determine[]" himself what a "typical employer plan" encompasses, *id.*, and would effectively preclude HHS from making timely regulatory changes concerning EHB. *Cf. Gen. Motors Corp. v. Darling's*, 444 F.3d 98, 108 (1st Cir. 2006) (explaining that courts should "avoid statutory constructions that create absurd, illogical, or inconsistent results").

Plaintiffs' contention that the Rule's SSTMP exclusion is unlawful because HHS did not "submit a report to Congress," PI Motion at 23, similarly misreads the ACA's text. The ACA requires the HHS Secretary, "[i]n defining" EHB under 42 U.S.C. § 18022(b)(1) or "in revising" EHB under § 18022(b)(4)(H), to "submit a report to the appropriate committees of Congress containing" certain actuarial certifications. *Id.* § 18022(b)(2)(B). The SSTMP exclusion does not implicate either of those statutory provisions, however. Rather, HHS implemented the exclusion pursuant to the HHS Secretary's obligation to "ensure" that EHB continues to be "equal to the scope of benefits provided under a typical employer plan." *Id.* § 18022(b)(2)(A). And § 18022(b)(2)(A) does not state that a typicality determination made by the Secretary triggers any sort of attendant obligation to submit a report to Congress. *See id.* Plaintiffs also do not explain why it is "for courts—rather than Congress— to police" the HHS Secretary's compliance with any congressional reporting requirements. *Dep't of*

*Com. v. New York*, 588 U.S. 752, 779 (2019).

Setting aside Plaintiffs' erroneous statutory arguments, the thrust of their challenge to the Rule's SSTMP exclusion is that the exclusion, and HHS's related "finding" that SSTMP are "not typically included in employer-sponsored plans," 90 Fed. Reg. at 27,152, are arbitrary and capricious. PI Motion at 23. They offer several reasons, but none carries the day. Plaintiffs assert, for instance, that "[i]n excluding" SSTMP from EHB, the Rule "arbitrarily diverges from" the state-benchmark-plan framework and "instead dictat[es] to all States a brand-new exclusion with little to no explanation for the change." *Id.* at 24. HHS did, of course, explain the reason for the change. *See* 90 Fed. Reg. at 27,152 (noting that "coverage of [SSTMP] is not typically included in employer-sponsored plans"). And States still have flexibility to select benchmark plans under the Rule. 45 C.F.R. § 156.111. That flexibility, though, has always been subject to various regulatory parameters and the HHS Secretary's broad authority to "define" EHB and "ensure" that the scope of EHB is "equal to the scope of benefits provided under a typical employer plan," 42 U.S.C. § 18022(b)(2)(A). Indeed, since the ACA's EHB requirements were first implemented, regulations have barred issuers in all States from covering certain services as EHB because those services are not typically covered by employer-sponsored health plans. 45 C.F.R. § 156.115(d). The Rule simply adds SSTMP to that list, in accordance with the HHS Secretary's obligation to ensure compliance with the ACA's typicality requirement.

Plaintiffs also argue that HHS "fail[ed] to consider or address" their "significant reliance interests" in having already selected benchmark plans, a few of which cover SSTMP as EHB. PI Motion at 25. Yet HHS expressly acknowledged that fact, as well as the fact that several States effectively mandate coverage for certain SSTMP through state law. 90 Fed. Reg. at 27,156. After considering those interests, HHS concluded that excluding SSTMP from EHB coverage better "aligns with the plain language and intent of" the ACA. *Id.* at 27,163. And HHS likewise acknowledged that this policy change would require certain issuers "to adjust their plan offerings in accordance with the [R]ule," but nonetheless determined that there would be "sufficient time for issuers to make such changes." *Id.* at 27,161. In short, HHS very much "assess[ed] whether there were reliance interests," and whether those interests outweighed other "competing policy concerns." *DHS v. Regents of the*

*Univ. of Cal.*, 591 U.S. 1, 33 (2020).

