United States District Court
District of Massachusetts

| | |
|---|---|
| State of California, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )    Civil Action No. |
| | )    25-12019-NMG |
| Robert F. Kennedy, Jr. in his | ) |
| official capacity as Secretary of | ) |
| Health and Human Services, et al., | ) |
| | ) |
| Defendants. | |

**MEMORANDUM & ORDER**

GORTON, J.

This case, brought by a coalition of 21 states including the Commonwealth of Massachusetts (collectively, "plaintiffs" or "the Several States"), challenges the validity of a regulation promulgated in June, 2025, by the Centers for Medicare & Medicaid Services ("CMS") and the Department of Health & Human Services ("HHS"), by and through its directors, Administrator Mehmet Oz and Secretary Robert F. Kennedy, Jr., (collectively, "defendants" or the "Departments"). Plaintiffs move for a preliminary injunction to stay the enforcement of the regulation. For the reasons set forth below, the motion for preliminary injunction will be denied.

## I.    **Background**

### a. **Affordable Care Act**

Before addressing the regulation at issue, a brief exposition of the Patient Protection and Affordable Care Act ("ACA") is necessary to provide context to plaintiffs' challenge.  Enacted by Congress in 2010, the ACA instituted complex reforms to the nationwide health insurance marketplace. Those reforms sought to make health insurance more affordable and thereby increase the number of Americans who are covered by it. Pub. L. No. 111-148, 124 Stat. 119 (2010); see Nat'l Fed'n of Indep. Bus. v. Sebelius, 567 U.S. 519, 538 (2012) (addressing the purpose of the ACA); King v. Burwell, 576 U.S. 473, 478-79, 493 (2015) (same).

Among the many statutory requirements of the ACA is the creation of a health insurance exchange in each state through which individuals can purchase "qualified health plans" ("QHPs") that, at a minimum, cover certain "essential health benefits" ("EHBs") such as prescription drugs. 42 U.S.C. §§18022(a)-(b), 18031(b)(1), 18031(d)(3)(B).  The states themselves are permitted to operate state-based exchanges ("SBEs" or "Exchanges") or, if a state elects not to do so, the federal government will do so on the state's behalf. Id. §18041(c). Individuals can then enroll in exchange plans for the upcoming

plan year during an annual "open enrollment period," id. §18031(c)(6), the next of which will occur on November 1, 2025.

To make enrollment more affordable, the ACA provides "premium tax credits" ("PTCs") to enrollees based upon their annual household income. Id. §18082(b). PTCs are claimed on an individual's tax return at the end of the year and are reimbursed by the Internal Revenue Service ("IRS"). Enrollees may also receive "advanced premium tax credits" ("APTCs") which are paid directly to insurance providers to offset the costs of coverage. Id. §18082(b). Before 2021, enrollees were entitled to such credits only if their annual income was between 100% and 400% of the federal poverty level ("the FPL"). See 26 U.S.C. §36B(b)-(c). In 2021, in response to the Covid-19 epidemic, Congress temporarily increased access for households above 400% of the FPL. Pub. L. No. 117-2, 135 Stat. 4 (2021). That increase is set to expire at the end of 2025. Pub. L. No. 117-169, 136 Stat. 1818 (2022).

CMS, an agency within HHS, is responsible for determining whether individuals meet the statutory eligibility requirements for APTCs, as well as for "redetermin[ing] eligibility on a periodic basis in appropriate circumstances." 42 U.S.C. §18081(f)(1)(B). The amount of the APTC owed ultimately depends on the individual's income at the end of the year. Thus, individuals must file a federal tax return each year to

"reconcile" the APTCs they received with the PTC amount for
which they ultimately qualify based on their actual income
during the applicable tax year. See 26 U.S.C. §36B(f)(1).

More broadly, the ACA affords the Secretary of the HHS
authority to issue regulations setting standards for the ACA
requirements, including exchanges and "such other requirements
as the Secretary determines appropriate." 42 U.S.C.
§18041(a)(1).

### b. **Marketplace Integrity and Affordability Rule**

#### i. **Generally**

In March, 2025, CMS proposed a regulation to combat
purported fraud and improper enrollments in health insurance
programs, the "Patient Protection and Affordable Care Act;
Marketplace Integrity and Affordability," 90 Fed. Reg. 12,942
(Mar. 19, 2025) (the "Proposed Rule").

