# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| STATE OF CALIFORNIA, *et al.*,<br><br>  *Plaintiffs,*<br><br>  v.<br><br>ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the Department of Health and Human Services, *et al.*,<br><br>  *Defendants.* | Civil Action No. 1:25-CV-12019-NMG<br><br><br>Leave to file excess pages granted on January 9, 2026 |

# PLAINTIFF STATES' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON CAUSES OF ACTION II-VI AND REQUEST FOR ORAL ARGUMENT

# TABLE OF CONTENTS

Page

I.      INTRODUCTION .................................................................................1

II.     FACTUAL AND PROCEDURAL BACKGROUND............................................2

        A.      The Affordable Care Act Makes Coverage Accessible and
                Affordable ...........................................................................2

        B.      The Rule Makes Coverage Less Accessible and Less Affordable .............5

        C.      Defendants Disregard Public Comments Pointing Out the Rule's
                Flawed Justifications................................................................6

        D.      The Plaintiff States' Action .......................................................7

III.    LEGAL STANDARD.......................................................................8

IV.     ARGUMENT .................................................................................9

        A.      The Rule Harms the States.........................................................9

        B.      The Provisions Making Coverage Harder to Obtain Are Arbitrary
                and Capricious, Contrary to Law, and *Ultra Vires* ...................................12

                1.      Ending Guaranteed Coverage for Otherwise Eligible
                        Individuals with Past-Due Premiums on Prior Policies, 45
                        C.F.R. § 147.104(i), Is Unlawful and Arbitrary.............................12

                        a.      Ending Guaranteed Issue is Contrary to Law ...................12

                        b.      Ending Guaranteed Issue is Arbitrary and
                                Capricious .................................................................13

                2.      Requiring 75% Verification for Triggering-Event SEPs, 45
                        C.F.R. § 155.420(g), is Arbitrary and Capricious.........................14

                3.      Shortening the Open Enrollment Period, 45 C.F.R.
                        § 155.410(e) and (f), is Arbitrary and Capricious.........................15

        C.      The Provisions Making Coverage More Expensive Are Arbitrary
                and Capricious, Contrary to Law, and *Ultra Vires* ...................................17

                1.      The $5 Re-Enrollment Penalty, 45 C.F.R. § 155.335(a)(3)
                        and (n), is Unlawful and Arbitrary...........................................17

                        a.      The $5 Re-Enrollment Penalty Is Contrary to Law ..........17

                        b.      The $5 Penalty Is Arbitrary and Capricious .....................18

                2.      Ending Acceptance of Self-Attested Projected Household
                        Income when IRS Data is Contradictory or Unavailable, 45
                        C.F.R. § 155.320(c)(3)(iii), (5), is Arbitrary and Capricious ........19

                3.      Shortening the FTR Eligibility Window to One Year, 45
                        C.F.R. § 155.305(f), is Arbitrary and Capricious .........................22

                4.      Changing the Premium Adjustment Percentage
                        Methodology, 45 C.F.R. § 156.130(e), is Arbitrary and
                        Capricious ..................................................................23

**TABLE OF CONTENTS**
**(continued)**

Page

D.    The Provisions Making Coverage Less Valuable Are Arbitrary and
Capricious, Contrary to Law, and *Ultra Vires* ...........................................25

1.    Allowing Health Plans to Offer Less Valuable Coverage,
45 C.F.R. §§ 156.140(c), 156.200(b)(3), and 156.400, is
Arbitrary and Capricious.................................................................25

2.    The Elimination of "Sex-Trait Modification Procedures" as
an Essential Health Benefit is Unlawful and Arbitrary ................27

a.    The EHB Modification is Contrary to Law ......................27

b.    The EHB Modification is Arbitrary and Capricious..........28

V.    CONCLUSION...................................................................................................30

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Air All. Hous. v. EPA*,
   906 F.3d 1049 (D.C. Cir. 2018) ............................................................18

*Azar v. Allina Health Servs.*,
   587 U.S. 566 (2019) ..............................................................................13

*Bos. Redevelopment Auth. v. Nat'l Park Serv.*,
   838 F.3d 42 (1st Cir. 2016) .....................................................................9

*City of Columbus v. Cochran*,
   523 F. Supp. 3d 731 (D. Md. 2021) ...................................................8, 19

*City of Columbus v. Kennedy*,
   796 F. Supp. 3d 123 (D. Md. 2025) ............................................ *passim*

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
   591 U.S. 1 (2020) ...........................................................9, 19, 21, 24

*Encino Motorcars, LLC v. Navarro*,
   579 U.S. 211 (2016) ..............................................................................24

*Fed. Comm'ns Comm. v. Prometheus Radio Proj.*,
   592 U.S. 414 (2021) .........................................................................16, 20

*Getty v. Fed. Sav. & Loan Ins. Corp.*,
   805 F.2d 1050 (D.C. Cir. 1986) .........................................................9, 22

*Grosso v. Surf. Transp'n Bd.*,
   804 F.3d 110 (1st Cir. 2015) ....................................................................9

*Judulang v. Holder*,
   565 U.S. 42 (2011) ................................................................................24

*King v. Burwell*,
   576 U.S. 473 (2015) .............................................................................2, 3

*Lujan v. Def's of Wildlife*,
   504 U.S. 555 (1992) ................................................................................9

*Mass. v. Nat'l Inst. of Health*,
   770 F. Supp. 3d 277 (D. Mass. 2025) ...................................................26

**TABLE OF AUTHORITIES**
(continued)

Page

*Michigan v. EPA*,
   576 U.S. 743 (2015)............................................................................30

*Miss. Comm'n on Env't Quality v. EPA*,
   790 F.3d 138 (D.C. Cir. 2015)......................................................29

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010)............................................................................9

*Motor Veh. Mfrs.' Ass'n of the U.S., Inc. v. State Farm Mut. Automobile Ins. Co.*,
   463 U.S. 29 (1983).............................................................. *passim*

*Nat'l Fed'n Indep. Bus. v. Sebelius*,
   567 U.S. 519 (2012)..........................................................................24

*Ohio v. EPA*,
   603 U.S. 279 (2024)..........................................................14, 25, 26

*Perez v. Mortgage Bankers Ass'n*,
   575 U.S. 92 (2015)......................................................9, 15, 28

*Pub. Int. Legal Found., Inc. v. Bellows*,
   92 F.4th 36 (1st Cir. 2024)................................................................10

*Russello v. United States*,
   464 U.S. 16 (1983)............................................................................13

*TRW, Inc. v. Andrews*,
   534 U.S. 19 (2001)............................................................................12

*Util. Air Regul. Grp. v. EPA*,
   573 U.S. 302 (2014)..........................................................................18

**STATUTES**

5 U.S.C.
   § 551............................................................................................8
   § 704............................................................................................8
   § 706....................................................................................2, 9, 30

**TABLE OF AUTHORITIES**
(continued)

Page

26 U.S.C.
§ 36B..............................................................................................3, 17, 18, 22
§ 36B(b)...............................................................................................17, 25
§ 36B(f)......................................................................................................4
§ 5000A......................................................................................................3

42 U.S.C.
§ 300gg-1(a)...................................................................................3, 12, 13
§ 300gg-2(b)..................................................................................12, 13
§ 18022(a)..................................................................................................4
§ 18022(b).............................................................................................27, 28
§ 18022(d)............................................................................................4, 26
§ 18031......................................................................................................3
§ 18031(d)...................................................................................................4
§ 18041(c)..................................................................................................3
§ 18081.....................................................................................................17
§ 18081(f)............................................................................................17, 18
§ 18082....................................................................................................22
§ 18082(c)................................................................................................17

American Rescue Plan Act of 2021,
    Pub. L. No. 117-2, 135 Stat. 4 (2021)....................................................3

Families First Coronavirus Relief Act,
    Pub. L. No. 116-127, § 6008(b)(3), 134 Stat. 178, 208-09 (2020) ...........7

Health Care and Education Reconciliation Act of 2010,
    Pub. L. No. 111-152, 124 Stat. 1029 (2010)............................................2

Patient Protection and Affordable Care Act,
    Pub. L. No. 111-148, 124 Stat. 119 (2010)..............................................2

**TABLE OF AUTHORITIES**
(continued)

Page

**REGULATIONS**

45 C.F.R.
§ 147.104(i) ...................................................................................................12
§ 155.305(f) ...................................................................................................22
§ 155.320(c) ...................................................................................................19
§ 155.335(a) ...................................................................................................17
§ 155.335(n) ...................................................................................................17
§ 155.410(e) ...................................................................................................15
§ 155.410(f) ...................................................................................................15
§ 155.420(g) ...................................................................................................14
§ 156.130(e) ...................................................................................................23
§ 156.140(c) ...................................................................................................25
§ 156.200(b) ...................................................................................................25
§ 156.400 ..................................................................................................25, 27

Patient Protection and Affordable Care Act; Market Stabilization,
82 Fed. Reg. 18,346 (Apr. 18, 2017) ...............................................16

Patient Protection and Affordable Care Act; Marketplace Integrity and
Affordability,
90 Fed. Reg. 12,942 (Mar. 19, 2025) ................................................6

Patient Protection and Affordable Care Act; Marketplace Integrity and
Affordability,
90 Fed. Reg. 27,074 (June 25, 2025) ........................................ *passim*

**OTHER AUTHORITIES**

Am.'s Health Ins. Plans Ctr. for Pol'y & Rsch., *Individual Health Insurance 2009:*
*A Comprehensive Survey of Premiums, Availability, and Benefits* (2009)...............................3

Dep't of Labor, Selected Medical Benefits: A Report from the Department of
Labor to the Department of Health and Human Services (Apr. 15, 2011) .............................27

## I.     INTRODUCTION

Despite being told they were relying on an analysis of enrollment data with undisputed and foundational flaws, the U.S. Department of Health and Human Services and one of its sub-agencies, the Centers for Medicare and Medicaid Services, wrongly claimed that fraudulent and improper enrollments in coverage plague the Affordable Care Act's (ACA) health insurance exchanges nationwide. Defendants persisted in this claim even though the evidence before the agency showed, at most, only a temporary and geographically limited issue caused by dishonest insurance brokers and agents—not consumers—concentrated in a handful of non-Plaintiff states that use the federal government's own exchange, not the states' exchanges. To tackle this manufactured crisis, Defendants adopted regulations that enact a battery of sweeping changes on federal *and* state exchanges that will make enrollment more difficult, require more paperwork, erect unlawful barriers to coverage, and make tax credits harder to obtain. These changes will cause harm not only to the very people the ACA was designed to protect, but also to states that must consequently bear costs associated with declining enrollment. By Defendants' own estimates, up to 1.8 million people could lose their health insurance coverage in 2026 alone, yet several of the changes will not even address the problem Defendants claim they are targeting. This Rule is arbitrary, capricious, contrary to law, and *ultra vires* action.

