## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Civil Action No. 1:25-cv-12019-NMG |
| v. ) | Leave to file in excess of page limit granted |
| ) | on Jan. 9, 2026 |
| ROBERT F. KENNEDY, JR., in his official ) | |
| capacity as Secretary of the United States ) | |
| Department of Health and Human Services, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |
| ) | |

## DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT
## AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Defendants respectfully move for summary judgment in their favor pursuant to Federal Rule of Civil Procedure 56(a). For the reasons presented in the accompanying memorandum in support of this motion, Defendants respectfully request that the Court deny Plaintiffs' Motion for Summary Judgment and uphold the Centers for Medicare & Medicaid Services' rule, "Patient Protection and Affordable Care Act; Marketplace Integrity and Affordability," 90 Fed. Reg. 27,074 (June 25, 2025), and declare the challenged provisions to be lawful and valid under the Administrative Procedure Act, 5 U.S.C. § 706.

DATED: February 27, 2026                    Respectfully Submitted,

                                            BRETT SHUMATE
                                            Assistant Attorney
                                            General Civil Division

                                            ERIC B. BECKENHAUER
                                            Assistant Director
                                            Federal Programs Branch

                                            */s/ Jordan A. Hulseberg*
                                            JORDAN A. HULSEBERG
                                            D.C. Bar No. 90033542
                                            Trial Attorney
                                            United States Department of Justice,
                                            Civil Division,
                                            Federal Programs Branch
                                            1100 L Street NW
                                            Washington, DC 20005


                                            Phone: (202) 598-3856
                                            Fax: (202) 616-8470
                                            Email: jordan.a.hulseberg2@usdoj.gov

                                            *Counsel for Defendants*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the United States Department of Health and Human Services, *et al.*, | ) |
| | ) |
| Defendants. | ) |

Civil Action No. 1:25-cv-12019-NMG

Leave to file in excess of page limit granted on Jan. 9, 2026

## DEFENDANTS' MEMORANDUM IN SUPPORT OF ITS CROSS MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 2

I.      The Affordable Care Act. .................................................................................... 2

II.     The Marketplace Integrity and Affordability Rule. ........................................... 3

III.    Procedural History. ............................................................................................. 5

LEGAL STANDARD ......................................................................................................... 5

ARGUMENT ...................................................................................................................... 6

I.      The past-due premium policy is neither unlawful nor arbitrary and capricious. ................ 6

      a.     The past-due premium policy is lawful. ................................................. 8

      b.     The past-due premium policy is not arbitrary and capricious. ................ 9

II.     The verification of eligibility for special enrollment periods policy is not arbitrary and capricious. ............................................................................ 10

III.    The shortened open enrollment period policy is not arbitrary and capricious. ................ 12

IV.    The $5 annual eligibility redetermination program is neither unlawful nor arbitrary and capricious. ................................................................................ 13

      a.     The $5 annual eligibility redetermination program is lawful. ............................ 14

      b.     The $5 annual eligibility redetermination program is not arbitrary and capricious. ........................................................................... 15

V.     The data matching policy is not arbitrary and capricious. ................................. 16

      a.     Provision Requiring Income Verification When Data Sources Indicate Income Less Than 100 Percent of the Federal Poverty Level. ............................. 17

      b.     Change Requiring Income Verification When Tax Data Is Unavailable. ............. 19

VI.    The one-year failure to file and reconcile policy is not arbitrary and capricious. ............ 21

VII.   The premium adjustment percentage policy is not arbitrary and capricious. ................... 22

VIII.  The actuarial value range policy is not arbitrary and capricious. ...................................... 24

i

IX.    The elimination of specified "sex trait modification procedures" as an Essential
Health Benefit is neither unlawful nor arbitrary and capricious.....................................28

X.    The scope of any relief should be narrowly tailored........................................................33

CONCLUSION.....................................................................................................................................35

# TABLE OF AUTHORITIES

## CASES

*Ala. Power Co. v. Castle*,
  636 F.2d 323 (D.C. Cir. 1979) .................................................................................... 25

*Ass'n of Am. Universities v. Dep't of Def.*,
  806 F. Supp. 3d 79 (D. Mass. 2025), *appeal filed*, No. 25-2184 (1st Cir. Dec. 16, 2025). ....... 34

*Bonumose, Inc. v. FDA*,
  747 F. Supp. 3d 211 (D.D.C. 2024) ............................................................................. 5

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971) ...................................................................................................... 6

*City of Columbus v. Cochran*,
  523 F. Supp. 3d 731 (D. Md. 2021) ........................................................................... 18

*Ctr. for Sci. in the Pub. Int. v. Perdue*,
  438 F. Supp. 3d 546 (D. Md. 2020) ............................................................................. 6

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.*,
  591 U.S. 1 (2020) ................................................................................................. 24, 33

*Dep't of Transp. v. Pub. Citizen*,
  541 U.S. 752 (2004) ...................................................................................................... 6

*Encino Motorcars, LLC v. Navarro*,
  579 U.S. 211 (2016) .................................................................................................... 33

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ................................................................................................. 6, 33

*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021) ............................................................................................... 17, 32

*Gen. Motors Corp. v. Darling's*,
  444 F.3d 98 (1st Cir. 2006) ........................................................................................ 31

*Gill v. Whitford*,
  585 U.S. 48 (2018) ...................................................................................................... 34

*Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*,
  527 U.S. 308 (1999) .................................................................................................... 34

*Jimenez-Cedillo v. Sessions*,
  885 F.3d 292 (4th Cir. 2018) ...................................................................................... 16

*Kadi v. Geithner,*
   42 F. Supp. 3d 1 (D.D.C. 2012) .................................................................. 5

*King v. Burwell,*
   576 U.S. 473 (2015) .................................................................................... 2

*Loper Bright Enters. v. Raimondo,*
   603 U.S. 369 (2024) ............................................................................. 26, 27

*Madsen v. Women's Health Ctr., Inc.,*
   512 U.S. 753 (1994) .................................................................................. 34

*Marsh v. Or. Nat. Res. Council,*
   490 U.S. 360 (1989) .................................................................................... 6

*Marshall Cnty. Health Care Auth. v. Shalala,*
   988 F.2d 1221 (D.C. Cir. 1993) .................................................................. 5

*Michigan v. EPA,*
   576 U.S. 743 (2015) .................................................................................. 33

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) .................................................................................... 33

*Ohio Valley Env't Coal. v. Aracoma Coal Co.,*
   556 F.3d 177 (4th Cir. 2009) ............................................................... 16, 19

*Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.,*
   494 F.3d 188 (D.C. Cir. 2007) .................................................................. 28

*Skidmore v. Swift & Co.,*
   323 U.S. 134 (1944) .................................................................................. 27

*Trump v. Hawaii,*
   585 U.S. 667 (2018) .................................................................................. 34

*United States v. Texas,*
   599 U.S. 670 (2023) ............................................................................. 34, 35

**STATUTES**

5 U.S.C. § 703 ................................................................................................ 35

5 U.S.C. § 705 .................................................................................................. 5

5 U.S.C. § 706 ............................................................................................. 6, 34

26 U.S.C. § 36B .......................................................................... 13, 18, 20, 21

42 U.S.C. § 300gg-1 ........................................................................................ 2, 8

42 U.S.C. § 300gg-2 ................................................................................... 2, 8, 13

42 U.S.C. § 18022 ..................................................................................... *passim*

42 U.S.C. § 18031 ............................................................................................... 2

42 U.S.C. § 18041 ............................................................................................... 3

42 U.S.C. § 18081 .............................................................................. 13, 15, 21

42 U.S.C. § 18082 ...................................................................................... 13, 15

49 U.S.C. § 32902 ............................................................................................ 26

Patient Protection and Affordable Care Act,
   Pub. L. No. 111-148, 124 Stat. 119 (2010)............................................... 2

**RULES**

Fed. R. Civ. P. 56............................................................................................... 5

**REGULATIONS**

26 C.F.R. § 1.36B-2 ......................................................................................... 17

26 C.F.R. § 1.36B-4 ......................................................................................... 21

45 C.F.R. § 147.106 ........................................................................................... 7

45 C.F.R. § 155.170 ......................................................................................... 29

45 C.F.R. § 155.305 .................................................................................. 13, 15

45 C.F.R. § 155.315 ......................................................................................... 18

45 C.F.R. § 155.320 .................................................................................. 17, 20

45 C.F.R. § 155.335 ......................................................................................... 13

45 C.F.R. § 155.400 ........................................................................................... 8

45 C.F.R. § 155.420 ..................................................................................... 2, 11

45 C.F.R. § 156.111 ............................................................................. 28, 29, 31

45 C.F.R. § 156.115 .................................................................................. 29, 32

45 C.F.R. § 156.130 ......................................................................................... 22

45 C.F.R. § 156.140 ............................................................................................... 25

Patient Protection and Affordable Care Act; Establishment of Exchanges and Qualified
  Health Plans; Exchange Standards for Employers,
  77 Fed. Reg. 18,310 (Mar. 27, 2012) ............................................................. 3

Patient Protection and Affordable Care Act; Standards Related to Essential Health
  Benefits, Actuarial Value, and Accreditation,
  78 Fed. Reg. 12,834 (Feb. 25, 2013) .......................................................... 27

Patient Protection and Affordable Care Act; Market Stabilization,
  82 Fed. Reg. 18,346 (Apr. 18, 2017) ...................................................... 3, 27

Patient Protection and Affordable Care Act; HHS Notice of Benefit and Payment
  Parameters for 2023,
  87 Fed. Reg. 27,208 (May 6, 2022) ............................................................ 27

Patient Protection and Affordable Care Act; Marketplace Integrity and Affordability,
  90 Fed. Reg. 12,942 (Mar. 19, 2025) .................................................. 3, 7, 14, 26

Patient Protection and Affordable Care Act; Marketplace Integrity and Affordability,
  90 Fed. Reg. 27,074 (June 25, 2025) ........................................................ *passim*

## OTHER AUTHORITIES

CMS, *Health Coverage Effectuation, Grace Periods, and Terminations* (June 2024),
  https://www.cms.gov/files/document/coverage-effectuation-job-aid.pdf .................................. 9

## INTRODUCTION

The American health care system is complicated. The Affordable Care Act ("ACA") is equally so. The ACA also grants the Secretary of Health and Human Services broad authority to issue regulations that implement and set standards for its various requirements. HHS Secretaries across presidential administrations have routinely exercised that authority by promulgating, adjusting, rescinding, and reinstating such regulations to advance various policy goals.

