# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

STATE OF CALIFORNIA, *et al.*,

    *PLAINTIFFS,*

    v.

ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the Department of Health and Human Services, *et al.*,

    *DEFENDANTS.*

Civil Action No. 1:25-CV-12019-NMG

Leave to file a reply
granted on November 23, 2025 (ECF No. 110)

Leave to file excess pages
granted on January 9, 2026 (ECF No. 115)

**PLAINTIFF STATES' OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFF STATES' MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

Page

INTRODUCTION ............................................................................................................1

ARGUMENT ...................................................................................................................2

    I.    Plaintiffs Should Prevail on the Merits .............................................................2

        A.    It Is Undisputed That the Rule Harms the States .......................................2

        B.    The Provisions Making Coverage Harder to Obtain Are Contrary to Law and Arbitrary and Capricious ............................................................3

            1.    Ending Guaranteed Issue Violates the ACA and Is Arbitrary and Capricious .......................................................................................3

                a.    Ending Guaranteed Issue Is Contrary to Law .....................4

                b.    Ending Guaranteed Issue Is Arbitrary and Capricious .........................................................................5

            2.    The 75% Verification Requirement for Triggering-Event SEPs Is Arbitrary and Capricious .......................................................7

            3.    Shortening the Open Enrollment Period Is Arbitrary and Capricious .........................................................................................8

        C.    The Provisions Making Coverage More Expensive Are Contrary to Law and Arbitrary and Capricious ..........................................................10

            1.    The $5 Re-Enrollment Penalty Violates the Text of the ACA and Is Arbitrary and Capricious ........................................10

                a.    The $5 Penalty Violates the ACA ....................................10

                b.    The $5 Penalty Imposes a Significant and Unnecessary Burden ...........................................................11

            2.    The Two Income-Verification Policies Are Arbitrary and Capricious .......................................................................................12

            3.    Shortening the Failure-to-Reconcile Grace Period Is Arbitrary and Capricious ...........................................................15

            4.    Changing the Premium Adjustment Percentage Is Arbitrary and Capricious ...........................................................16

        D.    The Provisions Making Coverage Less Valuable Are Contrary to Law and Arbitrary and Capricious ..........................................................17

            1.    Broadening the Actuarial Value Ranges Is Arbitrary and Capricious .......................................................................................17

            2.    The Secretary's Modification to Essential Health Benefits Failed to Comply with the ACA and Is Arbitrary and Capricious .......................................................................................19

                a.    Defendants Have Waived the Contrary-to-Law Argument ...........................................................................20

                b.    The EHB Modification Is Arbitrary and Capricious ..........22

**TABLE OF CONTENTS**
**(continued)**

Page

II.    The APA Authorizes Vacatur of the Challenged Provisions................................23

CONCLUSION...............................................................................................................25

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Allstate Interiors & Exteriors, Inc. v. Stonestreet Constr., LLC*,
    730 F.3d 67 (1st Cir. 2013)........................................................................................21

*Am. Hosp. Ass'n v. Kennedy*,
    Civ. No. 25-00600, 2025 WL 3754192 (D. Me. Dec. 29, 2025)............................................24

*Association of American Universities v. Department of Defense*,
    806 F. Supp. 3d 79 (D. Mass. 2025) ...................................................................24, 25

*Azar v. Allina Health Servs.*,
    587 U.S. 566 (2019)...................................................................................................5

*City of Columbus v. Kennedy*,
    796 F. Supp. 3d 123 (D. Md. 2025)........................................................................ *passim*

*Corner Post, Inc. v. Bd. of Gov's. of the Fed. Rsrv. Sys.*,
    603 U.S. 799 (2024)..................................................................................................24

*Council of Parent Atty's & Advoc's, Inc. v. DeVos*,
    365 F. Supp. 3d 28 (D.D.C. 2019) ............................................................................16

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
    591 U.S. 1 (2020)......................................................................................................11

*Fed. Commc'ns Comm'n v. Prometheus Radio Proj.*,
    592 U.S. 414 (2021)............................................................................................6, 9, 22

*Fed. Commc'ns Comm. v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009)..............................................................................................12, 17

*Harmon v. Thornburgh*,
    878 F.2d 484 (D.C. Cir. 1989).................................................................................24

*Illinois v. Fed. Emer. Mgmt. Agency*,
    801 F. Supp. 3d 75 (D.R.I. 2025) .............................................................................24

*Marasco & Nesselbush, LLP v. Collins*,
    6 F.4th 150 (1st Cir. 2021)....................................................................................24, 25

*Marsh v. Or. Nat. Res. Council*,
    490 U.S. 360 (1989)....................................................................................................1

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Motor Veh. Mfrs.' Ass'n of the U.S., Inc. v. State Farm Mut. Automobile Ins. Co.*,
   463 U.S. 29 (1983)................................................................................14, 18, 22, 23

*Nat'l Insts. of Health v. Am. Pub. Health Ass'n ("NIH")*,
   606 U.S. ___, 145 S. Ct. 2658 (Aug. 21, 2025)......................................................24, 25

*Ohio v. EPA*,
   603 U.S. 279 (2024)..............................................................................................6, 15

*Perez v. Mortgage Bankers Ass'n*,
   575 U.S. 92 (2015)................................................................................................8, 13

*Russello v. United States*,
   464 U.S. 16 (1983)...................................................................................................4, 5

*TRW, Inc. v. Andrews*,
   534 U.S. 19 (2001).......................................................................................................5

*United States v. Texas*,
   599 U.S. 670 (2023)....................................................................................................24

*Util. Air Regul. Grp. v. EPA*,
   573 U.S. 302 (2014)....................................................................................................11

**STATUTES**

5 U.S.C. § 706.......................................................................................................23, 25

26 U.S.C. § 36B.....................................................................................................10, 11

26 U.S.C. § 36B(b)......................................................................................................10

26 U.S.C. § 36B(b)(2)(A)............................................................................................10

26 U.S.C. § 36B(b)(2)(B)............................................................................................10

26 U.S.C. § 36B(b)(3).................................................................................................10

42 U.S.C. § 300gg-1(a)..............................................................................................3, 4

42 U.S.C. § 300gg-2(b)(1).............................................................................................4

42 U.S.C. § 18022(b)(1).........................................................................................19, 20

42 U.S.C. § 18022(b)(2)(A)..........................................................................19, 20, 21, 22

**TABLE OF AUTHORITIES**
(continued)

Page

42 U.S.C. § 18022(b)(2)(B)......................................................................20, 21

42 U.S.C. § 18022(b)(4)(H)......................................................................19, 20

42 U.S.C. § 18022(d)(3) ...........................................................................17, 18

42 U.S.C. § 18081(a)(1)..................................................................................11

42 U.S.C. § 18081(a)(2)..................................................................................10

42 U.S.C. § 18081(f)(1)(B)..............................................................................11

**REGULATIONS**

45 C.F.R. § 155.320(c)(5)................................................................................12

Patient Protection and Affordable Care Act, HHS Notice of Benefit and Payment
   Parameters for 2027; and Basic Health Program, 91 Fed. Reg. 6292 (Feb. 11,
   2026) ............................................................................................................12

Patient Protection and Affordable Care Act; Market Stabilization, 82 Fed. Reg.
   18,346 (Apr. 18, 2017)....................................................................................9

Patient Protection and Affordable Care Act; Marketplace Integrity and
   Affordability, 90 Fed. Reg. 12,942 (Mar. 19, 2025)....................................15

Patient Protection and Affordable Care Act; Marketplace Integrity and
   Affordability, 90 Fed. Reg. 27,074 (June 25, 2025)......................................1

**OTHER AUTHORITIES**

Black's Law Dictionary (3d ed. 1933)............................................................24

Diana M. Tengesdal, Memorandum for the Commissioner of Internal Revenue,
   U.S. Department of the Treasury, *The Internal Revenue Service's Readiness
   for the 2026 Filing Season (Audit No.: 2026400002)* (Jan. 26, 2026) (available
   at https://www.tigta.gov/sites/default/files/reports/2026-01-/2025400002-
   Readiness-Memo.pdf)...................................................................................15

**INTRODUCTION**

The challenged provisions of the Rule[1] are unlawful for the reasons set forth in Plaintiffs' Motion for Summary Judgment (ECF 120; hereafter "MSJ") and in the District of Maryland's decision in *City of Columbus v. Kennedy*, 796 F. Supp. 3d 123 (D. Md. 2025). In provision after provision of the Rule, the Department of Health and Human Services (HHS) and its Centers for Medicare & Medicaid Services (CMS) violate the text of the ACA and fail to properly explain their decision to make ill-conceived changes to the health insurance marketplaces that will erode coverage and increase health care costs. Plaintiffs stand on those arguments, which Defendants do not rebut. Indeed, Defendants' opposition is more revealing in illustrating what it is *not* arguing to this Court.

