# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| STATE OF CALIFORNIA, *et al.*,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the United States Department of Health and Human Services, *et al.*,<br><br>　　　　Defendants. | Civil Action No. 1:25-cv-12019-NMG<br>Leave to file in excess of page limit granted on Jan. 9, 2026 |

## DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF THEIR CROSS MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................... 1

ARGUMENT .......................................................................................................................... 2

    I.     The past-due premium policy is neither unlawful nor arbitrary and capricious. .... 2

          A.    The past-due premium policy is lawful. ........................................................ 3

          B.    The past-due premium policy is not arbitrary and capricious......................... 4

    II.    The verification of eligibility for special enrollment periods policy is not arbitrary and capricious. ............................................................................................................. 5

    III.   The shortened open enrollment period policy is not arbitrary and capricious........ 7

    IV.   The $5 annual eligibility redetermination program is neither unlawful nor arbitrary and capricious....................................................................................................... 8

          A.    The $5 annual eligibility redetermination program is lawful. ........................ 9

          B.    The $5 annual eligibility redetermination program is not arbitrary and capricious. ...................................................................................................... 9

    V.    The data matching policy is not arbitrary and capricious. .................................... 10

          A.    Provision Requiring Income Verification When Data Sources Indicate Income Less Than 100 Percent of the Federal Poverty Level. ......................11

          B.    Change Requiring Income Verification When Tax Data Is Unavailable. ..... 13

    VI.   The one-year failure to file and reconcile policy is not arbitrary and capricious. 14

    VII.  The premium adjustment percentage policy is not arbitrary and capricious. ....... 15

    VIII. The actuarial value range policy is not arbitrary and capricious. ......................... 17

    IX.   The elimination of "sex trait modification procedures" as an Essential Health Benefit is neither unlawful nor arbitrary and capricious. .................................... 20

    X.    Any relief granted should be narrowly tailored………………………….…………23

CONCLUSION...................................................................................................................... 24

**TABLE OF AUTHORITIES**

<u>**Cases**</u>

*Ala. Power Co. v. Costle,*
636 F.2d 323 (D.C. Cir. 1979)........................................................................................ 18

*Almendarez-Torres v. United States,*
523 U.S. 224 (1998) ......................................................................................................... 3

*City of Columbus v. Cochran,*
523 F. Supp. 3d 731 (D. Md. 2021).................................................................................11

*Dep't of Homeland Sec. v. Regents,*
591 U.S. 1 (2020) ........................................................................................................... 23

*Encino Motorcars v. Navarro,*
579 U.S. (2016) .............................................................................................................. 23

*Fulton v. Philadelphia,*
593 U.S. 522 (2021) ......................................................................................................... 3

*Gen. Motors Corp. v. Darling's,*
444 F.3d 98 (1st Cir. 2006).............................................................................................. 22

*Loper Bright Enters. v. Raimondo,*
603 U.S. 369 (2024) ....................................................................................................... 18

*Ohio Valley Env't Coal. v. Aracoma Coal Co.,*
556 F.3d 177 (2009) ....................................................................................................... 12

*Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.,*
494 F.3d 188 (D.C. Cir. 2007)........................................................................................ 19

*Trainmen v. Balt. & Ohio R. Co.,*
331 U.S. 519 (1947) ......................................................................................................... 3

**Statutes**

26 U.S.C. § 36B(a) .............................................................................................8, 11, 14

26 U.S.C. § 36B(c)(1) ................................................................................................11

26 U.S.C. § 36B(c)(1)(A) ..................................................................................... 8, 14

42 U.S.C. § 300gg-1 ................................................................................................... 3

42 U.S.C. § 300gg-1(a) .............................................................................................. 3

42 U.S.C. § 300gg-2 ................................................................................................... 3

42 U.S.C. § 300gg-2(a) .............................................................................................. 8

42 U.S.C. § 300gg-2(b)(1) ......................................................................................... 8

42 U.S.C. § 18022(a) ............................................................................................... 17

42 U.S.C. § 18022(b)(1) ........................................................................................... 20

42 U.S.C. § 18022(b)(2)(A) ................................................................... 20, 21, 22, 23

42 U.S.C. § 18022(c)(4) ................................................................................ 15, 16, 17

42 U.S.C. § 18022(d)(2) ........................................................................................... 17

42 U.S.C. § 18022(d)(3) ........................................................................................... 17

42 U.S.C. § 18081(a) ................................................................................................. 8

42 U.S.C. § 18081(a)(1) ............................................................................................. 9

42 U.S.C. § 18081(a)(2)(A) .................................................................................... 9, 14

42 U.S.C. § 18081(e)(4)(A) ...................................................................................... 14

42 U.S.C. § 18081(f)(1)(B) ........................................................................................ 9

42 U.S.C. § 18082(a) ................................................................................................. 8

42 U.S.C. § 18082(a)(1) ............................................................................................. 9

42 U.S.C. § 18082(a)(3) ............................................................................................. 9

49 U.S.C. § 32902(a) ............................................................................................... 18

iii

### Regulations

45 C.F.R. § 147.106(d)(4) ................................................................................ 2

45 C.F.R. § 155.305(a) ................................................................................... 8

45 C.F.R. § 155.305(f) .................................................................................... 8

45 C.F.R. § 155.305(f)(5) ................................................................................ 9

45 C.F.R. § 155.315(f)(1)-(4) ..........................................................................11

45 C.F.R. § 155.320(c)(1)(ii) .......................................................................... 13

45 C.F.R. § 155.320(c)(3)(v) ...........................................................................11

45 C.F.R. § 155.320(c)(3)(vi) ......................................................................... 13

45 C.F.R. § 155.320(c)(5) ............................................................................... 13

45 C.F.R. § 155.335(a)(1) ................................................................................ 8

45 C.F.R. § 155.400(e) .................................................................................... 3

45 C.F.R. § 155.420(a)(3) ................................................................................ 6

45 C.F.R. § 156.111(b)(1) .............................................................................. 20

45 C.F.R. § 156.115(a)(1) .............................................................................. 20

45 C.F.R. § 156.130(a) .................................................................................. 15

78 Fed. Reg. 12,834 (Feb. 25, 2013) .............................................................. 19

82 Fed. Reg. 18,346 (Apr. 18, 2017) .............................................................. 19

87 Fed. Reg. 27,208 (May 6, 2022) ................................................................ 19

Marketplace Integrity and Affordability Rule, 90 Fed. Reg. 27,074 (June 25, 2025) ........... *passim*

