**United States District Court**
**District of Massachusetts**

| | |
|---|---|
| State of California, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )   Civil Action No. |
| | )   25-12019-NMG |
| Robert F. Kennedy, Jr. in his | ) |
| official capacity as Secretary of | ) |
| Health and Human Services, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

**MEMORANDUM & ORDER**

GORTON, J.

In July, 2025, a coalition of 21 states ("plaintiffs") brought suit against the Department of Health & Human Services ("HHS") and the Centers for Medicare & Medicaid Services ("CMS" or "the Agency") (collectively, "defendants" or "the government"), challenging the validity of a regulation defendants promulgated in June, 2025 ("the Rule"). Plaintiffs moved for a preliminary injunction to stay the enforcement of that regulation, which the Court denied in October, 2025. Plaintiffs and defendants now both move for summary judgment. For the reasons that follow, those motions will be allowed, in part, and denied, in part.

## I.   Background

### A. Affordable Care Act

Enacted by Congress in 2010, the Affordable Care Act ("the ACA") instituted complex reforms to the nationwide health insurance marketplace.  Those reforms sought to make health insurance more affordable and thereby increase the number of Americans who are covered by it. Pub. L. No. 111-148, 124 Stat. 119 (2010); see Nat'l Fed'n of Indep. Bus. v. Sebelius, 567 U.S. 519, 538 (2012) (addressing the purpose of the ACA); King v. Burwell, 576 U.S. 473, 478-79, 493 (2015) (same).

Among the many statutory requirements of the ACA is the creation of a health insurance exchange in each state through which individuals can purchase "qualified health plans" that, at a minimum, cover certain "essential health benefits" ("EHBs") such as prescription drugs. 42 U.S.C. §§18022(a)-(b), 18031(b)(1), 18031(d)(3)(B).  The states themselves are permitted to operate state-based exchanges ("SBEs" or "Exchanges") or, if a state elects not to do so, the federal government will operate the Exchanges on the state's behalf. Id. §18041(c).  Individuals can then enroll in exchange plans for the upcoming plan year during an annual open enrollment period. Id. §18031(c)(6).

To make enrollment more affordable, the ACA provides "premium tax credits" ("PTCs") to enrollees based upon their

- 2 -

annual household income. Id. §18082(b).  PTCs are claimed on an individual's tax return at the end of the year and are reimbursed by the Internal Revenue Service ("IRS").  Enrollees may also receive "advanced premium tax credits" ("APTCs") which are paid directly to insurance providers to offset the costs of coverage. Id. §18082(b).  The amount of the APTC received is calculated by determining the difference between the cost of the second-lowest-cost Silver plan ("SLCSP") available through the insurance marketplace and the maximum amount the consumer is required to pay toward his or her premium based on household income and size.  Because that determination depends on the individual's income at the end of the year, individuals must file a federal tax return each year to "reconcile" the APTCs they received with the PTCs for which they ultimately qualify based on their actual income during the applicable tax year. See 26 U.S.C. §36B(f)(1).

More broadly, the ACA authorizes the Secretary of the HHS to issue regulations that set standards for the ACA requirements, including exchanges and "such other requirements as the Secretary determines appropriate." 42 U.S.C. §18041(a)(1).

B. **Marketplace Integrity and Affordability Rule**

In March, 2025, CMS proposed a regulation to thwart purported fraud and improper enrollments in health insurance

programs, the "Patient Protection and Affordable Care Act; Marketplace Integrity and Affordability," 90 Fed. Reg. 12,942 (Mar. 19, 2025).

The stated goal of the regulation is

> to reduce waste, fraud, and abuse [in enrollments and thereby] reduce the burden of . . . [ACA] subsidy expenditures to the Federal taxpayer.

Id.  According to the preamble of the regulation, HHS and CMS believe that ACA benefits have been "exploited to improperly gain access to fully-subsidized coverage." 90 Fed. Reg. 27,074 ("the Final Rule").  The components of the regulation provide both temporary and permanent measures.  Defendants submit that the changes will reduce improper enrollment in health insurance exchanges and thereby "improve affordability and stability" of the marketplace in the long run. Final Rule at 27,074.

The proposed rule was met with more than 26,000 comments but was ultimately adopted on June 20, 2025. Final Rule at 27,074.  The following month, plaintiffs filed suit in this Court challenging the validity of nine of the provisions of the Final Rule.  They sought a preliminary injunction to stay enforcement of the Final Rule, which this Court denied after a hearing on the matter.  The parties have narrowed the current dispute to five provisions as to which they have filed cross-motions for summary judgment.