Plaintiffs separately disagree with HHS's general conclusion that SSTMP are not typically covered by employer-sponsored plans, and they point to data that, in their view, "undercuts" that conclusion, PI Motion at 27.  But HHS did not "disregard[]" or "reject[]" that data, as Plaintiffs claim, *id.*; it "simply interpreted" that data "differently"—and reasonably so.  *Prometheus*, 592 U.S. at 426. HHS noted in the Rule's preamble, for instance, that a majority of States and territories either explicitly exclude SSTMP from coverage under their state employee health benefit plans or have no clear policy regarding such coverage.  90 Fed. Reg. at 27,153.  HHS further noted that "over half of States have taken action to restrict [SSTMP] for minors" since 2021, which reflects an "ongoing controversy over coverage of" SSTMP more generally.  *Id.* at 27,156.  And it observed that a survey cited by commenters indicated that only 24 percent of large employers (*i.e.*, ones with 200 or more workers) stated that they covered cross-sex hormonal interventions, while the rest either did not offer such coverage, or did not know if they did.  *Id.* at 27,155.  It is certainly rational to conclude that certain health coverage is not "typical," 42 U.S.C. § 18022(b)(2)(A), if it is definitively provided by only a small fraction of large employers and less than half of state employee benefit plans.  *See Encino Motorcars*, 579 U.S. at 221 (requiring only a "rational connection between the facts found and the choice made").  That the "vast majority of Fortune 500 companies . . . cover treatment for gender dysphoria," PI Motion at 27, does not require a different result.  As HHS explained, the ACA's typicality requirement "specifically references" the coverage provided by a "typical employer," not the coverage held by a typical employee, *see id.* (noting that "large employer plans . . . cover more Americans"), and HHS reasonably observed that smaller employers are not able to offer the same "generous and costly health plans" that "very large employers" provide.  90 Fed. Reg. at 27,155.  Furthermore, that HHS has not excluded other benefits and services from EHB coverage on typicality grounds, *see* PI Motion at 26-27, does not preclude it from doing so with respect to SSTMP in the Rule.  *See Fox*, 556 U.S. at 522 ("Nothing prohibits federal agencies from moving in an incremental manner.").

In sum, Plaintiffs again conflate "reasoned decisionmaking," *Regents*, 591 U.S. at 16, with decisionmaking that yields their preferred policy outcomes.  The APA requires the former, *id.*, and the

Rule's SSTMP exclusion cannot be deemed arbitrary merely because Plaintiffs desire the latter.

## I.    HHS's Consideration of Alternatives

Plaintiffs argue in a few sentences that the Rule is arbitrary and capricious because HHS supposedly failed to "seriously consider[]" alternative approaches to "block[ing] improper enrollments by unscrupulous brokers" that Plaintiffs suggested during the comment period.  PI Motion at 21-22. They do not explain how HHS's "supposed failure to consider . . . alternatives" concerning broker activity "should doom" other Rule provisions that have nothing to do with that issue.  *Craker*, 44 F.4th at 63.  HHS, in any event, acknowledged and considered alternative regulatory approaches throughout the Rule's preamble.  *See, e.g.*, 90 Fed. Reg. at 27,147, 27,215-18.  The relevant question under the APA is not "whether a regulatory decision is the best one possible or even whether it is better than the alternatives."  *FERC*, 577 U.S. at 292.  It is instead whether HHS "acted reasonably in considering the options before it."  *California v. EPA*, 72 F.4th 308, 317 (D.C. Cir. 2023).  HHS did so with respect to each challenged Rule provision, as explained above.  And the sufficiently reasoned "policy choices" the agency made "foreclose[]" Plaintiffs' preferred "alternatives."  *Id.*

## III.    The Remaining Preliminary Relief Factors Weigh Against Plaintiffs

That Plaintiffs cannot show a strong likelihood of success on any of their claims is sufficient on its own to deny their PI Motion.  *See Shurtleff v. City of Boston*, 928 F.3d 166, 171 n.3 (1st Cir. 2019). The other preliminary injunction factors nonetheless weigh against granting preliminary relief, and they certainly do not overcome Plaintiffs' failure to satisfy the likelihood-of-success factor.