The stated goal of the regulation is to

> reduce waste, fraud, and abuse [in enrollments and thereby]
> reduce the burden of . . . [ACA] subsidy expenditures to
> the Federal taxpayer.

Id. According to the preamble of the regulation, the
Departments believe that ACA benefits have been "exploited to
improperly gain access to fully-subsidized coverage." 90 Fed.
Reg. 27,074 ("the Final Rule"). The components of the
regulation provide both temporary and permanent measures.
Defendants submit that the changes will reduce improper

- 4 -

enrollment in health insurance exchanges and thereby "improve affordability and stability" of the marketplace in the long run. Final Rule at 27,074.

The Proposed Rule was met with more than 26,000 comments and was ultimately adopted on June 20, 2025. Final Rule at 27,074. The following month, plaintiffs filed suit in this Court challenging the validity of the regulation. The Several States take issue with eight provisions of the Final Rule, as well as the adequacy of the notice-and-comment period. The provisions most relevant to this motion are the new income verification requirements for APTC eligibility, a one-year Failure to Reconcile ("FTR") grace period and exclusion of "specified sex-trait modification procedures" ("SSTMP") from the EHBs.

### ii. **Income Verification**

The Final Rule amends the eligibility determination process for APTCs. As previously explained, individuals are eligible for APTCs if their income is between 100% and 400% of the FPL. Prior to the adoption of the Final Rule, SBEs were generally required to accept an applicant's income attestation without further verification. Id. at 27,200. The Final Rule amends that policy by requiring an Exchange to verify an applicant's household income if (1) an applicant attests to income that is between 100% and 400% of the FPL, (2) income data from the IRS

- 5 -

indicates household income below 100% of the FPL, and (3) the former income amount exceeds the latter amount by a "reasonable threshold." Id. at 27,123. The applicant would then be given an opportunity to resolve the inconsistency by providing additional documentation and taking other steps to verify their household income. See 45 C.F.R. §155.315(f)(1)-(4).

This provision of the Final Rule also rescinds a regulation that requires an Exchange to accept an applicant's self-attestation of projected annual household income "without further verification" whenever (1) the Exchange requests tax return data from the IRS to verify the applicant's attested income, but (2) the IRS confirms that there is no such data available, 45 C.F.R. §155.320(c)(5). See Final Rule at 27,130. Under the Final Rule, Exchanges will be required to follow the standard verification and data-matching procedures when tax return data is unavailable to verify an applicant's attestation of annual household income. That requirement was previously in effect until 2023.

### iii. **FTR Grace Period**

The Final Rule reinstates a prior policy that requires an Exchange to determine that a "tax filer" is ineligible for APTCs under the ACA if the applicant (1) received APTCs the prior year and (2) failed to comply with the statutory requirement to file

a tax return and "reconcile APTC" for that year. See id. at 27,113, 27,221.

The IRS requires taxpayers who receive APTCs, which are typically scaled to the recipient's projected annual household income, to reconcile those advanced payments with the PTC amount for which they otherwise qualify in the applicable tax year, as determined by their actual annual household income in that year. See 26 U.S.C. §36B(f). If the APTCs the taxpayer received exceed that allowable PTC amount, the taxpayer may incur a tax liability, subject to certain income-based caps. Id. at §36B(f)(2). Since 2012, HHS has prohibited an Exchange from "determin[ing] a tax filer eligible for" APTCs if the filer (1) received APTCs the prior year and (2) failed to comply with the requirement to file a federal income tax return and reconcile those APTCs for that year. 45 C.F.R. §155.305(f)(4). In 2023, CMS amended the FTR provision so that a taxpayer became ineligible for APTCs only after failing to reconcile for two consecutive years. The Final Rule reverts back to the requirement that a taxpayer be deemed ineligible for APTCs after one year of failing to reconcile and that amendment applies only through plan year 2026. See Final Rule at 27,115.

### iv. Exclusion of SSTMP from EHB Coverage

Again, to qualify for sale through the Exchanges, health plans must cover a list of ten EHBs. Several key ACA financial

- 7 -

protections, i.e., provisions that cap annual out-of-pocket costs and prohibit dollar limits on care, apply only to the coverage of EHBs.  The HHS Secretary is tasked with defining, and periodically revising, EHBs such that their scope is commensurate with that of benefits provided under a typical employer plan. 42 U.S.C. §§18022(a)(1), (b)(2)(A), (b)(4)(H).