Plaintiffs here, a coalition of twenty states and one governor's office, challenge nine unlawful provisions of the Rule, which fall into three categories. First, the Rule makes health care coverage harder to obtain by limiting enrollment windows and erecting byzantine new verification and paperwork requirements that the lowest-income Americans will be worst-equipped to navigate. Second, it makes coverage more expensive by increasing premiums and making tax credits harder to obtain and keep. Third, the Rule lessens the value of the coverage obtained by allowing insurers deliberately to undershoot the ACA's value targets and by prohibiting the coverage of medically necessary care as an essential health benefit (EHB). All provisions are arbitrary and capricious, and three—one from each category: the guaranteed coverage provision, the $5 fee, and the EHB provision—are also contrary to law and *ultra vires*.

This motion asks the Court to consider the merits of Plaintiffs' challenges as to six of the provisions for the first time. The Court has reached the merits of the other three provisions but held open the possibility of future relief. As to one such claim—that the Rule's modification of EHB was unlawful because the Secretary failed to comply with the statutory requirement to submit a report to Congress—Plaintiffs are entitled to relief for reasons already set forth by the Court, because the Secretary has failed to retroactively cure this procedural defect by submitting the report within the deadline required by the Court's order.

Throughout rulemaking, Defendants failed to engage with and respond to commenters who pointed out that Defendants' analysis of enrollment data was incorrect and therefore that their main justification for the Rule was nonexistent. In addition, Defendants repeatedly failed to justify the Rule's severe harms, and they prioritized a policy goal—reducing hypothetical fraud—over Congress's stated purposes for the ACA: increasing affordability and coverage of health insurance. Persuaded that this is likely not lawful agency decision-making, one district court has already preliminarily enjoined most of the provisions challenged here. *See City of Columbus v. Kennedy*, 796 F. Supp. 3d 123 (D. Md. 2025). This Court should follow suit, declare all challenged provisions unlawful, and vacate them under 5 U.S.C. § 706.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff States incorporate by reference the factual background set forth in Plaintiffs' Complaint, ECF 1 at ¶¶ 35-77, and their Memorandum in Support of Motion for a Preliminary Injunction and Stay (hereafter "PI Mot."), ECF 10 at 2-6.

### A.    The Affordable Care Act Makes Coverage Accessible and Affordable

The purpose of the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010) (as amended by Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029 (2010)), is "to make health insurance more affordable and thereby increase the number of Americans who are covered by it." Order Denying Mot. for Prelim. Inj. (hereafter "PI Order"), ECF 105 at 2. The ACA adopts three "interlocking reforms." *King v. Burwell*, 576 U.S. 473, 478–79 (2015). First, it "bars insurers from taking a person's health into

account when deciding whether to sell health insurance or how much to charge." *Id.* at 479; 42 U.S.C. § 300gg-1(a).[1] Second, to prevent adverse selection—*i.e.*, consumers only buying coverage when sick—it "generally requires" everyone to purchase insurance. *King*, 576 U.S. at 479; 26 U.S.C. § 5000A. Third, the ACA "gives tax credits to certain people to make insurance more affordable." *King*, 576 U.S. at 479; 26 U.S.C. § 36B.

To allow consumers to cross-shop available plans, the ACA also creates health insurance markets, or exchanges, in each state. *King*, 576 U.S. at 479; 42 U.S.C. § 18031. Congress authorized exchanges to be operated either by the state directly, or, if a state opted not to establish an exchange, by the federal government. 42 U.S.C. § 18041(c).

Consumers may buy coverage during the annual open enrollment period (OEP) or special enrollment periods (SEPs). The OEP typically runs from mid-fall to early winter, depending on the exchange. Exchanges have long had flexibility to calibrate the length of the OEP to balance the risk of adverse selection against the need to ensure health coverage is accessible to as many people as possible. Some consumers need to enroll in coverage during an SEP due to a triggering event such as the loss of minimum essential coverage, birth of a child, or a move to a new area.

To help consumers afford the coverage the ACA requires them to buy, Congress created substantial new premium tax credits (PTC) for low-to-moderate-income individuals. Most consumers estimate their projected annual income and choose to claim that credit up front, as an "advance" PTC (APTC), when enrolling in coverage. The U.S. Treasury then pays that amount directly to the insurer to lower the consumer's premium. 26 U.S.C. § 36B. To qualify for credits, a consumer's projected household income for the coming year must fall between 100% and 400% of the federal poverty level (FPL).[2]

---

[1] *See also* Amicus Br. of Nat'l Health L. Prog., *et al.*, ECF 68 at 2 (Prior to the ACA, "[n]early 13 percent of [applicants] were denied insurance due to pre-existing conditions") (*citing* Am.'s Health Ins. Plans Ctr. for Pol'y & Rsch., *Individual Health Insurance 2009: A Comprehensive Survey of Premiums, Availability, and Benefits* 10 (2009), https://www.kff.org/wp-content/uploads/sites/2/2011/08/2009individualmarketsurvey finalreport.pdf).
[2] Legislation passed during the COVID-19 pandemic temporarily expanded eligibility for PTCs to those earning above 400% of the federal poverty level, but it expired at the end of 2025. American Rescue Plan Act of 2021, Pub. L. No. 117-2, 135 Stat. 4 (2021).

After the plan year ends, those who claimed APTC must reconcile their projected household income against their actual household income as shown on their tax return. If an enrollee earned more than projected and thus collected more credits than permitted under the formula, that enrollee owes a tax liability for the difference. 26 U.S.C. § 36B(f)(2). Before the promulgation of the Rule, an enrollee who failed to file taxes and reconcile their claimed PTC award against their actual eligibility—known as failure to file and reconcile (FTR)—for two consecutive years lost their eligibility for any future APTCs and needed to file and reconcile before eligibility would be restored.

To afford consumers a range of options, plans eligible to be sold on the ACA's exchanges offer different amounts of coverage. Bronze plans are designed to cover 60% of the consumer's expected costs, leaving 40% to be paid out of the consumer's pocket; silver, gold, and platinum plans cover 70%, 80%, and 90%, respectively, of the plan's full value of benefits. 42 U.S.C. § 18022(d)(1). This measure is known as actuarial value. *Id.* The Secretary "shall develop guidelines to provide for a de minimis variation" in these levels, but only "to account for differences in actuarial estimates." *Id.* § (d)(2)(C).

Finally, the ACA also forbids certain individual and small-group plans from excluding from coverage at least ten "essential health benefits," such as emergency services, maternity and newborn care, and prescription drugs. Classification of a particular service as an EHB prohibits insurers from excluding that service, protects consumers from high health care costs by imposing cost-sharing limits for those services, and ensures the service counts toward a plan's actuarial value. The EHBs are minimum standards for these plans, and states are free to require "additional benefits," although they must defray the cost of those additional benefits. 42 U.S.C. § 18031(d)(3)(B). The ACA requires that the HHS Secretary "define" EHBs and, additionally, that he "submit a report to the appropriate committees of Congress" describing "a [Department of Labor] survey of employer-sponsored coverage" before "revising" these benefits. 42 U.S.C. § 18022(a)(2).

### B.     The Rule Makes Coverage Less Accessible and Less Affordable

The new regulation promulgated by HHS and CMS, Patient Protection and Affordable Care Act; Marketplace Integrity and Affordability, 90 Fed. Reg. 27,074 (June 25, 2025) (hereafter "Rule"), makes coverage harder to obtain, more expensive, and less valuable, in contravention of the express purpose of the ACA.

The Rule restricts a consumer's ability to enroll in coverage through three provisions. First, the Rule ends the ACA's guaranteed-issue requirement, allowing insurers to refuse to issue a new policy for individuals with past-due premiums from previous periods of coverage under a different policy. Rule at 27,084. Second, the Rule makes enrollment in SEPs more difficult, requiring the federal exchange to confirm eligibility for 75% of those claiming eligibility for an SEP. Rule at 27,148. Third, the Rule mandates a shorter OEP nationwide, rescinding states' flexibility. Rule at 27,222.

The Rule will make coverage less affordable in four important ways. First, the Rule requires the federal exchange to impose a $5 charge on enrollees who are by law entitled to pay $0 out-of-pocket premiums. Rule at 27,109. Second, the Rule forbids exchanges from accepting a consumer's self-reported income, thus blocking the consumer from APTC, if IRS data regarding that consumer's income is contradictory or unavailable. Rule at 27,221. Third, the Rule shortens the window for a consumer to reconcile their APTC claim against their tax return from two years to one year, making it harder to maintain eligibility for credits. Rule at 27,113. And fourth, the Rule changes the methodology for calculating a measure of inflation known as the premium adjustment percentage (PAP), which, in turn, will reduce the amount of credits available and increase maximum annual out-of-pocket cost limits. Rule at 27,166.

Finally, the Rule erodes the value of coverage that consumers can obtain on the marketplaces by allowing plans to undershoot actuarial value targets by up to four percentage points, Rule at 27,174, and by preventing an entire category of medically necessary health care from being covered as an essential health benefit. Rule at 27,223.