The 2025 Marketplace Integrity and Affordability Final Rule is the latest iteration of that practice. The Rule makes several regulatory changes to strengthen the integrity of the health insurance "Exchanges" where consumers purchase health care coverage under the ACA, and to make that coverage more affordable. In particular, the Rule seeks to address the high levels of improper enrollment in federally subsidized plans by better enforcing compliance with the eligibility requirements for such plans and providing additional safeguards to protect consumers from unwanted changes to their coverage. As HHS explained, this growth in improper enrollments is a consequence of temporary legislative changes related to the COVID-19 pandemic that expanded access to ACA premium subsidies and made those subsidies more generous, which in turn increased the availability of fully subsidized health care coverage and fueled enrollment, some of it improper, in Exchange plans. Those enhanced subsidies expired at the start of this year. The Rule accordingly implements a number of policies meant to reduce improper enrollments over the short term as Exchanges readjust to a new subsidy environment. And the Rule also makes permanent reforms to improve the stability of Exchanges, provide premium relief to enrollees who do not qualify for ACA premium subsidies, and protect the public fisc.

1

## BACKGROUND

### I.  The Affordable Care Act.

Enacted in 2010, the ACA "adopts a series of interlocking reforms designed to expand coverage in the individual health insurance market" and "to make insurance more affordable." *King v. Burwell*, 576 U.S. 473, 478-79 (2015); *see* Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010). To "ensure that anyone can buy insurance," *King*, 576 U.S. at 493, the ACA generally prohibits health insurance issuers in individual or group markets from denying coverage to applicants because of their health (the "guaranteed availability" requirement). 42 U.S.C. § 300gg-1(a). And to promote continuous coverage, the ACA generally requires issuers to "renew or continue in force" an enrolled customer's coverage "at the option of . . . the individual," provided they pay their premiums. *Id.* § 300gg-2(a), (b)(1).

The ACA also required the creation of an "Exchange" in each State where customers can compare and purchase individual "qualified health plans" (as opposed to group or employer-sponsored coverage), which must cover certain "essential health benefits" and adhere to limits on enrollee out-of-pocket costs for such benefits. *Id.* §§ 18022(a)-(c), 18031(b)(1). States can elect to operate their own Exchanges ("State-based Exchanges" or "SBEs"). In States that do not do so, HHS operates a federally facilitated Exchange ("FFE").[1] Customers can typically enroll in Exchange plans for the upcoming plan year during an annual "open enrollment period[]," or for the current plan year during "special enrollment periods" that become available if a certain "triggering event[]" occurs (*e.g.*, a person loses employer-based coverage). *Id.* § 18031(c)(6); 45 C.F.R. § 155.420(a)(3).

The HHS Secretary has broad authority under the ACA to issue regulations implementing

---

[1] As few States, including Illinois, operate a State-based Exchange on the federal Exchange platform ("SBE-FP").

and "setting standards for" the ACA's requirements, including those regarding the "establishment and operation of Exchanges," the "offering of qualified health plans through such Exchanges," and "such other requirements as the Secretary determines appropriate." 42 U.S.C. § 18041(a)(1). Since the ACA's enactment, HHS has accordingly engaged in numerous rulemakings to implement various aspects of the ACA. *See, e.g.*, 77 Fed. Reg. 18,310 (Mar. 27, 2012) ("Exchange Establishment Rule"); 82 Fed. Reg. 18,346 (Apr. 18, 2017) ("Market Stabilization Rule"); *see also* 90 Fed. Reg. 27,074, 27,080-84 (June 25, 2025) (summarizing past rulemakings).

## II.  The Marketplace Integrity and Affordability Rule.

On March 19, 2025, the Centers for Medicare & Medicaid Services ("CMS"), an agency within HHS, issued a Notice of Proposed Rulemaking for a proposed rule that would implement "several regulatory actions aimed at strengthening the integrity of the [ACA] eligibility and enrollment systems to reduce waste, fraud, and abuse." 90 Fed. Reg. 12,942 (Mar. 19, 2025) ("NPRM"). CMS further explained that it "expect[ed] these actions would provide premium relief to families who do not qualify for [ACA] subsidies and reduce the burden of . . . [ACA] subsidy expenditures to the Federal taxpayer." *Id.* CMS received more than 26,000 comments, some supporting and others opposing different aspects of the proposed rule. After reviewing those comments and revising certain provisions of the proposed rule in response, HHS issued and publicly released the Final Rule on June 20, 2025, and it was published in the Federal Register on June 25. 90 Fed. Reg. 27,074 ("the Rule").

HHS explained in the Rule's preamble that, "[b]ased on [its] review of enrollment data and [its] experience fielding consumer complaints," it believes that the "temporary expansion of ACA premium subsidies" via the American Rescue Plan Act (ARPA) and Inflation Reduction Act (IRA) "resulted in conditions that were exploited to improperly gain access to fully-subsidized coverage"

3

on Exchanges. *Id.* More specifically, "the widespread availability" of fully subsidized plans—*i.e.*, plans with post-subsidy net premiums of $0—"created the incentive and opportunity for fraudulent and improper enrollments at scale," either by enrollees wanting no-cost Exchange coverage or by third-party brokers that collected commissions on improper enrollments that were made without customers' knowledge. *Id.* The Rule accordingly "takes a carefully curated set of temporary actions" to reduce these high levels of improper enrollment "over the short-term," which will then sunset after the Exchange marketplace "readjusts to" a new environment in which the then soon-to-expire enhanced premium subsidies provided by the ARPA and IRA "are no longer available." *Id.* The Rule also implements a number of "permanent reforms to help" Exchanges "reset to the changing subsidy environment to improve affordability and stability over the long-term." *Id.*

The Rule implements eight policies that are challenged here, concerning—in the order presented in Plaintiffs' Motion for Summary Judgment—(1) the denial of new coverage when a customer owes past-due premiums to that issuer or an issuer in the same controlled group, *id.* at 27,084-91; (2) pre-enrollment verification procedures for special enrollment periods and verification of 75% of new enrollments during special enrollment periods, *id.* at 27,148-52; (3) a standardized, shorter open enrollment period, *id.* at 27,136; (4) a nominal $5 annual eligibility redetermination program to encourage certain enrollees to affirmatively reenroll each year, *id.* at 27,107; (5) data matching policies updated to comply with federal law and with income verification procedures, *id.* at 27,119-24; (6) a requirement that advanced premium tax credits (APTC) recipients file a federal tax return and reconcile those APTCs with the recipient's PTC amount each year, *id.* at 27,113-17; (7) the methodology used to calculate the "premium adjustment percentage," *id.* at 27,166-74; (8) the allowable ranges of actuarial values applicable to the different plan types sold on Exchanges, *id.* at 27,174-78; and (9) eliminating "sex-trait

4

modification procedures" as essential health benefits. *Id.* at 27,166-74.

### III. Procedural History.

Plaintiffs in this case are a group of 21 States or their executives. Compl. ¶¶ 10-30, ECF No. 1. They allege that the Rule violates the APA, claiming each of the nine challenged provisions are arbitrary and capricious and three are also contrary to law. *Id.* ¶¶ 88-234. On July 17, 2025, Plaintiffs filed a motion for preliminary relief, in which they sought a stay of the August 25, 2025 effective date of the challenged Rule provisions under 5 U.S.C. § 705 or, in the alternative, a preliminary injunction. ECF No. 6.

The Court declined to stay the challenged policies, concluding that Plaintiffs had not shown they were likely to succeed on the merits of their challenges.

Plaintiffs have moved for summary judgment, and Defendants now oppose and cross move for summary judgment.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), typically "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In a case involving review of a final agency action under the [APA], however, the standard set forth in Rule 56(a) does not apply because of the limited role of a court in reviewing the administrative record." *Bonumose, Inc. v. FDA*, 747 F. Supp. 3d 211, 223 (D.D.C. 2024) (quoting *Kadi v. Geithner*, 42 F. Supp. 3d 1, 8 (D.D.C. 2012)). "In the unique context of a case brought under the APA, the district court 'sit[s] as an appellate tribunal,'" *id.* (quoting *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1222–23 (D.C. Cir. 1993)), and "a motion for summary judgment is simply a vehicle to tee up a case for judicial review and, thus, an inquiring court must review an agency action not to determine

whether a dispute of fact remains but, rather, to determine whether the agency action was arbitrary and capricious." *Bos. Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016).