At the outset, Defendants have failed to contest, and therefore have waived, two issues. First, the Rule harms the States, which HHS concedes repeatedly in the Rule. Defendants never answer or rebut Plaintiffs' arguments regarding uncompensated care costs, compliance costs, or charity care, nor do they counter the sworn declarations submitted by the experts on the ground: the State officials responsible for running the exchanges on which millions of Americans rely. Second, the HHS Secretary failed to submit the required report to Congress, as this Court has already found. These issues are undisputed and should be resolved in Plaintiffs' favor.

As to the remaining contrary-to-law arguments—the termination of guaranteed issue, and the $5 charge—Defendants fail to engage with the statutory arguments, instead parroting the Rule's explanation, missing the point in each case.

Defendants' arbitrary-and-capricious arguments are similarly lacking. They fall back on the Rule's insufficient explanations without responding to Plaintiffs' specific arguments as to why those justifications are insufficient or incorrect. Although Defendants acknowledge that this Court's "'inquiry must be searching and careful,'" Defendants' Opposition and Cross-Motion for Summary Judgment (ECF 123, hereafter "MSJ Opp.") at 6 (quoting *Marsh v. Or. Nat. Res.*

---

[1] Patient Protection and Affordable Care Act; Marketplace Integrity and Affordability, 90 Fed. Reg. 27,074 (June 25, 2025) (Rule).

*Council*, 490 U.S. 360, 375-76 (1989)), they do not cite to a single page in the Administrative Record ("Record" or "AR")—while Plaintiffs cite it forty-five times. Nor do Defendants mention, let alone defend, the flawed Paragon Institute reports on which the Rule largely relied, even though commenters pointed out numerous flaws with those reports and Plaintiffs' briefing explained how HHS failed to engage with those comments.

Finally, Defendants make a remedial argument that would cabin APA vacatur in a way that no court has ever done in any published opinion. The Court should reject this novel reading of the APA, grant summary judgment for Plaintiffs, and vacate the challenged provisions of the Rule.

## ARGUMENT

### I.    PLAINTIFFS SHOULD PREVAIL ON THE MERITS

#### A.    It Is Undisputed That the Rule Harms the States

In their opening brief, Plaintiffs argue—as this Court has already found—that the Rule harms the States by imposing substantial "compliance costs associated with implementing these provisions." MSJ at 11; *see* Order Denying Mot. for Prelim. Inj. (ECF 105, hereafter "PI Order") at 15 (finding Plaintiffs were suffering "irreparable economic harm" due to the income-verification, FTR, and actuarial value provisions); *see also* Rule at 27,188-91 (regulatory impact analysis showing estimated compliance costs to States of each provision). Indeed, Plaintiffs submitted undisputed declarations showing the States are spending millions to comply with the Rule's provisions. *E.g.*, MSJ at 11 (citing ECF 10-4 (Altman Decl.) and ECF 10-22 (Humphreys Decl.)). Defendants have addressed none of these arguments or evidence. It is thus undisputed that the Rule imposes these costs.

Plaintiffs also explain that the Rule itself acknowledges that the challenged provisions will "increase[] the burden of uncompensated care on the healthcare system," "increase[] emergency care utilization," and increase "costs to State governments . . . in the form of charity care." MSJ at 10 (citing Rule at 27,213-14, 27,190). The Rule will also drive up premiums, reduce enrollment, and worsen risk pools, which in turn will increase the States' uncompensated-care

2

costs as well as their compliance and implementation costs. *See* MSJ at 10 (citing specific pages of the Rule where these harms are acknowledged); *accord City of Columbus*, 796 F. Supp. 3d at 144 (discussing same).

Plaintiffs cite over a dozen declarations from the States explaining precisely how the challenged provisions of the Rule would harm them. *See generally* MSJ at 10-12 (citing ECF 10-4 (Altman Decl.), ECF 10-6 (Michel Decl.), ECF 10-10 (Winters Decl.), ECF 10-11 (Schneider Decl.), ECF 10-12 (Woltman Decl.), ECF 10-13 (Eberle Decl.), ECF 10-16 (Brown Decl.), ECF 10-17 (Caulum Decl.), ECF 10-18 (Huck Decl.), ECF 10-19 (Zimmerman Decl.), ECF 10-20 (Baillio Decl.), ECF 10-21 (Holahan Decl.), ECF 10-22 (Humphreys Decl.), ECF 10-23 (Lang Decl.), ECF 10-25 (Ulrey Decl.), and ECF 10-26 (Smith Decl.)). Plaintiffs also point to the recent *City of Columbus* decision, which found that the Rule will cause harms via a "predictable chain of events," with the Rule being the "first domino." 796 F. Supp. 3d at 173.

Defendants address *none* of this evidence. Defendants do not acknowledge Plaintiffs' declarations, grapple with the import of the *City of Columbus* decision, or dispute the harms to the States that are sure to flow from the Rule's provisions. Because the Rule acknowledges the compliance and uncompensated-care costs borne by the States, and because Defendants failed to contest any of Plaintiffs' declarations or any of the Record evidence Plaintiffs cite, harm to the Plaintiff States is beyond dispute.

> **B. The Provisions Making Coverage Harder to Obtain Are Contrary to Law and Arbitrary and Capricious**
>
> **1. Ending Guaranteed Issue Violates the ACA and Is Arbitrary and Capricious**

The ACA requires that insurers accept all eligible applicants for coverage. *See* 42 U.S.C. § 300gg-1(a) (the "guaranteed issue" provision). The Rule violates that statutory command by inserting an exception that Congress never sanctioned: allowing insurers to deny new applicants who owe past-due premiums on prior policies. In trying to defend this violation of the ACA's guaranteed-issue requirement, the agency fails to engage with Plaintiffs' central argument: that Congress structured the ACA's guaranteed-issue and guaranteed-renewability provisions

differently, and that the absence of a past-due premium exception from the former but not the latter is a deliberate and dispositive congressional choice. Defendants' opposition never addresses, let alone disputes, that point. Defendants similarly fail to respond to Plaintiffs' record evidence showing that this policy was arbitrary and capricious. Accordingly, summary judgment should be granted in Plaintiffs' favor.

### a.    Ending Guaranteed Issue Is Contrary to Law

Two different provisions of the ACA control how insurers issue new coverage, 42 U.S.C. § 300gg-1(a), and renew that coverage, 42 U.S.C. § 300gg-2(b)(1). Plaintiffs' opening brief explains that, "[h]ad Congress meant to create an exception to the ACA's guaranteed *issue* provision requirement for enrollees who had not paid premiums owed under a different policy, it could have done so; in fact, Congress did include such an exception to the guaranteed *renewability* requirement . . . in a neighboring section of" the ACA, 42 U.S.C. § 300gg-2(b)(1). MSJ at 12 (emphases in original). The fact that Congress included such an exception in one provision proves that it knew how to include it in the second provision if it had wanted to. Indeed, it is "generally presumed that Congress acts intentionally" when, as here, it includes specific language in one provision but not another provision of the same statute. *See* MSJ at 13 (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)).

Defendants never acknowledge the different statutory language used in these two distinct sections of the ACA and make no attempt to rebut the presumption that *Russello* establishes. Instead, they merely repeat the policy rationale that they believe justifies terminating the guaranteed-issue provision and attempt to elide the distinction between *issuance* and *renewability* by arguing that "provision of coverage is of course contingent on the enrollee's payment of premiums." MSJ Opp. at 8 (citing 42 U.S.C. § 300gg-1(a)). Defendants deliberately choose their words to obscure the statutory distinction: the phrase "*provision* of coverage," which appears in neither statute, blurs the distinction between "accept[ing]" enrollees and "renew[ing] or continu[ing]" them. The ACA allows issuers to "nonrenew or discontinue" coverage due to "[n]onpayment of premiums," 42 U.S.C. § 300gg-2(b)(1), but it does not allow

4

issuers to deny new coverage based upon past-due premiums under older, different, policies. As Plaintiffs argue, "Defendants' attempt to 'rewrite [the ACA] under the banner of [their] own policy concerns' [. . .] is patently unlawful." MSJ at 13 (quoting *Azar v. Allina Health Servs.*, 587 U.S. 566, 581 (2019)). Congress expressly distinguished between new and renewing consumers and Defendants fail to rebut the presumption that Congress drew that line on purpose. *Russello*, 464 U.S. at 23. Again, Defendants "may not re-write the statute to create a new exception that Congress itself did not enumerate." MSJ at 12 (citing *TRW, Inc. v. Andrews*, 534 U.S. 19, 28 (2001)). Allowing insurers to deny new applicants who owe past-due premiums on prior policies is contrary to law.