Notice of Proposed Rule Making, 90 Fed. Reg. 12,942 (Mar. 19, 2025) ......................... 2, 5, 9, 18

### Other Authorities

*Inform*, Merriam Webster's Dictionary, https://www.merriam-webster.com/dictionary/inform .. 21

**INTRODUCTION**

In the Affordable Care Act, Congress vested the Secretary of Health and Human Services with broad discretion to issue regulations implementing its many requirements.  Over the decade and a half since the Act's passage, Secretaries across administrations have done just that, issuing, adjusting, rescinding, and reinstating regulations to advance various policy goals. The principal issue in this case is whether the policy changes reflected in the latest of these efforts, the Marketplace Integrity and Affordability Rule, are reasonable and reasonably explained. Plaintiffs fundamentally contend that the Rule will decrease enrollment and assert that Defendants did not give sufficient weight to their views. But on issue after issue, the record shows that this is simply a policy dispute: Defendants indeed considered Plaintiffs' views, but disagreed with them, for reasons thoroughly explained in the preamble to the Rule itself.

In particular, the Rule seeks to address the high levels of improper enrollment in federally subsidized plans by better enforcing compliance with the eligibility requirements for such plans and providing additional safeguards to protect consumers from unwanted changes to their coverage. As HHS explained, this growth in improper enrollments is a consequence of temporary legislative changes related to the COVID-19 pandemic that expanded access to ACA premium subsidies and made those subsidies more generous, which in turn increased the availability of fully subsidized health care coverage and fueled enrollment, some of it improper, in Exchange plans. Those enhanced subsidies expired at the start of this year. The Rule accordingly implements a number of policies meant to reduce improper enrollments over the short term as Exchanges readjust to a new subsidy environment. And the Rule also makes permanent reforms to improve the stability of Exchanges, provide premium relief to enrollees who do not qualify for ACA premium subsidies, and protect the public fisc. Although Plaintiffs fault Defendants for not

'grappl[ing] with the import' of a preliminary decision in *City of Columbus v. Kennedy*, 796 F. Supp. 3d 123 (D. Md. 2025), Pls.' Opp. at 3, Defendants have appealed that erroneous decision, and it is of course nonbinding here in any event.

The agency's explanations for these reforms amply satisfy the Administrative Procedure Act's deferential standard of review at each turn, and the Court should decline Plaintiffs' invitation to substitute their policy judgment for that of the agency.

## ARGUMENT

### I.  The past-due premium policy is neither unlawful nor arbitrary and capricious.

Under the Rule, issuers will be allowed—subject to applicable state law—(1) to attribute payments made to effectuate new coverage to past-due premium amounts owed to the issuer or an issuer in the same controlled group, and (2) to then refuse to effectuate the new coverage if both the past-due and initial premium amounts are not paid in full. Marketplace Integrity and Affordability Rule, 90 Fed. Reg. 27,074, 27,084 (June 25, 2025). Put another way, the Rule will allow issuers to require a customer to pay (1) any past-due premiums the customer owes the issuer (or related issuers) for prior coverage *and* (2) the initial premium amount (also known as a "binder payment") required for new coverage after enrollment is accepted. *Id.* at 27,084, 27,088.[1] And if the customer fails to pay that combined amount in full, the issuer can discontinue the new coverage. *Id.* at 27,084. The Rule's past-due premium policy is similar to one that CMS implemented in 2017, *see* Notice of Proposed Rule Making ("NPRM"), 90 Fed. Reg. 12,942, 12,951[2], which was

---

[1] The Rule provides that an issuer "may require a consumer to pay past-due premiums owed to that issuer, or owed to another issuer in the same controlled group." 90 Fed. Reg. at 27,089; *see* 45 C.F.R. § 147.106(d)(4) (defining "controlled group"). The Rule also provides that "[t]he amount of the past-due premium an issuer may require" before effectuating new coverage "is subject to any premium payment threshold the issuer has adopted pursuant to [45 C.F.R.] § 155.400(g)." 90 Fed. Reg. at 27,191.

[2] HHS explains in the Rule that unlike the 2017 policy, the Rule's past-due premium policy will not (1) "limit the policy to past-due premium amounts accruing over the prior 12 months" only or (2) "require the issuer to provide any notice of" any past-due premium policy the issuer adopts consistent with the Rule. 90 Fed. Reg. at 27,084.

later replaced in 2022 with the current regulation regarding past-due premiums and new coverage. Plaintiffs argue that this Rule provision is both contrary to the ACA and arbitrary and capricious, *see* Pls.' Mem. of Law in Supp. of their Mot. for Summ. J. at 12-14, ECF No. 122 ("Pls. Mot. for Summ. J."), but it is neither.

### A. The past-due premium policy is lawful.

The ACA is clear. Under 42 U.S.C. § 300gg-1(a), an issuer's provision of coverage is contingent on the enrollee's payment of premiums. An issuer may "nonrenew or discontinue health insurance coverage" if an enrollee "has failed to pay premiums." *See id.* § 300gg-2(b)(1). Plaintiffs argue that Section 300gg-2(b)(1), titled "[g]uaranteed renewability of coverage," permits an insurer to discontinue coverage while 300gg-1(a), titled "[g]uaranteed availability of coverage" does not. Pls.' Opp'n. to Defs.' Cross-Mot. for Summ. J. at 4-5, ECF No. 124 ("Pls.' Opp.") But this distinction is too closely tied to section headings, which are not a preferred tool of statutory interpretation. "'The title of a statute and the heading of a section' are 'tools available for the resolution of a doubt' about the meaning of a statute." *Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) (quoting *Trainmen v. Balt. & Ohio R. Co.*, 331 U.S. 519, 528–529 (1947)). However, a title will not "override the plain words" of a statute. *Fulton v. Philadelphia*, 593 U.S. 522, 536-37 (2021) (citation omitted).

Here, Section 300gg-1 guarantees insurers will accept an individual's enrollment, and once accepted, Section 300gg-2 governs when that insurer may nonrenew or discontinue coverage, including for failure to pay a binder payment. Importantly, an insurer's acceptance of enrollment occurs prior to an enrollee's premium payment. Thus, failure to pay that first premium would permit an insurer to "discontinue" coverage. *See* 45 C.F.R. § 155.400(e) (providing that federally facilitated Exchanges and State-based Exchanges on the federal platform "will . . . require payment

3

of a binder payment" equivalent to "the first month's premium" to "effectuate an enrollment" in an Exchange plan). This is generally true when coverage is attempted to be purchased off Exchange as well. The Rule simply allows an issuer who is owed past-due premiums from a particular customer to include the amount of those past-due premiums in the initial premium amount due for the continuation of newly accepted coverage. The Rule's past-due premium policy is thus entirely consistent with the text of the ACA.