The contested provisions are those which: (1) establish a uniform open enrollment period, (2) shorten the time enrollees have to reconcile the APTCs they received, (3) change the methodology used to calculate the "premium adjustment percentage," (4) expand the accepted de minimis ranges for the actuarial values of tiered health insurance plans and (5) prohibit certain medical procedures from being included as EHBs. The Court convened a hearing on those motions in July, 2026.

## II.  **Legal Standard**

Summary judgment is typically warranted where the movant can show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  That standard, however, does not apply in cases involving review of agency action under the APA. Bennett v. Murphy, 166 F. Supp. 3d 128, 139 (D. Mass. 2016) (citing Int'l Jr. Coll. of Bus. & Tech., Inc. v. Duncan, 802 F.3d 99, 106 (1st Cir. 2015)).  Instead, when a district court reviews an agency decision,

> judicial review, even at the summary judgment stage, is narrow because the APA standard affords great deference to agency decisionmaking and the [agency's] action is presumed valid.

Id. (internal quotation marks and citation omitted).

Accordingly, under the APA, a reviewing court may set aside an agency's determination only

if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, such as if it is unsupported by substantial evidence.

Atieh v. Riordan, 797 F.3d 135, 138 (1st Cir. 2015) (internal quotation marks and citation omitted).  An agency action is arbitrary and capricious when the agency

relied on improper factors, failed to consider pertinent aspects of the problem, offered a rationale contradicting the evidence before it, or reached a conclusion so implausible that it cannot be attributed to a difference of opinion or the application of agency expertise.

Bos. Redevelopment Auth. v. Nat'l Park Serv., 838 F.3d 42, 47 (1st Cir. 2016) (internal quotations omitted).

This is a deferential standard.  A court must not "substitute [its] judgment for that of the agency, even if [it] disagree[s] with its conclusions." Sig Sauer, Inc. v. Brandon, 826 F.3d 598, 601 (1st Cir. 2016) (internal quotations omitted).

## III. Analysis

### A. Open Enrollment Provision

Under the ACA, SBEs are required to provide for annual open enrollment periods as determined by HHS. 42 U.S.C. §18031(c)(6). Under current regulation, SBEs may establish the duration and deadlines of open enrollment periods, with certain constraints. California, for example, has used a 91-day open enrollment period, beginning on November 1 and ending on January 31, for the past ten years.  The Rule amends that flexibility and creates a uniform open enrollment period beginning no earlier

than November 1 and ending no later than December 31. Final Rule at 27,222.  The amendment takes effect for the 2027 plan year.

Plaintiffs challenge that provision as arbitrary and capricious, contending that the Agency ignored concerns about its potential to reduce enrollment and cause a deterioration of the risk pool.  They argue that shortening the enrollment period in states with long-established enrollment deadlines will confuse consumers and reduce enrollment.  Plaintiffs also note that younger, healthier enrollees often enroll in January and that the ability to transfer plans in January is valuable for many consumers because they may not be aware of cost increases in their current plans until they receive their first bill in the new year.

The administrative record shows that the Agency did consider such concerns.  HHS acknowledged that altering the enrollment deadline could confuse consumers accustomed to later deadlines in their states and therefore delayed the effective date of this provision to allow time to notify consumers of the new December 31 deadline.  Furthermore, the Agency found that the provision ultimately would reduce confusion by aligning more closely with enrollment deadlines in the employer-based market.

HHS also recognized concerns that younger, healthier individuals tend to enroll in January but concluded that consumers are deadline-driven and tend to enroll near the end of

the enrollment period regardless of when that deadline falls. As for the ability to transfer between plans in January, the Agency noted that a relatively small number of consumers (3%, or 470,000 enrollees) took advantage of that option and concluded that the benefits of the provision therefore outweigh any negative impact to consumers who otherwise would have transferred plans in January.[1]

In sum, the conclusion of the Agency that the provision should be adopted notwithstanding any adverse consequences, which, in any event, could largely be mitigated, was rational. Plaintiffs may disagree with the Agency's analysis of the costs and benefits but that does not render the policy arbitrary and capricious. See Consumer Elecs. Ass'n v. FCC, 347 F.3d 291, 303 (D.C. Cir. 2003).

### B. The Failure-to-Reconcile Provision

The Rule reinstates a prior policy that requires an Exchange to determine that a "tax filer" is ineligible for APTCs under the ACA if the applicant (1) received APTCs the prior year and (2) failed to comply with the statutory requirement to file a tax return and "reconcile APTC" for that year. Final Rule at 27,113, 27,221.

---

[1] Defendants add that the 470,000 figure includes a significant number of individuals who switched plans for reasons unrelated to higher premiums.