### A.    Plaintiffs Fail to Show They Will Be Irreparably Harmed By Each Of the Challenged Rule Provisions

"[I]rreparable harm constitutes a necessary threshold showing for an award of preliminary injunctive relief," and "[t]he burden of demonstrating" irreparable harm "rests squarely upon the movant."  *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004).  Plaintiffs assert that those of them that operate a SBE will suffer irreparable harm in the form of "compliance costs" related to implementing the Rule's regulatory changes.  PI Motion at 30-31.  Yet two of the Rule provisions Plaintiffs challenge—the one concerning HHS's annual redetermination of eligibility

for re-enrollment in fully subsidized Exchange plans and the one concerning SEP eligibility verification—do not apply to SBEs.  And for three other provisions—the past-due premium policy, the PAP methodology change, and the changes to de minimis ranges—Plaintiffs do not explain how SBEs will have to "immediately incur compliance costs." *Id.* at 31.

For those five provisions, Plaintiffs seem to ground their claim to irreparable harm on the downstream economic injuries the Rule will allegedly cause them, specifically via "increased expenses for providing medical care to individuals who lose [health] insurance due to" the Rule.  *Id.* at 32.  But those alleged injuries, even if they were to eventually materialize, lie at the end of a lengthy chain of contingencies and are not sufficiently imminent to warrant the extraordinary remedy of a preliminary injunction.  *See Massachusetts v. Nat'l Inst. of Health*, 770 F. Supp. 3d 277, 319 (D. Mass. 2025) (granting preliminary relief where "the risk of harm" was "*immediate*, devastating, and irreparable" (emphasis added)).  Indeed, the challenged Rule provisions will apply to Exchange plans that will not take effect until 2026 at the earliest and will thus have no immediate impact on Exchange enrollees' current coverage.  Even when those provisions do take effect, an essential premise of Plaintiffs' theory of future economic injury is that current enrollees will lose their Exchange coverage *because of the Rule*, as opposed to the myriad other factors that affect the ACA marketplace (including the upcoming expiration of COVID-era enhanced subsidies).  And even assuming that such a decline in enrollment eventually occurs, Plaintiffs still would not incur the "increased expenses" they allege unless newly uninsured residents seek medical care at state-funded institutions that ultimately goes uncompensated, or receive services that are covered by state-subsidized insurance (*e.g.*, Medicaid).  Plaintiffs, in short, have failed to establish that any such distant economic injuries will occur before their claims can be resolved in the regular course of litigation—an essential feature of irreparable harm.  *See New Jersey*, 131 F.4th at 33 (noting that a movant must showing "it is 'likely to suffer irreparable harm *in the absence of preliminary relief*'" (emphasis added)).

The two other economic injuries Plaintiffs assert fare no better.  They allege that the Rule will "reduce the specific revenue streams from the user fees" that certain Plaintiffs "lev[y] on plans sold on the SBEs."  PI Motion at 31.  But any such revenue-related injury is just as far off as the alleged

future expenses for providing medical care to uninsured residents, and it is even more speculative. *See Charlesbank*, 370 F.3d at 162 (noting that "irreparable harm must be grounded on something more than conjecture [or] surmise"). For instance, given that the "user fees" Plaintiffs highlight are "tied directly to insurance premiums paid by" Exchange enrollees and that Plaintiffs expect the Rule to cause premiums for Exchange coverage to "sharply increase[]," PI Motion at 18, 31, they have failed to provide any factual basis for their contention that they will earn less revenue (and in fact might earn *more* revenue). And the "adverse health outcomes" that the Rule will purportedly cause "*uninsured individuals*" to suffer, *id.* at 33, is largely irrelevant to whether *Plaintiffs* themselves will be irreparably harmed by the Rule. *See New Mexico v. Musk*, 769 F. Supp. 3d 1, 7 (D.D.C. 2025) ("[H]arm that might befall unnamed third parties does not satisfy the irreparable harm requirement[,] . . . which must instead be connected specifically to the parties before the Court.").

**B.      The Equities and Public Interest Weigh Against Preliminary Relief**

The balance-of-equities and public-interest factors "merge" when the Government "oppose[s] a preliminary injunction," *Massachusetts*, 770 F. Supp. 3d at 326, and both factors weigh against granting Plaintiffs such extraordinary relief here. Plaintiffs add nothing to their side of the scale beyond reiterating their same theories of irreparable harm. *See* PI Motion at 33-34. That Plaintiffs' concerns about the Rule's potential impact on Exchange enrollment do not clearly outweigh Defendants' equally weighty concerns about the overall integrity of Exchanges and the public fisc only further tips the balance against granting preliminary relief. Meanwhile, preliminarily enjoining certain Rule provisions would hamstring Defendants' efforts to address legitimate concerns about improper enrollments in Exchange plans that are subsidized by taxpayers, as well as interfere with Defendants' lawful implementation of their policy priorities. When a law is stayed, "the inability to enforce its duly enacted plans clearly inflicts irreparable harm on" the government that enacted it. *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018). Enjoining the Rule would inflict that very harm on Defendants here.