Based on the Secretary's finding that SSTMP are not covered under the typical employer plan, the Final Rule excludes such care from EHB coverage.

### c. **Plaintiffs' Claims**

According to plaintiffs, defendants violated the Administrative Procedure Act ("APA") by 1) failing to provide at least 30 days of notice and comment before adopting the regulation (Count I), 2) promulgating a regulation that is arbitrary and capricious (Counts II-III), and 3) adopting a regulation that exceeds agency's statutory authority (Counts IV-V).  Defendants are also alleged to have engaged in an ultra vires agency action not authorized by Congress (Count VI). Plaintiffs have filed a motion for preliminary injunction, on which this Court held oral argument, seeking to enjoin defendants from implementing the regulation while the merits of the case are adjudicated.

## II. **Legal Standard**

Under §705 of the APA, district courts have authority to enjoin the implementation of a regulation and stay its effect when "necessary to prevent irreparable injury" to the plaintiff. 5 U.S.C. §705. The same standard that governs the issuance of a stay under §705 is the standard that governs the issuance of a preliminary injunction. Ass'n of Am. Universities v. Dep't of Def., No. CV 25-11740-BEM, 2025 WL 2022628, at *13 (D. Mass. July 18, 2025); Mass. Fair Hous. Ctr. v. U.S. Dep't of Hous. & Urb. Dev., 496 F. Supp. 3d 600, 609 (D. Mass. 2020).

A preliminary injunction is a "extraordinary and drastic remedy that is never awarded as of right." U.S. Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC, 121 F.4th 339, 347 (1st Cir. 2024). It is warranted only when the moving party demonstrates that 1) he is likely to succeed on the merits of his case, 2) he is likely to suffer irreparable harm in the absence of injunctive relief, 3) the "balance of equities" favor him and 4) an injunction is in the public interest. New Jersey v. Trump, 131 F.4th 27, 33 (1st Cir. 2025).

The party seeking the preliminary injunction bears the burden of establishing that all four factors weigh in his favor, Esso Standard Oil Co. (Puerto Rico) v. Monroig-Zayas, 445 F.3d 13, 18 (1st Cir. 2006), but the first two factors, likelihood of success on the merits and irreparable harm, carry the most

weight, Together Emps. v. Mass. Gen. Brigham Inc., 32 F.4th 82, 85 (1st Cir. 2022).  In assessing whether those factors are met, the Court may accept as true well-pled allegations in the complaint and uncontroverted affidavits. Rohm & Haas Elec. Materials, LLC v. Elec. Circuits, 759 F. Supp. 2d 110, 114 n.2 (D. Mass. 2010) (citing Elrod v. Burns, 427 U.S. 347, 350 n.1 (1976)).

## III. **Analysis**

### a. **Irreparable Harm**

In resolving this motion, the element of irreparable harm presents the most critical issue.  The burden of demonstrating irreparable harm "rests squarely upon the movant." Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151, 162 (1st Cir. 2004).  District courts have "broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief." Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 19 (1st Cir. 1996) (citing K-Mart Corp. v. Oriental Plaza, Inc., 875 F.2d 907, 915 (1st Cir. 1989)).  Plaintiffs must make "a clear showing that substantial and immediate irreparable harm is likely in the absence of an injunction." Akebia Therapeutics, Inc. v. Azar, 443 F. Supp. 3d 219, 230 (D. Mass. 2020) (quoting Oxford Immunotec Ltd. v. Qiagen, Inc., 271 F. Supp. 3d 358, 367 (D. Mass. 2017)).

In this case, the Several States assert three sets of
purported harms: 1) compliance costs to adapt to the regulation,
2) reduced revenue from enrollment fees the states would have
otherwise received from insurance exchanges had individuals not
lost coverage and 3) increased expenses for providing medical
care to those who are likely to lose insurance coverage as a
result of the regulation.

### i.    Challenged Provisions 1-5

Defendants assert that with respect to five of the
challenged provisions, plaintiffs fail to explain how SBEs will
have to incur compliance costs immediately.  The Departments are
right that the Several States offer no facts to indicate that
the first five provisions require immediate compliance costs.
Rather, plaintiffs argue those provisions may result in a
decrease in enrollment, resulting in lost revenue from
enrollment fees and an increase in defrayal costs for care
sought by the uninsured.  Defendants claim that such alleged
harms are too attenuated to be classified as imminent and
therefore do not warrant preliminary injunctive relief.  The
Court agrees.