### C.    Defendants Disregard Public Comments Pointing Out the Rule's Flawed Justifications

During rulemaking, Defendants claimed the primary justification for many of these changes was to "strengthen[] the integrity of the [ACA] eligibility and enrollment systems to reduce waste, fraud, and abuse." Patient Protection and Affordable Care Act; Marketplace Integrity and Affordability, 90 Fed. Reg. 12,942, 12,942 (Mar. 19, 2025) (Proposed Rule). HHS asserted that insurance brokers and agents fraudulently enrolled consumers in coverage they either did not want or were not eligible for using tax credits to which they were not entitled, which both cost the federal government billions of dollars and imposed tax liabilities on unwitting consumers when those credits were due to be repaid. Proposed Rule at 12,942-43. While it is true that complaints of fraudulent and improper enrollments spiked in early 2024, CMS itself announced in October of that year that the problem had been handled: HHS had begun "blocking agents and brokers from making [unauthorized] changes" on the federal exchange and had resolved 99.6% of the complaints and had suspended 850 agents and brokers in connection with alleged fraudulent activity. AR at 035378-79.[3] Tellingly, in the final Rule, Defendants point to no fraud occurring *after* these 2024 protection measures were adopted. Defendants in fact acknowledge that the number of complaints in December 2024—7,134—is "a decrease from the high of *39,985* complaints received in February 2024." Rule at 27,133 (emphasis added). Instead, Defendants cite two reports from the Paragon Health Institute to justify the Rule's sweeping effects. Rule at 27,075, 27,114, 27,122, 27,141.

Commenters pointed out to Defendants the flaws with those reports. The Urban Institute, for instance, detailed how "three major methodological flaws in the Paragon report and in the CMS's [*sic*] analysis" all "bias estimates of improper exchange enrollments in the same direction, leading to an overestimate." AR at 031662-63; *accord, e.g.*, 031752 (Center on Budget and Policy Priorities), 032728 (Colorado Consumer Health Initiative), 032759 (Washington Health Benefit Exchange), 033446 (Center on Health Policy at Brookings). These commenters described how Paragon compared one enrollment metric that included children against another

---

[3] Citations to the Administrative Record will take the form "AR at ___."

metric that did not; failed to consider that, after the COVID-19 emergency ended, 15 million people were disenrolled from Medicaid, many of whom likely qualified for exchange coverage;[4] and failed to acknowledge that household income could be reported differently in different data sources because of methodological differences, not unethical conduct. *E.g.*, AR at 031663-64.

Many more commenters, including the Plaintiff States, insurance departments, health insurance exchanges, public health departments, and others, detailed how the Rule would harm consumers, decrease enrollment, weaken risk pools, drive up costs, and erode the value of coverage. *E.g.*, AR at 031352 (Plaintiff States), 029422 (New York City Department of Health and Mental Hygiene), 029061 (Massachusetts Health Connector), 024654 (Maryland Health Benefit Exchange), 034843 (Covered California). Crucially, these commenters emphasized that the *federal* exchange, not the states' exchanges, was the source of nearly all the complaints of fraudulent and improper enrollments. *E.g.*, AR at 031761. Even the Paragon authors acknowledged "a drastic difference between federal exchange states and state-based exchange states in fraudulent enrollment rates." AR at 039318. The Rule simply dismisses these concerns.

### D.    The Plaintiff States' Action

On July 17, 2025, the Plaintiff States filed their Complaint for Declaratory and Injunctive Relief, ECF 1, alongside their Motion and Memorandum in Support of Motion for a Preliminary Injunction and Stay, ECF 5-6, supported by 26 declarations from affected stakeholders in the Plaintiff States, including their insurance departments, their exchanges, public health agencies, and others, ECF 6-1 to 6-27. The Complaint challenges nine provisions of the Rule, eight of which the Plaintiffs sought to preliminarily enjoin and stay. The Defendants opposed the motion, ECF 90 (hereafter "PI Opp."), and this Court held oral argument on August 13, 2025. The Court denied the Plaintiffs' motion by written order on October 1, 2025. PI Order, ECF 105.

In its Order denying the motion for a preliminary injunction and stay, the Court addressed the merits of three provisions. For five provisions—coverage denial for past-due premiums

---

[4] *See* Families First Coronavirus Relief Act, Pub. L. No. 116-127, § 6008(b)(3), 134 Stat. 178, 208-09 (2020) (guaranteeing no Medicaid disenrollments until end of public emergency).

(Section IV.B.1 *infra*), the SEP verification requirement (IV.B.2), $5 charge (IV.C.1), premium adjustment percentage calculation methodology (IV.C.4), and actuarial value ranges (IV.D.1)— the Court did not address the merits, finding insufficient evidence of irreparable harm due to those provisions. PI Order at 11-14. Plaintiffs move here for the first time as to their ninth challenged provision—the shortening of the Open Enrollment Period (IV.B.3).

The Court previously addressed the merits of three provisions: the income verification requirement (Section IV.C.2 *infra*), the shortening of the FTR eligibility window (IV.C.3), and the elimination of "sex-trait modification procedures" as EHB (IV.D.2). As to the first two of these, the Court found the agency's decision "reasonable" and "within the discretion of the agency." PI Order at 22, 23. As to the EHB modification, the Court found that the Secretary "would be in compliance with the ACA" *only if* he "submits the required report at or before the time the provision becomes effective." PI Order at 28. Because that provision was not yet effective, the Court found that Plaintiffs "[had] no more likelihood of success than likelihood of failure" and denied the PI on that basis. PI Order at 29. The EHB modification became effective on January 1, 2026, and the Secretary has not submitted the required report.

Separately, a federal district court stayed seven provisions from taking effect. *See City of Columbus*, 796 F. Supp. 3d at 151, 156, 158, 160, 163, 168, 170 (staying the $5 fee, actuarial value policy, revocation of guaranteed issue, SEP verification, failure to reconcile, and the two income-verification provisions, respectively). Notably, another court four years ago vacated a very similar income-verification policy, finding that "HHS's decision to prioritize a hypothetical risk of fraud over the substantiated risk that its decision result in immense administrative burdens at best, and a loss of coverage for eligible individuals at worst, defies logic." *City of Columbus v. Cochran*, 523 F. Supp. 3d 731, 763 (D. Md. 2021).

## III.    LEGAL STANDARD

The Administrative Procedure Act (APA) provides that a "final agency action," such as rulemaking, is "subject to judicial review." 5 U.S.C. § 704; 5 U.S.C. § 551(4), (5). The statute empowers a federal court to "hold unlawful and set aside agency action" that is "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law." [5] 5 U.S.C.

§ 706(2)(A). Agency actions are arbitrary and capricious if they fail to "articulate a satisfactory

explanation" for their actions. *Grosso v. Surf. Transp'n Bd.*, 804 F.3d 110, 116 (1st Cir. 2015);

*see Motor Veh. Mfrs.' Ass'n of the U.S., Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S.

29, 43, 48-49 (1983) (agency must "cogently explain" its reasoning, providing a "rational

connection between the facts found and the choice made"). The APA "requires agencies to

engage in reasoned decisionmaking." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,

591 U.S. 1, 16 (2020). Further, "[a]n agency must consider and respond to significant

comments" during rulemaking. *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 96 (2015).

Conclusory responses do not suffice: "Stating that a factor was considered . . . is not a substitute

for considering it." *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986).

Ordinarily, summary judgment is appropriate where there is no dispute of material fact—

but "the summary judgment rubric has a special twist in the administrative law context." *Bos.

Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016) (internal citation

omitted). "In that context . . . an inquiring court must review an agency action not to determine

whether a dispute of fact remains but, rather, to determine whether the agency action was

arbitrary and capricious," *id.*, or otherwise unlawful.

## IV.    ARGUMENT

### A.    The Rule Harms the States

The States are suffering harms traceable to the Rule that would be redressed by this

Court's decision. Traceability is "a causal connection between the injury and the conduct

complained of[.]" *Lujan v. Def's of Wildlife*, 504 U.S. 555, 560 (1992). The harm need not be

immediate to be redressable; an "injury is imminent if it is certainly impending *or* if there is a

---

[5] Because declaratory relief and/or vacatur would be "sufficient to redress" the Plaintiff
States' injuries, Plaintiffs refrain from briefing the non-merits permanent injunction factors here.
*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165-66 (2010) (observing that district
courts should not issue permanent injunctions in APA cases unless doing so "would have [a]
meaningful practical effect independent of [the] vacatur").

substantial risk that harm will occur." *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 50 (1st Cir. 2024) (emphasis in original).

The Rule harms Plaintiffs by causing the States to shoulder increased uncompensated care costs, decreasing revenues derived from enrollments, and imposing compliance costs. As discussed *supra* at Section II.B and in each of the following sections, the Rule includes provisions that will make health coverage harder to obtain, more expensive, and less valuable. It is undisputed that the Rule will cause premiums to rise. *See, e.g.*, Rule at 27,206-07 (premium adjustment percentage methodology change will increase premiums by $530 million annually); 27,116-17 (FTR one-year window will increase premiums); 27,119-31 (income verification provisions will increase premiums); 27,176-77 (actuarial value changes will increase net costs); 27,192 (revocation of guaranteed issue will raise costs); *accord City of Columbus*, 796 F. Supp. 3d at 144 (discussing same). These higher costs, as detailed by commenters during rulemaking and declarants in this litigation, will result in decreased enrollment, shrinking risk pools, and higher uncompensated care costs for states—including Plaintiff States. *E.g.*, AR at 034843 (Covered California), 029061 (Massachusetts Health Connector), 031352 (Plaintiff States); ECF 10-4 (Altman Decl.) ¶ 24 ("It is important to highlight that a reduction in marketplace enrollment directly contributes to a rise in the uninsured rate, which in turn increases the burden of uncompensated care on the healthcare system."); ECF 10-16 (Brown Decl.) ¶¶ 21-42 (describing New Jersey's Uncompensated Care Fund); ECF 10-26 (Smith Decl.) ¶ 15 (facilities required to provide care for people who cannot pay will see costs rise); ECF 10-18 (Huck Decl.) ¶ 10 (detailing uncompensated care costs incurred by University Hospital).