Under the APA, courts shall "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Dep't of Transp. v. Pub. Citizen,* 541 U.S. 752, 763 (2004); *Marsh v. Or. Nat. Res. Council,* 490 U.S. 360, 375–76 (1989). "This inquiry must 'be searching and careful,' but 'the ultimate standard of review is a narrow one.'" *Marsh,* 490 U.S. at 378 (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416 (1971)). Under this "narrow standard of review, . . . a court is not to substitute its judgment for that of the agency," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (citations omitted), but instead to assess only whether the agency relied on factors which Congress has not intended it to consider, *entirely failed* to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is *so implausible* that it could not be ascribed to a difference in view or the product of agency expertise. *See Ctr. for Sci. in the Pub. Int.*, 438 F. Supp. 3d at 557. Likewise, a court must "hold unlawful and set aside agency action . . . not in accordance with law." *Id.* (quoting 5 U.S.C. § 706(2)(A)).

## ARGUMENT

### I.     The past-due premium policy is neither unlawful nor arbitrary and capricious.

Under the Rule, issuers will be allowed—subject to applicable state law—(1) to attribute payments made to effectuate new coverage to past-due premium amounts owed to the issuer or an issuer in the same controlled group, and (2) to then refuse to effectuate the new coverage if both the past-due and initial premium amounts are not paid in full. 90 Fed. Reg. at 27,084. Put another way, the Rule will allow issuers to require a customer to pay (1) any past-due premiums the

customer owes the issuer (or related issuers) for prior coverage *and* (2) the initial premium amount (also known as a "binder payment") required for new coverage before the latter coverage is effectuated. *Id.* at 27,084, 27,088.[2] And if the customer fails to pay that combined amount in full, the issuer can decline to effectuate the new coverage. *Id.* at 27,084. The Rule's past-due premium policy is similar to one that CMS implemented in 2017, which was later replaced in 2022 with the current regulation regarding past-due premiums and new coverage. *See* NPRM, 90 Fed. Reg. at 12,951.[3]

As explained in the Rule's preamble, CMS anticipates that the Rule's past-due premium policy will "help to promote continuous coverage, reduce gaming and adverse selection, ensure that ACA subsidies are targeted to those who are eligible, and allow issuers to more accurately predict costs and prices." 90 Fed. Reg. at 27,084. Indeed, CMS predicts that enrollees, including healthier ones who improve the risk pool, will likely "be more inclined to remain in their coverage" if they know that they would have to pay any past-due premiums before effectuating new coverage, which would in turn encourage continuous coverage more broadly. *Id.* at 27,086. And CMS notes that this expectation is consistent with data indicating that, when the 2017 past-due premium policy was in effect, the percentage of Exchange enrollees who had their coverage terminated for non-payment of premiums "dropped substantially," from 17.3 percent in 2017 to 7.8 percent in 2020. *Id.* at 27,087; *see* NPRM, 90 Fed. Reg. at 12,951-52. The Rule also eliminates the perverse incentives created by the current regulation, given that an enrollee's obligation to pay past-due

---

[2] The Rule provides that an issuer "may require a consumer to pay past-due premiums owed to that issuer, or owed to another issuer in the same controlled group." 90 Fed. Reg. at 27,089; *see* 45 C.F.R. § 147.106(d)(4) (defining "controlled group"). The Rule also provides that "[t]he amount of the past-due premium an issuer may require" before effectuating new coverage "is subject to any premium payment threshold the issuer has adopted pursuant to [45 C.F.R.] § 155.400(g)."). 90 Fed. Reg. at 27,089.

[3] HHS explains in the Rule that unlike the 2017 policy, the Rule's past-due premium policy will not (1) "limit the policy to past-due premium amounts accruing over the prior 12 months" only or (2) "require the issuer to provide any notice of" any past-due premium policy the issuer adopts consistent with the Rule. 90 Fed. Reg. at 27,220.

premium debt "[will] not change" based on whether the enrollee renews a current plan or enrolls in new coverage. *Id.* at 12,953. Plaintiffs argue that this Rule provision is both contrary to the ACA and arbitrary and capricious, *see* Pl. States' Mem. of Law in Supp. of their Mot. for Summ. J. on Causes of Action II-VI & Request for Oral Argument at 12-14, ECF No. 122 ("Pls.' Mot. for Summ. J."), but it is neither.

    a.  **The past-due premium policy is lawful.**

Plaintiffs contend that the Rule's past-due premium policy "re-write[s] the [Affordable Care Act's]" guaranteed-availability provision, *Id.* at 12 (citing 42 U.S.C. § 300gg-1(a)), by allowing issuers to deny coverage for a reason not permitted by the ACA—namely, an enrollee's failure to pay past-due premiums plus the initial premium for new coverage. *Id*. Not so. While it is true that the ACA requires an issuer that offers health insurance coverage to "accept every . . . individual in the State that applies for such coverage," 42 U.S.C. § 300gg-1(a), an issuer's provision of coverage is of course contingent on the enrollee's payment of premiums, *see id.* § 300gg-2(b)(1) (providing that an issuer may "nonrenew or discontinue health insurance coverage" if an enrollee "has failed to pay premiums"). Accordingly, the ACA cannot sensibly be read to "require issuers to provide coverage to applicants who have not paid for such coverage." 90 Fed. Reg. at 27,087. And that principle applies with equal force to individuals who fail to pay the initial premium required to effectuate a new policy. *See* 45 C.F.R. § 155.400(e) (providing that federally facilitated Exchanges and State-based Exchanges on the federal platform "will . . . require payment of a binder payment" equivalent to "the first month's premium" to "effectuate an enrollment" in an Exchange plan). If an individual applies for a new Exchange plan but fails to

pay the full amount of the initial premium, that plan never goes into effect.[4] This is generally true when coverage is attempted to be purchased off exchange as well. The Rule simply allows an issuer who is owed past-due premiums from a particular customer to credit any payments made by that customer for new coverage to the past-due balance before crediting any payments to the initial premium amount for the new coverage. The Rule's past-due premium policy is thus entirely consistent with the APA and regulations governing the effectuation of a new plan via an initial premium.

     **b. The past-due premium policy is not arbitrary and capricious.**

Plaintiffs separately contend that the past-due premium policy is arbitrary and capricious, but their arguments largely amount to policy disagreements and otherwise lack merit. Plaintiffs argue that CMS failed to adequately explain its reasoning. But CMS expressly acknowledged concerns about potential coverage losses; it reasonably concluded that, given (1) "the importance of health coverage," (2) the limited amount of past-due premium debt that a typical enrollee could potentially accrue, and (3) the intuitive expectation that customers are "accustomed to paying in full for one contract before they are allowed to enter another with the same contracting party," any effects the past-due premium policy might have on enrollment would likely "be minimal." 90 Fed. Reg. at 27,087; *see id.* (noting that "rules regarding grace periods and termination of coverage" ensure that customers receiving APTCs "generally ow[e] no more than 1 to 3 months of past-due premium amounts per year"). As for Plaintiffs' concern that individuals "might fail to pay premiums" for "a variety of reasons," Pls.' Mot. for Summ. J. at 13 that concern does not require CMS to abandon the sensible expectation that "all individuals who enroll for coverage . . . are

---

[4] *See* CMS, *Health Coverage Effectuation, Grace Periods, and Terminations* at 2 (June 2024), https://www.cms.gov/files/document/coverage-effectuation-job-aid.pdf ("Consumers must pay their binder payment (often the first month's premium) for enrollment to be effectuated (i.e., the policy is active)").

required to pay their share of the premium for every month of coverage" or preclude the agency from implementing lawful regulations to that effect. 90 Fed. Reg. at 27,085.

 CMS also considered Plaintiffs' concern about whether to require issuers to give enrollees notice of any past-due premium policies an issuer adopts, *see* Pls.' Mot. for Summ. J. at 14, but the agency decided to instead "defer to States on any additional parameters or standards that issuers must satisfy," including "provid[ing] advance notice" of past-due premium policies to customers, "as States are best positioned to set and oversee parameters of th[at] nature." 90 Fed. Reg. at 27,085.

## II.    The verification of eligibility for special enrollment periods policy is not arbitrary and capricious.

Under the Rule, federally facilitated Exchanges will be required to conduct pre-enrollment eligibility verification for all categories of special enrollment periods (*e.g.*, permanent move, marriage, etc.), which is in line with the eligibility verification policy that was in place between 2017 and 2022. *See* 90 Fed. Reg. at 27,148-49. The Rule further requires State Exchanges to conduct pre-enrollment eligibility verification "for at least 75 percent of new enrollments through SEPs." *Id.* at 27,150-51 ("the cost to verify eligibility for SEP triggering events with very low volumes could be greater than the benefit of verifying eligibility for them."). And for reasons related to the recent expiration of enhanced APTCs, the requirements will automatically sunset after program year 2026. *Id.*

Plaintiffs argue that the Rule's changes to the eligibility verification procedures for SEP enrollment are arbitrary and capricious because, in their view, the policy "is not reasonably related to [HHS's or CMS's] stated goals." *See* Pls.' Mot. for Summ. J. at 14. But CMS clearly identified what it deemed a critical shortcoming of the current SEP eligibility verification regulations— namely that, because of their limited scope, the regulations "do not provide enough protection

against misuse and abuse" of SEPs, which enables otherwise ineligible individuals to enroll in Exchange plans "only after they become sick or . . . need expensive health care services," which in turn "negatively impacts both the risk pool and program integrity around determining eligibility for" APTCs and other subsidies. 90 Fed. Reg. at 27,148.