### b.    Ending Guaranteed Issue Is Arbitrary and Capricious

The arbitrary-and-capricious defense is equally unavailing. Defendants mischaracterize Plaintiffs' concerns as "policy disagreements," fail to acknowledge or address the record before the agency and Plaintiffs' arguments citing to that record, and fail to explain the agency's decision not to require notice to consumers of this policy. The Rule's needless burden on consumers and its failure to require insurers to notify consumers that they are being denied insurance coverage because they owe money for past coverage is plainly arbitrary and capricious.

This policy creates an unjustified burden on consumers. During rulemaking, many commenters urged the agency to consider that past-due premium debt "can occur through insurer accounting errors and exchange recordkeeping mistakes," MSJ at 13 (citing AR at 024765-66 (Nat'l Health L. Prog.)), and may accrue because "consumers may be unaware they have entered a grace period during which they still owe premiums," MSJ at 13 (citing AR at 031756-60 (Ctr. on Budget & Pol'y Priorities)). This could lead to people being denied coverage without understanding the reason for the denial, and without knowing they have accrued a debt.

Moreover, because of the high likelihood of premium debt accruing without consumers' knowledge combined with the possibility of administrative error, proper notice is essential. It was therefore unreasonable for CMS to "attach[] no notice requirement to this provision of the

5

Rule." MSJ at 14. It is arbitrary to bar consumers from accessing new coverage without their knowing or being made aware of the reason for the denial of coverage. Far from a mere "policy disagreement[]," MSJ Opp. at 9, this is an "important aspect of the problem," *Ohio v. EPA*, 603 U.S. 279, 294 (2024), that merits fulsome consideration and explanation—which Defendants have not provided.

Defendants write that CMS "acknowledged" concerns about coverage losses but justified this policy by pointing to "(1) 'the importance of health coverage,' (2) the limited amount of past-due premium debt that a typical enrollee could potentially accrue, and (3) the intuitive expectation that customers are 'accustomed to paying in full for one contract before they are allowed to enter another with the same contracting party.'" MSJ Opp. at 9 (quoting Rule at 27,087). But Defendants cite to nothing in the Record supporting their claim regarding what customers are "accustomed to," and moreover, these boilerplate responses fail to address Plaintiffs' (and commenters') main concern: A customer who, because of the lack of a notice requirement, *does not know* they owe a past-due premium also does not know the level of debt they owe, and so does not realize they have not paid an existing contract in full, rendering all three of these justifications meaningless. That is why many commenters urged CMS to adopt a notice requirement, and why CMS's failure to do so is arbitrary and capricious. MSJ at 13-14.

Defendants devote a single sentence to defending the lack of a notice requirement. They write that the agency chose to "defer to States" to decide whether to "require issuers" to "provide *advance* notice" of "past-due premium *policies*." MSJ Opp. at 10 (cleaned up; emphases added). But specific notice to a consumer of the reason for their denial is distinct from general notice to all enrollees that such a policy exists. Defendants have thus failed to meaningfully respond to this argument. Moreover, answering consumers' concerns by merely punting the problem to the States—a problem the Rule itself created—is no answer at all, and is not the "reasonable" explanation the APA requires. *Fed. Commc'ns Comm'n v. Prometheus Radio Proj.*, 592 U.S. 414, 423 (2021). The Rule's failure to include a notice requirement is arbitrary and capricious.

6

### 2.    The 75% Verification Requirement for Triggering-Event SEPs Is Arbitrary and Capricious

While many enrollees obtain coverage during Open Enrollment (discussed below), others may experience a life event, such as a job loss, move to a new area, or birth of a child, that triggers a need to adjust coverage outside of that period. The Special Enrollment Periods serve that purpose. The Rule imposes a new requirement that exchanges on the federal platform must verify the eligibility of at least 75% of those claiming to be eligible for a Special Enrollment Period (SEP), across all SEP categories. Rule at 27,029. Those enrollees would not be able to obtain health insurance until that verification process is complete. This requirement is arbitrary and capricious because "HHS provides no new data" supporting its contention that the SEP is a pathway for fraudulent enrollments and "ignores evidence showing *fewer* people abusing the SEPs [between 2017 and 2022]." MSJ at 14 (emphasis in original) (citing Rule at 27,149-50).

Plaintiffs also point out that several commenters provided HHS with data showing that "the average cost to insure SEP enrollees is often the same as, *or lower than*, the cost to insure non-SEP enrollees," MSJ at 15 (emphasis in original; citing AR at 034846-47 (Covered California), 032768 (Washington Health Benefit Exchange), 024656-57 (Maryland)), and further, that HHS "acknowledges these facts," MSJ at 15 (citing Rule at 27,148, 27,150). This indicates that SEP enrollees are *not* disproportionately likely to game the system by signing up only when sick. If they were, the average cost to insure them would be higher than average, not the same or lower. There is thus no evidence showing fraud of this nature, much less that this provision is necessary to combat it. Defendants fail to refute these arguments, which demonstrates that this provision "is unmoored from the problem it seeks to address." *City of Columbus*, 796 F. Supp. 3d at 159.

Defendants address none of this record evidence, nor do they reckon with the implications that flow from it. Instead, they merely repeat the agency's justifications in the Rule, MSJ Opp. at 11 (this provision "restrict[s] people from gaming SEPs" and would "not create substantial barriers to Exchange enrollment,") and then conclude that "[t]hese explanations readily meet the agency's burden on arbitrary and capricious review." MSJ Opp. at 12. They do not. Defendants

never acknowledge California's, Washington's, and Maryland's data; never address Plaintiffs' evidence showing that SEP enrollees are *less* expensive than non-SEP enrollees (fatally undermining Defendants' adverse-selection fears); and never point to a single page of the Record that might lend credence to the agency's explanations. Instead, they fall back on "nearly decade-old data" on SEP enrollments, MSJ at 14 (citing Rule at 27,149-50) without explaining why that data trumps the Exchanges' more recent experiences. None of this passes muster under the APA, which requires the agency to "consider and *respond to* significant comments received during the period for public comment." *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 96 (2015) (emphasis added). The 75% verification requirement is thus arbitrary and capricious.

### 3.    Shortening the Open Enrollment Period Is Arbitrary and Capricious

The Open Enrollment Period (OEP) has varied across the States since the passage of the ACA. California's OEP has been 91 days long (from November 1 to January 31) for over ten years. MSJ at 15. Defendants have chosen to end this longstanding State flexibility and impose a shorter OEP nationwide, revoking States' authority to adjust the length of their OEPs to suit the needs of their unique marketplaces. The agency's defense of the shortened OEP rests on two assertions: (1) labeling Plaintiffs' objections as "policy disagreements," even though they rest upon robust data that commenters submitted to the agency during the rulemaking process, and (2) pointing to the Rule's delayed effective date as evidence of responsiveness to the States' concerns. Neither holds up. The APA does not permit an agency to dismiss well-documented, record-based objections from the States as mere policy disagreements, and a delayed implementation date only addresses the *timing* of the problematic change, not its substance.

Plaintiffs highlight specific, detailed comments from State Exchanges and others warning that condensing the OEP could reduce enrollment, particularly among younger and healthier individuals, and worsen risk pools. *See* MSJ at 15 (quoting AR at 033198 (State Marketplace Network), 029065-66 (Massachusetts Health Connector), 031356 (Navigators, certified application counselors, agents, and brokers)). Defendants do not acknowledge this evidence, nor do they point to any contrary facts in the Record. Instead, they simply assert—without any

evidence—that the delayed implementation date will give consumers adequate time to become aware of the shortened period. *See* MSJ Opp. at 12 (noting that "HHS found the delayed start of this provision of the Rule provides extensive time" to notify the public). But this is not an explanation for or defense of the policy on the merits.

Defendants also fail to adequately address the fact that nearly half a million people utilize the later portion of the OEP window that this provision cuts, meaning a massive population of individuals may be barred from accessing coverage under the shortened OEP. Defendants acknowledge that "470,000 individuals" opted to drop or switch federal exchange coverage between December 15, 2024, and January 15, 2025, and further acknowledge that those individuals may have chosen to switch plans after "find[ing] the policy to be inadequate or too expensive." MSJ Opp. at 12-13. But they dismiss that figure as "fewer than 3 percent of enrollees," MSJ Opp. at 13, and fail to recognize that this statistic captures only those who switched or dropped coverage—it says nothing about those who would have enrolled for the first time during the January window under the current OEP, but who will now be foreclosed from doing so under the shortened one. Even three percent, moreover, represents half a million Americans who may lose coverage under the new proposal. Defendants also fail to explain or defend the agency's decision to depart from its prior position that the longer OEP benefits younger and healthier enrollees, who often enroll later, thus benefiting risk pools. *See* MSJ at 16 (citing Patient Protection and Affordable Care Act; Market Stabilization, 82 Fed. Reg. 18,346, 18,377 (Apr. 18, 2017); *see also City of Columbus*, 796 F. Supp. 3d at 144 ("shortening of the open enrollment period" leads to higher premiums because of a sicker risk pool).