### B. The past-due premium policy is not arbitrary and capricious.

Plaintiffs also contend that the past-due premium policy is arbitrary and capricious, but Plaintiffs are again fixated on the Rule's purportedly negative effects. This is not the operative standard under the APA, and Plaintiffs' judgment should not be substituted for Defendants'. Indeed, CMS expressly acknowledged the very concerns about potential coverage losses that Plaintiffs raise. *See* Defs.' Cross-Mot. for Summ. J. at 9, ECF No. 123 ("Defs.' Cross-Mot.") (citing 90 Fed. Reg. at 27,087). As for Plaintiffs' argument that the Rule creates a "burden on consumers," Pls.' Opp. at 5, CMS acknowledged those concerns too. Defs. Cross-Mot. at 9 (citing 90 Fed. Reg. at 27,085).

Defendants promulgated this Rule to resolve ongoing, well-placed concerns on the integrity of the predecessor regulations. As explained in the Rule's preamble, CMS anticipates that the Rule's past-due premium policy will "help to promote continuous coverage, reduce gaming and adverse selection, ensure that ACA subsidies are targeted to those who are eligible, and allow issuers to more accurately predict costs and prices." 90 Fed. Reg. at 27,084. Indeed, CMS predicts that enrollees, including healthier ones who improve the risk pool, will likely "be more inclined to remain in their coverage" if they know that they would have to pay any past-due premiums before effectuating new coverage, which would in turn encourage continuous coverage more broadly. *Id.*

4

at 27,086. This expectation is consistent with data indicating that, when the 2017 past-due premium policy was in effect, the percentage of Exchange enrollees who had their coverage terminated for non-payment of premiums "dropped substantially," from 17.3 percent in 2017 to 7.8 percent in 2020. *Id.* at 27,087; *see* NPRM, 90 Fed. Reg. at 12,951-52. The Rule also eliminates the perverse incentives created by the predecessor regulation, given that an enrollee's obligation to pay past-due premium debt "[will] not change" based on whether the enrollee renews a current plan or enrolls in new coverage. NPRM, 90 Fed. Reg. at 12,953. Accordingly, the Rule tailored is well tailored to address the predecessor regulations' shortcomings, and its thorough explanation of its reasoning readily satisfies the deferential standard of review under the APA.

## II.    The verification of eligibility for special enrollment periods policy is not arbitrary and capricious.

Under the Rule, federally facilitated Exchanges (FFEs) will be required to conduct pre-enrollment eligibility verification for all categories of special enrollment periods (*e.g.*, permanent move, marriage, etc.), which is in line with the eligibility verification policy that was in place between 2017 and 2022. *See* 90 Fed. Reg. at 27,148-49. The Rule further requires State Exchanges to conduct pre-enrollment eligibility verification "for at least 75 percent of new enrollments through SEPs [or Special Enrollment Periods]." *Id.* at 27,150-51 ("the cost to verify eligibility for SEP triggering events with very low volumes could be greater than the benefit of verifying eligibility for them."). And for reasons related to the recent expiration of enhanced advance premium tax credits (APTCs), the requirements will automatically sunset after program year 2026. *Id.*

Plaintiffs argue that the Rule's changes to the eligibility verification procedures for SEP enrollment are arbitrary and capricious because, in their view, "HHS provides no new data. . . ," Pls.' Opp. at 7, but CMS does not need to provide *new* data. CMS reasonably relied on existing

5

data. CMS pointed to data suggesting that pre-enrollment verification requirements that previously applied to SEPs did not create substantial barriers to Exchange enrollment, and that such requirements had the effect of "encourag[ing] continuous enrollment by making it more difficult to engage in strategic enrollment and disenrollment" based on customers' changing health status. 90 Fed. Reg. at 27,149. CMS also underscored its general "responsibility to comply with the ACA[,]" *id.* at 27,152, which includes faithfully adhering to statutory and regulatory eligibility requirements, *see, e.g.*, 45 C.F.R. § 155.420(a)(3) (providing that an Exchange "must allow a qualified individual" to enroll via a SEP only if a specified "triggering event[] . . . occur[s]"). It ultimately concluded that the "positive impact" of the more robust SEP eligibility verification requirements in the Rule "far exceeds" any potential negative impacts. 90 Fed. Reg. at 27,148; *see id.* at 27,151 ("[W]e believe that the additional burden is not significant enough to outweigh the merits of SEP verification and the increases in program integrity that it provides . . . .").

CMS clearly identified what it deemed a critical shortcoming of the current SEP eligibility verification regulations—namely that, because of their limited scope, the regulations "do not provide enough protection against misuse and abuse" of SEPs, which enables otherwise ineligible individuals to enroll in Exchange plans "only after they become sick or . . . need expensive health care services," which in turn "negatively impacts both the risk pool and program integrity around determining eligibility for" APTCs and other subsidies. *Id.* at 27,148. This is the problem Defendants sought to solve, and this Rule is tailored to accomplish that goal. Plaintiffs disregard this problem and, likewise, disregard Defendants' efforts to address it. Nonetheless, the Rule is sufficiently reasoned under the APA.

### III. The shortened open enrollment period policy is not arbitrary and capricious.

Beginning in 2027, the Rule will create a standardized open enrollment period beginning no later than November 1 and ending no later than December 31, with a maximum duration of 9 weeks. This Rule thus rescinds the extended open enrollment period which was in effect over the last four years because the expected benefits of that extension "did not materialize." 90 Fed. Reg. at 27,137. HHS was also responsive to comments it received; it delayed this policy's effective date to mitigate commenters' concerns over the change. Plaintiffs' dissatisfaction with Defendants' justifications for the Rule again amounts to a policy disagreement. Defendants have sufficiently justified their reasoning for the Rule's implementation, as explained in the Rule itself.

HHS considered Plaintiffs' concerns carefully and concluded that the Rule's benefits outweighed any new minimal burdens the Rule concurrently imposed. *Id.* at 27,139. In particular, HHS found the delayed start of this provision of the Rule provides extensive time to "message the clearer [open enrollment period] end date to consumers, especially the younger and healthier consumers[.]" *Id.* Plaintiffs dismiss Defendants' responsiveness because it does not suit their narrative, but the Rule addressed any significant comments that Defendants received. Indeed, HHS found that a standardized open enrollment period would actually reduce confusion "by aligning more closely with the open enrollment dates for other coverage for many employer-based health plans." *Id.* at 27,136.