- 8 -

The IRS requires taxpayers who receive APTCs, which are typically scaled to the recipient's projected annual household income, to reconcile those advanced payments with the premium tax credit amount for which they otherwise qualify in the applicable tax year, as determined by their actual annual household income in that year. See 26 U.S.C. §36B(f).  If the APTCs the taxpayer received exceed the allowable PTC, the taxpayer may incur a tax liability, subject to certain income-based caps. Id. at §36B(f)(2).

Since 2012, HHS has prohibited an Exchange from "determin[ing] a tax filer eligible for" APTCs if the filer (1) received APTCs the prior year and (2) failed to comply with the requirement to file a federal income tax return and reconcile those APTCs for that year. 45 C.F.R. §155.305(f)(4).  In 2023, CMS amended the failure-to-reconcile ("FTR") provision so that a taxpayer became ineligible for APTCs only after failing to reconcile for two consecutive years.  The Rule reverts to the requirement that a taxpayer be deemed ineligible for APTCs after one year of failing to reconcile. That amendment applies only through plan year 2026.

Plaintiffs contend that the prior policy provides adequate incentives to reconcile and that the two-year FTR is therefore unjustified.  The Agency maintains that the new FTR provision further encourages reconciliation and detects fraud more quickly

than the prior policy.  That is not an irrational conclusion, nor is it arbitrary and capricious.

Plaintiffs first argue that the Agency has not explained why then-existing safeguards were insufficient, noting that most consumers who received a one-year FTR notice were able to resolve the issue before receiving a two-year FTR notice and are not "free riding on the two-year grace period to claim APTCs to which they are not eligible."  That same data, however, shows that there were approximately 400,000 enrollees with either a one-year FTR status or non-reconciler status, which undermines plaintiffs' contention that there is no real issue to address. Final Rule at 27,114.  While plaintiffs may contend that is a relatively small number, the Agency did not act irrationally in concluding otherwise.

Plaintiffs also note that the IRS already assesses a tax liability against consumers who fail to prove entitlement to the tax credits.  They allege that the Agency

> has not provided any evidence to show that this
> [recoupment] is not happening as it should [and thus] have
> not shown that a problem exists in the first place.

Not so.  During rulemaking,  the Agency explained that not all ineligible enrollees are required to repay fully any improperly received APTC. Final Rule at 27,115.  Given that improperly received APTCs may not be repaid in full, the FTR provision

addresses an issue that is not resolved by the IRS tax assessment.

Moreover, the Agency concluded that the one-year FTR policy would better protect consumers by preventing them from accumulating IRS tax liabilities for a second year. Final Rule at 27,115. That benefit is significant because consumers may have been improperly enrolled by brokers and therefore unaware of the need to reconcile their APTCs. Id. The government asserts that this problem could be resolved by notifying consumers of their FTR status without impacting their APTC eligibility. The question before the Court, however, is whether the Agency's decision was rational, not whether it is "the best one possible or even whether it is better than the alternatives." Bruno Project Rescue Inc. v. Ctrs. for Disease Control and Prevention, 2026 WL 2017744, at *7 (1st Cir. July 13, 2026). That question is answered in the affirmative.

### C. Premium Adjustment Provision

The ACA directs the HHS Secretary to determine an annual "premium adjustment percentage" ("PAP") based upon "the average per capita premium for health insurance coverage in the United States for the preceding calendar year." 42 U.S.C. §18022(c)(4). The PAP is then used to adjust the rates of increase for several parameters defined in the ACA, including the maximum annual limitation on cost sharing. 45 C.F.R. §156.130(a).

During the early years of the ACA, the PAP was calculated with reference to premiums for employer-sponsored coverage only, excluding premiums from the individual marketplace.  That approach "reflected trends in health care costs without being skewed by . . . premium fluctuations" in the individual insurance market. Final Rule at 27,166.  The Rule alters that methodology by including premiums in the individual and group health insurance markets.

Plaintiffs contend that the Agency failed to describe why the prior methodology no longer accurately reflects the average premium for health insurance.  The Court disagrees.  The Rule explains that individual market premiums were previously excluded from the PAP methodology because they were particularly affected by marketplace changes during the early years of the ACA.  Final Rule at 27,173.  The individual market was again excluded from the calculation beginning in 2022 because the Agency predicted that those premiums would be more volatile than employer-sponsored premiums during the COVID-19 pandemic. Id.

As articulated by the Agency, those concerns are now much diminished.  It has been more than a decade since the implementation of the ACA, giving the market ample time to stabilize.  As for concerns related to the COVID-19 pandemic, employer-sponsored premiums increased faster than premiums in

the individual market, thereby decreasing the gap in premium growth between the two markets. Id.