**IV.      Any Relief Should Be Appropriately Limited**

For the reasons explained above, Plaintiffs are not entitled to the preliminary relief they request. But in the event the Court were to conclude otherwise, any relief it grants should be

appropriately limited in two respects.  First, the Court should preliminarily enjoin or stay only those provisions of the Rule (1) that Plaintiffs specifically challenge and (2) that the Court finds are likely unlawful and will irreparably harm Plaintiffs absent such relief.  HHS makes clear in the Rule's preamble that it "generally intends" for the Rule's provisions "to be severable from each other."  90 Fed. Reg. at 27,180; *cf. Barr v. Am. Ass'n of Political Consultants, Inc.*, 591 U.S. 610, 625 (2020) ("The Court's cases have . . . developed a strong presumption of severability.").  Moreover, because each Rule provision addresses distinct facets of the ACA marketplace, they operate independently of each other and would thus "function sensibly" if any one were enjoined.  *Carlson v. Postal Reg. Comm'n*, 938 F.3d 337, 351 (D.C. Cir. 2019).  Plaintiffs do not argue to the contrary.  Any relief should thus encompass only the offending portions of the Rule and leave the rest intact.   Second, any preliminary relief "should be no more burdensome to [Defendants] than necessary to provide complete relief to [Plaintiffs]," *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979), consistent with Article III and equitable limitations on the Court's remedial authority.  Any preliminary relief granted to Plaintiffs here should accord with that clear command.

## V.    The Court Should Require Plaintiffs to Submit a Bond as Security

Finally, to the extent the Court issues any preliminary injunctive relief, it should also order Plaintiffs to "give[] security in an amount that the [C]ourt considers proper to pay the costs and damages" that Defendants would sustain as a result.  Fed. R. Civ. P. 65(c).  "[I]njunction bonds are generally required," *Nat'l Treasury Emps. Union v. Trump*, No. 25-5157, 2025 WL 1441563, at *3 n.4 (D.C. Cir. May 16, 2025) (per curiam), and a bond must "ensure that the enjoined party may readily be compensated for the costs incurred as a result of [an] injunction should it later be determined that [the party] was wrongfully enjoined," *Axia NetMedia Corp. v. Mass. Tech. Park Corp.*, 889 F.3d 1, 11 (1st Cir. 2018).  Here, Plaintiffs are asking the Court to preliminarily enjoin portions of a Rule that HHS estimates will reduce federal expenditures on APTCs by at least $10.3 billion in 2026 alone.  90 Fed. Reg. at 27,213.  Plaintiffs should be required to post a bond that reflects the gravity of their demand.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for preliminary relief should be denied.

DATED: August 8, 2025                    Respectfully submitted,

                                         BRETT A. SHUMATE
                                         Assistant Attorney General
                                         Civil Division

                                         BRENNA E. JENNY
                                         Deputy Assistant Attorney General
                                         Civil Division

                                         ERIC B. BECKENHAUER
                                         Assistant Director
                                         Federal Programs Branch

                                          /s/ *Zachary W. Sherwood*
                                         ZACHARY W. SHERWOOD
                                         (IN Bar No. 37147-49)
                                         Trial Attorney
                                         U.S. Department of Justice
                                         Civil Division, Federal Programs Branch
                                         1100 L Street NW
                                         Washington, DC 20005
                                         (202) 616-8467
                                         (202) 616-8470 (fax)
                                         zachary.w.sherwood@usdoj.gov

                                         *Counsel for Defendants*

## **CERTIFICATE OF SERVICE**

On August 8, 2025, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, District of Massachusetts, using the electronic case filing system of the court. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Zachary W. Sherwood*
ZACHARY W. SHERWOOD