Beginning with purported revenue losses from decreased
enrollment fees, plaintiffs' contention is undercut by its own
extensive briefing as to the amount by which enrollment premiums
are expected to increase.  As defendants point out, the

potential decrease in volume of enrollment fees may be offset by
the greater total amount of those fees.  Further, the Several
States exaggerate the extent of the predicted decrease in
enrollments; they claim that 1.8 million individuals will lose
health insurance but that is the high-end of the HHS estimate
and the Final Rule notes that

> coverage losses are expected to be concentrated in nine
> States where erroneous and improper enrollment is most
> noticeable,

none of which are plaintiff states. Final Rule at 27,213.  Thus,
the alleged irreparable injury is neither as likely nor as
extensive as plaintiffs claim.  Finally, this purported injury
is not imminent; the open enrollment periods of all of the
Several States run through at least January 15, 2026, and in
some states it is even longer.  Thus any lost enrollment fees
would not be felt until February, 2026 at the earliest.

The third class of alleged injury is even more remote.  The
Several States claim that they will need to offset the costs of
care provided to uninsured individuals, both in the short-term
(e.g., injuries sustained by an uninsured individual in a car
accident) and in the long-term (e.g., more unhealthy individuals
as a result of a lack of insurance and preventative care).  The
long-term costs, by definition, are not imminent and thus do not
warrant injunctive relief.  The short-term costs will not be
incurred in this calendar year and the Several States do not

allege any current budgetary problems. Sierra Club v. Larson,
796 F. Supp. 420, 422 (D. Mass. 1991) (noting that an
"injunction will not be issued to prevent the possibility of
some remote future injury; a presently existing actual threat
must be shown"); Wheelock v. Rhode Island, 00-cv-144, 2000 WL
1919997, at *2 (D. R.I. Dec. 19, 2000) ("[S]ubjective
apprehensions and predictions can not establish an immediate
threat of irreparable harm.") (citing In re rare Coins of
America, Inc., 862 F.2d 896, 901 (1st Cir. 1988)); cf.
Massachusetts v. Nat'l Inst. of Health, 770 F. Supp. 3d 277, 319
(D. Mass. 2025) (granting preliminary relief where "the risk of
harm" was "immediate, devastating, and irreparable").

Finally, to the extent plaintiffs rely upon alleged health-
related harms that may befall uninsured individuals in support
of their motion for injunctive relief, such reliance is
misplaced.  When assessing irreparable harm for the purposes of
a preliminary injunction, the only relevant harms are those
which affect the parties directly.  Injury that might occur to
third parties is not probative. See CMM Cable Rep., Inc. v.
Ocean Coast Prosps., Inc., 48 F.3d 618, 622 (1st Cir. 1995)
("[T]he issuance of a preliminary injunction requires a showing
of irreparable harm to the movant rather than to one or
more third parties.") (emphasis in original); see also
Cunningham v. Lyft, Inc., 19-cv-11974, 2020 WL 2616302, at *13

- 13 -

(D. Mass. May 22, 2020) (denying request for a preliminary injunction and noting that harm to third parties is not the same as harm to Plaintiffs themselves).

Because the Court finds that plaintiffs have failed to demonstrate irreparable injury resulting from the first five provisions of the Rule, the Court will not address the other factors necessary for injunctive relief, see Together Emps. v. Mass Gen. Brigham Inc., 19 F.4th 1, 7 (1st Cir. 2021) (noting that where plaintiffs "cannot demonstrate irreparable harm, we need not discuss the other factors"), and plaintiffs' motion for preliminary injunction will be denied as to those provisions.