The Rule acknowledges these harms. *See* Rule at 27,213-14 (observing that those who lose coverage "may go uninsured," which would "impose greater burdens on the health care system" through "increased emergency care utilization," "uncompensated care," and "additional costs" to the states, including "strain on emergency departments" and "reduction in labor productivity"); *see also id.* at 27,190 ("costs to State governments . . . in the form of charity care"). These undisputed harms are based on a "predictable chain of events," with the "first domino" to fall if

"the regulation goes into effect." *City of Columbus*, 796 F. Supp. 3d at 173. Moreover, the same chain of events results in another distinct harm to Plaintiff States: the loss of revenue from the user fees levied on plans sold on the States' exchanges. Commenters during rulemaking and declarants in this litigation have attested to this harm in Plaintiff States. *E.g.*, ECF 10-6 (Michel Decl.) ¶¶ 14-15 ("decreases of approximately $4M in assessment revenue" in Connecticut); ECF 10-10 (Winters Decl.) ¶¶ 9-12 ($1.8 million in lost enrollment revenue in Illinois); ECF 10-11 (Schneider Decl.) ¶¶ 14-17 (discussing lost enrollment revenue in Maine); ECF 10-13 (Eberle Decl.) ¶¶ 12-14 ($4 million in lost revenue in Maryland); ECF 10-17 (Caulum Decl.) ¶¶ 14-17 (lost enrollment revenue in Minnesota); ECF 10-19 (Zimmerman Decl.) ¶¶ 18-22 (same, New Jersey); ECF 10-22 (Humphreys Decl.) ¶¶ 24-29 (same, Pennsylvania); ECF 10-23 (Lang Decl.) ¶¶ 13-15 (same, Rhode Island). And although Defendants acknowledge that the Rule might cause some *insurers* to "experience a reduction in premium revenue" due to diminished enrollment, Rule at 27,218, they never address the issue of diminished user fees for state *exchanges*, and never cite any evidence to suggest that revenue from declining enrollments could be offset by increased revenue from higher premiums.

In addition to uncompensated care costs and revenue losses, the States have incurred, and continue to incur, compliance costs associated with implementing these provisions. *E.g.*, Michel Decl. ¶ 17 (Connecticut); Schneider Decl. ¶ 18 (Maine); ECF 10-12 (Woltman Decl.) ¶ 8 (Massachusetts); Eberle Decl. ¶¶ 15-20 (Maryland); ECF 10-21 (Holahan Decl.) ¶ 20 (New York). This Court has found that certain challenged provisions have already resulted in compliance costs for Plaintiff States, *see* ECF 105 at 14, and the remaining provisions will result in compliance costs if allowed to go into effect. *See* Rule at 27,188-91 (regulatory impact analysis showing estimated compliance costs to states of each provision); *see also* Altman Decl. ¶ 11 ("$1.5 million and 12,500 hours"); Humphreys Decl. ¶ 28 ("$5.5 million"). Finally, states' exchanges will still incur compliance costs as to the provisions of the Rule that bind only the federal exchange. For example, state exchanges provide consumer outreach and education, as well as mandatory training for brokers and enrollment assisters, all of which will have to be

updated because of the Rule. *E.g.*, ECF 10-20 (Baillio Decl.) ¶ 8 (New Mexico's exchange trains enrollment assisters); ECF 10-25 (Ulrey Decl.) ¶ 14 (Washington's provides training and customer education); Altman Decl. ¶ 11 (California, same); Michel Decl. ¶ 21 (Connecticut, same).

### B. The Provisions Making Coverage Harder to Obtain Are Arbitrary and Capricious, Contrary to Law, and *Ultra Vires*

#### 1. Ending Guaranteed Coverage for Otherwise Eligible Individuals with Past-Due Premiums on Prior Policies, 45 C.F.R. § 147.104(i), Is Unlawful and Arbitrary

The Rule guts one of the ACA's most important provisions: the guarantee that eligible applicants cannot be denied coverage. In contrast, the Rule allows insurance plans to deny coverage to individuals who owe a past-due premium on a prior policy, even if they pay the premium due on the policy for which they are applying. This change is both unlawful and arbitrary. The Court did not previously address the merits of this claim. PI Order at 11-14.

#### a. Ending Guaranteed Issue is Contrary to Law

Insurers may not refuse to issue new coverage to eligible enrollees. This longstanding policy is commanded by the ACA's so-called "guaranteed issue" provision, which requires that participating insurers "must accept *every* employer and individual in the State that applies for such coverage," subject to certain exceptions, 42 U.S.C. § 300gg-1(a) (emphasis added). No exception allows for denial of coverage due to past-due premiums under a different policy. The agency may not re-write the statute to create a new exception that Congress did not itself enumerate. *See TRW, Inc. v. Andrews*, 534 U.S. 19, 28 (2001) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent.") (internal citation omitted).

Had Congress meant to create an exception to the ACA's guaranteed *issue* requirement for enrollees who had not paid premiums owed under a different prior policy, it could have done so; in fact, Congress did include such an exception to the guaranteed *renewability* requirement, set forth in a neighboring section of the ACA, 42 U.S.C. § 300gg-2(b)(1). "[W]here Congress

includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983). That is exactly what Congress did here. The guaranteed renewability statute *does* allow insurers to drop coverage for consumers who owe past-due premiums: "A health insurance issuer may nonrenew or discontinue health insurance coverage . . . based [on] [n]onpayment of premiums." 42 U.S.C. § 300gg-2(b). But no such provision exists in the guaranteed-issue provision. "This demonstrates Congress's understanding that an outstanding debt could prevent an enrollee from maintaining the policy he or she currently has, but that the debt wouldn't lock the enrollee out of the market altogether." *City of Columbus*, 796 F. Supp. 3d at 157 (internal citation omitted). The Rule attempts to blur this distinction by proclaiming that "the guaranteed availability provision is not intended to require issuers to provide coverage to applicants who have not paid for such coverage," Rule at 27,087, but this reading is belied by the ACA's plain language. Insurers must *issue* a new policy to an eligible applicant who has paid for that new policy, 42 U.S.C. § 300gg-1(a), even if they need not *renew* an existing policy for an applicant who has not paid for prior periods of coverage under that policy, 42 U.S.C. § 300gg-2(b)(1). Accordingly, Defendants' attempt to "rewrite [the ACA] under the banner of [their] own policy concerns," *Azar v. Allina Health Servs.*, 587 U.S. 566, 581 (2019), is patently unlawful.

### b.    Ending Guaranteed Issue is Arbitrary and Capricious

This provision is also arbitrary and capricious. Commenters explained that this change would result in otherwise eligible enrollees being locked out of the market due to perceived premium debts that arise for reasons that are no fault of their own. *See, e.g.,* AR at 024765-66 (National Health Law Program explaining how perceived premium debt can occur through insurer accounting errors and exchange recordkeeping mistakes); 031756-60 (Center on Budget and Policy Priorities explaining that consumers may be unaware they have entered a grace period during which they still owe premiums). HHS even acknowledged that consumers might fail to pay premiums for a variety of reasons, such as if they switch to new coverage and simply stop

making premium payments rather than formally canceling coverage, *see* Rule at 27,088, but nonetheless attached no notice requirement to this provision of the Rule. HHS's failure to explain its decision not to require consumer notice is arbitrary and capricious. *See Ohio v. EPA*, 603 U.S. 279, 294 (2024) (agency must not neglect "an important aspect of the problem").

### 2. Requiring 75% Verification for Triggering-Event SEPs, 45 C.F.R. § 155.420(g), is Arbitrary and Capricious

Individuals seeking health coverage typically sign up during annual open enrollment periods (OEPs). But those who experience certain major life events—such as the loss of minimum essential coverage, the loss of a job, a move to a new area, or the birth of a child—may be eligible for special enrollment periods (SEPs). The Rule requires all exchanges on the federal platform to require supporting documentation from 75% of those claiming eligibility via SEPs, and this pre-enrollment verification requirement applies to all *types* of SEP—not just the loss of minimum essential coverage, as the prior policy required. Rule at 27,079. HHS estimates more than a quarter of a million people will encounter an enrollment roadblock due to this verification requirement. *See* Rule at 27,186 (estimating 293,073 new SEP enrollment verification issues due to this change). This change is not reasonably related to the Department's stated goals because it is unlikely to reduce purported fraud or improper enrollments. The Court did not previously address the merits of this claim. PI Order at 11-14.

Defendants claim that this change protects marketplaces from "misuse or abuse" by "ineligible individuals enrolling only after they become sick or otherwise need expensive health care services or medical products/equipment." Rule at 27,149. But this is a stark reversal from the agency's prior view—that these verification burdens negatively impact the risk pool, Rule at 27,149—even though HHS provides no new data showing such "misuse or abuse" is happening, nor any explanation for how a provision that sunsets after one year, Rule at 27,151, could effectively combat it. Instead, HHS reinterprets nearly decade-old data and ignores evidence showing *fewer* people abusing the SEPs. Rule at 27,149-50. Defendants offer a solution that "is unmoored from the problem it seeks to address." *City of Columbus*, 796 F. Supp. 3d at 159.

Commenters pointed out that the average cost to insure SEP enrollees is often the same as, *or lower than*, the cost to insure non-SEP enrollees. *E.g.*, AR at 034846-47 (Covered California), 032768 (Washington Health Benefit Exchange). Maryland's exchange wrote that SEP enrollees tended to be younger than OEP enrollees and were more likely to be unsubsidized, and that this change could "increase adverse selection by discouraging enrollment by younger, healthier individuals." AR at 024656-57. The Rule acknowledges these facts and the corresponding harms to the risk pool. Rule at 27,148, 27,150. Indeed, HHS's own data showed that many qualified enrollees—more than 75,000 individuals—struggle to submit documents and verify their eligibility in time, resulting in lost coverage. Proposed Rule at 12,983; Rule at 27,149. But HHS fails to engage with commenters' data on this point, flunking the requirement that it "must consider and respond to significant comments received during the period for public comment." *Perez*, 575 U.S. at 96.

### 3. Shortening the Open Enrollment Period, 45 C.F.R. § 155.410(e) and (f), is Arbitrary and Capricious

HHS has long allowed the states' exchanges to determine the length of their own open enrollment periods, within certain constraints. California, for instance, has utilized a 91-day OEP (from November 1 to January 31) for over ten years. The Rule ends this flexibility, limiting the OEP to nine weeks (63 days) on the federal and state exchanges, requiring it to begin no later than November 1 and end no later than December 31. Rule at 27,222. This cuts the OEP in some states, like California, by more than thirty percent. Because this change takes effect for the 2027 plan year, Plaintiffs did not request preliminary relief on this claim.