CMS explained that requiring pre-enrollment eligibility verification for all SEP categories would mitigate these problems by "restricting people from gaming SEPs" by enrolling in Exchange plans only when they need health care services, which would improve Exchange risk pools, "make[] health coverage more affordable for unsubsidized enrollees," and reduce federal expenditures on APTC subsidies. *Id.* at 27,150. CMS added that pre-enrollment verification "strengthens program integrity by denying ineligible enrollments" and "discouraging" enrollees "who know they cannot meet" applicable verification standards from attempting to improperly enroll in Exchange plans and claim APTCs for which they are not otherwise eligible. *Id.* The agency then pointed to data suggesting that pre-enrollment verification requirements that previously applied to SEPs did not create substantial barriers to Exchange enrollment, and that such requirements had the effect of "encourag[ing] continuous enrollment by making it more difficult to engage in strategic enrollment and disenrollment" based on customers' changing health status. *Id.* at 27,149. CMS also underscored its general "responsibility to comply with the ACA," *id.* at 27,152, which includes faithfully adhering to statutory and regulatory eligibility requirements. *See, e.g.*, 45 C.F.R. § 155.420(a)(3) (providing that an Exchange "must allow a qualified individual" to enroll via a SEP only if a specified "triggering event[] . . . occur[s]"). It ultimately concluded that the "positive impact" of the more robust SEP eligibility verification requirements in the Rule "far exceeds" any potential negative impacts. 90 Fed. Reg. at 27,148; *see id.* at 27,151 ("[W]e believe that the additional burden is not significant enough to outweigh the

merits of SEP verification and the increases in program integrity that it provides . . . ."). These explanations readily meet the agency's burden on arbitrary and capricious review.

### III.    The shortened open enrollment period policy is not arbitrary and capricious.

Plaintiffs challenge a modification to the timing and duration of ACA open enrollment periods. Pls.' Mot. for Summ. J. at 15. Beginning in 2027, the Rule will create a uniform open enrollment period beginning no earlier than November 1 and ending no later than December 31. This Rule thus rescinds the extended open enrollment period which was in effect over the last four years because the expected benefits of that extension "did not materialize." 90 Fed. Reg. at 27,137. HHS was also responsive to comments it received; it delayed this policy's effective date to mitigate commenters' concerns over the change.

Plaintiffs' principal complaints with the new open enrollment period are policy disagreements. Pls.' Mot. for Summ. J. at 15-16. Yet HHS considered these concerns carefully and concluded that the Rule's benefits outweighed any new minimal burdens the Rule concurrently imposed. 90 Fed. Reg. at 27,139. In particular, HHS found the delayed start of this provision of the Rule provides extensive time to "message the clearer [open enrollment period] end date to consumers, especially the younger and healthier consumers . . . ." *Id.* Similarly, Plaintiffs' concern that the Rule creates confusion without "navigators" can likewise be mitigated given the Rule's delayed implementation of this policy. Indeed, HHS found that a uniform open enrollment period would actually reduce confusion "by aligning more closely with the open enrollment dates for other coverage for many employer-based health plans." *Id.* at 27,136.

Plaintiffs also argue that the new enrollment period will eliminate enrollees' ability to switch plans before the end of the open enrollment period if they find the policy to be inadequate or too expensive. Pls.' Mot. for Summ. J. at 16. HHS considered this concern but found few

individuals took advantage of this option. 90 Fed. Reg. at 27,137 ("[O]nly a small number of consumers took advantage of the additional time to switch to a lower-cost plan after receiving a bill from their issuer in January with higher plan costs. During the most recent OEP prior to the Rule, fewer than 3 percent of enrollees (470,000 individuals) ended their FFE or SBE–FP coverage between December 15, 2024, and January 15, 2025, including those enrollees who switched to other plans as well as those who did not."). Particularly given the limited change that this Rule imposes, effectively reverting to the prior policy in view of the limited benefits that an extended open enrollment period yielded, HHS's decision to create a uniform open enrollment period is well reasoned and not arbitrary and capricious.

## IV.    The $5 annual eligibility redetermination program is neither unlawful nor arbitrary and capricious.

The eligibility requirements for enrolling in an Exchange plan and for receiving PTCs and APTCs are set forth in the ACA and its implementing regulations. *See* 42 U.S.C. §§ 18081(a), 18082(a); 26 U.S.C. § 36B(a), (c)(1)(A); 45 C.F.R. § 155.305(a), (f). HHS is generally responsible for determining whether a customer satisfies those requirements. If a customer does, then he can enroll in an Exchange plan for the upcoming plan year and receive APTCs. As a general matter, the ACA requires plan issuers to renew an enrollee's coverage the next year, subject to certain statutory exceptions. 42 U.S.C. § 300gg-2(a). Even when an enrollee's plan is subject to that guaranteed-renewability provision, however, an Exchange must still "redetermine" the enrollee's eligibility for subsidized Exchange coverage "on an annual basis" in accordance with HHS regulations. 45 C.F.R. § 155.335(a)(1).

The Rule provides that if (1) an enrollee does not submit an application for an updated eligibility determination for plan year 2026 on or before the deadline to select Exchange coverage and (2) that enrollee's post-APTC premium will be zero dollars (*i.e.*, the enrollee's coverage will

be fully subsidized), then (3) the Exchange "must decrease the amount of" the APTC "applied to the [enrollee's] policy such that the remaining monthly premium owed for the policy equals $5." NPRM, 90 Fed. Reg. at 13,031.

This temporary change to the annual eligibility redetermination process is the product of CMS's increasing concern about "the level of improper enrollments" in zero-premium plans on federal Exchanges. 90 Fed. Reg. 27,102, 27,105-06 (explaining that the gap between actual and reported enrollment in subsidized Exchange plans doubled between 2021 and 2024). CMS attributes that problem in part to agents and brokers improperly enrolling consumers in fully subsidized Exchange plans "without their knowledge" to earn commission payments. *Id.* at 27,103; *see id.* ("Because these enrollees do not receive a monthly premium bill requiring action on their part, they may not be aware they are enrolled."). CMS also notes that the recent expansion of premium subsidies via the ARPA and IRA "significantly increased the number of enrollees" who are enrolled in fully subsidized Exchange plans. *See id.* (explaining that 2.68 million enrollees were automatically re-enrolled in fully subsidized plans on federal Exchanges in plan year 2025, compared to 270,000 such enrollees in plan year 2019). The Rule thus addresses this enrollment issue by "prompt[ing]" individuals enrolled in fully subsidized Exchange plans to "update or confirm" their eligibility for such plans "or else pay a $5 monthly premium" until they do so. *Id.* at 27,103; *see id.* at 27,102.

**a. The $5 annual eligibility redetermination program is lawful.**

Plaintiffs separately claim that the Rule's eligibility redetermination provision is contrary to law because, they argue, HHS lacks the authority to set a $5 monthly premium for plans that would otherwise be fully subsidized via APTCs. *See* Pls.' Mot. for Summ. J. at 17-18. Yet the ACA tasks HHS with "determining" whether individuals enrolled in Exchange plans "meet[] the income

and coverage requirements" for claiming PTCs, as well as with determining "the amount" of those tax credits. 42 U.S.C. § 18081(a)(2). It is likewise HHS's responsibility to determine an Exchange enrollee's eligibility for APTCs (which mirrors the applicable requirements for PTC eligibility) and to calculate the amount of those APTCs. *See id.* § 18082(a)(1), (3); 45 C.F.R. § 155.305(f)(5). And the ACA grants the HHS Secretary the authority to "establish a program" for making these eligibility determinations, 42 U.S.C. § 18081(a)(1), and to "establish procedures" for "redetermin[ing] eligibility on a periodic basis in appropriate circumstances," *id.* § 18081(f)(1)(B).

The Rule's eligibility redetermination provision comports with that grant of authority. Indeed, this approach is narrower, less invasive, and less expensive than a nationwide audit of every zero-premium automatic enrollment to redetermine eligibility or, alternatively, the rescission of auto-enrollment entirely. The unusually high level of improper enrollment in fully subsidized Exchange coverage stemming from a soon-to-expire enhanced subsidy regime, *see* 90 Fed. Reg. at 27,103, presented the "appropriate circumstances" for implementing this temporary nominal-premium procedure, 42 U.S.C. § 18081(f)(1)(B). Furthermore, that procedure will not necessarily interfere with the Treasury Department's ability to "make" APTC payments to issuers of Exchange plans, *id.* § 18082(c)(2)(A); issuers' ability to apply those APTC payments to the premiums they charge Exchange enrollees, *id.* § 18082(c)(2)(B); or enrollees' ability to claim the full amount of their PTC on their federal income tax return. The Rule instead directs "the Exchange on the Federal platform"—that is, HHS—to decrease the APTC amount such that the monthly premium owed is $5 each month. 90 Fed. Reg. at 27,222.

**b.  The $5 annual eligibility redetermination program is not arbitrary and capricious.**

Plaintiffs claim that CMS acted arbitrarily because it failed to engage in "reasoned decisionmaking." Pls.' Mot. for Summ. J. at 18-19 (citation omitted). Plaintiffs argue that the

annual eligibility redetermination program could "surprise" enrollees, *id.* at 18, but CMS considered that possibility and found it would be correctable. CMS further highlighted that Exchanges will have "sufficient time" to "educate" enrollees about the Rule's eligibility redetermination provision through "updated notices," and that "training and technical assistance" will be provided to agents, brokers, issuers, and other "interested parties" so they can "assist enrollees in understanding the proposed change." *see* 90 Fed. Reg. at 27,107. Further, CMS has a strong interest in ensuring comprehensive education on this policy, as it will be more effective at identifying improper automatic enrollees if all genuine automatic enrollees are aware of the policy, affirmatively verify their reenrollment, and obviate the need for eligibility redetermination.