Finally, Defendants claim that HHS "delayed this policy's effective date to mitigate commenters' concerns," and they describe that delay as being "responsive to comments." MSJ Opp. at 12. But delaying the effective date does nothing to address Plaintiffs' substantive concerns about access issues. An agency's willingness to allow more lead time to implement a problematic change, without justifying the change itself, does not supply the "reasonable" explanation the APA substantively demands. *Prometheus Radio Proj.*, 592 U.S. at 423 (2021).

C.    **The Provisions Making Coverage More Expensive Are Contrary to Law and Arbitrary and Capricious**

1.    **The $5 Re-Enrollment Penalty Violates the Text of the ACA and Is Arbitrary and Capricious**

"Since the ACA's enactment, those who maintain eligibility for coverage from year to year have been automatically re-enrolled in the same plan unless they disenrolled or selected a different one." MSJ at 17. For those who receive sufficient premium tax credit (PTC) to reduce their out-of-pocket costs to $0, the Rule now instructs the federal exchange to reduce PTC such that these consumers must pay $5 instead, until they confirm their continued eligibility for no-cost coverage. Defendants claim that the ACA "tasks HHS" with "determining 'the amount'" of the PTC an enrollee is entitled to receive. MSJ Opp. at 14-15. They also characterize Plaintiffs' arbitrary-and-capricious argument as boiling down to a concern over enrollees being "surprise[d]." MSJ Opp. at 15-16. They are wrong on both points.

a.    **The $5 Penalty Violates the ACA**

Defendants ignore the structure of the ACA. As Plaintiffs explain, the ACA's "formula" that determines PTC "is definitive, leaving no room for the Secretary's discretion." MSJ at 17 (citing 26 U.S.C. § 36B(b)).[2] Once calculated pursuant to the formula, the ACA commands that the Secretary of the Treasury "shall make the advance payment" of PTC. "Defendants, in short, cannot tweak the calculation and have no role in distributing it." MSJ at 17.

Defendants grasp at straws attempting to find authority for their decision to unilaterally reduce an enrollee's PTC by $5 in contravention of the statute's plain text. They point out that HHS may "'determine' whether individuals enrolled in Exchange plans 'meet the income and coverage requirements.'" MSJ Opp. at 14-15 (quoting 42 U.S.C. § 18081(a)(2)). That is true. They then say that "the ACA grants the HHS Secretary the authority to 'establish a program' for making these eligibility determinations and to 'establish procedures' for 'redetermining eligibility on a periodic basis in appropriate circumstances.'" MSJ Opp. at 15 (cleaned up) (citing

---

[2] Section 36B of Title 26 mandates that "the premium assistance amount" is "the amount equal to" the result of a calculation that involves household income, a multiplier, and the cost of the "second lowest cost silver plan." 26 U.S.C. §§ 36B(b)(2)(A)-(B), (3).

10

42 U.S.C. §§ 18081(a)(1) and (f)(1)(B)). That, too, is true. But they never explain how creating a program for determining *eligibility for* PTC somehow permits a unilateral *reduction in* PTC. Defendants cannot explain how a rule that automatically reduces the PTC paid to enrollees by $5 per month is anything other than a modification to the PTC calculation laid out in the statute, regardless of the label applied to it. And "CMS lacks authority to tinker with the premium cost structure outlined in 26 U.S.C. § 36B." *City of Columbus*, 796 F. Supp. 3d at 150.

Ultimately abandoning the pretense that Defendants are adhering to the statutorily required formula, Defendants pivot to claiming that the $5 penalty is justified because it is "narrower, less invasive, and less expensive than a nationwide audit of every zero-premium automatic enrollment." MSJ Opp. at 15. Even if true, this does not change the fact that it is contrary to law. Defendants are not free to disregard a statutory mandate because of perceived inconvenience. It is well-established that "an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014).

#### b.    The $5 Penalty Imposes a Significant and Unnecessary Burden

Plaintiffs demonstrated the burden on consumers and the drop in enrollment this provision would cause. Their opening brief cites studies in the AR—evidence that Defendants never acknowledged, responded to, or addressed—showing that "'1 in 7 [enrollees] lost coverage as a result of new monthly premiums' that were under ten dollars." MSJ at 18 (quoting AR at 030427). Defendants do not respond to these arguments. They merely assert, without evidence, that CMS "reasonably concluded" that the $5 penalty is likely to "encourage consumers to actively confirm their plan eligibility." MSJ Opp. at 16. Simply labelling an evidence-free assertion "reasonable"—while failing to address studies in the Record that undermine the policy—is plainly not "reasoned decisionmaking." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020).

Plaintiffs also argue that the Rule's own justification for this provision—the "temporary expansion" of enhanced premium subsidies enacted during the COVID-19 emergency that supposedly drove high levels of improper zero-dollar-premium enrollments—backfires because

those subsidies "were set to expire at the end of 2025," thus negating the need for this provision. MSJ at 19. Those enhanced premium subsidies *did* expire, dramatically diminishing the Defendants' purported concern. This argument, too, goes wholly unaddressed. The $5 re-enrollment period is thus arbitrary and capricious.

### 2.    The Two Income-Verification Policies Are Arbitrary and Capricious

There are two provisions pertaining to income verification that significantly impact an enrollee's ability to claim PTC. First, the contradictory-data policy would generate a data-matching issue (DMI) whenever applicants estimated a higher income than that reflected in IRS data. MSJ at 19. Second, the missing-data policy would generate a DMI whenever an applicant's information is unable to be verified with IRS data. *Id*. at 19-20. Together, these policies will generate 2.6 million DMIs annually, each of which will block an enrollee from obtaining coverage until cleared. In both cases, the agency failed to provide sufficient evidence justifying the massive burden these policies would impose on enrollees who will be unable to obtain health insurance until the DMIs are cleared. *Id.* at 19-22.[3] The Court previously found Plaintiffs were suffering "irreparable economic harm" due to this provision. PI Order at 15.

With respect to the contradictory-data DMIs, Defendants have still failed to provide data justifying this policy, which will generate enrollment roadblocks for more than half a million people. MSJ at 19-20. Puzzlingly, Defendants continue to misleadingly point to a study from the Urban Institute that *does not say* what they claim, MSJ Opp. at 19 (citing Rule at 27,122), even after one of the authors of that study submitted a corrective comment during the rulemaking process. *See* MSJ at 21 (citing AR 031662-63, public comment from Dr. Jessica Banthin

---

[3] Defendants assert that this policy "will sunset at the end of program year 2026, and the current verification policy under 45 C.F.R. § 155.320(c)(5) will become effective again." MSJ Opp. at 20 n.5. But that is not the whole story. Defendants have proposed another rule that seeks to re-impose both DMI policies permanently. *See* Patient Protection and Affordable Care Act, HHS Notice of Benefit and Payment Parameters for 2027; and Basic Health Program, 91 Fed. Reg. 6292, 6301 (Feb. 11, 2026) (summary of proposed changes to Part 155). That proposal was published on February 11, 2026, and Defendants filed their brief on February 27, 2026, without acknowledging the agency's significant change in position on this issue. *See Fed. Commc'ns Comm. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (the "reasoned explanation" requirement "would ordinarily demand that [the agency] display awareness that it *is* changing position") (emphasis in original).

explaining how the agency misinterpreted her study, which "refrain[s] from estimating the exact number of people who enroll improperly" due to an "inconsistenc[ies]" in data sets and other concerns). Defendants never acknowledge this portion of the Record, ignore Dr. Banthin's comment, and do not explain why they continue to cite to Dr. Banthin's study to claim that "actual enrollment" exceeded "potential enrollments," MSJ Opp. at 19, despite her statement that doing so is improper due to important differences in the two data sets used to generate those numbers and because estimated income might exceed prior year income for a host of benign reasons, MSJ at 21. An agency that relies in part on a study to justify a rule and then fails to engage with the study's own author explaining why the agency has misread it has certainly not satisfied its obligation to "consider and respond to significant comments." *Perez*, 575 U.S. at 96.