Plaintiffs continue to argue that the new enrollment period will eliminate enrollees' ability to switch plans before the end of the open enrollment period if they find the policy to be inadequate or too expensive. Pls.' Opp. at 9. HHS considered this concern but found few individuals took advantage of this option. 90 Fed. Reg. at 27,137 ("[O]nly a small number of consumers took advantage of the additional time to switch to a lower-cost plan after receiving a bill from their

issuer in January with higher plan costs. During the open enrollment period (OEP) for plan year 2025, fewer than 3 percent of enrollees (470,000 individuals) ended their FFE or state-based exchange on the federal platform coverage between December 15, 2024, and January 15, 2025, including those enrollees who switched to other plans as well as those who did not."). As 97 percent of enrollees do not use the OEP in this manner, Defendants reasonably concluded that the Rule's uniformity outweighed any disadvantages. Particularly given the limited change that this Rule imposes, effectively reverting to the prior policy in view of the limited benefits that an extended open enrollment period yielded, as well as an anticipated improvement in the risk pool due to reduced confusion, HHS's decision to create a standardized open enrollment period is well reasoned and not arbitrary and capricious.

IV. **The $5 annual eligibility redetermination program is neither unlawful nor arbitrary and capricious.**

The eligibility requirements for enrolling in an Exchange plan and for receiving premium tax credits (PTCs) and APTCs are set forth in the ACA and its implementing regulations. *See* 42 U.S.C. §§ 18081(a), 18082(a); 26 U.S.C. § 36B(a), (c)(1)(A); 45 C.F.R. § 155.305(a), (f). HHS is generally responsible for determining whether a customer satisfies those requirements. If a customer does, then he can enroll in an Exchange plan for the upcoming plan year and receive APTCs. As a general matter, the ACA requires plan issuers to renew an enrollee's coverage the next year, subject to certain statutory exceptions. 42 U.S.C. § 300gg-2(a). Even when an enrollee's plan is subject to that guaranteed-renewability provision, however, an Exchange must still "redetermine" the enrollee's eligibility for subsidized Exchange coverage "on an annual basis" in accordance with HHS regulations. 45 C.F.R. § 155.335(a)(1).

The Rule provides, for plan year 2026 only, that (1) if an enrollee does not submit an application for an updated eligibility determination for plan year 2026 on or before the deadline to

8

select Exchange coverage on the federal platform and (2) that enrollee's post-APTC premium will be zero dollars (*i.e.*, the enrollee's coverage will be fully subsidized), then (3) the Exchange "must decrease the amount of" the APTC "applied to the [enrollee's] policy such that the remaining monthly premium owed for the policy equals $5." NPRM, 90 Fed. Reg. at 13,031.

### A.    The $5 annual eligibility redetermination program is lawful.

Plaintiffs argue the $5 annual eligibility redetermination is contrary to the ACA's text, but the ACA provides a clear grant of authority for HHS to "determine[e]" whether individuals enrolled in Exchange plans "meet[] the income and coverage requirements" for claiming PTCs, as well as with determining "the amount" of those tax credits. 42 U.S.C. § 18081(a)(2)(A). It is likewise HHS's responsibility to determine an Exchange enrollee's eligibility for APTCs (which mirrors the applicable requirements for PTC eligibility) and to calculate the amount of those APTCs. *See id.* § 18082(a)(1), (3); 45 C.F.R. § 155.305(f)(5). And the ACA grants the HHS Secretary the authority to "establish a program" for making these eligibility determinations, 42 U.S.C. § 18081(a)(1), and to "establish procedures" for "redetermin[ing] eligibility on a periodic basis in appropriate circumstances," *id.* § 18081(f)(1)(B). The Rule's eligibility redetermination provision comports with that grant of authority. The $5 premium is a program with procedures designed to redetermine eligibility through a fully waivable $5 premium, which is narrower and less invasive than the rescission of auto-enrollment entirely.

### B.    The $5 annual eligibility redetermination program is not arbitrary and capricious.

Plaintiffs claim that CMS acted arbitrarily because a fully waivable $5 premium "[i]mposes a [s]ignificant and [u]nnecessary [b]urden." Pls.' Opp. at 11. Plaintiffs again overlook CMS's thorough explanation of the problem it is trying to address. This temporary change to the annual eligibility redetermination process is the product of CMS's increasing concern about "the level of

improper enrollments" in zero-premium plans on federal Exchanges. 90 Fed. Reg. at 27,102, 27,105-06 (explaining that the gap between actual and reported enrollment in subsidized Exchange plans doubled between 2021 and 2024). CMS attributes that problem in part to agents and brokers improperly enrolling consumers in fully subsidized Exchange plans "without their knowledge" to earn commission payments. *Id.* at 27,103; *see id.* ("Because these enrollees do not receive a monthly premium bill requiring action on their part, they may not be aware they are enrolled."). CMS also notes that the recent expansion of premium subsidies via the ARPA and IRA "significantly increased the number of enrollees" who are enrolled in fully subsidized Exchange plans. *See id.* (explaining that 2.68 million enrollees were automatically re-enrolled in fully subsidized plans on federal Exchanges in plan year 2025, compared to 270,000 such enrollees in plan year 2019). Though those subsidies may have expired, the underlying problem persists to a lesser but still significant degree. The Rule thus addresses this enrollment issue by "prompt[ing]" individuals enrolled in fully subsidized Exchange plans to "update or confirm" their eligibility for such plans "or else pay a $5 monthly premium" until they do so. *Id.* at 27,103; *see id.* at 27,102.

CMS also acknowledged the potential effect a $5 premium could have on enrollment and the risk pool in Exchanges, as well as on individuals who are accustomed to fully subsidized coverage, *see id.* at 27,108, 27,194-95, and reasonably concluded that the $5 figure would likely encourage consumers to actively confirm their plan eligibility (because they want to avoid paying even this "nominal" cost) without risking "undue financial hardship," *id.* at 27,107. The fully waivable $5 premium is not a "[s]ignificant and [u]nnecessary [b]urden," Pls.' Opp. at 11, and this policy is not arbitrary and capricious.

## V.    The data matching policy is not arbitrary and capricious.

Plaintiffs challenge two Rule provisions that concern the processes by which HHS verifies "income eligibility" for APTC and cost-sharing-reduction subsidies. *See* 90 Fed. Reg. at 27,112.