In light of those developments, the Agency concluded that the previous methodology may "artificially inflat[e] the generosity of provisions of the ACA beyond the intent of Congress" and that the updated methodology would better reflect that intent. Thus, contrary to plaintiffs' assertion, the Agency sufficiently explained its rationale that changes in the market justify "disregarding facts and circumstances that underlay . . . the prior policy." FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515-16 (2009).

Plaintiffs also assert that the Agency failed to weigh properly the negative effect the Rule will have on premiums and enrollment. More specifically, they argue that the Agency did not consider that 80,000 people will lose coverage as a result. To the contrary, the agency acknowledged that the Rule will likely increase premiums and worsen the risk pool but concluded that the new methodology should be adopted notwithstanding those negative effects because it more accurately and consistently reflects congressional intent. As the government notes, any adverse impact is a result of the decision of Congress to tie certain forms of financial assistance to the PAP and its mandate that the PAP reflect the average premium for health insurance coverage.

In sum, the Court concludes that the Agency did not act arbitrarily or capriciously in adopting the new PAP methodology.

### D. **Actuarial Value Provision**

Under the ACA, health insurance plans offered on exchanges must adhere to certain "levels of coverage" specified in the statute. 42 U.S.C. §18022(a). A plan's "level of coverage," or actuarial value ("AV"), reflects the estimated average percentage of covered healthcare expenses that will be paid for by the insurance plan. The higher a plan's AV, the lower an enrollee's out-of-pocket costs and the higher the premium. Health plans offered on exchanges are divided into four "metal tiers" based on their actuarial values. Bronze plans are designed to cover 60% of an enrollee's expected costs. Silver, gold and platinum plans target 70%, 80% and 90%, of the enrollee's expected costs, respectively.

The ACA instructs HHS

> to develop guidelines to provide for a de minimis variation in the actuarial valuations used in determining the level of coverage of a plan to account for differences in actuarial estimates.

42 U.S.C. §18022(d)(3). Current regulation allows for a +2/-2 percentage point variation in AVs for the silver, gold and platinum plans, and a +5/-2 range for bronze plans. The Rule will change the former to +2/-4 and the latter to +5/-4.

The Agency acknowledges that this amendment will reduce the cost of the SLCSP benchmark plan used to calculate PTCs, thereby eliminating an estimated $1.2 billion in tax credits for all enrollees for 2026. Rule at 27,176, 27,208.

Plaintiffs challenge the provision on three grounds, claiming that (1) its justifications are conclusory and unsupported by the evidence, (2) it does not acknowledge the full impact it will have on the risk pool and (3) the Agency did not consider "differences in actuarial estimates" as it was required to do.  The Court will consider each challenge in turn.

### 1. **Conclusory Justifications**

The Agency explains that it is expanding the de minimis ranges because the previous AV targets "substantially reduce[d] issuer flexibility" and plan issuers expressed concerns about their ability to participate in the market generally. Plaintiffs retort that the Agency "offers no empirical support" for those assertions and thus has not justified its decision.

Plaintiffs are correct that the Agency did not provide empirical evidence for those assertions.  It did note, however, that it "received considerable feedback from issuers" attesting to their reduced flexibility and concerns about remaining in the market.  That is sufficient. See Cboe Glob. Mkts., Inc. v. SEC, 155 F.4th 704, 721 (D.C. Cir. 2025) (noting that "an agency need not—indeed cannot—base its every action upon empirical data" and

- 15 -

that the APA "imposes no general obligation on agencies to produce empirical evidence") (internal quotations omitted).

Plaintiffs also maintain that there is no data to support the Agency's belief that coverage will become more affordable over time.  Once again, the lack of empirical evidence is not dispositive. See id.  HHS acknowledges that costs for subsidized consumers may increase in the short term but concludes that the rule will improve the risk pool over time by lowering premiums for unsubsidized consumers, who tend to be healthier, thereby encouraging greater enrollment among that population.  Increased participation among healthier consumers improves the risk pool, which drives down premiums for both subsidized and unsubsidized consumers.  That conclusion, premised on the uncontroversial assumption that consumers are less likely to enroll when costs are higher, is logical.  Indeed, many of plaintiffs' arguments are premised on the common-sense notion that when premiums increase, enrollment declines.  The Agency merely relies on the inverse of that proposition.