### ii.  **Provisions 6-8**

For the remaining three provisions, the Several States have demonstrated that they are presently incurring one-time compliance costs in advance of open enrollment beginning on November 1, 2025.  While economic loss ordinarily does not warrant preliminary injunctive relief, that is only the case if the damages are recoverable.  The costs of complying with challenged regulations have been recognized as irreparable given the obstacles faced when suing for monetary damages. See Rosario-Urdaz v. Rivera-Hernandez, 350 F.3d 219, 222 (1st Cir. 2003) (reversing a preliminary injunction denial where "the district court made no findings concerning the many potential obstacles to [] a damage award, including whether the individual

- 14 -

defendants would be entitled to qualified immunity"); see also
Wages & White Lion Invs., L.L.C. v. FDA, 16 F.4th 1130, 1142
(5th Cir. 2021) (noting that "complying with [an agency order]
later held invalid almost always produces the irreparable harm
of nonrecoverable compliance costs")(citing Texas v. EPA, 829
F.3d 405, 433 (5th Cir. 2016)).  Consideration of recoverability
is particularly relevant in the context of the APA, which does
not allow for monetary damages. See Kentucky v. Biden, 23 F.4th
585, 611 (6th Cir. 2022) (finding economic damages irreparable
because "the APA does not waive federal sovereign immunity from
money-damages claims").

The matter at hand is clearly comparable to this line of
cases.  Unlike the speculative and remote harms discussed supra,
the Several States are likely incurring compliance costs
associated with the final three challenged provisions.  See,
e.g., Exhibit 3 of Plaintiffs' Memorandum (ECF No. 6) ("Memo")
at 22, 38; Memo at 16.  Because plaintiffs are suing under the
APA, they have no recourse to recover incurred costs if the
challenged regulations are later found invalid.  Thus, as to
provisions 6 through 8 of the Final Rule, plaintiffs have
demonstrated irreparable economic harm.  The Court will
therefore consider the likelihood of success on the merits as to
those claims.

**b.** **Likelihood of Success on the Merits**

Plaintiffs challenge the previously identified provisions of the Final Rule on the grounds that: 1) the notice-and-comment period was inadequate; 2) all three provisions are arbitrary and capricious and 3) the EHB coverage exclusion is contrary to law.

**i.    Notice and Comment**

Plaintiffs first argue that because the Proposed Rule was not published in the Federal Register until March 19, 2025, and the comment period ended on April 11, 2025, the notice-and-comment period was inadequate and thereby violated the APA. Defendants counter that, in fact, the notice-and-comment period extended for 30 days and, in any event, the APA does not require any specific length of time to receive comments on a proposed rule.

The Departments are correct: there is no statutorily-mandated length of time for the notice-and-comment period. Petry v. Block, 737 F.2d 1193, 1201 (D.C. Cir. 1984).  Rather, the standard is whether interested parties are given a meaningful opportunity to participate in rulemaking. 5 U.S.C. §553.  While 30 days is an oft-cited benchmark, there is nothing talismanic about that number; as such, the actual date of publication does not take on the significance ascribed to it by plaintiffs.

Assuming, arguendo, that 30 days is required, the Court finds that the notice-and-comment period did, in fact, extend

- 16 -

for 30 days.  Under the applicable statutory scheme, documents
required to be published in the Federal Register are

> not valid as against a person who has not had actual
> knowledge of it until the document has been filed [and made
> available for public inspection as provided by 44 U.S. Code
> §1503].

44 U.S.C. §1507.  Plaintiffs' contention that the invocation of
§1503 in §1507 refers to the publication process is incorrect.
Section 1503 notes that "upon filing, the document shall be
immediately available for public inspection."  As such, the
Proposed Rule was made available for public inspection and
comment for at least 30 days and gave the public a meaningful
opportunity to participate in the rulemaking.  The public took
advantage of that opportunity, evidenced by the more than 26,000
comments received by the Departments during the notice-and-
comment period.

> The Several States also contend that

> the notice-and-comment process was still inadequate because
> the agency failed to notify the public that many of the
> Final Rule's most burdensome provisions could be adopted
> for 2026 only.

Memo at 8.  In particular, they take issue with the sunsetting
of certain provisions after one year.  Yet the decision not to
extend such provisions was made in response to comments received
on the Proposed Rule which is proper rulemaking under the APA.
See Victim Rts. Law Ctr. v. Cardona, 552 F. Supp. 3d 104, 134
(D. Mass. 2021) ("An agency may deviate from its proposed rule

- 17 -

because agencies are free—indeed, they are encouraged—to modify
proposed rules as a result of the comments they receive.")
(internal quotations and alterations omitted).  As such, the
Court rejects plaintiffs' contention that the public was not
given a meaningful opportunity to participate in the rulemaking
while simultaneously challenging the outcome of public
participation in rulemaking.

For the foregoing reasons, plaintiffs' claims regarding the
notice-and-comment period are not likely to succeed.