Defendants claim the shorter OEP will reduce adverse selection, which, in turn, will reduce premiums, inducing younger and unsubsidized consumers to enroll. Rule at 27,201. But this assertion ignores state exchanges' comments that the shorter OEP will generate confusion and reduce enrollment, especially among younger consumers—*contributing* to adverse selection— while increasing the burden on navigators and agents who assist consumers to enroll. AR at 033198 (State Marketplace Network warning that "condensing enrollment periods in states with

long-established enrollment deadlines will create confusion and lower enrollment"); 029065-66 (Massachusetts Health Connector warning that shorter OEP will "weaken the merged market risk pool and increase premiums for all segments of the merged market"); 031356 ("Navigators, certified application counselors (CACs), agents, and brokers" need time "to fully assist all interested Exchange applicants"); *accord City of Columbus*, 796 F. Supp. 3d. at 144 (describing insurer UnitedHealthcare increasing premiums in part because the "shortening of the open enrollment period" and other changes in the Rule "will lead to healthier enrollees leaving the market and an overall worsening of the risk pool").

HHS has acknowledged that, for many consumers, the ability to switch plans in January is valuable because some enrollees "may not learn of cost increases" until the new year, and the longer OEP affords consumers "the opportunity to change plans" if they choose to. Rule at 27,136, 27,140. In fact, HHS itself previously adopted the position that a longer OEP is a benefit for the marketplaces because younger and healthier enrollees often enroll later. Patient Protection and Affordable Care Act; Market Stabilization, 82 Fed. Reg. 18,346, 18,377 (Apr. 18, 2017). Defendants' only response to these concerns is that they will "provide notice in advance of the OEP to consumers about the importance of updating information for the future plan year and actively comparing plan options and prices" so that consumers will not be caught off-guard when they receive their updated bills in January. Rule at 27,139. But merely asserting that Defendants will take some minimal step to address one element of a problem they are creating does nothing to explain why the change is necessary in the first place and does not come close to the "reasonable explan[ation]" required by the APA, *Fed. Commc'ns Comm'n. v. Prometheus Radio Proj.*, 592 U.S. 414, 423 (2021), nor does Defendants' explanation make any attempt to draw "a rational connection between the facts found and the choice made," *State Farm*, 463 U.S. at 43.

16

### C.    The Provisions Making Coverage More Expensive Are Arbitrary and Capricious, Contrary to Law, and *Ultra Vires*

#### 1.    The $5 Re-Enrollment Penalty, 45 C.F.R. § 155.335(a)(3) and (n), is Unlawful and Arbitrary

Since the ACA's enactment, those who maintain eligibility for coverage from year to year have been automatically re-enrolled in the same plan unless they disenrolled or selected a different one. For such individuals who qualify for sufficient APTC to fully cover their premium—leaving $0 in out-of-pocket premiums—the Rule now directs the federal exchange to reduce the APTC award by $5 per month—meaning enrollees would *owe* $5—until they confirm their continued eligibility for no-cost coverage. This provision violates the plain text of the ACA. It also does nothing to further HHS's stated goal of reducing improper enrollments and ignores the evidence available to the agency, rendering it arbitrary and capricious. The Court did not previously address the merits of this claim. PI Order at 11-14.

##### a.    The $5 Re-Enrollment Penalty Is Contrary to Law

The ACA sets forth a formula for calculating the amount of PTC (and thus APTC) that an enrollee receives, considering household size, household income as a percentage of the federal poverty level, the rate of inflation, and the cost of a benchmark plan. 26 U.S.C. § 36B(b). The formula is definitive, leaving no room for the Secretary's discretion. The ACA further requires that the Secretary of the Treasury—not HHS—"shall make the advance payment" of the APTC calculated in accordance with Section 36B's formula. 42 U.S.C. § 18082(c)(2)(A). Defendants, in short, cannot tweak the calculation of the APTC amount and have no role in distributing it. The Rule, however, unilaterally reduces the APTC award by $5. This is unlawful. In short, "CMS lacks authority to tinker with the premium cost structure outlined in 26 U.S.C. § 36B." *City of Columbus*, 796 F. Supp. 3d at 150.

The Rule asserts that 42 U.S.C. § 18081(f)(1)(B) gives the Secretary that authority, characterizing the $5 penalty as an "eligibility redetermination provision" issued under Section 18081(f)(1)(B) and not as a change to the PTC formula. Rule at 27,102, 27,109. But this is wrong for two reasons. First, nothing in Section 18081 gives the Secretary or anybody else the

authority to deviate from the APTC calculation formula mandated by 26 U.S.C. § 36B, and "an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014). Second, "it is well established that an agency may not circumvent specific statutory limits on its actions by relying on separate, general rulemaking authority." *Air All. Hous. v. EPA*, 906 F.3d 1049, 1061 (D.C. Cir. 2018). Section 18081(f)(1)(B)—which allows the Secretary to "establish procedures [for] redetermin[ing] eligibility on a periodic basis in appropriate circumstances"—is just such a statute providing general regulatory authority. Defendants cannot circumvent the more specific language at 26 U.S.C. § 36B simply by deeming their unlawful revision to its statutory formula an eligibility redetermination provision. Therefore, this provision is contrary to law.

### b.    The $5 Penalty Is Arbitrary and Capricious

HHS also failed to address the known-harmful effects of barriers to enrollment. The $5 penalty would require those who qualify for $0 premiums to return to the exchange or else pay premiums they do not owe. One study in the record found that this kind of "small hassle" has been shown to cause "one-third of eligible individuals" to "simply fail to take up health insurance" and has an impact on enrollment equivalent to a $470 annual premium increase. AR at 038968. Defendants were aware of that study but never addressed its significant findings regarding barriers to enrollment. Another commenter cited "direct evidence" of what happens when consumers face a "$0-to-positive premium transition": the result was "an excess 14% attrition, largely occurring immediately . . . . Put another way, 1 in 7 lost coverage as a result of new monthly premiums" that were under ten dollars. AR at 030427. Moreover, any surprise bill amount might go overlooked, especially by long-term enrollees who are accustomed to the automatic re-enrollment process, "complicat[ing] a previously clear picture." AR at 034849.

Defendants do not respond to these myriad concerns. They acknowledge that this policy could "compromise the Exchange risk pool" by causing "younger and healthier individuals" to lose coverage, Rule at 27,107, but write only that they "will provide more information about consumer outreach through existing interested party forums." Rule at 27,109. Further, they stress

that this policy is necessary to ensure that consumers are not wrongfully re-enrolling in $0 premium coverage to which they are not entitled. Rule at 27,103.

But on this point, Defendants' logic backfires. The Rule itself argues that the "temporary expansion of ACA premium subsidies" enacted by Congress in response to the COVID-19 pandemic was responsible for a "significant[] increase" in "the number of enrollees" receiving a full subsidy. Rule at 27,103, 27,105-06; PI Opp. at 16. But rather than acknowledging that these enhanced premiums were set to expire at the end of 2025, Defendants pivot to arguing that the $5 charge is a mere "prompt" for individuals "to update or confirm" their eligibility for subsidized coverage. Rule at 27,103; PI Opp. at 17. This leaves Plaintiffs' argument unaddressed. Defendants do not explain why, if the enhanced premium tax credits drove improper enrollments, the $5 penalty is necessary after those credits expire. This is not "reasoned decisionmaking." *Regents of the Univ. of Cal.*, 591 U.S. at 16.

### 2. Ending Acceptance of Self-Attested Projected Household Income when IRS Data is Contradictory or Unavailable, 45 C.F.R. § 155.320(c)(3)(iii), (5), is Arbitrary and Capricious

The Rule makes two arbitrary changes to the methods all exchanges must use to verify an applicant's projected household income when applying for subsidies. First, the Rule forbids exchanges from accepting the attestation of an enrollee who projects annual household income above 100% FPL if existing tax data from the IRS shows a lower income and if the difference is above a "reasonable threshold." Rule at 27,221. When that occurs, the exchange generates a "data matching issue" (DMI) (the "contradictory-data DMI"). Rule at 27,221. Second, if there is no IRS data available to corroborate the enrollee's attestation, the Rule requires exchanges to generate a DMI (the "missing-data DMI"). *Id.* In either case, consumers must submit additional paperwork before they may obtain health insurance. *Id.* The Court found Plaintiffs were suffering "irreparable economic harm" due to this provision, PI Order at 15, but declined to grant preliminary relief, PI Order at 19-22. In 2021, a federal district court invalided this same policy. *See Cochran*, 523 F. Supp. 3d at 763 (income verification requirements address a "hypothetical" concern and "def[y] logic"). Defendants' second attempt should fare no better: Because there is

no "evidence of a *nexus* between fraudulent enrollment and self-attestation" and there is a "lack of sufficient data" justifying the impact on consumers, these provisions are "'not reasonable [or] reasonably explained.'" *City of Columbus*, 796 F. Supp. 3d at 168-70 (emphasis in original) (citing *Prometheus Radio Proj.*, 592 U.S. at 423).

These changes will create significant barriers to coverage among the population of individuals least able to satisfy the verification requirements, clear the DMIs, and obtain coverage, while creating enormous financial and administrative burdens for the exchanges. HHS estimates that these two new requirements together will generate an estimated 2.7 million DMIs annually—each one of which represents a single person who will be unable to enroll in health insurance until they have gathered and submitted the necessary paperwork for approval. Additionally, the vast majority of these DMIs, 2.1 million, will be generated not because of contradictory IRS data, but *missing* data, which may be no fault of the consumer, and the coverage losses will be "concentrated among the young." AR at 033759-60. Moreover, low-income consumers often have widely variable income. *See* Amicus Br. of Nat'l Health L. Prog., et al., ECF 68, at 12; *see also* AR at 033761 ("For low-income workers, the standard deviation of monthly income was 85% of the mean—so that someone who earned an average of $1000 per month had so much variation month-to-month that a month where their income was anything from $150 to $1850 would be within a single standard deviation.").