Plaintiffs' overlook CMS's thorough explanation of the problem it is trying to address—*i.e.*, improper enrollments in fully subsidized Exchange plans that persist because of automatic re-enrollment procedures, *see id.* at 27,102—and how the Rule reasonably attempts to address that problem—*i.e.*, by encouraging enrollees in fully subsidized plans to actively confirm their knowledge of and eligibility for such plans, *id.* at 27,104. *See Jimenez-Cedillo v. Sessions*, 885 F.3d 292, 297-98 (4th Cir. 2018) (requiring only a "*rational* connection between the facts found and the choice made" (quoting *Ohio Valley Env't Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009) (emphasis added)). CMS also acknowledged the potential effect a $5 premium could have on enrollment and the risk pool in Exchanges, as well as on individuals who are accustomed to fully subsidized coverage, *see* 90 Fed. Reg. at 27,108, 27,194-95, and reasonably concluded that the $5 figure would likely encourage consumers to actively confirm their plan eligibility (because they want to avoid paying even this "nominal" cost) without risking "undue financial hardship," *id.* at 27,107. Thus, this challenge likewise fails.

## V.    The data matching policy is not arbitrary and capricious.

Plaintiffs challenge two Rule provisions that concern the processes by which HHS verifies

"income eligibility" for APTC and cost-sharing-reduction subsidies. *See id.* at 27,112. These provisions address the "critical balance HHS must achieve between assuring responsible stewardship of taxpayer dollars with protecting access to Federal program[s] for those who qualify for them." *Id.* at 27,113. Plaintiffs claim that the two provisions "will create significant barriers to coverage." Pls.' Mot. for Summ. J. at 20. But both provisions are "reasonable and reasonably explained," and thus pass muster under the deferential arbitrary-and-capricious standard. *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

**a. Provision Requiring Income Verification When Data Sources Indicate Income Less Than 100 Percent of the Federal Poverty Level.**

The first income eligibility verification provision that Plaintiffs challenge as arbitrary and capricious will require Exchanges to identify and further verify income-related information when (1) a tax filer's attested projected annual household income would qualify the taxpayer as an applicable taxpayer per 26 C.F.R. § 1.36B-2(b)  and (2) the income amounts returned by the IRS and other data sources with respect to that tax filer are less than 100 percent of the FPL. 90 Fed. Reg. at 27,121. As part of the process for verifying an applicant's household income for purposes of determining their eligibility for APTCs, an Exchange typically must consider the applicant's past tax return information, as well as the enrollee's attestation regarding their "projected annual household income." 45 C.F.R. § 155.320(c)(3)(ii)(A). Under current regulations, if an applicant's attestation regarding their projected annual household income reflects a higher household income than reflected in income data provided by the IRS or certain other sources, an Exchange generally "must accept the applicant's attestation without further verification," *id.* § 155.320(c)(3)(v), because it would result in a lower APTC amount. The Rule amends this provision by requiring an Exchange to instead further verify an applicant's household income if (1) an applicant attests to income that would qualify the taxpayer as an applicable taxpayer per 26 C.F.R. § 1.36B-2(b), (2)

17

income data from the IRS indicates household income below 100 percent of the FPL, and (3) the former income amount exceeds the latter amount by a "reasonable threshold." 90 Fed. Reg. at 27,123. The applicant may then resolve the inconsistency by providing additional documentation and taking other steps to verify their household income. *See* 45 C.F.R. § 155.315(f)(1)-(4).

This Rule provision parallels a provision from a 2018 rule that was vacated in *City of Columbus v. Cochran*, 523 F. Supp. 3d 731 (D. Md. 2021). Both then and now, the reasons for HHS wanting to take additional steps to verify an applicant's income when data from sources like the IRS indicate that the applicant's household income is less than 100 percent of the FPL are straightforward. Because individuals with household incomes below that threshold are generally not eligible for PTCs or, by extension, APTCs, *see* 26 U.S.C. § 36B(a), (c)(1), an applicant who attests to having a projected household income that is equal to or above 100 percent of the FPL might be deemed eligible for APTCs despite income data from other sources showing otherwise. 90 Fed. Reg. at 27,121. Such a discrepancy could be a consequence of an applicant overestimating his or her projected household income to obtain APTCs for which the applicant is not otherwise eligible. *Id.*

HHS's justification for the provision this time around does not suffer from the same flaws that were fatal to the 2018 provision. HHS now points to data that "provide substantial evidence that applicants with household incomes below the APTC income eligibility threshold"—that is, 100 percent of the FPL—"are strategically inflating their household incomes," or are "getting assistance from" agents and brokers that have a "financial incentive" to maximize Exchange enrollments, in order to obtain subsidized coverage in an Exchange despite their actual household incomes rendering them ineligible for such coverage. *Id.* at 27,122. Put another way, there is a reasonably deduced *nexus* between the current income self-attestation regulations and an increase

in fraud.

HHS cites one study—but simultaneously pursued its own analyses—that compared estimated potential enrollment in Exchanges based on income data reported in census surveys to actual enrollment by enrollees who reported household income above the FPL-based eligibility threshold and found that actual enrollment was 136 percent higher than the total population of potential enrollments. 90 Fed. Reg. at 27,122. That same study also found that a far higher number of enrollees reported household income that was just above the Exchange-eligibility threshold in non-Medicaid expansion States compared to those in States that did expand Medicaid. *Id.* A separate analysis of 2024 open enrollment data showed that plan selections on federal Exchanges among individuals who reported household income between 100 percent and 150 percent of the FPL in non-Medicaid expansion States were 70 percent higher than potential enrollments estimated from census data at that same income level, which provides another strong indicator that enrollees are overestimating their income to obtain subsidized health coverage. *Id.*; *see id.* (estimating that between four and five million people improperly enrolled in Exchange coverage subsidized by APTCs in 2024 at a cost of $15 to $20 million). HHS "examined the relevant data," "provided an explanation for its decision," and established with data a "rational connection between the facts found and the choice made." *Ohio Valley Env't Coal.*, 556 F.3d at 192 (citation omitted). Accordingly, Defendants promulgated a rule with burdens congruent to the problem it seeks to resolve. That comports with the APA's arbitrary-and-capricious standard.

**b.  Change Requiring Income Verification When Tax Data Is Unavailable.**

Plaintiffs also challenge the Rule's recission of a regulation that requires an Exchange to accept an applicant's self-attestation of projected annual household income "without further verification" whenever (1) the Exchange requests tax return data from the IRS to verify the applicant's attested income, but (2) the IRS confirms that there is no such data available, 45 C.F.R.

§ 155.320(c)(5). *See* 90 Fed. Reg. at 27,130. The current regulation, which was adopted in 2023, creates an exception to the general requirement that an Exchange must verify an applicant's annual household income with certain trusted data sources, 45 C.F.R. § 155.320(c)(1)(ii), and otherwise follow an alternative verification process if tax return data for an applicant is unavailable, *id.* § 155.320(c)(3)(vi). The Rule simply removes this exception and requires Exchanges to follow standard verification and data-matching procedures "when tax return data is unavailable to immediately verify a consumer's attestation of annual household income." 90 Fed. Reg. at 27,132.[5]

Plaintiffs argue CMS did not adequately consider the policy's potential effects on access to subsidized coverage on Exchanges. *See* Pls.' Mot. for Summ. J. at 20. But CMS did, in fact, consider commenters' concerns about the burden that extra verification steps might place on enrollees. *See* 90 Fed. Reg. at 27,131. The agency made the reasonable observation that applicants without tax return data will likely have documentation verifying their household income (*e.g.*, pay stubs) "readily available" to them and that the burden of submitting that documentation, by extension, would be relatively minimal. *Id.* at 27,131-32; *see also id.* at 27,132 ("[HHS] is of the view that th[e] 90-day period provided under statute [for resolving data inconsistencies] provides ample time for applicants to provide proof of their household income before their APTC is reduced.").

Beyond these policy concerns, Plaintiffs do not dispute that annual household income is a crucial metric in determining eligibility for subsidized coverage on Exchanges, *see* 26 U.S.C. § 36B(a), (c)(1)(A), and that the unavailability of tax return data does not relieve HHS of its statutory obligation to ensure compliance with such eligibility requirements, *see, e.g.*, 42 U.S.C.

---

[5] This policy requiring Exchanges to verify an applicant's attested annual household income when tax return data is unavailable will sunset at the end of program year 2026, and the current verification policy under 45 C.F.R. § 155.320(c)(5) will become effective again. *See* 90 Fed. Reg. at 27,131. Plaintiffs do not challenge this face of the policy.

§ 18081(a)(2) (tasking HHS with determining "whether [an] individual meets the income and coverage requirements" for claiming a PTC and "the amount of" that credit); *id.* § 18081(e)(4)(A) (prescribing procedures Exchanges must follow when an applicant's information cannot be verified with certain data sources). Thus, this provision, too, readily survives arbitrary and capricious review.