Defendants' other justifications for this provision fare no better. As Plaintiffs explain in their opening brief, commenters pointed out that the Paragon Institute's reports that supposedly show elevated levels of improper enrollment suffer from "major methodological flaws." MSJ at 6 (citing AR at 031662-63, 031752, 032728, 032759, 033446). The Paragon reports "compared one enrollment metric that included children against another that did not," "failed to consider" the impact of forced Medicaid disenrollment after the COVID-19 pandemic ended, and "failed to acknowledge that household income could be reported differently in different data sources because of methodological differences, not unethical conduct." MSJ at 6-7 (citing AR at 031663-64). And Defendants' own data does not show any elevated fraud occurring after HHS implemented far less draconian corrective measures in 2024, further weakening their justification for this Rule. As Plaintiffs explain, those measures were effective, driving complaints of fraudulent enrollment down from 39,985 in February 2024 to just 7,134 in December of that year, while HHS resolved "99.6% of the complaints and [] suspended 850 agents and brokers in connection with alleged fraudulent activity." MSJ at 6 (citing AR at 035378-79).

Defendants do not engage with these arguments, and in fact, they now acknowledge, just as Dr. Banthin found, "a far higher number of enrollees" who reported income "just above" the threshold for accessing APTC "in non-Medicaid expansion States compared to those in States

13

that did expand Medicaid." MSJ Opp. at 19. This is exactly what Plaintiffs argue: that the problem of income inflation "is confined to states that did not expand" Medicaid, because in Medicaid expansion States, "a low-income consumer can enroll in Medicaid and so has no incentive to inflate income to qualify for APTC and enroll in a subsidized plan on the exchanges." MSJ at 21 (citing AR at 032762). Defendants never explain why burdening Exchange enrollees in 40 Medicaid expansion States—where the asserted fraud rationale does not apply—is a rational response to a problem that HHS's own evidence shows is geographically confined to just 10 States. This is not "congruent to the problem" the agency claims it seeks to solve. MSJ Opp. at 19.

Regarding the missing-data DMIs—of which there will be an estimated 2.1 *million* annually, 81,000 of which will result in lost PTC—Defendants argue that verifying income is important and that the absence of IRS data does not eliminate HHS's statutory obligation. MSJ Opp. at 19-20. But that argument does not address the question before the Court: whether the agency's chosen mechanism is "rational[ly] connect[ed]" to the problem the agency seeks to solve. *Motor Veh. Mfrs.' Ass'n of the U.S., Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 48-49 (1983). Defendants merely repeat the claim from rulemaking that people without IRS data available will "likely" have pay stubs available, MSJ Opp. at 20, but entirely fail to address that "commenters and *amici* pointed out that large numbers of low-income consumers, especially those working irregular shifts, multiple jobs, gig-economy jobs, or cash-paid jobs might *not* have pay stubs or might have extremely variable income," MSJ at 22. Plaintiffs also point out that the Rule itself acknowledged that "income verification can be more challenging for lower-income tax filers due to less consistent employment." MSJ at 21-22 (quoting Rule at 27,200). Defendants respond to none of these arguments and never attempt to reconcile the contradiction between the Rule's finding regarding burden on low-income enrollees and the conclusion that low-income enrollees should have means to verify income readily available. An agency cannot simultaneously acknowledge that a burden falls hardest on those least able to bear it and then

14

characterize that burden as minimal without explanation. *See Ohio*, 603 U.S. at 294 (agency cannot ignore "an important aspect of the problem.")

Furthermore, the Department itself has acknowledged in the Rule proposal that consumers may face a missing-data DMI due to missing IRS data caused *not* by a consumer's failure to file taxes but instead by "IRS processing delays resulting from IRS processing facility closures and a corresponding processing backlog of paper filings." Patient Protection and Affordable Care Act; Marketplace Integrity and Affordability, 90 Fed. Reg. 12,942, 12,958 (Mar. 19, 2025). Those problems have not abated. In fact, a recent report from the Inspector General of the U.S. Department of the Treasury found they are getting worse: outstanding inventory backlog, including unprocessed tax returns, has more than doubled from 871,000 in December 2019 to 2 million in December 2025, "due to efforts to reduce staff and the government shutdown."[4] This backlog "may affect the IRS's ability to timely process tax returns during the filing season, especially with reduced staff."[5] It is patently unreasonable to prevent consumers from accessing PTC, thus rendering coverage unaffordable, due to processing delays at another federal agency.

### 3. Shortening the Failure-to-Reconcile Grace Period Is Arbitrary and Capricious

Because PTC awards are based on projections of future income, enrollees who receive PTC must later reconcile their claimed income against their actual income when they file taxes. Enrollees who fail to reconcile (FTR) for two consecutive years lose eligibility for future awards. The Rule shortens this window from two years to one year.

To justify this change, Defendants argue that "the Rule aims to solve" the problem of "the improper receipt of APTCs by enrollees who do not comply with the ACA's reconciliation requirement." MSJ Opp. at 22. This misses the point. That problem—*improper receipt* of APTCs—is solved by the reconciliation requirement generally, and Plaintiffs do not object to the

---

[4] Diana M. Tengesdal, Memorandum for the Commissioner of Internal Revenue, U.S. Department of the Treasury, *The Internal Revenue Service's Readiness for the 2026 Filing Season (Audit No.: 2026400002)*, at 1-2 (Jan. 26, 2026) (available at https://www.tigta.gov/ sites/default/files/reports/2026-01-/2025400002-Readiness-Memo.pdf)
[5] *Id.* at 2.

reconciliation requirement. Rather, the disagreement is about the *time frame* for reconciliation. As Plaintiffs argue, "this change is not about fraud—whether after one year or two, everyone must square up eventually—it is about the length of time consumers are afforded to reconcile their APTC." MSJ at 23. Defendants never acknowledge this critical distinction. They do not provide a single reason for shortening the reconciliation policy. *See* MSJ Opp. at 21-22.

Plaintiffs maintain that Defendants have not justified the additional burden on consumers by shortening the reconciliation window from two years to one year, nor is there any evidence that the current two-year window is unworkable. *See Council of Parent Atty's & Advoc's, Inc. v. DeVos*, 365 F. Supp. 3d 28, 50 (D.D.C. 2019) (holding that an agency rule is arbitrary and capricious when "the government failed to explain why the [existing] safeguards as a whole would not prevent against the risk" the rule purported to address). Defendants claim that "notices sent during the open enrollment period for Exchange plan enrollment 'were relatively effective' in resolving failure to reconcile issues," MSJ Opp. at 21 (citing Rule at 27,114), but this cuts against this provision of the Rule. If the notices are effective at prompting compliance, that supports robust notice procedures, not shortening the window. Defendants do not respond to Plaintiffs' argument that the vast majority of enrollees who receive one-year FTR codes are able to clear that status before incurring a two-year FTR code, making it unclear what problem Defendants hope to solve by shortening the window. MSJ at 23 (citing AR at 031360).

### 4. Changing the Premium Adjustment Percentage Is Arbitrary and Capricious

Several financial metrics within the ACA are calculated by reference to a measurement of premium inflation known as the premium adjustment percentage (PAP). "The PAP, in turn, affects maximum out-of-pocket limits and premium costs for consumers." MSJ at 23. The Rule increases the PAP, thus increasing costs for consumers, by including the individual market, which is more price-volatile, in its measure of inflation. As Plaintiffs and commenters explain, individual-market premiums in 2013 were more volatile than employer-sponsored premiums and including the individual market in the agency's annual calculation of inflation will "artificially

inflate[] premium growth over time." MSJ at 24 (citing AR at 033743). This will "reduce APTC awards to consumers by 'between $1.27 billion and $1.55 billion annually from 2026 to 2030,' resulting in significantly higher net premiums for millions of families." MSJ at 24 (quoting Rule at 27,207). HHS previously agreed with this view and excluded individual-market premiums from its calculation of the PAP because of volatility in the individual market. *See* MSJ at 24 (HHS's PAP formula excluded individual-market premiums from 2015-19 and 2022-25).

Again, Defendants do not acknowledge this record evidence and merely regurgitate the agency's prior justifications in the Rule. MSJ Opp. at 22-24. They do not explain why the agency's prior methodology for calculating the premium adjustment percentage was incorrect. *Id.* HHS needs to justify its decision to select one method over another, especially when the agency previously took the opposite view, has not provided sufficient rationale for its change in position, and is raising net premiums for working families by well over one billion dollars annually. MSJ at 23-24*; see Fox Television*, 556 U.S. at 515 (the "reasoned explanation" requirement "would ordinarily demand that [the agency] display awareness that it *is* changing position" (emphasis in original)).

### D. The Provisions Making Coverage Less Valuable Are Contrary to Law and Arbitrary and Capricious

#### 1. Broadening the Actuarial Value Ranges Is Arbitrary and Capricious

ACA marketplace plans "are categorized into tiers based on how much of the expected cost will be covered by the plan, and how much will be borne by the enrollee, a measure known as actuarial value (AV)." MSJ at 25. Bronze-tier plans are designed to cover 60% of an enrollee's health care costs, while higher tiers cover more (and charge higher premiums). Plans need not hit the target AV precisely; some de minimis variation is allowed to account for "differences in actuarial estimates." 42 U.S.C. § 18022(d)(3)). Currently, plans may undershoot their targets by up to minus 2 percentage points. The Rule expands that acceptable downward variability to minus 4 percentage points across all plans, decreasing the value of the health plan that consumers

17

are purchasing. The Court previously found that Plaintiffs were suffering "irreparable economic harm" due to this provision. PI Order at 15.