10

These provisions address the "critical balance HHS must achieve between assuring responsible stewardship of taxpayer dollars with protecting access to Federal program[s] for those who qualify for them." *Id.* at 27,113. Neither is arbitrary-and-capricious.

### A. Provision Requiring Income Verification When Data Sources Indicate Income Less Than 100 Percent of the Federal Poverty Level.

Under current regulations, if an applicant's attestation regarding their projected annual household income reflects a higher household income than reflected in income data provided by the IRS or certain other sources, an Exchange generally "must accept the applicant's attestation without further verification," 45 C.F.R. § 155.320(c)(3)(v), because it would result in a lower APTC amount. The Rule amends this provision by requiring an Exchange to instead further verify an applicant's household income if (1) an applicant attests to income that is between 100 and 400 percent of the FPL, (2) income data from the IRS indicates household income below 100 percent of the FPL, and (3) the former income amount exceeds the latter amount by a "reasonable threshold[.]" 90 Fed. Reg. at 27,123. The applicant may then resolve the inconsistency by providing additional documentation and taking other steps to verify their household income. *See* 45 C.F.R. § 155.315(f)(1)-(4). Because individuals with household incomes below that threshold are generally not eligible for PTCs or, by extension, APTCs, *see* 26 U.S.C. § 36B(a), (c)(1), an applicant who attests to having a projected household income that is equal to or above 100 percent of the FPL might be deemed eligible for APTCs despite income data from other sources showing otherwise, 90 Fed. Reg. at 27,121. Such a discrepancy could be a consequence of an applicant overestimating his or her projected household income to obtain APTCs for which the applicant is not otherwise eligible. *Id.*

This Rule provision parallels a provision from a 2018 rule that was vacated in *City of Columbus v. Cochran*, 523 F. Supp. 3d 731 (D. Md. 2021). HHS's justification for the provision

11

this time around does not suffer from the same flaws that were fatal to the 2018 provision. HHS now points to data that "provide substantial evidence that applicants with household incomes below the APTC income eligibility threshold"—that is, 100 percent of the FPL—"are strategically inflating their household incomes[,]" or are "getting assistance from" agents and brokers that have a "financial incentive" to maximize Exchange enrollments, in order to obtain subsidized coverage in an Exchange despite their actual household incomes rendering them ineligible for such coverage. 90 Fed. Reg. at 27,122.

Plaintiffs rely on a comment from one of the three authors of the American Journal of Health Economics ("AJHE") study to claim that study, as well as the Paragon methodology, suffers from major methodological flaws. Pls.' Opp. at 13. Notably, the other two authors of the AJHE did not join their coauthor's comments. Moreover, the commenter admitted that her own research "provides evidence of some improper enrollment in the marketplace by people with incomes below the eligibility threshold of 100 percent of the federal poverty line (FPL) from 2015 to 2017." AR 31663-64. What this commenter and the Plaintiffs call "major methodological flaws" are simply data limitations common to any study. In the final rule, HHS called out data limitations and made clear that the estimates do not provide precise measures of take-up, but are, instead, "useful for understanding trends in Exchange enrollment over time and different patterns of enrollment across States[.]" *Id.* at 27,210. These enrollment trends over time and patterns across states contributed to HHS's estimate that there were "as many as 4.4 million erroneous or improper enrollments" in 2024. *Id.* at 27,211.

HHS "examined the relevant data," "provided an explanation of its decision," and established with data a "rational connection between the facts found and the choice made." *Ohio Valley Env't Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (2009) (citation omitted). Plaintiffs

merely disagree with HHS's interpretation of the evidence before it. Defendants concluded that mitigating risks of fraud warranted this policy; contrary to Plaintiffs' arguments, all commenters' concerns were considered prior to the Rule's promulgation. Accordingly, Defendants promulgated a rule with burdens congruent to the problem it seeks to resolve. That comports with the APA's arbitrary-and-capricious standard.

## B. Change Requiring Income Verification When Tax Data Is Unavailable.

The current regulation, which was adopted in 2023, creates an exception to the general requirement that an Exchange must verify an applicant's annual household income with certain trusted data sources, 45 C.F.R. § 155.320(c)(1)(ii), and otherwise follow an alternative verification process if tax return data for an applicant is unavailable, *id.* § 155.320(c)(3)(vi). The Rule simply removes this exception and requires Exchanges to follow standard verification and data-matching procedures "when tax return data is unavailable to immediately verify a consumer's attestation of annual household income[.]" 90 Fed. Reg. at 27,132.[3]

CMS specifically considered commenters' concerns about the burden that extra verification steps might place on enrollees. *See id.* at 27,131. The agency made the reasonable observation that applicants without tax return data will likely have documentation verifying their household income (*e.g.*, pay stubs) "readily available" to them and that the burden of submitting that documentation, by extension, would be relatively minimal. *Id.* at 27,131-32; *see also id.* at 27,132 ("[HHS] is of the view that th[e] 90-day period provided under statute [for resolving data inconsistencies] provides ample time for applicants to provide proof of their household income before their APTC is reduced."). Even for enrollees with nontraditional employment or diverse sources of income,

---

[3] This policy requiring Exchanges to verify an applicant's attested annual household income when tax return data is unavailable will sunset at the end of program year 2026, and the current verification policy under 45 C.F.R. § 155.320(c)(5) will become effective again. *See* 90 Fed. Reg. at 27,131. Plaintiffs do not challenge this facet of the policy.

13

the Rule provides ample time for "gig economy" workers to collect their paystubs, which should already be preserved for future tax filings, and share them with HHS. *Id.* at 27,120.

The annual household income is a crucial metric in determining eligibility for subsidized coverage on Exchanges, *see* 26 U.S.C. § 36B(a), (c)(1)(A), and the unavailability of tax return data does not relieve HHS of its statutory obligation to ensure compliance with such eligibility requirements, *see, e.g.*, 42 U.S.C. § 18081(a)(2)(A) (tasking HHS with determining "whether [an] individual meets the income and coverage requirements" for claiming a PTC and "the amount of" that credit); *id.* § 18081(e)(4)(A) (prescribing procedures Exchanges must follow when an applicant's information cannot be verified with certain data sources). Defendants have statutory obligations they must fulfill regardless of Plaintiffs' policy disagreements, and those policy disagreements are properly resolved through the legislative process. Thus, this provision readily survives arbitrary and capricious review

## VI.    The one-year failure to file and reconcile policy is not arbitrary and capricious.

A basic principle animates the failure to file and reconcile policy: when means-tested subsidies are provided in advance based on projected income, there must be some way to reconcile the estimated subsidy paid with the amount a beneficiary is actually entitled to receive. The Rule will reinstate the notice procedures that CMS used before the current two-year policy was adopted in 2023, under which enrollees received their first failure to file and reconcile notice approximately six months before their APTC eligibility was impacted, and additional notices after that. 90 Fed. Reg. at 27,118. Moreover, CMS provided data suggesting that notices sent during the open enrollment period for Exchange plan enrollment "were relatively effective" in resolving failure to file and reconcile issues. *Id.* at 27,114.