The Agency has chosen to prioritize affordability and enrollment for unsubsidized consumers, believing it would ultimately benefit all consumers in the long term.  That is not arbitrary or capricious. See Nat'l Mining Ass'n v. United Steel Workers, 985 F.3d 1309, 1323 n.11 ("We readily conclude that the record adequately supports the requirements ... especially in

light of the fact that the Agency's reasoned explanations for these requirements are so firmly rooted in common sense and common experience."); see also Great Lakes Commc'n Corp. v. Fed. Commc'ns Comm'n, 3 F.4th 470, 476 (D.C. Cir. 2021) ("And [the agency] could reasonably rely on common sense and predictive judgments within its expertise 'even if not explicitly backed by information in the record.'") (citation omitted).

### 2. **Gross Premium**

Plaintiffs next assert that the Agency did not consider that the provision will increase gross premiums, rather than merely net premiums, and will therefore "have a larger impact on the risk pool than defendants acknowledge." In support of that proposition, plaintiffs point the Court to a comment submitted by the Urban Institute, among others, during the notice-and-comment period that offers a competing prediction of the Rule's effects on premiums and the risk pool.

The Agency responded to that comment by acknowledging "the differing viewpoints regarding the proposal's potential impacts on the risk pool" but ultimately concluded that the Rule is likely to result in a long-term strengthening of the market. Thus, contrary to plaintiffs' assertion, the Agency did not ignore an important aspect of the problem. It merely forecasted the long-term effect of the Rule differently, as it was entitled

to do. See, e.g., Verizon v. FCC, 740 F.3d 623, 643 (D.C. Cir. 2014) (noting that the court must be careful not to substitute its judgment for that of the agency, "especially when the agency's predictive judgments about the likely economic effects of a rule are at issue") (internal quotations omitted).

### 3. **Actuarial Estimates**

Finally, the Court is satisfied that the Agency has "account[ed] for differences in actuarial estimates" in promulgating the Rule. 42 U.C.S. §18022(d)(3).  As noted by plaintiffs at oral argument, actuarial values are difficult to calculate.  The de minimis ranges are intended to give insurance companies leeway when making those calculations.  Recognizing that AV calculations are not an exact science, the Agency determined that the previous ranges were too narrow and could cause plans to shift out of their established "metal tier" based on annual adjustments that, in the agency's view, do not materially change the plan's actual dollar value. Final Rule at 27,176.  Accordingly, the Agency expanded the ranges so as, in its considered opinion, to prevent those modifications from disrupting the established "metal tier" of a plan, thereby ensuring greater continuity for consumers.

### E. **EHB Provision**

To qualify for sale through the Exchanges, health plans must cover a list of ten EHBs.  Several key ACA financial

- 18 -

protections, i.e., provisions that cap annual out-of-pocket costs and prohibit dollar limits on care, apply only to the coverage of EHBs.  The HHS Secretary is required to define, and periodically to revise, EHBs such that their scope is commensurate with that of benefits provided under a typical employer plan. 42 U.S.C. §§18022(a)(1), (b)(2)(A), (b)(4)(H). The ACA requires the HHS Secretary to submit a report to the appropriate committees of Congress containing a certification from the Chief Actuary of the Centers for Medicare & Medicaid Services, stating that the scope of the EHBs is equal to that of the typical employer plan. 42 U.S.C. §18022(b)(2)(B).

The Court previously concluded that HHS was required to submit such a report to Congress by January 1, 2026, the effective date of the Rule.  HHS still has not done so and the government has not attempted to justify that failure.  Indeed, the government does not mention §18022(b)(2)(B) at all in its pleadings.  When asked about the issue at oral argument, the government maintained its position that the Agency is not required to submit such a report, notwithstanding the Court's clear ruling that it was required to do so.  The Court reaffirms that ruling and finds that HHS has acted in contravention of the ACA by revising the EHBs without abiding by the relevant statutory requirement in §18022(b)(2)(B).  Plaintiffs are entitled to summary judgment as to this provision.

- 19 -

## ORDER

For the foregoing reasons,

> 1) plaintiffs' motion for summary judgment (Docket No. 120) is, with respect to the Essential Health Benefits provision, **ALLOWED**, but otherwise, **DENIED**;

> 2) defendants' motion for summary judgment (Docket No. 123) is, with respect to the open enrollment provision, the Failure-to-Reconcile provision, the Premium Adjustment Percentage methodology provision and the de minimis range provision, **ALLOWED**, but otherwise **DENIED**.

For the foregoing reasons and because the Court rejects defendants' unsupported argument that the Administrative Procedures Act does not allow for vacatur, the Essential Health Benefits provision is hereby held unlawful and vacated.

**So ordered.**

Nathaniel M. Gorton
Senior United States District Judge

Dated:  August 14, 2026