### ii.  **Arbitrary and Capricious**

The APA requires agencies to engage in "reasoned
decisionmaking" and instructs courts to "hold unlawful and set
aside" agency actions found to be arbitrary or capricious. Dep't
of Homeland Sec. v. Regents of the Univ. of Cal., 591 U.S. 1, 16
(2020); 5 U.S.C. §706(2)(A).  The standard of review is "narrow"
however, and "a court is not to substitute its judgment for that
of the agency." FCC v. Fox Television Stations, Inc., 556 U.S.
502, 513 (2009) (internal quotations and citations omitted).  A
reviewing court should assess only "whether the [agency's]
decision was based on a consideration of the relevant factors
and whether there has been a clear error of judgment." Citizens
to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416
(1971).

### a. Income Verification

The Several States aver that the Departments did not engage in reasoned decision in promulgating the income verification provision because it is insufficiently tailored to the scope of the subject problem.  Specifically, they protest defendants' decision to apply the income verification requirement to Medicaid-expansion states, contending that there is no incentive to inflate income in states in which there is no coverage gap for individuals whose income is too high for Medicaid but too low to qualify for APTCs.

Defendants have made it clear, however, that there are still incentives to inflate income in Medicaid-expansion states. See Final Rule at 27,128 (noting that brokers are incentivized to inflate income to receive more in commissions, that individuals with higher health care needs may inflate their income to qualify for APTCs instead of Medicaid to the extent that coverage through State Exchanges is better than Medicaid and that all states, including Medicaid-expansion states, had instances of inflated income).  After consideration of the comments evincing reasoned judgment, the Departments concluded that there is "ample evidence of strategic behavior" by brokers and enrollees to justify the rule. Id. at 27,123.

Plaintiffs also take issue with the Final Rule's requirement of alternative income verification when there is no

IRS data to verify an individual's income.  They allege that
because missing data does not indicate any error on the part of
the individual, the provision is too broad and burdensome to be
justified.  That argument overlooks the fact that the policy is
not punitive and does not need to be tethered to errors on the
part of the enrollee.  The Departments have made this clear in
the Final Rule. See Final Rule at 27,130 (explaining that the
verification process "solely involved establishing eligibility
to receive a government benefit and did not involve a judgment
to mete out consequences of bad behavior").  More importantly,
this provision is supported by evidence of brokers enrolling
individuals in plans without their consent. Id. at 27,131.
Given that evidence, the Departments have concluded that
requiring further verification would curtail unauthorized
enrollments by alerting individuals of the enrollment and giving
them the chance to unenroll before incurring tax liabilities.
Id.  Thus, HHS offered "a satisfactory explanation for its
action including a rational connection between the facts found
and the choice made." Motor Vehicle Mfrs. Assn. of United
States, Inc. v. State Farm Mut. Automobile Ins. Co., 463 U.S.
29, 43 (1983) (internal quotations omitted).

Plaintiffs also allege that the decision to adopt the
policy was contrary to the evidence before the Departments.  In

support of that proposition, they point to the acknowledgement
in the Final Rule that

> 1)income verification can be more challenging for lower-
> income tax filers due to less consistent employment and
>
> 2) exchanges will spend time and money to meet the new
> requirements.

They claim that is contradictory to the Final Rule's conclusion
that the income verification process does not impose a
substantial burden but that is incorrect.  Indeed, the
Departments specifically acknowledge the burdens in conducting a
cost-benefit analysis.  The Several States may disagree with the
agency's determination that the burden does not outweigh the
benefits but that does not render the regulation arbitrary or
capricious. See, e.g., Dep't of Commerce v. New York, 588 U.S.
752, 777 (2019) (explaining that courts are prohibited from
"second-guessing the [agency's] weighing of risks and benefits
and penalizing [the agency] for departing from" the inferences
and assumptions of others).

Plaintiffs next contend that the sunset provision of the
Final Rule is arbitrary and capricious.  As previously
explained, that provision was the result of public rulemaking.
Having considered that the burdens would no longer outweigh the
benefits once the APTCs expire and the market adjusts, the
Departments made the reasonable decision not to extend the
policy through 2027. Final Rule at 27,127.

In sum, the Departments have exercised reasonable decision making in promulgating the income verification requirement and plaintiffs have not demonstrated a likelihood of success on the merits as to this claim.