The costs to the Plaintiff States of implementing this Rule are also substantial. The contradictory-data DMI will cause the states to spend $12.4 million to receive, review, and verify documents and conduct outreach and communication with consumers, on top of $14.7 million in one-time system update costs. Rule at 27,199. Then, because this Rule provision is set to sunset after PY 2026, the states will spend *another* $14.7 million to undo this change. *Id.* Consumers will spend $13 million complying with this Rule; for those who cannot comply, 81,000 will lose access to APTC (50,000 on the federal exchange and 31,000 on the state exchanges). *Id.*

As for the missing-data DMI, HHS estimates the cost to the States at $62.8 million in verification costs, plus $16.6 million in one-time system update costs—times two, because of the

20

one-year sunset provision. Rule at 27,200. HHS further expects 252,000 people to lose APTC on the federal exchange, and another 155,000 on the state exchanges. *Id.*

Defendants claim that these harms are justified because sufficiently large numbers of consumers "are intentionally inflating their incomes," Rule at 27,121, and HHS must "steward[] taxpayer dollars," PI Opp. at 18-19. But this conclusion improperly relies on the flawed Paragon analyses described above, as well as a misreading of the data before the agency. In fact, one of the authors of a study cited in the Proposed Rule made clear in a comment letter that her study did not support Defendants' attempt to justify the contradictory-data DMI. *See* AR at 031663 (HHS misunderstood Dr. Jessica Banthin's study, which "refrain[s] from estimating the exact number of people who enroll improperly" because of an "inconsistency . . . in how income is measured" and because "it is not improper or fraudulent for people seeking coverage . . . to anticipate that [their incomes] will be greater than that of a previous year.") Defendants have "failed to meaningfully address the comments pointing out potential flaws in the data contained in the Paragon report, despite continuing to rely on such data to justify the provision in the Rule." *City of Columbus*, 796 F. Supp. 3d at 168. This is not "reasoned decisionmaking." *Regents of the Univ. of Cal.*, 591 U.S. at 16.

Additionally, even taking Defendants at their word, the problem that this policy change seeks to solve is confined to states that did not expand their Medicaid programs to cover low-income adults. For those that did expand Medicaid, as every Plaintiff save Wisconsin has, a low-income consumer can enroll in Medicaid and so has no incentive to inflate income to qualify for APTC and enroll in a subsidized plan on the exchanges. AR at 032762.

Not only do Defendants fail to justify this provision, but they also fail to grapple with its enormous burden on consumers—while contradicting themselves. Defendants claim that "the [income verification] process does not impose a substantial burden," Rule at 27,200, and further claim it is "likely" that consumers would "have documentation other than tax information, such as pay stubs . . . readily available" for income verification purposes. Rule at 27,132. Yet simultaneously, Defendants acknowledge "that income verification can be more challenging for

lower-income tax filers due to less consistent employment," Rule at 27,200, and further acknowledge HHS's own "concerns related to the risk of coverage loss by low-income persons," Rule at 27,131. Moreover, commenters and *amici* pointed out that large numbers of low-income consumers, especially those working irregular shifts, multiple jobs, gig-economy jobs, or cash-paid jobs might *not* have pay stubs or might have extremely variable income.

Bare assertions that the agency has considered and rejected an objection are not enough to survive an APA challenge. "Stating that a factor was considered . . . is not a substitute for considering it." *Getty*, 805 F.2d at 1055. It is not enough for Defendants to assert some rationale for their chosen course of action; they must connect the decision taken with "*evidence* before the agency." *State Farm*, 463 U.S. at 43 (emphasis added). Here, there is no evidence supporting the efficacy of the DMIs, and Defendants did not adequately consider their impact on consumers.

### 3.    Shortening the FTR Eligibility Window to One Year, 45 C.F.R. § 155.305(f), is Arbitrary and Capricious

As explained above, the ACA awards APTC to enrollees based on their projected household income for the coming year. 26 U.S.C. § 36B; 42 U.S.C. § 18082. The enrollee then reconciles their projected household income against their actual household income when they file taxes the following year. HHS cannot access a consumer's tax data housed at the IRS. *See* Rule at 27,116 ("privacy concerns" prevent HHS from knowing an individual's tax status). Prior to the Rule, an enrollee who failed to file taxes and reconcile APTC against their actual income for two consecutive years lost eligibility for APTCs until they completed this process. The Rule temporarily ends this policy, imposing a one-year FTR window for PY 2026, before reverting to a two-year FTR window for PY 2027. The Court found Plaintiffs were suffering "irreparable economic harm" due to this provision, PI Order at 15, but declined to grant preliminary relief, PI Order at 22-24.[6]

---

[6] The Court previously found that the fact that there are fewer people with two-year codes than one-year codes "shows the need for a stricter enforcement policy" because those who receive a one-year code "have no incentive to reconcile" until the second year, "because they know they will remain eligible" until the grace period expires. PI Order at 22. However, the evidence before the agency led HHS to find that one-year notices sent during the open

(continued…)

To be clear, this change is not about fraud—whether after one year or two, everyone must square up eventually—it is about the length of time consumers are afforded to reconcile their APTC. Defendants argue that the one-year FTR window will save the federal government money by recouping excess APTC more quickly. PI Opp. at 14. But there are at least two problems with this argument. First, as this Court previously recognized, PI Order at 22, the population of APTC claimants with two-year FTR codes is much smaller than the population of APTC claimants with one-year FTR codes. In Massachusetts, for instance, the ratio was ten to one. AR at 031360. This implies most people who do receive such a code are able to clear that status before the second year, undermining Defendants' argument that any significant number of enrollees are free riding on the two-year grace period to claim APTCs to which they are not eligible.

The second problem with Defendants' argument is that tax law already requires consumers to pay back any excess APTC. Wholly separate from the FTR rules, the IRS assesses a tax liability against a consumer who fails to show that they were entitled to the tax credits they claimed. The agency has not provided any evidence to show that this is not happening as it should and instead invokes, once again, concerns about alleged improper enrollment to justify this policy. Rule at 27,116. Because Defendants have not shown that the problem exists in the first place, no "facts" exist to justify this change. *State Farm*, 463 U.S. at 43.

### 4.    Changing the Premium Adjustment Percentage Methodology, 45 C.F.R. § 156.130(e), is Arbitrary and Capricious

The Rule changes the calculation of the premium adjustment percentage (PAP), which is a measure of inflation. The PAP, in turn, affects maximum out-of-pocket limits and premium costs for consumers. The Rule raises the PAP by including premiums in the individual and employer-sponsored marketplaces (rather than the employer-sponsored marketplace alone). Rule at 27,166-73. Plaintiffs allege that this change is arbitrary and capricious. The Court did not previously address the merits of this claim. PI Order at 11-14.

---

enrollment period "were relatively effective" in resolving FTR issues, Rule at 27,114, indicating that those who received a one-year notice *were* adequately incentivized to clear their FTR status.

This change "artificially inflates premium growth over time," AR at 033743, and will reduce APTC awards to consumers by "between $1.27 billion and $1.55 billion annually from 2026 to 2030," Rule at 27,207, resulting in significantly higher net premiums for millions of families. It will also cause 80,000 individuals to drop their coverage. Rule at 27,206-07. This change is arbitrary and capricious for two reasons.

First, the premium adjustment percentage is supposed to measure underlying trends in health coverage costs, but the individual-market premiums in 2013, prior to the ACA's enactment, were much more volatile than the group marketplace premiums. AR at 033743; Rule at 27,173. Including the more-volatile individual market in this calculation will increase net premiums for "not only Marketplace enrollees but also the 160 million people with employer-sponsored coverage," AR at 033743, and HHS has not adequately balanced this burden against the Rule's purported benefits. Defendants claim the change is required to bring the PAP in line with true inflation in the marketplace, but do not explain why the current PAP formula, which was used from 2015-19 and again from 2022-25, is inaccurate. The main purpose of the ACA was to "increase the number of Americans covered by health insurance and decrease the cost of health care." *Nat'l Fed'n Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012). This policy does the opposite—raising costs and lowering enrollment. Because Defendants have not offered a strong justification for contravening the ACA's purpose, this provision is arbitrary and capricious. *See Judulang v. Holder*, 565 U.S. 42, 64 (2011) (an agency is not free to exercise its discretion in a manner that is "unmoored from the purposes and concerns" of the statute).

Second, HHS failed to "be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" *Regents of Univ. of Cal.*, 591 U.S. at 30 (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016)). The 24 million healthcare consumers who obtained health coverage through the exchanges in 2025 rely on HHS to keep healthcare premiums and out-of-pocket costs from rising too rapidly. As commenters explained, "this change would expose a typical family to an additional $900 in cost-sharing and $300 in premiums annually" when combined with the change to the actuarial value provision

24

discussed in the following section. AR at 033743. Defendants acted capriciously by ignoring "an important aspect of the problem," *Ohio*, 603 U.S. at 294, failing to consider the 80,000 people who will lose coverage as costs rise and the risk pool considerations that loss entails.

### D. The Provisions Making Coverage Less Valuable Are Arbitrary and Capricious, Contrary to Law, and *Ultra Vires*

#### 1. Allowing Health Plans to Offer Less Valuable Coverage, 45 C.F.R. §§ 156.140(c), 156.200(b)(3), and 156.400, is Arbitrary and Capricious

Plans on the ACA marketplaces are categorized into tiers based on how much of the expected cost will be covered by the plan, and how much will be borne by the enrollee, a measure known as actuarial value (AV). A bronze-tier plan is designed to cover 60% of the expected cost, leaving 40% to be paid through co-pays, premiums, and coinsurance. Silver, gold, and platinum plans target 70%, 80%, and 90%, respectively, of the enrollee's expected costs. The Rule allows all plans to undershoot the targeted levels of coverage within each metal tier by four percentage points. For example, the Rule allows insurers to lower the value of silver-tier plans to just 66%. The Court found Plaintiffs were suffering "irreparable economic harm" due to this provision, PI Order at 15, but declined to grant preliminary relief, PI Order at 24-29.