**VI.    The one-year failure to file and reconcile policy is not arbitrary and capricious.**

A basic principle animates the failure to file and reconcile policy: when means-tested subsidies are provided in advance based on projected income, there must be some way to reconcile the estimated subsidy paid with the amount a beneficiary is actually entitled to receive. Congress recognized this need by authorizing the Reconciliation Requirement, which requires APTC recipients to reconcile their actual income with their advanced credits when filing for taxes each year. *See* 26 U.S.C. § 36B(f)(1); 26 C.F.R. § 1.36B-4(a)(1)(i). The failure to file and reconcile policy applies to those who do not meet the Reconciliation Requirement.

The Rule will reinstate the notice procedures that CMS used before the current two-year policy was adopted in 2023, under which enrollees received their first failure to file and reconcile notice approximately six months before their APTC eligibility was impacted, and additional notices after that. 90 Fed. Reg. at 27,118. Moreover, CMS provided data suggesting that notices sent during the open enrollment period for Exchange plan enrollment "were relatively effective" in resolving failure to file and reconcile issues. *Id.* at 27,114.

Plaintiffs argue the rule will have negligible peripheral effects (e.g. that it will not save very much money, and the IRS can already pursue enforcement actions against filers who fail to reconcile their APTCs), Pls.' Mot. for Summ. J. at 23, but they neglect to grapple with the problem the Rule aims to solve. A major problem the failure to file and reconcile provision aims to address

is the improper receipt of APTCs by enrollees who do not comply with the ACA's reconciliation requirement, and CMS explained that a one-year failure to file and reconcile policy will address that very problem by ensuring that individuals who are improperly enrolled in subsidized Exchange coverage "lose[] APTC after 1 year of failing to file and reconcile instead of 2 years." 90 Fed. Reg. at 27,115. Accordingly, Defendants appropriately weighed the Rule's benefits with its impact on enrollees and determined it nonetheless merited implementation.

**VII.    The premium adjustment percentage policy is not arbitrary and capricious.**

The ACA directs the HHS Secretary to determine an annual "premium adjustment percentage" based on "the average per capita premium for health insurance coverage in the United States for the preceding calendar year." 42 U.S.C. § 18022(c)(4). That measure of premium growth is then used to adjust a number of parameters defined in the ACA, such as the maximum annual limitation on cost sharing, *see* 45 C.F.R. § 156.130(a). Because the IRS traditionally adopts the same premium growth indexing methodology as HHS, the methodology used to calculate the premium adjustment percentage also affects how PTC and APTC amounts are calculated and, by extension, the cost of health care coverage on Exchanges. *See* 90 Fed. Reg. at 27,171. In the early days of the ACA, the premium adjustment percentage was calculated based solely on estimates of average premiums for employer-sponsored health plans because that approach "reflected trends in health care costs without being skewed by . . . premium fluctuations" in the individual insurance market. *Id.* at 27,166. HHS later adopted a methodology that also used estimates of private health insurance premiums, but in 2021, HHS reversed course and now considers only premiums for employer-sponsored coverage in the premium adjustment percentage calculation. *Id.* at 27,166-67.

In the Rule, HHS once again adopts a premium adjustment percentage methodology that takes account of premium changes in both the individual and group health insurance markets. *See*

*id.* at 27,167. HHS explains in the Rule's preamble that this updated approach will allow it to "better achieve the statutory and regulatory goals of adopting a more comprehensive and accurate measure of premium costs across the private health insurance market," *id.* at 27,171, in keeping with the ACA's command that the premium adjustment percentage reflect the average premium "for health insurance coverage in the United States," 42 U.S.C. § 18022(c)(4). *See* 90 Fed. Reg. at 27,171 ("As the purpose of this index is to measure growth in premiums, we believe it is appropriate to use a premium measure that comprehensively reflects the actual growth in premiums in the related insurance markets.").

Plaintiffs' objection to the new premium adjustment percentage methodology stems almost entirely from its potential effect on the cost of Exchange plans. *See* Pls.' Mot. for Summ. J. at 23-25. HHS acknowledges that the new methodology will increase the maximum annual limitation on cost sharing and net premiums for enrollees with incomes under 400 percent of the FPL, which could in turn negatively impact the cost of Exchange coverage and enrollment. 90 Fed. Reg. at 27,171, 27,206-07. HHS addressed this concern head on in the Rule's preamble. *See id.* HHS offered a reasonable (and compelling) explanation for why it was adopting a new premium adjustment percentage methodology nonetheless. Specifically, HHS explained that the premium adjustment percentage reflects Congress's intent to "appropriately index various parameters defined in the ACA." *Id.* at 27,172. Given how the ACA defines that percentage, "the primary consideration for setting [its] value" should be "whether it accurately and comprehensively captures the rate of premium growth in the United States." *See id.*; 42 U.S.C. § 18022(c)(4). HHS acknowledged that the methodology used to calculate the premium adjustment percentage will have an impact on the cost of Exchange coverage, enrollment, and access to health care more broadly. *See* 90 Fed. Reg. at 27,171. But any such impact would be a consequence of *Congress's*

decision to tie the value of certain forms of financial assistance under the ACA to the premium adjustment percentage. Placing undue weight on considerations other than the rate of premium growth "in the United States" when calculating that percentage, 42 U.S.C. § 18022(c)(4), could thus yield a figure that "artificially inflat[es] the generosity of provisions of the ACA beyond the intent of Congress," 90 Fed. Reg. at 27,172. HHS therefore concluded—and reasonably so—that a premium adjustment percentage methodology that considers "all private health insurance premiums" is "more consistent with" that congressional intent and the ACA's text. *Id.*

Federal regulations often change, and though individuals may have grown accustomed to a certain policy, Plaintiffs cannot merely invoke those individuals' "reliance interest" and invalidate a rule as arbitrary and capricious. Such an approach would neuter the rule making process and eliminate agencies' ability to amend virtually all regulations. Instead, an agency need only "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 33 (2020). Defendants met this standard.

## VIII.   The actuarial value range policy is not arbitrary and capricious.

Under the ACA, health insurance plans offered on Exchanges must cover certain "essential health benefits" and adhere to certain "level[s] of coverage" specified in the statute. 42 U.S.C. § 18022(a). A plan's "level of coverage," or actuarial value, reflects the estimated average percentage of covered health care expenses that will be paid by the insurance plan. *Id.* For example, under a plan with an actuarial value of 80 percent, the insurer will pay, on average, 80 percent of covered essential health benefits, and the enrollee will pay the remaining 20 percent of expenses through a combination of deductibles, coinsurance, co-payments, and maximum out-of-pocket limits. Consequently, the higher a plan's actuarial value, the lower an enrollee's out-of-pocket

costs, on average. Of course, plans that have a higher actuarial value also have higher premiums.[6]

Health plans offered on Exchanges are divided into four "metal tiers"—bronze, silver, gold, and platinum—based on their actuarial values, *see id.* § 18022(d)(1)—covering, on average, 60, 70, 80, and 90 percent of costs, respectively. *Id.* The actuarial values of Exchange plans are calculated pursuant to regulations issued by the HHS Secretary. *See id.* § 18022(d)(2). The statute also instructs the Secretary to "develop guidelines to provide for a de minimis variation in the actuarial valuations used in determining the level of coverage of a plan to account for differences in actuarial estimates." *Id.* § 18022(d)(3). As relevant here, current regulations provide that the "allowable variation" in the actuarial value of silver, gold, and platinum plans is two percentage points above and below their respective benchmark actuarial values (*i.e.*, +2/-2 percentage points). 45 C.F.R. § 156.140(c)(1). The Rule will change this range to +2/-4 percentage points. 90 Fed. Reg. at 27,174. And for bronze plans, current regulations allow for a +5/-2 percentage point range, which the Rule will change to +5/-4 percentage points. *Id.*

HHS's decision to revert to a broader de minimis range similar to prior rules was not arbitrary and capricious. The ACA instructs HHS to "develop guidelines to provide for a de minimis variation in the actuarial valuations used in determining the level of coverage of a plan to account for differences in actuarial estimates." 42 U.S.C. § 18022(d)(3). The statute necessarily calls for the agency to exercise discretion in how much variation to permit. The phrase "de minimis" implies some play in the joints. *Cf. Ala. Power Co. v. Castle*, 636 F.2d 323, 360 (D.C. Cir. 1979) ("Determination of when matters are truly de minimis naturally will turn on the

---

[6] It is important to note that plans with the same actuarial value can have very different cost-sharing structures. For example, one plan with a $4,500 deductible and no coinsurance once that deductible is met could have the same (approximate) actuarial value as a plan with a smaller deductible (*e.g.*, $1,500) but a 30 percent coinsurance rate. Additionally, irrespective of a plan's actuarial value, the percentage of covered health care costs paid by any given enrollee can vary considerably depending on the cost-sharing structure of their particular plan (*e.g.*, high deductible versus a lower deductible) and the enrollee's health care needs in a given plan year.

assessment of particular circumstances."). Congress did not, for example, demand that HHS select the "maximum feasible" standard. *Cf.* 49 U.S.C. § 32902(a) (setting such a requirement for fuel economy standards). Instead, it used an open-textured phrase to assign to HHS responsibility for setting the range, thus delegating to the agency the discretion to make reasonable policy judgments in carrying out that duty. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024). In accounting for "differences in actuarial estimates," therefore, HHS may consider differences in cost-sharing and other components between plans. 90 Fed. Reg. at 27,174. HHS explained that it sought to "significantly improve issuer flexibility in plan design." *Id.* at 27,176. The agency predicted that this increase in flexibility would have three key benefits: It would (1) "promote competition" by allowing issuers to be more responsive to consumer needs, (2) allow "greater continuity for consumers," and (3) encourage issuers to continue participating in the Exchanges. *Id.* The agency therefore provided a reasoned explanation for its decision to alter the actuarial-value policy.