In trying to defend the actuarial value policy, Defendants argue that the ACA affords HHS broad discretion to set AV targets, and that wider AV ranges will improve issuer flexibility, promote competition, and stabilize risk pools by attracting unsubsidized enrollees. MSJ Opp. at 24-29. Neither argument has merit, and the second one relies on a chain of inference that runs directly counter to the evidence in the AR.

Defendants first point to 42 U.S.C. § 18022(d)(3), which provides that the ACA instructs the Secretary to "develop guidelines to provide for a de minimis variation in the actuarial valuations used in determining the level of coverage of a plan to account for differences in actuarial estimates." MSJ Opp. at 25. But as Plaintiffs point out in their opening brief, "the Rule does not attempt to explain this change in terms of the law's allowance for 'differences in actuarial estimates,'" as the ACA requires, and the Secretary's modification of the AV ranges without referring to the touchstone of actuarial estimates is arbitrary and capricious. MSJ at 26 (citing 42 U.S.C. § 18022(d)(3)). Defendants respond that HHS has always "looked to factors beyond 'differences in actuarial estimates.'" MSJ Opp. at 26-27. But the fact that HHS has looked to factors "beyond" the one factor that the statute requires the agency to consider does not answer whether the agency considered the required factor. There is no evidence in the Rule or in the Record that Defendants looked to this factor. In other words, whether a four-point downward range represents a reasonable "de minimis variation" that "account[s] for differences in actuarial estimates" is a question about the existence of a "rational connection between the facts found and the choice made" that Defendants do not answer. *State Farm*, 463 U.S. at 48-49.

And on all other points, Defendants have again refused to engage with the Record that is supposed to serve as the basis for rulemaking. Although Defendants assert (without evidence) that broader AV ranges will increase issuer participation, Plaintiffs note that "at least one commenter pointed to *increased* issuer participation" after AV ranges were *narrowed*. MSJ at 26 (citing AR at 033745). Plaintiffs also point out that the vast majority of marketplace consumers

18

are subsidized, so when PTCs shrink and net premiums rise for subsidized enrollees, the risk pool weakens as healthier consumers drop coverage. MSJ at 25 (citing AR at 031785-86, 034403, 030495, 033744-45). Defendants do not engage with any of these claims.

Further, confronted with Plaintiffs' evidence that broader AV ranges will result in higher costs, lowered enrollment, and weaker risk pools, MSJ at 26, all Defendants do is label those effects "short-term." MSJ Opp. at 27. But "Defendants cannot merely label something a 'short-term' trade-off to avoid engaging with data and justifying the change during the rulemaking process." *City of Columbus*, 796 F. Supp. 3d at 156. There is "no data" to support Defendants' bald assertion that wider AV ranges will make coverage "more affordable over time when *even CMS itself* estimates that the policy widening the de minimis range will reduce aggregate PTCs by $1.2 billion in 2026," $1.2 billion in 2027, $1.3 billion in 2028, and $1.4 billion in 2029. *Id.* (emphasis in original); *see* Rule at 27,208 (presenting 2026-29 cost estimates). Reducing the PTC available to consumers makes coverage less—not more—affordable. And Defendants have submitted no evidence supporting their contrary belief that this policy will somehow increase enrollment among unsubsidized consumers.

### 2. The Secretary's Modification to Essential Health Benefits Failed to Comply with the ACA and Is Arbitrary and Capricious

The ACA defines a list of ten categories of care that all plans sold on the exchanges must cover, known as Essential Health Benefits (EHB). Several of the ACA's protections, such as out-of-pocket maxima, apply only to EHB, so inclusion or exclusion of a particular category of care as EHB can have a major effect on consumers' ability to access affordable care. The law requires the Secretary to ensure that the EHB categories are consistent with coverage offered in a "typical employer plan," and further requires the Secretary to look to the Department of Labor's survey of employer plans and to submit a report to Congress notifying the appropriate committees of any decision to modify EHB categories and affirming that the Secretary's decision was "inform[ed]" by the survey. 42 U.S.C. §§ 18022(b)(1), (b)(2)(A), (b)(4)(H).

19

Here, the Rule excludes "specified sex-trait modification procedures" from being classified as EHB. In doing so, the Secretary did not look to the Department of Labor survey, did not inform Congress, and did not select a reasonable definition of a "typical employer plan." For all these reasons, this change was contrary to law and arbitrary and capricious.

### a.    Defendants Have Waived the Contrary-to-Law Argument

Defendants have failed to acknowledge, let alone respond to, a straightforward and dispositive argument—one this Court has already endorsed—against the Secretary's unilateral decision to attempt to modify EHB: that the Secretary's modification of EHB is unlawful because he failed to submit the report to Congress certifying that the modified EHB is equal to the scope of benefits provided under a typical employer plan, as required by 42 U.S.C. § 18022(b)(2)(B), before the modification became effective.

This Court already ruled that the report to Congress was required. *See* PI Order at 27 (the "statutory scheme makes clear" that "the Secretary must follow [the reporting requirement of 42 U.S.C. § 18022(b)(2)(B)] when exercising his authority to define and revise EHBs under [subsections] (b)(1) and (b)(4)(H)"). Thus, the Secretary was required "to submit the required report at or before the time the provision [became] effective," that is, January 1, 2026. PI Order at 28. No such report was ever submitted, rendering the Secretary's modification to EHB contrary to law and *ultra vires* agency action. MSJ at 28.

Defendants have no answer for the Secretary's failure to comply with this statutory requirement, even after this Court invited HHS to comply retroactively. They do not address this Court's prior opinion finding that the report is not optional, nor do they attempt to defend the Secretary's failure to submit the report to Congress. Instead, they discuss only the ACA's parallel requirement that the Secretary's oversight of EHBs must be "inform[ed]" by a survey conducted by the Department of Labor and argue that the completion of such a survey is not a prerequisite to the HHS Secretary exercising his authority to modify EHB. MSJ Opp. at 30-31.

But the Department of Labor's survey and the HHS Secretary's report to Congress are two different things, governed by different subsections of the statute. *Compare* 42 U.S.C.

20

§ 18022(b)(2)(A) (requiring that the HHS Secretary's determination of typicality be "inform[ed]" by the Department of Labor's survey), *with id*. § 18022(b)(2)(B) (requiring that, when revising EHB, the HHS Secretary submit a report to Congress "containing a certification from the Chief Actuary of [CMS] that such essential health benefits meet the limitation described" in (b)(2)(A)). The purpose of the survey is to enable the HHS Secretary to make an "inform[ed]" decision regarding EHB, 42 U.S.C. § 18022(b)(2)(A), and presumably it should be updated periodically to ensure the EHB categories remain consistent with typical employer plan coverage. If no recent Department of Labor survey has been conducted, then the HHS Secretary, informed by the most recent survey available, must submit a report to Congress certifying that the scope of EHBs is "equal to the scope of benefits provided under a typical employer plan, as determined by the Secretary," with the survey "inform[ing] this determination." MSJ at 27-28; 42 U.S.C. § 18022(b)(2)(A). Defendants never mention the report to Congress, never acknowledge this Court's prior finding, and make no attempt to justify the Secretary's failure to submit the report as required. This is fatal.

Having failed to address this argument in their opposition, Defendants have waived it and cannot respond to it for the first time in their forthcoming reply brief. "Issues advanced for the first time in reply briefs are deemed waived." *Allstate Interiors & Exteriors, Inc. v. Stonestreet Constr., LLC*, 730 F.3d 67, 74 n.4 (1st Cir. 2013). On this basis alone, the Court should hold that the Secretary's modification of EHBs without the required report to the appropriate committees of Congress was contrary to law and *ultra vires* agency action.

In addition, Plaintiffs argue that the HHS Secretary did not "even glance[] at" any Department of Labor survey when making the EHB modification, as the only survey to have ever been conducted "is absent from the Administrative Record" and the Department of Labor has not performed another one. MSJ at 27. Therefore, no survey could have "informed" the Secretary's modification to EHBs, as required by the ACA. MSJ at 27. Defendants do not dispute this, nor do they attempt to explain how the EHB modification could be lawful when the Labor survey meant to "inform" the HHS Secretary's decisionmaking was never considered by the agency. It

is also unclear how a survey conducted before 2011 could usefully inform the Secretary's determination of typicality in 2025.