Plaintiffs concede that a reconciliation requirement is permissible but disapprove of a

14

return to the pre-2023 policy. Pls.' Opp. at 16. As Plaintiffs acknowledge, "everyone must square up eventually[,]" but the parties disagree about how quickly fraud will be subject to detection. *Id.* The Rule's one-year reconciliation policy will more quickly identify fraud than the current two-year reconciliation policy for self-evident reasons: the one-year policy occurs annually rather than biennially. Indeed, a major problem the failure to file and reconcile provision aims to address is the improper receipt of APTCs by enrollees who do not comply with the ACA's reconciliation requirement, and CMS explained that a one-year failure to file and reconcile policy will address that very problem by ensuring that individuals who are improperly enrolled in subsidized Exchange coverage "lose[] APTC after 1 year of failing to file and reconcile instead of 2 years." 90 Fed. Reg. at 27,115. Accordingly, Defendants weighed the Rule's benefits with its impact on enrollees and determined it nonetheless merited implementation.

## VII.    The premium adjustment percentage policy is not arbitrary and capricious.

The ACA directs the HHS Secretary to determine an annual "premium adjustment percentage" based on "the average per capita premium for health insurance coverage in the United States for the preceding calendar year." 42 U.S.C. § 18022(c)(4). That measure of premium growth is then used to set the rate of increase for a number of parameters defined in the ACA, such as the maximum annual limitation on cost sharing under Exchange plans. *See* 45 C.F.R. § 156.130(a). Because the IRS traditionally adopts the same premium growth indexing methodology as HHS, the methodology used to calculate the premium adjustment percentage also affects how PTC and APTC amounts are calculated and, by extension, the cost of health care coverage on Exchanges. *See* 90 Fed. Reg. at 27,171. In the early days of the ACA, the premium adjustment percentage was calculated based solely on estimates of average premiums for employer-sponsored health plans because that approach "reflected trends in health care costs without being skewed by . . . premium

fluctuations" in the individual insurance market. *Id.* at 27,166. HHS later adopted a methodology that also used estimates of private health insurance premiums, but in 2021, HHS reversed course and now considers only premiums for employer-sponsored coverage in the premium adjustment percentage calculation. *Id.* at 27,166-67.

In the Rule, HHS once again adopts a premium adjustment percentage methodology that takes account of premium changes in both the individual and group health insurance markets. *See id.* at 27,167. HHS explains in the Rule's preamble that this updated approach will allow it to "better achieve the statutory and regulatory goals of adopting a more comprehensive and accurate measure of premium costs across the private health insurance market[,]" *id.* at 27,171, in keeping with the ACA's command that the premium adjustment percentage reflect the average premium "for health insurance coverage in the United States," 42 U.S.C. § 18022(c)(4). *See* 90 Fed. Reg. at 27,171 ("As the purpose of this index is to measure growth in premiums, we believe it is appropriate to use a premium measure that comprehensively reflects the actual growth in premiums in the related insurance markets.").

HHS explained it was adopting a new premium adjustment percentage methodology to "appropriately index various parameters defined in the ACA[.]" *Id.* at 27,172. Given how the ACA defines that percentage, "the primary consideration for setting [its] value" should be "whether it accurately and comprehensively captures the rate of premium growth in the United States." *See id.*; 42 U.S.C. § 18022(c)(4). HHS acknowledges that the methodology used to calculate the premium adjustment percentage will have an impact on the cost of Exchange coverage, enrollment, and access to health care more broadly. *See* 90 Fed. Reg. at 27,171. But any such impact would be a consequence of *Congress's* decision to tie the value of certain forms of financial assistance under the ACA to the premium adjustment percentage. Placing undue weight on considerations other

16

than the rate of premium growth "in the United States" when calculating that percentage, 42 U.S.C. § 18022(c)(4), could thus yield a figure that "artificially inflat[es] the generosity of provisions of the ACA beyond the intent of Congress[,]" 90 Fed. Reg. at 27,172. HHS therefore concluded—and reasonably so—that a premium adjustment percentage methodology that considers "all private health insurance premiums" is "more consistent with" that congressional intent and the ACA's text. *Id.* Plaintiffs disagree with Defendants' interpretation of congressional intent because it produces a policy result of which Plaintiffs disapprove. Again, Plaintiffs should petition Congress and avail themselves of the legislative process. This suit cannot alter Defendants' statutory obligation to create the most comprehensive premium adjustment percentage methodology.

## VIII.    The actuarial value range policy is not arbitrary and capricious.

Under the ACA, health insurance plans offered on Exchanges must cover certain "essential health benefits" and adhere to certain "level[s] of coverage" specified in the statute. 42 U.S.C. § 18022(a). A plan's "level of coverage," or actuarial value, reflects the estimated average percentage of covered health care expenses that will be paid by the insurance plan. *Id.*

The actuarial values of Exchange plans are calculated pursuant to regulations issued by the HHS Secretary. *See id.* § 18022(d)(2). The statute also instructs the Secretary to "develop guidelines to provide for a de minimis variation in the actuarial valuations used in determining the level of coverage of a plan to account for differences in actuarial estimates." *Id.* § 18022(d)(3).

HHS's decision to revert to a broader de minimis range similar to prior rules was not arbitrary and capricious. The ACA instructs HHS to "develop guidelines to provide for a de minimis variation in the actuarial valuations used in determining the level of coverage of a plan to account for differences in actuarial estimates." *Id*. The statute necessarily calls for the agency to exercise discretion in how much variation to permit. The phrase "de minimis" implies some play

17

in the joints. *Cf. Ala. Power Co. v. Costle*, 636 F.2d 323, 360 (D.C. Cir. 1979) ("Determination of when matters are truly de minimis naturally will turn on the assessment of particular circumstances."). Congress did not, for example, demand that HHS select the "maximum feasible" standard. *Cf.* 49 U.S.C. § 32902(a) (setting such a requirement for fuel economy standards). Instead, it used an open-textured phrase to assign to HHS responsibility for setting the range, thus delegating to the agency the discretion to make reasonable policy judgments in carrying out that duty. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024). HHS explained that it sought to "significantly improve issuer flexibility in plan design." 90 Fed. Reg. at 27,176. The agency predicted that this increase in flexibility would have three key benefits: It would (1) "promote competition" by allowing issuers to be more responsive to consumer needs, (2) allow "greater continuity for consumers[,]" and (3) encourage issuers to continue participating in the Exchanges. *Id.* The agency therefore provided a reasoned explanation for its decision to alter the actuarial-value policy.