### b. **FTR Provision**

The Several States next challenge the policy decision to revert to a one-year FTR grace period, contending it is arbitrary and capricious because it is insufficiently tailored to the subject problem and is overly broad.  Plaintiffs note that many more people receive one-year FTR codes than two-year FTR codes, demonstrating that most people can reconcile the year following their first missed reconciliation.  Yet that data also shows the need for a stricter enforcement policy, i.e. individuals have no incentive to reconcile until after their one-year FTR code because they know they will remain eligible so long as they reconcile the following year.  Such evidence reasonably supports a one-year FTR grace period.

Plaintiffs next assert that the Departments did not respond to concerns about IRS delays which they suggest will increase because the Administration "may be planning cut the IRS in half."  To the contrary, the Departments did address the concerns about long IRS processing times and concluded that such concerns were

unlikely a sufficient reason to maintain the current two-
year FTR process for 1 year while addressing the imminent
program integrity concerns.

Final Rule at 27,116.  The Departments also note that they have
instituted measures to mitigate the long IRS processing times,
demonstrating their attention to the problem. Id.  Once again,
Plaintiffs ask this Court to second-guess the agency's
consideration of the burdens and benefits of the regulation.
The Court declines to do so.

Finally, the Several States argue that the Departments'
decision to require all Exchanges to effectuate this policy for
Plan Year 2026, despite the opposition of a majority of
Exchanges to the timing, was arbitrary and capricious.  As an
initial matter, plaintiffs ignore the significance of the
compliance date chosen.  The Final Rule becomes effective in
time for PY 2026 in order "to gather data from this plan year."
Id. at 27,199.  Requiring compliance in time for the 2026 open
enrollment is eminently reasonable given that this provision is
currently slated to be in place for 2026 only.

Further, HHS acknowledges that many SBEs expressed concern
about the compliance timeline but it ultimately decided that the
countervailing interest in gathering data for this plan year
justified the effective date.  Such a decision is within the
discretion of the agency and will not be disrupted by this
Court. See Ponce Paramedical Coll., Inc. v. U.S. Dep't of Educ.,

858 F. Supp. 303, 311 (D.P.R. 1994) ("Although the Secretary
could have avoided possible hardship to institutions and
students by delaying the implementation of the regulations, this
Court may not substitute its own judgment for a reasonable
judgment by the agency."); see also Am. Meat Inst. v. U.S. Dep't
of Agric., 968 F. Supp. 2d 38, 73 (D.D.C. 2013) (finding
effective date was not arbitrary and capricious where plaintiffs
"all but ignore the significance of the date"); Pennsylvania v.
DeVos, 480 F. Supp. 3d 47, 66 (D.D.C. 2020) (effective date was
not arbitrary and capricious where agency considered concerns
raised by commenters and even though a later date might have
been preferable).

### c. EHBs

Plaintiffs also contend that the Final Rule's exclusion of
any SSTMP from EHBs is arbitrary and capricious.  They proffer
two arguments in support of that contention: (1) HHS diverged
without good reason from its settled policy of determining "on a
flexible state-by-state basis" what benefits are provided under
a "typical" employer plan and did not consider the reliance
interests of the states in doing so, and (2) its findings on
typicality run counter to the evidence before the agency.  Both
arguments are unavailing.

First, HHS did not diverge from past practice.  Plaintiffs
invoke language from the original EHB rule in 2013 for the

- 24 -

proposition that states maintain flexibility in defining benefits within the ten statutory EHB categories. Yet the original rule also excluded several services, such as routine non-pediatric eye exam services, from EHB on the grounds that they are not included in the medical plans offered by the typical employer. 45 C.F.R. §156.115(d). Thus, the flexibility to which the states refer is undiminished from 2013. Certain exclusions have always been part of the definition of EHBs. The Several States remain free to select the specific details of their EHB coverage by reference to a range of benchmark plans, subject to certain exclusions that apply to all states.

Plaintiffs' contention that the Departments failed to consider their reliance interests is also disproven by the record. See, e.g., Final Rule at 27,161. After consideration of those interests, the Departments, in their discretion, concluded that

> finalizing this policy without delay, for [Plan Year] 2026, is important to align issuer coverage of EHBs with section 1302 of the ACA.

Id. Thus, contrary to plaintiffs' assertion, the Departments did consider the reliance interests at stake.