Allowing insurers to undershoot AV targets will reduce their costs, lowering the cost of the benchmark plan used to set premium tax credits. 26 U.S.C. § 36B(b)(2)(B). As a result, tax credits for all enrollees will be slashed by $1.2 billion for 2026, by Defendants' own estimate. Rule at 27,208. As credits evaporate, premiums "will *increase* . . . for comparable coverage for subsidized enrollees, who represent most of the risk pool," leading to coverage losses. AR at 033745. Reducing these AV targets will increase consumer costs by around $714 for a family of four, AR at 031785-86, on top of the cost increases due to the change to the premium adjustment percentage discussed previously. This provision therefore reduces enrollment, weakens the risk pool, and increases costs for those who remain enrolled. AR at 034403, 030495, 033744-45.

This change is arbitrary and capricious for two reasons. First, HHS's primary justifications are conclusory and unsupported by evidence. Defendants claimed the prior AV ranges

25

"substantially reduce[d] issuer flexibility" and that plan issuers "voiced concern about their ability to continue to participate in the market generally." Rule at 27,175. But the Rule offers no empirical support for these assertions, and by contrast, at least one commenter pointed to *increased* issuer participation since the prior *de minimis* ranges were adopted. *See* AR at 033745 (insurer participation *increased* after HHS adopted the prior narrower AV ranges). HHS also asserts that the changes will improve the risk pool by promoting unsubsidized (and healthier) enrollee participation through lowered premiums. Rule at 27,175. But, as commenters noted, the "vast majority" of consumers will face *higher* costs because, "due to smaller APTCs, recipients will face the choice of either purchasing less comprehensive coverage or paying more in premiums for comparable coverage." AR at 033744. "There is no data to back up the claim and reasoning that coverage would become 'more affordable' over time when *even CMS itself* estimates that [this policy] will reduce aggregate PTCs by $1.2 billion in 2026." *City of Columbus*, 796 F. Supp. 3d at 156 (emphasis in original). HHS's purported justification lacks support and "runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 43.

Second, the Rule fails to consider that the impact on net premiums is only half the story. While Defendants admit that the loss of APTC due to this provision will cause "an initial weakening of the risk pool" caused by healthier, subsidized enrollees "drop[ping] coverage when net premiums rise," Rule at 27,177, they fail to consider that this provision increases gross premiums as well, affecting all enrollees—not just subsidized ones. This, in turn, will have a larger impact on the risk pool than Defendants acknowledge. AR at 033745. This is "an important aspect of the problem," *Ohio*, 603 U.S. at 294, that Defendants overlook.

Finally, the Rule does not attempt to explain this change in terms of the law's allowance for "differences in actuarial estimates," Rule at 27,175, so the agency has not adopted a guideline providing for "a de minimis variation in the actuarial valuations used in determining the level of coverage of a plan to account for differences in actuarial estimates," 42 U.S.C. § 18022(d)(3). Defendants' contrary assertion is a "conclusory statement[]" that cannot satisfy the APA. *Mass. v. Nat'l Inst. of Health*, 770 F. Supp. 277, 306 (D. Mass. 2025).

### 2. The Elimination of "Sex-Trait Modification Procedures" as an Essential Health Benefit is Unlawful and Arbitrary

For the first time, the Rule forbids plan issuers from "includ[ing] . . . specified sex-trait modification procedures (as defined at 45 C.F.R. § 156.400) as EHB." Rule at 27,223. As this Court previously observed, removal of a treatment as an EHB takes it outside the protection of "[s]everal key ACA financial protections, i.e., provisions that cap annual out-of-pocket costs and prohibit dollar limits on care[.]" PI Order at 7-8. This provision of the Rule is both contrary to law and arbitrary and capricious.

### a. The EHB Modification is Contrary to Law

The ACA mandates that "the [HHS] Secretary shall define the [EHBs]," 42 U.S.C. § 18022(b)(1), and shall "periodically update the [EHBs] under paragraph (1) to address any . . . changes in the evidence base the Secretary identifies" when conducting his review, § 18022(b)(4)(H). When "revising the benefits under paragraph (4)(H)," the Secretary must "submit a report to the appropriate committees of Congress" that must certify that the EHBs "meet the limitation described in paragraph (2)." That "limitation" is the following:

> The Secretary shall ensure that the scope of the essential health benefits under paragraph (1) is equal to the scope of benefits provided under a typical employer plan, as determined by the Secretary. To inform this determination, the Secretary of Labor shall conduct a survey of employer-sponsored coverage to determine the benefits typically covered by employers, including multiemployer plans, and provide a report on such survey to the Secretary.

42 U.S.C. § 18022(b)(2)(A). In short, when the Secretary modifies EHBs, he must submit a report to Congress certifying that the modification is consistent with the scope of benefits offered by "a typical employer plan," and that this determination has been "inform[ed]" by a "survey of employer-sponsored coverage" performed by the Secretary of Labor. *Id.* The Department of Labor completed its only such survey in 2011, using data from 2008 and 2009.[7] Defendants do not assert that they even glanced at that survey, let alone that it "informed" the Secretary's decision as required by Section 18022(b)(2)(A), as it is absent from the Administrative Record.

---

[7] Dep't of Labor, *Selected Medical Benefits: A Report from the Department of Labor to the Department of Health and Human Services* (Apr. 15, 2011), *available at* https://www.bls.gov/ebs/additional-resources/selected-medical-benefits-a-report-from-dol-to-hhs.pdf.

Defendants unlawfully excluded Congress from the rulemaking process by failing to submit a report to the legislature as required. Defendants have unsuccessfully argued that no report to Congress is needed because subsection (b)(2)(A)'s requirements do not apply here. But as this Court already found, "[c]ontrary to Defendants' assertion," the "statutory scheme makes clear" that "the Secretary must follow [the reporting requirement of 42 U.S.C. § 18022(b)(2)(B)] when exercising his authority to define and revise EHBs under [subsections] (b)(1) and (b)(4)(H)." PI Order at 27. "Thus," the Secretary was required "to submit the required report at or before the time the provision [became] effective," that is, January 1, 2026. PI Order at 28. In fact, the Secretary needed to submit the report to Congress well in advance of the Rule's effective date, to allow for the agency to respond to any "significant comments" Congress might submit. *Perez*, 575 U.S. at 96. But in any event, even assuming a retroactive submission could have cured the deficiency, no such report was ever submitted to Congress. Therefore, the Rule's modification to the allowable EHBs without notification to Congress and without the required Department of Labor employer survey was contrary to law and *ultra vires*, and must be set aside. 42 U.S.C. § 18022(b)(2)(A).

Finally, 42 U.S.C. § 18022(b)(2)(A) requires the Secretary to define EHBs to "be equal in scope to the benefits provided under a typical employer plan." Therefore, if the Secretary ignored or misunderstood the definition of "typical"—and he did, as the next section explains—then his modification to EHBs would also be contrary to law for that reason.

### b.    The EHB Modification is Arbitrary and Capricious

The Rule's exclusion of "specified sex-trait modification procedures" from EHB is arbitrary and capricious because Defendants adopted an incorrect definition of a typical employer plan and disregarded the need for a state-by-state definition of typicality.

First, as discussed above, Congress intended the Department of Labor's survey of employer-sponsored coverage to "inform [the HHS Secretary's] determination" of "the scope of benefits provided under a typical employer plan." 42 U.S.C. § 18022(b)(2)(A). Because Defendants determined typicality without reference to any such survey, their determination was

arbitrary. *See State Farm*, 463 U.S. at 43 (action is arbitrary where agency "relied on factors which Congress has not intended it to consider" or "entirely failed to consider an important aspect of the problem").

Second, Defendants' incorrect understanding of typicality is based on an erroneous premise. The agency justifies the exclusion of sex-trait modification procedures as EHB in part by reference to the supposedly low utilization rate for such care. Rule at 27,155. But Defendants do not explain why utilization rates are relevant to determining typicality. Utilization has nothing to do with typicality of *coverage*: Heart and lung transplants, for instance, are rare, yet widely covered. And other treatments with high utilization rates are excluded as EHB, such as non-pediatric dental or eye exam services, long-term nursing care, and non-medically necessary orthodontia. Put simply, utilization data has *never* been used as a basis for excluding certain medical services from EHB, and Defendants fail to explain their decision to consider it now despite its patent irrelevance to the question of typicality of coverage.

Third, Defendants' determination of typicality is arbitrary for the independent reason that HHS was "unable or unwilling" to neutrally consider the evidence before it. *Miss. Comm'n on Env't Quality v. EPA*, 790 F.3d 138, 183 (D.C. Cir. 2015). Specifically, HHS disregarded without meaningful explanation all but one of the metrics of typicality proposed by commenters, electing not to define typicality by reference to the plans that cover most workers in a given state, or the states' plans that cover their own employees, or the plans of companies with 5,000 or more workers. By each of those metrics, a "typical employer plan" would cover sex-trait modification procedures. Instead, HHS established typicality by looking *only* at small business plans, and without performing a formal analysis or survey of those plans. *See* Rule at 27,155 (stating unsupported "belie[f]" that "small business health options program (SHOP) [plans are] more reflective of the coverage typically provided by the majority of employers"). Nowhere in the Rule does HHS actually marshal data to support its belief that SHOP plans represent the "typical" employer plan. And if HHS had marshaled such data, it would have seen that many SHOP plans, being fully insured, *do* cover medically necessary treatment for gender dysphoria,

including sex-trait modification procedures, in all states that mandate such coverage. Yet the Rule makes no effort to disaggregate SHOP plans that do cover such care from those that do not, rendering its blanket assertions about SHOP plans unreliable.

Under nearly any analysis, employer plans typically do cover medically necessary treatments for gender dysphoria, including sex-trait modification procedures. In fact, Defendants themselves admit that seventy-two percent of Fortune 500 companies' health plans, and "over 1,300 major employers nationwide," provide this coverage. Rule at 27,154; *see* AR at 036261 (Corporate Equality Index 2025). Fifty percent of companies with 5,000 or more workers certified that their plans cover gender-affirming hormone therapy. AR at 035628 (KFF Employer Health Benefits Annual Survey 2024). Further, of the states whose employer plans mention such care, 24 cover it while 14 do not, and 12 "do not mention or have no clear policy" on such coverage, meaning 63% of the plans that mention it require it to be covered. Rule at 27,153.