HHS also acknowledged that its decision involved trade-offs. The agency recognized that expanding the de minimis range would likely reduce tax credits for subsidized consumers. *Id.* at 27,076. But the reason for that reduced subsidy is that premiums would be cheaper, thus increasing affordability for unsubsidized consumers. *See id.* HHS decided to prioritize getting these unsubsidized consumers into risk pools because it believed that, in the long-term, the risk pools would be more stable and coverage would be more affordable. *See id.*; *see also* NPRM, 90 Fed. Reg. at 12,997 (warning that "healthier, unsubsidized enrollees are [being] priced out of the market" and criticizing "short-sighted approach" of focusing only on maximizing subsidies). HHS did not act unreasonably in making that policy choice.

The agency has consistently understood its statutory obligation in this more holistic light.

*See Loper Bright*, 603 U.S. at 388 (consistency in agency interpretation bolsters its "power to persuade" (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944))). Indeed, every time that HHS has set or adjusted the de minimis range, it has looked to factors beyond "differences in actuarial estimates." 90 Fed. Reg. at 27,174. When HHS set the range initially in 2013, it sought to "strike[] a balance between ensuring comparability of plans within each metal level and allowing plans the flexibility to use convenient cost-sharing metrics," and sought to "allow[] plans to retain the same plan design year to year." 78 Fed. Reg. 12,834, 12,851 (Feb. 25, 2013). When the agency subsequently adjusted the range, it also based its reasoning on these factors, 87 Fed. Reg. 27,208, 27,307 (May 6, 2022), as well as others such as market competitiveness, 82 Fed. Reg. at 18,369.

Plaintiffs focus on the effect these changes to the "de minimis" ranges will have on the value of PTCs that are available to Exchange enrollees. CMS estimates that the changes will reduce aggregate PTCs by $1.2 billion in 2026, *see* 90 Fed. Reg. at 27,208, which, according to Plaintiffs, will translate into higher premium costs for Exchange enrollees, a decrease in enrollment, and a weaker risk pool. *See* Pls.' Mot. for Summ. J. at 26. But CMS squarely considered the "impact" a wider "de minimis" range would have on PTCs and the "burden that increased cost-sharing and decreased PTCs may have on enrollees in the short-term." 90 Fed. Reg. at 27,176, 27,208. CMS just made the reasoned judgment that such "short-term" concerns about how wider ranges would affect subsidized enrollees should not necessarily take priority over the longer-term prospect of plans with lower premiums and competitive cost-sharing structures drawing unsubsidized consumers to Exchanges, "potentially improv[ing] the risk pool as coverage becomes more affordable for generally healthy people who currently may opt to forgo coverage altogether." *Id.* at 27,175. HHS, in particular, considered the decline of unsubsidized enrollees over time, which was contrary to certain government projections. *See id.* at 27,076. Far from reflecting a failure to

27

consider relevant factors, as Plaintiffs seem to claim, CMS's reasoning represents a paradigmatic "policy balance" between short-term costs and long-term benefits. *Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 211 (D.C. Cir. 2007). And Plaintiffs' mere disagreement with that balance does not render it arbitrary and capricious. *Id.*

IX.    **The elimination of specified "sex trait modification procedures" as an Essential Health Benefit is neither unlawful nor arbitrary and capricious.**

Lastly, Plaintiffs challenge a Rule provision barring issuers from including coverage for "[s]pecified [s]ex-[t]rait [m]odification [p]rocedures" (a term the Rule defines) as essential health benefits ("EHB") beginning in plan year 2026. 90 Fed. Reg. at 27,152. Plaintiffs argue that this change is both contrary to law and arbitrary and capricious, but these claims, too, fail.

As background, the ACA requires health insurance coverage in the individual and small group markets, including coverage offered on Exchanges, to cover a "package" of "essential health benefits." 42 U.S.C. § 18022(a)(1). This EHB package must cover at least ten different "categories" of services, ranging from "[a]mbulatory patient services" and "[h]ospitalization" to "[p]rescription drugs" and "[l]aboratory services." *Id.* § 18022(b)(1). EHB services are also subject to certain cost-sharing limits, such as annual out-of-pocket maximums. *Id.* § 18022(a)(2)-(3), (c)(1), (d). The ACA provides that the HHS Secretary "shall define the essential health benefits," and, as relevant here, directs the Secretary to "ensure that the scope of" those benefits "is equal to the scope of benefits provided under a typical employer plan, as determined by the Secretary." *Id.* § 18022(b)(1), (2)(A).

Pursuant to this authority, HHS adopted a regulatory framework during the initial rollout of the ACA in which EHB are defined based on a "benchmark" health plan selected by each State. 45 C.F.R. § 156.111. Under this framework, States designate a benchmark plan pursuant to various parameters, one of which is that the plan must cover items and services within all ten EHB

categories. *See id.* § 156.111(b)(1). And all applicable health plans sold in a State's individual and small group markets, including Exchange plans, must provide coverage for EHB that is "substantially equal to" the applicable benchmark plan. *Id.* § 156.115(a)(1). Health plans can of course cover more than just EHB. Non-EHB, however, are not subject to the cost-sharing limits and other requirements that apply to EHB. PTCs and APTCs also cannot be applied to the portion of an enrollee's premium that covers non-EHB. Relatedly, States can mandate that health plans cover certain benefits in addition to EHB, but States must generally "defray the cost" of any such "additional required benefits," which ensures that those benefits are not covered by federal premium subsidies. *Id.* § 155.170(b).

In addition to setting the parameters under which States can select their EHB benchmark plans, HHS regulations provide that "an issuer of a plan offering EHB may not include" certain listed benefits and services "as EHB." *Id.* § 156.115(d). Those listed benefits and services currently include "routine non-pediatric eye exam services, long-term/custodial nursing home care benefits, [and] non-medically necessary orthodontia." *Id.* The Rule adds to that list "[s]pecified [s]ex-[t]rait [m]odification [p]rocedures," which the Rule defines as

> any pharmaceutical or surgical intervention that is provided for the purpose of attempting to align an individual's physical appearance or body with an asserted identity that differs from the individual's sex either by: (1) intentionally disrupting or suppressing the normal development of natural biological functions, including primary or secondary sex-based traits; or (2) intentionally altering an individual's physical appearance or body, including amputating, minimizing or destroying primary or secondary sex-based traits such as the sexual and reproductive organs.

90 Fed. Reg. at 27,152, 27,154. This policy regarding specified sex-trait modification procedures ("SSTMP") will be applicable to health plans taking effect in 2026 and beyond. *Id.* at 27,154.

"The basis for" this exclusion of SSTMP from EHB "is that such benefits are not covered under typical employer plans." *Id.* at 27,158. As HHS explained in the Rule's preamble, the ACA

requires that the "scope of EHB . . . be equal in scope to the benefits provided under a typical employer plan." *Id.* at 27,152; *see* 42 U.S.C. § 18022(b)(2)(A). The statute likewise "gives the [HHS] Secretary broad latitude to define EHB, subject to ensuring that EHB" comport with this typicality requirement, 90 Fed. Reg. at 27,158. Based on its review of data "suggesting that . . . [SSTMP], as defined in th[e] [R]ule, are not benefits covered under a typical employer plan," HHS determined that such procedures should not be covered as EHB. *Id.* at 27,164; *see id.* at 27,157 ("[W]e take seriously the responsibility to ensure consistency with the parameters on EHB enumerated in the [ACA].").

Plaintiffs argue that the Rule's exclusion of SSTMP from EHB is contrary to law, seemingly because they read the ACA to require the *Secretary of Labor* to "conduct a survey of employer-sponsored coverage" assessing "the benefits typically covered by employers" before the *HHS Secretary* can do anything with respect to his statutory obligation to "ensure that the scope of" EHB "is equal to the scope of benefits provided under a typical employer plan," 42 U.S.C. § 18022(b)(2)(A). *See* Pls.' Mot. for Summ. J. at 28-29. That cabined reading of the HHS Secretary's authority cannot be squared with the ACA's text. Indeed, the ACA instructs the HHS Secretary to "define" EHB and to "ensure that the scope of" such EHB "is equal to the scope of benefits provided under a typical employer plan, as determined by the Secretary." 42 U.S.C. § 18022(b)(2)(A). The statute separately instructs the Secretary of Labor to "conduct a survey of employer-sponsored coverage," which is meant to "inform" the HHS Secretary of "the benefits typically covered by employers." *Id.* That "survey" was conducted back in the ACA's early days, when the HHS Secretary was still in the process of initially "defin[ing]" EHB and the regulations that would implement EHB requirements moving forward. *Id.* § 18022(b)(2)(B). That survey ultimately "inform[ed]" HHS's decision to "define" EHB by implementing the state-benchmark-

plan framework described above. *Id.* § 18022(b)(2)(A). Yet the ACA provides that the HHS Secretary must continue to "ensure" that the scope of EHB "*is* equal" to the scope of benefits covered by a "typical employer plan, *as determined by the Secretary*." *Id.* (emphases added). That present-tense and HHS-specific language indicates that the HHS Secretary's obligation to "ensure" consistency between EHB and "typical employer plan" coverage is an ongoing one. *Id.* And it would be nonsensical to read the ACA—as Plaintiffs apparently do—to condition the HHS Secretary's ability to fulfill that ongoing obligation on another federal official's (*i.e.*, the Secretary of Labor) willingness and ability to repeatedly conduct economy-wide surveys. Such an interpretation would be at odds with the HHS Secretary's authority and obligation to "determine[]" himself what a "typical employer plan" encompasses, *id.*, and would effectively preclude HHS from making timely regulatory changes concerning EHB. *Cf. Gen. Motors Corp. v. Darling's*, 444 F.3d 98, 108 (1st Cir. 2006) (explaining that courts should "avoid statutory constructions that create absurd, illogical, or inconsistent results" (citation omitted)).