Finally, Plaintiffs argue that the Secretary's misapplication of the word "typical" in Section 18022(b)(2)(A)—as the next section explains—renders his decisionmaking contrary to law. Defendants again fail to respond to this argument. For all these reasons, the Rule's exclusion of "specified sex-trait modification procedures" from EHB is contrary to law.

### b.    The EHB Modification Is Arbitrary and Capricious

For three reasons, the agency chose an arbitrary definition of typicality when deciding what a "typical employer plan" means for purposes of defining the EHB categories: (1) Defendants refused to consider the factors Congress requires; (2) Defendants failed to explain their decision to disregard evidence regarding major employers' health plans; and (3) Defendants misinterpreted small-plan utilization data. MSJ at 28-30.

The first of these points is straightforward and beyond dispute: as explained above, the agency's modification of EHB was not "inform[ed]" by any Secretary of Labor employer survey, as the ACA requires. 42 U.S.C. § 18022(b)(2)(A). No such survey is present in the Administrative Record. The agency's definition of "typicality" was therefore unmoored from the "factors which Congress [intended] it to consider." *State Farm*, 463 U.S. at 43. This violation of the statute renders the resulting decision arbitrary as well as contrary to law.

Second, the agency did not adequately explain why it chose a narrow definition of "typical employer plan" that excludes the plans covering the majority of American workers or why, in its view, "typical" is defined by what small employers offer rather than by what most employees receive—which is the more natural reading of a provision designed to calibrate the scope of required coverage against the market norm. And Plaintiffs point out that Defendants "themselves admit that seventy-two percent of Fortune 500 companies' health plans, and 'over 1,300 major employers nationwide,' provide this coverage." MSJ at 30 (quoting Rule at 27,154 and citing AR at 036261). Defendants argue that the agency simply "interpreted" the data "differently," MSJ Opp. at 32 (citing *Prometheus*, 592 U.S. at 426), yet they then address only the data regarding

*state employee* plans and plans of employers with over 200 employees. Defendants never directly respond to Plaintiffs' arguments regarding small business plans, or to the argument that "typical employer plan" should mean the employer plan experienced by the typical worker rather than small business plans that cover only a minority of workers.

Third, Plaintiffs explain why the agency's reliance on small business health options (SHOP) plan data was flawed, in part because the supposedly low *utilization rates* for sex-trait modification procedures in these plans have nothing to do with the availability of *coverage* for such procedures. MSJ at 29. The agency offers no theory under which utilization rates are a proxy for typicality of coverage. Covered atypical treatments abound: "Heart and lung transplants, for instance, are rare, yet widely covered." MSJ at 29. "Put simply, utilization data has *never* been used as a basis for excluding certain medical services from EHB." MSJ at 29. In failing to respond to this argument, Defendants have "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43.

For these reasons, HHS's definition of "typical" is arbitrary and capricious.

## II.    THE APA AUTHORIZES VACATUR OF THE CHALLENGED PROVISIONS

Plaintiffs' MSJ asks this Court for "a declaratory judgment finding that the Rule's *challenged provisions*" are contrary to law, arbitrary and capricious, and/or *ultra vires* agency action, "as appropriate to each provision," and for "vacatur of all *challenged provisions* under Section 706 of the APA." MSJ at 30 (emphases added). To be clear, Plaintiffs have never argued that they are entitled to vacatur of the unchallenged provisions of the Rule. For any provision that this Court finds to be contrary to law or arbitrary and capricious, Plaintiffs are entitled to exactly the relief Congress prescribed: that it be "h[e]ld unlawful and set aside" in accordance with 5 U.S.C. § 706.

To the extent Defendants dispute that the APA affords this remedy, they are mistaken. Defendants claim that Section 706 "does not authorize the type of universal vacatur that Plaintiffs seek." MSJ Opp. at 34. If they intend "universal" vacatur to mean vacatur of provisions Plaintiffs have not challenged, Plaintiffs clarify that they do not seek that remedy, as explained

23

above. But if Defendants intend to argue that vacatur of *any* provision is beyond the scope of the APA, their argument fails. Plaintiffs are not aware of any published decision from any court holding that vacatur is not a valid remedy under the APA, and Defendants cite none.[6] And of course, binding First Circuit authority holds that vacatur is the remedy for agency action found to be unlawful under the APA, and courts in every district continue to follow that practice. *E.g., Marasco & Nesselbush, LLP v. Collins*, 6 F.4th 150, 179 (1st Cir. 2021) (holding that an "arbitrary . . . rule" affecting law firms representing clients in Social Security disputes "must be eliminated" as "a remedy under the APA"); *Illinois v. Fed. Emer. Mgmt. Agency*, 801 F. Supp. 3d 75, 97 (D.R.I. 2025) ("[V]acatur under the APA remains . . . a valid remedy."). The Supreme Court has not ended the practice of vacating unlawful agency action under the APA. *See NIH*, 145 S. Ct. at 2660 (denying application to stay orders vacating agency certain policies); *see also Am. Hosp. Ass'n v. Kennedy*, Civ. No. 25-00600, 2025 WL 3754192, at *9 (D. Me. Dec. 29, 2025) ("[C]ourts have long understood the APA to authorize vacatur and the Supreme Court has yet to dictate otherwise."). And Defendants also acknowledge the recent decision of a Court in this District in *Association of American Universities v. Department of Defense*, 806 F. Supp. 3d 79 (D. Mass. 2025). MSJ Opp. at 34. That decision, of course, held the same: "vacatur and declaratory relief remain appropriate and normal remedies under the Administrative Procedure

---

[6] Defendants point to Justice Gorsuch's musings on the APA suggesting that Section 706's instruction that a reviewing court "shall hold unlawful and set aside" unlawful agency action might not specify a remedy. But this position has never been endorsed by a majority of the Justices. At most, in *United States v. Texas*, three Justices expressed doubt about the practice of "set[ting] aside" agency action under the APA. *See* 599 U.S. 670, 693-702 (2023) (Gorsuch, J., concurring in the judgment). Since then, one of those Justices has clearly endorsed vacatur. *See Nat'l Insts. of Health v. Am. Pub. Health Ass'n ("NIH")*, 606 U.S. ___, 145 S. Ct. 2658, 2661 (mem.) (Aug. 21, 2025) ("In my view, however, the Government is not entitled to a stay of the judgments insofar as they vacate the guidance documents,") (Barrett, J., concurring).

Other Justices have squarely rejected Justice Gorsuch's suggestion. "The text and history of the APA authorize vacatur." *Corner Post, Inc. v. Bd. of Gov's. of the Fed. Rsrv. Sys.*, 603 U.S. 799, 829 (2024) (Kavanaugh, J., concurring); *see also id.* at 831 ("When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed,") (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989)). "When Congress enacted the APA in 1946, the phrase 'set aside' meant 'cancel, annul, or revoke.'" *Id.* at 829 (quoting Black's Law Dictionary (3d ed. 1933)). "Over the decades, this Court has affirmed countless decisions that vacated agency decisions, including agency rules." *Id.* at 830-31 (collecting cases).

24

Act." 806 F. Supp. 3d at 89 (citing *NIH*, 145 S. Ct. at 2661 (mem.) (Barrett, J., concurring in the partial grant of application for stay)). "The APA's remedies are 'not party-restricted and allow[] a court to set aside an unlawful agency action.'" *Id.* at 123 (internal quotation marks omitted).

Moreover, Defendants do not argue, and cite no cases holding, that it is possible to somehow vacate a provision of a rule as to some entities and not others. That is not the practice in this, or any, Circuit. *See Marasco*, 6 F.4th at 179 (vacating a rule and requiring the agency to "adjust its rules . . . to ensure that *the law firms* that employ salaried associates . . . may receive direct payment," not just the plaintiff law firm in the case) (emphasis added).

Defendants also argue that this Court cannot grant vacatur because "nearly identical parallel litigation under the APA is taking place in the District of Maryland"—the ongoing *City of Columbus* matter—"in which motions for summary judgment have already been briefed," and that the existence of this separate litigation somehow ties this Court's hands. MSJ Opp. at 35. It does not. Vacatur in *this* case would not "deprive another court of the opportunity to resolve this question on its own terms," as Defendants argue, nor would it "create substantial nationwide confusion in the event of competing district court orders." MSJ Opp. at 35. The District of Maryland will issue its decision, and this Court will issue its own decision. If either Court were to hold that any provision must be vacated under Section 706, the result would be vacatur of that provision, regardless of what the other Court were to decide. Neither court has been asked to *enforce* a particular provision, so there is no possibility of conflicting orders and Defendants' prediction of "substantial nationwide confusion" is unfounded.