HHS also acknowledged that its decision involved trade-offs. The agency recognized that expanding the de minimis range would likely reduce tax credits for subsidized consumers. *Id.* But the reason for that reduced subsidy is that premiums would be cheaper, thus increasing affordability for unsubsidized consumers. *See id.* HHS decided to prioritize getting these unsubsidized consumers into risk pools because it believed that, in the long-term, the risk pools would be more stable and coverage would be more affordable. *See id.*; *see also* NPRM, 90 Fed. Reg. at 12,997 (warning that "healthier, unsubsidized enrollees are [being] priced out of the market" and criticizing "short-sighted approach" of focusing only on maximizing subsidies). HHS did not act unreasonably in making that policy choice.

Every time that HHS has set or adjusted the de minimis range, it has looked to factors

18

beyond "differences in actuarial estimates." 90 Fed. Reg. at 27,174. When HHS set the range initially in 2013, it sought to "strike[] a balance between ensuring comparability of plans within each metal level and allowing plans the flexibility to use convenient cost-sharing metrics[,]" and sought to "allow[] plans to retain the same plan design year to year." 78 Fed. Reg. 12,834, 12,851 (Feb. 25, 2013). When the agency subsequently adjusted the range, it also based its reasoning on these factors, 87 Fed. Reg. 27,208, 27,307 (May 6, 2022), as well as others such as market competitiveness, 82 Fed. Reg. 18,346, 18,369 (Apr. 18, 2017).

CMS estimates that the changes will reduce aggregate PTCs by $1.2 billion in 2026, *see* 90 Fed. Reg. at 27,208, which, according to Plaintiffs, will translate into higher premium costs for Exchange enrollees, a decrease in enrollment, and a weaker risk pool. But CMS squarely considered the "impact" a wider de minimis range would have on PTCs and the "burden that increased cost-sharing and decreased PTCs may have on enrollees in the short-term." 90 Fed. Reg. at 27,176, 27,208. These are "short-term" concerns because new plans with lower premiums and competitive cost-sharing structures will draw unsubsidized consumers to Exchanges, "improv[ing] the risk pool as coverage becomes more affordable for generally healthy people who currently may opt to forgo coverage altogether." *Id.* at 27,175. HHS, in particular, considered the decline of unsubsidized enrollees over time, which was contrary to certain government projections. *See id*. at 27,076. Far from reflecting a failure to consider relevant factors, as Plaintiffs seem to claim, CMS's reasoning represents a paradigmatic "policy balance" between short-term costs and long-term benefits. *Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 211 (D.C. Cir. 2007). And Plaintiffs' mere disagreement with that balance does not render it arbitrary and capricious. *Id.*

### IX. The elimination of "sex trait modification procedures" as an Essential Health Benefit is neither unlawful nor arbitrary and capricious.

Finally, Plaintiffs challenge the regulations that implement the ACA's "essential health benefits" ("EHB") requirements. Under the Rule, issuers will not be permitted to provide EHB coverage for "specified sex-trait modification procedures" ("SSTMP") (a term the Rule defines) beginning in plan year 2026. 90 Fed. Reg. at 27,152. Plaintiffs argue that this change is both contrary to law and arbitrary and capricious, but these claims, too, fail.

The ACA provides that the HHS Secretary "shall define the essential health benefits," and, as relevant here, directs the Secretary to "ensure that the scope of" those benefits "is equal to the scope of benefits provided under a typical employer plan, as determined by the Secretary." 42 U.S.C. § 18022(b)(1), (b)(2)(A). Pursuant to this authority, HHS adopted a regulatory framework during the initial rollout of the ACA in which EHB are defined based on a "benchmark" health plan selected by each State. Under this framework, States designate a benchmark plan pursuant to various parameters, one of which is that the plan must cover items and services within all ten EHB categories. *See* 45 C.F.R. § 156.111(b)(1). And all non-grandfathered health plans sold in a State's individual and small group markets, including Exchange plans, must provide coverage for EHB that is "substantially equal to" the applicable benchmark plan. *Id.* § 156.115(a)(1).

"The basis for" this exclusion of SSTMP from EHB "is that such benefits are not covered under typical employer plans." 90 Fed. Reg. at 27,158. As HHS explained in the Rule's preamble, the ACA requires that the "scope of EHB . . . be equal in scope to the benefits provided under a typical employer plan[.]" *Id.* at 27,152; *see* 42 U.S.C. § 18022(b)(2)(A). The statute likewise "gives the [HHS] Secretary broad latitude to define EHB, subject to ensuring that EHB" comport with this typicality requirement. 90 Fed. Reg. at 27,158. Based on its review of data "suggesting that . . . [SSTMP], as defined in th[e] [R]ule, are not benefits covered under a typical employer

20

plan[,]" HHS determined that such procedures should not be covered as EHB. *Id.* at 27,164; *see id.* at 27,157 ("[W]e take seriously the responsibility to ensure consistency with the parameters on EHB enumerated in the [ACA].").

Plaintiffs argue that the Rule's exclusion of SSTMP from EHB is contrary to law, seemingly because they read the ACA to require the *Secretary of Labor* to "conduct a survey of employer-sponsored coverage" assessing "the benefits typically covered by employers" before the *HHS Secretary* can do anything with respect to his statutory obligation to "ensure that the scope of" EHB "is equal to the scope of benefits provided under a typical employer plan[.]" 42 U.S.C. § 18022(b)(2)(A); *see* Pls.' Opp. at 22-23. That cabined reading of the HHS Secretary's authority cannot be squared with the ACA's text. Indeed, the ACA instructs the HHS Secretary to "define" EHB and to "ensure that the scope of" such EHB "is equal to the scope of benefits provided under a typical employer plan, as determined by the Secretary." 42 U.S.C. § 18022(b)(2)(A). The statute separately instructs the Secretary of Labor to "conduct a survey of employer-sponsored coverage," which is meant to "inform" the HHS Secretary of "the benefits typically covered by employers[.]" *Id.* That "survey" was conducted back in the ACA's early days, when the HHS Secretary was still in the process of initially "defin[ing]" EHB and the regulations that would implement EHB requirements moving forward. That survey ultimately "inform[ed]" HHS's decision to "define" EHB by implementing the state-benchmark-plan framework described above. *Id.* This survey does not commit the HHS Secretary to a certain course of conduct. Indeed, "to inform" merely means "to communicate knowledge to." *Inform*, Merriam Webster's Dictionary, https://www.merriam-webster.com/dictionary/inform (last visited Apr. 8, 2026). This further comports with the ACA's text which provides additional authority and responsibility to the HHS Secretary in determining EHB's scope.