Plaintiffs assert that the Departments' finding that SSTMP are not covered under typical employer plans is counter to prevailing evidence. To the contrary, the Several States do not, and cannot, refute the fact that the evidence before the

- 25 -

Departments showed that fewer than one-half of the states and
territories require coverage for SSTMP.  Instead, plaintiffs
emphasize that most Fortune 500 companies cover SSTPM in their
health plans.  The Departments were reasonably unpersuaded by
that evidence.  As stated in the Final Rule,

> the statute specifically references the typical employer
> and not the typical employee, which acts to restrain the
> EHB from reflecting the more generous and costly health
> plans offered by very large employers.

Final Rule at 27,155.  In essence, plaintiffs simply disagree
with the Departments' interpretation of the data before them.
Such disputes over interpretation of data do not warrant a
finding that the rule was arbitrary and capricious.  See FCC v.
Prometheus Radio Project, 592 U.S. 414, 426 (2021).

### iii. **Ultra Vires**

In addition to arguing the EHB policy is arbitrary and
capricious, the Several States also claim it is contrary to law.
Specifically, they argue that the Departments did not comply
with the statutory requirement that the Secretary

> shall submit a report to the appropriate committees
> of Congress containing a certification from the Chief
> Actuary of the Centers for Medicare & Medicaid Services

that the scope of the EHBs is equal to that of the typical
employer plan. 42 U.S.C. §18022(b)(2)(B).  HHS responds that the
Congressional report requirement relative to subsection
(b)(2)(B) is implicated only in defining EHBs under subsection
(b)(1) and revising EHBs under subsection (b)(4)(H), and that in

- 26 -

excluding certain health benefits from EHB coverage in the Final Rule, the Secretary did not act under either of those provisions.  Rather, the Secretary was acting pursuant to subsection (b)(2)(A) to ensure that EHBs continue to be equal in scope to the benefits provided under a typical employer plan. HHS contends that (b)(2)(A) is distinct from (b)(1) and (b)(4)(H) and does not include a reporting requirement.

Contrary to the Departments' assertion, the statutory scheme makes clear that (b)(2)(A) is a limitation on the Secretary's authority under (b)(1) and (b)(4)(H).  Subsection (b)(1) is entitled "In General" and requires the Secretary to define EHBs.  Subsection (b)(2)(A) immediately follows that section and is entitled "Limitations," implying that (b)(2) modifies the task imposed by (b)(1) and, by extension, (b)(4)(H).  Thus, subsection (b)(2)(B) does not mention subsection (b)(2)(A) as being subject to the reporting requirement because the latter does not provide an independent authority for the Secretary to revise EHBs.  It is a standard that the Secretary must follow when exercising his authority to define and revise EHBs under (b)(1) and (b)(4)(H).  Apparently, subsection (b)(2)(B) conjoins the actuarial limitation of (b)(2)(A) to the operative parts of the statute to ensure compliance.

The construction urged by the Departments does not adhere to the Supreme Court's long-standing guidance of interpreting statutes in their entirety because it does not construe (b)(2)(A) in the context of the whole statute or its relationship with other subsections.  See, e.g., United States v. DiCristina, 726 F.3d 92, 96 (2nd Cir. 2013) (explaining that the "Whole Act" rule of statutory construction exhorts us to read a section of a statute not "in isolation from the context of the Whole Act [but to] look to the provisions of the whole law, and to its object and policy.") (quoting Richards v. United States, 369 U.S. 1, 11 (1962)).

The statute is, nevertheless, silent on when the Secretary must submit any actuarial report to Congress.  There is nothing in the statute that requires the Secretary to submit that report prior to revising the EHBs, and courts "will not ordinarily read requirements into a statute that do not appear on its face." U.S. ex rel. Heineman-Guta v. Guidant Corp., 718 F.3d 28, 35 (1st Cir. 2013) (internal quotations and citations omitted). Thus, as long as the Secretary submits the required report at or before the time the provision becomes effective, he would be in compliance with the ACA.

Ultimately, plaintiffs may or may not be able to prove their claim that the Secretary and the Administrator acted ultra vires but, at this stage, they have no more likelihood of

- 28 -

success than likelihood of failure on the issue and are therefore not entitled to injunctive relief.

### ORDER

For the foregoing reasons, the motion of plaintiffs for a preliminary injunction (Docket No. 5) is **DENIED**.

**So ordered.**

_____
Nathaniel M. Gorton
Senior United States District Judge


Dated:  October /  , 2025