Despite having acknowledged in 2011 that "large employer plans . . . account for the majority of employer plan enrollees,"[8] and despite recognizing the vast array of employers offering this coverage and of employees who are enrolled in plans that offer it, HHS focuses myopically on its flawed analysis of small business plans. Rule at 27,155. This is not a "dispute[] over interpretation of data," PI Order at 26, but rather a misunderstanding of what constitutes a "typical" employer plan based on multiple faulty premises. This arbitrary and capricious conclusion is not "reasoned decisionmaking." *Michigan v. EPA*, 576 U.S. 743, 750 (2015).

## V.    CONCLUSION

For these reasons, the Plaintiff States are entitled to: (1) a declaratory judgment finding that the Rule's challenged provisions are (a) contrary to the laws of the United States (Counts II and III), (b) arbitrary and capricious (Counts IV and V), and (c) *ultra vires* agency action (Count VI), as appropriate to each provision; and (2) vacatur of all challenged provisions under Section 706 of the APA.

---

[8] Centers for Medicare and Medicaid Servs., Ctr. for Consumer Information & Oversight, Essential Health Benefits Bulletin (Dec. 16, 2011) at 3-4, *available at* https://www.cms.gov/cciio/resources/files/downloads/essential_health_benefits_bulletin.pdf.

Dated:  January 23, 2026

Respectfully Submitted,

**ANDREA JOY CAMPBELL**
Attorney General
Commonwealth of Massachusetts

*/s/ Allyson Slater*
ALLYSON SLATER (BBO No. 704545)
Director, Reproductive Justice Unit
MORGAN CARMEN
JAK KUNDL
Assistant Attorneys General
Office of the Attorney General
One Ashburton Place, 20th Floor
Boston, MA
(617) 963-2811
Allyson.Slater@mass.gov
*Attorneys for Plaintiff Commonwealth of Massachusetts*


**JENNIFER DAVENPORT**
Acting Attorney General
State of New Jersey

*/s/ Mayur P. Saxena*
JEREMY M. FEIGENBAUM
Solicitor General
MAYUR P. SAXENA*
Assistant Attorney General
JOSHUA P. BOHN*
BRYCE K. HURST
AMANDA I. MOREJON
ESTEFANIA PUGLIESE-SAVILLE
Deputy Attorneys General
Office of the Attorney General
25 Market Street
Trenton, NJ 08625
Telephone: (609) 969-5365
Email: Mayur.Saxena@law.njoag.gov
*Attorneys for Plaintiff State of New Jersey*

**ROB BONTA**
Attorney General
State of California

*/s/ Sean C. McGuire*
SEAN C. MCGUIRE*
Deputy Attorney General
NELI PALMA*
Senior Assistant Attorney General
NIMROD PITSKER ELIAS*
Supervising Deputy Attorney General
CRYSTAL ADAMS*
HILARY BURKE CHAN*
Deputy Attorneys General
600 West Broadway, Suite 1800
San Diego, CA 92101
(619) 738-9543
Sean.McGuire@doj.ca.gov
*Attorneys for Plaintiff State of California*


**KRISTIN K. MAYES**
Attorney General
State of Arizona

*/s/ Joshua Nomkin*
JOSHUA NOMKIN*
LAUREN WATFORD*
Office of the Attorney General
2005 North Central Avenue
Phoenix, Arizona 85004
(602) 542-3333
Joshua.Nomkin@azag.gov
Lauren.Watford@azag.gov
*Attorneys for Plaintiff State of Arizona*

*\* Denotes pro hac vice admission*

**PHILIP J. WEISER**
Attorney General
State of Colorado

*/s/ David Moskowitz*
DAVID MOSKOWITZ*
Deputy Solicitor General
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203
Phone: (720) 508-6000
David.Moskowitz@coag.gov
*Attorneys for Plaintiff State of Colorado*

**KATHLEEN JENNINGS**
Attorney General
State of Delaware

*/s/ Vanessa L. Kassab*
IAN R. LISTON*
Director of Impact Litigation
VANESSA L. KASSAB*
Deputy Attorneys General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
Vanessa.Kassab@delaware.gov
*Attorneys for Plaintiff State of Delaware*

**AARON M. FREY**
Attorney General
State of Maine

*/s/ Molly A. Moynihan*
MOLLY A. MOYNIHAN*
Assistant Attorneys General
Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
Tel.: 207-626-8800
Lauren.LaRochelle@maine.gov
*Attorneys for Plaintiff State of Maine*

**WILLIAM TONG**
Attorney General
State of Connecticut

*/s/ Janelle Medeiros*
JANELLE MEDEIROS*
Special Counsel for Civil Rights
165 Capitol Ave
Hartford, CT 06106
(860) 808-5450
Janelle.Medeiros@ct.gov
*Attorneys for Plaintiff State of Connecticut*

**KWAME RAOUL**
Attorney General
State of Illinois

*/s/ Alice L. Riechers*
SARAH J. NORTH*
Deputy Chief, Public Interest Division
ALICE L. RIECHERS*
Assistant Attorney General,
Special Litigation Bureau
Office of the Illinois Attorney General
115 S. LaSalle Street
Chicago, IL 60603
312-814-3000
Sarah.North@ilag.gov
Alice.Riechers@ilag.gov
*Attorneys for Plaintiff State of Illinois*

**ANTHONY G. BROWN**
Attorney General
State of Maryland

*/s Michael Drezner*
MICHAEL DREZNER*
Senior Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
410-576-6959
MDrezner@oag.state.md.us
*Attorneys for Plaintiff State of Maryland*

*\* Denotes pro hac vice admission*

32

**DANA NESSEL**
Attorney General
State of Michigan

*/s/ Carl Hammaker*
CARL HAMMAKER (P81203)*
AARON LEVIN (P81310)*
Assistant Attorneys General
Michigan Department of Attorney General
525 W. Ottawa St.
Lansing, MI 48933-1067
517.335.7573
HammakerC@michigan.gov
LevinA@michigan.gov
*Attorneys for Plaintiff State of Michigan*

**KEITH ELLISON**
Attorney General
State of Minnesota

*/s/ Lindsey E. Middlecamp*
LINDSEY E. MIDDLECAMP**
Special Counsel, Rule of Law
445 Minnesota Street, Suite 600
St. Paul, MN 55101
(651) 300-0711
Lindsey.Middlecamp@ag.state.mn.us
*Attorneys for Plaintiff State of Minnesota*

**RAÚL TORREZ**
Attorney General
State of New Mexico

*/s/ Aletheia V.P. Allen*
ALETHEIA V.P. ALLEN*
Solicitor General
LAWRENCE M. MARCUS*
Assistant Solicitor General
New Mexico Department of Justice
201 Third St. NW, Suite 300
Albuquerque, NM 87102
505-527-2776
AAllen@nmdoj.gov
*Attorneys for Plaintiff State of New Mexico*

**AARON D. FORD**
Attorney General
State of Nevada

*/s/ Heidi Parry Stern*
HEIDI PARRY STERN (Bar. No. 8873)*
Solicitor General
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
HStern@ag.nv.gov
*Attorneys for Plaintiff State of Nevada*

**LETITIA JAMES**
Attorney General
State of New York

*/s/ Stephen Thompson*
STEPHEN C. THOMPSON*
Special Counsel
ANDRES IVAN NAVEDO*
Assistant Attorney General
28 Liberty Street
New York, NY 10005
(212) 416-6183
stephen.thompson@ag.ny.gov
*Attorneys for Plaintiff State of New York*

**DAN RAYFIELD**
Attorney General
State of Oregon

*/s/ Scott P. Kennedy*
SCOTT P. KENNEDY*
Senior Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel (971) 453-9050
Fax (971) 673-5000
Scott.Kennedy@doj.oregon.gov
*Attorneys for Plaintiff State of Oregon*

\* *Denotes pro hac vice admission*
\*\* *Denotes pro hac vice forthcoming*

**JOSH SHAPIRO**
in his official capacity as Governor of the
Commonwealth of Pennsylvania

Jennifer Selber
 General Counsel

*/s/ Aimee D. Thomson*
AIMEE D. THOMSON*
Deputy General Counsel
Pennsylvania Office of the Governor
30 N. 3rd St., Suite 200
Harrisburg, PA 17101
(223) 234-4986
*AimeeThomson@pa.gov*
*Counsel for Governor Josh Shapiro*

**CHARITY R. CLARK**
Attorney General
State of Vermont

*/s/ Jonathan T. Rose*
JONATHAN T. ROSE*
Solicitor General
109 State Street
Montpelier, VT 05609
(802) 828-3171
Jonathan.Rose@vermont.gov
*Attorneys for Plaintiff State of Vermont*

**JOSHUA L. KAUL**
Attorney General
State of Wisconsin

*/s/ Jody J. Schmelzer*
JODY J. SCHMELZER*
Assistant Attorney General
Wisconsin Department of Justice
17 West Main Street
Post Office Box 7857
Madison, WI 53707-7857
(608) 266-3094
Jody.Schmelzer@wisdoj.gov
*Attorneys for Plaintiff State of Wisconsin*

**PETER F. NERONHA**
Attorney General
State of Rhode Island

*/s/ Julia Harvey*
JULIA HARVEY (RI Bar No. 10529)*
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2103
JHarvey@riag.ri.gov
*Attorneys for Plaintiff State of Rhode Island*

**NICHOLAS W. BROWN**
Attorney General
State of Washington

*/s/ William McGinty*
WILLIAM MCGINTY, WSBA 41868*
Deputy Solicitor General
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
William.McGinty@atg.wa.gov
360-709-6027
*Attorneys for Plaintiff State of Washington*

*\* Denotes pro hac vice admission*

## LOCAL RULE 7.1 CERTIFICATE

I certify that at 3:01 p.m. Eastern time on January 20, 2026, I spoke by phone with Jordan Hulseberg, Trial Attorney, Federal Programs Branch, Civil Division, U.S. Department of Justice, regarding the relief requested in this motion. The parties met and conferred in good faith and were unable to resolve or narrow the subject of this motion.

*/s/ Sean C. McGuire*
Sean C. McGuire
Deputy Attorney General
California Department of Justice

*Counsel for Plaintiff State of California*

**CERTIFICATE OF SERVICE**

I certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

_/s/ Sean C. McGuire_
Sean C. McGuire
Deputy Attorney General
California Department of Justice

_Counsel for Plaintiff State of California_