Setting aside Plaintiffs' erroneous statutory arguments, the thrust of their challenge to the Rule's SSTMP exclusion is that the exclusion, and HHS's related "finding" that SSTMP are "not typically included in employer-sponsored plans," 90 Fed. Reg. at 27,152, are arbitrary and capricious. Pls.' Mot. for Summ. J. at 29. They offer several reasons, but none carries the day. Plaintiffs assert, for instance, that HHS "misunderstand[s] . . . what constitutes a 'typical' employer plan based on multiple faulty premises." *Id.* at 30. HHS did, of course, explain the reason for the change. *See* 90 Fed. Reg. at 27,152 (noting that "coverage of [SSTMP] is not typically included in employer-sponsored plans"). And States will still have flexibility to select benchmark plans under the Rule. 45 C.F.R. § 156.111. That flexibility, though, has always been subject to various regulatory parameters and the HHS Secretary's broad authority to "define" EHB and "ensure" that

the scope of EHB is "equal to the scope of benefits provided under a typical employer plan," 42 U.S.C. § 18022(b)(2)(A). Indeed, since the ACA's EHB requirements were first implemented, regulations have barred issuers in all States from covering certain services as EHB because those services are not typically covered by employer-sponsored health plans. 45 C.F.R. § 156.115(d). The Rule simply adds SSTMP to that list, in accordance with the HHS Secretary's obligation to ensure compliance with the ACA's typicality requirement.

HHS also expressly acknowledged that several States effectively mandate coverage for certain SSTMP through state law. 90 Fed. Reg. at 27,156. After considering those interests, HHS concluded that excluding SSTMP from EHB coverage better "aligns with the plain language and intent of" the ACA. *Id.* at 27,163. And HHS likewise acknowledged that this policy change would require certain issuers "to adjust their plan offerings in accordance with th[e] [R]ule," but nonetheless determined that there would be "sufficient time for issuers to make such changes." *Id.* at 27,161.

Plaintiffs separately disagree with HHS's general conclusion that SSTMP are not typically covered by employer-sponsored plans, and they point to data that, in their view, undercuts that conclusion, Pls.' Mot. for Summ. J. at 30. But HHS did not disregard that data, as Plaintiffs claim; it "simply interpreted" that data "differently"—and reasonably so. *Prometheus*, 592 U.S. at 426. HHS noted in the Rule's preamble, for instance, that a majority of States and territories either explicitly exclude SSTMP from coverage under their state employee health benefit plans or have no clear policy regarding such coverage. 90 Fed. Reg. at 27,153. HHS further noted that "over half of States have taken action to restrict [SSTMP] for minors" since 2021, which reflects an "ongoing controversy over coverage of" SSTMP more generally. *Id.* at 27,156. And it observed that a survey cited by commenters indicated that only 24 percent of large employers (*i.e.*, ones with 200 or more

workers) stated that they covered cross-sex hormonal interventions, while the rest either did not

offer such coverage, or did not know if they did. *Id.* at 27,155. It is certainly rational to conclude

that certain health coverage is not "typical," 42 U.S.C. § 18022(b)(2)(A), if it is definitively

provided by only a small fraction of large employers and less than half of state employee benefit

plans. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (requiring only a "rational

connection between the facts found and the choice made" (quoting *Motor Vehicle Mfrs. Ass'n of*

*U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983))). That "seventy-two percent

of Fortune 500 companies' health plans" cover treatment for gender dysphoria, Pls.' Mot. for

Summ. J. at 30, does not require a different result. As HHS explained, the ACA's typicality

requirement "specifically references" the coverage provided by a "typical employer," not the

coverage held by a typical employee, *see id.* (noting that "large employer plans . . . account for the

majority of employer plan enrollees" (citation omitted)), and HHS reasonably observed that

smaller employers are not able to offer the same "generous and costly health plans" that "very

large employers" provide. 90 Fed. Reg. at 27,155. Furthermore, that HHS has not excluded other

benefits and services from EHB coverage on typicality grounds does not preclude it from doing so

with respect to SSTMP in the Rule. *See Fox*, 556 U.S. at 522 ("Nothing prohibits federal agencies

from moving in an incremental manner.").

In sum, Plaintiffs again conflate "reasoned decisionmaking," *Regents*, 591 U.S. at 16

(quoting *Michigan v. EPA*, 576 U.S. 743, 750 (2015)), with decisionmaking that yields their

preferred policy outcomes. The APA requires the former, *id.*, and the Rule's SSTMP exclusion

cannot be deemed arbitrary merely because Plaintiffs desire the latter.

### X.   **Any relief should be narrow to narrowly tailored.**

The Court should enter judgment for Defendants. But if it enters judgment for Plaintiffs, it

should not grant the extraordinarily sweeping relief that they seek. Plaintiffs request that the Court "[v]acate the [f]inal [r]ule." Compl., Prayer for Relief ¶ e. That request for universal relief would transgress basic principles of jurisdiction, equity, and judicial review under the APA.

To start, where party-specific remedies can provide Plaintiffs with complete relief, any broader relief would contradict constitutional and equitable limitations on this Court's remedial authority. Because this Court's "constitutionally prescribed role is to vindicate the individual rights of the people appearing before it," any "remedy must be tailored to redress" each State's "particular injury." *Gill v. Whitford*, 585 U.S. 48, 72–73 (2018); *accord United States v. Texas*, 599 U.S. 670, 702 (2023) (Gorsuch, J., joined by Thomas and Barrett, JJ., concurring in the judgment) ("Any remedy . . . must not be more burdensome to the defendant than necessary to redress the complaining parties." (citation modified). Traditional principles of equity reinforce that constitutional limitation, *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318–19 (1999), instructing that a remedy "be no more burdensome" to defendants "than necessary to provide complete relief" to plaintiffs, *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted); *accord Trump v. Hawaii*, 585 U.S. 667, 717 (2018) (Thomas, J., concurring) (explaining that English and early American "courts of equity" typically "did not provide relief beyond the parties to the case"). Thus, any relief should not extend more broadly than needed to remedy the injuries of any particular plaintiff found to have standing.

The APA's provision for courts to "set aside" unlawful agency actions, 5 U.S.C. § 706(2), does not authorize the type of universal vacatur that Plaintiffs seek in tension with these precepts. *But see Ass'n of Am. Universities v. Dep't of Def.*, 806 F. Supp. 3d 79 (D. Mass. 2025), *appeal filed*, No. 25-2184 (1st Cir. Dec. 16, 2025). As a matter of first principles, the "set aside" language in § 706(2) should not be read as authorizing remedies, which are governed by § 703 of the APA.

Section 703 states that "[t]he form of proceeding for judicial review" of agency action is either a "special statutory review proceeding" or, in "the absence or inadequacy thereof," any "applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus." 5 U.S.C. § 703. Because Plaintiffs do not purport to identify any applicable "special statutory review proceeding," § 703 affords them only traditional equitable remedies like injunctions. In contrast, § 706(2) does not address remedies at all. Rather, § 706(2) is properly understood as a rule of decision directing the reviewing court to disregard unlawful "agency action, findings, and conclusions" in resolving the case before it, consistent with basic principles of judicial review. Universal vacatur is therefore not an available remedy under the APA. *See Texas*, 599 U,S, at 693-99 (Gorsuch, J., concurring in the judgment).

The Court also has equitable alternatives to vacatur. Rather than vacating the Rule nationwide, the Court could simply enjoin Defendants from enforcing the Rule against Plaintiffs, which would alleviate any adverse effects applicable to them. In contrast, the problems caused by overbroad universal remedies are well catalogued and apply whether such a remedy takes the form of a universal vacatur or a nationwide injunction. Importantly, nearly identical parallel litigation under the APA is taking place in the District of Maryland, *City of Columbus, et al. v. Kennedy, et al.*, Case No. 1:25-cv-2114 (D. Md.), in which motions for summary judgment have already been briefed. Universal vacatur in this case could deprive another court of the opportunity to resolve this question on its own terms or, perhaps more problematically, create substantial nationwide confusion in the event of competing district court orders.

## CONCLUSION

Plaintiffs' Motion for Summary Judgment should be denied and Defendants' Cross Motion for Summary Judgment should be granted.

DATED: February 27, 2026          Respectfully Submitted,

BRETT SHUMATE
Assistant Attorney General
Civil Division

ERIC B.
BECKENHAUER
Assistant Director
Federal Programs Branch

*/s/ Jordan A. Hulseberg*
JORDAN A. HULSEBERG
D.C. Bar No. 90033542
Trial Attorney
United States Department of
Justice Civil Division,
Federal Programs Branch
1100 L Street NW
Washington, DC 20005


Phone: (202) 598-3856
Fax: (202) 616-8470
Email: jordan.a.hulseberg2@usdoj.gov

*Counsel for Defendants*