## CONCLUSION

For these reasons, the Court should deny Defendants' cross-motion for summary judgment and grant the Plaintiff States' motion for summary judgment, finding that the Rule's challenged provisions are (a) contrary to law (Counts II and III), (b) arbitrary and capricious (Counts IV and V), and (c) *ultra vires* agency action (Count VI), as appropriate to each provision; and vacating all challenged provisions under Section 706 of the APA.

25

Dated:  March 20, 2026

Respectfully Submitted,

**ANDREA JOY CAMPBELL**
Attorney General
Commonwealth of Massachusetts

*/s/ Allyson Slater*
ALLYSON SLATER (BBO No. 704545)
Director, Reproductive Justice Unit
MORGAN CARMEN
JAK KUNDL
Assistant Attorneys General
Office of the Attorney General
One Ashburton Place, 20th Floor
Boston, MA
(617) 963-2811
Allyson.Slater@mass.gov
*Attorneys for Plaintiff Commonwealth of Massachusetts*

**ROB BONTA**
Attorney General
State of California

*/s/ Sean C. McGuire*
SEAN C. MCGUIRE*
Deputy Attorney General
NELI PALMA*
Senior Assistant Attorney General
NIMROD PITSKER ELIAS*
Supervising Deputy Attorney General
CRYSTAL ADAMS*
HILARY BURKE CHAN*
Deputy Attorneys General
600 West Broadway, Suite 1800
San Diego, CA 92101
(619) 738-9543
Sean.McGuire@doj.ca.gov
*Attorneys for Plaintiff State of California*

**JENNIFER DAVENPORT**
Attorney General
State of New Jersey

*/s/ Mayur P. Saxena*
JEREMY M. FEIGENBAUM
Solicitor General
MAYUR P. SAXENA*
Assistant Attorney General
JOSHUA P. BOHN*
BRYCE K. HURST
AMANDA I. MOREJON
ESTEFANIA PUGLIESE-SAVILLE
Deputy Attorneys General
Office of the Attorney General
25 Market Street
Trenton, NJ 08625
Telephone: (609) 969-5365
Email: Mayur.Saxena@law.njoag.gov
*Attorneys for Plaintiff State of New Jersey*

**KRISTIN K. MAYES**
Attorney General
State of Arizona

*/s/ Joshua Nomkin*
JOSHUA NOMKIN*
LAUREN WATFORD*
Office of the Attorney General
2005 North Central Avenue
Phoenix, Arizona 85004
(602) 542-3333
Joshua.Nomkin@azag.gov
Lauren.Watford@azag.gov
*Attorneys for Plaintiff State of Arizona*

*\* Denotes pro hac vice admission*

26

**PHILIP J. WEISER**
Attorney General
State of Colorado

*/s/ David Moskowitz*
DAVID MOSKOWITZ*
Deputy Solicitor General
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203
Phone: (720) 508-6000
David.Moskowitz@coag.gov
*Attorneys for Plaintiff State of Colorado*

**KATHLEEN JENNINGS**
Attorney General
State of Delaware

*/s/ Vanessa L. Kassab*
IAN R. LISTON*
Director of Impact Litigation
VANESSA L. KASSAB*
Deputy Attorneys General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
Vanessa.Kassab@delaware.gov
*Attorneys for Plaintiff State of Delaware*

**AARON M. FREY**
Attorney General
State of Maine

*/s/ Molly A. Moynihan*
MOLLY A. MOYNIHAN*
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
Tel.: 207-626-8800
Molly.Moynihan@maine.gov
*Attorneys for Plaintiff State of Maine*

**WILLIAM TONG**
Attorney General
State of Connecticut

*/s/ Janelle Medeiros*
JANELLE MEDEIROS*
Special Counsel for Civil Rights
165 Capitol Ave
Hartford, CT 06106
(860) 808-5450
Janelle.Medeiros@ct.gov
*Attorneys for Plaintiff State of Connecticut*

**KWAME RAOUL**
Attorney General
State of Illinois

*/s/ Alice L. Riechers*
SARAH J. NORTH*
Deputy Chief, Public Interest Division
ALICE L. RIECHERS*
Assistant Attorney General,
Special Litigation Bureau
Office of the Illinois Attorney General
115 S. LaSalle Street
Chicago, IL 60603
312-814-3000
Sarah.North@ilag.gov
Alice.Riechers@ilag.gov
*Attorneys for Plaintiff State of Illinois*

**ANTHONY G. BROWN**
Attorney General
State of Maryland

*/s Michael Drezner*
MICHAEL DREZNER*
Senior Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
410-576-6959
MDrezner@oag.state.md.us
*Attorneys for Plaintiff State of Maryland*

*\* Denotes pro hac vice admission*

27

**DANA NESSEL**
Attorney General
State of Michigan

*/s/ Carl Hammaker*
CARL HAMMAKER (P81203)*
AARON LEVIN (P81310)*
Assistant Attorneys General
Michigan Department of Attorney General
525 W. Ottawa St.
Lansing, MI 48933-1067
517.335.7573
HammakerC@michigan.gov
LevinA@michigan.gov
*Attorneys for Plaintiff State of Michigan*

**KEITH ELLISON**
Attorney General
State of Minnesota

*/s/ Lindsey E. Middlecamp*
LINDSEY E. MIDDLECAMP*
Special Counsel, Rule of Law
445 Minnesota Street, Suite 600
St. Paul, MN 55101
(651) 300-0711
Lindsey.Middlecamp@ag.state.mn.us
*Attorneys for Plaintiff State of Minnesota*

**RAÚL TORREZ**
Attorney General
State of New Mexico

*/s/ Aletheia V.P. Allen*
ALETHEIA V.P. ALLEN*
Solicitor General
LAWRENCE M. MARCUS*
Assistant Solicitor General
New Mexico Department of Justice
201 Third St. NW, Suite 300
Albuquerque, NM 87102
505-527-2776
AAllen@nmdoj.gov
*Attorneys for Plaintiff State of New Mexico*

**AARON D. FORD**
Attorney General
State of Nevada

*/s/ Heidi Parry Stern*
HEIDI PARRY STERN (Bar. No. 8873)*
Solicitor General
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
HStern@ag.nv.gov
*Attorneys for Plaintiff State of Nevada*

**LETITIA JAMES**
Attorney General
State of New York

*/s/ Stephen Thompson*
STEPHEN C. THOMPSON*
Special Counsel
ANDRES IVAN NAVEDO*
Assistant Attorney General
28 Liberty Street
New York, NY 10005
(212) 416-6183
stephen.thompson@ag.ny.gov
*Attorneys for Plaintiff State of New York*

**DAN RAYFIELD**
Attorney General
State of Oregon

*/s/ Scott P. Kennedy*
SCOTT P. KENNEDY*
Senior Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel (971) 453-9050
Fax (971) 673-5000
Scott.Kennedy@doj.oregon.gov
*Attorneys for Plaintiff State of Oregon*

*\* Denotes pro hac vice admission*

28

**JOSH SHAPIRO**
in his official capacity as Governor of the
Commonwealth of Pennsylvania

Jennifer Selber
 General Counsel

*/s/ Aimee D. Thomson*
AIMEE D. THOMSON*
Deputy General Counsel
Pennsylvania Office of the Governor
30 N. 3rd St., Suite 200
Harrisburg, PA 17101
(223) 234-4986
*AimeeThomson@pa.gov*
*Counsel for Governor Josh Shapiro*

**CHARITY R. CLARK**
Attorney General
State of Vermont

*/s/ Jonathan T. Rose*
JONATHAN T. ROSE*
Solicitor General
109 State Street
Montpelier, VT 05609
(802) 828-3171
Jonathan.Rose@vermont.gov
*Attorneys for Plaintiff State of Vermont*

**JOSHUA L. KAUL**
Attorney General
State of Wisconsin

*/s/ Jody J. Schmelzer*
JODY J. SCHMELZER*
Assistant Attorney General
Wisconsin Department of Justice
17 West Main Street
Post Office Box 7857
Madison, WI 53707-7857
(608) 266-3094
Jody.Schmelzer@wisdoj.gov
*Attorneys for Plaintiff State of Wisconsin*

**PETER F. NERONHA**
Attorney General
State of Rhode Island

*/s/ Julia Harvey*
JULIA HARVEY (RI Bar No. 10529)*
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2103
JHarvey@riag.ri.gov
*Attorneys for Plaintiff State of Rhode Island*

**NICHOLAS W. BROWN**
Attorney General
State of Washington

*/s/ William McGinty*
WILLIAM MCGINTY, WSBA 41868*
Deputy Solicitor General
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
William.McGinty@atg.wa.gov
360-709-6027
*Attorneys for Plaintiff State of Washington*

*\* Denotes pro hac vice admission*

29

**CERTIFICATE OF SERVICE**

I certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

/s/ Sean C. McGuire
Sean C. McGuire
Deputy Attorney General
California Department of Justice

*Counsel for Plaintiff State of California*