The ACA provides that the HHS Secretary must continue to "ensure" that the scope of EHB "*is* equal" to the scope of benefits covered by a "typical employer plan, *as determined by the Secretary*." 42 U.S.C. § 18022(b)(2)(A) (emphases added). That present-tense and HHS-specific language indicates that the HHS Secretary's obligation to "ensure" consistency between EHB and "typical employer plan" coverage is an ongoing one. *Id.* And it would be nonsensical to read the ACA—as Plaintiffs apparently do—to condition the HHS Secretary's ability to fulfill that ongoing obligation on another federal official's (*i.e.*, the Secretary of Labor) willingness and ability to repeatedly conduct economy-wide surveys. Such an interpretation would be at odds with the HHS Secretary's authority and obligation to "determine[]" himself what a "typical employer plan" encompasses, *id.*, and would effectively preclude HHS from making timely regulatory changes concerning EHB. *Cf. Gen. Motors Corp. v. Darling's*, 444 F.3d 98, 108 (1st Cir. 2006) (explaining that courts should "avoid statutory constructions that create absurd, illogical, or inconsistent results" (citation omitted)).

Plaintiffs also disagree with HHS's general conclusion that SSTMP are not typically covered by employer-sponsored plans. Pls. Opp. at 22. HHS noted in the Rule's preamble that a majority of States and territories either explicitly exclude SSTMP from coverage under their state employee health benefit plans or have no clear policy regarding such coverage. 90 Fed. Reg. at 27,153. HHS further noted that "over half of States have taken action to restrict [SSTMP] for minors" since 2021, which reflects an "ongoing controversy over coverage of" SSTMP more generally. *Id.* at 27,156. And it observed that a survey cited by commenters indicated that only 24 percent of large employers (*i.e.*, ones with 200 or more workers) stated that they covered cross-sex hormonal interventions, while the rest either did not offer such coverage, or did not know if they did. *Id.* at 27,155. It is certainly rational to conclude that certain health coverage is not

"typical," 42 U.S.C. § 18022(b)(2)(A), if it is definitively provided by only a small fraction of large employers and less than half of state employee benefit plans, *see Encino Motorcars v. Navarro*, 579 U.S. at 211, 221 (2016) (requiring only a "rational connection between the facts found and the choice made" (citation omitted)). As HHS explained, the ACA's typicality requirement "specifically references" the coverage provided by a "typical employer," not the coverage held by a typical employee, *see* 90 Fed. Reg. at 27,155, and HHS reasonably observed that smaller employers are not able to offer the same "generous and costly health plans" that "very large employers" provide, *id*. Plaintiffs misunderstand this critical distinction. Defendants looked to the plans offered by a plurality of employers, not a plurality of employees, because that is what the statute requires.

In sum, Plaintiffs again conflate "reasoned decisionmaking," *Dep't of Homeland Sec. v. Regents*, 591 U.S. 1, 16 (2020) (citation omitted), with decisionmaking that yields their preferred policy outcomes. The APA requires the former, *id.*, and the Rule's SSTMP exclusion cannot be deemed arbitrary merely because Plaintiffs desire the latter.

## X.      Any relief granted should be narrowly tailored.

If this Court enters judgment for Plaintiffs, it should not grant the extraordinarily sweeping relief that they seek. Plaintiffs request that the Court "[v]acate the [f]inal [r]ule." Compl., Prayer for Relief ¶ e. That request for universal relief would transgress basic principles of jurisdiction, equity, and judicial review under the APA. This Court also has equitable alternatives to vacatur. Rather than vacating the Rule nationwide, the Court could simply enjoin Defendants from enforcing the Rule against Plaintiffs, which would alleviate any adverse effects applicable to them. In contrast, the problems caused by overbroad universal remedies are well catalogued and apply whether such a remedy takes the form of a universal vacatur or a nationwide injunction.

23

Importantly, nearly identical parallel litigation under the APA is taking place in the District of Maryland, *City of Columbus, et al. v. Kennedy, et al.,* Case No. 1:25-cv-2114 (D. Md.), in which motions for summary judgment have already been briefed. Universal vacatur in this case could deprive another court of the opportunity to resolve this question on its own terms or, perhaps more problematically, create substantial nationwide confusion in the event of competing district court orders. Plaintiffs dismiss this concern because it provides them with two bites at the apple. If this Court were to hold portions of the Rule lawful, Plaintiffs could nonetheless disregard this Court's holding for a more favorable ruling from another court; whereas in Plaintiffs' telling, Defendants must win in every court or face universal vacatur. To avoid this unequitable gamesmanship, this Court should provide relief only to the parties before it.

## CONCLUSION

Plaintiffs' Motion for Summary Judgment should be denied and Defendants' Cross Motion for Summary Judgment should be granted.

Dated: April 10, 2026                    Respectfully Submitted,

                                         BRETT SHUMATE
                                         Assistant Attorney General
                                         Civil Division

                                         ERIC B. BECKENHAUER
                                         Assistant Director
                                         Federal Programs Branch

                                         */s/ Jordan A. Hulseberg*
                                         JORDAN A. HULSEBERG
                                         (D.C. Bar No. 90033542)
                                         Trial Attorney
                                         United States Department of Justice
                                         Civil Division
                                         Federal Programs Branch
                                         1100 L Street NW
                                         Washington, DC 20005


                                         Phone: (202) 598-3856
                                         Fax: (202) 616-8470
                                         Email: jordan.a.hulseberg2@usdoj.gov

                                         *Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I certify that this document filed through the ECF system will be sent electronically to the

registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies

will be sent to those indicated as non-registered participants.

> */s/ Jordan A. Hulseberg*
> JORDAN A. HULSEBERG
> (D.C. Bar No. 90033542)
> Trial Attorney
> United States Department of Justice
> Civil Division
> Federal Programs Branch